IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA          )
                                  )
v.                                )
                                  )
SCOTT HOWARD JENKINS,             )          Case No. 3:23-cr-00011
                                  )
                Defendant.        )
                                  )
                                  )

**GOVERNMENT'S TRIAL BRIEF AND NOTICE OF INTENT TO INTRODUCE CO-CONSPIRATOR STATEMENTS**

# CONTENTS

I.   **Procedural History** ................................................................................. 1

II.  **Anticipated Facts** .................................................................................... 2

    A.   Background: Auxiliary Deputy Sheriffs .................................................. 2

    B.   Origins of the Bribery Scheme ............................................................... 3

    C.   Bribery in Connection with the 2019 Election ....................................... 4

    D.   Bribery in Connection with the 2023 Election ....................................... 9

III. **Law Governing the Charged Offenses** .................................................. 15

    A.   Count One: Conspiracy ......................................................................... 15

    B.   Counts Two though Five: Honest-Services Fraud ................................. 15

    C.   Counts Six through Twelve: Federal Programs Bribery ....................... 18

IV.  **Evidentiary Issues** ................................................................................. 20

    A.   Stipulations ........................................................................................... 20

    B.   Authentication ....................................................................................... 20

    C.   Hearsay Issues ....................................................................................... 22

    D.   Witness and Exhibit Issues ................................................................... 25

V.   **Other Issues** ........................................................................................... 28

    A.   Government Representative .................................................................... 28

    B.   Forfeiture ............................................................................................... 29

Defendant Scott Howard Jenkins, the former elected Sheriff of Culpeper County, Virginia, is charged with conspiracy, honest services mail and wire fraud, and federal programs bribery in connection with a multi-year scheme to sell law-enforcement badges and credentials, and to perform other official acts, in exchange for cash bribes and campaign contributions. The government respectfully submits this Trial Brief summarizing its anticipated factual presentation, the law governing the charged offenses, and other evidentiary and legal issues that may arise at trial. In addition, pursuant to this Court's Amended Criminal Pretrial Order ¶ 3, ECF No. 128 ("Pretrial Order"), the government hereby notifies the defendant of its intent to introduce evidence of co-conspirator statements pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, as detailed below.

## I.    Procedural History

On June 28, 2023, a grand jury returned a 16-count Indictment charging Jenkins and three co-defendants—Rick Tariq Rahim, Fredric Gumbinner, and James Metcalf—with conspiracy, honest-services mail and wire fraud, and federal programs bribery. *See* ECF No. 3. As alleged in the Indictment, Jenkins accepted over $70,000 in bribes in exchange for appointing the bribe payors as auxiliary deputy sheriffs, issuing them law-enforcement badges and credentials, and other official acts. Jenkins' co-defendants have all pleaded guilty pursuant to plea agreements and are awaiting sentencing. *See* ECF Nos. 80–81 (Gumbinner); 89–90 (Metcalf); 117–18 (Rahim). On June 12, 2024, a grand jury returned a Superseding Indictment charging Jenkins alone with one count of conspiracy, four counts of honest-services mail and wire fraud, and seven counts of federal programs bribery. Jenkins' jury trial is set to begin on November 12, 2024.

## II.    Anticipated Facts

The government intends to present approximately five trial days of evidence to establish the corrupt agreement between Jenkins, Rahim, Gumbinner, Metcalf, Individual 1, and others to exchange auxiliary deputy badges and credentials for both cash bribes and bribes in the form of campaign contributions.  The government will present witness testimony, corroborated by emails and text messages, bank records, local government records, campaign finance records, photographs, and other documentary evidence, as well as tangible items such as badges, credentials, and firearms.  In addition, the government will introduce audio and video recordings of Jenkins' and his co-conspirators' own statements acknowledging the existence of that corrupt agreement and their efforts to conceal it.  The evidence will prove that, for years, Jenkins engaged in a corrupt scheme to enrich himself and to fund his re-election campaigns through bribery, in breach of his duties of honesty and loyalty to the people of Culpeper County.  The government anticipates that the following facts, among others, will be established at trial.

### A.  Background: Auxiliary Deputy Sheriffs

Auxiliary deputy sheriffs, also known as reserve deputy sheriffs, are sworn law-enforcement officers appointed by the Sheriff to supplement the County's law-enforcement capabilities on a volunteer basis.  Virginia law grants the Sheriff sole authority to appoint deputies, including auxiliary deputies.  *See* Va. Code § 15.2-1603.  Culpeper County, by ordinance, has authorized the Sheriff to "appoint as auxiliary deputies as many persons of good character as he deems necessary, not to exceed fifteen (15) percent of the paid force."  Culpeper County Ordinances. § 9:83, *available at* https://library.municode.com/va/culpeper_county/codes (visited Oct. 21, 2024).  The County ordinances further provide that auxiliary deputies "shall have all the powers and immunities of constables at common law" and requires that they must "meet the

training requirements established by the Department of Criminal Justice Services." *Id.* §§ 9-83(b), 9-86.

To appoint an auxiliary deputy, the Sheriff first signs a form styled "Appointment of Reserve Deputy Sheriff," also referred to as an "oath order," which is filed with the Culpeper Circuit Court. In signing the oath order, the Sheriff certifies that he has "appointed the above named person(s) as an Auxiliary Deputy Sheriff of Culpeper County, Virginia, pursuant to the provisions of Section 15.2-1731 of the 1950 Code of Virginia, as amended." The Circuit Court judge then signs the oath order, which orders the County Clerk to administer the oath of office to the auxiliary deputy. The County Clerk then swears in the auxiliary deputy and the auxiliary signs a written oath of office, which is filed with the Clerk's Office.

Auxiliary deputies receive an official Culpeper County Sheriff's Office ("CCSO") badge and identification card identifying them as a "duly sworn and qualified deputy sheriff vested with the powers and authorized to perform all duties of that office." The card identifies them as an auxiliary only on the back, in the section listing their "rank." The CCSO adopted General Order No. 1-15 governing auxiliary deputies, which was signed by Jenkins. That General Order provides that an auxiliary deputy "generally performs the same duties and has law-enforcement powers equivalent to those of a paid deputy," and sets forth various selection, training, and in-service requirements for auxiliary deputies.

### B. Origins of the Bribery Scheme

In approximately 2011, Jenkins met Individual 1 via a mutual acquaintance. At the time, Jenkins was serving as chief deputy in the Rappahannock County Sheriff's Office. Individual 1 was a businessman residing in Northern Virginia who owned various businesses including a gun store. Individual 1 had previously served as an auxiliary deputy in several Virginia counties. Jenkins told Individual 1 that he was planning to run for Sheriff in Culpeper County and indicated

that, if elected, he would swear Individual 1 as an auxiliary deputy in exchange for a contribution to his campaign. Individual 1 donated approximately $5,000 to Jenkins' campaign and Jenkins appointed him as an auxiliary deputy when he took office in January 2012.

