USA v. Jenkins, 3:23-cr-11, 11/22/2024

1

2                     UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF VIRGINIA
3                       CHARLOTTESVILLE DIVISION

4  **************************************************************

5  UNITED STATES OF AMERICA,     CRIMINAL CASE NO.:  3:23-CR-11
                                 NOVEMBER 22, 2024, 11:04 A.M.
6                                CHARLOTTESVILLE, VIRGINIA
          Plaintiff,            BOND HEARING
7  vs.

8  SCOTT HOWARD JENKINS,         Before:
                                 HONORABLE ROBERT S. BALLOU
9                                UNITED STATES DISTRICT JUDGE
          Defendant.            WESTERN DISTRICT OF VIRGINIA
10
   **************************************************************
11
   APPEARANCES:
12

13 For the Government:          CELIA RUTH CHOY, ESQUIRE
                                LINA PENG, ESQUIRE
14                              DOJ-Crm
                                Public Integrity Section
15                              1301 New York Avenue NW, 10th Floor
                                Washington, DC 20530
16                              202-875-1557

17                              MELANIE SMITH, ESQUIRE
                                DOJ-USAO
18                              Western District of Virginia
                                255 West Main Street, Suite 130
19                              Charlottesville, VA 22902
                                434-293-4283
20

21

22 Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                    255 West Main Street, Suite 304
23                  Charlottesville, Virginia  22902
                    434.296.9284
24

         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25 TRANSCRIPT PRODUCED BY COMPUTER.

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1  APPEARANCES CONTINUED:

2  For the Defendant:          PHILIP ANDONIAN, ESQUIRE
                              JOSEPH P. CALEB, ESQUIRE
3                             Caleb Andonian PLLC
                              1100 H Street, NW, Suite 315
4                             Washington, DC 20005
                              202-953-9850
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1                       INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE GOVERNMENT:            PAGE

3    JOHN DORAN, M.D.

4     Direct Examination by Ms. Smith                   12
      Cross-Examination by Mr. Andonian                 22
5

6    DAVID BROOKE MILLER, M.D.

7     Direct Examination by Ms. Peng                    25
      Cross-Examination by Mr. Andonian                 51
8     Examination by the Court                          54
      Redirect Examination by Ms. Peng                  57
9

10   WILL GOODRICH, M.D.

11    Direct Examination by Ms. Choy                    58
      Cross-Examination by Mr. Andonian                 82
12    Examination by the Court                          87

13

14   SPECIAL AGENT ANDREW CLOUSER

      Direct Examination by Ms. Choy                    90
15

16   MARIANA SALAZAR

17    Direct Examination by Ms. Smith                   97
      Cross-Examination by Mr. Andonian                102
18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1                    INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE GOVERNMENT:

3          EXHIBIT:                Marked      Received

4          2                                   22          22

5          4                         63          63

6          5                        104         104

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1   (Proceedings commenced, 11:04 a.m.)

2               THE COURT:  Good morning, folks.

3               Let's call our case, please.

4               THE CLERK:  *United States of America versus Scott*

5   *Howard Jenkins,* Criminal Action Number 3:23-cr-11.

6               THE COURT:  All right.  Let the record reflect the

7   government is present by its counsel.  The defendant likewise

8   is present along with his counsel.

9               Let me kind of recap where we are and where we're

10  going.  So we continued the trial from last week.  I set this

11  hearing with the request that counsel for the defendant obtain

12  the medical records from Fauquier Health, UVA Health at

13  Culpeper, which were the two emergency rooms where the

14  defendant was seen last week, and also with the family -- the

15  family doctor, Dr. Miller, if I remember correctly.  And they

16  did that.  They provided those.  My days are running together.

17  I want to say it was Tuesday, if I remember correctly,

18  Mr. Andonian.  And I have placed those records that were

19  provided, since they were requested by the Court, on the record

20  under seal.  Since then, the government has requested a

21  subpoena for records from the same entities.  I granted that

22  request, restricted part of the timeline for it.  I allowed I

23  think two years of records with respect to Dr. Miller, but I

24  restricted it to the month of November with respect to the

25  emergency room.  Those records have been received.  The

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1    government has immediately provided those I think both to the

2    Court and also to counsel.  Since they weren't requested by the

3    Court, I did not place those on the record.  So to the extent

4    there's anything in addition from a medical record standpoint

5    that the government wants to put in, you'll need to do so.

6             The main purpose of today's hearing, at least from my

7    perspective, is I think we're all on the same page.  We have a

8    trial that is set to begin on December the 11th to run through

9    the following week, and we all want to see that trial get done.

10   And whether the conditions of bond that are presently in place

11   are sufficient to reasonably assure that Mr. Jenkins can

12   proceed to trial, that trial will not have a negative impact on

13   his health to the extent that it would justify him not being

14   here.  And so it's my understanding -- I've talked to

15   probation -- I think Ms. Salazar has seen Mr. Jenkins outside

16   of court and then again today.  But he has been taking his

17   medication as well.  So that's where we are, at least from the

18   Court's perspective.

19            And so what I want to hear is what are the conditions

20   that are going to make this work, are going to reasonably

21   assure that Mr. Jenkins takes the medication that's prescribed

22   and that he is in a position to be able to be in court, be able

23   to assist in his defense as well.  With that, the Court called

24   the hearing, but that's kind of where I think we are.  I don't

25   think anyone has any burdens necessarily at this point because

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1   there are no pending motions that have been filed.

2           So from the government's standpoint, where are we?

3           MS. SMITH:  Yes, Your Honor.  What the government,

4   after speaking with multiple doctors and reviewing the medical

5   records, what we are going to be asking for today is some bond

6   modifications to ensure the defendant's appearance, as you've

7   indicated.  We are specifically asking that the defendant be

8   housed at Albemarle County Regional Jail in the medical unit.

9           THE COURT:  That's revoking the bond, though, right?

10          MS. SMITH:  That is, Your Honor, but I think we are

11  asking for a very limited time.  The week prior to trial and

12  throughout the pendency of the trial, we are asking that his

13  bond be revoked and he be housed there to ensure that he is

14  taking his medication and that he's getting proper medical

15  attention.

16          THE COURT:  So under 3148, I mean, I can't revoke the

17  bond absent a violation of the condition or absent the pendency

18  of a motion.  The way a bond revocation gets to the court is

19  two ways.  One is on a petition that the court signs, and the

20  other is on a motion initiated by the government filed with the

21  court.  And so there may be other ways.

22          MS. SMITH:  And you're right, Your Honor.  We didn't

23  want to make that motion absent having an opportunity to speak

24  with these doctors and to have a full understanding of what

25  happened last week.  We were not able to complete those

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1   conversations with doctors until late last night.  We had

2   multiple conversations with multiple doctors after hours in

3   order to get this information.  And so this wasn't something

4   that we took lightly, and we weren't prepared to make that

5   motion until today after having that information.  But in

6   support of the oral motion we're making at this time, we have

7   numerous witnesses we'd like to have appear before Your Honor

8   either via Zoom or in person, and we have some evidence we

9   would like to show the Court in support of that.

10          THE COURT:  And I'm going to want to hear from those

11  as well.

12          All right.  And so before we do that, Mr. Andonian,

13  what's the defendant's position with respect to whether any

14  conditions need to be modified?

15          MR. ANDONIAN:  Your Honor, it's our position that no

16  conditions need to be modified.  I think Your Honor accurately

17  recapped where we were, but I think there's a couple of

18  important factors.  I'm happy to get into them now or I'm happy

19  to wait.  Mr. Jenkins is here.  He was here at the last

20  proceeding before we adjourned.  He was excused from the

21  proceeding before that.  He wasn't here on the 12th.

22          THE COURT:  Well, he excused himself.  I didn't

23  excuse him on the 13th.  He excused himself because he went to

24  the ER, even though he never went in.

25          MR. ANDONIAN:  Oh, I -- I think I mentioned this last

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1  time -- I thought I read from your email that you had excused

2  his presence.  In any event, I'm not --

3          THE COURT:  I'd have to go back and look at the

4  email.

5          MR. ANDONIAN:  The point being, I think what my

6  understanding of what we were trying to do by setting the

7  hearing today is give Mr. Jenkins an opportunity to follow the

8  treatment protocol that his primary care physician put into

9  place, which included medication both to reduce blood pressure

10 and stress and anxiety, one of which took a little bit of time

11 to kick in, as opposed to some of the medications that might

12 work more quickly, and to get Mr. Jenkins in a stable position

13 where he wasn't prior to the first trial call.

14         We're only a week into it.  As Your Honor noted,

15 Mr. Jenkins is taking his medications.  He has a follow-up

16 appointment with his primary care on the 26th.  Presumably any

17 adjustments that need to be made, if any, will be made at that

18 point in time.

19         Our position is he is managing the symptoms the best

20 way that he can by his doctor's orders.  He is here in court

21 today.  He will be here in court when we start trial, you know,

22 absent something acute that happens.  But that's -- that's not

23 going to -- regardless of where he is, that isn't -- if there's

24 a medical emergency, there's a medical emergency.  Presumably

25 he's going to be treated accordingly, regardless of where he

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1  is.

2           So we're asking that the Court simply allow

3  Mr. Jenkins to continue the treatment protocol that he is just

4  halfway through right now, just a week into, and with the

5  understanding -- with the understanding that he needs to be

6  here on December 11th, and that's when we're starting, and he

7  needs to continue to take his medication.  We have no problem

8  with that being a condition; to the extent it's not already,

9  that he continue to follow his primary care physician's

10  directives, including taking all medications, and obviously

11  that he appear here for the trial hearing.

12           THE COURT:  Okay.  All right.  Ms. Smith, why don't

13  we go ahead and put on whatever evidence you like, and then

14  we'll go from there.

15           MS. SMITH:  Great.  And Your Honor, if I could just

16  give you a roadmap of who we're anticipating testifying today.

17           THE COURT:  Okay.

18           MS. SMITH:  We have FBI Special Agent Andrew Clouser.

19  Appearing via Zoom will be Dr. John Doran from Fauquier County.

20  Also appearing via Zoom is Dr. Brooke Miller.  We have

21  probation officer Mariana Salazar in person, and then we also

22  have in person Dr. Will Goodrich, who is from UVA Culpeper

23  Hospital.

24           We will also be entering into evidence the pretrial

25  report which was found at ECF Number 32, as well as the U.S.

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1    marshal's form at Government's Exhibit 5.

2           And I do additionally anticipate proffering for the

3    Court some information regarding that USM130 Government's

4    Exhibit 5, as well as some information from Rachel Gaddis, who

5    is the ACRJ medical director.  And I can proffer for the Court

6    what she would testify to.

7           THE COURT:  I was going to say, let's go ahead and

8    let's get the medical folks done so they can get back to their

9    day.

10          With respect to especially the ER docs -- I don't

11   want to completely hijack your examination -- I have read the

12   medical records.  And so I don't need them to -- unless

13   Mr. Andonian wants to have a fully -- I don't need them to go

14   through all of that in great detail, as you would if you were

15   putting someone on in front of the jury.  I've read the

16   records.  I know the examinations.  I know the treatment that

17   was given and I know Mr. Jenkins's condition upon discharge as

18   well.

19          MS. SMITH:  Thank you, Your Honor.

20          The government will be calling FBI Special Agent

21   Andrew Clouser as our first witness.

22          THE COURT:  Can we get the medical doctors --

23          MS. SMITH:  Oh, sure, we can.  So we'll do Dr. John

24   Doran, then, Your Honor.

25          THE COURT:  Dr. Doran, can you hear us?  I'll take

Doran - Direct

1    that as a no.

2            Dr. Doran?

3            THE WITNESS:  Yes.

4            THE COURT:  Can you hear us just fine?

5            THE WITNESS:  Say that again.

6            THE COURT:  Can you hear us just fine?

7            THE WITNESS:  Yes.

8            THE COURT:  All right.  Very well.  So let me get you

9    sworn, if you would, please.  Raise your right hand.

10          JOHN DORAN, M.D., CALLED BY THE GOVERNMENT, SWORN

11           THE COURT:  Very well.  There's a slight delay.  So

12   just be patient as you go back and forth.

13           And Ms. Smith, I think you're going to have to be

14   patient as well.  Go right ahead, please.

15                        DIRECT EXAMINATION

16    BY MS. SMITH:

17   Q    Good morning, Dr. Doran.  Can you hear me as well?

18   A    Yes.

19   Q    Can you please give your name for the record?

20   A    John Thomas Doran.

21   Q    And how are you employed, sir?

22   A    I'm employed as an emergency physician by VEMA at Fauquier

23   Hospital.

24   Q    And how long have you been at Fauquier Hospital?

25   A    About a year and three months now.

Doran - Direct

1  Q    And where were you previously?

2  A    Before I worked here, I was up in Buffalo, New York where

3  I was partaking in an EMS fellowship; and before that,

4  emergency medicine residency.

5        THE COURT:  And I don't think you need to qualify him

6  like you'd qualify an expert.  He's an ER doc.  And unless

7  there's an issue, let's get right to --

8        MS. SMITH:  That was my next question, Your Honor.  I

9  was just trying to set up his experience.  Thank you.

10  BY MS. SMITH:

11  Q    Were you working the early morning of November 12th, 2024?

12  A    Yes.

13  Q    And that was at Fauquier County Hospital?

14  A    Yes.

15  Q    Were you the treating physician for someone by the same of

16  Scott Jenkins?

17  A    Yes.

18  Q    And prior to your encounter in the emergency room, had you

19  ever encountered Mr. Jenkins before?

20  A    No.

21  Q    And what were Mr. Jenkins's chief complaints that day?

22  A    The chief complaint was for a syncopal episode with a head

23  injury.

24  Q    And what is a syncopal episode?

25  A    So that is when you lose consciousness or you faint.

Doran - Direct

Q    And when you made contact with Mr. Jenkins, what were your

impressions about him generally?

A    So he was lying in the hospital bed when I first saw him.

He seemed tired.  But outside of that, he did not appear to be

in any acute distress.

Q    And what is acute distress?  What does that mean?

A    So typically somebody who is showing outward signs of pain

or respiratory distress or having issues along those lines,

altered mental status.

Q    And you did not see any of that in Mr. Jenkins that day?

A    No.

Q    And in the medical records from Fauquier County, it

mentions that he was not on any medications for high blood

pressure.

     Did you have a conversation about high blood pressure with

Mr. Jenkins on that date?

A    I did, yes.  His first set of vital signs showed a very

high blood pressure, and so I spoke with him about that, and

then asked him if he was on medications for it.  Sometimes

people's blood pressures are very high in the morning when they

haven't taken their medications yet.  But when I asked him

about that, he said that he was not currently on any kind of

antihypertensive medicines.

Q    Did he make any statements about whether he had a history

of high blood pressure?

15

Doran - Direct

1  A    He told me that his doctor told him his blood pressure

2  numbers were high, but he was not currently taking any

3  medicines for it.

4  Q    Did he make any statements to you about whether he had

5  ever been on blood pressure medication?

6  A    Not if he had ever been on it, but he did tell me that it

7  was just being followed by his primary doctor.

8  Q    If he had a history of high blood pressure, would that be

9  something important for your treatment?

10  A    Yes.

11  Q    And why would that be important information to have?

12  A    It's a risk factor for cardiac disease, you know, heart

13  attacks and things like that, put him at a risk for stroke.

14  And if he was on medications for his high blood pressure, we

15  could have gotten him those to try and get that blood pressure

16  number closer to normal.

17  Q    And when his blood pressure was taken when he first got to

18  the hospital, it was 206/122.  You mentioned that was high.

19  But you don't have any information about what his blood

20  pressure normally is; is that correct?

21  A    Correct.

22  Q    Now, you also did additional testing beyond just kind of

23  monitoring his blood pressure.

24      What generally did -- additional testing did you do?

25  A    So the concern was if he had a syncopal episode and came

Doran - Direct

1   in with severely high blood pressure, the worry would be for

2   either some type of cardiac event -- and so there was EKG,

3   blood work, chest X-ray performed in regards to that -- and

4   also the concerns for either a spontaneous intracranial

5   hemorrhage like an aneurysmal burst with very high blood

6   pressure causing changes leading to him passing out, or also a

7   traumatic -- because if he passed out and then hit his head

8   during the fall from it, if he had any intracranial hemorrhage

9   or skull fracture injuries like that from the head injuries.

10  So a CT scan of his head was obtained.

11  Q    So you did a pretty extensive workup for him?

12  A    Yes.

13  Q    Would you also do that type of workup for someone with

14  high blood pressure?

15  A    For somebody who has high blood pressure that's well

16  controlled, typically no.  Especially if they were on home

17  medications, the first line would have been to give them their

18  home medicines and see if they responded well.  But for the

19  instances in which the gentleman presented telling me that he

20  had lost consciousness, struck his head, was experiencing chest

21  pain and a headache, the workup was warranted.

22  Q    And for those symptoms he was describing and what had

23  occurred -- him falling, hitting his head and having chest

24  pains -- was that information that he reported to you or

25  someone else did?

Doran - Direct

1    A    That was information provided by the patient.

2    Q    And he was the only individual that was present when he

3    fell and hit his head?

4    A    To my knowledge, that's what was described to me.  His

5    wife was present in the emergency department as well, but I did

6    not specifically ask if she witnessed the event.

7    Q    Did you observe any external evidence of head trauma?

8    A    Not that I appreciated on physical exam.

9    Q    And what were the results of all these tests that you did?

10   A    So the CT imaging did not show any intracranial injuries

11   or skull fracture, facial injuries that were seen on the parts

12   of the CT that were obtained.  And then the laboratory work,

13   EKG, the rest of the workup was all reassuring without any

14   major findings that warranted hospitalization or emergent

15   intervention.

16   Q    So it all seemed to be normal; is that correct?

17   A    Yes.

18   Q    And in your records you mention that his blood pressure

19   responded well to Labetalol.  I'm probably pronouncing that

20   wrong.  It's L-A-B-E-T-A-L-O-L.

21        What is that?

22   A    So Labetalol is a beta blocker medicine.  And the form

23   that he received was an IV dose that was meant to lower his

24   blood pressure.

25   Q    And did it?

Doran - Direct

1  A    It did, yes.

2  Q    And generally how long does it take blood pressure

3  medication to work?