Around the time Jenkins launched his first re-election campaign in 2015, he asked Individual 1 to recruit wealthy Northern Virginia businessmen who wanted to be sworn as auxiliary deputies in exchange for campaign contributions. In text message conversations, Jenkins and Individual 1 referred to Individual 1's recruits as "money guys." The "money guys" were motivated to purchase sheriff's badges primarily because Jenkins and Individual 1 told them that the badges gave them authority to carry a concealed weapon in all 50 states without obtaining a concealed carry permit. In addition, Jenkins and Individual 1 told the "money guys" that if they were pulled over by law-enforcement while driving, they could show their badges and credentials to request "professional courtesy" and avoid a ticket.

### C. Bribery in Connection with the 2019 Election

#### i. Jenkins accepts $25,000 cash bribe from Rick Rahim

Jenkins ran for re-election in 2019. In the run-up to the election, Jenkins again solicited Individual 1's help in recruiting bribe payors. In June and July 2019, Jenkins repeatedly texted Individual 1 to ask for help in building his "war chest," meaning his campaign account. On July 25, 2019, Individual 1 responded: "Hey bubba. Working on it. I think I got a big fish for you. Call me in am. [Individual 1's initial]."

That "big fish" was Rick Rahim, a businessman residing in Fairfax County. As a result of several non-violent felony convictions dating back to 1992, Rahim had lost his right to possess firearms. He wanted to get his firearms rights restored and become an auxiliary deputy. Under Virginia law, a felon can petition the circuit court of the county in which he resides to restore his firearms rights. *See* Va. Code § 18.2-308.2(C). The petition must be served on the

Commonwealth's Attorney, who may object. *Id.* Rahim believed that his petition would not be approved if he filed in Fairfax County, where he resided, because he had prior negative interactions with County officials.

Individual 1 set up a meeting between himself, Jenkins, and Rahim at the CCSO on or about July 31, 2019. At that meeting, Rahim and Jenkins reached a corrupt agreement whereby Jenkins promised to use his official position to help Rahim get his firearms rights restored in Culpeper County and to appoint Rahim as an auxiliary deputy in exchange for a cash bribe and in-kind contributions to his campaign. In particular, Jenkins promised to use his official position to pressure the Commonwealth's Attorney and the presiding judge of the Culpeper County Circuit Court to approve Rahim's petition to restore his firearms rights. Jenkins promised that after Rahim's rights were restored, he would swear in Rahim as an auxiliary deputy.

Following that meeting, Rahim gave Jenkins a manila envelope containing a $15,000 cash bribe, which Jenkins accepted. Subsequently, on September 19, 2019, Jenkins and Rahim met for dinner at a steakhouse in Tyson's Corner, Virginia. During the meal, Rahim gave Jenkins another envelope containing an additional $10,000 cash bribe. Throughout the fall of 2019, Rahim also made substantial in-kind contributions to Jenkins' campaign, such as billboards, robocalls, flyers, and other campaign materials. Neither the $25,000 bribe nor Rahim's in-kind contributions were reported in Scott Jenkins for Sheriff's public campaign finance filings.

At the same dinner on September 19, 2019, Rahim also gave Jenkins two checks in the amount of $17,500 each, both made out to Jenkins personally. One of the checks was from Rahim's business, BV Management LLC, and one was from an associate of Rahim. The checks were purportedly a bridge loan for the construction of Jenkins' home. Rather than deposit the checks into his own account, Jenkins laundered them through an account held by his brother.

Jenkins deposited both checks into his brother's account, then, over several days, funneled the funds back into his own personal account via cash and checks. Although Jenkins eventually repaid the $17,500 to Rahim's associate, Jenkins never repaid the $17,500 he owed to Rahim. Rahim refrained from requesting repayment because he wanted to maintain his relationship with Jenkins and was concerned that Jenkins would revoke his auxiliary deputy badge if he sought repayment. Jenkins failed to disclose the loan on mortgage applications filed with Fulton Bank and Federal Savings Bank and failed to disclose the loan on his personal financial disclosures filed with the Virginia Conflict of Interest and Ethics Advisory Council.

### ii. Jenkins delivers on his end of the corrupt agreement with Rahim

As noted above, under Virginia law, a petition to restore firearms rights must be filed in the circuit court of the county in which the petitioner resides. As Jenkins well knew, Rahim did not reside in Culpeper County. To create the appearance that he did, Jenkins arranged for Rahim to enter a purported lease agreement to rent a bedroom in a farmhouse on a rural property in Culpeper belonging to Jenkins' brother. The lease agreement provided that Rahim would pay Jenkins' brother $500 per month. By check dated September 18, 2019, Rahim paid Jenkins' brother $3,000, purportedly for the first six months' rent. Rahim never set foot inside the farmhouse, nor did he make any subsequent "rent" payments.

Nonetheless, when Rahim filed his petition to restore his firearms rights in Culpeper County Circuit Court on November 14, 2019, Rahim represented that he was a resident of Culpeper County. Rahim's petition could not be processed immediately because of an outstanding restraining order. Once that order expired in April 2020, Jenkins texted Rahim that he had been in contact with the Culpeper County Commonwealth's Attorney, whom Jenkins had promised to pressure to approve Rahim's petition.

By April 2020, however, Virginia courts had closed for non-emergency business due to the COVID-19 pandemic.  Over the spring and summer of 2020, Jenkins repeatedly texted Rahim describing his efforts to pressure the Commonwealth's Attorney to sign off on Rahim's petition without an in-person hearing so that it could be approved notwithstanding the court closure.  When Rahim's file was under review at the Commonwealth's Attorney's office, the Deputy Commonwealth's Attorney assigned to review Rahim's file noticed discrepancies relating to Rahim's address and flagged the issue for the Commonwealth's Attorney.  When the Deputy called Scott Jenkins to inquire about the issue, Jenkins falsely assured him that Rahim resided at his brother's farmhouse.

In August 2020, when the courts began to reopen, Rahim's attorney filed a notice requesting a hearing on Rahim's petition on September 22, 2020.  Impatient that he would have to wait an additional month for the hearing, Rahim texted Jenkins for assistance: "I was hoping you could pull strings and just get it on this week…"  Jenkins replied immediately that that he would "personally go to the judge I'm [*sic*] the morning soon as he arrives in parking lot. You have my word I'm going to either get an actual favor finally from them or I'll be in the doghouse."  On August 13, 2020, Jenkins called the Culpeper Circuit Judge, advised him that the Commonwealth's Attorney had agreed to the order, and asked him to schedule a hearing on Rahim's petition.  The Judge acceded to Jenkins request and the hearing was set for the following day.  At the hearing, which Jenkins did not attend, Rahim falsely represented under oath that he was a resident of Culpeper County.  The Judge granted the petition.