4  A    IV forms of the medicine can work much faster than oral.

5  And so he responded fairly quickly to the IV medicine that was

6  given, as suspected.  Oral medications can take an hour or so.

7  Q    You said it takes an hour -- one hour?

8  A    About, yes, roughly.

9  Q    So do blood pressure medications take weeks to take

10 effect, or just the same day you take it you should see --

11 A    The same day you take it.

12 Q    So based on the high blood pressure which you were able to

13 get under control with an IV medication and the clean results

14 from the testing, what did you decide to do?

15 A    So it was appropriate for him to be discharged home.  I

16 asked him about his situation with his primary care doctor.

17 Sometimes people are able to follow up either the same day or

18 in the next couple of days.  And so I direct them to see their

19 primary doctor to get started on high blood pressure medicines,

20 or to at least have their blood pressure rechecked to make sure

21 it is normal again.  Sometimes in high stress or pain, those

22 numbers can be high.  But in his instance he told me he did not

23 feel he would be able to see them in the next few days.  And so

24 I gave him a prescription for lisinopril to try and manage his

25 blood pressure.

Doran - Direct

1  Q    You said you gave him a prescription for lisinopril; is

2  that right?

3  A    Yes.

4  Q    And how long was that?  That was a 30-day regimen?

5  A    A 30-day, yes.  That would give him several weeks to

6  follow up with his doctor.

7  Q    So did you tell him to follow up with his doctor in the

8  next several weeks?

9  A    Yes.  I told him to call and schedule an appointment as

10  soon as possible.

11  Q    At any point in your discharge instructions to Mr. Jenkins

12  did you tell him that he needed to see his primary care

13  physician right away or that day?

14  A    No.  And he told me he did not feel he would be able to do

15  that, which is why I gave him a prescription.

16  Q    If he was able to see his primary care physician that day,

17  would you have given him the prescription that you gave him?

18  A    No.

19  Q    That's your standard practice to only give that

20  prescription if someone can't see their primary care physician?

21  A    Yes, from the emergency department, yes.

22  Q    What other discharge instructions did you give

23  Mr. Jenkins?

24  A    I gave him instructions for monitoring his blood pressure

25  at home so that he can trend that and provide the values to his

Doran - Direct

1  primary doctor so that can help with managing his blood

2  pressures appropriately, and then standard return precautions

3  to the emergency department if he had any worsening condition

4  or severe signs such as chest pain and another syncopal

5  episode, things like that.

6  Q    You said you gave him instructions when to return.  You

7  said it was if he had another syncopal -- or fainted again or

8  chest pains.

9      Were there any other conditions in which you told him to

10  come back to the emergency room?

11  A    Beyond that, it would be listed in the discharge

12  instructions, but off the top of my head, I could not recall.

13  Q    And you concluded there was no need for admission to the

14  hospital that morning.

15      Was he discharged around 11 a.m.?

16  A    It would be -- the specific time would be in the

17  documentation.  But from what I can recall, yes, it was around

18  that time.

19  Q    What observations did you have of his condition upon

20  discharge?

21  A    So the last that I saw him was in the room.  He was still

22  laying in the bed.  Again, he didn't appear to be in any acute

23  distress.  I did not see him actually walk out of the emergency

24  department or leave the building.

25  Q    But there was nothing that would concern you as a doctor

Doran - Direct

1   that you observed when he was discharged?

2   A    Correct.

3   Q    Are there any issues with cognitive abilities or the

4   ability to participate meaningfully in any sort of proceeding

5   when someone has high blood pressure?

6   A    Not that I observed during my time with the patient.

7   Q    So at no time during that emergency room visit on November

8   12th did you see any issues with his cognitive abilities and

9   functioning?

10  A    I did not.

11  Q    Did you give him any discharge instructions about whether

12  or not he should modify his day-to-day activities?

13  A    I did not.

14  Q    So he was free to go about the rest of his day and resume

15  normal activities?

16  A    Yes.

17          MS. SMITH:  Your Honor, if I could just have one

18  moment to confer.

19          THE COURT:  Yes, ma'am.

20          MS. SMITH:  And Your Honor, I was planning on moving

21  into evidence the Fauquier medical records as Government

22  Exhibit Number 1.  We don't have a way to easily show it --

23  excuse me, 2.  We don't have an easy way to show it to

24  Dr. Doran, but they're what we received in the subpoena.

25          THE COURT:  So you're moving in all the records?

Doran - Cross

1              MS. SMITH:  Say that again.

2              THE COURT:  You're moving in all the records?

3              MS. SMITH:  The Fauquier County records as

4    Government's Exhibit 2.

5              THE COURT:  All of them you received in the subpoena,

6    which I think was about 42 pages; is that right?

7              MS. SMITH:  It's 12 pages, Your Honor.

8              THE COURT:  So it's not the entire subpoena?

9              MS. SMITH:  Correct, just 12 pages.

10             THE COURT:  This was his treatment notes and

11   discharge summary?

12             MS. SMITH:  Correct, Your Honor.

13             THE COURT:  No objection, Mr. Andonian?

14             MR. ANDONIAN:  No, Your Honor.

15             MS. SMITH:  Usually I would show it to him, but it's

16   difficult with Zoom.

17             THE COURT:  That's fine.  So we'll admit those and

18   they'll be -- since they have personal identifying information

19   on there, they'll be admitted under seal.

20             MS. SMITH:  Thank you, Your Honor.

21             No further questions of this witness at this time.

22             (Government Exhibit 2 marked and admitted.)

23             THE COURT:  Mr. Andonian?

24                         CROSS-EXAMINATION

25   BY MR. ANDONIAN:

Doran - Cross

1  Q    Good morning, Dr. Doran.  How are you?

2  A    Good morning.  Not too bad.  Thank you.

3  Q    Just a couple of questions.  When somebody has a blood

4  pressure reading of 206/122, you would consider that high,

5  right?

6  A    Yes.

7  Q    And that is independent of what their baseline blood

8  pressure might be at any given point.  That is an objective

9  measure.  206/122 is a high reading?

10 A    Yes, that's classified as hypertension.

11 Q    Okay.  Turning back to Mr. Jenkins's report of the

12 syncopal episode, you have no reason -- no medical basis to

13 disbelieve that Mr. Jenkins suffered a syncopal episode,

14 correct?

15 A    I did not, no.

16 Q    And when a patient reports a syncopal episode, there are

17 certain -- and in conjunction with the blood pressure at the

18 level that it was at, the tests that you performed would be

19 considered medically appropriate to rule certain things out

20 like you said, like heart -- certain heart ailments, stroke,

21 etc.; is that right?

22 A    Yes.

23 Q    If Mr. Jenkins had been able to get an appointment with

24 his primary care physician on that same day, there would be

25 nothing inappropriate or medically wrong with him doing that,

Doran - Cross

1  right?

2  A    No.  For some patients who have that capability, that

3  would be standard practice to be discharged from the hospital

4  to go to their primary office.

5  Q    Right.  So it would actually be ideal if he were able to

6  make that happen?

7  A    If possible, yes.

8            MR. ANDONIAN:  Court's brief indulgence.

9            THE COURT:  Yes, sir.

10           MR. ANDONIAN:  I don't have anything further.  Thank

11 you, Doctor.

12           THE COURT:  Any redirect?

13           MS. SMITH:  Nothing further, Your Honor.

14           THE COURT:  So Dr. Doran, thank you very much for

15 being on today.  You are free to go.  I appreciate your time,

16 and I hope you have a nice holiday.  Thank you.

17           THE WITNESS:  Thank you.  You as well.

18           THE COURT:  Call your next witness, please.

19           MS. PENG:  We call Dr. Miller, please, also on Zoom.

20           THE COURT:  Dr. Miller, can you hear us just fine?

21           Can you hear us, Dr. Miller?

22           I don't know whether he hasn't connected to audio.

23 Do you all have a cell phone you can text him to make sure he

24 connects to audio?

25           MS. PENG:  Yes, we do.

Miller - Direct

1    THE COURT:  Dr. Miller, if I can get you to raise

2   your right hand, I'll get you sworn in, please.

3    DAVID BROOKE MILLER, M.D., CALLED BY THE GOVERNMENT, SWORN

4    THE COURT:  Go ahead, please, Ms. Peng.

5    MS. PENG:  Thank you.

6    DIRECT EXAMINATION

7   BY MS. PENG:

8   Q    Dr. Miller, would you just state your name for the record,

9   please?

10  A    David Brooke Miller.

11  Q    Briefly speaking, could you run through your medical

12  history -- I mean, not your medical history, your practice of

13  medicine, please?

14  A    Yeah, I graduated from University of Virginia in 1986;

15  went on to a residency, MCV Chippenham Hospital, and graduated

16  from a family practice residency in 1989.  I'm a board

17  certified family physician for almost 40 years.  I have

18  practiced in emergency medicine for six years and in family

19  medicine for -- my total practice of medicine has been 38

20  years.  So 32 years in family medicine and six years in

21  emergency medicine.

22  Q    Are you currently certified in emergency medicine?

23  A    No, ma'am.

24  Q    Now, you said you spent about six years in the emergency

25  room, and then I think the rest of your career as a family

Miller - Direct

1  doctor; is that right?

2  A    Correct.

3  Q    Would you say -- would you agree with me that there are

4  differences between what an ER doctor looks for and a family

5  physician?

6  A    No.

7  Q    You think that they look for identical things?

8  A    I see identical things.  I as a physician look for

9  everything that an ER doctor looks for.

10 Q    Would you agree with me that an ER doctor may be focused

11 on immediate life-threatening conditions, whereas a family

12 doctor such as yourself are looking to the long-term welfare of

13 a particular patient?

14 A    No.  I'm looking at both.

15 Q    You're looking at potentially -- I'm talking about an ER

16 doctor, though.  Would an ER doctor be interested --

17 A    I'm talking about myself as a physician.  It's my duty as

18 a physician to take care of the patient in front of me, both

19 long-term and immediate.

20 Q    So you would not agree with me that an ER doctor may be

21 potentially looking for different things than all the things

22 that you would look for as a family physician?

23 A    I don't understand your question.  I'm looking for

24 everything that I think could be possibly wrong with the

25 patient.

Miller - Direct

1  Q    So you just disagree with me on that?  It's a yes or no.

2  A    Yes, I do.  I disagree with you.

3  Q    So let me talk to you about Mr. Jenkins.  So Mr. Jenkins

4  saw you for a total of three visits; is that right?

5  A    That is correct.

6  Q    And those visits started in July of 2024?

7  A    That is correct.

8  Q    And so the first time you had seen Mr. Jenkins is in July

9  of 2024?

10  A    Yes.

11  Q    And at the time of that visit, did you have access to his

12  prior medical history?

13  A    I took his medical history from the patient itself, which

14  is what we normally do.  I did not have copies of previous

15  medical records from other physicians or facilities.

16  Q    Understood.  And at the time when you were taking his

17  medical history, did he report to you that he had hypertension

18  in the past?

19  A    You'd have to refer to the medical record.  I don't have

20  independent recollection of that right now.

21  Q    Do you have those medical records in front of you that you

22  could review right now?

23       If I were to represent to you that it wasn't documented

24  that he had hypertension in his history, would you take that to

25  mean that he didn't report that?

Miller - Direct

1   A    Yes.

2   Q    Okay.  So he did not report to you, then, a history of

3   hypertension when he saw you in July of 2024?

4   A    Okay.

5   Q    Is that a yes?

6   A    Yes.

7   Q    Okay.  And so I assume that it's also true, then, he also

8   did not report taking medication for hypertension in the past

9   when he saw you in July of 2024?

10  A    Yes.

11  Q    And so, if -- you know, assuming that he, in fact, did

12  have a history prior to seeing you, then, of hypertension and

13  took medication for that, is that something you would have

14  liked to have known in your evaluation of him as his family

15  doctor during that visit?

16  A    Yes.

17  Q    And would that have changed anything in your assessment of

18  him during that visit?

19  A    No, because his blood pressure was normal at the time of

20  his visit.

21  Q    But I think it was in the high range, though, right; still

22  within normal, but on the high side?

23  A    His blood pressure was normal.  132/80 is considered a

24  normal blood pressure.

25  Q    But you would have liked to have known if he had a history

Miller - Direct

1  of high blood pressure, though, at the time?

2  A    I suspected he may certainly have had a history of

3  hypertension with all of his medical problems, but it would

4  have been something good to know if he did have it.  But it

5  wouldn't have changed how I treated him on the day of his

6  visit.  I wouldn't have put him on antihypertensive medication

7  with a normal blood pressure.

8  Q    Understood.  But he didn't report that to you, right?

9  A    Yes.

10 Q    Okay.  So I'm just looking at your notes from that day and

11 the plan that you put him on after that particular visit.  And

12 I think it says that you strongly recommended diet and

13 lifestyle changes and certain prescriptions, correct?

14 A    Yes.  Correct.  There were I think -- let's see.  Let me

15 see what we -- I don't think we put him on any new

16 prescriptions.  We suggested some dietary supplements that were

17 over the counter.

18 Q    Let me -- so first of all, why did you strongly

19 recommend -- I think there are a series of things you

20 recommended that you call lifestyle changes.

21     Why did you make those recommendations?

22 A    Because he's at high risk of cardiovascular disease.

23 Q    Anything else?

24 A    No.  I recommended that he change his diet and lifestyle

25 to reverse what I suspected was severe metabolic dysfunction

Miller - Direct

1  and increased risk of cardiovascular disease.

2  Q    So it's fair to say you made those recommendations because

3  based on what you observed and his vitals that day, you were

4  concerned that he was at higher risk of various cardiovascular

5  diseases?

6  A    Yes, ma'am.

7  Q    Would that have included stroke?

8  A    Certainly.

9  Q    What about a heart attack?

10  A    Yes.

11  Q    And were you concerned if Mr. Jenkins did not follow the

12  recommendations or the changes to his lifestyle that you made

13  that day, that his risk for those things would increase even

14  further?

15  A    Over time, yes, ma'am.

16  Q    And I just want to go through a couple of things that you

17  prescribed for him that day.  It looks like Berberine, Lithium

18  Orotate and Vitamin D3.

19      Could you just very briefly discuss why you prescribed

20  those particular medications?

21  A    Berberine is an all-natural supplement.  There have been

22  numerous studies in the literature, including Nature Medicine,

23  that compared it to usual care in people with atherosclerosis.

24  Atherosclerosis is plaque buildup in arteries.  They studied a

25  group of patients for four months -- in men 65 and above for

Miller - Direct

1    four months who took Berberine, 500 milligrams twice daily,

2    versus usual care.  The usual care group the plaque buildup

3    increased by 1 percent over those four months.  And the people

4    that took Berberine, it regressed by 4 percent.  So that was

5    pretty much clearcut that this helps reduce cardiovascular

6    disease.  It's also known to help lose weight and also with

7    blood sugar metabolism.

8        Lithium Orotate -- the patient was also thinking that he

9    may have long COVID or a COVID vaccine injury.  Lithium Orotate

10   is a natural supplement.  In very low doses, there is research

11   to show that it helps reverse brain fog in vaccine injury, and

12   also helps prevention of the progression to Alzheimer's

13   disease, which people with Type II diabetes are at high risk

14   for.

15   Q    Do any of those also have the effect of potentially

16   lowering blood pressure, if taken?

17   A    Not that I know of.

18   Q    All right.  So the next time you saw him -- oh, actually,

19   let me just ask about this.  You also diagnose him from the

20   July visit of stress, correct?

21   A    Yes, ma'am.

22   Q    And is that based on what Mr. Jenkins reported to you at

23   the time?

24   A    Yes, it is.

25   Q    And so is it fair to say if a patient comes to you and

Miller - Direct

1   reports stress, that they might get a stress diagnosis from

2   you?

3   A    Yes.

4   Q    Now, let's go to the August 2024 visit.  Do you have that

5   note in front of you, Doctor?

6   A    I am pulling it up.

7   Q    So that's about a little over a month after the last

8   visit.  I just want to point you to your notes that day.  It

9   looks like you observed that he didn't actually take any of

10  your recommendations in terms of lifestyle changes?

11  A    He reported that he had not made any of those changes,

12  yes, ma'am.

13  Q    And in fact, he didn't take any of the supplements or

14  other medicines that you recommended he take from the last

15  visit; is that right?

16  A    Let me just read my note, but I would assume that's what

17  it was.  Let me see.  I'm not sure.  Does it say somewhere in

18  the medical record that he didn't take Berberine or Lithium

19  Orotate?

20  Q    It looks like you prescribed those same substances in the

21  same amount as the one you did in July?

22  A    Okay.  Well, that would be a good assumption, then, that

23  he did not take either one of those supplements.

24  Q    So is it fair to say that, in essence, in the August visit

25  your recommended plan for him was exactly the same as the plan

Miller - Direct

1  you recommended in July?

2  A    It's not exactly the same.  We also wanted to help him

3  start with his weight loss journey by prescribing Ozempic.

4  Q    With that exception, your recommendations stayed the same?

5  A    Yes, ma'am.

6  Q    And so it's also fair to say that as of the August 2024

7  visit, your prior concerns about a higher risk of stroke,

8  higher risk of heart attack, they were all still there?

9  A    Yes, ma'am.

10  Q    All right.  So now I want to turn you to the third time

11  you saw him, which was November 12th, 2024.  And was that the

12  last time you saw Mr. Jenkins?

13  A    Yes, ma'am.

14  Q    And do you recall how that particular appointment came to

15  be?

16  A    I received a phone call from my receptionist on that

17  morning that he had been taken to the emergency department with

18  hypertension and -- after a syncopal episode, which is a

19  pass-out spell.  He was evaluated at Fauquier Hospital, and he

20  wanted to see me later that day.

21  Q    Do you recall approximately what time that phone call

22  might have been relayed to you?

23  A    It would have been before my office hours started at 9

24  a.m., but I can't tell you exactly what time the phone call

25  happened.

Miller - Direct

1  Q    And so was he told that -- or did you tell your

2  receptionist to tell him that you were, in fact, available to

3  see him later that same day?

4  A    We did see him that day, yes, ma'am.

5  Q    All right.  So during that visit -- you already referenced

6  this -- was there anything that you observed objectively that

7  would have supported his report of a fall?