After Rahim's petition was granted, Rahim pushed Jenkins to swear him in as an auxiliary deputy, as Jenkins had promised.  However, because Rahim was a convicted felon, he was not qualified to become a deputy sheriff under Virginia law.  *See* Va. Code § 15.2-1705(A)(vii).

Although that requirement could be waived by the Department of Criminal Justice Services ("DCJS"), *see id.* § 15.2-1705(D), Jenkins balked at requesting a waiver. As an interim measure, in the fall of 2020, Jenkins agreed to issue Rahim civilian (non-sworn) credentials identifying him as a "Helicopter Pilot" with the CCSO and issue him a "helicopter unit" badge. However, the CCSO did not, in fact, own a helicopter, and Rahim never served as a "Helicopter Pilot" in the office. In May 2021, after additional prodding from Rahim and Individual 1, Jenkins claimed to have found a "loophole" that would allow him to swear in Rahim without a DCJS waiver. On May 18, 2021, Jenkins signed an oath order appointing Rahim as an auxiliary deputy, and Rahim took the oath of office on May 27, 2021, with Jenkins in attendance.

### iii. Jenkins accepts $20,000 cash bribe from Fred Gumbinner in exchange for deputy badge

In addition to paying his own bribe, Rahim also recruited Fred Gumbinner, a Northern Virginia businessman and attorney, to pay a $20,000 bribe to Jenkins in exchange for becoming an auxiliary deputy sheriff. In the summer of 2019, Rahim and Gumbinner were negotiating a business deal. Rahim told Gumbinner that he was an auxiliary deputy and that he could get Gumbinner sworn in exchange for a $20,000 "donation" to the Sheriff. At a meeting on October 1, 2019, Gumbinner gave Rahim a check for $20,000, payable to Food Truck Company LLC, a company owned by Rahim. In the memo line, Gumbinner falsely wrote, "LLC Investment." In reality, the money was not an investment, but a bribe in exchange for Jenkins deputizing Gumbinner. Rahim deposited the check into the bank account of his business, BV Management LLC, and gave Jenkins $20,000 in cash. Gumbinner's $20,000 "donation" was not reported on Scott Jenkins for Sheriff's campaign finance filings.

After Jenkins won re-election, Rahim repeatedly pushed Individual 1 to get Gumbinner sworn in as an auxiliary deputy in exchange for the $20,000 bribe. On February 26, 2020,

Individual 1 sent a series of messages to Jenkins relaying Rahim's complaints. In the messages, Individual 1 informed Jenkins: "Rick giving me crap about Fred not getting sworn yet after putting up all that $$." Individual 1 relayed Rahim's complaints that "[w]e've had [Fred's] $20k for 6+ months," and that Rahim believed "all we needed was to get him sworn."

After receiving the messages, Jenkins called Individual 1 and the two spoke for approximately 12 minutes. Jenkins agreed to set a date to swear Gumbinner in. Immediately after the call, Individual 1 called Rahim to relay the news. Individual 1 then texted Jenkins, "Rick good now/happy. I told him next week mid week to get back worth [*sic*] me with date." On March 2, 2020, Jenkins signed an oath order appointing Gumbinner as an auxiliary deputy, and Gumbinner traveled to Culpeper to take the oath of office on March 6, 2020.

### D. Bribery in Connection with the 2023 Election

In March 2022, Individual 1 entered a cooperation plea agreement with the U.S. Attorney's Office for the Eastern District of Virginia to plead guilty to a tax violation in connection with his businesses. Individual 1 provided information to the FBI regarding the bribery scheme Scott Jenkins had been engaged in and was ready to repeat. Several months prior, Jenkins had again reached out to Individual 1 to solicit his help in building his "war chest" by recruiting individuals who were willing to pay to be deputized. Jenkins and Individual 1 had agreed on a goal to raise $50,000 by the end of the year. In June 2022, as part of his cooperation, Individual 1 agreed to arrange meetings between Jenkins and prospective bribe payors at the direction of the FBI, and to record those meetings using hidden audio and video recording devices.

> **i. Jenkins accepts $5,000 bribe from James Metcalf, solicits Metcalf's help recruiting additional bribe payors, and encourages laundering of cash bribes through his brothers**

After Individual 1 began actively cooperating with the government, Jenkins instructed Individual 1 to send the prospective bribe payors' drivers licenses to Pete Siebel, a full-time deputy

in the CCSO, to process the paperwork necessary for them to be sworn in. When Siebel received driver's licenses from Individual 1, he would typically run a criminal history check in the National Crime Information Center, seek Jenkins' approval to get them sworn in, then prepare the oath order for Jenkins' signature.

The first prospective bribe payor that Individual 1 contacted was Jim Metcalf. Metcalf and Individual 1 had previously been auxiliary deputies under Lee Stoffregen, the then-Sheriff of Prince William County, Virginia, and had contributed to Stoffregen's campaigns. Individual 1 told Metcalf that he could get him sworn in Culpeper County in exchange for a $5,000 contribution to Jenkins' campaign. Metcalf agreed.

On August 29, 2022, Individual 1 called Scott Jenkins and, in a recorded conversation, told him Metcalf was willing to pay to be deputized: "So Jim Metcalf called me, and he is ready to plop down 5k. I was wondering if you could put your boot behind Pete [Siebel] and see if we can get that done quick and, you know, get Jim over for lunch and have him hit you." Jenkins agreed and, on September 6, 2022, signed an oath order appointing Metcalf as an auxiliary. Metcalf traveled to Culpeper the following day. Jenkins, Metcalf, and Individual 1 went to lunch at a restaurant in Culpeper, after which Metcalf handed Jenkins an envelope containing a $5,000 check made out to Scott Jenkins for Sheriff. Metcalf was then sworn in as an auxiliary by the Clerk of Court. Metcalf's $5,000 contribution was deposited into Scott Jenkins for Sheriff's bank account and disclosed on its campaign finance report.

During his visit to Culpeper, Metcalf offered to recruit additional individuals to purchase Culpeper County badges. In a recorded conversation, Metcalf told Individual 1 that the individuals he had in mind were "pay-to-play guys" who "want it just for the creds so they can carry, get out of a ticket." Later, at the CCSO, Individual 1 relayed Metcalf's offer to Jenkins: "On the way

over, he said, you know just to remember, I got these other guys I brought to Lee [Stoffregen] first. They're $10,000 guys and you'll never hear from them." Jenkins replied: "Sounds good to me." Jenkins suggested that if Metcalf's recruits did not want their names associated with the "donations," they could give the money to one of Jenkins' brothers to pass along to him.