8  A    No, not objectively.  I did not see any obvious injury to

9  the patient.

10 Q    Did you have a regular conversation with him?  Did he seem

11 cogent during this visit?

12 A    I had a regular conversation with him and he was mentally

13 clear.

14 Q    Mentally clear, you said?

15 A    Yes, ma'am.

16 Q    Okay.  And so it looks like from that visit when -- at the

17 time he saw you, his blood pressure was 172/92; is that right?

18 A    172/92, that is correct.

19 Q    Would you consider that to be a high blood pressure level

20 for someone that is --

21 A    That's elevated blood pressure.

22 Q    Elevated.

23      And is that the type of blood pressure that would be high

24 enough to warrant you to recommend him to go back to the ER at

25 that point in time?

Miller - Direct

1   A    No, ma'am, it was not.

2   Q    Why not?

3   A    Why would I not recommend him go to the ER at that point

4   in time?

5   Q    Right, with a blood pressure of 172/92?

6   A    Because typically that's not the range in blood pressure

7   you see that someone is at an increased risk of having an acute

8   cardiovascular event such as a heart attack or stroke.  Over

9   long-term that certainly could cause that, but typically the

10  patient is not in danger right at that moment of having a heart

11  attack or stroke.

12  Q    And in your opinion, what would be a blood pressure that

13  would warrant a visit to the ER?

14  A    200 to 210 systolic and over 100 diastolic.

15  Q    And is that the case regardless of what other

16  characteristics that patient might have?

17  A    Everybody is different.  So no, there are other

18  characteristics, yes, but everybody is different and we have to

19  treat each person as an individual, not everybody the same.  So

20  I hope that answers your question.

21  Q    It does.  And so it's fair to say that there are certain

22  individuals who could have blood pressure in the 200 to 210

23  range that would not require immediate attention in the ER; is

24  that right?

25  A    Well, they require immediate medical attention.  Maybe not

Miller - Direct

1  emergency department attention.  I see patients in my office

2  with blood pressures over 200, and we work to get it down in

3  the office and make sure that it's coming down before we let

4  them go.

5  Q    I see.  So you as a primary care physician are equipped to

6  basically treat some condition like that if they present

7  themselves to you?

8  A    Yes, ma'am.

9  Q    Okay.  So let me talk to you about the plan after the

10  November 12th visit.  So it looks like he was already

11  prescribed medications from the ER, and then you added some

12  additional medication.

13      Could you just real quick walk us through, starting with

14  the Lisinopril, which is the 10 milligrams prescribed in the

15  ER, what those medications were for?

16  A    Okay.  Lisinopril, 10 milligrams was prescribed in the

17  emergency room by the emergency room physician.  It's an

18  antihypertensive medication that's been around and very safe

19  and effective at helping control blood pressure.

20  Q    And how long does it take for that to take effect?

21  A    I'm sorry?

22  Q    How long does it take to take effect?

23  A    Well, I mean, some blood pressure medicines you see some

24  effect after the first pill, but typically for a lot of

25  antihypertensive medications it takes several days to weeks to

Miller - Direct

1  start seeing significant effect from those, yes.

2  Q    What about this one in particular, though, the Lisinopril,

3  how long does it take?

4  A    I wouldn't expect it to tremendously lower someone's blood

5  pressure within the first several days.

6  Q    Okay.  What about the next one, the Jardiance, 10

7  milligrams?

8  A    Jardiance is a medication we use for Type II diabetes

9  mellitus.  It also acts as a diuretic.  It reduces glucose

10 reuptake.  It lowers blood sugar, but it also has an

11 antihypertensive effect.  Again, it would not have an immediate

12 reduction in blood pressure, but over the course of several

13 days to weeks, then it could possibly lower blood pressure.  It

14 also has been shown to reduce risk of congestive heart failure

15 and cardiovascular disease.

16 Q    And it looks like you added Clonidine, right, twice?

17 A    Clonidine is used to lower blood pressure rather rapidly

18 or -- not rapidly, but in a timely fashion within 30 minutes or

19 so after giving blood pressure is above a certain range.

20 Q    Is it fair to say that that can take -- be a substitute

21 for an IV medication at the ER, but you would just prescribe it

22 from your office?

23 A    You could prescribe that from the office in certain

24 situations if it was not extremely -- like if you had a patient

25 that came in whose blood pressure was 200, 210 in the office,

Miller - Direct

1   you would first try to get their blood pressure down with some

2   Clonidine and see how they respond in your office for about 30

3   minutes.

4       If the blood pressure is exceedingly high, like 230, 240,

5   then that usually requires IV therapy, even though you would

6   start -- depending on what the situation was, if you don't have

7   access to IV medication and monitoring like they do in the

8   emergency department, you would certainly start with the

9   Clonidine and send them to the emergency department.

10  Q    I see, but the Clonidine, as opposed to the other

11  medication you were talking about, is a fast-acting medication

12  that you would expect to take effect within 30 minutes?

13  A    Yes, ma'am.

14  Q    And you prescribed that for Mr. Jenkins, and you

15  instructed him that if his blood pressure went above 170 over

16  100, he was to take this medication?

17  A    Yes, ma'am.

18  Q    You then you also prescribed Lorazepam?

19  A    Lorazepam, yes.  I prescribed Lorazepam and Fluoxetine.

20  Q    And what is that for?

21  A    Fluoxetine is a medication that we use for people with

22  anxiety, depression, and panic disorder, which I feel like this

23  gentleman was suffering from.  It is a medicine that's taken

24  daily.  It's a long-acting medicine.  It's a medicine that

25  takes several weeks to start seeing the significant effects.

Miller - Direct

1   You usually don't start seeing significant effects before two

2   weeks, and maximum effects are at six weeks.

3       The Lorazepam is a short-acting, early-onset medicine in

4   the class of benzodiazepines.  It's a sedative, hypnotic, and

5   it can help with panic and anxiety acutely, like within 20

6   minutes.  If taken long term, it can be habit forming and

7   addictive.  And so we'd like to get something on board to treat

8   the disorder that's not habit forming and addictive, but it

9   takes a little while for that medication to start taking

10  effect.  And that's why we use Lorazepam on an as-needed basis

11  or a short-term basis.

12  Q    I see.  So the short-term basis -- it would take effect in

13  20 minutes, but you add the Fluoxetine for potential long-term

14  management, is that right, for anxiety?

15  A    Yes, ma'am.

16  Q    And so neither of those medications, though, have anything

17  to do with controlling blood pressure; is that right?

18  A    Well, they're not antihypertensive medications, but if you

19  prevent a patient from having anxiety and panic, in my

20  experience if someone is having an anxiety or panic attack and

21  you give them Lorazepam acutely, it will relax them and their

22  blood pressure will come down.

23  Q    So is it fair to say that at the end of the visit with him

24  with his prescriptions, you were giving him medications in the

25  short term to control blood pressure and anxiety, and then you

Miller - Direct

1  had sort of more of a long-term plan for him as well?

2  A    That is correct.

3  Q    All right.  So let me ask you about the note in your

4  records where it says, At this point I feel as though he's

5  having an acute stress reaction with elevated blood pressure

6  and syncope.  I would like to get his condition stable before I

7  would recommend resuming or starting trial.  Please follow up

8  in two weeks.  Do you see that?

9  A    Unfortunately, my iPad keeps cutting off.  I'll just --

10 you just go ahead and read the record and I'm sure it's

11 accurate.

12 Q    Okay.  The part that I want to focus your attention on is

13 just, "I would like to get his condition stable before I

14 recommend resuming or starting his trial."

15      Do you remember writing that?

16 A    Yes, ma'am.

17 Q    And so when you say "get his condition stable," what do

18 you mean by that?

19 A    Making sure his blood pressure doesn't go up when he

20 starts getting nervous or anxious, and that he has medicines on

21 board that will help prevent those reactions from happening.

22 Q    Isn't it true that those medications you prescribed to him

23 for short-term control of those conditions you already gave him

24 on that day?

25 A    Can you rephrase that?  I didn't quite --

Miller - Direct

Q    Yeah.  When you say you want to make sure that if he experiences another episode again it would be able to be controlled, I mean, the short-term medications we were just discussing, the Clonidine and the Lorazepam, wasn't that the medication you prescribed for short-term control of his condition?

A    Yes.

Q    And so was it your expectation that with those prescriptions that, in fact, he did have a way to control his conditions in an emergent situation if they were to occur again?

A    Are you going to have a doctor in the courtroom with him?

Q    Well, I mean, isn't the purpose of those medications to bring down his blood pressure if it spikes, and to calm his anxiety in the short term?

A    Yes, ma'am.

Q    And is it true also that, you know, in terms of an acute stress reaction, which is what you felt like he had that day, there's no way for you to know in advance whether he's going to experience another acute reaction -- stress reaction?

A    That is correct.  That's why I wanted to get the Fluoxetine on board and make sure he was feeling a lot better and being a lot more stable before we went back to a courtroom in a stressful situation.  That was my medical opinion.

Q    Understood.  But you would agree with me, though, you

Miller - Direct

1  know, you can't put a time frame on when you can say with

2  certainty that even with the regimen that you put him on that

3  he would not experience another acute stress episode?

4  A    I would agree with that.

5  Q    But you would also agree that with the medication that you

6  gave him for the short-term control, that if he did have one,

7  that you would expect that those symptoms would subside within

8  30 minutes or so?

9  A    I would hope that they would.  I wouldn't say that I would

10 expect they would.  I would hope that they would.  That was the

11 intended -- that's the intended action to happen, but again,

12 everything -- everything is different.  I mean, everything is

13 not like, okay, you do this and this happens; you do this and

14 this happens.  Everybody is different and everybody reacts

15 differently.  So we couldn't predict that.  I will tell you

16 that -- I would say that if he had time to get on the

17 Fluoxetine and adjust it and get it to what I think is an

18 appropriate level, it would be much less likely to have a

19 serious event when put in a stressful situation such as going

20 to court.

21 Q    And in terms of the stressful situation because of going

22 to court, your understanding of that comes exclusively from

23 Mr. Jenkins; is that right?

24 A    Common sense and Mr. Jenkins, yes.

25 Q    As in Mr. Jenkins --

Miller - Direct

1 A    Thirty-some years of medical practice and seeing people

2 that have been put in stressful situations and have acute

3 reactions.  Everybody that goes into a courtroom is not going

4 to have the same reaction.

5 Q    Yes.

6 A    Everybody is different.

7 Q    Right.  But my point is that the -- you only know about

8 the existence of the trial as a potential stressor in

9 Mr. Jenkins's life because he told you that?

10 A    Yeah.  I mean, it's common knowledge.

11 Q    Let me ask you this --

12 A    We live in a small community, and his case is common

13 knowledge throughout the community.

14 Q    Let me ask you this:  Let's say hypothetically some other

15 individual came to see you presenting the exact same symptoms

16 as Mr. Jenkins, and reported that, let's say, he was undergoing

17 a divorce proceeding.  That was the source of his stress.

18     How would you have addressed that?  Would you have made

19 the same recommendations to that individual as you did for

20 Mr. Jenkins?

21 A    Meaning not go through the divorce proceedings?

22 Q    Yeah.  How would you manage that if they're going to go

23 through the divorce anyway?

24 A    I would try to treat the patient and get them stable and

25 get them feeling better just the same way I did Mr. Jenkins.

44

Miller - Direct

1   Q    But you wouldn't be concerned, would you, that the divorce

2   would somehow trigger like an emergency situation such that,

3   you know, your regimen that you prescribed now wouldn't be able

4   to handle it?

5   A    Can you rephrase that?  I didn't understand what you were

6   asking.

7   Q    I'll withdraw the question.

8        But you would treat them the same way, basically, as the

9   regimen that you have Mr. Jenkins on; is that right?

10  A    Probably, yes.  I mean, it depends on the patient and the

11  situation, but most -- this -- yeah, I would agree with that in

12  general.

13  Q    All right.  Let's talk about did you give Mr. Jenkins any

14  discharge instructions or post-visit instructions regarding

15  whether or not he should go back to the ER?

16  A    No, I did not.

17  Q    So you didn't tell him, you know, if his blood pressure

18  goes above 170, he should immediately go back to the ER.

19  A    No, I did not.  I told him if his blood pressure is above

20  170 he should take a Clonidine, as well as a Lorazepam, and see

21  if his blood pressure came down.  If his blood pressure was

22  dangerously high, such as over 200, I would expect him to go

23  back to the emergency room if he had taken those steps that we

24  had discussed in order to get his blood pressure down and his

25  panic and anxiety situation under control.

Miller - Direct

1  Q    And when you discharged him, he was in good condition?

2  A    Yes, ma'am.

3  Q    At some point during the visit did you have a conversation

4  with Mr. Jenkins's attorney?

5  A    I spoke with Mr. Jenkins's attorney before he left the

6  office in that most recent November -- you have the date

7  there -- November 12th visit.

8  Q    And do you recall generally what you told his attorney

9  about Mr. Jenkins's condition?

10 A    I told him he was -- I don't remember my exact words, but

11 I'm sure I told him the exact same thing that I told

12 Mr. Jenkins.  He's having a panic and anxiety stress reaction,

13 and that we needed to get it under control before he went back

14 to court.

15 Q    Do you recall whether you told his attorney that

16 Mr. Jenkins was at fairly acute risk of heart attack and stroke

17 in that conversation?

18 A    I did not say that.  I don't think I discussed that with

19 his attorney.

20 Q    Now I want to turn your attention to the following day, so

21 November 13th, 2024.  After that visit on November 12th, did

22 you ever get a call from Mr. Jenkins or speak to Mr. Jenkins

23 again about his medical condition?

24 A    No, I did not.

25 Q    As far as you're aware, did anybody at your office ever

Miller - Direct

1  have a conversation or dispense any instructions to Mr. Jenkins

2  after November 12th?

3  A    Not to my knowledge.

4  Q    And are the people who work for you, like a nurse or

5  staff, would they know to relay any message from a patient to

6  you before they give any instructions that's medical?

7  A    Absolutely.

8  Q    Why do you say absolutely?  Do you have a rule about that

9  in your office?

10 A    No, but it's an unwritten rule.  I mean, I don't have to

11 have a rule about that.  That's just what they do.  They

12 don't -- they don't give out medical information.  They always

13 ask -- medical advice.  They always ask me.

14 Q    Now, if Mr. Jenkins had called your office a day later

15 after his visit on November 12th seeking advice on high blood

16 pressure, would somebody at your office have relayed that

17 message to you?

18 A    I would certainly hope so.  I don't have any reason to

19 believe that they wouldn't have.

20 Q    And as a general practice, if there is an injury from a

21 patient like that, would there be a record at your office that

22 they made that call or some advice was given?

23 A    Yes, they would put it in the medical record.

24 Q    Was there a record of Mr. Jenkins reaching out on November

25 13th or any time after November 12th to your office seeking

Miller - Direct

1  medical advice?

2  A    Well, since you asked, I don't think there is, but let me

3  go ahead and look at the medical record.  It will take me a

4  moment to get this back up.  So hopefully bear with me.

5        THE COURT:  I think the record speaks for itself.

6  I'm not aware of anything that's in the record that shows that.

7  You can represent that if that's indeed the case, Ms. Peng.

8        MS. PENG:  That's the case based on the records I

9  received, but I'm not sure if the doctor has some other record.

10        THE WITNESS:  I want to make sure there was no phone

11  call listed in the medical record.  So just let me -- I want to

12  be completely accurate.

13        (Pause.)

14        No, there was no message from November for

15  Mr. Jenkins in the medical record.

16   BY MS. PENG:

17  Q    And since you had spoken to his attorney the day prior,

18  were you kind of on alert for anything that would have further

19  happened with Mr. Jenkins?

20  A    No.  I didn't -- I wasn't -- I was focused on patients.

21  I'm not sure what the question is, but -- what the purpose of

22  the question is, but, I mean, I'm focused on the patients in

23  front of me.  I'm not -- I was not set up for -- I was not

24  setting up any follow-up by phone with Mr. Jenkins or anything.

25  He was given an appointment, I believe, to be seen on November

Miller - Direct

1  26.

2  Q    Okay.  So then to be clear on November 13th, you never

3  advised Mr. Jenkins to go to the ER and wait in the parking

4  lot, did you?

5  A    No, ma'am, I did not.

6  Q    So just a couple more questions.  I appreciate your time.

7       Now I'm going to direct your attention to November 14th,

8  2024.  At some point did you get records indicating that

9  Mr. Jenkins went to the ER at UVA on November 14th?

10 A    Yes.

11 Q    Did Mr. Jenkins notify you of that or did you just receive

12 the records?

13 A    No.  I think we got notification.  I'm not sure.  I think

14 I heard it from my receptionist, and I'm not sure how she

15 heard, but my receptionist I think told me that he had gone

16 back to the ER.  I don't have a clear memory of what exactly

17 happened there.

18 Q    But my question is just that you never spoke to

19 Mr. Jenkins directly about his visit to the ER after that, did

20 you?

21 A    No, ma'am, I did not.

22 Q    Did he ever contact you or the office about adjusting the

23 medications you had prescribed for him?

24 A    No.

25 Q    And have you had a chance to review those records?

Miller - Direct

1   A    I'm looking at them right now.  It's not real complete,

2   but yeah.

3   Q    Yeah, they're not -- I don't think you have the complete

4   records.

5        But in any case, let me ask you this:  Would it surprise

6   you if the ER doctor from that day concluded that the patient

7   was not having an emergency medical condition at this time?

8   A    Well, I think what the doctor was saying was that the

9   patient was not -- did not require hospitalization or further

10  care.

11  Q    But my question was:  Did it surprise you that that was

12  the conclusion?

13  A    Can you show me where that was his impression?  His

14  impression when he was discharged was he was not having an

15  emergency medical situation.  He was stabilized.  The patient I

16  think was given -- according to what I see in the medical

17  record, was given three doses of IV Lopressor.  You don't give

18  someone three doses of IV Lopressor when they aren't having

19  some sort of serious medical condition.