### ii. Jenkins and Individual 1 discuss concealment of the bribes

On October 6, 2022, Jenkins met with Individual 1 in Culpeper. Individual 1 updated Jenkins on his progress, informing him that he had lined up individuals willing to pay a total of $50,000 for auxiliary badges: "With everybody we've got lined up, it's worth about 50. So, I don't know if you want to get them in on this quarter." Jenkins responded: "It's better -- I would rather swear them in sooner and anything that's coming in can just trickle in week two, three, whatever after so that -- I'd rather do my part first." Jenkins further explained that swearing in the bribe payors first, then depositing their checks several weeks later would conceal the *quid pro quo* nature of the transaction.

### iii. Jenkins accepts $5,000 bribe from Tom Cooper in exchange for deputy badge, encourages Individual 1 to break up bribe amounts to avoid scrutiny

Tom Cooper was an associate of Fred Gumbinner. After Gumbinner received his auxiliary badge, he showed it to Cooper and explained that he had made a "donation" to the Sheriff to obtain it. Gumbinner introduced Cooper to Individual 1 as the person who had facilitated the transaction. In September 2022, Cooper and Gumbinner visited Individual 1's gun store to pick up a gun Cooper had purchased. Rahim also happened to be there and Rahim, Cooper, Gumbinner, and Individual 1 went to lunch. Individual 1 explained that Cooper could become an auxiliary in Culpeper in exchange for a $5,000 contribution to Jenkins' campaign. Cooper agreed and sent his driver's license to Individual 1 to begin the process.

On October 24, 2022, Jenkins signed Cooper's oath order. On October 26, 2022, Cooper traveled to Culpeper. During that trip, he gave Jenkins a $5,000 check made out to Scott Jenkins for Sheriff and was sworn in as an auxiliary deputy. Cooper's $5,000 contribution was disclosed on Scott Jenkins for Sheriff's campaign finance report.

After Jenkins received $5,000 bribes from both Metcalf and Cooper, Individual 1 told Jenkins he would "keep them rolling slow." In response, Jenkins encouraged Individual 1 to vary the amount of the bribe payments to avoid arousing suspicion: "I know the amounts, you know, we've talked about -- and we've had a couple, you know, the same number so far. I guess just give it some thought to if there's a way to break them down or make them, you know, odd number of -- whether it's half and half or, you know, if it's like three or four. So, anyways instead of like just -- you know what I'm saying?" Individual 1 followed up: "Okay. So they don't look all the same you mean?" Jenkins replied: "Probably -- yeah, I think it might be better to break it down."

### iv. Jenkins accepts $15,000 in bribes from FBI undercover agents in exchange for deputy badges

In November and December 2022, Individual 1 introduced two FBI undercover agents to Jenkins as business associates who were willing to pay bribes to be sworn as auxiliaries. The first undercover agent ("UC-1"), who worked under the pseudonym Jerry McKee, paid Jenkins a $5,000 cash bribe on November 14, 2022, and was sworn in as an auxiliary deputy the same day. Following that bribe payment, Individual 1 told Jenkins that he had another potential bribe payor, "Mike Taylor," who was in fact another FBI undercover agent ("UC-2"). Individual 1 informed Jenkins that Taylor had an old conviction for credit card fraud but was "big dough" and would "hit [Jenkins] a couple times before the thing." Jenkins told Individual 1 to send Taylor's license directly to him, rather than to Pete Siebel, and he would "just personally walk it through."

Individual 1 texted Mike Taylor's driver's license to Jenkins as directed. In contrast to every other bribe payor, no criminal history check of Mike Taylor was run in the National Crime Information Center. Nonetheless, on December 27, 2022, Jenkins signed an oath order for Taylor. The following day, Taylor traveled to Culpeper to be sworn in. As Jenkins gave Taylor his badge and credentials, Taylor handed Jenkins an envelope containing $10,000 in cash. Scott Jenkins for Sheriff did not report any contribution from Jerry McKee or Mike Taylor, nor was the cash they gave him deposited into Scott Jenkins for Sheriff's bank account.

### v. Jenkins accepts $5,000 bribe from Phil Howell in exchange for deputy badge and spends it at the Dulles Gun Expo

Phil Howell was a business associate of Jim Metcalf. In the fall of 2022, Metcalf offered to get Howell sworn in Culpeper County in exchange for $5,000. Howell initially declined because he believed $5,000 was too expensive, but eventually agreed. On December 29, 2022, Howell traveled to Culpeper and was sworn in as an auxiliary deputy. Immediately after Jenkins presented him a badge and credentials, Howell gave Jenkins a white envelope containing $5,000 in cash.

Scott Jenkins for Sheriff did not report any donation from Howell, nor was Howell's cash deposited into the campaign account. However, on December 31, 2022, Jenkins visited the Dulles Gun Expo. There, he purchased a Wilson pistol using $3,000 in cash that he removed from a white envelope resembling the envelope that Howell had given him just two days earlier.

### vi. Jenkins accepts $5,000 bribe from Rubar Sandi in exchange for deputy badge and deposits it into his personal bank account

Rubar Sandi is a businessman of Turkish origin residing in Potomac, Maryland, and is an associate of Tom Cooper. Cooper knew that Sandi was interested in obtaining a concealed weapon permit. Cooper offered to facilitate Sandi getting a CCSO badge, which Cooper believed conveyed 50-state concealed carry authority. Cooper initially did not tell Sandi that he would have to pay $5,000 for the badge. Shortly before Sandi was scheduled to be sworn in, Cooper told him that he

would have to make the "donation." Because Sandi did not have time to obtain cash himself, Cooper gave him $5,000 in cash, which Sandi subsequently repaid.

On January 4, 2023, Sandi and Cooper traveled to Culpeper for Sandi's swearing in. Sandi brought a gift bag containing some souvenirs from Turkey and the $5,000 cash, which he gave to Jenkins. Sandi was sworn in as an auxiliary the same day. Sandi's $5,000 was not deposited into Scott Jenkins for Sheriff's bank account nor was it reported in Scott Jenkins for Sheriff's campaign finance filings. However, on January 4, 2023, approximately an hour and fifteen minutes after Sandi left the CCSO, a $7,000 cash deposit was made into Jenkins' personal bank account.