20       We also don't perform a CTA of the brain if you don't

21  think there might be something serious --

22  Q    Well, my question -- we're going to hear from that doctor.

23  We're going to hear from that doctor.  But my question was:

24  Assuming the conclusion that he was not having a medical

25  condition, would that have surprised you, given you having just

Miller - Direct

1    seen him two days prior?

2    A    I don't understand your question.

3    Q    Okay.  That's fine.

4        So last question:  So I know you don't have the complete

5    records there, so, you know, you don't have to look at them.

6    But if there was a notation in the ER records that suggested

7    that Mr. Jenkins might have been malingering regarding some of

8    his conditions, would that have changed your assessment of his

9    medical condition?

10   A    I would have thought about it, but no, ultimately it

11   wouldn't have changed my opinion.  Unless there was some

12   evidence to suggest that his speculation or his questioning or

13   wondering -- I think he said "I'm wondering" -- unless there

14   was some evidence that laid proof to that, no, there's nothing

15   that I've seen that would make me believe that the patient was

16   intentionally harming himself.

17   Q    So I think -- let me just ask my question again.  If there

18   was a notation in the medical records of a different doctor who

19   saw Mr. Jenkins in the ER that suggested malingering, that

20   would not -- yes-or-no question -- change your opinion or your

21   assessment of his condition; is that right?

22   A    Again, that's a difficult question to answer yes or no.

23   Q    I think it's a yes-or-no question.

24            THE COURT:  Let him answer the question, please.

25            Go ahead, please, Dr. Miller.

Miller - Cross

1              THE WITNESS:  If there was something in the medical

2    record that indicated that he could -- something objective

3    indicated that he could be malingering, then yes, it would

4    change my opinion.  But if it's just speculation, no, it would

5    not.

6              MS. PENG:  Thank you.

7              THE COURT:  Thank you very much.

8              All right.  Any cross?

9                        CROSS-EXAMINATION

10   BY MR. ANDONIAN:

11   Q    Good morning, Dr. Miller.  How are you?

12   A    I'm doing all right.

13   Q    Yeah, I know.  Fun times, right?

14   A    Yeah.

15   Q    I just have, I think, two questions.  You might have

16   answered these, but I just want to make sure the record is

17   clear about this.  If somebody had a blood pressure reading

18   between 200 and 210 over -- anything over 100, you would expect

19   them to get some sort of medical attention right away, right?

20   A    Yes, sir, I would.

21   Q    Okay.  And that could include going to the emergency room

22   at a hospital?

23   A    Yes.

24   Q    Okay.  And then the other thing I wanted to ask you about,

25   the attorney for the government had a lot of questions about

Miller - Cross

1   some of the medications that you prescribed Mr. Jenkins.  I

2   want to focus on the Fluoxetine, which you were trying to talk

3   about a couple of times.

4        Fluoxetine I think you described was primarily to manage

5   anxiety; is that right?

6   A    It's in a class of medicine called selective serotonin

7   reuptake inhibitors.  It has multiple uses -- anxiety,

8   depression, and in his case anxiety and I suspected that he

9   might be having some depression as well with everything that

10  was going on in his life.

11  Q    Okay.  But one of the benefits of Fluoxetine -- among I'm

12  sure many -- is that if there is a decrease in anxiety or

13  depression, that there could be a corresponding decrease in

14  blood pressure; is that right?

15  A    That is correct.

16  Q    Okay.  And Fluoxetine, unlike some of the other

17  medications you were discussing with government's counsel, it

18  takes -- it's not an immediately effective medication; is that

19  fair to say?

20  A    That is correct.

21  Q    Okay.  And in fact, I think you said anywhere from two to

22  six weeks would be the time that you would expect levels to

23  build to a sufficient degree that you would see the benefit of

24  it; is that right?

25  A    Yes, that is correct.

Miller - Cross

1  Q    Sorry.  I lied.  One more question.  You do have a nurse

2  in your office; is that correct?

3  A    We have a medical assistant and -- we have a medical

4  assistant in my office.  My wife is also in the office.  She's

5  a registered nurse and also a certified family nurse

6  practitioner.

7  Q    Okay.  And those two individuals do field phone calls from

8  patients; is that right?

9  A    I'm sorry, the connection was bad.  What did you say?

10  Q    Oh, I'm sorry.  Your wife and the medical assistant, they

11  do at times take phone calls from patients; is that correct?

12  A    The medical assistant and the receptionist do.  They're

13  all trained to take phone calls from patients and relay those

14  to me in an appropriate manner.

15  Q    Very well.  Okay.  Sorry, Doctor.  I may have --

16        (Pause.)

17  A    Are you still there?

18  Q    I am.  I'm sorry.  I'm looking at a note from my

19  colleague.  Give me one second.

20  A    All right.  I heard silence and I didn't know what was

21  going on.

22  Q    Your receptionist's name is Michelle; is that correct?

23  A    Michelle is our receptionist.  That is correct.

24  Q    Okay.  And I don't know if you can remember this, but on

25  November the 13th -- so the day after you saw Mr. Jenkins --

Miller - Examination by the Court

1  you were out of the office at that time; is that right?

2  A    What day of the week was that?

3  Q    Wednesday.  I think the 13th was a Wednesday.

4         THE COURT:  It was a Wednesday.

5  Q    It's my son's birthday, so I should probably know that.

6  A    Yeah, I was out of the office because our cattle sale was

7  on Saturday and I was out in preparation for that.

8         MR. ANDONIAN:  Thank you.  I don't have anything

9  further.  Thanks, Dr. Miller.

10         THE COURT:  Dr. Miller, I've got a couple of

11  questions and then there may be some follow-up by the

12  government.  First of all, thank you very much for being on

13  today and sharing your thoughts with us.

14         So I guess for someone such as Mr. Jenkins, when you

15  saw him on the 12th, your short-term goals for him are to get

16  his blood pressure under control and to try to get his anxiety

17  under control; is that fair to say?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  And to place him on appropriate

20  medications that would then monitor that blood pressure going

21  forward -- not monitor, but control his blood pressure going

22  forward, correct?

23         THE WITNESS:  Yes.

24         THE COURT:  And to control any level of anxiety that

25  he may have as a result of reactions to stress and other life

Miller - Examination by the Court

1   events; fair to say as well?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  And I take it that you let all your

4   patients know, including Mr. Jenkins, that if they're having

5   any ongoing problems, to return to you if appropriate or to the

6   ER if appropriate, right?

7           THE WITNESS:  Correct.

8           THE COURT:  And he hasn't reached back out to you,

9   correct?

10          THE WITNESS:  I'm sorry, again, we have a bad

11  connection and I didn't understand that last statement.

12          THE COURT:  I'm so sorry.  But he has not otherwise

13  reached back out to you since the 12th that your records show?

14          THE WITNESS:  Not that I -- no, he has not.

15          THE COURT:  But you're going to see him next Tuesday

16  to see where he is at that point in time?

17          THE WITNESS:  Yeah.  My thought process is to give

18  the medication some time to work to see how he's doing and

19  reevaluate.

20          THE COURT:  And what's important, to make sure I

21  understand it, with respect to these medications, is not just

22  that they're prescribed, but that they're taken, correct?

23          THE WITNESS:  That's always important.

24          THE COURT:  Kind of an obvious question, right?

25          But what's also important is that they're taking --

Miller - Examination by the Court

1  they're taken as prescribed on the schedule as prescribed,

2  correct?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  And would you expect that if -- because

5  Fluoxetine is a long-acting antianxiety medication, correct?

6          THE WITNESS:  Yes.

7          THE COURT:  And if you take that as prescribed, that

8  that's going to be able to control -- your expectation is it

9  would control any anxiety as a result of life's stresses?

10          THE WITNESS:  Yes.

11          THE COURT:  All right.  Had it been -- in looking at

12  your records, it appeared as though Mr. Jenkins was not always

13  compliant with your directions with respect to taking his

14  medications as prescribed or otherwise following your medical

15  advice, correct?

16          THE WITNESS:  Yes.

17          THE COURT:  All right.

18          THE WITNESS:  That's not unusual.  Unfortunately,

19  that's not unusual.

20          THE COURT:  That's the way chronic conditions persist

21  frequently, correct?

22          THE WITNESS:  Uh-huh.

23          THE COURT:  So our goal is to be able to get this

24  trial taken care of.  How do we assure -- how do we make sure

25  that someone such as Mr. Jenkins takes his medications as

Miller - Redirect

1  prescribed so they can have the intended effect and he can go

2  through what is -- we all know is a stressful situation, and

3  that is being in court for a couple of weeks?

4           THE WITNESS:  Was that a question for me?

5           THE COURT:  Yeah.

6           THE WITNESS:  I don't have an answer for that.

7  Typically --

8           THE COURT:  That's your eternal conundrum; is it not?

9           THE WITNESS:  I'm sorry?

10          THE COURT:  That's your eternal conundrum with every

11 patient, is it not?

12          THE WITNESS:  Yeah, there are family members that can

13 ensure patients take it.  We always try to encourage the

14 patient to have support so they're doing what they need to do,

15 but that's a conundrum all the time.

16          THE COURT:  All right.  Thank you.  I think the

17 government may or may not have some follow-up questions.

18          Ms. Peng?

19          MS. PENG:  Just one question.

20          THE COURT:  Yes, ma'am.

21                      REDIRECT EXAMINATION

22  BY MS. PENG:

23 Q    So if you were out of the office on December 13th and

24 Mr. Jenkins had called your office, would you have expected to

25 get that --

Goodrich - Direct

1  A    Do you mean November?

2  Q    Oh, I'm sorry, November 13.  I apologize.

3       Would you have expected to have received that message?

4  A    Yes.  It should have been in -- we have a place for

5  messages and phone calls, and Michelle is very good at putting

6  those messages in.

7            MS. PENG:  Thank you.  No further questions.

8            THE COURT:  Thank you very much.  Dr. Miller, thank

9  you very much.  You're free to go.  I appreciate you being on

10 today.

11           THE WITNESS:  Thank you very much.

12           THE COURT:  Ms. Choy, is Dr. Goodrich next?

13           MS. CHOY:  Yes.  The government calls Dr. Will

14 Goodrich.

15           THE COURT:  Dr. Goodrich, if we can get you sworn

16 here.  Raise your right hand.

17    WILL GOODRICH, M.D., CALLED BY THE GOVERNMENT, SWORN

18           THE COURT:  Please have a seat and answer Ms. Choy's

19 questions.  You may have to slide up to the microphone so it

20 catches your voice.

21                     DIRECT EXAMINATION

22  BY MS. CHOY:

23 Q    Good afternoon, Dr. Goodrich.

24 A    Good afternoon.

25      Thank you, Your Honor.

Goodrich - Direct

1    Q    Could you please state your name for the record?

2    A    Will Goodrich.

3    Q    How are you employed, sir?

4    A    I'm employed as an emergency medicine physician.

5    Q    At which hospital?

6    A    UVA Culpeper.

7    Q    How long have you held that position?

8    A    Since May 2023.

9    Q    And how long have you been practicing emergency medicine?

10   A    Since July of 2017.

11   Q    Are you board certified?

12   A    I am board certified in emergency medicine.

13   Q    Were you on duty at UVA Culpeper in the early hours of

14   Thursday, November 14th?

15   A    I was.

16   Q    Did you treat a patient named Scott Jenkins?

17   A    I did.

18   Q    What were Mr. Jenkins's chief complaints?

19   A    Dizziness and elevated blood pressure.

20   Q    Did anyone accompany Mr. Jenkins to the emergency

21   department?

22   A    Yes.

23   Q    Who accompanied him?

24   A    It was his wife and his brother.

25   Q    Did Mr. Jenkins also report a syncopal episode?

Goodrich - Direct

1   A    He reported that he might have passed out at home, but he

2   wasn't sure.

3   Q    Did either of those witnesses, Mr. Jenkins's wife or

4   brother, confirm whether he had a syncopal episode?

5   A    No, they did not.

6   Q    And did either of those witnesses confirm whether or not

7   he hit his head?

8   A    On the day that I saw him?

9   Q    Correct.

10  A    There was no report that he hit his head on the day that I

11  saw him.

12  Q    Had he reported that he had a suspected concussion?

13  A    He reported that he thought he had a concussion from

14  earlier in the week.

15  Q    And did you ask either of those witnesses who were present

16  whether they had observed him hit his head at that time?

17  A    From the events that led up to him seeing me, or from the

18  events earlier in the week?

19  Q    The events that led up to the suspected concussion that he

20  reported.

21  A    I don't recall if I asked them if they witnessed that

22  episode or not.

23  Q    Thank you.

24       Did you inquire about Mr. Jenkins's medical history?

25  A    I did.

Goodrich - Direct

1   Q    Did he report a history of hypertension?

2   A    He stated it was a new diagnosis for him.

3   Q    Did he indicate that he had had incidents of high blood

4   pressure in the past?

5   A    As I just stated, he said this was a newer problem that he

6   was dealing with.

7   Q    So in other words, he denied having high blood pressure in

8   the past?

9   A    Yes.

10  Q    And did he indicate whether he had ever been prescribed

11  medication for hypertension in the past?

12  A    He was prescribed medication prior to seeing me.  How

13  long, I don't exactly know.

14  Q    Let me put that in a better way.  He reported to you that

15  he had gone to the emergency room several days prior; is that

16  correct?

17  A    That's true.

18  Q    And did he report to you that he had ever been prescribed

19  medication for high blood pressure before that emergency room

20  visit several days before he saw you?

21  A    I don't recall how long before he had seen me that it was

22  prescribed.

23  Q    But he had said he did not have a long history of

24  hypertension; fair to say?

25  A    Yes.

Goodrich - Direct

1    Q    If he did have a history of hypertension of episodes of

2    high blood pressure of being prescribed high blood pressure

3    medications in the past, would that have been important

4    information for you to know?

5    A    Yes.

6    Q    Why is that?

7    A    It would help me to know if this was a new problem that he

8    was dealing with or if this was a long-standing issue that he's

9    just having I guess an episode with that's causing him trouble.

10   Q    Would that have affected the treatment you gave him in any

11   way?

12   A    I don't think it really would have.

13   Q    Did you create notes of your interactions with

14   Mr. Jenkins?

15   A    I did.

16         MS. CHOY:  Ms. Fastenau, could you please show

17   Dr. Goodrich Government's Exhibit 4?

18   Q    It will pop up on the screen right by you.  Are you able

19   to see that, Dr. Goodrich?

20   A    Yes.

21   Q    Do you recognize this document?

22   A    Yes.

23   Q    Are these the notes that you made of the visit you had

24   with Mr. Jenkins?

25   A    These are my notes.

Goodrich - Direct

1        MS. CHOY:  The government moves Government's Exhibit

2  4 into evidence.

3        MR. ANDONIAN:  No objection.

4        THE COURT:  All right.  So admitted.

5        (Government Exhibit 4 marked and admitted.)

6  BY MS. CHOY:

7  Q    So directing you to page 4, Dr. Goodrich, did you perform

8  a physical exam of Mr. Jenkins?

9  A    I did.

10 Q    And in your notes you indicated that Mr. Jenkins was not

11 in acute distress; is that correct?

12 A    Yes.

13 Q    And you indicated that his appearance was normal; is that

14 correct?

15 A    Yes.

16 Q    Was he alert and oriented?

17 A    He was.

18 Q    What was his demeanor?

19 A    I think I noted it further down.  It was -- I think I

20 noted anxious and somber, if I recall.  I'd have to look at the

21 record.

22        MS. CHOY:  Ms. Fastenau, would you pull up the next

23 page?

24        THE COURT:  It's at the bottom of this page.

25        MS. CHOY:  Page 4 -- sorry, page 5.

Goodrich - Direct

1    BY MS. CHOY:

2  Q    So is it correct you noted his demeanor was anxious and

3  somber?

4  A    Yes, I would say he was anxious and somber, yes.

5  Q    And Mr. Jenkins had self-reported that several days prior

6  he had a suspected concussion; is that correct?

7  A    Yes.

8  Q    Did you observe during your physical exam any symptoms of

9  concussion?

10  A    I did not observe any symptoms of concussion on my exam.

11  Q    When Mr. Jenkins presented at the emergency department,

12  did he have elevated blood pressure levels?

13  A    He did.

14         MS. CHOY:  Ms. Fastenau, could you please flip back

15  to page 4.

16  Q    So it looks like his systolic blood pressure readings were

17  in the range of 180, give or take; is that correct?

18  A    Yes.

19  Q    Do you treat patients with similar blood pressure levels

20  on a regular basis?

21  A    Yes.

22  Q    Can blood pressure in that range typically be treated on

23  an outpatient basis?

24  A    Can be.

25  Q    Is it a routine practice for you to discharge patients who

Goodrich - Direct

1  have blood pressure in that range?

2  A    Yes.

3  Q    Does that level of blood pressure ordinarily warrant

4  advanced imaging?

5  A    It depends.

6  Q    What does it depend on?

7  A    Other symptoms, if any present.

8  Q    Did you order advanced imaging in this case?

9  A    I did.

10  Q    Why?

11  A    With the report of elevated blood pressure -- mostly I

12  ordered advanced imaging because of dizziness.

13  Q    And that was self-reported, correct?

14  A    Yes.

15  Q    Did you -- did the self-report of a syncopal episode also

16  contribute to your decision to order advanced imaging?

17  A    It also played in, yes.

18  Q    So absent the self-report of dizziness and the self-report

19  of the syncopal episode, would you routinely have ordered

20  advanced imaging for a patient with Mr. Jenkins's other

21  symptoms?

22  A    If I can clarify, I think what you're asking is if I have

23  a patient that just has elevated blood pressure and they did

24  not have any other complaints, would I have ordered advanced

25  imaging?

66

Goodrich - Direct

1  Q    Correct.

2  A    Generally not.

3  Q    And so it's fair to say that these self-reported symptoms

4  that Mr. Jenkins had played a role in your decision to order

5  advanced imaging; is that right?

6  A    Yes.

7  Q    And did the imaging that you performed show any

8  abnormalities at all?

9  A    Not that I recall, but I would have to look at the report

10  again to see.

11        MS. CHOY:  Ms. Fastenau, could you please just slowly

12  scroll through the report.

13  Q    And will you let us know when it shows the point where it

14  shows the imaging results?  I'm not practiced at reading these

15  things.