### vii. Jenkins solicits Individual 1 to cover up the cash bribes by falsely characterizing them as purchases of firearms

On January 30, 2023, Jenkins called Individual 1 and asked him for an urgent meeting. Jenkins refused to say on the phone what he wanted to discuss. Individual 1 agreed to meet Jenkins at a Target parking lot in Gainesville. In the parking lot, Jenkins explained that he had a deadline to file a state-mandated disclosure form the next day and was concerned about reporting the four cash "donations" he had received. Jenkins gave Individual 1 four guns and asked Individual 1 to help him disguise the bribe payments as purchases of those guns. Jenkins asked Individual 1 to fabricate the required paperwork for the gun transfer in his capacity as a federally licensed firearms dealer, then to deliver the guns to the four bribe payors. Jenkins instructed Individual 1 to tell the four bribe payors that the money they had given Jenkins was payment for the guns. In fact, as Jenkins was aware, there had been no discussion of any gun purchase with any of the four bribe payors who paid in cash.

## III.    Law Governing the Charged Offenses

### A.    Count One: Conspiracy

Count One of the Superseding Indictment charges Jenkins with a conspiracy to commit honest services mail and wire fraud and federal programs bribery, in violation of 18 U.S.C. § 371. The offense of conspiracy to violate federal law has three elements: "an unlawful agreement to commit an offense, the defendant's knowing and willing participation, and an overt act in furtherance of the conspiracy." *United States v. Camara*, 908 F.3d 41, 46 (4th Cir. 2018).

The "essence" of the crime of conspiracy "is the agreement or confederation to commit a crime." *Hanford v. United States*, 231 F.2d 661, 662 (4th Cir. 1956) (per curiam) (internal quotation marks omitted). "It is not necessary to prove a formal agreement to establish a conspiracy in violation of federal law; a tacit or mutual understanding among or between the parties will suffice." *United States v. Depew*, 932 F.2d 324, 326 (4th Cir. 1991). The existence of the agreement may be proved by circumstantial evidence. *See United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996). "[O]nce a conspiracy is established, even a slight connection between a defendant and the conspiracy is sufficient to include him in the plan." *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997) (citations and internal quotation marks omitted).

### B.    Counts Two though Five: Honest-Services Fraud

Counts Two through Five charge Jenkins with honest-services fraud. Count Two charges honest-services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346, while Counts Three, Four, and Five charge honest-services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. "To obtain a conviction for mail fraud, the Government must prove (1) the existence of a scheme to defraud and (2) the use of the mails (or another interstate carrier) for the purpose of executing the scheme." *United States v. Delfino*, 510 F.3d 468, 471 (4th Cir. 2007). Similarly, wire fraud requires proof of "(1) a scheme to defraud and (2) the use of a wire communication in furtherance of that scheme."

*United States v. Mason*, 41 Fed. App'x 612, 617 (4th Cir. 2002) (unpublished) (quoting *United States v. ReBrook*, 58 F.3d 961, 966 (4th Cir. 1995)). For purposes of the mail and wire fraud statutes, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The Supreme Court has interpreted the honest-services fraud statute to apply only to schemes involving bribery or kickbacks. *See Skilling v. United States*, 561 U.S. 358, 404 (2010).

To establish bribery in an honest-services fraud prosecution, the government must prove "a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Higgins*, No. 21-4245, 2022 WL 17592125, at *2 (4th Cir. Dec. 13, 2022) (quoting *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404 (1999)). In *McDonnell v. United States*, 579 U.S. 550 (2016), the Supreme Court defined the "official act" requirement for bribery.[1] First, there must be a "'question, matter, cause, suit, proceeding or controversy'" that "involve[s] a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." 579 U.S. at 574. It must "be something specific and focused that is 'pending' or 'may by law be brought' before a public official." *Id.* Second, the "public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." *Id.* "[S]etting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" *Id.* at 567. However, a public official commits an official act within the meaning

---

[1]     Although *McDonnell* was an honest-services fraud case, the parties agreed to define honest-services fraud with reference to the federal bribery statute, 18 U.S.C. § 201(b), which makes it a crime for a public official to accept anything of value in return for "being influenced in the performance of any official act." *See McDonnell*, 579 U.S. at 562. Thus, although the honest-services fraud statute does not use the term "official act," courts routinely apply *McDonnell*'s "official act" requirement to bribery schemes charged under the honest-services fraud statute. *See, e.g.*, *United States v. Pinson*, 860 F.3d 152, 167 (4th Cir. 2017).

of *McDonnell* when he uses his "position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.* at 574.

The bribery statutes encompass corrupt agreements where the thing of value—the *quid* in the *quid pro quo*—is a campaign contribution. *See McCormick v. United States*, 500 U.S. 257, 73 (1991); *United States v. McCabe*, 103 F.4th 259, 270–71 (4th Cir. 2024), *petition for cert. filed* (Sept. 6, 2024) (No. 24-5480). In such cases, however, the government must meet a higher standard of proof. *Id.* Where the thing of value is a personal benefit, the corrupt agreement "need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain." *McDonnell*, 579 U.S. at 572. By contrast, where the thing of value consists of campaign contributions, the government must establish "an explicit promise or undertaking by the official to perform or not to perform an official act." *United States v. Taylor*, 993 F.2d 382, 385 (4th Cir. 1993) (quoting *McCormick*, 500 U.S. at 273). Whether a payment to an elected official is in fact a campaign contribution is a question of fact for the jury.

"Explicit" in this context means that the terms of the *quid pro quo* must be "obvious and unambiguous"—not that the agreement must be "stated in words." *McCabe*, 103 F.4th at 282. Put another way, "[e]xplicit . . . does not mean express." *Id.* (quoting *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011)). The government meets its burden if it shows "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *United States v. Hairston*, 46 F.3d 361, 365 (4th Cir. 1995) (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)). "Such an intent may be established by circumstantial evidence." *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998).

### C. Counts Six through Twelve: Federal Programs Bribery

Counts Six through Twelve charge Jenkins with bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B), with one count each for the bribes that Jenkins received from Rahim, Gumbinner, Metcalf, Cooper, UC-1, UC-2, and Howell.

The federal programs bribery statute "was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds." *Salinas v. United States*, 522 U.S. 52, 58 (1997). To establish federal jurisdiction, the government must show that the organization or state or local government of which the defendant was an agent received, in any one-year period, "benefits" in excess of $10,000 under a Federal program. Federal "benefits," within the meaning of Section 666, include federal funds intended to "promote[] well-being," such as "financial help in time of sickness, old age, or unemployment." *Fischer v. United States*, 529 U.S. 667 (2000); *see also United States v. Underwood*, 95 F.4th 877, 886 (4th Cir. 2024). The government need not prove that the federal funds were involved in the bribery transaction, or that the bribe had any nexus to the federal funds. *See Salinas*, 522 U.S. at 61.