16  A    Pause.

17        What's the question again, please?

18  Q    Did the advanced imaging show any abnormalities?

19  A    There's some potential abnormalities, but for the general

20  impression, there was no acute vessel occlusion in the neck.  I

21  think there's more to this report as well that's not in here.

22  Q    Just sitting here today, do you recall whether anything in

23  those imaging results gave you cause for concern?

24  A    No.  If there was, I think I would have explored those

25  further.

Goodrich - Direct

 1          MS. CHOY:  Now, Ms. Fastenau, could you please pull

 2   up page 6.

 3   Q    In your notes you use the term "malingering."  Could you

 4   explain what that means?

 5   A    So malingering is making up or exaggerating symptoms for

 6   secondary gain.

 7   Q    By virtue of your years practicing emergency medicine and

 8   the training that you have received, have you learned to

 9   recognize signs of malingering?

10   A    Yes.

11   Q    Do you encounter malingering on a routine basis?

12   A    I do.

13   Q    During your physical exam, you note that Mr. Jenkins

14   attempted to sit upright in bed; do you recall that?

15   A    Yes.

16   Q    Could you please describe for us what you observed?

17   A    I asked him to sit up to assess for stability of his

18   trunk.  And it was a slow -- he was in a reclined position and

19   it was kind of more of a slow reaching up, grabbing the

20   handrail and kind of pulling himself up until he was finally

21   sitting upright and kind of leaning on that rail.

22   Q    And at some point did you ask him to sit upright without

23   the assistance of the rail?

24   A    I did.

25   Q    And what happened at that point?

Goodrich - Direct

1  A    Pretty quickly he fell backwards back into the bed.

2  Q    In your notes you state, quote, "my initial impression

3  observing the attempt to sit upright in bed is that this is

4  related to malingering based from years of treating emergency

5  patients," end quote.

6      What gave you the impression, based on what you observed,

7  that this was an instance of malingering?

8  A    From my initial impression when I walked in the room that

9  he was generally not distressed, and then -- and he was able to

10  answer questions easily, go through history, participate in a

11  physical exam otherwise -- and this is one of the later things

12  I asked him to do -- that this now was a very difficult thing,

13  whereas everything else before that seemed to be very normal.

14  Q    So is it fair to say the amount of effort and distress

15  that seemed to be incurred was not proportionate to the other

16  things you had observed about Mr. Jenkins?

17  A    It seemed out of proportion.

18  Q    And based on your many years of emergency experience, your

19  impression was that he was malingering; is that fair?

20  A    There was -- there was potential -- I think the words I

21  used here is it was related to malingering.

22         MS. CHOY:  And Ms. Fastenau, could you please turn to

23  page 8.  There is a note here at the very bottom of the page at

24  3:34 a.m.  It begins at the bottom of the page, and then it

25  continues on to the next page, so if you would please continue.

Goodrich - Direct

1  Q    So it looks like at 3:34 a.m. you wrote, "I wonder if the

2  patient was artificially taking something to make his blood

3  pressure elevated, not compliant with his outpatient

4  medications, altering the blood pressure cuff in some way, or

5  if the cuff size is wrong, or most likely if he has so much

6  stress that he may need other medications like anxiolytics that

7  would calm the patient and allow the blood pressure to

8  normalize."

9      What caused you to wonder whether Mr. Jenkins was

10  artificially elevating his blood pressure?

11  A    Because we gave him three doses of IV beta blockers, which

12  I would have expected could have done a little more than it

13  did.

14  Q    And how could a patient artificially elevate his blood

15  pressure?

16  A    Not taking their medication, taking some kind of stimulant

17  or other medication, cough and cold medications, potentially

18  caffeine use -- but it's a varied response per individual --

19  illicit drugs.

20  Q    And you also mentioned that altering the blood pressure

21  cuff or if the cuff size is wrong, that could affect the blood

22  pressure reading.

23      Could you explain that further?

24  A    That came from some discussions with nursing staff as

25  well, who had also been helping to care for the patient.  She

Goodrich - Direct

1  was wondering whether body positioning or pressure on the cuff

2  or something like that was causing a falsely elevated pressure.

3  Q    So after this note about your concern for the accuracy of

4  the blood pressure readings, did the nursing staff take a new

5  reading?

6  A    They did.

7  Q    And there is a note at 3:52 a.m. related to that reading.

8  And it looks like taking a new reading resulted in improved

9  blood pressure of 168 over 98; is that correct?

10  A    Yes, I did note it as improved, but it's pretty similar to

11  the other ones.

12  Q    What did the nursing staff do differently to obtain that

13  slightly improved reading?

14  A    She put the blood pressure cuff on the other side of the

15  patient on the same side as the monitor, made sure he was in an

16  appropriate position that would give the most accurate reading,

17  and monitored the patient during the entire time that the blood

18  pressure was cycling until we got that value there.

19  Q    And so when the nurse was closely monitoring the taking of

20  the blood pressure, it resulted in a lower reading; is that

21  fair to say?

22  A    Can you say that again, please?

23  Q    So is it fair to say that when the nurse was closely

24  monitoring the taking of that blood pressure reading, that

25  resulted in a lower reading?

Goodrich - Direct

1    A    It was a slightly lower reading, yes.

2    Q    By the way, do at-home blood pressure devices sometimes

3    lead to incorrect readings?

4    A    Definitely.

5    Q    Now, in your prior note that we're looking at, you

6    mentioned that medications like anxiolytics would calm

7    Mr. Jenkins and allow his blood pressure to normalize.

8         What are anxiolytics?

9    A    Those would be medications -- if you look at the word,

10   they would lyse anxiousness.  So that would be to help lower

11   anxiety.

12   Q    Did you offer Mr. Jenkins any anxiolytics?

13   A    I discussed them with him, and I did offer them at some

14   point, yes.

15   Q    Did he accept them?

16   A    No.

17   Q    Now, you mentioned earlier when you were discussing the

18   definition of malingering that one factor you consider is the

19   presence of secondary gain.

20        Could you explain what you meant by that?

21   A    Just to clarify, there's another disorder called

22   factitious disorder, which is similar to malingering; but in

23   that, somebody fakes or exaggerates symptoms, but there is no

24   perceived external gain.  But with malingering, there is faked

25   or exaggerated symptoms and there is some kind of perceived

Goodrich - Direct

1  secondary gain to be obtained by faking or exaggerating those

2  symptoms.

3      Did that answer your question?

4  Q   Yes, it did.  Thank you.

5  A   Okay.

6      MS. CHOY:  Okay.  Now, Ms. Fastenau, could you please

7  turn to the note at 5:22 a.m.  Is there one that's higher up at

8  5:22 a.m.  There it is.  Thank you.

9  Q   So at 5:22 a.m. you wrote, quote, "at this time I have

10 deemed the patient does not have an emergency medical

11 condition," unquote.

12     Could you please explain what you meant by that?

13 A   What I mean is that the patient -- what I mean by that,

14 when you come to see me in the emergency department, one of

15 five things is going to happen.  Unfortunately, some people

16 die, they either get them into the hospital, maybe sent to the

17 operating room, transferred to another hospital with more

18 capabilities or different capabilities, or they get discharged

19 home.  Those first four, somebody generally has an emergency

20 medical condition leading to needing further care beyond the

21 scope of the emergency department.  I deemed that Mr. Jenkins

22 did not have anything that would require one of those other

23 four dispositions, and that he was safe to be discharged home.

24 Q   Did you relay that conclusion to Mr. Jenkins?

25 A   I did.

Goodrich - Direct

1  Q    And so generally speaking, are there medications that are

2  effective for controlling blood pressure?

3  A    I would say generally there are many medications effective

4  at controlling blood pressure.

5  Q    Are there medications, either oral or IV, that can reduce

6  blood pressure within a matter of minutes or hours?

7  A    Yes.

8  Q    Do blood pressure medications interfere with a patient's

9  alertness or memory in any way?

10  A    There's a lot of those medications.

11  Q    Well, let me ask it more specifically.

12  A    Sure.

13  Q    The patient was prescribed Lisinopril, correct?

14  A    Yes.

15  Q    Does Lisinopril interfere with the patient's alertness or

16  memory in any way?

17  A    I would not perceive that it would.

18  Q    And he was prescribed -- what was the one that starts with

19  a C?

20  A    It's Clonidine.

21  Q    Thank you.  Does Clonidine interfere with a patient's

22  alertness or memory in any way?

23  A    Generally, no.  But it could have some sedating effects, I

24  guess, slight sedating effects.

25  Q    Would those effects be mild?

Goodrich - Direct

1  A    I think they would be mild, or else we would not give them

2  for blood pressure.

3  Q    Do they interfere with a patient's ability to go about

4  their ordinary daily duties, routines?

5  A    Not that I'm aware of.

6  Q    For outpatient medications to effectively control blood

7  pressure, is it important for the patient to be compliant with

8  the prescribed medication regime?

9  A    Yes.

10 Q    All right.  Going back to the visit that you had, what did

11 you determine was the likely cause of Mr. Jenkins's elevated

12 blood pressure levels?

13 A    It seemed a lot of it had to do with his current legal

14 issues and the stress and anxiety surrounding that.

15 Q    So you observed him to be under a lot of stress and

16 anxiety; is that fair?

17 A    Yes.

18 Q    Are stress and anxiety a risk factor for self-harm?

19 A    Yes.

20 Q    Now, you mentioned earlier that you determined that

21 Mr. Jenkins did not have an emergency medical condition and

22 didn't require any further treatment in the emergency

23 department; is that correct?

24 A    Yes.

25 Q    And you relayed that information to Mr. Jenkins; is that

Goodrich - Direct

1  correct?

2  A    Yes.

3  Q    Were Mr. Jenkins's wife and brother in the room for those

4  discussions?

5  A    I think his wife was in the room the entire time.  So she

6  was there for most of the discussions, if not all.  She might

7  have arrived shortly after.  I can't recall from my initial

8  evaluation.  The same with his brother.  I don't know that his

9  brother was in the room during every discussion I had with him.

10 I think later in the visit, he was not.

11         MS. CHOY:  So could we flip down to page 11, please,

12 Ms. Fastenau.

13 Q    So in the middle of the page, this is a note about your

14 interaction with Mr. Jenkins's brother; is that correct?

15        Do you need to see more than --

16 A    Sorry, you said this is a discussion with Mr. Jenkins's

17 brother?

18 Q    Correct.

19 A    Yes.

20 Q    And in the middle of that first paragraph it says he had

21 been present in the room for all previous discussions.

22        Do you see that?

23 A    Okay.  Yes.

24 Q    Does that refresh your recollection about whether

25 Mr. Jenkins's brother was in the room for the discussions about

Goodrich - Direct

1  whether there was an emergency medical condition or not?

2  A    I'd have to read back through all my notes to see.

3  Q    Fair enough, but he was in the room for at least some of

4  those discussions?

5  A    He was in the room for many of them.

6  Q    Did you have further interactions with Mr. Jenkins's

7  brother?

8  A    Yes.

9  Q    Could you please describe that interaction?

10 A    When I performed my duties as an emergency medicine

11 physician going around to different rooms, he was out in the

12 hallway and approached me and asked to speak with me.  And I

13 said I would speak to him, but he would have to wait because I

14 had other patients that I needed to see.

15 Q    And was that after you had informed both Mr. Jenkins and

16 his brother that Mr. Jenkins was going to be discharged, that

17 he didn't have an emergency medical condition?

18 A    I think -- I would have to read through these notes to

19 see.

20 Q    Sure.

21 A    Some of this is best timeline, but maybe not completely in

22 order.

23         MS. CHOY:  So Ms. Fastenau, could you flip up one

24 page.

25

Goodrich - Direct

1  Q    So just based on your notes, do you see the note at 5:22

2  that says, "I have deemed the patient does not have an

3  emergency medical condition"?

4  A    I'll take a moment to read this whole page, if that's

5  okay.

6  Q    Take your time.

7  A    (Witness reviewing document.)

8       Okay.  Can you ask the question again, please?

9  Q    Okay.  So it looks to me at 5:22 a.m. your note indicates

10 you had deemed the patient did not have an emergency medical

11 condition; is that fair?

12 A    Yes.

13 Q    And does that mean that the patient would be discharged

14 from the ER?

15 A    Yes.  At that time I had made a decision on disposition.

16 Q    And then subsequently there is a note at 5:41 a.m.,

17 correct?

18 A    Yes.

19 Q    And that's the note that memorializes your discussion with

20 the patient's brother; is that correct?

21 A    Yes.

22 Q    So after you had decided that the patient was going to be

23 discharged, that's when the brother approached you; is that

24 correct?

25 A    Yes.

Goodrich - Direct

1  Q    And did the brother make requests of you?

2  A    He did.

3  Q    What did he request?

4  A    If I recall, he requested that I contact the patient's

5  primary care physician to see if there was any other further

6  testing or evaluations that would need to be done in the

7  emergency department.  I believe he also asked me if the

8  patient needed to be admitted and monitored in the hospital.

9  Q    Did he ask you multiple times whether he needed to be

10  admitted?

11  A    There were multiple requests or asks, yes.

12  Q    Did he make any asks for additional testing or imaging?

13  A    When you ask that question, are you asking did he ask me

14  anything specific or just --

15  Q    Was he asking for additional medical attention, let's say?

16  A    My impression was he was asking for additional medical

17  attention or monitoring or evaluation.

18  Q    And did he ask for the patient to be admitted into the

19  hospital?

20  A    Yes, he did.

21  Q    And those were repeated requests?

22  A    Yes.

23  Q    How did you respond to those requests?

24  A    I responded that I didn't believe the patient had an

25  emergency medical condition that would require admission to the

Goodrich - Direct

1   hospital, that I believed he could be discharged home and take

2   his medications outpatient and follow up with his primary care

3   physician.

4   Q    Was this interaction with Mr. Jenkins's brother unusual in

5   your experience?

6   A    Yes.

7        Sorry.  There's a lot of unusual things that happen in the

8   emergency department or outside the emergency department that

9   leads to people coming in.

10  Q    Do patients - when patients go to the hospital, do they

11  typically want to get out of there as soon as possible, in your

12  experience?

13  A    Most patients don't want to be in the hospital.

14  Q    And did your interaction with Mr. Jenkins's brother -- was

15  that a factor that you would consider relevant when deciding

16  whether this was -- the patient was someone who was

17  malingering?

18  A    Definitely.

19  Q    Okay.  So from your notes it appears that Mr. Jenkins was

20  discharged around 5:42 a.m.  And on page 12 you write, "The

21  patient does not have an emergency medical condition at this

22  time.  He does not require admission to the hospital."  And I

23  think you've already testified about why Mr. Jenkins did not

24  require admission to the hospital.

25       In your experience, is it typical to discharge a patient

Goodrich - Direct

1  who presents with blood pressure levels similar to those that

2  Mr. Jenkins had that night?

3  A    In my practice, yes.

4  Q    Do patients typically require inpatient treatment?

5  A    Can you further --

6  Q    Do patients with those levels of blood pressure typically

7  require inpatient treatment?

8  A    Just for the blood pressure?

9  Q    Correct.

10 A    I would say no.

11 Q    At the time of discharge, was Mr. Jenkins in any distress?

12 A    No.

13 Q    Was he alert and oriented?

14 A    Yes.

15 Q    In your opinion, was he at an acute risk of heart attack

16 or stroke?

17 A    You're asking -- let me clarify this -- at the time of

18 discharge was he at an acute risk of heart attack or stroke?

19 Q    Correct.

20 A    I would say no, because I determined he did not have an

21 emergency medical condition.

22 Q    At any time did you tell Mr. Jenkins that he was at an

23 acute risk of heart attack or stroke?

24 A    There may have been some discussions that he does have

25 risk factors, you know, for a stroke or heart attack.  And

Goodrich - Direct

1  that's mainly due to his elevated blood pressure, he had

2  symptoms of dizziness, and some other medical factors

3  concerning his body mass index and other co-morbidities like

4  diabetes.

5  Q    So there were some factors related to his chronic

6  conditions that put him at elevated risk of heart attack or

7  stroke; is that fair?

8  A    He has conditions that put him at a continued risk of

9  heart attack or stroke.

10 Q    And was there anything about his condition at the time you

11 discharged him that put him at an acute risk of heart attack or

12 stroke?

13 A    I did not believe there was anything at the time of

14 discharge that put him at an acute risk, other than his

15 underlying risk.

16 Q    If he had been at an acute risk of heart attack or stroke,

17 would you have discharged him?

18 A    It depends.

19 Q    What does it depend on?

20 A    I think it depends on other factors, what else is going on

21 with the patient.  But if we admitted everybody to the hospital

22 that was at an acute risk of a heart attack or stroke, our

23 hospitals would constantly be full and we wouldn't be able to

24 care for patients.

25 Q    Based on your evaluation, was there anything about

Goodrich - Cross

1  Mr. Jenkins's condition at the time of discharge that would

2  prevent him from going about his daily routine?

3  A    No.

4  Q    Was there anything that would prevent Mr. Jenkins from

5  participating in court proceedings?

6  A    Not that I perceived.

7  Q    Did you advise Mr. Jenkins not to participate in his court

8  proceedings?

9  A    I did not.

10         MS. CHOY:  Court's indulgence for a moment.

11         (Pause.)

12         Nothing further from the government.

13         THE COURT:  Thank you, Ms. Choy.

14         Mr. Andonian?

15                  CROSS-EXAMINATION

16  BY MR. ANDONIAN:

17  Q    Good morning, Doctor.

18  A    Good morning.

19  Q    Dr. Goodrich, you know Mr. Jenkins's brother who was

20  speaking to you that day, right?

21  A    When you say "know," what do you mean by know?

22  Q    He's been a patient of yours in the past?

23  A    He was a patient, as documented in this medical record.

24  Q    Right.  So that wasn't the first time you and Mr. -- this

25  Mr. Jenkins's brother had had a conversation, right?

Goodrich - Cross

1  A    That was not the first time we had had a conversation, no.

2  Q    In all of your years as an emergency room doctor, you've

3  interacted with a lot of family members, right?

4  A    Yes.

5  Q    And you've interacted with concerned family members?

6  A    Yes.

7  Q    And you've interacted with concerned family members who

8  have voiced an opinion about what they would like for their

9  loved one who is being treated, correct?