In contrast to the honest-services fraud statutes discussed above, the federal programs bribery statute does not require proof of an "official act" as defined in *McDonnell*. *See United States v. Lindberg*, 39 F.4th 151, 175 (4th Cir. 2022). The statutory language of Section 666 is broader: the public official must intend to be influenced "in connection with" the "business, transaction, or series of transactions" of the state or local government or agency of which he is an agent. "Business" is not limited to business in the commercial sense but includes the intangible business of governmental organizations. *Id.* at 173. Nonetheless, the relevant business or transaction "must be a discrete, actionable item under the purview of the covered entity," and not merely "something as general as broad policy matters relevant to the covered entity." *Id.* A "typical meeting, call, or event (without more)" does not qualify. *Id.* at 175. The Fourth Circuit

has recognized that a Sheriff's "granting of employment" qualifies as the "business" or "transaction" of the County within the meaning of Section 666. *See United States v. Grubb*, 11 F.3d 426, 434 (4th Cir. 1993); *see also United States v. Jackson*, 688 F. App'x 685, 693 (11th Cir. 2017) (holding that appointing an individual as a "law enforcement officer," performing a "swearing-in ceremony," and "administer[ing] the oath of office" were "the type of act covered by § 666(a)(1)(B)").

Section 666 further requires that the relevant "business" or "transaction" of the government or agency have a value of $5,000 or more. Where the relevant "business" is intangible, courts rely on "a variety of valuation methods," including "the value of the bribe," also known as the "market approach." *Lindberg*, 39 F.4th at 174. Under this approach, the jury "may consider the value of a bribe *as evidence* of the value of the relevant *quo*." *Id.* at 175. For example, in *United States v. Marmolejo*, 89 F.3d 1185 (5th Cir. 1996), the Fifth Circuit held that the fact that the bribe payor (an inmate in a county jail) was willing to pay the public official defendants (a sheriff and chief deputy sheriff) $6,000 per month plus $1,000 per visit for conjugal visits was sufficient evidence that the visits had a value of more than $5,000. *See id.* at 1194.

Finally, the defendant must have acted corruptly. Corrupt intent, for purposes of Section 666, means the intent "to engage in 'some more or less specific quid pro quo'"—that is, the "intent to receive a specific benefit in return for the payment." *Jennings*, 160 F.3d at 1013 (quoting *United States v. Duball*, 846 F.2d 966, 972 (5th Cir. 1988)). As with the honest-services fraud charges discussed above, where the bribe is a campaign contribution, the government must show the existence of an "explicit" *quid pro quo*, meaning one whose terms are "obvious and unambiguous." *McCabe*, 103 F.4th at 282.

**IV.    Evidentiary Issues**

To assist the Court, the following section summarizes the bases for admissibility of the government's evidence and anticipated evidentiary issues that may arise at trial.

### A.    Stipulations

To streamline the evidence at trial, the parties have agreed to stipulate that both Culpeper County and the Culpeper County Sheriff's Office received federal benefits in excess of $10,000 in each of the fiscal years ending June 30, 2019, June 30, 2020, June 30, 2021, June 30, 2022, and June 20, 2023. The stipulation will be filed as soon as it is fully executed. The government has proposed additional stipulations to the jurisdictional elements of the mail and wire fraud charges, which are under consideration by the defense.

### B.    Authentication

#### i.    Witness Testimony

The proponent of a piece of evidence must offer "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). The burden to authenticate under Rule 901 is "not high – only a prima facie showing is required." *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009). That is because the "factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury." *Id.* (citing *United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992)).

The most common way to authenticate evidence is through testimony by a witness with knowledge that the "item is what it is claimed to be." Fed. R. Evid. 901(b)(1). With respect to recorded conversations, "all that is required under [4th Circuit] precedent is some proof that the audio recording accurately reflects the conversation in question." *United States v. Spence*, 566 Fed. App'x 240, 243 (4th Cir. 2014) (unpublished). In this case, the government intends to authenticate a variety of evidence through witness testimony, including: emails and text messages

to which the witness was a party, other documents and records, audio and video recordings, and tangible objects.

### ii. Business and public records

Records of a regularly conducted activity are self-authenticating when accompanied by a certification of the custodian or other qualified person that the records were: (1) made at or near the time by – or from information transmitted by – someone with knowledge; (2) kept in the course of regularly conducted activity of a business or organization; and (3) made in the regular practice of that activity. *See* Fed. R. Evid. 803(6), 902(11). Business records may also be authenticated by a witness qualified to testify to those foundational facts. Business records are excepted from the rule against hearsay. *See* Fed. R. Evid. 803(6); *United States v. Peninger*, 456 Fed. App'x 214, 217 (4th Cir. 2011) (unpublished) (holding that certified bank records fell within business records exception to hearsay rule).

Similarly, copies of official records or documents filed in a public office are self-authenticating when certified by the custodian or other person authorized to make the certification. *See* Fed. R. Evid. 902(4). Public records may also be authenticated through testimony of a witness that the document "was recorded or filed in a public office as authorized by law" or "is from the office where items of this kind are kept." Fed. R. Evid. 901(b)(7); *see also United States v. Miller*, 394 Fed. App'x 18, 21 (4th Cir. 2010) (holding that Social Security administration ("SSA") records were sufficiently authenticated through testimony of SSA employee that "he received them from another SSA office, and that they are in the custody of the SSA office").

The government intends to offer a variety of business and public records into evidence via either certification or witness testimony, including: bank statements, telephone toll records, records filed with the Culpeper County Clerk's Office, Scott Jenkins for Sheriff's campaign

finance filings, and Scott Jenkins' filings with the Virginia Conflict of Interest and Ethics Advisory Council.

### C. Hearsay Issues

#### i. Defendant's Admissions Offered by the Government

The government will introduce many of Jenkins' own out-of-court statements, including text messages and recorded statements. Jenkins' statements are admissible under Federal Rule of Evidence 801(d)(2)(A) as admissions of a party opponent. Many of Jenkins' statements occurred in conversation with others. The statements of other parties to those conversations are admissible "to place [the defendant's] responses into context" and to make the defendant's statements "'intelligible to the jury and recognizable as admissions.'" *United States v. Wills*, 346 F.3d 476, 490 (4th Cir. 2003) (quoting *United States v. Lemonakis*, 485, F.2d 941, 948 (D.C. Cir. 1973)).