10  A    Yes.

11  Q    Mr. Jenkins -- Scott Jenkins -- you prescribed him -- you

12  referred to them as beta blockers when he first checked into

13  the ER, correct?

14  A    I did order beta blockers to be administered in the

15  emergency department.

16  Q    And that specifically was intravenous Lopressor; is that

17  right?

18  A    Yes.

19  Q    And there were three doses total of that that were

20  administered?

21  A    Yes.

22  Q    And you would not have ordered that three doses of IV

23  Lopressor be administered if there wasn't a good reason for you

24  to have done that, right?

25  A    I do not do things unless I believe there's a good reason

84

Goodrich - Cross

1   to do them.

2   Q    Correct.  A medical-based reason to do it?

3   A    Yes.

4   Q    Okay.  I want to go back to Mr. Jenkins's report of

5   passing out at home.  You -- obviously, you weren't there with

6   him at that time, right?

7   A    I was not.

8   Q    And I think you testified that as far as you're aware, his

9   family members weren't there with him at that time; is that

10  right?

11  A    I wasn't sure if they were or were not there per his

12  reports.

13  Q    Okay.  And you testified that you didn't see any physical

14  signs of injury to his head; is that right?

15  A    Yes.

16  Q    And the imaging didn't show any significant abnormality at

17  least that you were worried about, right?

18  A    No.

19  Q    That doesn't mean that Mr. Jenkins didn't pass out, right?

20  A    It doesn't mean he did or didn't.

21  Q    Right.

22  A    I have no way of determining that.

23  Q    Right.  You're not sitting here today telling us that you

24  have a medical basis to believe that he did not pass out?

25  A    I have no way of knowing whether or not he passed out at

Goodrich - Cross

1  home or not.

2  Q    When you offered -- and I'm going to, I'm sure, screw up

3  the names and the categories -- but the anxiolytics, that's a

4  class of drugs that can manage stress and anxiety, right, just

5  for lay --

6  A    In general, yes.

7  Q    Okay.  Those medications do have side effects, right?

8  A    Yes.

9  Q    And that can include side effects that would potentially

10 impair somebody's ability to focus during the day, right?

11 A    Potentially.

12 Q    Potentially have side effects that can impair somebody's

13 ability to participate, say, in a court proceeding, right?

14 A    Potentially.

15 Q    And when you offered Mr. Jenkins the anxiolytics, whatever

16 they were at the time, you testified already that he declined

17 your offer?

18 A    Yes.

19 Q    And he did that because he informed you that he didn't

20 want to be foggy for court, right?

21 A    That was one of the reasons, yes.

22 Q    And in fact, he was coming to court from the ER -- I mean,

23 he was leaving the ER visit going to court, right?

24 A    He informed me that he had a court date in the morning.  I

25 don't know where he was going when he left the hospital.

Goodrich - Cross

1  Q    Okay.  But he told you about the court date?

2  A    He did tell me, yes.

3  Q    You would agree that managing stress and anxiety would

4  also be beneficial for blood pressure management, right?

5  A    In this case, it potentially would.

6  Q    And there are medications that can manage stress and

7  anxiety?

8  A    Yes, there are.

9  Q    Now, you talked a little bit -- I'm going to touch back on

10 your -- the report that we just looked at when you indicated

11 that you wondered whether or not there was some connection to

12 malingering with respect to Mr. Jenkins when he tried to sit up

13 in the bed and fell back over.

14      When you say that you wondered if that was related to

15 malingering, I just wanted to make sure we're clear that that

16 was when he sat up and then appeared to fall back in the bed,

17 right?

18 A    Yes, sir.

19 Q    Okay.  Having an acute stress reaction could potentially

20 keep blood pressure numbers elevated even when somebody is on

21 medications to lower them, right?

22 A    I believe so, yes.

23 Q    Just to make sure we're clear, you have -- as you're

24 sitting here today, you have no medical basis to say -- I mean

25 with certainty -- that Mr. Jenkins was doing something to

Goodrich - Examination by the Court

1  artificially elevate his blood pressure, right?

2  A    I have no medical certainty that he was doing something to

3  artificially elevate it.

4  Q    Okay.  To the extent there were any abnormalities in blood

5  pressure readings, it is possible that the placement of the

6  blood pressure cuff could be a cause of that, right?

7  A    Are you saying placement of the blood pressure cuff could

8  artificially alter a blood pressure reading?

9  Q    I guess that's what I'm saying, yes.

10  A    Placement of a blood pressure cuff could artificially

11  alter a blood pressure reading.

12  Q    And the same goes for the body positioning somebody is in

13  when the test is being administered, right?

14  A    Yes.

15           MR. ANDONIAN:  Court's brief indulgence.

16           THE COURT:  Yes, sir.

17           (Pause.)

18           MR. ANDONIAN:  Thank you, Doctor.  I don't have

19  anything else.

20           THE COURT:  Doctor, I've got a couple of questions,

21  if I can.

22           THE WITNESS:  Yes, Your Honor.

23           THE COURT:  You were asked a question as to whether

24  stress and anxiety could lead to self-harm.  Do you remember

25  that line of questioning?

Goodrich - Examination by the Court

1          THE WITNESS:  Yes, a few minutes ago, yes.

2          THE COURT:  I guess as an ER physician when you're

3   meeting people, one of the things you always look for in every

4   patient is to make sure -- to eliminate any concern you have

5   about self-harm for the patient, correct?

6          THE WITNESS:  I believe as part of the nursing

7   screening and triage protocols, that they go through and ask

8   those questions, and it's documented somewhere in the medical

9   record.

10         THE COURT:  Okay.  As it relates to Mr. Jenkins, you

11  didn't have any concern for self-harm?

12         THE WITNESS:  I didn't have any immediate concern for

13  self-harm.

14         THE COURT:  Okay.  All right.  As an ER physician

15  when someone such as Mr. Jenkins comes in with a blood pressure

16  and anxiety or a stress reaction as he did, I guess your

17  initial goal is to get the blood pressure and anxiety under

18  control so that they can be discharged, right?

19         THE WITNESS:  I don't believe the blood pressure

20  always needs to be controlled, and the stress and anxiety

21  doesn't always need to be controlled.

22         THE COURT:  You need to get them on the path,

23  however?

24         THE WITNESS:  Ideally that's my job is to help people

25  have an improved state of health.

Goodrich - Examination by the Court

1          THE COURT:  And then you refer them back to their

2     family doctor for regular management?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  And you would expect any ongoing

5     issues in connection with blood pressure, anxiety, stress

6     management should be -- in the perfect world would be managed

7     then by Mr. Jenkins's family doctor?

8          THE WITNESS:  Ideally, yes.

9          THE COURT:  Managing those problems -- I think you

10    were asked this question as well -- is dependent upon taking

11    your medication as prescribed and when prescribed; fair enough?

12         THE WITNESS:  Yes.

13         THE COURT:  And you haven't had any follow-up as to

14    what Mr. Jenkins' current medications are, what his compliance

15    with medications are, or anything along those lines; is that

16    fair to say?

17         THE WITNESS:  Since he left the emergency department,

18    I have had no follow-up with him.

19         THE COURT:  Thank you.  I don't have any other

20    questions.

21         Ms. Choy, does that prompt anything further?

22         MS. CHOY:  Nothing further from the government.

23         THE COURT:  Thank you, Dr. Goodrich.  You're free to

24    go.  Thank you very much.  I appreciate you being here.  Have a

25    nice day.

Clouser - Direct

1              THE WITNESS:  You're welcome, Your Honor.  Thank you.

2              THE COURT:  Ms. Choy?

3              MS. CHOY:  The government calls Special Agent Andrew

4      Clouser.

5              THE COURT:  Agent Clouser, come on up, if you would,

6      please, sir.  Stand and be sworn.

7      SPECIAL AGENT ANDREW CLOUSER, CALLED BY THE GOVERNMENT, SWORN

8                         DIRECT EXAMINATION

9      BY MS. CHOY:

10     Q     Good afternoon, Special Agent Clouser.

11     A     Good afternoon.

12     Q     Could you please state your name and spell it for the

13     record?

14     A     My name is Andrew Clouser.  Clouser is spelled

15     C-L-O-U-S-E-R.

16     Q     How are you employed?

17     A     I am a special agent with the FBI.

18     Q     Are you assigned to the investigation of Scott Jenkins?

19     A     I am.

20     Q     Was Scott Jenkins arrested on June 29th, 2023?

21     A     He was.

22     Q     Did you participate in that arrest?

23     A     I did.

24     Q     Did any other agents from the FBI participate in that

25     arrest?

Clouser - Direct

1   A    Yes.

2   Q    Who?

3   A    Special Agent Scott Medearis also participated.

4   Q    Was Mr. Jenkins allowed to self-surrender?

5   A    He was.

6   Q    Where did he self-surrender to?

7   A    That morning he self-surrendered to our office here in

8   Charlottesville.

9   Q    Approximately what time did he report to your office in

10  Charlottesville?

11  A    It would have been approximately between 8 a.m. and 9 a.m.

12  that morning.

13  Q    Did you observe how he got to your office?

14  A    I did.

15  Q    How was that?

16  A    He was driven to our office by his brother.

17  Q    And what was his condition upon arrival at your office?

18  A    His condition, he appeared to be emotionally distraught,

19  but he did not appear to be in any physical distress.

20  Q    And were there procedures that were followed once he

21  arrived?

22  A    Yes.

23  Q    Could you briefly describe what he had to do upon arrival?

24  A    So once he arrived, we took him into custody; let him know

25  that he was, in fact, under arrest and in our custody, at which

Clouser - Direct

1   point we then took him into our office, because he arrived a

2   the lobby of our building.  So we took him up to our office

3   where he was then processed.

4   Q    And what does that processing involve?

5   A    So we placed him in handcuffs.  We had him sit in our

6   interview room where we had also fingerprinted him and took his

7   DNA sample and let him know what the next steps were going to

8   be for the day.

9   Q    At some point during that processing process, did you

10  observe Mr. Jenkins to be in distress?

11  A    He appeared, by my observations, to have a very red face,

12  and we asked him if he had any physical conditions that could

13  be contributing to that.

14  Q    Approximately what time was that?

15  A    That would have been somewhere around 8:53 a.m., if I

16  remember the time correctly.

17  Q    So you inquired about his physical condition.  And did he

18  make statements in response?

19  A    He did.

20  Q    Was that interaction audio recorded?

21  A    It was.

22  Q    And I'm about to play for you what's been marked as

23  Government's Exhibit 1, which is an audio file.

24       Before this testimony, have you had an opportunity to

25  review that file?

Clouser - Direct

1  A    I have.

2  Q    Is Government's Exhibit 1 a fair and accurate recording of

3  the conversation that occurred between Mr. Jenkins and the

4  arresting agents on the morning of Mr. Jenkins's arrest?

5  A    It is.

6         MS. CHOY:  The government offers Government's Exhibit

7  1 into evidence.

8         THE COURT:  Any objection?

9         MR. ANDONIAN:  No, Your Honor.

10        THE COURT:  So admitted.

11        (Government Exhibit 1 marked and admitted.)

12        MS. CHOY:  Ms. Fastenau, could you please play

13  Government's Exhibit 1.

14        (Audio playing.)

15   BY MS. CHOY:

16  Q    Did you recognize the voices that you heard on that

17  recording?

18  A    I do.

19  Q    Who were they?

20  A    So they were Scott Jenkins, Special Agent Scott Medearis,

21  and myself.

22  Q    Did Mr. Jenkins bring any medications with him when he

23  self-surrendered?

24  A    He did.

25  Q    Did he tell you what medications they were?

Clouser - Direct

1   A    He said those medications were for his diabetes.

2   Q    So he didn't bring any hypertension medications with him?

3   A    He did not.

4   Q    After that recorded interaction, did you continue the

5   booking process?

6   A    We did.

7   Q    And what was his condition during that continued process?

8   A    His condition continued to be emotional distress, but he

9   did not complain of any physical issues aside from saying he

10  had lifelong claustrophobia.  But with myself and Special Agent

11  Medearis in the room, he had no issues with it.

12  Q    At any point did he request medical attention?

13  A    He did not.

14  Q    And was he alert and oriented that whole time?

15  A    He was.

16  Q    After being processed, where did Mr. Jenkins go next?

17  A    After he was processed he asked to use the restroom.  So

18  we took him to the bathroom just down the hall.  From there, we

19  transported him to this building to the U.S. marshal's office.

20  Q    And did you deliver him to the custody of the U.S.

21  marshal?

22  A    We did.

23  Q    And were you able to observe his condition during that

24  time?

25  A    Yes.

95

Clouser - Direct

1   Q    You were, while he was in custody of the U.S. marshals?

2   A    Not while he was in custody, at the handoff.  Sorry.

3   Q    How was his condition at the handoff?

4   A    At the handoff, again, there was really no change.  As we

5   were driving to the United States marshal's office, we had

6   asked how he was feeling.  Special Agent Medearis specifically

7   had asked how is his blood pressure?  And there was no

8   indication from Scott Jenkins that he needed any emergency

9   medical attention or medical attention of any kind.

10  Q    Was Mr. Jenkins's initial appearance scheduled for 1 p.m.

11  the same day?

12  A    It was.

13  Q    Did you attend that hearing?

14  A    I did.

15  Q    Did you observe Mr. Jenkins during that hearing?

16  A    I did.

17  Q    What was his demeanor?

18  A    So his demeanor -- I didn't observe any redness in the

19  face as I had before.  It seemed to have dissipated over time.

20  I did observe him as he interacted with his counsel.  I wasn't

21  close enough to hear any of the interactions, but there was a

22  point in the proceeding at which point it was being argued

23  whether or not he should be allowed to keep his firearms, and I

24  observed him interact with his attorney multiple times in an

25  effort to craft an argument in his favor.

Clouser - Direct

1   Q     So he was alert?

2   A     Yes.

3   Q     He didn't appear to be in any physical distress?

4   A     Correct.

5   Q     And he appeared to be able to assist his attorneys in his

6   defense?

7   A     Correct.

8   Q     Are you aware that Mr. Jenkins's trial is scheduled to

9   begin on November 12th, 2024?

10  A     Yes.

11  Q     And are you aware that the morning of trial Mr. Jenkins

12  went to the emergency department at Fauquier Hospital?

13  A     Yes.

14  Q     Did you do any research to determine how far away Fauquier

15  Hospital is from Mr. Jenkins's residence?

16  A     Yes.

17  Q     And what did you do to determine that?

18  A     So we just -- we looked it up on Google Maps.  We had his

19  home address and the address of the hospital in Fauquier.

20  Q     And how far is the Fauquier Hospital from his home

21  address?

22  A     According to Google Maps, it's about 29 miles.

23  Q     How long would it take to drive that distance?

24  A     Approximately 30 minutes.

25  Q     Have you determined whether there is an emergency

Salazar - Direct

1   department that is closer to Mr. Jenkins's residence than

2   Fauquier Hospital?

3   A    Yes.

4   Q    And what is that hospital?

5   A    There is a hospital in Culpeper, UVA Culpeper Hospital,

6   approximately three miles from his residence.

7   Q    And how long would it have taken to drive to that

8   hospital?

9   A    Less than five minutes.

10          MS. CHOY:  Nothing further.

11          THE COURT:  Any cross?

12          MR. ANDONIAN:  No.

13          THE COURT:  Thank you very much, Special Agent

14   Clouser.  You may step down.

15          MS. SMITH:  The government calls Probation Officer

16   Mariana Salazar.

17          THE COURT:  Ms. Salazar, come on up.

18       MARIANA SALAZAR, CALLED BY THE GOVERNMENT, SWORN

19                    DIRECT EXAMINATION

20    BY MS. SMITH:

21   Q    Good afternoon.  Can you please state your name?

22   A    It's Mariana Salazar.

23   Q    And how are you employed?

24   A    I am the supervision officer for the Charlottesville

25   probation office.

Salazar - Direct

1  Q    So do you supervise criminal defendants while they're out

2  on pretrial release?

3  A    Yes.

4  Q    And as part of your duties and responsibilities, do you

5  supervise Scott Jenkins?

6  A    Yes.

7  Q    And how long have you supervised him?

8  A    I have supervised him since the end of October of 2023.

9  Q    So over a year at this point?

10 A    Yes.

11 Q    On November 12th of 2024, did someone reach out to you

12 about Mr. Jenkins's whereabouts?

13 A    Yes.

14 Q    And who reached out to you?

15 A    His wife.

16 Q    What did she tell you?

17 A    She sent me a text message from his phone saying that he

18 was in Fauquier Hospital, and he had hit his head and had some

19 chest pains.  That's it.

20 Q    And this was the morning that his jury trial was supposed

21 to begin?

22 A    Yes.

23 Q    Was this the first and only contact you've ever had with

24 his wife?

25 A    I think I've seen her one time during a home visit, but

Salazar - Direct

1  yeah, pretty much the only other interaction with her.

2  Q    Do you conduct home visits regularly as part of your

3  supervision?

4  A    Yes.

5  Q    And have you had multiple home visits at Mr. Jenkins's

6  residence?

7  A    Yes.

8  Q    And Ms. Jenkins is not typically there?

9  A    No.

10  Q    Does she work outside of the home?

11  A    I have no idea.

12  Q    So you haven't had really any interaction with her?

13  A    Correct.

14  Q    Now, what district is Fauquier Hospital located in?

15  A    It's the Eastern District of Virginia.

16  Q    And is one of Mr. Jenkins's pretrial requirements that he

17  remain in the Western District of Virginia?

18  A    Yes.

19  Q    Because he had gone outside of the district absent

20  permission from you, what did you do to follow up with that?

21  A    I reached out.  I left him a voicemail just asking him for

22  documentation.  I wasn't sure why he went to Fauquier when

23  there is other places in Culpeper.

24  Q    And when did you reach out to him and request that

25  additional information?

100

Salazar - Direct

1   A    November 12th.

2   Q    So that same day?

3   A    Yes.

4   Q    What did he end up sending you?

5   A    Just the first page of the discharge summary.  He said he

6   could provide me further documents later on.

7   Q    So he sent you a picture of the first page of his

8   discharge paperwork?