#### ii. Defendant's Statements Offered by Defendant

Although Jenkins' admissions are non-hearsay when offered by the government, the hearsay rules preclude Jenkins from introducing his own self-serving out-of-court statements into evidence. *See United States. v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) ("Admissions by a party-opponent are not considered hearsay and therefore can be admitted against that party . . . . The rules do not, however, provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party.").

If the government offers an excerpt of a statement by Jenkins, the admission of that excerpt does not necessarily render other portions of that statement admissible under Rule 106. That rule, which is often referred to as the "rule of completeness," provides for the admission of "any other part – or any other statement – that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Rule 106 was amended in 2023 to clarify that it authorizes the admission of evidence "over a hearsay objection." Fed. R. Evid. 106. However, the Advisory Committee Notes caution

that this "amendment does not give a green light of admissibility to all excised portions of statements. It does not change the basic rule, which applies only to the narrow circumstances in which a party has created a misimpression about the statement, and the adverse party proffers a statement that in fact corrects the misimpression." Fed. R. Evid. 106, Advisory Comm. Notes to 2023 Amendments. In other words, under the rule of completeness, "the court need only admit the portions [of a statement] that are necessary to clarify or explain the portion of the testimony already admitted." *United States v. Bollin*, 264 F.3d 391, 414 (4th Cir. 2001), *overruled on other grounds*, *United States v. Chamberlain*, 868 F.3d 290 (4th Cir. 2017)).

### iii. Co-Conspirator Statements and Notice of Government's Intent to Introduce Such Statements

The government intends to introduce numerous written and oral statements made by Jenkins' co-conspirators during and in furtherance of the conspiracy pursuant to Federal Rule of Evidence 801(d)(2)(E). To admit co-conspirator statements under Rule 801(d)(2)(E), the government "must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy." *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013) (quoting *United States v. Pratt*, 239 F.3d 640, 643 (4th Cir. 2001)). Each prong of admissibility "must be supported by a preponderance of the evidence." *Id.* "A statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994). The "in furtherance" requirement is construed "so broadly that even casual relationships to the conspiracy suffice to satisfy the exception." *United States v. Smith*, 441 F.3d 254, 262 (4th Cir. 2006) (quoting Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* vol. 5, §§ 801.34[5], 801–89 (Joseph M. McLaughlin ed., 2d ed., Matthew Bender 2005)).

As described above, Jenkins participated in a wide-ranging conspiracy whose participants included various charged and un-charged individuals, including: Individual 1 (until March 2022, when Individual 1 entered a cooperation plea agreement with the government), Rick Rahim, Fred Gumbinner, Jim Metcalf, Tom Cooper, Phil Howell, and Rubar Sandi. These individuals' statements relating to the conduct described above were made in furtherance of that conspiracy and are admissible as co-conspirator statements.

Pursuant to paragraph 3 of the Pretrial Order (ECF No. 128), the government hereby notifies Jenkins that it intends to introduce statements of the following co-conspirators pursuant to Rule 801(d)(2)(E): Individual 1 (as to statements made prior to March 2022, when Individual 1 entered a cooperation plea agreement with the government), Rick Rahim, Fred Gumbinner, Jim Metcalf, Tom Cooper, Phil Howell, and Rubar Sandi.

### iv. Statements of Defendant's Agents and Employees

As Sheriff of Culpeper County, Jenkins employed and supervised deputies and civilian staff working in the CCSO. Statements by Jenkins' "agent[s] or employee[s]" are admissible if made "on a matter within the scope of that relationship and while it existed." Fed. R. Evid 801(d)(2)(D). The Fourth Circuit has explained that "[t]he concern of Rule 801(d)(2)(D) is not whether the employee was carrying out the employer's wishes or whether the employee's statement was authorized. Rather, the court must determine whether the subject matter and circumstances of the out-of-court statement demonstrate that it was about a matter within the scope of the employment." *McCabe*, 103 F.4th at 276 (quoting *United States v. Poulin*, 461 Fed. App'x 272, 282 (4th Cir. 2012)). Even "a statement of illegal activity can still be within the scope of employment and can be admissible under 801(d)(2)(D)." *United States v. Riley*, 621 F.3d 312, 338 (3d Cir. 2010), *as amended* (Oct. 21, 2010) (citing *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 488 (4th Cir. 1982)). Matters such as processing paperwork for auxiliary deputies, creating ID

cards, and running background checks were within the scope of CCSO deputies' employment. Thus, statements by CCSO employees regarding their work on the auxiliary program are admissible under Rule 801(d)(2)(D).

### v. Rule 15 Deposition Testimony

As the Court is aware, the government previously took the deposition of Individual 1 pursuant to Federal Rule of Criminal Procedure 15. Jenkins did not oppose the government's motion to authorize the deposition. Jenkins and his attorney attended the deposition and had "an opportunity and similar motive to develop [Individual 1's] testimony" by cross examination. Fed. R. Evid. 804(b)(1)(B). If Individual 1 is unavailable to testify at trial, the government will move to have his deposition testimony admitted pursuant to Federal Rule of Evidence 804. *See United States v. Rivera*, 859 F.2d 1204, 1208 (4th Cir. 1988) (finding no error in admission of deposition testimony where "[defendant] and his attorney were present and participated fully in the taking of the deposition[]").

### D. Witness and Exhibit Issues

### i. Testimony as to a party's understanding of a conversation

At trial, the government intends to question various witnesses, including Individual 1 and the bribe payors, regarding their understanding of Jenkins' statements made in recorded conversations and text message exchanges to which those witnesses were a party. This testimony is admissible as lay opinion testimony under Rule 701, which provides that a lay witness may offer testimony in the form of an opinion so long as it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. "Rule 701 thus 'allows testimony based on the person's reasoning and opinions about witnessed events.'" *United States v. Hassan*, 742 F.3d 104, 135 (4th Cir. 2014)

(quoting *United States v. Offill*, 666 F.3d 168, 177 (4th Cir. 2011)).  The Fourth Circuit has held that "testimony regarding a witness's understanding of what the defendant meant by certain statements is permissible lay testimony, so long as the witness's understanding is predicated on his knowledge and participation in the conversation."  *Id.* at 136.  Thus, government witnesses' understanding of Jenkins' statements during conversations in which the witnesses participated is admissible.

### ii.  Audio and video recordings and transcripts

The government intends to offer into evidence numerous audio and video recordings of telephone calls and in-person meetings, which were consensually recorded by Individual 1.  The audio and video recordings will be authenticated by a party to the conversation, who will identify the speakers and testify that the recordings fairly and accurately represented the relevant conversations.  *See United States v. Spence*, 566 Fed. App'x 240, 243 (4th Cir. 2014) (unpublished) (holding that to authenticate a recorded conversation, "all that is required under [4th Circuit] precedent is some proof that the audio recording accurately reflects the conversation in question").