9   A    Yes.

10  Q    When did he provide that documentation to you?

11  A    November 13th.  So the next day.

12  Q    So it took him almost a full day to send you that

13  documentation?

14  A    Yes.

15  Q    Did you attempt to reach out to him as well?

16  A    Yes.

17  Q    And how did you attempt to reach out to him?

18  A    I was just trying to reach out to him to see how he was

19  doing.  And I think that was when he was in the parking lot of

20  the ER, or he had just left.

21  Q    So that was the next day on November 13th of 2024?

22  A    Yes.

23  Q    So on November 12th, 2024, you reached out, asked for

24  documentation, but did not hear a response?

25  A    Correct.

Salazar - Direct

1   Q    Then you followed up with him again the next day on

2   November 13th of 2024?

3   A    Yes.

4   Q    Was that based on learning information that he was at the

5   emergency department again?

6   A    Yes.

7   Q    And what did you do when you learned he was allegedly at

8   the emergency department?

9   A    I just gave him a call.

10  Q    And do you remember about what time that call occurred?

11  A    I want to say it was like 1 p.m.  Around there.

12  Q    And what -- what happened during that phone call?

13  A    Oh, I had tried to call him previously and he had not

14  responded.  We played phone tag for a while.  He just told me

15  he was at the ER, and his primary had told him that if he took

16  his blood pressure twice in an hour and it went down, he didn't

17  need to go inside the emergency room.

18  Q    So based on that conversation, was it your impression that

19  he was -- his doctor had told him to stay in the car, take his

20  blood pressure twice, and then if it did not go down, to go

21  into the emergency room?

22  A    That was the impression I got from that conversation, yes.

23  Q    And you said this occurred about 1:00?

24  A    Yes.

25  Q    Did he tell you how long he had been sitting in the

Salazar - Cross

1  parking lot of the emergency room?

2  A    No.

3  Q    And did he end up ever entering the hospital that day?

4  A    To my knowledge, no.

5  Q    Have you seen Mr. Jenkins since last week's hearing on the

6  14th of November?

7  A    Yes.

8  Q    And when did you see him?

9  A    I saw him Monday, November 18th.

10  Q    And how did he appear during your visit?

11  A    He seemed more relaxed.  He had told me he was on his

12  medications and felt better.  There was no concern for his

13  health that I saw at that time.

14  Q    So he seemed fine at that point?

15  A    Yes.

16          MS. SMITH:  One minute, Your Honor.

17          (Pause.)

18          No further questions.  Thank you.

19          THE COURT:  Mr. Andonian?

20                    CROSS-EXAMINATION

21   BY MR. ANDONIAN:

22  Q    Good afternoon, Ms. Salazar.

23  A    Good afternoon.

24  Q    On November 12th of 2014 last week, just to be clear,

25  Mr. Jenkins's wife reached out to you, correct?

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1   A    Correct.

2   Q    It wasn't the other way around?

3   A    Correct.

4   Q    Okay.  And she informed you that Mr. Jenkins had passed

5   out?

6   A    I think she had told me that he hit his head.

7   Q    And was having chest pains?

8   A    Yes.

9   Q    And as a result of that, they were in the emergency room?

10  A    Correct.

11  Q    And she told you exactly where they were, correct?

12  A    Yeah, Fauquier Hospital.

13  Q    Mr. Jenkins has been compliant on release, right?

14  A    Correct.

15  Q    And although there was a delay on the 12th -- between the

16  12th and the 13th, you -- Mr. Jenkins did send you information

17  regarding his visit to Fauquier Health, correct?

18  A    Yes.  This is not a violation.

19  Q    Right.  Okay.  That's what I'm getting at.

20  A    Yeah.

21       MR. ANDONIAN:  Okay.  Great.  I think that's it.

22  Thank you.

23       THE COURT:  Thank you very much.  You may step down,

24  Ms. Salazar.

25       I'm sorry, any follow-up?

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1          MS. SMITH:  Nothing further from the government, Your

2     Honor.

3          Your Honor, at this time that's all of the live

4     witness testimony we have.  I do want to proffer some

5     additional information and enter into evidence some additional

6     exhibits.

7          Initially I would like to proffer at the time of

8     booking that Special Agent Clouser discussed where he was

9     handed off to the United States marshals, Mr. Jenkins was

10    interviewed by U.S. Deputy Marshal Mike Allen.  If Ms. Fastenau

11    could pull up Government's Exhibit 5.  This is called a USM130,

12    Your Honor.  It is a form that is filled out by the marshals

13    when someone is arrested.  I would move this into evidence at

14    this time.

15         THE COURT:  Any objection?

16         MR. ANDONIAN:  No, Your Honor.

17         THE COURT:  All right.  It will be admitted and

18    placed under seal since it has personal identifying

19    information.

20         (Government Exhibit 5 marked and admitted.)

21         MS. SMITH:  And if Deputy Mike Allen would testify,

22    he would state the following, Your Honor:  That he interviewed

23    Mr. Jenkins about medical conditions and other important

24    information, and that this information is typically taken from

25    someone when they are booked, and is used to alert the jail of

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1   any items of concern or things they need to be aware of such as

2   medical conditions or suicide risk.  As part of the interview,

3   Mr. Jenkins reported multiple health conditions.  And it's kind

4   of blurry, but if you see listed that he's diabetic and he has

5   high blood pressure.  So he did mention that he had

6   hypertension back on June -- in June of 2023.

7         Additionally, you'll see listed under suicidal

8   tendencies Deputy Allen would testify that Mr. Jenkins made

9   comments that caused concern about possible self-harm or

10  suicide.  So that also was noted in the record.  And that's the

11  only proffer I have for this record, Your Honor.

12        If I could also proffer for the Court the testimony

13  of Rachel Gaddis.  She is the medical unit director of

14  Albemarle County Regional Jail.  If Mr. Jenkins were to be

15  incarcerated at any point in this case, he would need to be

16  housed locally at ACRJ, not the one out in Orange County

17  because there are Culpeper inmates there, Your Honor.

18        Rachel Gaddis, if called to testify, would state that

19  the medical unit consists of ten rooms and is part of the jail

20  facility.  They also have a nurse in the facility 24 hours a

21  day, seven days a week and a doctor on call at all times.  She

22  would testify that the medical unit has cared for people with

23  hypertension in the past; and that they have processes in place

24  for high blood pressure, including the regular monitoring of

25  blood pressure.  They also ensure that inmates take any

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1    prescribed medications at the appropriate time as part of their

2    care.

3            THE COURT:  So let me ask you one question about

4    that.  Generally jails will only prescribe what's on their

5    formulary, and the doctor needs to examine a new inmate or

6    detainee before they'll prescribe anything.

7            Did she give you any information about how long it

8    would take someone such as Mr. Jenkins or any new inmate or

9    detainee before they would be prescribed medication for any

10   particular medical condition?

11           MS. SMITH:  We did not specifically discuss that

12   issue, Your Honor.  We did discuss if inmates bring medication

13   with them and they are valid prescriptions, that they can then

14   administer those prescriptions pursuant to the prescription as

15   to dosage and the appropriate time.  So she said it's helpful

16   when inmates bring with them their medication because they can

17   administer them.  She also did mention that if someone comes in

18   with hypertension, their process is to monitor it quite closely

19   for the first three days to kind of get a baseline of what's

20   going on, and that they can then prescribe anything that's

21   appropriate based on that monitoring.

22           She also would finally testify, Your Honor, that if

23   Mr. Jenkins were to be incarcerated, they would provide him the

24   appropriate medical care.

25           I have two additional exhibits, Your Honor,

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1  Government's Exhibit Number 6, which is the pretrial report at

2  ECF Number 2, Ms. Fastenau.

3          THE COURT:  That's already on the docket.

4          MS. SMITH:  Yes, Your Honor.

5          THE COURT:  I'll take judicial notice of that.

6          MS. SMITH:  Thank you.

7          If we could, on the third page, I believe, Your

8  Honor, it's listed as page 2, but it's actually page 3 of the

9  document.  Under physical health, Mr. Jenkins reported that he

10  had high blood pressure.  So again, back in June of last year

11  he was reporting this hypertension as a chronic condition.  And

12  I would move -- you took judicial notice.  Thank you.

13          THE COURT:  I took judicial notice.

14          MS. SMITH:  And then finally Government's Exhibit 7,

15  Your Honor, which is the email correspondence between the

16  parties that all of us were a part of.  If you could just go to

17  the sent November 13th of 2024 at 9:27.

18          And Your Honor, this is the email discussing

19  Mr. Jenkins being excused from the hearing on that day and

20  about the fact that he had been in touch with the nurse from

21  his doctor's office about 45 minutes ago.  So I'd move to admit

22  that into evidence as well, Your Honor.

23          THE COURT:  No objection?

24          MR. ANDONIAN:  No.  I was going to bring this up too.

25  I would also just ask that your response to that email be part

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1  of the record in which you, in fact, excused Mr. Jenkins.  I'm

2  happy to provide that.

3          THE COURT:  If you want to provide that to make that

4  record complete -- do you all have that?

5          MS. SMITH:  I don't think we have it already pulled,

6  Your Honor, but we could look for it.

7          THE COURT:  That was on what day?

8          MS. SMITH:  It was on November 13th, Your Honor.

9          And that would be the government's evidence.

10          THE COURT:  All right.  So we've been going a little

11  bit over two hours.  I don't know whether the defendant is

12  going to have any evidence.  We're going to have some argument,

13  but my thought is that we take about a ten-minute comfort break

14  and come back, and then take any evidence the defendant wishes

15  to put on and then we'll have argument.

16          We'll stand in recess for ten minutes.

17          (Recess.)

18          THE COURT:  We are back on the record in the *United*

19  *States of America versus Scott Jenkins.*  The government is

20  present by its counsel.  The defense is likewise present along

21  with the benefit of counsel.

22          Mr. Andonian, any evidence you wish to offer or

23  proffer?

24          MR. ANDONIAN:  I have a proffer.  We don't have any

25  evidence.  We weren't expecting this issue about the phone call

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1  to Dr. Miller's office on the 13th to be contested.  But

2  Mr. Jenkins has a phone record, I mean, in his phone, a call

3  record to Dr. Miller's office from that morning.  And --

4           THE COURT:  How long was the call?  Does it show?

5           MR. ANDONIAN:  I'm sure.  I mean, at least on my

6  phone you can go and you can --

7           THE COURT:  Right.  You can see --

8           MR. ANDONIAN:  You can see how long the duration of

9  the call was.  I guess I would just ask --

10          THE COURT:  I guess he probably wasn't allowed to

11 bring his phone in.

12          MR. ANDONIAN:  He wasn't allowed to bring his phone

13 in.  I mean, if this is really going to be a major sticking

14 point, I guess I would ask that Mr. Jenkins be allowed to show

15 Ms. Salazar the phone log, and she can report back.  I just

16 didn't want that to get lost.  He's adamant that he called and

17 had a conversation with Michelle, who told him that Dr. Miller

18 was at a cattle -- whatever he said it was.  And that's the

19 reason he went to the emergency room, but ultimately didn't go

20 in, is because he was told take your blood pressure a few

21 times, and he did.  It was down.  He didn't go in.  That's it.

22          Other than that, we don't have any evidence.

23          THE COURT:  All right.  Thank you.  Who wants to

24 argue on behalf of the government?

25          MS. SMITH:  I will, Your Honor.  Thank you.

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1          Your Honor, the government today is asking that

2     Mr. Jenkins's bond be revoked and ask that --

3          THE COURT:  But I can't do that, can I?

4          MS. SMITH:  You can if we make a motion for it, Your

5     Honor.

6          THE COURT:  But it says a motion filed with the

7     district court.  There hasn't been a motion.  So 3148(b) says

8     the attorney for the government may initiate a proceeding for

9     revocation of an order of release by filing a motion with the

10    district court.  And the reason a written motion is required is

11    for notice -- I mean, for the pure reason of notice that a

12    defendant knows when they walk into court what the government

13    is asking for, rather than it coming up as an oral motion.  And

14    so that's somewhat anticipated, given all the records that were

15    circulated beforehand, but without a motion, how can I act on

16    that today?

17         MS. SMITH:  And I understand that, Your Honor.  I

18    think because we had this hearing today with the idea of

19    revisiting bond and revisiting the conditions of bond --

20         THE COURT:  I said it's a bond review.  It's not a

21    revisit of bond.  It's a bond review.

22         So I guess the more global question would be:  What

23    is the condition of his release that he has violated?

24         MS. SMITH:  Your Honor, quite frankly, I think that

25    Mr. Jenkins has not been candid with the Court.  He has not

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1   been candid with his physicians.  And he has shown that he will

2   not necessarily show up for court.  He was not excused on that

3   first day of trial, November 12th.  He took himself to the

4   hospital, was never admitted for any sort of follow-up care or

5   additional monitoring, and he self-excused that day.  And then

6   on November 13th, only after representations were made that he

7   was told to go to the ER with certain conditions, was he then

8   excused by the Court.  And so I think the government has some

9   significant concerns about Mr. Jenkins's ability to show up for

10  trial.  And if the Court is unable to consider a motion to

11  revoke his bond at this time, I would ask that I at least be

12  able to make arguments as to why we believe that's appropriate.

13  We can file a motion today.  We are not asking for his bond to

14  be revoked today, but when we were in court last week Your

15  Honor had mentioned the possibility of him being incarcerated

16  the week before trial in the medical unit to confirm that he

17  would show up for trial and be properly monitoring his medical

18  conditions.

19          THE COURT:  But I've got to find that -- if I was to

20  do that, I've got to find by clear and convincing evidence that

21  he's violated a condition of his bond, right?

22          MS. SMITH:  Correct, Your Honor.

23          THE COURT:  By clear and convincing evidence that

24  he's violated a condition of bond, and that there are then no

25  conditions that can be set that would reasonably assure his

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1   appearance at trial, right?

2           MS. SMITH:  Correct.  And Your Honor, I think

3   Mr. Jenkins has shown that he will not necessarily show up for

4   trial.  If I may, we have -- what we have before us, Your

5   Honor, is a chronic condition.  It is a condition that he

6   self-reported to the FBI agents.  He reported it to the

7   marshals, and he reported it to probation when he was -- when

8   he was being --

9           THE COURT:  That by all accounts had never been

10  treated medically with any medication management.  I mean,

11  there is some reference that maybe he was taking some

12  medication for it.  But as of July last year when he went to

13  see Dr. Miller for the first time, he was not on any blood

14  pressure medication.  Dr. Miller didn't prescribe any.  When he

15  went to see him in August of last year, he was still not on any

16  blood pressure medication.  Not compliant with Dr. Miller's

17  recommendations -- no doubt about that -- but those were

18  primarily directed towards his diabetes problem, and was not

19  prescribed any blood pressure medication, nor was he prescribed

20  either time any medication for anxiety, despite the fact that

21  Dr. Miller's records make pretty clear that Mr. Jenkins

22  suffered from stress, right?

23          And so I guess that's my question, is:  There is

24  reason to be able to conclude that this may be the first time

25  that Mr. Jenkins is medically managed for blood pressure and

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1   anxiety.

2           MS. SMITH:  Your Honor, I think the problem is that

3   we have different -- we have Mr. Jenkins telling different

4   people different things.  So back when he was arrested last

5   year, he even said, I've had stroke-level blood pressure for

6   multiple months.  I have a pill -- which would suggest that he

7   has been to a doctor and gotten a prescription for that -- to

8   control it.

9           THE COURT:  But what were the pills that he brought

10  with him?  What were they for?

11          MS. SMITH:  He did bring his diabetic medication,

12  Your Honor, and he had a fast-acting blood pressure medication.

13  That was by his own admission.

14          THE COURT:  But the only pills he brought with him,

15  according to Special Agent Clouser, were pills to treat his

16  diabetes, correct?

17          MS. SMITH:  That is correct.  But he mentioned on his

18  person when they first encountered him that he did have this

19  blood pressure medication he could take, and he neglected to

20  take it at that time.

21          THE COURT:  But that wasn't identified with respect

22  to anything that he had.  I mean, what he said and ultimately

23  what he had were two different things, right?

24          MS. SMITH:  Yes, Your Honor.

25          THE COURT:  Right.  And so what he said ended up not

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1    being exactly right.  He may have thought that it was a blood

2    pressure medication, but the only medications that he had were

3    for his diabetes.  I think I'm correct about that.

4         MS. SMITH:  That's what Special Agent Clouser

5    testified to.  But we do have a history of this chronic

6    condition that he then this year does not report to his primary

7    care physician, and then as he also indicated, he never

8    followed up with any of the medication or lifestyle changes

9    that were prescribed to him.  He never reported a history of

10   hypertension to either ER doctor.  And so, quite frankly, it

11   looks like Mr. Jenkins is picking and choosing who he gives

12   information to because it serves him to go to the emergency

13   room and not report a history of hypertension so that he can

14   blame it on this trial and further delay trial.

15        And I think it's important to remember that this is a

16   continued tactic in this case.  Mr. Jenkins delayed getting

17   counsel for multiple months.  We had to have five status

18   hearings for him to get counsel.  And so I think --

19        THE COURT:  Well, there may have been other issues

20   before I was involved in the case that delayed getting the case

21   set for trial, but this is the first time that a medical issue

22   has interfered with the progress of the case; is it not?

23        MS. SMITH:  That is true, Your Honor.  But I'm not

24   even sure that -- I mean, we have testimony before Your Honor

25   that there was no acute risk of stroke or heart attack, which

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1    is what was relayed to the Court, which was relayed to counsel

2    by Mr. Jenkins.  No doctor testified that that's what they told

3    him.  We have an ER doctor that said, I've been a medic or

4    involved in emergency medicine for a very long time, and I

5    immediately was concerned about malingering, and he described

6    these exaggerated movements by the defendant.  And we also have

7    him checking into the hospital the morning of trial.  He was

8    never admitted.  They got his blood pressure under control and

9    then no one heard from him all day.  It wasn't until defense

10   counsel was pushed by the Court and by the government that we

11   got any information, and that was at 5:30 that evening.  He was

12   discharged at 11.  He didn't provide documentation.  He didn't

13   provide any information about his condition.  We were all led

14   to believe that it was because it was such an extreme incident

15   and an extreme episode.  Rather, he was told he could just go

16   about his day.