The government respectfully requests permission to display, during trial, versions of the audio and video recordings that contain subtitles prepared by the government as an aid to the jury.  The government will not offer the subtitled recordings into evidence.  Rather, it will provide separate versions of each audio or video file without the subtitles to be received into evidence and provided to the jury for use in its deliberations.  The government will provide the subtitled recordings to the defendant before trial so that he may object to any claimed inaccuracies or submit his own transcripts.  It will also request that the Court instruct the jury that the subtitles are not evidence and that the jury's own interpretation of the recordings controls.

The Court has discretion to "allow the use of transcripts to aid in the presentation of tape recorded evidence."  *United States v. Collazo*, 732 F.2d 1200, 1203 (4th Cir. 1984).  It is

appropriate to do so here because the recordings in some instances contain crosstalk and background noise, which make the words difficult to decipher. Permitting the jury to refer to transcripts will "help prevent jury confusion and wasted time as a tape is being played." *United States v. Holton*, 116 F.3d 1536, 1542 (D.C. Cir. 1997). The Fourth Circuit has approved the use of government-prepared transcripts as an aid to the jury where the defendant has "the opportunity to explore through cross-examination any inaccuracies in the transcripts"; the defendant has an opportunity to "submit [his] own transcripts"; and the court gives "an appropriate limiting instruction." *United States v. Capers*, 61 F.3d 1100, 1107 (4th Cir. 1995); *see also United States v. Morris*, 406 F. App'x 758, 759 (4th Cir. 2011) (unpublished) (holding that district court did not abuse its discretion by admitting subtitled recordings into evidence).

### iii. Summary exhibits, charts, and testimony

The government expects to use charts and summaries during the trial. The government may offer some such charts and summaries into evidence pursuant to Rule 1006. Rule 1006 provides that a party may present charts and summaries to prove the "content of voluminous writings . . . that cannot conveniently be examined in court." Fed. R. Evid. 1006; *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004). The defense will be permitted an opportunity to review any summaries or charts prior to their introduction at trial. Consistent with Rule 1006, the underlying documents supporting the charts and summaries have been produced in discovery and therefore are "available for examination or copying." Fed. R. Evid. 1006. Rule 1006 does not require that the underlying documents be introduced into evidence. *See Janati*, 374 F.3d at 272–73.

The government may seek to use at trial and to introduce into evidence, pursuant to Rule 611(a), summary charts that will aid the jury in sifting through the extensive evidence presented at trial. It is well established that "[s]ummary charts are admissible if they aid the jury in

ascertaining the truth," *United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997) (citing *Johnson*, 54 F.3d at1159), and the Fourth Circuit has repeatedly affirmed the use of summary charts in complex cases such as this one, *see, e.g.*, *id.* at 264 (approving admission of summary charts in a three-day trial that included testimony from 13 government witnesses); *United States v. Johnson*, 54 F.3d 1150, 1159 (4th Cir. 1995) (approving admission of summary charts in a seven-day trial that included testimony from 30 witnesses); *United States v. Mamalis*, 498 F. App'x 240, 249 (4th Cir. 2012) (concluding "that the district court did not abuse its discretion when it admitted the summary charts into evidence" during a seven-day trial involving 23 witnesses).

The government may also seek to introduce summary testimony pursuant to Rule 611(a) to aid the jury in understanding the voluminous evidence that will be presented at trial. Specifically, the government may question the FBI agent assigned to the case regarding the timeline of events that occurred over the course of the charged conspiracy. Admission of such testimony is within the sound discretion of the trial court, which "may admit summary testimony" if it "will help the jury to better understand the evidence presented and to "ascertain[] the truth." *Johnson*, 54 F.3d at 1162. The Fourth Circuit has explained that courts must consider "[t]he complexity and length of the case as well as the numbers of witnesses and exhibits . . . in making that determination." *Loayza*, 107 F.3d at 264. Here, the proposed testimony will assist the jury in sifting through multiple bribe payments, involving eight or more bribe payors, occurring over the course of many years.

## V.    Other Issues

### A.  Government Representative

The government respectfully requests that the two FBI case agents be exempted from Federal Rule of Evidence 615's sequestration as designated representatives of the United States. *See* Fed. R. Evid. 615(b) (indicating that "a person whose presence a party shows to be essential

to presenting the party's claim or defense" should not be excluded); *see also United States v. Kosko*, 870 F.2d 162, 164 (4th Cir. 1989) (upholding the district court's decision to "permit[] both a DEA agent and an IRS agent to remain in the courtroom during the trial"). The government respectfully requests that all other potential witnesses for both the United States and the defense be excluded from the courtroom and prohibited from discussing the evidence introduced during the trial.

### B. Forfeiture

The Superseding Indictment notifies Jenkins that the government will seek forfeiture of the proceeds of the charged offenses pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Here, the property that the government will seek to forfeit includes $10,000 that was previously seized from the bank account of Scott Jenkins for Sheriff. The Court must determine, before the jury begins its initial deliberations on guilt or innocence, whether either party requests a jury as to forfeiture. Fed. R. Crim. P. 32.2(b)(5)(A). If Jenkins does not request a jury determination, the government will also waive the jury and ask the Court to decide whether the nexus has been established. Fed. R. Crim. P. 32.2(b)(1)(A)(B). The government anticipates that the trial evidence will be sufficient for the Court or, if necessary and requested by Jenkins, the jury, to decide the forfeiture of the property without additional evidence or arguments of counsel. If Jenkins requests a jury determination of forfeiture, the jury's role is limited to a determination of whether the government has established the requisite nexus between the property and the count or counts of conviction. Fed. R. Crim. P. 32.2(b)(5)(B).

Respectfully submitted,

CHRISTOPHER R. KAVANAUGH
UNITED STATES ATTORNEY

COREY R. AMUNDSON
CHIEF, Public Integrity Section
U.S. Department of Justice

By: */s/Melanie Smith*
MELANIE SMITH
VA Bar No. 82663
Assistant United States Attorney
255 West Main Street, Room 130
Charlottesville, VA 22902
(434) 293-3180
melanie.smith@usdoj.gov

By: */s/ Celia Choy*
CELIA CHOY
DC Bar No. 1017211
LINA PENG
NY Bar No. 5150032
Trial Attorneys
U.S. Department of Justice
Public Integrity Section
1301 New York Ave. NW, 10th Fl.
Washington, DC 20530
(202) 514-1412
celia.choy@usdoj.gov
lina.peng@usdoj.gov

Date: October 22, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for the defendant.

*/s/ Celia Choy*
CELIA CHOY
Trial Attorney