17            THE COURT:  But why can't I set conditions short of

18   detention at this point in time that, for example, do a couple

19   of things.  Right now, there is not any condition requiring him

20   to follow all doctor's appointments, follow all doctor's

21   orders, take all medication as prescribed.  That's kind of

22   easy.  But also refer him to a local community services

23   board -- whoever it may be -- or a therapist of his choosing

24   for, one, medication management to assure that he takes his

25   medication as required; and two, for any therapy treatment

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1  counseling, whatever may be recommended at least in the short

2  term for stress, anxiety, whatever it may be.  In other words,

3  if the condition -- everyone agreed that if the condition is

4  controlled, no reason not to go forward, right?  And even maybe

5  in hindsight the medical records -- I may agree with you is

6  that perhaps we could have proceeded, but we -- we didn't have

7  the benefit of the medical records.  We didn't have the benefit

8  of the medical history that we will now have, knowing what the

9  condition is.

10        Why can't I go -- why can't we do something such as

11  that because I don't know how I say I can set conditions of

12  release between now and December the 4th, if I'm doing my math

13  right, but then on December the 4th, there are no conditions

14  that can reasonably assure your appearance.  I'm not sure the

15  Bail Reform Act lets me do that.

16        MS. SMITH:  Your Honor, I think you are right we need

17  to make sure this condition is controlled.  I think the

18  evidence presented today shows that Mr. Jenkins is not able to

19  do that on his own.  So if the Court does not believe that him

20  being housed in the medical unit is appropriate at this time,

21  we do think a third party who would oversee the administration

22  of his medication and the monitoring of his blood pressure,

23  along with the therapy and other items that you just discussed,

24  would be appropriate.

25        The government does not believe that a family member

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1    is appropriate for this role.  We would ask that he go to his

2    doctor's office and have the doctor watch him or the nurse

3    watch him take his medication, because quite frankly, he's been

4    living with his wife --

5        THE COURT:  That means he's got to go every night or

6    every morning or whatever, show up at your doctor's office and

7    watch him take his medication.

8        MS. SMITH:  But, Your Honor, he's been living with

9    his wife.  It has not been controlled.  His brother appeared to

10   be trying to help him in any delay tactics.  That would be the

11   government's impression of the evidence.  So we have concerns

12   about family members being responsible for making sure he is

13   taking his medication, but we do think some sort of third-party

14   custodian watching him, making sure that he's taking his

15   medication -- and we also have a problem with that home cuff.

16   I mean, Dr. Goodrich discussed the problem that they have

17   sometimes with those home blood pressure monitoring.  So if we

18   also need to be monitoring his blood pressure, it seems to me

19   that some sort of visit with a doctor at some point prior to

20   trial could help make sure we have a baseline, and that it is

21   under control and we can proceed as normal.

22       THE COURT:  Or you get a blood pressure reading right

23   before trial that requires maybe you shouldn't go forward.  Be

24   careful what you ask for.

25       MS. SMITH:  I think the doctors testified, though,

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1  that he could have continued on with his day.  They gave no

2  instructions to change his daily life.  That included coming to

3  court.  And I think the only reason we didn't have these

4  medical records last week was because of a delay by the

5  defendant.  It appears that everything we received from him

6  could have been printed off that day from his MyChart, and I

7  think that's what was done in many cases.  And so the lack of

8  information is not anyone's fault but the defendant's in this

9  case.

10       So Your Honor, if we are at a place where we need to

11  just impose additional conditions, we would ask that he be

12  monitored, and if therapy is appropriate, that he see a

13  therapist to help get any anxiety under control.  We would ask

14  that there be a third-party custodian to monitor his medication

15  and to make sure --

16       THE COURT:  Who would be the third-party custodian,

17  because I, frankly, have thought about a third-party custodian.

18  I agree with you the brother is not the right person, given the

19  interaction in the ER.  But I'm not sure that his wife has

20  shown up at any of the days here at trial.  So I'm not sure

21  that that's the right person, either.  I don't know the nature

22  of the relationship.  I've always been reluctant to make a

23  spouse a third-party custodian because you can change the power

24  dynamics in the relationship and that can be difficult.

25       MS. SMITH:  That's why we suggested the doctor for at

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1  least a few days prior to trial to make sure he's taking his

2  medication as directed.  Trial starts on a Wednesday.  It's in

3  the middle of the week.  So he could go to the doctor a few

4  days beforehand to make sure that he is properly taking his

5  medication, especially since it appears these blood pressure

6  medications can be taken and have effect within about an hour.

7         And then the last thing, Your Honor, is we would like

8  to revisit the firearms in the home.

9         THE COURT:  I think that the proffer was last week

10 that they are out of the house.  I believe that's correct.

11        Is that right, Mr. Andonian?  I think the brother has

12 all the firearms.

13        THE DEFENDANT:  Yes, sir.

14        MS. SMITH:  My understanding is that Mr. Jenkins

15 occasionally does spend time -- and I don't know if he spends

16 the night or is over at that brother's house.  So I don't know

17 which brother has the firearms, but we would ask that he be

18 ordered not to possess firearms.  And if they're out of the

19 house, that's great.

20        Thank you.

21        THE COURT:  Mr. Andonian?

22        MR. ANDONIAN:  Yes, Your Honor.

23        Your Honor, I want to answer any questions the Court

24 has, and I don't want to sweep anything under the rug that the

25 Court is thinking about, but I just kind of want to focus in on

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1    the issue at hand.

2              THE COURT:  I'll tell you exactly -- I try not to be

3    opaque in these situations because I think it's helpful for

4    counsel on both sides to understand where I am, that the

5    government knows where I am with respect to whether there's

6    been a motion for detention.

7              But I am concerned that it's in the records that he

8    has not always been compliant with the treatment

9    recommendations, especially when they're basic, daily, healthy

10   lifestyle recommendations such as take your medications for

11   diabetes so you don't develop a chronic long-term condition

12   that will destroy your organs and cause early death; lose

13   weight so you don't make yourself potentially subject to

14   cardiovascular problems, and now -- maybe he had high blood

15   pressure in the past, maybe there's some medication in the

16   past, it's not really clear -- but we now know that he's on

17   blood pressure medication.  By gosh, take it every single day.

18   We know the short-term and long-term risk of having high blood

19   pressure.  And especially if it's an anxiety-driven response

20   that creates the blood pressure problem, take your antianxiety

21   medications that sometimes do take some time to build up in the

22   body.  We will have the benefit of four weeks of Fluoxetine,

23   which is a long-acting antianxiety medication.  That needs to

24   be monitored to assure that he is doing what he's supposed to

25   do every single day.

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1          MR. ANDONIAN:  Fair enough, Your Honor.  We have no

2     principled objection to that.  I think it's a question of,

3     practically speaking, what makes sense.  He has an appointment

4     with Dr. Miller for next Tuesday.  He can certainly make

5     another -- he's perfectly willing to make another appointment

6     after that and at any point the Court thinks would be an

7     appropriate benchmark date to follow up that follow-up.

8          He is taking -- I'll just represent he is taking all

9     the medications that he was prescribed.  He intends to continue

10    taking the medications he was prescribed.  And to the extent

11    that follow-ups with Dr. Miller to ensure that he's on track

12    and that things are working the right way, and dosages don't

13    need to be adjusted, perfectly willing to do that.  And we

14    think that would be the appropriate measure to take at this

15    point in time.

16         THE COURT:  All right.  Very well.

17         Ms. Smith, I'll give you the last word.

18         MS. SMITH:  Nothing further, Your Honor, at this

19    point.

20         THE COURT:  All right.  Mr. Jenkins, if I can get you

21    to stand up, I'd be much obliged, sir.

22         So Mr. Jenkins, I do think it's appropriate to amend

23    your conditions of release.  I'm going to remind you of a

24    couple of things that I'm sure Judge Hoppe reminded you of, and

25    that is that violation of your conditions of release can

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1   subject you to being taken into custody and held until this

2   matter is resolved.  Commission of a federal, state or local

3   crime can be considered contempt for which you can be

4   separately prosecuted as well.

5           Do you understand all these things?

6           THE DEFENDANT:  Yes, sir.

7           THE COURT:  So what's very clear to me in looking at

8   the medical records that have been received and the decision

9   that I make is that the medical conditions that you have, your

10  doctors are doing their level best to manage.  And they're

11  giving you medications to manage those medical conditions, and

12  medications that traditionally, from what I know about those,

13  are very successful in managing those conditions.  But they're

14  dependent upon the patient; and that is that the patient takes

15  the medications on a regular basis, takes them as prescribed,

16  doesn't skip, doesn't double up, doesn't take them early,

17  doesn't take them late, takes them when prescribed.  There is a

18  reason why they're prescribed the way they are, and there's a

19  reason why the doses are prescribed the way they are.

20          And so the first condition that I'm going to impose

21  is that you follow all of your doctor's orders, regardless of

22  what that order is and regardless of whether you agree with it.

23  It may be related to diet.  It may be related to sleep.  It may

24  be related to medication, but you take all -- follow all your

25  doctor's orders, take all medication as prescribed, as well as

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1  the second condition that I'm going to impose.  You have an

2  added layer of -- that doctors are dealing with that a lot of

3  patients don't have, and that is that you're going to stand

4  trial for your federal charges.  That's a stressful situation.

5  It is going to be a stressful two weeks.  It is going to be a

6  stressful time leading up to that.  But you don't stand alone

7  for doing that, and there are medications to manage that.

8         There have been two medications that have been

9  prescribed for you.  You may only be taking one of them right

10 now, if I'm understanding Dr. Miller correctly, the Lorazepam

11 and the Fluoxetine.  I don't know whether you're still taking

12 the Lorazepam because that can sometimes be a short-term

13 medication.  Are you still taking that?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  The Lorazepam and the Fluoxetine?

16         THE DEFENDANT:  Yes.

17         THE COURT:  All right.  So still continue to take

18 those.  But they're designed to treat your anxiety and they're

19 designed to treat -- they have the added benefit, if you take

20 care of that, that will help deal with any blood pressure

21 issues that do otherwise exist.

22         The third thing that I'm going to do is I'm going to

23 require you to be followed for medication management by the

24 local community services board or other medical professional of

25 your choosing.  And that is to assure that you're taking your

124

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1   medication, that they're managing it.  I'm not at this point in

2   time -- and I'm going to tell you why in a second -- going to

3   require you to show up and have someone watch you put a pill in

4   your mouth.  You're a grown adult.  If you don't do that, I

5   have -- there are consequences of that both medically and

6   legally.  And so -- but I want you to be followed.

7            And I also want you to be evaluated by the local

8   community services board or other provider of your choosing for

9   counseling as it relates to management of your stress and

10  anxiety.  It may only be in the short term between now and when

11  the trial is, but these are not issues that people deal with

12  easily on their own.  And we here sit in the courtroom see

13  people that are dealing with anxiety all the time.  And those

14  that deal with it successfully have assistance in that regard,

15  and there is nothing the matter with that.  In fact, you should

16  welcome and embrace that, because nobody is an island unto

17  themselves.  And so, I want you to be evaluated.  We're coming

18  into a short week.  And so I want that evaluation to be done no

19  later than Wednesday, December the 4th, or as soon thereafter

20  as it can be set up.  Ms. Salazar will help you with all those

21  arrangements, and she'll be able perhaps to be able to cut

22  through to be able to get those appointments.  And then follow

23  up any recommendations for that.

24           Next I'm going to require you to provide a medical

25  authorization to probation that will allow Ms. Salazar to reach

125

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1    out to your providers to obtain medical records and to

2    understand whether you're compliant as well so that she can do

3    that.

4           I'm not going to require you to go be evaluated

5    immediately before trial.  We're going to get the medical

6    records following next Tuesday's visit.  Ms. Salazar, with the

7    medical authorization, will be able to get those.  And if we

8    need to make a change in that, then we'll make a change in

9    that.  But based upon what Ms. Salazar testified to, that your

10   having been on the medications prescribed for a week, that

11   you're doing well, I have no doubt we'll be able to attend

12   trial without disruption or interruption at all.

13          With respect to the government's request that you be

14   taken into custody, I'm going to take that under advisement

15   following any written motion that you want to make, but here's

16   what I will do.  I have spoken to our marshal and I'm

17   satisfied, based upon the medical records that we have, that if

18   we have a repeat of the events that occurred last week, that I

19   will consider -- I don't know what I'm going to do on any

20   particular day, so I'm not going to tell you that -- but I will

21   consider having the marshal meet you at whatever medical

22   facility you are and then effort you to court that day so that

23   you can be there and that you can then be placed on a medical

24   unit so that you can be managed every single day thereafter as

25   well.

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1          So the additional condition that I'm going to require

2   is that you notify Ms. Salazar immediately if you seek medical

3   treatment outside of any prescribed appointments -- any

4   scheduled appointments, that you notify her of any scheduled

5   appointments.  We know about the 26th.  If you schedule any

6   others, let us know, and that you notify her immediately.  And

7   then she'll notify me and the parties as well, because I don't

8   want to find out from your lawyer at 7:45 on the morning of

9   trial that you're not here.

10         Last week we had 55 citizens that came to court on

11  Monday for this trial.  They set aside everything in their

12  daily lives, many of which may have made requests for me to be

13  excused that I denied because I wanted to assure that we had a

14  jury here of a wide cross-section of those in the Western

15  District in the Charlottesville division.  We continued the

16  case ultimately until Thursday.  Some didn't get the memo and

17  they showed up on Wednesday, but then everyone else showed up

18  on Thursday.  They set aside their lives so that they could

19  fulfill their duties that the Constitution asks of them.  And

20  perhaps we could have gone forward.  Perhaps not.  I continued

21  the trial.  But I have summonsed in more people for next month

22  because of the fact that it's the holiday season.  And I intend

23  to get this trial under way as scheduled and to get it

24  completed as scheduled.

25         And so those are the conditions that I'm additionally

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1    going to impose.  Do you understand all of them?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Are there any conditions that I have

4    imposed that you don't think you can comply with?

5              THE DEFENDANT:  No, sir.

6              THE COURT:  Any conditions I've imposed that you

7    don't understand?

8              THE DEFENDANT:  No, sir.

9              THE COURT:  Any questions for me?

10             THE DEFENDANT:  No, sir.

11             THE COURT:  Okay.  Very well.  Did I cover

12   everything, Ms. Salazar?

13             PROBATION OFFICER:  I just want to make sure that if

14   he is deemed to have mental health counseling that he does it

15   throughout his pretrial supervision, not just during trial,

16   like throughout his entire pretrial supervision time frame.

17             THE COURT:  For as long as he is under supervision by

18   the Court.

19             PROBATION OFFICER:  Okay.

20             THE COURT:  Yes.  So -- and that is until your

21   conditions of bond are released, either -- and that is -- that

22   will be at the end of this case -- you are to follow each of

23   these conditions.  These conditions won't be released at the

24   conclusion of trial unless you're acquitted on all charges,

25   right, and then the conditions will be released.  If you are

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1    convicted on anything and remain under pretrial supervision,

2    you remain under each of these conditions as well.

3            THE DEFENDANT:  Yes, sir.

4            THE COURT:  Because I don't want the same problem to

5    arise later on if we have to have further proceedings.

6            Do you understand?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  Ms. Smith, anything else?

9            MS. SMITH:  The only thing I was going to ask, Your

10   Honor, is for the firearms, has there been a modification

11   officially?

12           THE COURT:  Ms. Salazar?

13           PROBATION OFFICER:  The only other thing I would ask

14   is if he could check on -- like send me, call me weekly so I

15   can follow up with his appointments and get back to you guys

16   about what he has going on so that we can all be on the same

17   page.  That can be a text or a phone call, which we do anyway.

18           THE COURT:  Okay.  So as it relates to Ms. Salazar's

19   request, I'm going to let her set the time and the date and the

20   schedule for you that's going to work between the two of you

21   all, but check in with her.  I think you already have the

22   condition you are to comply and cooperate with your probation

23   officer.  But I'll make clear that you are to be in touch with

24   Ms. Salazar, as required by her, and to provide the information

25   updates as required by her.

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1           With respect to firearms, you are not to have any

2    firearms in the household.  I understand that they're out of

3    the household and I appreciate that.  You are not to possess a

4    firearm while on pretrial release, nor are you to stay

5    overnight in a household that has firearms.  So if, for

6    example, you're at your brother's house and you want to spend

7    the night, he can't have firearms.  I'm not going to tell you

8    you can't go visit homes -- I'm not going to say, for example,

9    if you go to your brother's for Thanksgiving he's got to remove

10   all his firearms.

11          Do you understand?

12          Does that make sense, Ms. Smith?

13          MS. SMITH:  Yes, Your Honor.  Thank you.

14          THE COURT:  Does that meet the government's request?

15          MS. SMITH:  Yes, Your Honor.

16          THE COURT:  Any questions about that?

17          THE DEFENDANT:  No, sir.

18          THE COURT:  Very well.  So Ms. Brown is going to

19   write up the amended conditions.  She'll go over them with you,

20   have you sign them, and then we'll sign them and make them part

21   of the record.

22          (Off-the-record discussion with the courtroom deputy

23   clerk.)

24          THE COURT:  We can just enter an order that amends

25   those conditions, but he'll sign those as well.

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1              Is he going to meet with you this afternoon?

2              PROBATION OFFICER:  To get release of information.

3              THE COURT:  So afterwards you're going to meet with

4   Ms. Salazar, and the amended conditions will be with her.  I'll

5   enter that as an order, but you need to sign that indicates

6   you've received them, read them, and understood them.

7   Understand?

8              THE DEFENDANT:  Yes.

9              THE COURT:  All right.  Very well.  We will stand in

10  recess.  Thank you.

11  (Proceedings adjourned, 2:09 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 11/22/2024

1                    C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3    the United States District Court for the Western District of

4    Virginia, appointed pursuant to the provisions of Title 28,

5    United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction

8    with computer-aided transcription, and that same is a

9    true and correct transcript to the best of my ability and

10   understanding.

11       I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14       /s/ Lisa M. Blair                  Date: December 10, 2024

15

16

17

18

19

20

21

22

23

24

25