USA v. Jenkins, 3:23cr11, 12/11/2024

```
 1              UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF VIRGINIA
 2                CHARLOTTESVILLE DIVISION

 3  ************************************************************

 4  UNITED STATES OF AMERICA,    CRIMINAL CASE NO.:  3:23-CR-11
                                 DECEMBER 11, 2024, 8:59 A.M.
 5                               CHARLOTTESVILLE, VIRGINIA
            Plaintiff,           JURY TRIAL, DAY 1
 6  vs.

 7  SCOTT HOWARD JENKINS,        Before:
                                 HONORABLE ROBERT S. BALLOU
 8                               UNITED STATES DISTRICT JUDGE
            Defendant.           WESTERN DISTRICT OF VIRGINIA
 9
    ************************************************************
10
    APPEARANCES:
11

12  For the Government:          CELIA RUTH CHOY, ESQUIRE
                                 LINA PENG, ESQUIRE
13                               DOJ-Crm
                                 Public Integrity Section
14                               1301 New York Avenue NW, 10th Floor
                                 Washington, DC 20530
15                               202-875-1557

16                               MELANIE SMITH, ESQUIRE
                                 DOJ-USAO
17                               Western District of Virginia
                                 255 West Main Street, Suite 130
18                               Charlottesville, VA 22902
                                 434-293-4283

19

20

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                      255 West Main Street, Suite 304
23                    Charlottesville, Virginia  22902
                      434.296.9284
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25  TRANSCRIPT PRODUCED BY COMPUTER.
```

USA v. Jenkins, 3:23cr11, 12/11/2024

1   APPEARANCES CONTINUED:

2   For the Defendant:          PHILIP ANDONIAN, ESQUIRE
                                JOSEPH P. CALEB, ESQUIRE
3                               Caleb Andonian PLLC
                                1100 H Street, NW, Suite 315
4                               Washington, DC 20005
                                202-953-9850
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23cr11, 12/11/2024

1  (Proceedings commenced, 8:59 a.m.)

2          THE COURT:  Good morning, everybody.

3          Let's call our case, please.

4          THE CLERK:  *United States of America v. Scott Howard*

5  *Jenkins*, Criminal Action Number 3:23-cr-11.

6          THE COURT:  Let the record reflect that the

7  government is present by its counsel.  The defendant, likewise,

8  is present along with counsel.  We're here today for trial.

9          Is the government ready to proceed?

10          MS. PENG:  Yes, Your Honor.

11          THE COURT:  And is the defendant ready to proceed?

12          MR. ANDONIAN:  Yes, Your Honor.

13          THE COURT:  So just a couple of things that I've got

14  on my agenda this morning.  First of all, I think all the

15  jurors are here.  We have about 70 or so, maybe just a couple

16  over that.  I'm going to start out by thanking them for coming

17  in with the weather.  I looked outside about ten minutes before

18  I came up here, and it's raining quite heavily.

19          A couple of things, just so you all will know who is

20  not on your list.  Mr. Engle, I think by agreement or without

21  objection, we struck him for cause.  Ms. Ramirez got to us the

22  travel documents that we have been looking for.  She had

23  preplanned travel over a portion of the trial.  Mr. Douglas, I

24  excused him.  He provided a medical excuse.  Ms. Meyer provided

25  travel documents as well.  She had preplanned travel as well.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Mr. Falls, who I believe is here -- I haven't confirmed that

2  he, in fact, is here -- has had his civil rights restored as

3  well.

4        What I thought we would do, to the extent we need to

5  do individual voir dire -- and you all are going to have to

6  help me as we identify folks that need to be individually voir

7  dired.  Just ask yes-or-no questions in your voir dire so we

8  don't have anyone -- not all have to be yes or no, but those

9  questions that may delve into things that are private or may

10 elicit a response that we don't want in front of the entire

11 venire, just ask yes-or-no questions, and then we can

12 individually voir dire them.  My thought is we can do so here

13 in the courtroom.  It may be a little bit easier.  That will

14 allow the jurors to get up and wander around, go out in the

15 hallway, go back to the jury room.  We don't have to then bring

16 everyone back.  We'll just close the courtroom because a number

17 of the matters are going to be private.  I think that will work

18 a little bit better.

19        Any objection, Ms. Peng, to proceeding that way?

20        MS. PENG:  So Your Honor, you'll excuse the rest of

21 the jurors and just ask them to come in individually?

22        THE COURT:  Right.  I'll excuse everybody, anyone who

23 is not part of the case.

24        MS. PENG:  But the courtroom will remain open to the

25 public since the proceeding has to be public?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  No, because if we had gone back in the

2    back -- a number of the matters are private matters.

3          MS. PENG:  I think we're okay with that, Your Honor.

4          THE COURT:  Mr. Andonian?

5          MR. ANDONIAN:  We're fine with that, Your Honor.

6          THE COURT:  Very well.  With respect to the *Lafler*

7    *Frye* inquiry, I don't want to know the status of any plea

8    negotiations at all.  The purpose of the *Lafler Frye* inquiry,

9    Mr. Jenkins, is to assure to the extent there were any plea

10   negotiations, that those have all been conveyed to you, you

11   understood the nature of any plea offers that were made; and

12   that after consultation with your counsel, and understanding

13   all those, that you have made the decision to proceed to trial.

14         So Ms. Choy, I'll just turn to the government.  When,

15   if at all, were any -- the last plea offers extended to

16   Mr. Jenkins?

17         MS. CHOY:  A plea offer was extended in May of this

18   year.

19         THE COURT:  Okay.  Very well.  Mr. Andonian -- a

20   number of counsel sometimes object if I address the defendant

21   directly with respect to some of those things, but I'll follow

22   back up with Mr. Jenkins -- you all received a plea offer in

23   May, you conveyed it to Mr. Jenkins?

24         MR. ANDONIAN:  Yes, Your Honor.

25         THE COURT:  Went over it with Mr. Jenkins fully and

6

USA v. Jenkins, 3:23cr11, 12/11/2024

1  completely?

2          MR. ANDONIAN:  Yes, Your Honor.

3          THE COURT:  He understood all the aspects of it?

4          MR. ANDONIAN:  Yes, Your Honor.

5          THE COURT:  And made a decision not to accept, and

6  it's his decision to go to trial; is that correct?

7          MR. ANDONIAN:  That's correct.

8          THE COURT:  Mr. Jenkins, do you understand all these

9  things?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  You can sit right there.

12          And received a plea offer in May, went over it with

13  your counsel, and have elected to proceed to trial; is that

14  correct?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  All right.  Very well.  That's all I've

17  got on my list.

18          Anything we need to address before we bring the jury

19  in?  I'm not sure they're all in line yet.

20          MS. PENG:  Just one logistical question, Your Honor.

21  When you're doing your voir dire -- and I think yesterday we

22  had discussed that maybe jurors will raise their hands.  We

23  don't know who they are, even though --

24          THE COURT:  I'm going to have them identify

25  themselves, yes.  For a number of things, I'll follow back up.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A number of questions on my standard voir dire we have already

2  covered through the questionnaires.  And so I have changed my

3  script a little bit to where it's going to be:  Each of you

4  have filled out a questionnaire and we appreciate you doing so.

5  To the extent there's anything additional to offer in response

6  to these questions, please let us know.  I mean, the

7  questionnaires are under penalty of perjury.  So they're under

8  oath just as though they were here as well.  I don't think we

9  have to go back through them all.  There's a number of folks,

10  for example, who previously served as jurors.  You all have

11  that information.  If you want to follow back up with it in

12  your voir dire, you can certainly do so, but I was not planning

13  to have them restate what was already in their questionnaires.

14  And I would fully anticipate and will not be offended when I'm

15  doing my voir dire, I would expect to see the back of you all's

16  heads if you want to turn around and look at the jury, and

17  don't feel like you have to be facing this way.  You can turn

18  around and look at the jury as well.

19          MR. ANDONIAN:  Your Honor, may I ask just a couple of

20  questions as well.

21          THE COURT:  Yes.

22          MR. ANDONIAN:  And they might be dumb questions,

23  but --

24          THE COURT:  No.

25          MR. ANDONIAN:  -- I'll ask them anyway.

USA v. Jenkins, 3:23cr11, 12/11/2024

1           And now I just -- oh, I want to make sure we are not

2    missing any questionnaires.  I had on my list just a handful

3    that we didn't appear to have a questionnaire for.  Are those

4    people presumptively going to be individually voir dired or do

5    you have a different understanding of the state of questioning?

6           THE COURT:  So anyone who came today -- and when

7    Ms. Melvin gets the jury lined up, anyone who came today who

8    had not filled out a questionnaire should fill out -- should be

9    given a questionnaire that we should receive.

10          Do we know how many are in that category?

11          We'll find out about that.  I did not count how many

12   questionnaires we had or not.  If you have the list, if we have

13   those questionnaires we'll get those to you.  I know there's

14   some -- you all were able to get --

15          MR. ANDONIAN:  I think there were about eight people

16   that had not -- at least we had not gotten a questionnaire for.

17          THE COURT:  We're getting some questionnaires filled

18   out.  I presume they'll be scanned and emailed to you all as

19   well.  So let me find out about that and give you all a few

20   minutes.

21          Do you have a written list of the eight that you

22   have?

23          MR. ANDONIAN:  Yes.

24          THE COURT:  Hand it over to the government.  Let them

25   take a look at it -- or actually, I'll have Ms. Brown just make

USA v. Jenkins, 3:23cr11, 12/11/2024

1  a copy of it.

2          MR. ANDONIAN:  Oh, I can write the names down.

3          THE COURT:  Okay.  If you could do that, that would

4  be good.

5          MS. PENG:  Your Honor, on that note, I think we did

6  receive an additional questionnaire for a Kimberley McDaniel.

7  The government has a for-cause challenge against her.  So I

8  don't know if you want to hear that now so she can be excused,

9  if she did show up today, without sitting through the whole

10  thing.

11          THE COURT:  I had seen Ms. McDaniel.  I'm trying to

12  remember where I put her.  We'll see how many of these folks I

13  have questionnaires for.  My guess is we're getting

14  questionnaires for each of those if they showed up.  We'll

15  figure out how those are going to get to us and how many of

16  those folks have otherwise shown up.

17          MR. ANDONIAN:  Your Honor, I just had a couple of

18  other -- while we're sitting here.

19          THE COURT:  Sure.

20          MR. ANDONIAN:  At some point I think you had

21  mentioned we would be getting the randomized list?

22          THE COURT:  Right, once we know who all -- everybody

23  is here.

24          MR. ANDONIAN:  Oh, that's still processing.

25          THE COURT:  Yeah.  So once we have everybody here,

USA v. Jenkins, 3:23cr11, 12/11/2024

1   then we then provide you the random list.

2           MR. ANDONIAN:  Okay.

3           THE COURT:  It will be from that list that we're then

4   selecting the jury once we've gone through our for-cause

5   strikes.

6           MR. ANDONIAN:  Okay.  And then the final question --

7   this is just -- since we haven't been in front of Your Honor,

8   and I understand things in the Western District kind of work

9   differently depending on where you are -- but in terms of just

10  the mechanics of this, after you make introductory remarks,

11  will counsel have a chance to introduce ourselves?

12          THE COURT:  Yeah.  So I sent you the script before

13  our first trial, and it is substantially the same.  I put a

14  little preamble in there that I'm going to just thank folks for

15  being here.  I add a little section at the -- and actually,

16  this will be after the jury is selected and my instructions

17  that we'll indicate that counsel may come and go because you're

18  working on the case.  That way in the event that however you

19  all are working things, working witnesses, you can do so.  And

20  then I think I changed the introduction to a number of my

21  questions:  Have you previously served on a jury, have you

22  previously been involved in a civil or criminal matter to the

23  extent not provided in your questionnaires.  And then after

24  that, I'll have you all do voir dire.

25          What I typically do for introductions is I'll

USA v. Jenkins, 3:23cr11, 12/11/2024

1  introduce counsel, and then I'll let counsel introduce your

2  case agents.  I'll let you introduce Mr. Jenkins.

3           MR. ANDONIAN:  Very well.

4           THE COURT:  And then we'll go from there.

5           MS. PENG:  Your Honor, we just wanted to revisit the

6  courtroom closure issue.  In terms of, you know, the public

7  does have a right to jury selection, if there are private

8  medical issues, perhaps that would be a reason to seal the

9  courtroom, but otherwise we would request that at least the

10  public have access even to the portions that are closed, so to

11  speak, to the rest of the jury pool because the purpose is not

12  to taint the rest of the pool with any information that may be,

13  you know, derogatory or whatnot, but it doesn't extend to the

14  right of public access to those proceedings, in our view.

15           THE COURT:  Because we were otherwise going to go

16  back in the jury room and the government was perfectly fine

17  with that.

18           MS. PENG:  That's true.

19           THE COURT:  I know that's the way this has been done

20  on a number of other occasions in the district.  I haven't had

21  to address that question.

22           Mr. Andonian?

23           MR. ANDONIAN:  I mean, Your Honor, in my experience

24  selecting juries in other jurisdictions, there is often -- I

25  mean, almost as a matter of course -- bench conferences with

USA v. Jenkins, 3:23cr11, 12/11/2024

1   the white noise on that nobody can hear except counsel and the

2   client.  So it's always been my understanding that certain

3   parts of jury selection are not broadcast to the public, even

4   if the public happens to be in the courtroom.  So I don't think

5   that there's any problem with what Your Honor suggested,

6   whether we go in the back, or whether we close the courtroom

7   and have people come in here.

8          THE COURT:  I've always done my cause strikes -- I

9   know we've did the ones off the questionnaires yesterday

10  here -- I've always done my cause strikes at the bench during

11  trial.

12         My concern, if I deny a strike for cause and that

13  ends up being in the jury that the judge denied a strike that

14  the government or the defendant requested to be struck, and

15  that person winds up on the jury and that gets to the jury,

16  you've got -- you now have a problem.

17         MS. PENG:  I think the strikes can be just done

18  through --

19         THE COURT:  No, I'm talking about the cause strikes.

20  The peremptory strikes, those are --

21         MS. PENG:  Do you mean the jury would be excused

22  during the discussion of the for-cause strikes, because they

23  could be excused when we're having those discussions.

24         THE COURT:  I wouldn't have that -- I'd have the

25  record, but I wouldn't have the press here.  I'd have the

USA v. Jenkins, 3:23cr11, 12/11/2024

1  courtroom closed for the cause strikes.  I don't want that

2  broadcast.  I don't want that put in the press.

3          MS. PENG:  I don't think we would object to that

4  portion, but --

5          THE COURT:  And also I think to the extent people

6  have questions that are private.

7          So let me see if I can -- we'll do some work on it.

8  And when we get to that point, I'll let you know and I'll

9  revisit it.  So we'll look at that issue.  And I've just handed

10 you all five additional questionnaires.  So the others are not

11 here.  So I think we now have all of the -- all of the

12 questionnaires.

13         So why don't I take five minutes and let you all look

14 through those real quickly so you know who they are, and then

15 we'll -- assuming that Ms. Melvin is ready and she has the jury

16 ready, then we'll go ahead and begin with the trial.

17         All right.  We'll stand in recess.

18         (Recess.)

19         THE COURT:  We are back in the record in the matter

20 of *United States versus Jenkins.*

21         I am told that our jury is present and lined up and

22 ready to go.  You all have these additional questionnaires we

23 provided to you, the randomized list and the alphabetical list

24 as well.  Let me address the issue that we were dealing with as

25 we went out.

USA v. Jenkins, 3:23cr11, 12/11/2024

1              So the Supreme Court in 1984 decided the case of

2    *Press-Enterprise Company v. Superior Court of California,* which

3    is at 464 U.S. 501.  It is a decision by Chief Justice Burger,

4    and I believe Justice Blackmun concurred.  In that particular

5    case, it was a six-week long voir dire process that was closed,

6    and -- and over the objections not of the parties but of the

7    press.  And in that particular case, the court found that the

8    court had not made adequate findings for purposes of closing

9    voir dire.  Specifically, the court said jury selection process

10   may in some circumstances give rise to a compelling interest of

11   prospective juror when interrogation touches on deeply personal

12   matters that a person has legitimate reasons for keeping out of

13   the public domain.  Before then, the court had said, the right

14   of the accused to a fundamental fairness in the jury selection

15   process is a compelling interest.  The court had closed it

16   because of -- to assure a fundamentally fair trial.  And it

17   says, but the court's conclusion that the Sixth Amendment

18   privacy was sufficient to warrant prolonged closing was

19   unsupported by findings showing that an open proceeding in fact

20   threatened those interests.  Hence, it is not possible to

21   conclude that closure was warranted.  Even with findings

22   adequate to support this closure, the court orders denying

23   access to the voir dire testimony -- because then after the

24   trial, the court denied requests for the voir dire testimony,

25   and it failed to consider whether alternatives were available

USA v. Jenkins, 3:23cr11, 12/11/2024

1  to protect the interests of the prospective jurors that the

2  trial court's orders sought to guard.  Absent consideration of

3  alternatives to closure, the trial court should not

4  Constitutionally close the voir dire.

5          Interestingly -- and I will put this in my

6  conversation with the jurors as well -- to preserve fairness,

7  at the same time to protect legitimate privacy, a trial judge

8  must at all times maintain control of the process of jury

9  selection, and should inform the array of prospective jurors,

10  once the general nature of sensitive questions is made known to

11  them, that those individuals believing public questioning would

12  prove damaging because of embarrassment may properly request an

13  opportunity to present the problem to the judge in camera, but

14  with counsel present and on the record.  Requiring the

15  prospective juror to make an affirmative request, the trial

16  judge can then ensure that there is, in fact, a valid basis for

17  a belief that disclosure infringes on the significant interests

18  of privacy.

19          In that particular case, it was a -- I believe it

20  was a -- the defendant was charged with rape, and the court

21  acknowledged that there are probably some privacy interests for

22  those previous victims of sexual assault or sexual violence,

23  but not for closing general voir dire.

24          So thank you for bringing it to my attention,

25  Ms. Peng.  Individual voir dire will not be -- will not be

USA v. Jenkins, 3:23cr11, 12/11/2024

1   closed.  And then we've done all of our for-cause strikes.

2   We're continuing to look.  We've done all of our for-cause

3   strikes on the record, and we'll continue to do so, so --

4   unless we find something that suggests we should do something

5   different.  Like I said, my concern is -- I just don't want

6   someone on the jury that may have been the subject of a

7   for-cause strike to believe one thing or the other if they ever

8   find that out.

9           Other than that, does that address the government's

10  concern, Ms. Peng?

11          MS. PENG:  Yes, Your Honor.  Thank you.

12          THE COURT:  Mr. Andonian, any issues in that regard?

13          MR. ANDONIAN:  No.

14          THE COURT:  All right.  Are we otherwise ready for

15  our jury?

16          MS. PENG:  Yes.

17          THE COURT:  So I think -- do we want to put all the

18  people that are here, stick them on the far back?  So if I

19  could ask everybody who's here -- first of all, I have excluded

20  witnesses.  So anyone who is going to be a witness, I'm going

21  to ask you to be excluded during the course of the trial once

22  we begin.  Anyone who is here to observe, you're welcome to

23  stay, but we're going to -- because we have about 70-some folks

24  here, I'm going to bring them in, I'm going to have them in

25  alphabetical order.  I'm going to pack you all tightly into the

USA v. Jenkins, 3:23cr11, 12/11/2024

1    back.  And then once we get our jurors in and seated, if we

2    have some additional space, I'll let you spread out at that

3    point in time, but I want to keep all the jurors together and

4    in alphabetical order.  So if I could put you in the back, what

5    would be your back left, my back right, I'd be much obliged.

6    Thank you.

7    **(Jury in, 9:48 a.m.)**

8              THE COURT:  You all please be seated.  Well, good

9    morning, ladies and gentlemen.  My name is Robert Ballou.  I'm

10   one of the district judges here in the Western District of

11   Virginia.  Let me first of all welcome you to federal court and

12   also thank you for being here, especially on a day with the

13   weather the way that it was and that it is.  I know that many

14   of you came from long distances in a lot of rain, and I very

15   much appreciate it.  The parties, I know, appreciate it as

16   well.  Today you have been summonsed for possible jury service.

17   The right to a trial by jury is enshrined in the Sixth

18   Amendment of the Constitution, and service as a juror is one of

19   the highest duties that we have as citizens.  And today, you

20   join a long line of those citizens since the dawn of our

21   country who have answered the call to serve, and on behalf of

22   the Court and on behalf of the parties and on behalf of all the

23   citizens in the Western District of Virginia, I want to thank

24   you very much.

25             With that, I'm going to turn you over briefly to

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Ms. Brown, my courtroom deputy, who is going to call each of

2  you.

3          Ms. Brown?

4          THE CLERK:  This is the *United States of America v.*

5  *Scott Howard Jenkins*, Criminal Action Number 3:23-cr-11.

6          Ladies and gentlemen, as your name and juror number

7  are called, please answer.

8          THE COURT:  If you can just -- if you're able to

9  stand so the lawyers can put a face with a name, and then you

10  can sit right back down, I'd appreciate it.

11          THE CLERK:  Percy Waddlle Ayers.

12          THE COURT:  And if you can say "here," so that way

13  the court reporter can get you, so --

14          PROSPECTIVE JUROR:  Present.

15          THE COURT:  All right.  Thank you, Mr. Ayers.

16          THE CLERK:  Elizabeth Wilfong Bailey.

17          PROSPECTIVE JUROR:  Here.

18          THE CLERK:  James Lawrence Belew, Jr.

19          PROSPECTIVE JUROR:  Here.

20          THE CLERK:  Patrick Alan Betz, Jr.

21          PROSPECTIVE JUROR:  Here.

22          THE CLERK:  Brandon Michael Bilyard, Jr.

23          PROSPECTIVE JUROR:  Here.

24          THE CLERK:  Donald Andrew Birkelund.

25          PROSPECTIVE JUROR:  Here.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE CLERK:  Jeffrey de Witt Blauvelt.

2          PROSPECTIVE JUROR:  Here.

3          THE CLERK:  Laura Gail Boltz.

4          PROSPECTIVE JUROR:  Here.

5          THE CLERK:  Ana Bowler.

6          PROSPECTIVE JUROR:  Here.

7          THE CLERK:  Kelly Bright.

8          PROSPECTIVE JUROR:  Here.

9          THE CLERK:  Dawn Marie Brunk.

10         PROSPECTIVE JUROR:  Here.

11         THE CLERK:  Cody Daniel Bryant.

12         PROSPECTIVE JUROR:  Here.

13         THE CLERK:  Karson Byers.

14         PROSPECTIVE JUROR:  Here.

15         THE CLERK:  Tessa Maria Chisholm.

16         PROSPECTIVE JUROR:  Here.

17         THE CLERK:  Lisa Michelle Choi.

18         PROSPECTIVE JUROR:  Here.

19         THE CLERK:  David Bradley Cohen.

20         PROSPECTIVE JUROR:  Here.

21         THE CLERK:  Charmaine Elaine dill.

22         PROSPECTIVE JUROR:  Here.

23         THE CLERK:  Stacie Lee Dowdy.

24         PROSPECTIVE JUROR:  Here.

25         THE CLERK:  Joan Michele Dreicer.

USA v. Jenkins, 3:23cr11, 12/11/2024


1            PROSPECTIVE JUROR:  Here.

2            THE CLERK:  Christine Crute Estes -- oh, excuse me,

3   let me go back one.  Michael Stephen Drotos.

4            PROSPECTIVE JUROR:  Skipped me.

5            THE CLERK:  Sorry.  Christine Crute Estes.

6            PROSPECTIVE JUROR:  Here.

7            THE CLERK:  Timothy David Falls.

8            PROSPECTIVE JUROR:  Here.

9            THE CLERK:  Jeffrey Lee Ford.

10           PROSPECTIVE JUROR:  Here.

11           THE CLERK:  Meagan Forsht.

12           PROSPECTIVE JUROR:  Here.

13           THE CLERK:  Sherrie Lynn Frazier.

14           PROSPECTIVE JUROR:  Here.

15           THE CLERK:  Michael Dwaine Fulkerson.

16           PROSPECTIVE JUROR:  Here.

17           THE CLERK:  Jo Lea Gilmore.

18           PROSPECTIVE JUROR:  Here.

19           THE CLERK:  Tyler Victoria Haislip.

20           PROSPECTIVE JUROR:  Here.

21           THE CLERK:  Richard Henry Harris.

22           PROSPECTIVE JUROR:  Here.

23           THE CLERK:  Karen Martinsen Hathaway.

24           PROSPECTIVE JUROR:  Here.

25           THE CLERK:  Heather Bell Heuschen.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  Here.

2          THE CLERK:  Karen Carpenter Ingram.

3          PROSPECTIVE JUROR:  Here.

4          THE CLERK:  Sydney Bagley Kelly.

5          PROSPECTIVE JUROR:  Here.

6          THE CLERK:  Hawa Sabatue Kennedy St. Hill.

7          PROSPECTIVE JUROR:  Here.

8          THE CLERK:  Frank Jay Krick.

9          PROSPECTIVE JUROR:  Here.

10         THE CLERK:  Elizabeth Lemieux-Denton.

11         PROSPECTIVE JUROR:  Here.

12         THE CLERK:  Amanda Dawn Long.

13         PROSPECTIVE JUROR:  Here.

14         THE CLERK:  Brian Thomas McCarthy.

15         PROSPECTIVE JUROR:  Here.

16         THE CLERK:  Kimberley Robyn McDaniel.

17         PROSPECTIVE JUROR:  Here.

18         THE CLERK:  Lisa Polk-Green Meade.

19         PROSPECTIVE JUROR:  Here.

20         THE CLERK:  Kira Rose Memery.

21         PROSPECTIVE JUROR:  Here.

22         THE CLERK:  Molly Catherine Mitchell.

23         PROSPECTIVE JUROR:  Here.

24         THE CLERK:  Shawn Holden Mitchell.

25         PROSPECTIVE JUROR:  Here.

USA v. Jenkins, 3:23cr11, 12/11/2024

1        THE CLERK:  Karina A. Monroy.

2        PROSPECTIVE JUROR:  Here.

3        THE CLERK:  Cody Moubray.

4        PROSPECTIVE JUROR:  Here.

5        THE CLERK:  Megan O'Donnell.

6        PROSPECTIVE JUROR:  Here.

7        THE CLERK:  Alicia Orbeta.

8        PROSPECTIVE JUROR:  Here.

9        THE CLERK:  Jaclyn Woodyatt Patrizia.

10       PROSPECTIVE JUROR:  Here.

11       THE CLERK:  Marsha Honaker Peterson.

12       PROSPECTIVE JUROR:  Here.

13       THE CLERK:  Carolyn Shifflett Powell.

14       PROSPECTIVE JUROR:  Here.

15       THE CLERK:  Mary Jane L. Reed.

16       PROSPECTIVE JUROR:  Here.

17       THE CLERK:  Bobbie Swaringen Relken.

18       PROSPECTIVE JUROR:  Here.

19       THE CLERK:  Kelly Marie Rhoden.

20       PROSPECTIVE JUROR:  Here.

21       THE CLERK:  Tanner Grayson Rocha.

22       PROSPECTIVE JUROR:  Here.

23       THE CLERK:  Karl Alan Roelofs.

24       PROSPECTIVE JUROR:  Here.

25       THE CLERK:  Deborah Johnson Scott.

USA v. Jenkins, 3:23cr11, 12/11/2024

1    PROSPECTIVE JUROR:  Here.

2    THE CLERK:  Margaret Conway Short.

3    PROSPECTIVE JUROR:  Here.

4    THE CLERK:  Dora Shelton Smith.

5    PROSPECTIVE JUROR:  Here.

6    THE CLERK:  Kristin Parker Southard.

7    PROSPECTIVE JUROR:  Southard.

8    THE CLERK:  Southard.

9    Cody Brett Stanley.

10   PROSPECTIVE JUROR:  Here.

11   THE CLERK:  Christopher Michael Stapler.

12   PROSPECTIVE JUROR:  Yeah, Stapler.  Here.

13   THE CLERK:  Kimberly Marie Stokes-Rath.

14   PROSPECTIVE JUROR:  Here.

15   THE CLERK:  Robert Charles Taylor.

16   PROSPECTIVE JUROR:  Present.

17   THE CLERK:  Susan Thomas.

18   PROSPECTIVE JUROR:  Here.

19   THE CLERK:  Diana Veronica Walker.

20   PROSPECTIVE JUROR:  Here.

21   THE CLERK:  Emily Hobgood Walker.

22   PROSPECTIVE JUROR:  Here.

23   THE CLERK:  Martha Claire Weiss.

24   PROSPECTIVE JUROR:  Weiss.  Here.

25   THE CLERK:  Karie Ann Wilson.

USA v. Jenkins, 3:23cr11, 12/11/2024

1              PROSPECTIVE JUROR:  Here.

2              THE CLERK:  Ladies and gentlemen, please stand and

3    raise your right hands to be sworn.

4              Do you and each of you solemnly swear that you will

5    make true answers to such questions as may be propounded to you

6    upon touching your qualifications to serve in the case of

7    *United States v. Scott Howard Jenkins*?  You do?

8              ALL JURORS:  Yes.

9              THE CLERK:  You may be seated.  Ladies and gentlemen,

10   in order to serve as a juror in this court, you must be a

11   citizen of the United States who has attained the age of 18

12   years, and has resided in the Western District of Virginia for

13   one year.  You must not be under charge or have been convicted

14   in any court, state or federal, of a crime punishable by

15   imprisonment for a period of more than one year, unless your

16   civil rights have been restored.  You must be able to read,

17   write, and understand the English language, and must be able to

18   both physically and mentally render efficient jury service.  Do

19   you and each of you qualify on these grounds?

20             ALL JURORS:  Yes.

21             THE COURT:  All right.  Ladies and gentlemen, like I

22   said, welcome to federal court.  Today you've been summonsed

23   here for a possible jury trial in the case brought by the

24   United States of America against Scott Howard Jenkins.  From

25   2012 through 2023, Mr. Jenkins served as the elected sheriff of

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Culpeper County, Virginia.  The government alleges that

2  beginning no later than April 2019 and continuing until

3  approximately January of 2023, Mr. Jenkins conspired to and did

4  accept bribes, totaling at least $75,000, from a series of

5  individuals, in exchange for appointing those individuals as

6  auxiliary deputy sheriffs and issuing them law enforcement

7  credentials and badges.  The alleged bribes consisted of cash

8  payments, as well as monetary and in-kind contributions to

9  Mr. Jenkins's reelection campaigns.  The government alleges

10  that Mr. Jenkins further agreed to use his official position to

11  help one of those individuals gain approval for his petition to

12  restore his firearm rights in exchange for the bribes.

13        Mr. Jenkins is charged with one count of conspiracy

14  to commit offenses against the United States, four counts of

15  honest services mail and wire fraud, and seven counts of

16  bribery concerning programs receiving federal funds.

17  Mr. Jenkins has pled not guilty to these charges.

18        I will instruct you further, but if selected as a

19  juror in this case, please keep in mind that throughout these

20  proceedings, the defendant, Mr. Jenkins, is innocent of the

21  charges until proven guilty.  The indictment or the charges

22  against Mr. Jenkins are only accusations and nothing more.

23  They are not proof of guilt or anything else.  Mr. Jenkins

24  starts out this trial with a clean slate.

25        I'm going to ask you certain questions, and when I'm

USA v. Jenkins, 3:23cr11, 12/11/2024

1   through, counsel for the government and counsel for Mr. Jenkins

2   will be permitted to ask you questions as well.  The process of

3   questioning jurors is referred to as voir dire, which literally

4   means "to speak the truth."  The purpose of the voir dire

5   examination is to enable the Court to determine whether any

6   prospective juror should be excused for cause, and to enable

7   counsel for the government and counsel for Mr. Jenkins to

8   exercise their individual judgment with respect to peremptory

9   challenges; that is, challenges for which no reason need be

10  given by counsel.

11        If you have an affirmative answer to any of my

12  questions, I ask you please to raise your hand.  I'll ask you

13  to identify yourself by name so that we can get it on the

14  record, and I will likely have some follow-up questions as

15  well.  Some of these questions will need to be answered without

16  anyone present.  And for that reason, some of the follow-up

17  questions may be done on an individual basis outside the

18  presence of the entire venire.  And if there are any questions

19  that are asked of you that are particularly personal in nature,

20  that you wish not to discuss in public, then you need to make

21  that request as well, and we'll address that on an individual

22  basis as well.

23        So with that, let me begin this way:  In this

24  particular case, the government is represented by Celia Choy,

25  Lina Peng, and Melanie Smith, who are Assistant United States

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Attorneys.  Can I ask y'all each to rise and identify

2  yourselves for the jury?

3           MS. PENG:  Lina Peng for the government.  Nice to

4  meet you all.

5           MS. SMITH:  Melanie Smith.  Nice to meet you.

6           MS. CHOY:  And I'm Celia Choy.  Good morning.

7           THE COURT:  Do any of you know Ms. Choy, Ms. Peng, or

8  Ms. Smith?

9           Has any member of the panel had any dealings with

10 Ms. Choy, Ms. Peng, or Ms. Smith?

11           And counsel, I'll ask you to rise and introduce your

12 case agents who are sitting with you at counsel table.

13           MS. PENG:  This is Mr. Scott Medearis, Special Agent

14 Scott Medearis, with the FBI.

15           MR. MEDEARIS:  Morning.

16           MS. PENG:  And Andrew Clouser with the FBI.

17           MR. CLOUSER:  Good morning.

18           MS. PENG:  And Lauren Fastenau is our paralegal, who

19 will be assisting us in this trial.

20           MS. FASTENAU:  Good morning.

21           THE COURT:  Are any of -- members of the panel

22 personally acquainted with, related to, or had any business

23 dealings with either the case agents or the paralegal that was

24 introduced?

25           All right.  The defendant, Scott Jenkins, is

USA v. Jenkins, 3:23cr11, 12/11/2024

1  represented by Phil Andonian and Joseph Caleb.  Gentlemen, if

2  you could rise and introduce yourselves, I'd be much obliged.

3          MR. ANDONIAN:  Good morning, everybody.  My name is

4  Phil Andonian.

5          MR. CALEB:  And good morning, everyone.  My name is

6  Joseph Caleb.

7          THE COURT:  Thank you.  Has any member of the panel

8  had any dealings with Mr. Andonian or Mr. Caleb?

9          And gentlemen, if I could ask you to rise and

10  introduce Mr. Jenkins, I'd be much obliged.

11          MR. CALEB:  Good morning again.  This is Scott

12  Jenkins, our client.

13          THE COURT:  Thank you.

14          All right.  So ladies and gentlemen, all of you

15  filled out your questionnaires beforehand, and I very much

16  appreciate you doing so.  Many of you have indicated -- or

17  you've answered all the questions.  And so for those of you on

18  the panel that have -- that have answers that are different

19  from your questionnaires, I'm going to ask you to raise your

20  hand as I ask these next questions.  So as it relates to

21  Mr. Jenkins, do any of you know him personally?

22          All right.  So let's start -- we'll start over here

23  on the left -- or my left.  And you are?

24          PROSPECTIVE JUROR:  Timothy Falls.

25          THE COURT:  You're Mr. Falls.  And you know

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Mr. Jenkins?

2          PROSPECTIVE JUROR:  Yes, sir.

3          THE COURT:  Okay.  How long have you known

4  Mr. Jenkins?

5          PROSPECTIVE JUROR:  Probably 30, 35 years.

6          THE COURT:  Do you know him personally, or did you

7  know him as the elected sheriff in his official capacity?

8          PROSPECTIVE JUROR:  I knew him as a deputy when he

9  came to Rappahannock County, Virginia.

10          THE COURT:  Okay.  All right.  Thank you, Mr. Falls.

11          We had a hand over here on the far left as well.  And

12  you are?

13          PROSPECTIVE JUROR:  Ana Bowler.

14          THE COURT:  All right.  Ms. Bowler, how long have you

15  known Mr. Jenkins?

16          PROSPECTIVE JUROR:  I don't know him in a personal

17  capacity, but I'm from Culpeper, so I'm familiar with him, and

18  he assisted me in a car accident one time.

19          THE COURT:  And he what?

20          PROSPECTIVE JUROR:  Assisted me in a car accident.

21          THE COURT:  In a car accident?  Okay.  How long ago

22  was that?

23          PROSPECTIVE JUROR:  2016.

24          THE COURT:  Okay.  About eight or so years ago?

25          PROSPECTIVE JUROR:  (No verbal response).

USA v. Jenkins, 3:23cr11, 12/11/2024

1            THE COURT:  Okay.  Anybody else over there on that

2  side of the -- yes, ma'am?

3            PROSPECTIVE JUROR:  I'm Charmaine Dill, and I also am

4  from Culpeper.

5            THE COURT:  All right.

6            PROSPECTIVE JUROR:  I do not know him personally, but

7  I was a server in a restaurant there in Culpeper that he and a

8  lot of the deputies would frequent occasionally.

9            THE COURT:  All right.  And are you still working in

10 that restaurant?

11           PROSPECTIVE JUROR:  No, sir.

12           THE COURT:  Okay.  How long ago has it been since you

13 worked there?

14           PROSPECTIVE JUROR:  About ten years.

15           THE COURT:  Have you had -- go ahead.  I'm sorry.  I

16 interrupted you.  Please excuse me.

17           PROSPECTIVE JUROR:  I was calculating.

18           THE COURT:  And in the last ten years, have you had

19 any dealings with Mr. Jenkins?

20           PROSPECTIVE JUROR:  No, sir.

21           THE COURT:  All right.  Thank you.  Anybody else over

22 there on the left side?  Yes, ma'am?

23           PROSPECTIVE JUROR:  I'm Jo Gilmore.  I'm also from

24 Culpeper County.  I don't know Mr. Jenkins personally, but he

25 has been a sheriff a long time, as long as I've been in the

USA v. Jenkins, 3:23cr11, 12/11/2024

 1  county.  And I always thought he was a good sheriff.

 2          THE COURT:  Well, I just want to know -- you know,

 3  you didn't know him personally or have any involvement with him

 4  as the -- as a sheriff?

 5          PROSPECTIVE JUROR:  No, sir.

 6          THE COURT:  Okay.  All right.  Thank you, Ms.

 7  Gilmore.

 8          And ladies and gentlemen, I'm going to ask you all to

 9  be -- to answer the question that's asked, because some of the

10  questions we may end up needing to ask each of you all

11  individually out of the presence of everyone.  And so just try

12  to stick just to the question that's asked.

13          Anyone else over on the left side, before we move on

14  over to -- my left -- move over to the right?

15          All right.  I believe there was -- over here on the

16  front row.  Yes, ma'am?

17          PROSPECTIVE JUROR:  Hi, I'm Amanda Long.  I'm the

18  director of the Youth Network in Culpeper County, and

19  Mr. Jenkins and myself have served on several committees

20  together over the past five years, I would say.

21          THE COURT:  Okay.  And that's the past five years

22  from the present?

23          PROSPECTIVE JUROR:  Yes, sir.  Yes, Your Honor.

24          THE COURT:  Okay.  Are you all still on -- serving

25  together on anything?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  No, sir.  No, Your Honor.

2          THE COURT:  All right.  Thank you.

3          Anybody else over on that side?  Yes, ma'am?

4          PROSPECTIVE JUROR:  Good morning.  My name is

5   Kimberley McDaniel.  I used to work at Social Services in

6   Culpeper.  And I am not close with Mr. Jenkins, but his aunt

7   did work there, Ms. Clatterbuck, and we've all worked very

8   closely together and have had Christmas parties together.

9          THE COURT:  All right.  Thank you, Ms. McDaniel.

10  Anybody else, as we work back there?

11         PROSPECTIVE JUROR:  I'm Mary Jane Reed.  And I don't

12  know Mr. Jenkins personally, but my late husband I know did

13  take concealed weapon training from him about 12 years ago.  My

14  husband has since passed away eight years ago.  I also have

15  probably met him in town at an event, shook hands.  That was

16  the extent of it.

17         THE COURT:  But you all are not personal friends?

18         PROSPECTIVE JUROR:  No, I'm not.

19         THE COURT:  And may have run across him in some --

20         PROSPECTIVE JUROR:  Correct.

21         THE COURT:  -- electoral capacity?  Okay.  Thank you,

22  Ms. Reed.

23         Anybody else?

24         All right.  Ladies and gentlemen, during the course

25  of the trial, you may hear certain names of certain people.  I

USA v. Jenkins, 3:23cr11, 12/11/2024

1  don't know whether they'll be witnesses or just names that are

2  part of the trial, but I'm going to read those names out.  And

3  if you -- let me get to the end, and then I'm going to ask you

4  the question of whether you know any of these folks as well.

5          Carson Beard, Harry Carr, Thomas Cooper, Dale Durrer,

6  Bernard Feaganes, Fredric Gumbinner, Philip Howell, David

7  Jones, Seppo Karkkainen, Valerie Lamb, Jennifer Locsin.  Let me

8  stop right there.  Anybody familiar with any of these names or

9  know any of these names?

10          Okay.  So let's start over here.  And you are Ana

11  Bowler?

12          PROSPECTIVE JUROR:  Carson Beard is a close personal

13  friend.

14          THE COURT:  Do you all socialize together?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  And in a six-month period, how frequently

17  would you all socialize with one another?

18          PROSPECTIVE JUROR:  Several times a month.

19          THE COURT:  Okay.  Thank you, Ms. Bowler.

20          Anybody else on that side?  There was another hand --

21  was there another hand over there?  Okay.  I know there was a

22  hand over here on the front row.  And you are?

23          PROSPECTIVE JUROR:  Amanda Long.

24          THE COURT:  Ms. Long, yes, ma'am?

25          PROSPECTIVE JUROR:  Judge Durrer, I'm very close

USA v. Jenkins, 3:23cr11, 12/11/2024

1  friends with his wife.  And Valerie Lamb is the finance

2  director for me as well, for the county.

3           THE COURT:  Is she still the finance director of the

4  office where you are?

5           PROSPECTIVE JUROR:  Yes, Your Honor.

6           THE COURT:  All right.  Thank you very much.

7           Over here on the far end?

8           PROSPECTIVE JUROR:  I'm Karen Ingram, and I'm

9  affiliated with Judge Durrer.

10           THE COURT:  Judge Durrer?

11           PROSPECTIVE JUROR:  Yes.

12           THE COURT:  And do you know him personally?

13           PROSPECTIVE JUROR:  Not -- he's not in a social

14  circle.

15           THE COURT:  Not in a social circle?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  All right.  Thank you.

18           Anybody else on that side?  Yes, ma'am?

19           PROSPECTIVE JUROR:  Carolyn Powell.  And Carson Beard

20  is the son of a dear friend of mine.

21           THE COURT:  You describe him as a dear friend.  Do

22  you all socialize frequently?

23           PROSPECTIVE JUROR:  No.  His mother is a friend.

24           THE COURT:  I'm sorry, could you --

25           PROSPECTIVE JUROR:  I'm sorry.  His mother is my

USA v. Jenkins, 3:23cr11, 12/11/2024

1  friend.

2          THE COURT:  His mother is your friend.  And do you

3  socialize with her?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Okay.  Anybody else?

6          PROSPECTIVE JUROR:  I know Carson Beard.  He --

7          THE COURT:  And you are -- if you could --

8          PROSPECTIVE JUROR:  I am Mary Jane Reed, I apologize.

9          THE COURT:  Thank you, Ms. Reed.

10         PROSPECTIVE JUROR:  I met Carson Beard, and he helped

11  me when he was assistant county clerk with a will issue, my

12  late husband's will.  We were made in Nevada, and getting it

13  all straightened out for Virginia.

14         THE COURT:  Okay.  How long ago was that?

15         PROSPECTIVE JUROR:  Eight years ago.

16         THE COURT:  All right.  Have you had any involvement

17  with Mr. Beard since that time?

18         PROSPECTIVE JUROR:  No, I have not.

19         THE COURT:  All right.  Thank you, Ms. Reed.

20         Anybody else?

21         All right.  Other names that you may hear include,

22  Richard Mack, Maggie McDaniel, Jerry McKee, Chad McKnight,

23  Scott Medearis, James Metcalf, Don Miesle, David Myers, Travis

24  Owens, Clayton Phelps, Rick Rahim, Sylvia Renninger, Kevin

25  Rychlik, Peter Siebel, Jaime Travis, Jennifer Weakley.  So let

USA v. Jenkins, 3:23cr11, 12/11/2024

1  me ask that same question.  Is anybody familiar with any of

2  those names?

3          All right.  So like I said, you all have all filled

4  out your questionnaires, and we very much appreciate you doing

5  so.  So as I go through these next questions, to the extent

6  that you have answers to these questions that you have not

7  already provided on your questionnaires, I'll ask you to raise

8  your hand as well.

9          Have you ever served as a juror in a criminal or a

10  civil case, or as a member of the grand jury, either in the

11  federal or state courts?

12          Yes, sir?

13          PROSPECTIVE JUROR:  I was on a jury --

14          THE COURT:  Hang on, let us get your name.

15          PROSPECTIVE JUROR:  Robert Taylor.

16          THE COURT:  All right.  Mr. Taylor?

17          PROSPECTIVE JUROR:  I was on a jury in a criminal

18  case in Nelson County.

19          THE COURT:  All right.  How long ago was that?

20          PROSPECTIVE JUROR:  Three years ago.

21          THE COURT:  What type of case?

22          PROSPECTIVE JUROR:  Domestic.

23          THE COURT:  Domestic?  And did you reach a verdict?

24          PROSPECTIVE JUROR:  Yes, sir.

25          THE COURT:  What was that verdict?

USA v. Jenkins, 3:23cr11, 12/11/2024

1              PROSPECTIVE JUROR:  Guilty.

2              THE COURT:  Guilty?  And did you serve as the

3    foreperson?

4              PROSPECTIVE JUROR:  No, sir.

5              THE COURT:  Anything about that experience that would

6    affect your ability to sit today?

7              PROSPECTIVE JUROR:  No, sir.

8              THE COURT:  All right.  Thank you, Mr. Taylor.

9              Anybody else that has any other answers that they

10   didn't otherwise put on their questionnaire?

11             PROSPECTIVE JUROR:  I put them on the questionnaire.

12             THE COURT:  All right.  Thank you very much.

13             All right.  And the same thing, to the extent not on

14   your questionnaire, have you or any member of your family

15   worked in law enforcement, including corrections at any level,

16   whether federal, state, or local?

17             Have you or any member of your family or any close

18   friend been a victim -- I'm sorry.  There was a hand.

19             I'm sorry, please go ahead.

20             PROSPECTIVE JUROR:  My name is Tessa Chisholm.

21             THE COURT:  Hang on a second, Ms. Chisholm, if we

22   can, please.

23             PROSPECTIVE JUROR:  Are you hearing me?

24             THE COURT:  Yes, ma'am.

25             PROSPECTIVE JUROR:  My stepfather is a retired D.C.

USA v. Jenkins, 3:23cr11, 12/11/2024

1   police officer, and then he was a sergeant at the

2   Charlottesville-Albemarle Joint Security Complex.  And my

3   mother worked for Offender Aid & Restoration here in

4   Charlottesville, OAR.

5           THE COURT:  Okay.  So as it relates to your

6   stepfather, how long ago was it since he was in law

7   enforcement?

8           PROSPECTIVE JUROR:  Oh, it's been a while.  He's

9   passed away.  Probably 20 years or so.

10          THE COURT:  20 years ago?  Okay.  Was he in law --

11  were you living with him while he was in law enforcement?

12          PROSPECTIVE JUROR:  Yes.  Well, when he was here in

13  Charlottesville, not when he was in D.C.

14          THE COURT:  All right.  And your mother, is she still

15  with the offender restoration?

16          PROSPECTIVE JUROR:  No, she's retired.

17          THE COURT:  Okay.  When did she retire?

18          PROSPECTIVE JUROR:  About the same, about 20-some

19  years.

20          THE COURT:  About 20-some years or so ago?

21          PROSPECTIVE JUROR:  I think, yes.

22          THE COURT:  Anything about their experiences that

23  would affect your ability to be a fair and impartial juror in

24  connection with this case?

25          PROSPECTIVE JUROR:  I don't think so, no.

USA v. Jenkins, 3:23cr11, 12/11/2024

1           THE COURT:  Okay.  Thank you, Ms. Chisholm.

2           Any other -- anything else?  And again, we're looking

3    for things that are not already on your questionnaires.  We've

4    got one other hand that's not already on your questionnaire.

5           PROSPECTIVE JUROR:  Charmaine Dill.

6           THE COURT:  Yes, ma'am.  Ms. Dill.

7           PROSPECTIVE JUROR:  Brother-in-law and a

8    sister-in-law from Illinois, both in law enforcement, and my

9    oldest son's father-in-law.

10          THE COURT:  All right.  What type of law enforcement

11   for your brother and sister-in-law?

12          PROSPECTIVE JUROR:  Brother-in-law was local.

13   Sister, canine.  She traveled extensively.

14          THE COURT:  And your son's father-in-law?

15          PROSPECTIVE JUROR:  Really not that socially active.

16   I cannot tell you.  I do not know.

17          THE COURT:  Okay.  Anything about their experience as

18   law enforcement officers that would affect your ability to be a

19   fair and impartial juror in today's case?

20          PROSPECTIVE JUROR:  No, sir.

21          THE COURT:  All right.  Thank you very much,

22   Ms. Chisholm [sic].

23          Anybody else with anything that's not already on

24   their questionnaire?  One question all the way in the back.

25          THE CLERK:  And up front, two in the second row.

USA v. Jenkins, 3:23cr11, 12/11/2024

1      PROSPECTIVE JUROR:  Lisa Choi.  I wasn't sure if a

2  brother-in-law was considered family.  So --

3      THE COURT:  It may depend upon the family, but we'll

4  say yes.

5      PROSPECTIVE JUROR:  So I didn't put that down on the

6  questionnaire, but my brother-in-law was in the military

7  police.

8      THE COURT:  Okay.  How long ago was that?

9      PROSPECTIVE JUROR:  I would say ten years.

10      THE COURT:  Okay.  All right.  And what type of work

11  did he do with the military police; do you know?

12      PROSPECTIVE JUROR:  I don't know a lot.  He was in

13  the Air Force.  I don't really know that much about --

14      THE COURT:  Okay.  Anything about his experience as a

15  law enforcement officer that would affect your ability to be

16  fair and impartial in today's case?

17      PROSPECTIVE JUROR:  I don't think so.

18      THE COURT:  Okay.  You seem uncertain about that.

19      PROSPECTIVE JUROR:  No.  I mean --

20      THE COURT:  You will -- and this is true for the

21  entire panel.  I give the instruction -- I give instructions to

22  the jury throughout the trial.  One of the instructions that

23  you will always hear from me, probably more than you want to

24  hear it, but it's critically important, and that is, all

25  decisions that the jurors make have to be based upon the

USA v. Jenkins, 3:23cr11, 12/11/2024

1   evidence that comes before them during the course of the trial,

2   and the instructions that I give at the conclusion of the case.

3   That's what the decision has to be based upon, setting aside

4   any preconceived notions or prior experiences that you had.

5   Can you follow that instruction?

6             PROSPECTIVE JUROR:  Yes.

7             THE COURT:  That's my question, really.  You can?

8             PROSPECTIVE JUROR:  Yes.

9             THE COURT:  All right.  Thank you, Ms. Choi.

10            Anybody else?  Anyone over on this side over here on

11  the right side?

12            All right.  Very well.  Have you or any member of

13  your family or any close friend been a victim of a crime?

14            Let's start over here on the front row.  The

15  microphone is coming around to you, sir.

16            PROSPECTIVE JUROR:  James Belew.

17            THE COURT:  All right.  Mr. Belew.  And we spell our

18  name differently.  The question is, who gets it right?

19            PROSPECTIVE JUROR:  My stepfather was murdered.

20            THE COURT:  Okay.  How long ago was that?

21            PROSPECTIVE JUROR:  About 25 years ago.

22            THE COURT:  All right.  Was there an investigation

23  that led to an arrest in connection with that?

24            PROSPECTIVE JUROR:  Yes.

25            THE COURT:  Was that person put on trial?

USA v. Jenkins, 3:23cr11, 12/11/2024

1            PROSPECTIVE JUROR:  Yes.

2            THE COURT:  Did they plead or did they go to trial?

3            PROSPECTIVE JUROR:  They went to trial.

4            THE COURT:  They went to trial?  What was the outcome

5   of that?

6            PROSPECTIVE JUROR:  Six months.

7            THE COURT:  Okay.  So he was found guilty and

8   sentenced to six months?

9            PROSPECTIVE JUROR:  (No verbal response).

10           THE COURT:  That was, you said, 25 years ago?

11           PROSPECTIVE JUROR:  25 years ago.

12           THE COURT:  Is there anything about that experience,

13  Mr. Belew, that would affect your ability to render a fair and

14  impartial verdict based solely upon the evidence that comes in

15  and the law as I instruct it?

16           PROSPECTIVE JUROR:  I don't think so.

17           THE COURT:  All right.  Thank you very much.

18           Anybody else over on the -- that side of the room?

19  Let's come over to this side.  Anyone over here?  We'll start

20  right here in the corner.

21           PROSPECTIVE JUROR:  Megan O'Donnell.  I can't

22  remember if I put this on my questionnaire, but one of my good

23  friend's nieces was murdered.

24           THE COURT:  Okay.  How long ago was that?

25           PROSPECTIVE JUROR:  It was about eight to ten years

USA v. Jenkins, 3:23cr11, 12/11/2024

1  ago.

2          THE COURT:  And was there an investigation that led

3  to an arrest?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  All right.  Was that person --

6          PROSPECTIVE JUROR:  They pled.

7          THE COURT:  They pled?  All right.  And where was

8  this?  In -- go ahead, where was it?

9          PROSPECTIVE JUROR:  This was in Illinois.

10          THE COURT:  Illinois?  Okay.  And how much time did

11  they get?

12          PROSPECTIVE JUROR:  I don't remember the exact

13  amount.

14          THE COURT:  Okay.  Is there anything about that

15  experience, Ms. O'Donnell, that would affect your ability to be

16  a fair and impartial juror, deciding the case solely upon the

17  evidence and the instructions that I give?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  All right.  Thank you.

20          And Mr. Belew, if you can just speak up quickly,

21  where was your father murdered, what jurisdiction?

22          PROSPECTIVE JUROR:  Buckingham.

23          THE COURT:  Buckingham County?  All right.  Thank you

24  very much.

25          All right.  There was someone over -- someone else

USA v. Jenkins, 3:23cr11, 12/11/2024

1    here on the second row.  Yes, ma'am?

2            PROSPECTIVE JUROR:  It's Molly Mitchell.

3            THE COURT:  Yes, ma'am, Ms. Mitchell?

4            PROSPECTIVE JUROR:  I'm sorry, was the question has

5    any member of your family been the victim of any crime?

6            THE COURT:  Yes, ma'am.

7            PROSPECTIVE JUROR:  Okay.  My sister had her car

8    stolen at gunpoint.

9            THE COURT:  Okay.  How long ago was that?

10           PROSPECTIVE JUROR:  About 15 years.

11           THE COURT:  Where was this?

12           PROSPECTIVE JUROR:  In Jackson, Mississippi.

13           THE COURT:  Was there an investigation that led to an

14   arrest?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  And did that person go to trial or did

17   they plead?

18           PROSPECTIVE JUROR:  They pled.

19           THE COURT:  They pled?  All right.  Do you remember

20   how much time they got?

21           PROSPECTIVE JUROR:  I don't remember.

22           THE COURT:  All right.  Is there anything about that

23   experience that would affect your ability to be fair and

24   impartial?

25           PROSPECTIVE JUROR:  I don't think so.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  All right.  Thank you very much,

2   Ms. Mitchell.

3          All right.  Continuing on back, anyone else?  Yes,

4   sir?

5          PROSPECTIVE JUROR:  Yes, sir.  Robert Taylor.  My

6   sister was shot and killed in Greene County 25 years ago.

7          THE COURT:  Same questions, Mr. Taylor.  Was there an

8   investigation that led to an arrest?

9          PROSPECTIVE JUROR:  Yes, sir.

10         THE COURT:  And that person, did they go to trial or

11  did they plead?

12         PROSPECTIVE JUROR:  Went to trial.

13         THE COURT:  And what was the outcome of the trial?

14         PROSPECTIVE JUROR:  Two life sentences plus 80 years.

15         THE COURT:  Okay.  And how long ago was this?

16         PROSPECTIVE JUROR:  25 years.

17         THE COURT:  25 years ago.  Is there anything about

18  that experience, Mr. Taylor, that would affect your ability to

19  be fair and impartial, deciding the case solely upon the

20  evidence and the law as I give it to you?

21         PROSPECTIVE JUROR:  No, sir.

22         THE COURT:  All right.  Thank you, Mr. Taylor.

23         Anybody else?  All right.  Coming back around to the

24  front row.

25         PROSPECTIVE JUROR:  My name is Elizabeth Bailey.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  Yes, ma'am, Ms. Bailey?

2          PROSPECTIVE JUROR:  My brother-in-law died under

3    sheriff's custody 2017 -- 2016 in Georgia.

4          THE COURT:  All right.  Were there any criminal

5    charges that came out of that?

6          PROSPECTIVE JUROR:  Civil.

7          THE COURT:  It was just a civil case?  Okay.

8          PROSPECTIVE JUROR:  Wrongful death.

9          THE COURT:  All right.  And was that case settled?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  All right.  Were you a party to that, or

12    did he have separate family that were --

13          PROSPECTIVE JUROR:  My husband and his brother and

14    mother were the parties to the case.

15          THE COURT:  Okay.  All right.

16          PROSPECTIVE JUROR:  So indirectly, yes.

17          THE COURT:  All right.  Where in Georgia was this?

18          PROSPECTIVE JUROR:  Ben Hill County, I believe.

19    Fitzgerald, Georgia.

20          THE COURT:  Is there anything in connection with that

21    experience, Ms. Bailey, that would affect your ability to be

22    fair and impartial, deciding the case solely on the evidence

23    that comes before you and the instructions I give?

24          PROSPECTIVE JUROR:  I don't think so.

25          THE COURT:  All right.  Thank you very much.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          All right.  Anybody else?

2          Again, to the extent not answered on your

3   questionnaire, has any member of the panel at any time been

4   involved in a criminal matter in any court that concerned

5   yourself, any member of your family, or a close friend, either

6   as a defendant, a witness, or as a victim?  I think we may have

7   covered the victims.

8          All right.  Let's come over here.  And again, to the

9   extent not on your questionnaire.

10         PROSPECTIVE JUROR:  Hi, I'm Dawn Brunk.

11         THE COURT:  Yes, Ms. Brunk.

12         PROSPECTIVE JUROR:  I was a witness about two and a

13  half, three years ago.  It was a case for my sister.  She's a

14  felon now.  She was charged, and I was a witness in that case.

15  And my father was also a felon, and he was convicted wrongly,

16  and I'm not very impartial.  I think this guy is guilty --

17         THE COURT:  Hey, hey -- hang on a second, Ms. Brunk.

18  I just want to -- I just want to know the answers to your

19  questions with respect to this.  So let me ask you a couple of

20  questions, Ms. Brunk.

21         PROSPECTIVE JUROR:  Uh-huh.

22         THE COURT:  With respect to the times that you've

23  testified, have you testified as character witnesses, or were

24  you testifying regarding the facts of the underlying case?

25         PROSPECTIVE JUROR:  I was a witness in two of her

USA v. Jenkins, 3:23cr11, 12/11/2024

1    trials.  She had two trials.

2           THE COURT:  The facts of the underlying case, not as

3    a character witness for her; is that correct?

4           PROSPECTIVE JUROR:  I guess I was a character -- they

5    just wanted to know -- I was her sister, so they wanted to know

6    everything about her.  They were trying to send her to jail.

7           THE COURT:  Okay.  All right.  And where was this?

8           PROSPECTIVE JUROR:  Winchester, Virginia.

9           THE COURT:  Winchester?  All right.  Thank you very

10   much.

11          PROSPECTIVE JUROR:  And I'm -- I don't see how I --

12          THE COURT:  Hang on.

13          PROSPECTIVE JUROR:  -- how I can be impartial.

14          THE COURT:  Thank you very much, Ms. Brunk.  Thank

15   you.

16          And again, ladies and gentlemen, please just answer

17   the questions that you're asked.  Anybody else?

18          Yes, sir?

19          PROSPECTIVE JUROR:  Michael Drotos.

20          THE COURT:  Yes, sir.

21          PROSPECTIVE JUROR:  I can't remember any of the

22   details, it was so long ago, but I think -- I know I was a

23   witness once for a trial where somebody broke into the church,

24   and I was a witness to see -- they asked me if I locked the

25   doors and windows.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR:  I don't even remember what

3    happened.

4          THE COURT:  All right.  I appreciate it.  Where was

5    that?

6          PROSPECTIVE JUROR:  It was here in Charlottesville.

7          THE COURT:  In Charlottesville?

8          PROSPECTIVE JUROR:  Yeah.  And I think it was in this

9    court.

10         THE COURT:  All right.  Do you remember how -- do you

11   remember what the outcome of the trial was?

12         PROSPECTIVE JUROR:  He was guilty.  He kicked in the

13   door.

14         THE COURT:  All right.  Anything about that

15   experience, Mr. Drotos, that would affect your ability to be a

16   fair and impartial juror?

17         PROSPECTIVE JUROR:  No, not at all.

18         THE COURT:  Thank you very much, sir.

19         Anybody else?  Let's come over to this side of the

20   room.  Anybody else on that side?

21         Again, I'm looking to the extent not on your

22   questionnaire.  Have you heard anything, read anything, or know

23   anything about this case at all, to the extent you haven't

24   already provided that on your questionnaire?

25         Yes, sir?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  My pastor is a retired -- Michael

2    Fulkerson.  My pastor is a retired Orange County sheriff

3    deputy.

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR:  And I --

6          THE COURT:  Hang on.  Let me ask you a few questions,

7    Mr. Fulkerson.  So your pastor is a retired deputy.  And in

8    connection with that, have you learned some facts about this

9    case?

10          PROSPECTIVE JUROR:  Not facts.

11          THE COURT:  Okay.  All right.  When was the last time

12   you had any discussions about this case with a -- with your

13   pastor?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  All right.  When was the last time you

16   had any discussions?

17          PROSPECTIVE JUROR:  Sunday.

18          THE COURT:  Sunday?  All right.  Did you learn any

19   facts about the case that may affect your ability to sit --

20          PROSPECTIVE JUROR:  He --

21          THE COURT:  Let me -- hang on a second,

22   Mr. Fulkerson.  It really is important.  Let me ask my question

23   and you answer, because it's going to be a yes or no.  Were the

24   facts that you learned or anything in the discussion that would

25   affect your ability to be a fair and impartial juror?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Okay.  All right.  Thank you very much.

3          Anybody else?

4          In that regard, let me just make sure that I'm clear

5    with respect to learning anything.  Has anyone seen any press

6    coverage in connection with this case that you haven't already

7    put down on your questionnaire?

8          I may ask this question a couple of different times,

9    but you will be instructed on your duty to decide the case

10   solely on the facts presented and the instructions that are

11   provided by me, and to put aside anything which you may learn

12   or know outside of the courtroom.  Is there any reason that

13   anyone cannot follow those instructions and render a verdict

14   based solely on the facts presented, and the law as I give it

15   to you?

16         All right.  Thank you.

17         Does anyone have any strong views, either positive or

18   negative, about the Department of Justice or the FBI that you

19   haven't already put on your questionnaire?

20         As I indicated, I will instruct you that Mr. Jenkins

21   is presumed innocent of the charges brought by the government

22   unless and until proven guilty by the government's evidence.

23   Do any of you have any hesitation or reservation in following

24   this instruction?

25         In this case, as in all criminal cases, a defendant

USA v. Jenkins, 3:23cr11, 12/11/2024

1  has no obligation to testify or to present any proof of his

2  innocence.  Do you understand in this case that a defendant is

3  not required to prove his innocence?  If you all can answer yes

4  in the affirmative.

5         ALL JURORS:  Yes.

6         THE COURT:  Is there anyone that doesn't understand

7  that or can't follow that instruction?

8         Thank you.  You may also not infer guilt from any

9  decision that Mr. Jenkins may take to exercise his right not to

10  testify or to offer evidence.  If a defendant chooses to remain

11  silent or to present no evidence, will each of you follow my

12  instructions that you may not infer anything from those

13  decisions?

14         ALL JURORS:  Yes.

15         THE COURT:  Is that a yes?  Thank you.

16         I will instruct you that in order to find the

17  defendant guilty, the government must present proof that

18  convinces you beyond a reasonable doubt.  Will each of you

19  follow this instruction as to the burden of proof?  And I'll

20  give you further instructions as to what reasonable doubt

21  means.  Will each of you follow this instruction?

22         ALL JURORS:  Yes.

23         THE COURT:  Thank you.

24         If you're selected to sit on this case, would you be

25  able to render a verdict solely on the evidence presented at

USA v. Jenkins, 3:23cr11, 12/11/2024

1  the trial and in the context of the law as I will give it to

2  you in my instructions, disregarding any other ideas, notions,

3  or belief that you might have about the law?

4         ALL JURORS:  Yes.

5         THE COURT:  Is that a yes?  Thank you.

6         Is there anyone -- and I'll tell you this:  We're

7  starting today here on December the 11th.  We're scheduled to

8  go through December the 20th.  The lawyers and I have been

9  working diligently to be ready for this trial, and I feel very

10 convinced we're going to be done by the 20th without any

11 difficulty at all.

12        Is there anybody who has any special disability or

13 problem that would make it difficult or impossible to serve as

14 a member of the jury that you haven't already otherwise told us

15 about in your questionnaires?

16        Yes, sir?

17        PROSPECTIVE JUROR:  Jeffrey Ford.  My uncle recently

18 passed away and his funeral is on the 20th.

19        THE COURT:  The funeral is on the 20th?

20        PROSPECTIVE JUROR:  Yes, sir.

21        THE COURT:  Okay.  Where is that funeral?  First of

22 all, I'm sorry very much, Mr. Ford.

23        PROSPECTIVE JUROR:  Appreciate it.

24        THE COURT:  Where is that funeral?

25        PROSPECTIVE JUROR:  Purcellville, Virginia.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  Okay.  Are there things that are planned

2    leading up -- I'm sure family will be coming in and so forth?

3          PROSPECTIVE JUROR:  Yes.  Yes.

4          THE COURT:  All right.  Thank you very much.

5          I saw another hand over here, come around to this

6    side.

7          PROSPECTIVE JUROR:  Charmaine Dill.

8          THE COURT:  Yes, Ms. Dill?

9          PROSPECTIVE JUROR:  I have some serious night blind.

10         THE COURT:  Some serious what?

11         PROSPECTIVE JUROR:  It's embarrassing.  Night blind.

12         THE COURT:  Night blindness?

13         PROSPECTIVE JUROR:  In terms of driving, negotiating

14   out of Charlottesville after about 4:00.

15         THE COURT:  Okay.  My typical schedule -- and I'll

16   tell everyone this -- is that we're going to start promptly at

17   9:00 every morning, and I break wherever there's a natural

18   break, typically between 5 and 6, but I will go until 6.  And

19   with it being December, it's dark by then.  It's dark by 5 as

20   well.  So does that present a problem for you, as I understand

21   it, Ms. Dill?

22         PROSPECTIVE JUROR:  Yes, sir, it actually does,

23   unless --

24         THE COURT:  And you're about an hour away, hour and a

25   half?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  Yes, sir.

2          THE COURT:  Okay.  All right.  Thank you very much,

3    Ms. Dill.

4          PROSPECTIVE JUROR:  If I could stay, that would be

5    fine, if I were selected, but I just can't --

6          THE COURT:  If you had --

7          PROSPECTIVE JUROR:  If I had to.

8          THE COURT:  Okay.  If hotel arrangements were made

9    for you?

10          PROSPECTIVE JUROR:  Yes, sir.

11          THE COURT:  Okay.  All right.  Thank you.

12          Over here on the front row -- or second row, excuse

13    me.  Yes, ma'am?

14          PROSPECTIVE JUROR:  I have night blindness also.

15          THE COURT:  Give me your name again.

16          PROSPECTIVE JUROR:  Tessa Chisholm.

17          THE COURT:  Yes, Ms. Chisholm?

18          PROSPECTIVE JUROR:  And I did state that in the

19    papers.  So after 4:00 I'm no good for myself or anybody else

20    if I'm on the road.

21          THE COURT:  All right.  Thank you very much.  And you

22    are about an hour away?

23          PROSPECTIVE JUROR:  An hour, yes.  Well, yeah, it

24    took an hour today.

25          THE COURT:  Okay.  Yeah, not really chamber of

USA v. Jenkins, 3:23cr11, 12/11/2024

1    commerce weather today to be driving in, that's for sure.

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  Thank you.

4            Anybody else over on that side?  How about the other

5    side?  Yes, ma'am?

6            PROSPECTIVE JUROR:  I'm Jaclyn Patrizia.

7            THE COURT:  Yes, ma'am?

8            PROSPECTIVE JUROR:  I didn't realize that it might be

9    over nine hours, and I would have to pick up my daughter before

10   nine hours because she's in day care.

11           THE COURT:  Okay.  If you are selected, Ms. Patrizia,

12   is there anybody that can get your daughter during this period?

13           PROSPECTIVE JUROR:  No, not that I have arranged yet,

14   so I'd have to find out.

15           THE COURT:  Could it be arranged if you're selected?

16           PROSPECTIVE JUROR:  Possibly, but not 100 percent.

17           THE COURT:  Okay.  And the reason I ask -- and I'll

18   say this to everybody -- is that one of the reasons I began the

19   opening is that this is one of the highest responsibilities

20   that we have as citizens in serving our civic duty.  I also

21   recognize that it is a tremendous burden, as well.  For me to

22   do my job, I have to take you away from your job, and to take

23   you away from your families and your daily affairs.  And that's

24   not lost on me as well, but it does require some personal

25   sacrifice.  And that's the reason I asked, Ms. Patrizia, if you

USA v. Jenkins, 3:23cr11, 12/11/2024

1   are selected to serve and to fulfill your civic duty, could you

2   make arrangements as well.  So thank you.

3             Anybody else over on that side?

4             All right.  Similar type question.  I told you that

5   the time frame -- we expect to go through up to December 20th,

6   to get completed by then.  Recognizing our civic

7   responsibilities, is there anybody that has an issue with

8   respect to this time frame?  We understand Mr. Ford, I think it

9   was -- yeah -- I know you've got a commitment on that

10  particular day.  Is there anybody else that has commitments or

11  wouldn't be able to serve that can't otherwise be addressed?

12            Yes, sir?

13            PROSPECTIVE JUROR:  Richard Harris.

14            THE COURT:  Yes, Mr. Harris?

15            PROSPECTIVE JUROR:  I run the mobile unit for All

16  Blessings Flow out to outlying counties five days a week.  And

17  the shop will be closed for two weeks at the end of the year,

18  but if I miss two weeks at the beginning of this month, people

19  will not get their items for -- till next year.

20            THE COURT:  All right.  What do you all deliver

21  again?

22            PROSPECTIVE JUROR:  It's a nonprofit.  We give out --

23  taking used medical equipment to the county.

24            THE COURT:  Are you the only mobile unit driver?

25            PROSPECTIVE JUROR:  Only member of the -- yeah.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  And can coverage be obtained if you're

2   selected to be a juror?

3          PROSPECTIVE JUROR:  Well, there's no coverage for me

4   if I'm selected as a juror.  The mobile unit will cease to

5   operate while I'm a juror.

6          THE COURT:  There is no coverage?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  All right.  Thank you.

9          Anybody else?

10         All right.  If you are selected as a juror in this

11  case, you cannot discuss the case with your fellow jurors

12  before you're permitted to do so at the conclusion of the

13  trial.  That means -- and you all are going to be together a

14  long time -- that when you're back in the jury room, the only

15  subject that's off limits is this case, even though it's the

16  case is what brings you together.  But talk about friends, talk

17  about family, talk about sports, talk about your likes and

18  dislikes, but nothing about the case.  Nor can you have any

19  discussion with anyone else about the case.  You'll go home

20  every night.  You'll see family.  You'll see friends.  You

21  cannot have any discussions at all about the case until a

22  decision has been reached by the jury.  And the reason for this

23  is because it's very important that anyone who sits on the jury

24  withhold beginning to make any decisions at all until all the

25  evidence is in, until I've instructed you on what the law is

USA v. Jenkins, 3:23cr11, 12/11/2024

1  that governs the case, and until the final arguments are made.

2  Then you can begin to discuss the case, then you can begin to

3  make decisions as well.  So you cannot talk about the case or

4  have any communications about the case with anyone, including

5  your fellow jurors, until I tell you that such discussions can

6  take place.

7          In addition to that, in addition to not having

8  face-to-face discussions with your fellow jurors, you can't

9  communicate with anyone in any way, whether in writing, or

10  through e-mail, text messaging, blogs, comments, or on social

11  media, websites, or apps.  You can't put on your favorite

12  social media, hey, I'm sitting on a jury, as well.  You can't

13  do that as well.

14          Is there anyone who will not be able to comply with

15  this restriction and the instructions that I give in that

16  regard?

17          Yes, Ms. Brunk?

18          PROSPECTIVE JUROR:  Yes --

19          THE COURT:  Hang on a second, Ms. Brunk, let's get

20  the -- so the question is -- if you can stand up and have the

21  microphone -- so the question is:  Will you not be able to

22  follow those instructions that you can't have any

23  communication --

24          PROSPECTIVE JUROR:  I can't.  I'm a big mouth.

25  People already know I'm here.  I've already told people I feel

USA v. Jenkins, 3:23cr11, 12/11/2024

1  like he's guilty.

2        THE COURT:  It's just a yes or no, all right?

3        PROSPECTIVE JUROR:  No, I can't.  I have a big mouth.

4        THE COURT:  Thank you.

5        All right.  Likewise, you cannot conduct any

6  independent or personal research or investigation regarding any

7  matters related to this case.  You cannot use your cell phones,

8  iPads, computers, or any other device to do any research or

9  investigation regarding the case, the matters in the case, the

10 legal issues in the case, the individuals involved in the case,

11 the lawyers involved in the case, the defendant, the case

12 agents, anybody, or any other entities that are involved in the

13 case.  You must ignore any information about the case that you

14 might see either accidentally while browsing the Internet or on

15 your social media feeds.  This is because, like I said, you

16 must base your decisions that you will make in this case solely

17 on what you hear and see in this courtroom.  I will instruct

18 you as well:  Don't read any press coverage about this case as

19 long as the case is pending and the trial is ongoing.

20        Is there anybody -- and Ms. Brunk, I know you've

21 already answered this question -- is there anybody who will not

22 be able to follow or to comply with this restriction?

23        All right.  Having heard the questions put to you by

24 me, does any other reason suggest itself to you as to why you

25 could not sit on this jury, render a fair verdict based on the

USA v. Jenkins, 3:23cr11, 12/11/2024

1   evidence presented, and in the context of the Court's

2   instructions to you on the law?

3           Okay.  With that, Ms. Peng, any questions on behalf

4   of the government?

5           MS. PENG:  Yes, Your Honor.  Thank you.

6           THE COURT:  Yes, ma'am.

7           MS. PENG:  So good morning again, everyone.  My name

8   is Lina Peng.  I'm one of the attorneys on behalf of the

9   government in this case.  And so as you've heard Judge Ballou

10  told you, the purpose of voir dire here is to really find out

11  if you all are appropriate jurors for this case.  So as we've

12  read your questionnaires very carefully, you all come with your

13  own life experiences, your sense of, you know, different views

14  about things, your common sense and reason.  And that's exactly

15  why we want you, the regular people, to be the decider of facts

16  in this case.  It's not going to be the government.  It's not

17  going to be the defendant.  It's going to be you.  But at the

18  same time, you know, we want to also make sure that this is a

19  fair trial for both sides.  And so like I said, it's fine to

20  have views and your experiences.  That's exactly what we want.

21  But some of you may have certain views that are so strong that

22  you won't be able to set them aside for the purposes of this

23  case, and to evaluate the evidence as presented to you in this

24  courtroom, and to be an impartial arbiter of the facts, and

25  then to follow Judge Ballou's jury instructions at the end of

USA v. Jenkins, 3:23cr11, 12/11/2024

1   the case.

2           So I'm going to ask you some questions as a group,

3   and some of you individually as well.  Some of them might feel

4   a little uncomfortable.  Please don't be offended if I pick on

5   you or don't pick on you.  This is just part of the process.

6           So -- and I thank you again for already being candid

7   in your questionnaires.  And this is really important that you

8   be as truthful and honest as you can, because only you can

9   really answer these questions.

10          So with that, I want to start with Mr. Blauvelt,

11  Jeffrey Blauvelt.  Sir, so you've heard some of the issues in

12  this case and I just wanted to ask you:  Are you able to, do

13  you think, given what you've heard about this case, evaluate

14  the evidence as presented fairly and impartially and keep an

15  open mind until the end of the case and then follow the jury

16  instructions?

17          PROSPECTIVE JUROR:  Well, I put on my form that I've

18  read some news articles already.  So I can listen to the

19  evidence and decide one way or the other.

20          MS. PENG:  Yeah, I'm really glad you raised that,

21  because I think many of you have read some news coverage about

22  this case, and that is -- and you've heard what the case is

23  about generally.  But that's different than whether you're able

24  to keep an open mind and listen to the evidence as it comes in

25  this courtroom.  And I think I hear you say that you can do

USA v. Jenkins, 3:23cr11, 12/11/2024

1  that, despite sort of knowing some stuff from the news about

2  this case; is that right?

3           PROSPECTIVE JUROR:  Yeah, I mean, I have certain

4  biases, but I think I can be open.

5           MS. PENG:  That you'd be able to follow the judge's

6  instructions at the end of the case?

7           PROSPECTIVE JUROR:  Yes.

8           MS. PENG:  Thank you, sir.

9           Ms. Patrizia -- Patrizia, so it sounds like you've

10  also read some stuff in the news about this case, and so I want

11  to ask you the same question.  You've read some stuff, maybe

12  you have some views as you walk into the courtroom today.  But

13  will you be able to keep an open mind and still judge the

14  evidence fairly and impartially, and then follow the judge's

15  instructions at the end of the case?

16           PROSPECTIVE JUROR:  Yes.

17           MS. PENG:  Thank you.  And I want to open it up to,

18  you know, everyone else.  I know, again, a lot of you have read

19  some news coverage about this case.  I don't want to hear, you

20  know, what you may have read necessarily, but the question

21  really is, do any of you have an issue with still keeping an

22  open mind, despite reading some stuff in the news, and listen

23  to the evidence as it comes in, and still be able to deliberate

24  fairly and impartially according to the judge's instructions,

25  or does anybody have some hesitation still about that?

64

USA v. Jenkins, 3:23cr11, 12/11/2024

1              I know, Ms. Brunk, I've heard from you.  I got you.

2         Anyone else?

3              So the next thing I want to ask about is a type of

4    evidence that you'll hear.  So you'll hear that there's going

5    to be direct evidence and what's called circumstantial

6    evidence.  So circumstantial evidence is just a more

7    complicated term for indirect evidence.  So I'll give you an

8    example of what this means.  So let's say you have a toddler

9    who really likes cookies, but who has been told they can't have

10   any.  There are some cookies on the counter, they're tall

11   enough to reach it.  And then you step outside of the room for

12   five minutes.  You come back in, your toddler -- the cookies

13   are gone, the toddler has some crumbs on their face, they look

14   a little guilty, they kind of run away.  So that is

15   circumstantial evidence, right, because you didn't actually see

16   your toddler eat those cookies, but your common sense and

17   reason tells you that based on other things you can see, you

18   can draw an inference that your toddler, in fact, ate those

19   cookies.  So that's the only difference between direct and

20   circumstantial evidence.  Does anyone have an issue with, you

21   know, the concept of circumstantial evidence?  I expect that

22   Judge Ballou at the end of the case will tell you that you

23   ought to treat direct and circumstantial evidence exactly the

24   same way.  Does anyone have any issues or concerns about that

25   particular instruction I expect you'll hear regarding

USA v. Jenkins, 3:23cr11, 12/11/2024

1  circumstantial evidence?

2          Okay.  Let me call on Ms. Ingram, Ms. Karen Ingram.

3  So I think you stated in your questionnaire that you would want

4  to see strong evidence in the case.  Now, so I want to ask you

5  the question specifically, do you have an issue or concerns

6  about the distinction between circumstantial and direct

7  evidence, or are you able to follow the instruction to treat

8  those with the same weight?

9          PROSPECTIVE JUROR:  I'm able to follow the

10 instructions, yes.

11         MS. PENG:  And just while I have you, I think -- I'm

12 not sure you raised your hand on this, but did you talk about

13 your acquaintance with Judge Durrer?  Did you already speak

14 about that?

15         PROSPECTIVE JUROR:  I just know him.

16         MS. PENG:  And can you tell me a little bit more how

17 you know him?

18         PROSPECTIVE JUROR:  His mother was a neighbor of mine

19 before she went into assisted living.

20         MS. PENG:  And did you have personal interactions

21 with him at all, or --

22         PROSPECTIVE JUROR:  No, not at all.

23         MS. PENG:  Okay.  Thank you.

24         And let me ask Mr. Byers, I think you answered in

25 your questionnaire that you had some certain expectations about

USA v. Jenkins, 3:23cr11, 12/11/2024

1  how perhaps an investigation would be done in a criminal case.

2  Do you have any additional thoughts about, you know, what I

3  said about circumstantial or direct evidence?

4          PROSPECTIVE JUROR:  No.

5          MS. PENG:  Thank you.

6          And so the other topic I want to talk to you about in

7  terms of types of evidence -- and some of you -- or all of you

8  were asked this, right?  So several government witnesses you're

9  going to hear are going to be individuals who themselves have

10  committed crimes.  So they're going to be talking to you about

11  the crimes that they've committed, and the crimes that they've

12  committed with the defendant.  And so -- and some of them will

13  tell you that they hope to get credit for their cooperation in

14  testifying with the government.  I also expect that you will

15  see evidence -- other evidence besides their testimony that

16  will corroborate the testimony of these witnesses.  And so the

17  judge will give you instructions on how to evaluate the

18  testimony of these types of witnesses at the end of the trial.

19  He'll tell you that you should consider them carefully because

20  of their interest in the case.  But I want to ask you

21  individually now about your views about hearing testimony from

22  one of these witnesses.

23          So Mr. Robert Taylor, so I read from your

24  questionnaire that I think you indicated that you were more

25  likely to believe the testimony of somebody with a prior

USA v. Jenkins, 3:23cr11, 12/11/2024

1   criminal conviction.  Do I have that right?

2          PROSPECTIVE JUROR:  Yes, ma'am.

3          MS. PENG:  Okay.  And can you tell me a little bit

4   more about why you have that view?

5          PROSPECTIVE JUROR:  I have no clue as to why.  Why

6   would I believe that?

7          MS. PENG:  Yeah, why -- I mean, if you have -- if you

8   hear testimony from a witness and you heard also that they've

9   committed crimes in the past, are you -- do you have any -- you

10  know, are you more likely to believe them, less likely to

11  believe them, or just neutral?

12         PROSPECTIVE JUROR:  Just neutral.

13         MS. PENG:  Okay.  But not less likely to believe?

14         PROSPECTIVE JUROR:  Yes, ma'am.

15         MS. PENG:  And do you have a reason as to why, or

16  just sort of a hunch?

17         PROSPECTIVE JUROR:  Well, I mean, I would rather

18  believe what they're saying is the truth, because they should

19  have paid for their punishment the first time.

20                  (Reporter clarification)

21         PROSPECTIVE JUROR:  Oh, I'm sorry.  I'm sorry.

22         MS. PENG:  Sorry, go ahead.  Can you repeat your

23  answer?

24         PROSPECTIVE JUROR:  I mean, I would hope they would

25  tell the truth on the stand.  Your question was if they're a

USA v. Jenkins, 3:23cr11, 12/11/2024

1    witness, right?

2              MS. PENG:  Yes.

3              PROSPECTIVE JUROR:  Okay.  You know, I guess it all

4    depends, you know, if they're on your side or their side, the

5    way I see it.

6              MS. PENG:  Can you say more about that?  It's okay.

7              PROSPECTIVE JUROR:  Yeah, we got all day.  Well, as

8    long as they -- I feel like I'm digging myself a hole.

9              MS. PENG:  There are no wrong answers.  We're just

10   having a conversation.

11             PROSPECTIVE JUROR:  It's hard to explain.  I'm sorry.

12             MS. PENG:  Thank you.  I appreciate the effort.

13             PROSPECTIVE JUROR:  Yes, ma'am.

14             MS. PENG:  All right.  Let me pick on you, Mr. Ford.

15   I think you said you had an answer to this question as well, as

16   in evaluating the testimony of someone who has a prior criminal

17   conviction.  And I think you said something to the effect of

18   you can't go on a person's past, and you need to hear all of

19   the evidence.

20             PROSPECTIVE JUROR:  Right.  Correct.

21             MS. PENG:  Can you explain a little bit more about

22   what you meant by that?

23             PROSPECTIVE JUROR:  I mean, because somebody was

24   guilty before, that don't mean they're -- or maybe they didn't

25   tell the truth before, that don't mean they're going to do it

USA v. Jenkins, 3:23cr11, 12/11/2024

1   again.  You have to listen to everything, all the evidence, and

2   then decide.

3          MS. PENG:  Thank you.  Does anyone have, you know,

4   any thoughts or reactions to what Mr. Ford just said about how

5   he might evaluate the testimony of someone like this?

6          Ms. Emily Walker, so if I read your questionnaire

7   correctly, you actually expressed some skepticism regarding

8   believing the testimony of these types of witnesses versus

9   others; is that right?

10         PROSPECTIVE JUROR:  Yes.

11         MS. PENG:  And can you explain a little bit more

12  about what you meant by that?

13         PROSPECTIVE JUROR:  If someone has been convicted of

14  something in the past, or guilty, unless there's been a change

15  of heart, then I would consider them to tend towards that

16  dishonesty again.

17         MS. PENG:  Yeah.  And I think some of you in this

18  room probably share Ms. Walker's view on that.  But let me ask

19  you this:  If somebody -- you're listening to someone's

20  testimony in that position, and there's additional evidence

21  that corroborate what they're saying, would you still have a

22  hard time believing what they're saying just because of a prior

23  criminal conviction?

24         PROSPECTIVE JUROR:  No, I kind of go with Mr. Ford, I

25  believe, that, you know, this needs to start at a level playing

USA v. Jenkins, 3:23cr11, 12/11/2024

1    field, and you know, I need to listen to the evidence that's

2    presented and not let any prior -- anybody's past really affect

3    my opinion of what's being presented.

4         MS. PENG:  Thank you.  Appreciate that answer.

5         I'm going to open it up to the group.  Does anyone

6    have a reaction to these questions or what's been said, such

7    that they feel like because somebody has a prior criminal

8    conviction they're going to not be starting at the same

9    starting line as everybody else, despite what other evidence

10   there might be corroborating what they're saying?  Does anyone

11   just sort of have a gut reaction, I'm not going to be able to

12   trust somebody who has been convicted before, or somebody who

13   has lied before, or been in some kind of -- you know, engaged

14   in dishonesty?  I want you to really think about that question.

15   Does anyone have any sort of just nagging feeling that you're

16   not going to be able to, you know, look at all the evidence and

17   evaluate that person's testimony?

18        All right.  So those are the main subjects I wanted

19   to go over.  Now I have some more individual questions based on

20   your questionnaire that I want to ask.  So Mr. -- I'm going to

21   just go in alphabetical order so you all can relax while I work

22   my way through.

23        Mr. Betz, hello, sir.  So I think there's some

24   answers in your questionnaire we're going to probably have a

25   private discuss with you on.  But I want to ask you this

USA v. Jenkins, 3:23cr11, 12/11/2024

1  question.  So you indicated in response to the question, do you

2  have discomfort regarding judging -- sitting in judgment of

3  someone.  I think your answer was you'd rather not pass

4  judgment on someone; is that right?

5           PROSPECTIVE JUROR:  Correct.

6           MS. PENG:  Can you tell me a little bit more about

7  that perspective?

8           PROSPECTIVE JUROR:  I don't really know how to put it

9  in words.  I'd rather not set at home after being here and

10  questioning whether or not I made the right decision.  That's

11  the best way I can explain it.

12           MS. PENG:  Right.  So -- and that's a feeling you

13  hold pretty strongly?

14           PROSPECTIVE JUROR:  Yes.

15           MS. PENG:  And so if you're seated as a juror and,

16  you know, listening to the evidence, is that feeling going to

17  stay with you, do you think?

18           PROSPECTIVE JUROR:  Possibly.  I can't say no.

19           MS. PENG:  So that might be a yes, then?

20           PROSPECTIVE JUROR:  Yeah.

21           MS. PENG:  Okay.  So do you think that -- you know,

22  if -- would you be an appropriate juror for this case if you're

23  going to have that feeling throughout the deliberations?

24           PROSPECTIVE JUROR:  In that aspect, I would say no.

25           MS. PENG:  So you don't think you would be?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  No, ma'am.

2          MS. PENG:  Thank you, sir.

3          Ms. Christine Estes, hi.

4          PROSPECTIVE JUROR:  Hello.

5          MS. PENG:  So I think you also indicated similarly

6   that you may have certain views that you don't take lightly in

7   your questionnaire.  And so I have like a similar question,

8   which is:  Do you think that's going to impact your ability to

9   be a fair and impartial juror in this case and to render

10  judgment if you are seated as a juror?

11         PROSPECTIVE JUROR:  No, I don't think so.

12         MS. PENG:  Thank you.

13         Ms. Meagan Forsht, hello.

14         PROSPECTIVE JUROR:  Hello.

15         MS. PENG:  So you are a true crime podcast fan.

16         PROSPECTIVE JUROR:  Yes, ma'am.

17         MS. PENG:  As am I.  I have very narrow interests.

18         And so my question to you is -- you know, I guess my

19  first question is:  What is it about these true crime podcasts

20  that really pique your interest?

21         PROSPECTIVE JUROR:  I like to think about how the

22  brain works and why someone would do the things that they do.

23         MS. PENG:  And how many of these podcasts do you

24  think you've listened to?

25         PROSPECTIVE JUROR:  Several hundred.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MS. PENG:  Several hundred, wow.

2          PROSPECTIVE JUROR:  I don't listen to music.  I just

3   listen to podcasts and books while I drive.

4          MS. PENG:  And so do you think that it's fair to say

5   that based on what you've listened to, you have views formed

6   about crimes, justice, and things of that nature?

7          PROSPECTIVE JUROR:  I do.

8          MS. PENG:  Okay.  And so my question is -- well, can

9   you tell me a little bit more about what those views might be?

10         PROSPECTIVE JUROR:  The type of true crime that I

11  typically listen to is more serial killer type things.  I don't

12  think that those would have any impact on this type of case.

13         MS. PENG:  Are they typically, you know, trying to

14  find serial killers, or like -- like that?

15         PROSPECTIVE JUROR:  Just discussing the historical --

16         MS. PENG:  I see.

17         PROSPECTIVE JUROR:  -- like Ted Bundy, John Wayne

18  Gacy.

19         MS. PENG:  Got it.  Did you also indicate that

20  because this case is about bribery and fraud that that created

21  some negative emotions in you because you have listened to some

22  podcasts about those types of matters?

23         PROSPECTIVE JUROR:  It has.

24         MS. PENG:  Can you tell me a little bit more about

25  what you were feeling?

USA v. Jenkins, 3:23cr11, 12/11/2024

1        PROSPECTIVE JUROR:  Upon some of the rumors that I

2   have heard in my workplace, it did create some negativity bias,

3   but I do believe that I could put that aside and put my true

4   crime brain to work and deliberate based on the evidence.

5        MS. PENG:  Got it.  And that was going to be my, you

6   know, question to you is -- you know, this is a courtroom.

7   There's rules about evidence.  It's not a true crime podcast

8   obviously.  And we have FBI agents here who conducted an

9   investigation.  Do you think that you're going to be able to

10  hear their testimony, you know, fairly and impartially without

11  the interference of your knowledge gained from the podcasts?

12       PROSPECTIVE JUROR:  Yes, ma'am.

13       MS. PENG:  And the last question -- sorry to stick

14  with you for a little bit -- so you did indicate in your

15  questionnaire also that you might have beliefs or morals that

16  might be different from other people's.  Can you tell me a

17  little more about that?  Did I get that right?

18       PROSPECTIVE JUROR:  I don't remember what that was in

19  regards to when I had answered that question.

20       MS. PENG:  But is that just on a -- you know, putting

21  aside the questionnaire, is that true for you, that sometimes

22  you might have beliefs or morals or whatever that you feel

23  don't align with those of other people?

24       PROSPECTIVE JUROR:  I'm sorry, I don't remember what

25  my thought process was when answering that.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MS. PENG:  Okay.  But is that -- that's not true,

2   then?

3          PROSPECTIVE JUROR:  No.

4          MS. PENG:  Okay.  Got it.  And so there's nothing

5   else sort of that you feel might limit your ability to be a

6   fair and impartial juror in this case?

7          PROSPECTIVE JUROR:  No, ma'am.

8          MS. PENG:  Thank you.

9          Mr. Richard Harris.  Hello, sir, how are you?

10          PROSPECTIVE JUROR:  I'm doing fine.

11          MS. PENG:  So I think you indicated that you might

12   have some financial hardship -- or I'm sorry, that you might

13   have some difficulty sitting for long periods of time?

14          PROSPECTIVE JUROR:  Did I write that on there?

15          MS. PENG:  I think you did, but --

16          PROSPECTIVE JUROR:  I don't know about sitting long

17   periods of time.  Just I know if I don't go to work I won't get

18   paid.  And I do pay child support once a month.

19          MS. PENG:  So you will have no difficulty paying

20   attention, staying alert?

21          PROSPECTIVE JUROR:  Paying attention, no.

22          MS. PENG:  Okay.  And again, I don't want to tell you

23   -- you to tell me anything about what you saw, but did you

24   Google Mr. Jenkins?

25          PROSPECTIVE JUROR:  Yeah, I just Googled to see what

USA v. Jenkins, 3:23cr11, 12/11/2024

1  the case was about.

2          MS. PENG:  Okay.  Was that after you completed the

3  questionnaire or before?

4          PROSPECTIVE JUROR:  That was before I completed the

5  questionnaire.

6          MS. PENG:  Is there anything -- I know you mentioned

7  that you're -- you know, you're the only person who can deliver

8  the medical equipment.  Anything else you think that would

9  prevent you from being a juror in this case?

10          PROSPECTIVE JUROR:  The only other thing I have is a

11 mother at home that can't drive, so I have to take her to

12 appointments and different things.

13          MS. PENG:  She needs to be driven to places, and

14 you're the only person who can drive her around?

15          PROSPECTIVE JUROR:  Yeah.

16          MS. PENG:  And is she going to be needing to be taken

17 to places in the next few days?

18          PROSPECTIVE JUROR:  I have no idea.  They set

19 appointments like two days in advance, so --

20          MS. PENG:  Okay.  So it's possible?

21          PROSPECTIVE JUROR:  Yeah.

22          MS. PENG:  Okay.  Thank you, sir.

23          Let me ask Ms. Powell, Carolyn Powell -- so it looks

24 like your son is a deputy in Louisa County?

25          PROSPECTIVE JUROR:  Uh-huh.

USA v. Jenkins, 3:23cr11, 12/11/2024


 1          MS. PENG:  Has he discussed with you the nature of

 2   his job at all?

 3          PROSPECTIVE JUROR:  Of course.

 4          MS. PENG:  And what types of things would you

 5   generally say he's told you about?

 6          PROSPECTIVE JUROR:  Cases that he's worked.

 7          THE COURT:  Can you hold the microphone up a little

 8   bit?  Thank you, Ms. Powell.  Thank you.

 9          MS. PENG:  Interesting cases he's worked?

10          PROSPECTIVE JUROR:  Uh-huh.

11          MS. PENG:  And you know, given the defendant is a law

12   enforcement officer and that your son is a law enforcement

13   officer, do you think you have concerns that you might -- you

14   know, that might affect your ability to be a fair and impartial

15   juror, since he's doing the same thing, basically?

16          PROSPECTIVE JUROR:  No.

17          MS. PENG:  I think you indicated in your

18   questionnaire that you might have a hard time with media

19   restrictions.  Did I get that right?

20          PROSPECTIVE JUROR:  With what restrictions?

21          MS. PENG:  As in you don't look at the media or the

22   news like during the pendency of this case that Judge Ballou

23   just instructed on.  I thought that you had said you might have

24   a hard time with that.  So I just wanted to confirm whether

25   that's true.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  I don't remember answering that

2    question.

3          MS. PENG:  Okay.  Did you also indicate that you had

4    some, like, religious -- you might have some religious beliefs

5    that you might be concerned about, or do you think that you

6    could be a juror in this case?

7          PROSPECTIVE JUROR:  I don't have religious beliefs

8    unless it's like the death penalty or something of that sort.

9          MS. PENG:  Okay.  You're Ms. Carolyn Powell, right?

10         PROSPECTIVE JUROR:  Uh-huh.

11         MS. PENG:  I'm just double-checking my notes are

12   correct.  Thank you.

13         Mr. Stapler, sir, I think you might have indicated on

14   your questionnaire that you would have some financial

15   difficulties if you were to be seated.  I just wanted to check

16   in with you about that.

17         PROSPECTIVE JUROR:  Yes, ma'am.  Yes, ma'am.  My wife

18   is unemployed, and I currently do not have a job, so I collect

19   unemployment.  So that's income for -- help with income for our

20   home.  So I would not collect my full benefits to help with

21   finances for my home.

22         MS. PENG:  So if you were to be seated for -- you

23   know, until December 20th, that would present a difficulty for

24   your household?

25         PROSPECTIVE JUROR:  Correct.  Yes, ma'am.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MS. PENG:  Thank you.

2          Judge, those are all the questions I have, except for

3  the ones that I think we should address in private.

4          THE COURT:  Okay.  Thank you.

5          Mr. Andonian?

6          MR. ANDONIAN:  Just one moment.

7          THE COURT:  Yes.

8          MR. CALEB:  Your Honor, if the Court is okay with it,

9  we're just going to split it up a little bit; is that okay?

10          THE COURT:  Yeah.

11          MR. CALEB:  Good morning again, ladies and gentlemen.

12  So I just have a few questions I want to ask generally, and

13  then my colleague will follow up and ask some more specific

14  questions.  So I just wanted to know:  Is there anyone here

15  that knows or recognizes anyone else on the panel?

16          Okay.  Should we just start in the front, Judge?

17          THE COURT:  Yeah, we'll go in an orderly way.

18          MR. CALEB:  Okay.  Ma'am?

19          PROSPECTIVE JUROR:  Yes.  Amanda Long and I have

20  worked together before.

21          THE COURT:  And give us your name, ma'am.

22          PROSPECTIVE JUROR:  Kimberley McDaniel.

23          THE COURT:  Thank you, Ms. McDaniel.

24          MR. CALEB:  Okay.  And just a follow-up, is there

25  anything about -- I'm sorry, who did you say you knew?

USA v. Jenkins, 3:23cr11, 12/11/2024

1           PROSPECTIVE JUROR:  My name is Kimberley McDaniel.

2           MR. CALEB:  And who do you know?

3           PROSPECTIVE JUROR:  Amanda Long.

4           MR. CALEB:  Amanda Long.

5           Okay.  And Ms. Long?

6           PROSPECTIVE JUROR:  Yes, and I also know Patrick

7    Betz.  I know Patrick as well.

8           MR. CALEB:  Okay.  So I don't think we need to go to

9    Patrick unless he knows someone else.

10          THE COURT:  And that's Patrick Betz, just so the

11   record is clear.

12          Okay.  Anyone else?  Ma'am?

13          PROSPECTIVE JUROR:  I don't know her, but I recognize

14   a woman from my Pilates class that I take all the time.  So we

15   often work out next to each other.  Her name is Joan, I think.

16          MR. CALEB:  Joan.  Hi, Joan.

17          PROSPECTIVE JUROR:  Hi.

18          MR. CALEB:  Okay.  Anyone else?

19          PROSPECTIVE JUROR:  My name is Cody Moubray.  I

20   recognize Amanda Long.

21          MR. CALEB:  Amanda didn't recognize you.

22          PROSPECTIVE JUROR:  Sorry.

23          PROSPECTIVE JUROR:  Yeah, I know.  She's, I guess,

24   indirect family member.

25          MR. CALEB:  Okay.  All right.  Next?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  My name is Lisa Meade.  I

2    recognize Carolyn Powell.  I used to work with her.

3          THE COURT:  Can you say that a little bit louder?

4          PROSPECTIVE JUROR:  My name is Lisa Meade.  I

5    recognize Carolyn Powell.  We used to work together.

6          MR. CALEB:  Thank you, Ms. Meade.

7          And Ms. Powell, I take it you recognize Ms. Meade?

8          PROSPECTIVE JUROR:  Uh-huh.

9          MR. CALEB:  Is Ms. Meade the only one on the panel

10   that you recognize?

11         PROSPECTIVE JUROR:  I think so, yes.

12         MR. CALEB:  Okay.  Thank you.

13         Is there anyone else?

14         PROSPECTIVE JUROR:  My name is Tyler Haislip.  Cody

15   Bryant was a childhood neighbor of mine, and then Ms. Carolyn

16   Powell's husband is a friend of my father's.

17         PROSPECTIVE JUROR:  My name is Kelly Bright, and I

18   recognize Amanda Long.  Her and I went to school together.

19         MR. CALEB:  Okay.  Anyone else?

20         Okay.  So just another general question:  Is there

21   anything -- you know, for the people who mentioned knowing

22   someone else on the panel, anything about your knowledge of

23   your fellow jury member that would make it difficult for you to

24   sit on this jury?

25         Okay.  Another question:  Is there anyone here that

USA v. Jenkins, 3:23cr11, 12/11/2024

1    thinks that just because a person is sitting and charged as a

2    defendant in a case means that they're either guilty or that

3    they must have done something wrong?

4            All right.  I think that's it for the general

5    questions.

6            THE COURT:  All right.  Mr. Andonian?

7            MR. ANDONIAN:  If I could just have one moment, Your

8    Honor.  It might be that my questions are better --

9            THE COURT:  Better reserved?

10           MR. ANDONIAN:  -- for the back.

11           So I actually have just a couple of -- good morning,

12   everybody, again.  My name is Phil Andonian.  Thank you for

13   your patience.  Thank you for bearing with all of us and for

14   volunteering information.  I know this is probably not the most

15   comfortable thing that you would pick to do on a midweek

16   morning.

17           One question I wanted to ask is, a lot of you -- and

18   we might talk about this individually later -- but a lot of you

19   talked about news coverage that you had been exposed to about

20   the case, and opinions that you might have formed about the

21   case based on the news coverage.  What I want to -- I guess the

22   first question I want to ask is:  Since filling out your

23   questionnaire, has anybody had exposure through the media to

24   the facts or circumstances or the allegations in this case?

25           Yes, sir?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  Hang on a second.  Give us your name?

2          PROSPECTIVE JUROR:  Jeff Blauvelt.

3          THE COURT:  Yes, sir.

4          PROSPECTIVE JUROR:  And I do subscribe to the

5     *Washington Post*, and just flipping through, you know,

6     scrolling, I saw there was an article.  And I tried not to read

7     the details, but there was an article in the *Post* recently.

8          MR. ANDONIAN:  Okay.  You said you tried not to read

9     it.  Did you pick up any information from it?

10          PROSPECTIVE JUROR:  Yeah, I mean, do you want me to

11     talk about it now, or private?

12          THE COURT:  Don't talk about any of the facts.

13          MR. ANDONIAN:  Yeah, just a yes or no question

14     whether or not you picked up any of the facts based on your

15     skimming of the article?

16          PROSPECTIVE JUROR:  A couple key words, yes.

17          MR. ANDONIAN:  Okay.  Is there anything about -- and

18     again, this is just a yes or no question -- is there anything

19     about your kind of picking up of key words based on a quick

20     skimming over that article that you think would impact your

21     ability to be fair and impartial if you were selected as a

22     juror in this case?

23          PROSPECTIVE JUROR:  Well, I think I put on my form --

24     I don't know how much I should say here.

25          THE COURT:  Why don't we just reserve it for later?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MR. ANDONIAN:  That's fine.  We can reserve it.

2   That's fine.

3          Just to follow up on the question -- and again, this

4   is a yes or no question.  We're not trying to get into -- I

5   don't want anybody to volunteer anything specific, but for

6   those of you who have heard about or read about or had any

7   exposure to the facts of this case or the allegations that are

8   being made in this case through the press, does anybody feel

9   that they would be -- they would have a very difficult time

10  sitting as a juror and being impartial in this case?

11         Yes, Ms. Brunk, thank you for raising your hand

12  again.

13         I think those are the only questions I have for right

14  now.  We reserve --

15         THE COURT:  Okay.  Ladies and gentlemen, it's about

16  11:20.  We've been going for approaching two hours.  What I'm

17  going to do -- we need to talk to some of you individually.

18  And I need to get a list of exactly who those folks are going

19  to be.  So I'm going to release you all, but not from the

20  courthouse, from here, let you be able to -- and we need to do

21  this outside the presence of the entire venire.  So I'm going

22  to ask you all to leave the courtroom, not come back in the

23  courtroom.  We'll call you in as we need you.  But you're

24  welcome to mill around outside, mill around in the jury

25  assembly area, but stay on this floor so when we need you --

USA v. Jenkins, 3:23cr11, 12/11/2024

1  and what we'll do is as we know who's going to be called, we'll

2  say, you know, Mr. Smith is up next, and Ms. Jones is after

3  that, and then Mr. So-and-so after that, so you all will know

4  as well who's going to be coming.

5        I ask you this:  Do not discuss anything about

6  today's process thus far amongst yourself.  It is very

7  important that as we select a jury, we do so based upon the

8  persons who walked in here, not upon any conversation that you

9  had with each other.  Don't talk to anybody about the case at

10  all.  Don't talk to anybody who is not part of the venire as

11  well.  I ask you not to have any conversations in that regard.

12  We want you in your bubble, if you will, as we select our jury.

13  And I promise you we're going to work our way through this as

14  expeditiously as we can.  If it looks like we're going to go

15  past lunch, I'll let you know so that you can break and go get

16  something to eat, if you want to brave the weather.  But we'll

17  keep you informed in that regard.

18        So with that, I'm going to ask the jury to be

19  excused.  And again, don't discuss anything, and we'll keep you

20  advised.

21  **(Jury out, 11:22 a.m.)**

22        THE COURT:  The jury has been excused, but the

23  courtroom is not closed.  And those of you all who have been

24  sequestered on the back row, you can now move around freely as

25  you like.

USA v. Jenkins, 3:23cr11, 12/11/2024

1           Here's what I'd like to do, in hopes that maybe this

2    is an orderly process.  Let's take five minutes, if you all

3    have a list of those people we're going to have to talk to,

4    hand them up to Ms. Brown, and then we'll put them in some type

5    of order so that we can take them and we can kind of let those

6    folks know, you know, who we're going to take first, and who's

7    next, and so forth.  And then let's take ten minutes for

8    ourselves, take some comfort breaks.  It's just a little after

9    11:20 now.  You all will have to fight for the restrooms and so

10   forth.  If we come back -- it's closer to 11:25.  If we come

11   back at 11:40, is that enough time for you all to get the list,

12   provide it to us, and then for you all to have a moment for a

13   comfort break?

14           MS. PENG:  Yes, Your Honor.

15           MR. CALEB:  Your Honor, I did have a question.

16           THE COURT:  Yes, sir.

17           MR. CALEB:  If I may.  So it didn't even dawn on me

18   until the Court was reading its instructions about -- it was

19   specifically the question that was being asked about whether --

20   when the Court was reading the names of the people that the

21   jury may hear from -- and so realizing that we use pseudonyms

22   for some of the -- for a couple of the agents, I'm just

23   flagging that as an issue, because the names that were read to

24   the jury, the jurors -- prospective jurors likely won't

25   recognize those names.

USA v. Jenkins, 3:23cr11, 12/11/2024

```
1              THE COURT:  So I think -- and we took the names of

2    the -- I believe the two undercovers who have pseudonyms, those

3    are not out.  And one of them, I only have a first name on.

4    And if need be, before we conduct any strikes, we can bring

5    them back in and we can give those two names.  For the one

6    undercover, we have a first name.  I think it's Mike.  Anybody

7    know a Mike, right?  That one may not -- but the other, which

8    did have a first and last name, we can read it out, if

9    necessary.  But I think the jury is never going to know the

10   names of those undercovers.

11             MR. CALEB:  No, that's right.  I think my concern was

12   more so I guess anticipating if there's an issue when the

13   witness takes the stand, and a juror may or may not know the

14   witness, and just trying to figure out how we -- how we deal

15   with that, if that issue --

16             THE COURT:  Ms. Choy, the undercovers are not from

17   this area; is that correct?

18             MS. CHOY:  That's correct.

19             THE COURT:  Okay.  Probably not likely.  And since

20   we're going to sit three alternates, if we lose one, I would be

21   surprised.  I'd be amazed if we lose more than one.  I can't

22   read their actual names.

23             MR. CALEB:  I know.  I was just flagging the issue.

24             THE COURT:  Right.  Okay.

25             MS. PENG:  Your Honor, we had marked one of the
```

USA v. Jenkins, 3:23cr11, 12/11/2024

1  jurors, one of the ones who had night blindness after 4 p.m.,

2  as someone to voir dire privately, but are we in agreement that

3  she should be excused?

4              THE COURT:  So I'll let you all talk among

5  yourselves.  If you all agree to that, then that's fine.  But

6  what I don't want to do is kind of deal with some of them and

7  then come back.  I mean, if you all agree that she can -- she

8  has night blindness, I think she's also the person that put on

9  there that she takes medication, and she's not -- she doesn't

10  like to drive after she takes her medication -- or that may

11  have been a different juror that we've already excused.  But if

12  you all agree that there are certain persons that should be

13  struck for cause, and you want to give me that list when I come

14  back, that's fine as well.  I can think of one that probably

15  ought to be struck for cause.  But if there's not agreement,

16  then we're going to go through the process, and I'll deal with

17  the motions when they come.

18              MS. PENG:  Okay.  Thank you.

19              MR. ANDONIAN:  I'm sorry, may I just raise one

20  other --

21              THE COURT:  Yes, sir.

22              MR. ANDONIAN:  It just occurred to me now that we're

23  going to be commingling, using restrooms and such, I'm not sure

24  if Your Honor said this initially --

25              THE COURT:  I didn't give them that instruction yet.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MR. ANDONIAN:  Okay.

2          THE COURT:  But if you want in the -- you know, for

3   the short term, why don't you all go down to the second floor.

4   The U.S. Attorney's office is here.  They've got a place that

5   they can go, if you all want to go down to the second floor.

6   Yeah, you can just use the back walkway and go down to the

7   second floor so you kind of stay out of everyone's way.

8          All right.  Once you all get your lists, give them to

9   Ms. Brown either before or after she takes her break and then

10  we'll -- I'll come back around 11:40 or as soon as we can all

11  gather back together.  Thank you.

12                          (Recess)

13         THE COURT:  We are back on the record in the matter

14  of *United States v. Jenkins.*  The government is present by

15  counsel, and the defendant likewise is present along with

16  counsel.

17         So I've got an agreed list of who you all agreed to

18  excuse.  We just won't individually voir dire them, and then

19  when we get to the strikes for cause, we'll just go through

20  those.

21         Okay.  Do these names, do they overlap at all?  Do we

22  know yet?

23         MS. PENG:  Between the two parties?

24         THE COURT:  Yes.

25         MS. PENG:  I don't know that.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  On these lists?  Okay.  So let me --

2    let's just do this.  So what we'll do is -- why don't we start

3    with the government's list and I'll just go back and forth.  Do

4    you all have copies of each other's lists?  Okay.  So let me

5    make copies of each other's lists so we can go back and forth.

6          And how long do you all anticipate with each one of

7    these folks, five minutes?

8          MS. PENG:  Five minutes.

9          MR. CALEB:  Can we actually make two copies?

10         THE COURT:  Yeah, once we get them scanned into our

11   system, we can print out as many as we need.  Okay.  So we're

12   going to get some others printed out.  So what I propose that

13   we do -- and Kelly, get a copy to Campbell as well.  What I

14   propose that we do is we just -- have we only printed one --

15         MR. ANDONIAN:  I think we each just need one more of

16   the defense's list.

17         THE COURT:  Okay.  So we've just got to print the

18   defense out.

19         Is that we'll just go back and forth.  We'll take --

20   start with the government's, take Mr. Birkelund first, and then

21   we'll take Mr. Falls, then we'll take Mr. Blauvelt, and then

22   Ms. Meade, and just go straight down the list that way, back

23   and forth.  We'll run out of defense -- I mean government folks

24   first, and then we'll get through everyone else.  So as we are

25   getting these things printed out, let's go ahead and we'll call

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Donald Birkelund, and tell Timothy Falls and Jeffrey Blauvelt

2  that they will be next.  So Donald Birkelund.  And I was just

3  going to have the juror just be in the witness box.

4          Mr. Birkelund, come on up.  We're going to have you

5  sit right over here in the witness box.  So I will remind you,

6  you are under oath.  As you advance through the questions,

7  you'll remain that way.  If there's anything -- because we are

8  on the record, and we haven't excluded -- we've only excluded

9  jurors, but not anyone else who wants to watch the case.  If

10  you ask any -- I have no idea the questions that the parties

11  want to ask you, but if you're asked any personal questions

12  that you want to take up outside the presence of anyone from

13  the public, you just let us know.  But you need to make that

14  request.

15          All right.  Ms. Peng?

16          MS. PENG:  Thank you, Your Honor.

17                      EXAMINATION

18   BY MS. PENG:

19  Q    Mr. Birkelund, how are you?

20  A    All right.  How are you?

21  Q    So just -- I noticed that on your questionnaire you

22  indicated that you don't trust the DOJ or the FBI.  Did I read

23  that correctly?

24  A    I believe so.

25  Q    Could you tell me a little bit more about why?

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A    I think in pure -- in its purest form, I do trust it.  But

2  I know there can be corruption and some other things behind the

3  scenes that could happen, so -- yeah.

4  Q    Got it.  So you just -- you're aware -- or you believe

5  that there could be general corruption at the FBI and the DOJ.

6  And do you mind telling me, you know, if you can, like what

7  gave rise to those views that -- of those views?

8  A    Just what you see on the news, I guess.

9  Q    Yeah.  And so you're aware that this prosecution is going

10 to involve the DOJ and the FBI?

11 A    Yes.

12 Q    Do you think that those general views you have, you know,

13 of corruption is going to affect your ability to adjudicate

14 this case if you're seated?

15 A    I don't think so. I'm a pretty fair guy, so --

16 Q    So -- yeah, so you understand that this is an individual

17 case and it doesn't really --

18 A    Yeah.

19 Q    -- potentially have to do with the larger issues here?

20 A    Right.

21 Q    Okay.  Anything else that we should know in terms of your

22 ability to be a fair and impartial juror in this case?

23 A    No, ma'am.

24         THE COURT:  Mr. Andonian, any questions?

25         MR. ANDONIAN:  No questions.

USA v. Jenkins, 3:23cr11, 12/11/2024

1         THE COURT:  All right.  Thank you, Mr. Birkelund.

2  Please do not discuss the matters that we discussed.  Thank you

3  very much.

4         All right.  We'll next have Timothy Falls, and then

5  Lisa Meade, and then Jeffrey Blauvelt.

6         Did you all get copies of the defendant's list?

7         MS. SMITH:  We did not.

8         THE COURT:  Yeah, we'll get that printed out.

9         Mr. Falls, come on up, if you would, please, sir.

10  Just have a seat, if you would.  Be careful stepping up,

11  Mr. Falls.  Hope you're well today.  I will remind you,

12  Mr. Falls, we put you under oath.  You'll remain under oath as

13  long as you're answering these questions.  And if there's

14  anything that's asked of you that is of a particularly personal

15  nature that you don't want to have the public to be able to

16  see, you can ask to take that up in private.

17         PROSPECTIVE JUROR:  Yes, sir.

18         THE COURT:  We'll have still the counsel and the

19  defendant present.

20         All right.  Mr. Andonian?

21         MR. ANDONIAN:  Thank you, Your Honor.

22                         EXAMINATION

23   BY MR. ANDONIAN:

24  Q    Good morning, Mr. Falls.

25  A    Good morning.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Mr. Falls, I have just a few follow-up questions for you.

2  You mentioned that you had known Scott Jenkins for 30 to 35

3  years, and it went back to his time as a deputy in

4  Rappahannock; is that correct?

5  A    Yes, sir.

6  Q    When you say you know him, did you have a personal -- and

7  I'm sorry if I missed this -- a personal relationship with him,

8  or you just knew of him?

9  A    I just knew of him.  It wasn't a personal relationship

10  with him.

11  Q    Okay.  Did you have any feelings about him, positive or

12  negative, based on that?  It's a pretty long period of time.

13  A    I wouldn't say necessarily negative.  I put on the sheet

14  that I just, you know -- I put on the questionnaire I feel that

15  -- I thought he was a little arrogant at the time, but you

16  know, I always liked him.  I never had any problem with him.

17  Q    Okay.  If I'm recalling correctly, on your questionnaire,

18  you -- I thought you had answered that you had some negative

19  opinions of Mr. Jenkins, and maybe had formed an opinion about

20  his guilt or innocence in this case; is that right -- am I

21  remembering that right?

22  A    No, I haven't formed an opinion on his guilt or innocence,

23  but I would rather not -- I would rather recuse myself from it,

24  you know, working in Culpeper with people that may know him and

25  his family and, you know, say I either sent him away or didn't

USA v. Jenkins, 3:23cr11, 12/11/2024

1  send him away, have an opinion on it, when you have to, you

2  know, live in the community.

3  Q    Do you think that those concerns would make it difficult

4  for you to follow the Court's instructions and to apply the law

5  as the judge instructs you in this case?

6  A    No, sir.  I would still be unbiased.

7  Q    Okay.  And then I think my final question is, I believe

8  you noted that you had some medical issues that might pose a

9  hardship.  If you could just talk to us a little bit about what

10 those entail?

11 A    I have a rod on each side of my spine, and rods going to

12 all my vertebrae, and rods going to my pelvis, and a cage up

13 the front of my spine too.  That's not very comfortable,

14 especially sitting in the hard seats.

15 Q    Is that something that you think -- and I'm sorry, that

16 sounds like a lot.

17 A    That's all right.

18 Q    Would that make it difficult for you to serve as a juror,

19 do you think?

20 A    It's pretty uncomfortable, but we can work through it if

21 we have to.

22 Q    Just to circle back -- I'm sorry, one last question, to

23 circle back on your questionnaire.  I believe you said that

24 you -- you would, quote, "I would say Scott Jenkins is guilty."

25      Do you remember writing that on your questionnaire?

96

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A    No, I don't remember writing that.  I could have.

2  Q    Okay.  And so I guess I just want to -- want to make sure

3  I'm understanding clearly.  I mean, if you could have written

4  that down -- I mean, I'll represent to you that's what's on

5  your questionnaire.

6  A    Okay.

7  Q    So there's no views that you have of Mr. Jenkins's guilt

8  or innocence, or is it possible that you do have some feelings?

9  A    It's possible to have a feeling, but I wouldn't have a

10  feeling -- would be unbiased with, you know, what the evidence

11  showed.

12         MR. ANDONIAN:  Okay.  I think that's all I have, Your

13  Honor.  Thank you.

14         THE COURT:  Hang on a second, Mr. Falls.  Ms. Peng

15  may have a couple of questions.

16         MS. PENG:  No questions.  Thank you.

17         THE COURT:  All right.  Mr. Falls, thank you very

18  much.  Please do not discuss what we've talked with you about

19  here today with the other jurors.

20         PROSPECTIVE JUROR:  Yes, sir.

21         THE COURT:  All right.  Thank you.

22         All right.  We'll have Jeffrey Blauvelt, and then

23  Lisa Meade.

24         COURT SECURITY OFFICER:  We have Lisa Meade on deck

25  right now.

USA v. Jenkins, 3:23cr11, 12/11/2024

 1              THE COURT:  Okay.  We'll take Ms. Meade right now.

 2              Come on up if you would, Ms. Meade.  Please be

 3   careful as you step into the witness box there.  And Ms. Meade,

 4   I will remind you that the same oath you took this morning

 5   still exists.  And if you're asked any questions -- I don't

 6   know what counsel may ask you, but if you're asked any

 7   questions that you believe are of a particularly personal

 8   nature we need to take up in private, you can ask -- make that

 9   request.

10              PROSPECTIVE JUROR:  Okay.  Thank you.

11              THE COURT:  All right.  Thank you.

12              Mr. Andonian?

13              MR. ANDONIAN:  Thank you, Your Honor.

14                            EXAMINATION

15   BY MR. ANDONIAN:

16   Q    Good morning, Ms. Meade.

17   A    Hello.

18   Q    Ms. Meade, just a few questions.  On your jury

19   questionnaire, you indicated that you had a very favorable

20   opinion of the DOJ or the FBI, and a somewhat unfavorable

21   opinion about criminal defense attorneys.  Can you talk to us a

22   little bit about those views?

23   A    Well, as far as the Department of Justice, the law

24   enforcement, this sort of thing, when I was -- when I was --

25   before I moved to this area, I lived in Beckley, West Virginia,

USA v. Jenkins, 3:23cr11, 12/11/2024

1  and I worked at a police department for 13 years.  So I had a

2  lot of involvement with officers, different things of that

3  nature.  Now, and over the past 15 years, I handle insurance

4  claims, commercial liability insurance claims.  So I have a lot

5  of dealings with plaintiff counsels, and I work a lot with

6  defense counsels, be that negotiating settlements, mediations,

7  that basically sums up why I said it that way.

8  Q    Okay.  So this case obviously involves the Department of

9  Justice and the FBI on the one hand, and criminal defense

10 lawyers on the other hand?

11 A    Right.  Right.

12 Q    Do you think you would have any trouble being fair and

13 impartial, given your views of the Department of Justice and

14 the FBI on the one hand and criminal defense lawyers on the

15 other?

16 A    I would like to think no.  To say 100 percent, I can't

17 really say that, but I would like to think that I could.  I

18 know that's kind of a shady answer, and I don't mean to be that

19 way.

20 Q    No, no --

21 A    Just trying to be honest.

22 Q    That's fine.  That's all we can ask of you.

23      Do you think -- and this might be hard to answer because

24 I'm trying to probe into an intangible here -- but when you say

25 that you would like to think, do you have some way of -- or

USA v. Jenkins, 3:23cr11, 12/11/2024

1   degree of certainty that you think you could be impartial, like

2   maybe as a percentage, or some other way to measure?

3   A    No, not really.  I don't really know how I could measure

4   it.  I mean, I feel like, yes, do I believe that everyone is

5   innocent until they're proven guilty?  Yes, 100 percent on

6   that.  In all of that side, I feel confident that I can be very

7   impartial.  I guess it's just -- I guess it's just my daily

8   life, my daily job dealing with -- certain plaintiff counsels

9   hasn't always been very nice to me, so -- over the last however

10  many years.  That's why.

11  Q    Okay.  Thank you.  Thank you very much.

12  A    You're welcome.

13          THE COURT:  Hang on a second, Ms. --

14          PROSPECTIVE JUROR:  Oh, I'm sorry.

15          MS. PENG:  If I could --

16                    EXAMINATION

17  BY MS. PENG:

18  Q    So Ms. Meade, just so I'm clear, when you're saying

19  plaintiff's counsel, that's in the context of civil insurance

20  claims?

21  A    Yes.  Yes, ma'am.

22  Q    So you understand that this is criminal?

23  A    Yes -- this is criminal, yes.

24  Q    These criminal attorneys are not --

25  A    Yes.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    -- civil defense --

2  A    100 percent, yes.

3  Q    So -- and then I think you said you would like to think,

4  but you would try to follow the judge's instructions and

5  consider the evidence to the best of your ability; is that

6  right?

7  A    Yes, ma'am.  I mean, I would definitely want to do that,

8  yes.  And I think that I can.  I don't think there's a problem

9  there.

10          MS. PENG:  Thank you.

11          THE COURT:  Let me ask you a couple questions,

12  Ms. Meade.

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  I used to do insurance defense work.

15          PROSPECTIVE JUROR:  You did?  So you understand.

16          THE COURT:  Well, but it informs me that you sat

17  through a number of jury selections as a claims adjustor, or

18  have had reports back?

19          PROSPECTIVE JUROR:  Yes, reports --

20          THE COURT:  And you understand that the obligation

21  that every juror has when they take the oath to sit as a juror,

22  they swear to well and truly try a case based upon the facts

23  that come before them and the judge's instructions, and to set

24  aside any preconceived notions they may have; do you understand

25  that?

USA v. Jenkins, 3:23cr11, 12/11/2024

1           PROSPECTIVE JUROR:  Yes, sir.

2           THE COURT:  All right.  Can you follow those

3  instructions?

4           PROSPECTIVE JUROR:  Yes, sir.

5           THE COURT:  Okay.  And the reason I ask the question

6  is to kind of go back to some of the questions that you were

7  previously asked, is that -- that means set aside any

8  preconceived notions that you may have about your like or

9  dislike of plaintiff's lawyers, civil defense lawyers, criminal

10  defense lawyers.  And this is a case not about the lawyers.

11  This is a case about whether this defendant, who is accused of

12  crimes, has committed those crimes, and whether the government

13  can prove that based upon the evidence.  Can you do that?

14           PROSPECTIVE JUROR:  Yes, sir.

15           THE COURT:  Okay.  Does that prompt any further

16  questions, Mr. Andonian?

17           MR. ANDONIAN:  No, Your Honor.

18           THE COURT:  Ms. Peng?

19           MS. PENG:  No, Your Honor.  Thank you.

20           THE COURT:  Thank you.  Please don't discuss your --

21  what we talked about.

22           PROSPECTIVE JUROR:  No, no, I won't.  Thank you.

23           THE COURT:  Thank you.

24           All right.  Jeffrey Blauvelt will be next, and then

25  after that will be Kelly Rhoden.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          Come on up, Mr. Blauvelt.  Am I pronouncing that

2    correctly?

3          PROSPECTIVE JUROR:  Yeah, Blauvelt.

4          THE COURT:  Blauvelt.  Come on up, and we're going to

5    have you sit right over here in the witness box.  As you answer

6    questions, you will remain under oath.  And if you're asked any

7    questions of a personal nature that you don't wish to discuss

8    in public, you can ask to take those up in private, if you

9    like.

10         All right.  Ms. Peng.

11                         EXAMINATION

12    BY MS. PENG:

13   Q    So Mr. Blauvelt, I think you indicated that, you know,

14   perhaps there were some things you saw in the news that you

15   wanted to discuss out of the presence of the other jurors.  So

16   just an open-ended question regarding whether you wanted to say

17   more about that *Washington Post* article you might have seen?

18   A    Well, it's more when everybody kept asking, can you be

19   fair and impartial and look at the evidence and ignore

20   everything else.  For being fair and impartial, I would have to

21   admit I already have a bias against the defendant, because in

22   the articles -- I've read the NBC29 before -- I've seen NBC29

23   reports before I got called for jury duty.  And in those

24   reports, it said that three people had already pleaded guilty

25   to their charges, and that there were two FBI agents that were

USA v. Jenkins, 3:23cr11, 12/11/2024

1   undercover in this case.  And I'm presuming that's still

2   happening.  And then just scrolling past, you know -- like I

3   say -- well, I read tons of news all the time in the *Washington*

4   *Post*, and saw they -- just kind of as I scroll by, I'm not

5   supposed to read that, but you know, kind of quickly confirmed

6   those facts to me again.  And again, to be fair and impartial,

7   I also have to say that I'm more of a gun control proponent.  I

8   believe that existing gun laws should be really enforced, and

9   so I'd have a bias against somebody who tried to circumvent

10  some of those laws.  And so, you know, I have to admit all of

11  that in saying I can still keep an open mind, but I might not

12  be that open-minded and so forth.

13  Q    Yeah, I appreciate your candor about that.  That's really

14  helpful.

15       Just a couple of follow-up questions.  You know, in terms

16  of you're going to several a whole host of jury instructions at

17  the end of the case that are going to address, for instance,

18  how you should consider the guilty pleas of other people.  I

19  expect that they're going to say, don't consider that.  And

20  you're also going to receive instructions that basically say

21  you're only to consider the issues presented before you, and so

22  these other issues about gun control or things like that are

23  not going to be a part of this case.  I appreciate your candor

24  in terms of telling us what you've read, and it sounds like

25  you've read a couple of things.  I guess my question to you is,

USA v. Jenkins, 3:23cr11, 12/11/2024

1   you know, the case, what it's about, has already been told to

2   all of the jury.  So the question isn't really have you had

3   exposure, so to speak, to other information, but rather can

4   you, in the context of the jury instructions, look at the

5   evidence and consider the evidence that's presented in the

6   trial, and only base your decision ultimately on that evidence?

7   A    Yeah, it would have to be some really good evidence for

8   the defendant that -- obvious, you know, he's -- I think the

9   NBC article said that he was claiming everything he did was for

10  supporting gun rights, and that that was his whole excuse for

11  what was going on.  And I'm opposed to that.  So I feel I can't

12  say -- can I be fair and impartial?  I probably could, but I'm

13  just being up front about it, you know.

14  Q    Yeah, I appreciate that.  So probably could, does that

15  mean -- I know it's hard to quantify.  Is that --

16  A    Yeah, they'd have to present something that every -- it

17  was a big conspiracy, and all these FBI agents and everybody

18  else were trying to frame them or something.  You know,

19  something like that, I could -- if I hear all that evidence,

20  you know, then I go, whoa, maybe.  But that's more like a TV

21  thing, right?

22  Q    Just one last question.  So the judge had previously asked

23  all of the jurors that, you know, in this country we have a

24  presumption of innocence, so the burden really is on the

25  prosecution to prove guilt beyond a reasonable doubt.  And I

USA v. Jenkins, 3:23cr11, 12/11/2024

1  don't think you raised your hand in terms of having an issue

2  with that.  Is that an instruction that you're able to follow

3  and that, you know, just because charges have been brought,

4  he's presumed innocent, and that he doesn't really have a

5  burden to produce any evidence to disprove his guilt, really

6  the burden is on the prosecution to bring forth evidence to

7  prove his guilt beyond a reasonable doubt?

8  A    Yeah, well, if I hear -- if there's -- if I hear all the

9  prosecution evidence and I hear nothing from the defense, I'll

10  be able to weigh fairly?

11  Q    Yeah, because he has a Fifth -- the defense has a Fifth

12  Amendment --

13  A    Right, right.

14  Q    -- right to be silent, and you'll be instructed that you

15  can't construe that against him.

16  A    Honestly, I feel he's guilty, you know.

17          MS. PENG:  Thank you.

18          THE COURT:  Anything else, Ms. Peng?

19          MS. PENG:  No.  Thank you.

20          THE COURT:  Mr. Andonian?

21          MR. ANDONIAN:  Nothing from us.  Thank you.

22          THE COURT:  Mr. Blauvelt, I think the question -- let

23  me just ask you a question real quick.  The instructions that I

24  give to every criminal jury is that the defendant has zero

25  obligation to prove anything.  The entire burden rests upon the

USA v. Jenkins, 3:23cr11, 12/11/2024

1  government to prove its case beyond a reasonable doubt.  Do you

2  understand that?

3              PROSPECTIVE JUROR:  Uh-huh.

4              THE COURT:  Is that a yes?

5              PROSPECTIVE JUROR:  Yes, I understand what you're

6  saying.

7              THE COURT:  And so the point is -- this is the point

8  of Ms. Peng's question, is that a defendant has an absolute

9  right to put on no evidence, and the jury's burden then becomes

10 to weigh whether the government has proven its case beyond a

11 reasonable doubt, based upon its evidence alone.  Do you

12 understand that?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  You can't infer that because a defendant

15 puts on no evidence that the defendant is guilty.  You can't

16 consider that at all.  Do you understand that?

17             PROSPECTIVE JUROR:  That's right.  So I would have to

18 hear from the FBI agents explicitly how they -- you know,

19 bribes were offered or exchanged to say, well, that's evidence

20 that I believe, yeah.  But I have high respect for the FBI.  I

21 don't think they'd be here if there wasn't a case.

22             THE COURT:  Okay.  All right.  Thank you.  Anything

23 further?

24             MS. PENG:  No, Your Honor.  Thank you.

25             THE COURT:  Thank you, Mr. Blauvelt.  Please do not

USA v. Jenkins, 3:23cr11, 12/11/2024

1   discuss what we've discussed here today with your fellow jurors

2   out there.

3           PROSPECTIVE JUROR:  Sure.

4           THE COURT:  All right.  Let's take Kelly Rhoden and

5   then Cody Stanley after that.

6           All right.  Ms. Rhoden, come on up if you would,

7   please, ma'am.  Thank you very much for being here.  So

8   Ms. Rhoden, I will just simply remind you you remain under the

9   same oath that you took earlier this morning.  If you're asked

10  any questions -- I don't know what questions that counsel is

11  going to ask you, but if you're asked any questions that are of

12  a particularly personal nature that you want to discuss in

13  private, you can make that request.  All right.  Thank you.

14          PROSPECTIVE JUROR:  Thanks.

15          THE COURT:  All right.  Mr. Andonian?

16          MR. ANDONIAN:  Thank you, Your Honor.

17                          EXAMINATION

18  BY MR. ANDONIAN:

19  Q    Good morning, Ms. Rhoden.

20  A    Good morning.

21  Q    Ms. Rhoden, just a few questions.  On your questionnaire,

22  you answered that you had a very favorable opinion of the DOJ

23  and the FBI, and that you found it -- and I think the word you

24  used was slimy, when criminal defense attorneys know their

25  client is guilty, but point to others.  Do you -- and that's

USA v. Jenkins, 3:23cr11, 12/11/2024

1  totally okay.  That's totally okay.  We're --

2  A    There may have been wine involved as I wrote that.  Sorry.

3  Q    Totally understandable.  I just want to I guess ask, given

4  those answers, very favorable view of the DOJ, FBI, find it --

5  you know, at least under certain circumstances -- slimy

6  behavior by criminal defense lawyers -- do you foresee those

7  views presenting a problem with you being fair and impartial in

8  this case?

9  A    No.  I think that's more of an anomaly.  I think of people

10  who I think -- I don't know, past trials of people who are

11  generally looked at as being guilty, but kind of got off.

12  You've got to have an anomaly.  There's just some -- you know

13  what I mean?  But I don't think that's common.  I think you

14  have to treat your client as innocent.  So I respect that as

15  well.

16  Q    Okay.  Do you have any views in this case about whether or

17  not Mr. Jenkins is guilty or innocent?

18  A    No.  I know nothing about the case, honestly.  The first I

19  heard about it was today -- or what it was about.

20          MR. ANDONIAN:  Okay.  I think that's all I have.

21  Thank you.

22          THE COURT:  Thank you, Mr. Andonian.

23          Ms. Peng?

24          MS. PENG:  No questions.  Thank you.

25          THE COURT:  All right.  Thank you, Ms. Rhoden.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Please do not discuss our conversation in here today.

2              PROSPECTIVE JUROR:  Okay.  No problem.

3              THE COURT:  Thank you.

4              All right.  Cody Stanley and then Karie Wilson.

5              Mr. Stanley, come on up to the witness box if you

6  would, please, sir.  Thank you again for being here,

7  Mr. Stanley, and you will remain under oath.  If there is any

8  questions of a particularly personal nature that you wish to

9  take up outside of the presence of anyone else who is in the

10 courtroom, you can make that request.

11             PROSPECTIVE JUROR:  Yes, sir.

12             THE COURT:  All right.  Thank you.

13             All right.  Ms. Peng?

14                         EXAMINATION

15   BY MS. PENG:

16 Q    Hi, sir, how are you?

17 A    I'm well.  How about you?

18 Q    Good.  Thank you.  So I see that you said you're a

19 certified fraud examiner; is that right?

20 A    No, ma'am.

21 Q    What is it that you do for a job?

22 A    I work with IT.  I work inside of a data center.  I'm an

23 HVAC guy.

24                    (Reporter clarification)

25 A    Data center -- I work -- I'm a HVAC technician for a data

USA v. Jenkins, 3:23cr11, 12/11/2024

1  center.  I was a commissioning agent during the time of that.

2  I have recently switched jobs.

3  Q    Does your father-in-law work for the Fairfax County

4  Police?

5  A    He is a retired police officer, yes.

6  Q    And are you close to your father-in-law?

7  A    We speak regularly, yes.

8  Q    Have you learned about what it means to be a police

9  officer from him?

10  A    We don't talk much about the job, other than just what he

11  is to -- or what he was now.  Don't go into much detail on what

12  he was in the line of duty, so --

13  Q    Understood.  Have you formed any views about police work

14  through your father-in-law?

15  A    No, ma'am.

16  Q    And I think you indicated that you voted for Scott

17  Jenkins?

18  A    Correct.

19  Q    How many times did you vote for him?

20  A    I lived in Culpeper County from 2018 to 2021.  I voted for

21  him once.

22  Q    And when was that?

23  A    I believe it was the year 2019.

24  Q    Okay.  And then you also I think indicated that you know

25  about the possible allegations in this case, or you read about

USA v. Jenkins, 3:23cr11, 12/11/2024

1   it before you came in here today; is that right?

2   A    Correct.  Being a citizen of Culpeper County, it was kind

3   of big news.

4   Q    Okay.  And so that was going to be my question.  Where did

5   you learn about --

6   A    Just being a citizen of the county.

7   Q    So from news sources, or from people, word of mouth?

8   A    Just being a citizen of the county.  I mean, they kind of

9   blasted it all over Culpeper County.  I mean, it was a big

10  thing for Culpeper County to have a sheriff, you know, with

11  these allegations.  So that's -- I found out just being a part

12  of the county.  At that time, I didn't have social media.  I

13  didn't have any of that.  I didn't have TV, I didn't have

14  cable.  So I found out strictly from being within the county.

15  Q    Got it.  And you know, how did you feel about learning

16  those allegations, given that you voted for him?

17  A    Unfortunately, seeing as I did not know that at the time

18  of voting, it does put a damper on things.  Unfortunately, when

19  I found out about the allegations, I was no longer a part of

20  the Culpeper County community.  It does kind of make an

21  individual think twice about why -- or who he should be voting

22  for, for sure.  Unfortunately, as I stated, the allegations did

23  not come out until after the fact.  So it's not as if any of us

24  whom had voted for him knew about it during the time of voting

25  for him during that time, so --

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Understood.  And just, you know, in terms of the

2  allegations, can you tell me, like, if there were any specifics

3  that you learned, or were they just sort of general --

4  A    Just the doing business outside of what his

5  responsibilities were as a sheriff, you know, doing things that

6  could, you know, hurt yourself with the position that you were

7  voted in for to protect the community.  It kind of does put a

8  damper on things.  But I will allow, you know, the Court and,

9  you know, evidence to persuade me either way.  I'm not

10 persuaded based off of what I hearsay -- or she say.  So

11 that's --

12 Q    Okay.  I think that's helpful.  Thank you.

13 A    Awesome.

14 Q    Oh, I'm sorry, just one more question.

15 A    Yes, of course.

16 Q    I think you had indicated on your questionnaire too that

17 you have an unfavorable view of the DOJ; is that right?

18 A    I think that there is a lot that goes on within our

19 government from top to bottom that is kind of suspicious in

20 senses.  I think that with what's going on, I think that if

21 there is a guilty plea or a guilty verdict, that I think that

22 we should prosecute individuals not based off of Mr. Jenkins

23 himself, but I think anybody who doesn't take their job sincere

24 enough to uphold the respect that others have voted for, I

25 think that they need to be prosecuted in that nature, just as

USA v. Jenkins, 3:23cr11, 12/11/2024

1  any other civilian or citizen shall be prosecuted in an

2  incident of this nature, outside of being a public figure.  I

3  think that anybody from top to bottom in our government needs

4  to be prosecuted and upheld for the laws that they break.

5  Q    Understood.  And so you understand that this prosecution

6  is being brought by the DOJ, and the FBI was involved in the

7  investigation?

8  A    Yes, I do believe that you guys also have individuals

9  within your precinct that probably aren't following the laws

10  and doing the same thing.  Yes.  I don't believe that any --

11  that 100 percent of our government are doing 100 percent of

12  what they're supposed to do based off of what they're supposed

13  to do in their guidelines of their law.

14  Q    And so my question to you is, given all of those views you

15  have about the government, and that this prosecution is being

16  brought by --

17  A    Understood.

18  Q    -- government actors, is that going to influence how you

19  view --

20  A    If you guys have the ability to prove that the individual

21  is guilty with evidence, I will take that evidence and use it

22  to form my own opinion based on guilty or not.

23  Q    Right.  So you understand that --

24  A    Yes, I'm -- I do.

25  Q    -- in the context of the courtroom, this is one individual

114

USA v. Jenkins, 3:23cr11, 12/11/2024

1  case?

2  A    Yes, I understand.

3  Q    Okay.  And my other question is, so your description of

4  there are bad actors up and down the government, is that

5  specific to federal government, or do you believe that to be

6  the case in all levels of government?

7  A    I think it falls within all jurisdiction of our

8  government, all of it.  I think that the local government is

9  corrupt.  I think that the governments that protect the

10 citizens -- not all of them, per se -- but a good portion of

11 them probably do follow the law.  There are a few bad apples

12 within our Constitution -- or within our government that

13 probably deserve to be put in the limelight, as the gentleman

14 to the left of you is.  That's what I'm saying.  I'm saying

15 that not everybody takes and upholds what they're supposed to

16 within our government the way they're supposed to.  They took

17 an oath to uphold the same laws that us individuals as

18 citizens, who are prosecuted far more than what our government

19 individuals are, based off of their reputation and their

20 ability to have that litigation to say that, hey, I'm a

21 government official, this doesn't apply to me.  You know, I

22 mean, it's kind of -- you know, let's just look at it as it is.

23 The President just pardoned his son for, you know, cocaine

24 habits.  And, well, let's just be real.  The only reason he was

25 pardoned was because it was his son.  So I think that, you

USA v. Jenkins, 3:23cr11, 12/11/2024

1  know, if you are in a position where you have broken the law, I

2  think that you need to be prosecuted for it.  I myself have

3  been in that situation twice.  I have pled no contest to those

4  and did my time.  And I believe that anybody of that nature,

5  whether you are a sheriff's officer, a police officer, an

6  individual whom is standing around me with the blue coats on,

7  the individual whom is sitting behind me, if you have broken

8  the law, I believe that you need to be punished and take that

9  responsibility as an adult in regards to that.  That's how I

10 feel about the situation.

11 Q     I appreciate your honesty about that.

12 A     Absolutely.

13 Q     Just one last question from me, I think.  So given all of

14 those views you just shared with us, you know, in terms of the

15 jury instructions that this court is going to give you on what

16 the law is, do you have any hesitation about following those

17 instructions?

18 A     No, I do not.

19 Q     Okay.

20 A     No, I do not.

21        MS. PENG:  Thank you.

22        PROSPECTIVE JUROR:  Awesome.

23        THE COURT:  Hang on a second, the other side gets

24 to --

25        PROSPECTIVE JUROR:  Oh, yeah, not a problem.

USA v. Jenkins, 3:23cr11, 12/11/2024

1            THE COURT:  All right.  Go ahead, Mr. Andonian.

2            MR. ANDONIAN:  I don't think we have anything, Your

3    Honor.

4            THE COURT:  Let me follow up on a couple of

5    questions.  One thing you said, and I may have just

6    misunderstood.  You said -- it sounded like you've been charged

7    with crimes before?

8            PROSPECTIVE JUROR:  Yes, sir.  I have been charged --

9            THE COURT:  With a felony?

10           PROSPECTIVE JUROR:  No, sir.  These are misdemeanor

11   crimes.

12           THE COURT:  Okay.  All right.  And I don't need -- if

13   they want to follow up on it, they can.

14           Let me take some of the general views that you had

15   and let me distill it down to this case.  And that's this:

16   First of all, regardless of any views that you may have about

17   government actors, do you understand that Mr. Jenkins, as he

18   sits over there, is a man who is presumed innocent?

19           PROSPECTIVE JUROR:  Yeah, I made that clear, to this

20   individual.

21           THE COURT:  Right.  And that as a man presumed

22   innocent, he has zero burden of proof, the burden rests solely

23   on the defendant -- on the government to prove his guilt beyond

24   a reasonable doubt.  Can you set aside your views of what you

25   may believe some actors do and don't do in government, and

USA v. Jenkins, 3:23cr11, 12/11/2024

1   decide the case solely on the evidence that comes in and the

2   instructions that I give to you, and that will be the tunnel

3   focus of your decision?

4          PROSPECTIVE JUROR:  Yeah, absolutely.  Yes, sir.

5          THE COURT:  Okay.  Thank you.

6          Ms. Peng, does that prompt any further questions?

7          MS. PENG:  Just one question.

8                      EXAMINATION

9   BY MS. PENG:

10  Q    You mentioned that you had dealings with the criminal

11  justice system yourself.  Does that impact your, you know, view

12  of this particular case or prosecution at all?

13  A    No, ma'am, not at all.

14         THE COURT:  Mr. Andonian, did my questions prompt

15  anything further?

16         MR. ANDONIAN:  No, Your Honor.

17         THE COURT:  All right.  Thank you, Mr. Stanley.  You

18  may step down.  Please do not discuss your -- what we've

19  discussed in --

20         PROSPECTIVE JUROR:  No problem.

21         THE COURT:  All right.  We have Karie Wilson and then

22  Michael Fulkerson.

23         Ms. Wilson, come on up, if you would, please.  So

24  Ms. Wilson, I'll remind you, you remain under oath from earlier

25  this morning.  And also, if anyone asks you any questions of a

USA v. Jenkins, 3:23cr11, 12/11/2024

1   particularly personal nature that you believe you need to bring

2   up in private, you can make that request.  Thank you.

3           All right.  Mr. Andonian?

4           MR. ANDONIAN:  Thank you, Your Honor.

5                         EXAMINATION

6    BY MR. ANDONIAN:

7   Q    Good afternoon, Ms. Wilson.

8   A    Hello.

9   Q    Ms. Wilson, I want to ask you a couple of questions about

10  some answers that you gave on your jury questionnaire.  And I

11  want to start with what you wrote -- and I think I'm quoting

12  you correctly -- that it sounds like Mr. Jenkins took bribes.

13          Do you -- well, let me first ask:  Is that, in fact, your

14  opinion of this case as you sit here today?

15  A    I didn't know much about the case.  I'm not really a

16  follower of politics or the news, but I see headlines and I

17  read it.  And so if -- I assumed if he was investigated that

18  there was something to back it.  Like I wasn't brought up on

19  charges, you know, in the courtroom.  So there's -- you know,

20  there has to be some -- I'm in healthcare.  There has to be

21  some -- on my part -- assumption that whoever is doing the

22  investigation has some information.  That's not fact, what I

23  wrote, based -- because I don't know any -- much about more

24  than the headline that I read.

25  Q    Okay.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A    Basically.

2  Q    Given your views -- and I'm paraphrasing -- but your views

3  that if somebody is being charged, there must be some --

4  A    Something --

5  Q    -- some basis, something there, do you think that would

6  make it hard for you to be fair and impartial in this case?

7  A    No, I think I just -- I didn't have facts.  I was just

8  answering the questionnaire based on the very limited amount

9  that I read.  But I don't think I'm an unreasonable person.

10 Like I think if the facts were there, I just -- I figured there

11 has to be some reason somewhere along the way that somebody did

12 their job.

13 Q    Okay.  And where -- when you say you read the facts, where

14 specifically did you get the facts from, if you remember?

15 A    The facts for the --

16 Q    The small amount that you heard?

17 A    Oh, just headlines and the article.  I don't even read the

18 whole article.  I skim my news, because I don't have time to

19 read it.  And quite frankly, none of it really interests me.  I

20 don't follow it.  I'm not a crime junkie.  So basically that.

21 Q    Okay.  You also indicated on your questionnaire that

22 serving on this jury would pose a hardship because of your -- I

23 believe because of your clinical patients would essentially

24 not --

25 A    I would just need to know to cancel clinic.  You know, I

USA v. Jenkins, 3:23cr11, 12/11/2024

1  went to the hospital this morning, but I had to leave to come

2  here without being able to tell them when I would be back.  So

3  whichever patients that I was seeing for the duration -- I just

4  need to know, like because they have to be rescheduled.

5          MR. ANDONIAN:  Okay.  Thank you very much.

6          THE COURT:  Hang on a second, Ms. Wilson.

7          Ms. Peng?

8          MS. PENG:  No questions.  Thank you.

9          THE COURT:  Just real quick to make sure I

10 understand.  I'm going to instruct the jury here, as I've said

11 a number of times, that you have to base your decisions solely

12 upon the evidence that's presented and the instructions that I

13 give, and set aside any prior beliefs that you have before you

14 come in.  Can you do that?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Okay.  All right.  And you work as a

17 nurse practitioner in the hospital, or do you have a private

18 clinic?

19         PROSPECTIVE JUROR:  In the hospital, but I do

20 inpatient and outpatient.

21         THE COURT:  Okay.  Is there coverage if you --

22         PROSPECTIVE JUROR:  Yeah, the resident that I work

23 with inpatient is very unhappy today and will be very unhappy,

24 but yes, I do have coverage.

25         THE COURT:  The resident becomes more busy if you're

USA v. Jenkins, 3:23cr11, 12/11/2024

1    not there?

2              PROSPECTIVE JUROR:  He was whining pretty hard when I

3    left this morning.

4              THE COURT:  All right.  Thank you very much.  Please

5    do not discuss what we discussed in here today.

6              PROSPECTIVE JUROR:  Yes.  Thank you.

7              THE COURT:  All right.  Michael Fulkerson, and then

8    after that, Karen Ingram.

9              Mr. Fulkerson, come on up, if you would, please.  And

10   I'll remind you, Mr. Fulkerson, you remain under oath.  And if

11   there's anything that's of a particularly personal nature

12   that's asked of you, you can request that that be taken up in

13   private.  Thank you.

14             All right.  Ms. Peng?

15                        EXAMINATION

16    BY MS. PENG:

17   Q    Hello, sir, how are you?

18   A    Good.

19   Q    I just wanted to follow up on something that you mentioned

20   earlier, that you had learned some information about the case

21   from your pastor potentially.  I was just curious what that

22   was?

23   A    He's a retired deputy from Orange County, and the

24   questionnaire asked, do you know anybody in Culpeper sheriff's

25   office.  I was like, I don't think he did, so I called him up

USA v. Jenkins, 3:23cr11, 12/11/2024

1  and asked him, did you work for Culpeper?  He said no.  He

2  said, why are you asking me?  And I said, I got a jury

3  selection thing here, and it says something about Culpeper

4  County.  He goes, oh, you got the sheriff's case.

5  Q    Is that the extent of that --

6  A    That's the extent.  I was like, stop.  That's all I

7  needed to hear.  Did you work for Culpeper?  He said no.

8  Q    Got it.  So you didn't have any other discussions with him

9  about the case or anything like that?

10  A    No.

11           MS. PENG:  Okay.  I appreciate that.  Thank you.

12           PROSPECTIVE JUROR:  You're welcome.

13           THE COURT:  Hang on a second, Mr. Fulkerson.

14           Mr. Andonian?

15                       EXAMINATION

16   BY MR. ANDONIAN:

17  Q    Good afternoon.  Just very briefly.  Based on that very

18  limited -- it sounds like limited conversation with the deputy,

19  do you have any opinions, or did it cause you to form any

20  opinions about --

21  A    No.

22           MR. ANDONIAN:  Okay.  Nothing further.

23           THE COURT:  All right.  Thank you, Mr. Fulkerson.

24  Please do not discuss what we've discussed in here today with

25  your fellow jurors.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  Okay.  Yes, sir.

2          THE COURT:  All right.  Karen Ingram and then Jo

3  Gilmore.

4          Ms. Ingram, come on up, if you would, please.  We're

5  going to have you come right over here -- right in there.  All

6  right.  Ms. Ingram, I'll remind you you're under oath, and if

7  anything is asked of you that's of a particularly personal

8  nature you wish to take up in private, you can make that

9  request.

10          PROSPECTIVE JUROR:  Okay.

11          THE COURT:  All right.  Thank you.

12          PROSPECTIVE JUROR:  Thank you.

13          THE COURT:  All right.  Mr. Andonian?

14          MR. ANDONIAN:  Thank you, Your Honor.

15                        EXAMINATION

16   BY MR. ANDONIAN:

17  Q    Good afternoon, Ms. Ingram.

18  A    Good afternoon.

19  Q    Ms. Ingram, just maybe one or two quick questions.  I

20  believe you noted on your questionnaire that you had read in

21  the news about Mr. Jenkins being charged in this case; is that

22  correct?

23  A    I have not read a full story, no.

24  Q    Have not read a full story?

25  A    No.  Just headlines, yes.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Based on the headlines that you have read, have you formed

2  any opinions about Mr. Jenkins's guilt or innocence?

3  A    No, not at all.

4          MR. ANDONIAN:  Okay.  That was all I had.  Thank you

5  very much.

6          THE COURT:  Ms. Peng?

7          MS. PENG:  No questions.  Thank you.

8          THE COURT:  All right.  Thank you.  Please do not

9  discuss what we've discussed in here today.

10          All right.  So Jo Gilmore and then Meagan Forsht.

11          Ms. Forsht, so have a seat, and I'll remind you you

12  remain under oath.  And then if anything is asked of you of a

13  particularly personal nature that you wish to take up in

14  private, you can make that request.

15          PROSPECTIVE JUROR:  Yes, sir.

16          THE COURT:  Thank you.  I'm going to get you to speak

17  up a little bit.

18          PROSPECTIVE JUROR:  Yes, sir.

19          THE COURT:  Very well.  And I believe, Mr. Andonian,

20  the questions are to you.

21          THE CLERK:  This is Gilmore.

22          THE COURT:  Oh, I'm sorry.

23          MS. PENG:  This is Ms. Gilmore.

24          MR. ANDONIAN:  Yeah, this is I believe the

25  government's --

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  Are you Ms. Gilmore?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  I'm sorry.  Because on my sheet it's

4    J-O-E for Jo.  So you're -- okay.  You're J-O Gilmore.  All

5    right.  Thank you, Ms. Gilmore.  I apologize for calling you

6    the wrong name.

7          PROSPECTIVE JUROR:  I didn't even hear you.  Sorry

8    about that.

9                         EXAMINATION

10   BY MS. PENG:

11   Q    Good morning, ma'am, how are you?

12   A    I'm fine.

13   Q    Just a couple of questions for you.  So I think you wrote

14   in your questionnaire that you were not sure which agents to

15   trust in response to the question about your views about the

16   DOJ and the FBI.  Do you recall that?

17   A    Yes.

18   Q    Can you tell me a little bit more about what you meant by

19   that comment?

20   A    Well, what I meant was that I don't particularly trust the

21   FBI on certain different cases that you see in the news, why

22   they go into Catholic churches and spy on people, and school

23   board meetings, and things like that.

24   Q    And in terms of what you've learned about the FBI in those

25   contexts, can you give me a little more detail about the

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Catholic church and the spying?  What were those about?

2  A    Yeah, they sent FBI agents into the Catholic church in

3  Richmond to spy on the traditional mass.  I think maybe they

4  thought they were terrorists or something.  I don't know.

5  Q    And is that the incident that comes to mind, or were there

6  others that you learned of as well?

7  A    That's the main one.

8  Q    And when did that happen; do you know?

9  A    It was in the last year.

10  Q    And so that's the main basis for you not trusting agents

11  with the FBI?  Are there other reasons for that distrust you

12  have?

13  A    Just in general, I'm not sure I trust them.

14  Q    And does your distrust, is that specific to the FBI, or

15  all law enforcement agencies or police?

16  A    Mainly the FBI.

17  Q    Okay.  And so you're aware that the FBI was involved in

18  the investigation in this case?

19  A    Yes, ma'am.

20  Q    Do you think your views and your distrust of the FBI is

21  going to influence how you view the evidence being presented

22  here?

23  A    I think I can view the evidence, but I'm just -- we're

24  being honest, so going in, yeah --

25  Q    Yeah, I appreciate your honesty.  I mean, this

USA v. Jenkins, 3:23cr11, 12/11/2024

1  investigation was conducted by the FBI, so the evidence you're

2  viewing will have been gathered by the FBI.  And so given what

3  you just discussed about distrust of them, are you going to

4  just sort of view that evidence with a little bit more

5  skepticism than you would view evidence --

6  A    Probably, in honesty, probably.

7  Q    Probably?

8       And so when you're looking at the evidence here knowing

9  that the FBI gathered it, do you think that in the back of your

10 mind you're just going to have that skepticism and distrust?

11 A    I can't tell you for certain that I wouldn't.  I think

12 that I could hear the evidence, but it's in the back of my

13 mind.

14 Q    Okay.  I appreciate that.

15      So you also indicated, I think, that you voted for Scott

16 Jenkins?

17 A    Yes, ma'am.

18 Q    Can you tell me when -- how many times you voted for him?

19 A    Twice.  I don't know what -- most recently, whenever he

20 ran this last time, but the time before that as well.

21 Q    So that would have been about a year ago, maybe?

22 A    I think it was probably a little over a year.

23 Q    And when you voted for him the second time, had you read

24 any news about the allegations against him in this case?

25 A    I heard some, yeah.  I don't follow that much of the local

USA v. Jenkins, 3:23cr11, 12/11/2024

1    news, but yeah, I had heard some stuff from some people that I

2    volunteer with downtown.

3    Q    And do you recall what you had heard by the time you voted

4    for him?

5    A    Just that there was something with campaign finances or

6    something.  I wasn't really 100 percent sure.

7    Q    And then when you voted for him, did that -- those

8    allegations, how did you -- you just didn't think about them?

9    A    (No verbal response).

10   Q    You didn't think about them?

11   A    No.

12   Q    Okay.  And you still consider Sheriff Jenkins a good

13   sheriff?

14   A    Yes, I do.

15   Q    And why do you think he's a good sheriff?

16   A    Because he kept the community safe for as long as -- you

17   know, I've been in the county for 18 years, and he always had a

18   presence at the high school, and games, and the parades and

19   everything.  So he -- I thought he was a stand-up sheriff.

20   Q    And has that view changed at all given what you learned

21   here today?

22   A    No.

23   Q    And given that you're -- you voted for him twice, and then

24   you think he did a really great job, and he's a good sheriff,

25   do you think that's going to impact how you view this case,

USA v. Jenkins, 3:23cr11, 12/11/2024

1  because obviously, you know, Mr. Jenkins is on trial here in a

2  criminal matter?

3  A    I think that I could hear the evidence.  But you asked me,

4  I think he was a good sheriff, and I'm being honest with you.

5  I voted for him.  I can listen to evidence, but I think he's a

6  stand-up guy.

7  Q    So it sounds like it's going to be pretty difficult to,

8  you know, persuade you that he's not a stand-up guy because

9  that's how you feel?

10 A    I didn't say that.

11 Q    I'm sorry?

12 A    I didn't say that.  You said that.  I'm just saying

13 that --

14 Q    Oh, I'm sorry.

15 A    -- I can listen to the case; however, I think he's a

16 stand-up guy.

17 Q    So I guess my question is:  After the evidence -- when

18 you're listening to the evidence in this case, given your views

19 of the FBI, and then your views of Mr. Jenkins, do you think

20 that you could be a fair and impartial juror in this case, or

21 do you think you come in with, you know, what we were

22 discussing before, certain views that will make it difficult

23 for you to have an open mind?

24 A    It would probably make it difficult for me.

25         MS. PENG:  I appreciate that.  Thank you.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  Thank you, Ms. Peng.

2          Mr. Andonian?

3          MR. ANDONIAN:  Thank you.

4                        EXAMINATION

5    BY MR. ANDONIAN:

6    Q    Good afternoon.  In this case, as the judge has already

7    mentioned, the judge is going to instruct you that you have to

8    follow the law as he reads it to you, and that you have to

9    apply those legal principles to the evidence in the case.  Do

10   you think you're able to do that?

11   A    Yes, sir.

12   Q    And do you think that even if you had certain feelings

13   about Mr. Jenkins or certain feelings about the FBI, that if

14   you were instructed that you had to follow the law, again, as

15   the judge tells it to you, and you have to consider only the

16   evidence that came in, that you'd be able to do that?

17   A    Yes, sir.

18          MR. ANDONIAN:  Nothing further.

19          THE COURT:  So I guess the question is, kind of

20   following up on Mr. Andonian, is that given any views that you

21   may already have, if you -- in looking at the evidence that's

22   presented here, and following the instructions that I give, if

23   you believe that the government has proven its case beyond a

24   reasonable doubt, can you find someone such as Mr. Jenkins

25   guilty?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  If I heard the evidence and I

2     believed that they presented it, yes -- and if I believed that

3     they presented it -- all the facts, and --

4          THE COURT:  If they carried their burden?

5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  Okay.  All right.  Thank you.

7          MS. PENG:  May I follow up with one more question?

8          THE COURT:  Yes, ma'am.

9                        EXAMINATION

10    BY MS. PENG:

11    Q    And again, I really appreciate you being candid here,

12    Ms. Gilmore.  So I want you to imagine if you were sitting here

13    at counsel table on the government's side, do you think you

14    would want someone like you judging this case?

15    A    No, I don't think so.

16    Q    And you don't think so?

17    A    Not -- no.  No, I don't think you would want me, no.

18    Q    Why is that?

19    A    Because I think you think that I don't trust the FBI.

20    Q    Fair enough.  But do you think that's a valid concern?

21    A    Probably.

22          MS. PENG:  I appreciate that.  Thank you.

23          THE COURT:  All right.  Anything -- my questions

24    prompt anything further, Mr. Andonian?

25          MR. ANDONIAN:  No, Your Honor.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  All right.  Thank you very much,

2   Ms. Gilmore.  Please do not discuss what we've discussed in

3   here today.

4          PROSPECTIVE JUROR:  Yes, sir.

5          THE COURT:  All right.  Now we'll take Meagan Forsht

6   and then Frank Krick.

7          All right.  Ms. Forsht -- so Ms. Forsht, I will

8   remind you that you remain under oath.  And then if anything is

9   asked of you today that's of a particularly personal nature

10  that you wish to take up in private, you can make that request.

11         PROSPECTIVE JUROR:  Yes, sir.

12         THE COURT:  All right.  Thank you very much.

13         All right.  Mr. Andonian?

14                      EXAMINATION

15   BY MR. ANDONIAN:

16  Q    Thank you.

17       Good afternoon, Ms. Forsht.

18  A    Hello.

19  Q    Ms. Forsht, just a few questions.  I think you mentioned

20  earlier when you were being asked questions by the government

21  that you had heard some rumors about the case at work; is that

22  correct?

23  A    Yes, sir.

24  Q    Can you tell us what those rumors are that you heard?

25  A    Not in a specific nature.  I don't listen to things like

USA v. Jenkins, 3:23cr11, 12/11/2024

1   that, but I know that there's been conversations around me via

2   some other people that have -- that used to work in the

3   Culpeper County sheriff's department.

4   Q    Okay.  And those are the individuals that you heard the

5   rumors from?

6   A    Yes, sir.

7   Q    Were the rumors overall positive or negative about

8   Mr. Jenkins?

9   A    I would say neutral or negative.

10  Q    Neutral or negative.  Did any of those rumors that you

11  heard that were neutral or negative impact your view of

12  Mr. Jenkins as you sit here today?

13  A    No, sir.

14  Q    I think you also indicated in your questionnaire that you

15  had some -- and I think the phrase you used were negative

16  emotions about the case based on news reports that you had

17  read; is that right?

18  A    I believe based on the way they were written, I was

19  feeling negative emotions at the time that I was reading, but I

20  would be able to put those aside, if need be.

21  Q    Okay.  So -- and that was going to be my follow-up.  Given

22  all of this, do you have any concerns about your ability to be

23  fair and impartial?

24  A    No, sir.

25           MR. ANDONIAN:  Brief indulgence?

134

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  Yes, sir.

2     BY MR. ANDONIAN:

3    Q    And just to be clear as you sit here today, you can't say

4    with specificity what the rumors that you heard were at your

5    workplace?

6    A    No, sir.  I do not take work home with me.  So any

7    conversations that are had, I don't take home with me.

8          MR. ANDONIAN:  Thank you.  That's all I have, ma'am.

9          THE COURT:  Ms. Peng?

10                          EXAMINATION

11    BY MS. PENG:

12   Q    Yes.  Hello again.  I think you indicate on your

13   questionnaire that you might have had an unfavorable view of

14   the DOJ; is that true?

15   A    Could you define DOJ?

16   Q    The Department -- the U.S. Department of Justice, or the

17   FBI?

18   A    Oh, some of the true crime podcasts that I watch,

19   sometimes the victims don't get enough service quickly enough,

20   and that's all that that meant.

21   Q    Understood.  And so would that influence your ability to

22   evaluate the evidence in this case?

23   A    No.

24   Q    I think you also indicated that you might have worked with

25   some former deputies?

USA v. Jenkins, 3:23cr11, 12/11/2024

1   A    Yes, ma'am.

2   Q    Can you tell me more about who they were and in what

3   capacity you worked with them?

4   A    Am I to use a specific name?

5            THE COURT:  That would be okay.

6            PROSPECTIVE JUROR:  His name is Lee Wilson, and I am

7   his manager at my full-time job.

8    BY MS. PENG:

9   Q    And Mr. Wilson is a former Culpeper sheriff deputy?

10  A    I believe that was his position at one time.

11  Q    Okay.  And have you discussed in detail his prior job with

12  him?

13  A    No.

14  Q    Have you discussed with him Scott Jenkins at all?

15  A    No.

16           MS. PENG:  Okay.  That's all I have.  Thank you.

17           THE COURT:  All right.  Thank you very much.  Please

18  do not discuss anything that we've discussed in here,

19  Ms. Forsht.  Appreciate it.

20           All right.  Frank Krick, and then Carolyn Powell.

21           Mr. Krick, I will remind you you remain under oath.

22  And if anything is asked of you that's of a particularly

23  personal nature that you wish to take up in private, you can

24  make that request.

25           PROSPECTIVE JUROR:  All right.  Thank you.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  All right.  Thank you.

2          All right.  Ms. Peng?

3                         EXAMINATION

4    BY MS. PENG:

5    Q    Hello, sir, how are you?

6    A    Good, how are you doing?

7    Q    Good.  First I wanted to ask you, did you indicate that

8    you might have had some issues driving long distances?

9    A    Yeah, I've got -- do you want me to kind of explain it to

10   you?

11   Q    Yeah.

12   A    I got a virus like last -- probably last fall, and after

13   that -- it lasted a long time, and it just affected my immune

14   system.  And I went to doctors, you know, Charlottesville and

15   everywhere.  And then they really couldn't come up with

16   anything.  But what was happening, I would get real lightheaded

17   and stay real tired during the day.  It just so happens I was

18   retired so it didn't -- you know, didn't affect my job or

19   anything.  But usually I have to sleep during the day sometime,

20   but you know, I thought maybe I could, you know, try to do it

21   because I wanted to do it, you know, but -- you know, I don't

22   know if that's going to cause a problem or not.  But that's

23   mainly what it was.

24   Q    I see.  So you have -- you normally would sleep during the

25   day because your virus condition makes you --

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A    Right.  It just makes me real tired.

2  Q    I see.  And so how many hours would you normally sleep?

3  A    Like during the day?

4  Q    Yeah.

5  A    It just depends.  Say I got up at 7.  A lot of times I'd

6  have to go back at 9 or 10 and sleep until 2, something like

7  that.

8  Q    So 9 to 2.  And --

9  A    That's not every day, though.  You know, it just depends

10 on how it works out.

11 Q    Got it.  And how long has this been going on?

12 A    It's been going ever since last fall, which would be

13 almost -- well, a little over a year.

14 Q    And have you since last fall have had to, you know, go

15 back to a job full-time or engage in any activities?

16 A    No, I've been retired for a couple of years.  So like I

17 say, it didn't affect that.

18 Q    I see.  So did you have some concerns that, you know --

19 that this court is going to be in session from 9 to 6?

20 A    Right.  That's correct.

21 Q    And so you've never actually done -- well, you haven't sat

22 through something like that?

23 A    That's correct, yes.

24 Q    Okay.  And so what is your level of concern about your

25 condition and how that might impact --

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A    Well, I mean, as long as I, you know, can focus and carry

2  on, you know, during the day, because -- you know what I'm

3  saying -- I just get real tired.  And you know, it's just -- I

4  don't know how to explain.  It's just like I'm not -- you know

5  what I mean -- like you're just, you know, ready to go to

6  sleep.  So I didn't know if I could take everything in, you

7  know what I'm saying, that -- you know, that I should be doing.

8  Q    Okay.  And then what about the driving long distances; is

9  that a concern?

10  A    Well, that's kind of what it is too, like getting tired.

11  You know how you get tired, like mostly at nighttime, like you

12  were sleeping or whatever, then you're driving, you -- you know

13  what I'm saying, you --

14  Q    Yeah.

15  A    -- make sure you're aware.  But you know, I could probably

16  do it, but I just -- you know, just concerned.

17  Q    Yeah.  Thank you for sharing that.

18  A    No problem.

19  Q    And so if the Court were to adjourn at 6, you would have

20  to drive how long to go back home?

21  A    Well, it's 40 -- 45 miles.

22  Q    Let me ask about some other things that you mentioned on

23  your questionnaire.

24  A    Okay.

25  Q    So I think you indicated also that you might have some

USA v. Jenkins, 3:23cr11, 12/11/2024

1    religious beliefs that would prevent you from sitting in

2    judgment of people?

3    A    I don't think so.

4    Q    No?  That's not true?

5    A    Unless I marked it wrong, no, that's not true.

6    Q    Okay.  I could have read it wrong.

7         What about your views in terms of the FBI and the DOJ?

8    A    That's mainly -- that's mainly more or less watching court

9    cases on TV.  Just some things -- it's just a personal type

10   thing.  I don't think that would have any, you know, bearing on

11   me, you know, being here, but it's just something I have a

12   little problem with.

13   Q    Yeah, can you tell me more about that?  What did you see,

14   what did you watch that --

15   A    It's just different things that happened, not just for the

16   Trump case.  It's others.  But that's mainly, you know, a lot

17   to do with that, the things that went on there.  The DOJ, you

18   know, to me, didn't do what they should be doing and stuff like

19   that, so --

20   Q    Yeah.  And so you're talking about those types of cases

21   that you read on the news?

22   A    Uh-huh.  Mostly on TV, you know, as you're watching court

23   cases.  You know, they're real court cases, but it's on like

24   YouTube or whatever.

25   Q    So you watch YouTube?

USA v. Jenkins, 3:23cr11, 12/11/2024

1   A    Yes.

2   Q    And what other sources of news do you watch?

3   A    That's about it.

4   Q    Okay.  So you understand this case is being brought by the

5   DOJ and the FBI -- are you aware of that?

6   A    Yes.

7   Q    Okay.  Why are you laughing?

8   A    I know what you're saying.  I mean, I understand, but --

9   Q    Yeah, so I guess my question is, you know, given your

10  views that are unfavorable about the DOJ and the FBI overall,

11  is that going to impact your ability to --

12  A    I'm saying it shouldn't, because I think I would have my

13  own views, you know, about the case itself, if that makes any

14  sense.  I mean, I don't know -- that's why I wanted to mention

15  it to you, though.

16  Q    Yeah.

17  A    You know, just make sure it was okay to be here, you know.

18  Q    Yeah, I mean, I guess the real question is, you know,

19  given those views you have maybe about other cases, are you

20  going to hold that against --

21  A    No, I don't think so.  That's what I'm saying.

22  Q    -- the government in this case?

23  A    I don't think so, no.

24         MS. PENG:  Okay.  Thank you, sir.

25         THE COURT:  Mr. Andonian?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MR. ANDONIAN:  No questions.

2          THE COURT:  Mr. Krick, just a couple of questions.

3    So going back to your health issues, I take a mid-morning break

4    and I take a mid-afternoon break for 15 minutes.  And I also

5    tell the jurors that if your attention begins to wane, flag me

6    down, we can take another break.  I let you bring in drinks

7    with you, and we have coffee in the back.  No promises as to

8    how good it is, however, so --

9          PROSPECTIVE JUROR:  That's no problem.

10         THE COURT:  But if we are able to accommodate you in

11   that regard, would that be able to help to address some of --

12         PROSPECTIVE JUROR:  Well, like I say, some days I'm

13   fine, but most of the time when it happens, I have to -- you

14   know what I mean, I mean, I'm just like dead tired.

15         THE COURT:  You've got to go down?

16         PROSPECTIVE JUROR:  I have to go down, yeah.  But I

17   mean, like I say, I wanted to come here to try -- you know, if

18   I could try, but then I don't want to get here and cause a

19   problem.

20         THE COURT:  How many days a week does that happen to

21   you?

22         PROSPECTIVE JUROR:  It just depends.  Two or three

23   times, you know, and sometimes all week, but it just depends.

24         THE COURT:  So if we're likely to go to next Friday,

25   are you likely to have a day that --

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  Probably.

2          THE COURT:  -- you're going to ask to be --

3          PROSPECTIVE JUROR:  And I don't want to do that if --

4     you know what I mean -- if I can't be here.

5          THE COURT:  You don't want to do it from a cot

6     either, do you?

7          PROSPECTIVE JUROR:  No.  Right.

8          THE COURT:  All right.  Thank you very much.

9          My questions prompt anything further?

10          MS. PENG:  No, thank you.

11          THE COURT:  Anything further?

12          Thank you very much, Mr. Krick.  Please don't discuss

13     what we discussed.

14          PROSPECTIVE JUROR:  All right.  Thank you very much.

15          THE COURT:  Before we bring in the next person, I

16     want to ask counsel something.  So it's about 1:00.  We've

17     gotten through it looks like maybe 12 or so people in about an

18     hour.  Just looking at the numbers, we probably have another

19     hour, maybe a little bit longer than that.  That would put us

20     around 2:30.  These folks haven't eaten lunch.  Given what I

21     just heard, I'm not sure anyone wants to go get lunch, if that

22     was rain.  But I want to be efficient with our time, but I want

23     to be respectful because we're going to get some hangry people

24     if we don't give them a chance to do lunch.  What are you all's

25     thoughts?  I mean, we can take a short lunch and we can ask

USA v. Jenkins, 3:23cr11, 12/11/2024

1    some of the folks to come back early.  We can take an hour and

2    come back at 2, get through these, and I think we'll be able to

3    get our jury selected and probably get our openings in this

4    afternoon if we take an hour at this point.

5           MR. ANDONIAN:  I think it makes sense.  I'm always in

6    favor of not starving jurors.

7           THE COURT:  I agree.  So let me -- Ms. Peng,

8    Ms. Choy, Ms. Smith, any objection to that, coming back around

9    2:15?

10          MS. PENG:  That's fine, Your Honor.

11          THE COURT:  Okay.  Let's do this:  We'll come back at

12   2:15.  We can tell everyone that they can take lunch for an

13   hour, but that we need to have -- and make sure these folks are

14   going to be back.  I'm going to ask about six to make sure that

15   they are especially on time:  Ms. Powell, Mr. McCarthy,

16   Ms. Moubray, Ms. Long, Mr. Roelofs, and Ms. McDaniel, that

17   we'll start with them, but for everyone to be back at 2:15.

18          All right.  Anything we need to address before we

19   come back?

20          Why don't we try to be back up here at 2:10, so in

21   case there's anything to take up, we can take up and we can

22   promptly get started.  All right.  We'll stand in recess.

23                          (Recess)

24          THE COURT:  We are back on the record in the matter

25   of *United States v. Jenkins.*  The government is present by

USA v. Jenkins, 3:23cr11, 12/11/2024

1    counsel, the defendant is present with the benefit of counsel

2    as well.

3              Before we continue with our individual voir dires, is

4    there anything we need to address on behalf of the government?

5              MS. PENG:  Not from the government.

6              THE COURT:  Anything, Mr. Andonian?

7              MR. ANDONIAN:  No, Your Honor.

8              THE COURT:  All right.  So I've got -- I had my list

9    and I was checking it twice.  What did I do with it.

10             Going to start with Ms. Powell and then Amanda Long

11   next.

12             All right.  Ms. Powell, thank you very much for being

13   here.  You remain under oath.  Counsel is going to ask you some

14   questions.  If at any point in time you're asked some questions

15   of a particularly personal nature and you wish to discuss those

16   in private, you're welcome to ask to do so, all right?

17             PROSPECTIVE JUROR:  Okay.

18             THE COURT:  All right.  Thank you very much.  Go

19   ahead, Mr. Andonian.

20             MR. ANDONIAN:  Thank you, Your Honor.

21                           EXAMINATION

22    BY MR. ANDONIAN:

23   Q   Good afternoon, Ms. Powell.  Ms. Powell, just a few

24   questions about some answers that you put down on your

25   questionnaire.  You indicated that you had some beliefs that

USA v. Jenkins, 3:23cr11, 12/11/2024

1  might make it difficult for you to serve on a jury, and I was

2  wondering if you could just tell us about those.

3  A    I -- I must have had like the death penalty on my brain

4  with that question.

5  Q    Oh, okay.  So you don't otherwise have any issue sitting

6  on a jury and considering the evidence and rendering a verdict

7  at the end of the case?

8  A    Correct.

9  Q    Okay.  I think you also indicated on your questionnaire

10  that you might have some difficulty not reading about the

11  matter in the press, or if you did read about it, it might have

12  an impact on you.  I don't know if I'm recalling that

13  correctly, but is that the case?

14  A    I mean, I read the news.  And so if it -- I read the news

15  more than I watch the news, but if the news is on, then I

16  may -- if they're talking about the case, then I may hear about

17  it.

18  Q    Okay.  In terms of the -- if the Court were to order that

19  you not listen to anything that you hear on the news or read

20  anything about it in the news, is that something that you

21  think -- an order you think you'd be able to comply with?

22  A    Yes.

23  Q    I think you had mentioned also in your questionnaire that

24  you might have a potential hardship due to the fact that you're

25  a caregiver for your grandchild; is that correct?

USA v. Jenkins, 3:23cr11, 12/11/2024

1   A    Right.

2   Q    Is that -- can you just tell us a little bit more about

3   the nature of that arrangement?

4   A    Yeah, because my son is a deputy, and the mother is the

5   dispatcher.  So they work the crazy shift.  So, yeah, that's --

6   their shift work impacts me because I take care of the baby

7   while they work.

8   Q    And are you the sole caregiver while they're working?

9   A    Yes.

10  Q    And would that -- would that -- I guess given that you're

11  the sole caregiver, are their shifts regular?  Like do they

12  work the same shifts every day such that during the day you're

13  the person that's on call for child care?

14  A    Yeah, they're -- they're -- like I babysit three days one

15  week, two days the next week, depending on their shift.  And

16  that changes monthly, so --

17  Q    Okay.  Given that this trial is supposed to go until

18  through potentially next Friday, do you foresee that -- that

19  your caregiving arrangement being a problem -- or I should

20  phrase it better -- that this trial would be a problem for --

21  A    Absolutely, yeah.

22          MR. ANDONIAN:  Okay.  That's all I have.  Thank you,

23  ma'am.

24          THE COURT:  Thank you, Mr. Andonian.

25          Ms. Peng?

USA v. Jenkins, 3:23cr11, 12/11/2024

1                              EXAMINATION

2     BY MS. PENG:

3   Q    Just one question, Ms. Powell.  I think you mentioned that

4   your -- Carson Beard is the son of a dear friend.  Can you tell

5   me whether you've had interactions -- how often do you interact

6   with this friend?

7   A    So Nancy, we -- well, we don't live that close together,

8   so we get together when we can.  So I haven't seen her

9   recently, but we try to get together quarterly.

10  Q    Quarterly?  Do you go over to her house, or does she come

11  over to your house?

12  A    We go to her house, we meet in between.  It just depends

13  on whose birthday it is and where we can all get together.

14  Q    And when you get together, is Mr. Beard there at all?

15  A    No.  Carson?

16  Q    Carson?

17  A    No.

18  Q    So how would you describe your interaction with Mr. Carson

19  Beard?

20  A    I don't really have any interaction with him, just his

21  mom.

22  Q    Okay.  And when you hang out together with his mom, does

23  she discuss him at all?  Do you know what he does for a living,

24  for example?

25  A    Yeah, we discuss -- yeah, we discuss our children, yeah.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Yes, I know he's the Clerk of the Court in Culpeper.

2  Q    So if he were to testify here as a witness, would that

3  pose some kind of issue for you because you know his mom, for

4  example?

5  A    No.

6           MS. PENG:  Okay.  Thank you.

7           THE COURT:  Ms. Powell, I've got just a couple of

8  questions.

9           With respect to any news coverage -- and I'll break

10 it into broadcast and also print journalism -- if you're in the

11 room and a story comes on, would you be willing to just leave

12 the room so you don't hear that story, or ask that the -- ask

13 the TV be turned off?

14          PROSPECTIVE JUROR:  Yeah.  Because -- yeah, my

15 husband has the TV on a lot -- or you know, the news on a lot,

16 so yeah.

17          THE COURT:  And if something comes on, you would just

18 leave the room?

19          PROSPECTIVE JUROR:  Yeah.

20          THE COURT:  Okay.  Fair enough.  And with respect to

21 news articles, I don't ask people to become hermits when they

22 serve as jurors, but if you see an article in the paper, not

23 read it.  You know, you can't unsee a headline, but not read

24 the newspaper?

25          PROSPECTIVE JUROR:  Right.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  And you could do that as well?

2          PROSPECTIVE JUROR:  Right.  Because what I read is

3  not local.  It's 1440 -- whatever that news e-mail is that I

4  get, it's not local news, it's U.S. news.

5          THE COURT:  Okay.  All right.  Fair enough.

6          As it relates to Carson Beard, you know his mom.  It

7  sounds like she and you are part of a group of friends that get

8  together periodically; is that right?

9          PROSPECTIVE JUROR:  Yeah.  Friends before he was

10  born, yeah.

11          THE COURT:  Are there any planned get-togethers

12  between now and the end of next week?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Okay.  And if his -- Mr. Beard's mom

15  called you for whatever reason just to catch up, could you

16  agree not to have any conversations with her until after this

17  trial is over?

18          PROSPECTIVE JUROR:  Yeah, we would not -- yeah, we

19  wouldn't discuss this.

20          THE COURT:  Okay.  And then as it relates to your

21  role as grandma, as a caregiver, if you are selected as a

22  juror, can you find coverage for the -- any days you would have

23  this week and through next week?

24          PROSPECTIVE JUROR:  Well, they -- I mean, they would

25  have to do what they need to do, I guess.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  They'd figure it out?

2          PROSPECTIVE JUROR:  They would have to figure it out,

3    yeah, because they understand that I have to do this.

4          THE COURT:  Okay.  Fair enough.

5          Mr. Andonian, does that answer -- or give any further

6    questions from you?

7          MR. ANDONIAN:  No, Your Honor.

8          THE COURT:  Ms. Peng?

9          MS. PENG:  No, Your Honor.

10          THE COURT:  All right.  Thank you very much,

11    Ms. Powell.  Please don't discuss what we've discussed here

12    today.  Thank you.

13          Amanda Long, and then Brian McCarthy.

14          Ms. Long, come on up, if you would, please, ma'am.

15    So Ms. Long, thank you very much for being here.  You remain

16    under oath from this morning.  And if you're asked any

17    questions of a particularly personal nature that you wish to

18    discuss in private, you're welcome to ask that we do so.  All

19    right?

20          PROSPECTIVE JUROR:  Okay.  Thank you.

21          THE COURT:  Thank you very much.

22          All right.  Ms. Peng?

23                         EXAMINATION

24    BY MS. PENG:

25    Q    Thank you.  Hello, how are you?

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A    Good.  How are you?

2  Q    You're very popular, lots of people know you.  So let me

3  start by asking you some of the people that you know and just

4  kind of give a little more detail if you could about how you

5  know them.

6  A    Okay.

7  Q    So Valerie Lamb, how do you know Ms. Lamb?

8  A    I am the director of the Youth Network in Culpeper County,

9  and Valerie Lamb is the finance director for Culpeper County,

10 so she oversees my entire budget.

11 Q    Got it.  And so how frequently would you say you have to

12 interact with Ms. Lamb?

13 A    At least weekly, at minimum weekly.

14 Q    And how would you characterize your relationship to her?

15 A    It's a professional relationship.  I did attend her

16 mother's funeral, but it's because she's a co-worker.

17 Q    Got it.  And then you said you're close friends with the

18 wife of Judge Durrer?

19 A    Yes, ma'am.

20 Q    Could you tell me a little bit more about that

21 relationship, please?

22 A    Holly Durrer also worked for the county.  So when I came

23 on to -- was hired at Culpeper County five years ago, we became

24 friends, and we've just -- she's no longer an employee of the

25 county.  We've remained friends.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    And how often do you socialize with Ms. Durrer?

2  A    Weekly.  Sometimes daily, but weekly.

3  Q    And how about in those interactions, is Judge Durrer also

4  there sometimes?

5  A    Occasionally.  We've gone on trips, and Judge Durrer has

6  taken us to the airport or transported or picked us up from the

7  airport and transported us home.

8  Q    So he's been around when you've socialized with Holly?

9  A    Yes.

10  Q    And when you and Holly socialized, do you discuss her

11  husband at all and what he does for a living, things of that

12  nature?

13  A    No, we do not.

14  Q    And so you're also friends with a couple of current

15  employees, it sounds like, at Culpeper County sheriff's office?

16  A    Correct.

17  Q    So let me just go down the list.  Do you know Dodson --

18  how do you know Ms. Dodson?

19  A    So Dana and I became acquainted because her husband and a

20  friend of mine are very good friends.  So I attend her --

21  normally around Christmas Eve I go to her house every year for

22  Christmas Eve.  We've gone on a mini vacation together.  And we

23  also have a professional relationship.  She investigates cases

24  that -- for children that I receive services for.

25  Q    So you have a pretty close relationship with her, would

USA v. Jenkins, 3:23cr11, 12/11/2024

1  you say, or --

2  A    I would say so, yes.

3  Q    Okay.  Jeff Seation, or Seation --

4  A    Uh-huh, Seation.

5  Q    Seation.

6  A    Jeff and I met each other, gosh, probably 30 years.  He

7  worked at the jail.  He's now in dispatch.  I interact with

8  Jeff.  We go to baseball games together, and we go through

9  months without speaking, but we do go to baseball games

10 together.

11 Q    Would you say that Jeff is a good friend of yours?

12 A    Yes, I would.

13 Q    And how about David Jenkins, how do you know David

14 Jenkins?

15 A    Dave and I graduated together.  So I've known David my

16 entire life.

17 Q    And so how often do you see him now?

18 A    Recently not very often because he had surgery, but prior

19 to that, he was a deputy at the clerk -- at the clerk's office

20 of the court.  So I'm in court three times a week.  So I would

21 see him often.

22 Q    And you still keep in touch regularly, would you say?

23 A    Not outside of work, no.

24 Q    And do you know what the relationship of Mr. David Jenkins

25 is to Scott Jenkins?

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A      I do not.  I do not.

2  Q      And how about Ana Ortiz?

3  A      Ana and I also attend baseball games together.  Ana and I

4  met when I first came onto the Culpeper County, and we talk

5  occasionally.  I probably haven't spoken with Ana in --

6  somewhere Black Friday was the first time I've seen her in

7  months, but we are friends.  We do -- we do chat on the phone

8  and we used to text each other quite often.

9  Q      Thank you.  And in your questionnaire, you indicated that

10 you have information or knowledge about Scott Jenkins outside

11 of what you might have heard today.  Can you tell me about what

12 that information is?

13 A      So initially when all of this started coming about, News

14 Channel 4 was always out front constantly.  I do not watch the

15 news.  So there was a lot of chatter and what they were here

16 for, a lot of speculation.  But that was just it, speculation.

17 So -- and that was quite some time ago.  Since then, I haven't

18 been part of any of the news.  I don't watch the news.  I don't

19 listen.  I don't read the newspaper.  I don't -- and in my

20 office, it's a locked office, so it's only four of us, and none

21 of us really talk about it.  So I don't go outside my confines

22 of my office any longer.  So I haven't heard anything in quite

23 some time.

24 Q      So when you said knowledge, you meant initially the news?

25 A      Correct.

USA v. Jenkins, 3:23cr11, 12/11/2024

1   Q    Okay.  And did you have -- with any of these individuals

2   who were formerly at Culpeper or may now be in the same kind of

3   circles, did you guys ever discuss the case at all?

4   A    I have not.

5   Q    Have you personally worked with Scott Jenkins?

6   A    So we were on a committee together, CJB committee, I

7   believe, is what we were on together.

8   Q    And what kind of committee was that?

9   A    It was more of a community -- oh, gosh, I don't even know

10  what it stands for, isn't that terrible?  I'm on so many

11  committees.  But it was -- we would meet quarterly, kind of

12  talk about court improvement, talk about the jail improvements,

13  things such as that.

14  Q    And so what do you recall of Mr. Jenkins's role in that

15  committee when you were working on it with him?

16  A    So oftentimes it would be a representative from his

17  office.  I think he attended once or twice while I was there.

18  We were all just -- we were assigned by the Board of

19  Supervisors to be present.  We would normally just receive

20  information, and then it was a very short meeting most of the

21  time, held at the Commonwealth Attorney's office and the adult

22  probation office.

23  Q    And what was your impression of working with Scott Jenkins

24  as it related to that committee?

25  A    Very positive.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Let's see.  So I guess my question to you is, based on all

2  of your friendships and social interactions with people who are

3  at least working at the sheriff's office now and your

4  interactions with Scott Jenkins, does that give you pause at

5  all in terms of being a juror on this case?

6  A    It does.  I feel like I could absolutely be unbiased.  I

7  have no -- I have no bias whatsoever, but it does make me feel

8  uncomfortable to know so many -- inner circle.

9  Q    Yeah, and do you think that discomfort might, you know, be

10  with you as you deliberate, and just sort of in the back of

11  your mind because you know so many people who are --

12  A    It would not influence my decision, no, I mean, based upon

13  evidence presented.  I would be fair.

14  Q    Let me ask you this:  Were you part of a DUI trial a while

15  ago in the state courts?

16  A    Yes, I was.

17  Q    And can you tell me what occurred in that trial?

18  A    So the gentleman was arrested for DUI.  He -- I'm trying

19  to think of all -- this was like six years ago.  So he was

20  arrested for DUI.  He took the keys out of the ignition, threw

21  them, and they found him a half a mile from the accident.  And

22  it was -- he was found not guilty.

23  Q    Was that a positive experience for you?

24  A    It was.  I worked at the clerk's office, became a deputy

25  clerk after that.  So, yes.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Oh, so very positive.  That's good to hear.  Was there

2  anything in particular about that experience that you think

3  will impact your ability to serve on this jury?

4  A    I do not.

5          MS. PENG:  Okay.  Thank you.

6          THE COURT:  Thank you, Ms. Peng.

7          Mr. Andonian, Mr. Caleb?

8          MR. CALEB:  Indulgence, please.

9          THE COURT:  Yes, sir.

10          MR. ANDONIAN:  No questions.

11          THE COURT:  All right.  Thank you very much.

12  Ms. Long, thank you very much for being in.  Please do not

13  discuss what we've discussed in here today with your fellow

14  jurors.  Thank you.

15          All right.  Brian McCarthy and then Karl Roelofs.

16          All right.  Mr. McCarthy, come on up, if you would,

17  please, sir.  Mr. McCarthy, thank you very much for being here.

18  I'll remind you you remain under oath.  If any of the questions

19  that are asked of you are particularly personal in nature,

20  you're free to ask that they be taken up in private outside the

21  presence of the public.

22          PROSPECTIVE JUROR:  Understood.

23          THE COURT:  Thank you very much.

24          All right.  Mr. Andonian?

25          MR. ANDONIAN:  Thank you, Your Honor.

USA v. Jenkins, 3:23cr11, 12/11/2024

1                              EXAMINATION

2     BY MR. ANDONIAN:

3   Q    Good afternoon, Mr. McCarthy.

4   A    Hello.

5   Q    I just had a couple of questions based on answers in your

6   questionnaire.  And I'll just start at random with the hardship

7   question.  It sounds like you had indicated serving on the jury

8   at this time would pose a hardship given your sales.  Could you

9   tell us a little bit more about the impact?

10  A    When I wrote that, I thought this was going to go longer.

11  If it's to the 20th, I can make it work.  I own a small floral

12  shop and retail shop.  So this is a very busy time leading up

13  to the holidays.  And it's a small business with a limited

14  staff.  So it would take some creative scheduling, calling in

15  some favors, but I could probably make it work.

16  Q    Okay.  You had also indicated on your questionnaire that

17  you held a very favorable view of the DOJ and the FBI, and a

18  somewhat favorable view of criminal defense attorneys.  And I

19  was wondering if you could just talk a little bit about that,

20  and more specifically, whether those views would pose a

21  difficulty to you in being fair and impartial in a case where

22  obviously you have the DOJ and criminal defense attorneys?

23  A    Sure.  Sure.  I think it's a response to current climate,

24  that the DOJ and those organizations have come under fire in

25  certain ways, and I think unfairly so.  So it's not -- I would

USA v. Jenkins, 3:23cr11, 12/11/2024

1  say it's not a mandate of mine or a pursuit of mine, it's just

2  a feeling.  So I don't think -- or I know it's not a prejudice

3  that would make its way into influencing how I'm interpreting

4  evidence or testimony.

5  Q    Okay.  And then I guess on the other side of that coin,

6  your somewhat unfavorable -- I'm sorry, somewhat favorable

7  views of criminal defense attorneys; do you see that as posing

8  any issue?

9  A    I don't.  I think it's a lack of exposure.  So no, I

10  don't.

11  Q    And when you say a lack of exposure, just your personal --

12  A    Exactly, yeah.

13  Q    Okay.  You also -- on your questionnaire you indicated

14  that you think some elected officials lack proper experience or

15  integrity.  Can you just tell us a little bit about what you

16  mean by that?

17  A    Yeah.  I think that is probably situational from watching

18  the news, and I think it's just that folks who have acted in an

19  improper way get a lot of coverage in the news, and so it

20  becomes out of line, I think.  I know there's a lot of people

21  who are in those fields that very quietly do a great job.  So I

22  think it's just a situational sort of political climate

23  response.

24  Q    Okay.  Given that this case involves a former elected

25  official, do you think those views would pose any problems for

USA v. Jenkins, 3:23cr11, 12/11/2024

1  you in being fair and impartial?

2  A    I would say they're not -- would not be prejudicial.  I

3  don't think they pose an issue.

4            MR. ANDONIAN:  Okay.  Thank you very much, sir.

5            THE COURT:  Thank you, Mr. Andonian.

6            Ms. Peng?

7            MS. PENG:  No questions.  Thank you.

8            THE COURT:  So I'll just -- just to make sure I'm

9  clear, Mr. McCarthy, when jurors are impaneled in this case,

10 they make a decision solely upon the evidence that's presented

11 in this case, and the instructions that I give, set aside any

12 preconceived notions or views that you have coming in.  Can you

13 do that?

14           PROSPECTIVE JUROR:  Yes, I can.

15           THE COURT:  All right.  Thank you very much.  Please

16 do not discuss what we've discussed here today.

17           PROSPECTIVE JUROR:  Absolutely.

18           THE COURT:  All right.  Karl Roelofs, and then we'll

19 have Cody Moubray.

20           Mr. Roelofs, come on up, if you would, please, sir.

21 All right.  Please have a seat, Mr. Roelofs.  I will just

22 remind you you remain under oath from earlier this morning.

23 And if any questions are asked of you are of a particularly

24 personal nature that you wish to take up in private, you can

25 make that request.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          PROSPECTIVE JUROR:  Okay.

2          THE COURT:  All right.  Thank you very much.

3          Ms. Peng?

4                        EXAMINATION

5    BY MS. PENG:

6    Q    Hello, sir, how are you?

7    A    Hi.  Okay.

8    Q    I just have a couple of questions based on the responses

9    you gave in your questionnaire.  I think in response to your

10   views about the DOJ, I think you indicated that you thought it

11   was politicized.  Could you just tell me a little bit more

12   about what you meant when you said that?

13   A    Well, you know, given the way things are nowadays, I just

14   feel that everything can be politicized, you know.  So it's

15   just kind of a broad view that I have, really.

16   Q    And if you can, because I know it can be hard, what -- are

17   there things that specifically gave rise to you holding that

18   particular view, like news stories, or you know, friends,

19   things of that nature?

20   A    Well, you know, I grew up in Chicagoland area, and they

21   say during election if you don't like the way the vote went,

22   you count again.  So the political corruption around there, you

23   know, just -- I see that, you know, we saw that growing up, and

24   you know, don't see much different nowadays.

25   Q    Gotcha.  That's helpful.  And so you know that this case

USA v. Jenkins, 3:23cr11, 12/11/2024

1  is about -- involves bribery, which is corruption.  Do you

2  think that those views are going to carry over to how you view

3  this case in certain ways?

4  A    I don't really believe so.

5  Q    Let me ask you this:  I think you also indicated that you

6  disliked prosecutions of law enforcement officials if they're

7  just doing their jobs.  Can you explain to me more what you

8  meant by that?

9  A    I was speaking more of the rank and file.

10  Q    I see.

11  A    Them doing their jobs.

12  Q    Is it kind of a use of force situation, is that what

13  you're referring to, or do you have any --

14  A    I don't have any specifics, you know, just whatever is

15  going on.  It seems like there's -- you know, there has been a

16  lot of that.

17  Q    And again, same question, do you think those views are

18  going to influence how you view the evidence if you're seated

19  as a juror in this case?

20  A    I don't think so.

21  Q    And I'm just going to ask you about this as well:  You

22  know, you were -- you said that the defense side may be looking

23  for loopholes.  Can you explain a little bit more what you mean

24  by that?

25  A    No, I don't remember.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Okay.  I think it was in the context of whether you had a

2  favorable or unfavorable view of defense counsel.  But if you

3  don't hold that view, then...

4  A    It was probably a comment I made because I was grumpy or

5  something.  I don't know.

6           MS. PENG:  Okay.  Thank you.  That's all I have.

7           THE COURT:  Mr. Andonian?

8                       EXAMINATION

9   BY MR. ANDONIAN:

10 Q    Good afternoon, sir.

11 A    Hello.

12 Q    Just a follow-up on the last question that Ms. Peng asked

13 you.  I think the comment you made in your questionnaire

14 regarding criminal defense attorneys was that they're looking

15 for, quote, any loopholes to get criminals off.  I don't know

16 if that jogs your memory or not, but I guess I'll just ask:  Is

17 that a view that you hold of criminal defense attorneys

18 generally?

19 A    That's a strong blanket statement that I wouldn't say I

20 would hold for every case.

21 Q    Okay.  Do you think that those views, to the extent you

22 hold them in any circumstances, would pose a problem for you

23 fairly sitting as a juror and giving the defense a chance, you

24 know, and being as fair -- being fair and impartial?

25 A    I don't think that would impact it.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Okay.  You also indicated that you had read some headlines

2  regarding the allegations?

3  A    It was just a headline.

4  Q    Okay.

5  A    The question was -- I was trying to be specific.  It was

6  just kind of like the headline.

7  Q    Okay.  So you haven't formed any opinions about the case

8  based on that?

9  A    I have not.

10          MR. ANDONIAN:  Thank you, sir.

11          THE COURT:  Mr. Roelofs, just real quick question

12  just to follow up on a couple of questions you had.

13          Setting aside any views that you have regarding

14  criminal defense lawyers or prosecutors or the DOJ, do you

15  understand that in this particular case the government carries

16  the burden of proving guilt beyond a reasonable doubt; the

17  defendant has no obligation either to present any evidence, and

18  they have no burdens at all in this case?  Do you understand

19  that?

20          PROSPECTIVE JUROR:  I do.

21          THE COURT:  Okay.  And is that an instruction you can

22  follow?

23          PROSPECTIVE JUROR:  Yes.  I think I can, yes.

24          THE COURT:  Okay.  And the other instruction that you

25  can follow is that you'll make the decision, if you're selected

USA v. Jenkins, 3:23cr11, 12/11/2024

1  as a juror in this case, based solely upon the evidence that

2  comes in, and the instructions of law that I give to you.  This

3  is not a general case about the DOJ or FBI or criminal defense.

4  This is a specific case involving a specific defendant and a

5  specific set of facts.  And you can make the decision on that

6  specific set of facts?

7          PROSPECTIVE JUROR:  Yes, I can.

8          THE COURT:  All right.  Thank you very much.

9          Does that prompt anything further, Ms. Peng?

10          MS. PENG:  No, thank you.

11          THE COURT:  Mr. Andonian?

12          MR. ANDONIAN:  No, Your Honor.

13          THE COURT:  All right.  Thank you very much.

14          And thank you very much, Mr. Roelofs.  And please do

15  not discuss what we've discussed here today.

16          PROSPECTIVE JUROR:  All right.  Fair enough.  Thank

17  you.

18          THE COURT:  All right.  Cody Moubray and then

19  Kimberley McDaniel.

20          Mr. Moubray, come on up, if you would, please, sir.

21  As you sit down, Mr. Moubray, I'll remind you you remain under

22  oath earlier this morning.  And if any questions are asked of

23  you of a particularly personal nature that you wish to take up

24  in private, you're welcome to make that request.  Thank you

25  very much.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          Mr. Andonian?

2          MR. ANDONIAN:  Thank you, Your Honor.

3                          EXAMINATION

4    BY MR. ANDONIAN:

5    Q    Good afternoon, sir.  Just a couple of questions based on

6    what you answered on your questionnaire.  You indicated that

7    you think most politicians are in it for personal financial

8    gains; is that correct?

9    A    Yeah, for the most part that's how I feel.

10   Q    Can you just explain a little bit more about what you mean

11   by that?

12   A    It's hard to explain.  I think -- I think the world we

13   live in nowadays, I think it's all about personal gain.  You

14   know, I don't think it's so much about what the job is about.

15   I think it's a lot to do with how can I benefit from this

16   position versus the latter.

17   Q    Okay.  This case involves an elected official.  It

18   involves allegations of bribery.  Do you think your views,

19   which sounds like you hold pretty firmly -- do you think they

20   would impact your ability to be fair and impartial in making,

21   you know -- in evaluating the evidence and rendering a verdict?

22   A    I do not.  I filled out that questionnaire before I ever

23   knew about, you know, what the case was about.  So I do not.

24          MR. ANDONIAN:  Court's brief indulgence?

25          THE COURT:  Yes.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MR. ANDONIAN:  Okay.  That's all I have.  Thank you,

2   sir.

3          THE COURT:  All right.  Ms. Peng?

4          MS. PENG:  Nothing from the government.

5          THE COURT:  All right.  Mr. Moubray, thank you very

6   much for being in.  Please do not discuss what we've discussed

7   here today with your fellow jurors.

8          All right.  We'll have Kimberley McDaniel and then

9   Karina Monroy.

10          Good afternoon, Ms. McDaniel.  Thank you very much

11   for being here today.  I'll remind you you remain under oath

12   from this morning.  And also, if you're asked any particularly

13   personal questions, you're welcome -- if you think that you'd

14   rather answer those in private -- to make that request as well.

15          PROSPECTIVE JUROR:  Yes, sir.

16          THE COURT:  All right.  Thank you very much.  And I

17   believe Ms. Peng has some questions for you initially.

18                        EXAMINATION

19    BY MS. PENG:

20   Q    Hello, how are you?

21   A    Doing well, thanks.

22   Q    So let me ask you first, it seems like from your

23   questionnaire that you might have experienced some health

24   issues lately.  Could you tell me a little bit more about

25   those?

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A    I had a change of job.  So it was a lot of anxiety and

2  nerves and stuff going on, weakened immune system.  But I seem

3  to be doing better.

4  Q    And how long ago did you start that new job?

5  A    I started -- my health started going back in March, and I

6  started my new position in July.  And things are starting to

7  look up and look better.

8  Q    Okay.  And so those symptoms like anxiety, do you think

9  that's going to prevent you from paying attention --

10 A    No.

11 Q    -- during the trial?

12     No?  Okay.  I think you also indicated that you might have

13 some personal views or religious views that made you hesitate

14 in answering whether you could be a juror; is that right?

15 A    When it came to the judgment part, yes, because I felt

16 like I don't really have the right to judge, you know, an

17 outcome that may affect other people's lives in a negative way.

18 But I guess every day that we're living we have to make

19 judgment at some point to do what's best for us and overall

20 everyone else.

21 Q    Yeah, understood.  Thanks for sharing that.

22     I guess, you know, this will be a little bit different,

23 right?  It's -- you're making a judgment on somebody else, or

24 -- somebody else in a criminal case.  Does that -- is that

25 different -- does that feel different to you, making that kind

169

USA v. Jenkins, 3:23cr11, 12/11/2024

1  of judgment versus a decision you might make in your personal

2  life, let's say?

3  A    It would be different, but it would be based on facts.

4  You know, and that's something that you can't argue with.

5  Right is right.  Wrong is wrong.  But the facts that are

6  presented to you, we have to go off that regardless of what the

7  situation is.

8  Q    And so let's say you're seated as a juror in this case,

9  and you're asked to render a verdict with the other jurors, and

10 you've seen all the evidence.  Are you going to feel when

11 you're in that jury room any kind of discomfort about having to

12 render a verdict that may have an impact on someone else's

13 life?

14 A    Absolutely not.  I'm confident in the decisions that I

15 make as far as something like that goes.

16 Q    Okay.  Thank you.  Now, I want to ask you about a

17 Ms. Doris Clatterbuck?

18 A    Yes.

19 Q    Who is she to you?

20 A    She was a former co-worker.  She has -- both of us were

21 working at Culpeper Social Services, and that's how I became

22 acquainted with her.  In working with her down through the

23 years at Social Services in Culpeper, I learned that

24 Mr. Jenkins was I believe her nephew.

25 Q    And when you were working together with her -- how long

USA v. Jenkins, 3:23cr11, 12/11/2024

1  did you work together with her?

2  A    From 2017 up to '21, August of '21.

3  Q    And how closely did you work with her on a daily basis?

4  A    Day-to-day interactions, but you know, mostly

5  professional.  You know, when personal things would happen or

6  whatever, Doris is very verbal.

7  Q    Is very what?

8  A    She's a very verbal person.

9  Q    Okay.  So did you have -- did your professional

10 relationship become like a friendship?  Did you socialize

11 outside of work?

12 A    Not intentionally.  I mean, when I would go somewhere, if

13 she was there, of course we would speak, but we never made

14 plans to have lunch together or anything like that.

15 Q    And do you remember at what point she mentioned to you

16 that Scott Jenkins is her nephew?

17 A    Yeah, I mean, election time was coming around for

18 Mr. Jenkins's election for sheriff, and -- oh, yeah, she was

19 quite the advocate for him.

20 Q    And --

21 A    He's family.  She should have, I suppose.

22 Q    I see.  So when she was advocating for him, what kind of

23 things would -- did she tell you?

24 A    Oh, that she's going to work the polls, just things like

25 that, her involvement.  She wasn't asking me to vote for him or

USA v. Jenkins, 3:23cr11, 12/11/2024

1   support him or anything.  I don't live in the county.

2   Q    I see.  But I mean, I guess through that interaction, you

3   learned a little bit more about Mr. Jenkins; is that fair to

4   say?

5   A    No more than just he was running for sheriff of Culpeper

6   and he was already the sheriff at the time.

7   Q    And so this was the last election, 2023?

8   A    I don't recall what the date was, to be quite honest with

9   you, because -- it couldn't have been '23, because -- it was

10  before then.

11  Q    It was before then?

12  A    Before then.

13  Q    Okay.  And have you kept in touch with

14  Ms. Clatterbuck since you guys were --

15  A    No.

16  Q    So when was the last time you had contact with her?

17  A    Probably a year ago at Wood Grill.  I was walking by a

18  table and somebody grabbed my arm, and it was her.

19  Q    Okay.  And then you had a conversation?

20  A    Yeah.  But --

21  Q    Have you ever had any personal interactions with Mr. Scott

22  Jenkins?

23  A    No.

24  Q    And you also mentioned in your questionnaire that you

25  thought this prosecution, or Mr. Jenkins, is being used as a,

USA v. Jenkins, 3:23cr11, 12/11/2024

1  quote, political pawn; do you remember writing that?

2  A    I made a comment about that, but I'm not sure if he's

3  being used as that or not.  A lot of times in the political

4  systems, we've seen here a lot lately that when people express

5  political views, it appears that they're targeted to some

6  degree.  I don't know the depth of what has happened in this

7  situation, and I've steered away from conversations that

8  involved it.  I felt like if something hasn't affected me

9  directly, then I really am not -- but yeah, I did express that.

10 Q    But when you expressed that, what did you have in mind, I

11 guess, specific to Mr. Jenkins?  Like who was he going to be a

12 pawn for if -- again, you know, off the cuff comment?

13 A    I'm not sure.  But it seemed like once that Mr. Jenkins

14 started making -- and this is my opinion -- it seemed that when

15 Mr. Jenkins was really starting to make more of a name for

16 himself in support of, you know, taking care of illegals in the

17 community, and people who were coming in with guns and drugs

18 and stuff, that he was becoming more verbal about his stance

19 against things.  And then his interviews with Fox, you know, on

20 TV, it just felt like he was just kind of -- I just felt like

21 at the time as a down home country boy he was being targeted

22 for some of his stances he was taking.

23 Q    And so you saw his interviews on -- you saw him being

24 interviewed on Fox News?

25 A    I heard about it.  I didn't watch it.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    And do you remember how you came to know that, you know,

2  Mr. Jenkins was becoming more verbal, maybe speaking out about

3  some of these issues?  Do you remember how you became aware of

4  that?

5  A    Hearsay, a lot -- co-workers, people -- you know, I mean,

6  it's a local thing that's turned into something that -- that

7  was bigger than what I think people expected.  But a lot of

8  co-workers have, you know, chitchatted, talked about it, kept

9  up with it.  But like I said, I didn't become involved in it.

10  I just heard about it.

11  Q    Yeah, and so then you felt like once that kind of stuff

12  came about, he was just, you know, a sheriff, and then he

13  became -- he was targeted because of the more prominence he was

14  gaining; is that --

15  A    I kind of feel that way, yeah.  I felt like he was taking

16  such a strong stance on that -- and that, you know, and him

17  being more, you know, in the media, it kind of, you know,

18  attracted that, I suppose.

19  Q    Do you still feel like he's been targeted, sitting here

20  today?

21  A    I can't say anything about that, yes or no.  I don't know

22  the facts on that.  I don't -- I can't really say whether he's

23  being targeted or not, or -- I can't say.  I don't know the

24  facts of the situation.  I don't know the depth and all the

25  details.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    I guess let me ask you this question, and it may be a hard

2  question to answer:  What does it mean to you when someone is

3  targeted?

4  A    Well, I guess it depends on the situation.  Sometimes we

5  can set our own selves up, you know, for that attention, you

6  know, just by -- you know, we can bring that attention to

7  ourselves in some ways.  But if I'm being quite honest with you

8  about everything, some of the information that I put on my

9  questionnaire, I put it on there because I really didn't want

10 to be here today, if I'm going to be honest with you.  You

11 know, I'm like, well maybe if I'm -- you know, show like that

12 I'm biased or unbiased or something, they'll just blow me off

13 and I'll just go home.  You know, that's my honest opinion --

14 that's the honest thing I did.  So I just filled this out

15 quickly at work.  I just got this summons yesterday morning.

16 There was a yellow envelope on my counter, kitchen counter.  I

17 asked my husband about it.  He said, oh, yeah, by the way, you

18 have a message from the court in Charlottesville.  And I looked

19 at the corner of the packet, and I'm like, oh my gosh, it's a

20 summons from Charlottesville.  So I opened it up and

21 immediately I'm like, oh, no, this is tomorrow.  So I went to

22 work and got in touch with the person that had the contact

23 information in there, and called her, and she went ahead and

24 emailed me the questionnaire, and I just filled it out as

25 quickly as I could while I was at work, and sent it back in, in

USA v. Jenkins, 3:23cr11, 12/11/2024

1  hopes that, you know, yeah, maybe I could get out of doing

2  this.  I didn't want to be here.

3  Q    You don't want to be here?  Understandably so.  You still

4  don't want to be here?

5  A    I mean, if I'm needed, I will do what I'm supposed to do

6  and I will be truthful about it.  But I'm just telling you the

7  honesty from my perspective of why I answered some of the

8  questions the way that I did.

9              MS. PENG:  Thank you very much.

10             THE COURT:  Mr. Andonian?

11             MR. ANDONIAN:  Thank you, Your Honor.

12                          EXAMINATION

13   BY MR. ANDONIAN:

14  Q    Good morning -- or no, afternoon.

15  A    Good afternoon.

16  Q    It all blends together at some point.

17  A    It does.

18  Q    Just a couple questions.  Do you have, as you sit here,

19  any doubt in your ability to be fair and impartial if you were

20  called to be on this jury?

21  A    No, I have no doubt.  I would be honest and truthful about

22  it.

23  Q    And do you have any doubt that you would be able to follow

24  the instructions that the Court gives you about what you're

25  supposed to do as a juror if you were selected for this case?

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A    Absolutely not.

2            MR. ANDONIAN:  Nothing further.

3            THE COURT:  Let me just ask you a couple of

4  questions, two things you put on your questionnaire.  You may

5  have answered one of them already.  Your last question was, is

6  there anything else the Court should know about you that would

7  impact your ability to serve as a fair and impartial juror, and

8  you said, I'd like to be dismissed from this case because of

9  personal reasons.  Is there anything else other than what

10 you've already told us?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  As part of those personal reasons?

13           PROSPECTIVE JUROR:  No, sir.

14           THE COURT:  Okay.  There's also one other thing, just

15 to follow up on Mr. Andonian, question 52 was:  Have you formed

16 any opinions about Mr. Jenkins's guilt or innocence.  You said,

17 I believe he's innocent of any severe charges.  What did you

18 mean by that?

19           PROSPECTIVE JUROR:  That was one of the things I made

20 up.

21           THE COURT:  You just made it up?

22           PROSPECTIVE JUROR:  Yeah.

23           THE COURT:  Okay.  So the question becomes this,

24 Ms. McDaniel.  I will instruct the jury over and over and over

25 in this case that you can make a decision only upon the

USA v. Jenkins, 3:23cr11, 12/11/2024

1  evidence that comes before the jury here in this courtroom and

2  the instructions of law that I provide, setting aside any

3  personal beliefs that you may otherwise bring into the

4  courtroom.  Can you follow that instruction and abide by that

5  throughout this case?

6              PROSPECTIVE JUROR:  Yes, sir.

7              THE COURT:  Okay.  Thank you.

8         Ms. Peng --

9         MS. PENG:  Sorry, can I just ask one more follow-up

10  question?

11   BY MS. PENG:

12  Q    I think in your questionnaire, you also said that your

13  relationship with Ms. Doris Clatterbuck might make it possible

14  for you not to be fair and impartial.  Is that one of the

15  questions that you answered honestly, or were you -- it was

16  part of what you made up?

17  A    I know Doris.  We're not close.  We used to work together.

18  I thought that by adding Doris and Calvert, people that I've

19  worked with at Social Services and the sheriff's department,

20  would deter me from having to be here.  So yes, I know them.

21  Yes, I've worked with them.  But I don't associate with them,

22  nor do I associate with Mr. Jenkins.

23              MS. PENG:  Thank you.

24              THE COURT:  Thank you very much.  Please do not

25  discuss what we've discussed in here today with your fellow

USA v. Jenkins, 3:23cr11, 12/11/2024

 1  jurors.

 2          PROSPECTIVE JUROR:  Yes, sir.

 3          THE COURT:  Thank you very much.

 4          All right.  Karina Monroy, followed by David Cohen.

 5          Ms. Monroy, thank you very much for being here.  You

 6  do remain under oath from this morning.  And if any questions

 7  are asked of you that are of a particularly personal nature

 8  that you wish to answer in private, you can make that request.

 9          PROSPECTIVE JUROR:  Okay.

10          THE COURT:  All right.  Thank you very much.

11          All right.  Mr. Andonian?

12          MR. ANDONIAN:  Thank you, Your Honor.

13                          EXAMINATION

14   BY MR. ANDONIAN:

15  Q    Good afternoon, ma'am.

16  A    Afternoon.

17  Q    Just a few questions about some answers you gave on your

18  questionnaire.  And I want to start with the hardship around --

19  I believe you noted that you have finals plus work; is that

20  right?  Can you just tell us a little bit about that?

21  A    Yeah, I'm a full-time graduate student at George

22  Washington University, and I also work 30 hours a week at a

23  nonprofit here.  It's a very busy time for -- and finals are

24  this week.  So definitely feeling the stress of that.

25  Q    Okay.  Would serving on this jury -- maybe this is a

USA v. Jenkins, 3:23cr11, 12/11/2024

1  self-evident question -- would serving on this jury pose a

2  hardship to you given your finals and work schedule?

3  A    Yes, absolutely.

4  Q    You also indicated on your questionnaire that you had read

5  some information online about Mr. Jenkins or about this case;

6  is that correct?

7  A    Yes.

8  Q    And can you just tell us what that information was and

9  where you got it from?

10 A    Yeah.  I can't remember the news source exactly, but just

11 online read about like alleged bribery, misuse of power, those

12 type of things.  So I kind of just got broad strokes from --

13 yeah, from the news.

14 Q    Okay.  I believe you indicated on your questionnaire --

15 and correct me if I'm wrong -- that based on what you learned

16 through whatever news outlet or medium it was that it would be

17 difficult for you to be fair and impartial with having gained

18 that knowledge; is that correct?

19 A    Uh-huh.  Yes.

20 Q    Can you just tell us a little bit more about that, like

21 what, you know, opinions or views you've developed, and you

22 know, why you think that you wouldn't be able to, you know,

23 overcome that?

24 A    Sure.  Yeah.  I mean, I'm just acknowledging my personal

25 bias.  I have, like, a bit of a personal bias about law

USA v. Jenkins, 3:23cr11, 12/11/2024

1    enforcement in general, particularly like around police

2    brutality and things like that.  So I just wanted to make it

3    like -- that comes up for me emotionally when I'm reading about

4    this case, or just about law enforcement in general.

5    Q    Okay.  Do you think those feelings would ultimately make

6    it difficult for you to be fair and impartial if you were

7    selected to be a juror in this case?

8    A    I think it would make it internally difficult for me, like

9    emotionally difficult, yeah.  Uh-huh.

10   Q    Would you be able to follow court instructions -- you

11   know, the judge would instruct you, for example, on the law to

12   follow, the law to apply, and would instruct you that you have

13   to consider only the facts and the evidence that comes out in

14   this case.  Would you have trouble following those

15   instructions; do you think?

16   A    I don't think so.  I'm a therapist, so I have to often

17   separate the facts from the personal.  So I think I'd be able

18   to do that.

19              MR. ANDONIAN:  I think that's all I have.  Thank you.

20              THE COURT:  All right.  Thank you very much.

21              Ms. Peng?

22                        EXAMINATION

23    BY MS. PENG:

24   Q    Yes.  What are you studying in grad school?

25   A    I'm studying art therapy.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    And you mentioned that you're having finals come up.  Can

2  you tell me a little bit more?  Is it like exams?  Is it like a

3  final paper?  What kind of --

4  A    Multiple final papers, and like final art projects that

5  accompany, like writing.  So those are all due this week.

6  Q    And in terms of your work at the nonprofit, you said you

7  work 30 hours a week approximately?

8  A    Uh-huh.

9  Q    Is there -- if you had to be seated on this jury, is there

10  somebody who could cover for you for just, you know, the

11  couple -- until the 20th?  Would you be able to find coverage?

12  A    Yeah, I'd be able to have a conversation with my

13  supervisor about offloading some of my responsibilities.

14        MS. PENG:  Great.  Thank you.

15        THE COURT:  All right.  Thank you very much,

16  Ms. Monroy.  Please do not discuss what we've discussed here

17  today.

18        PROSPECTIVE JUROR:  Yes.  Thank you.

19        THE COURT:  All right.  So David Cohen followed by

20  Tyler Haislip.

21        Mr. Haislip, thank you very much for being here.  I

22  will remind you you're under oath from this morning.  And if

23  any questions are asked that are of a particularly personal

24  nature that you'd like to take up in private, you can ask to do

25  so.  All right.  Thank you very much.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          All right.  I believe -- actually, you're Mr. Cohen.

2   Excuse me.  I called you Mr. Haislip.

3          Go ahead, Ms. Peng.

4                         EXAMINATION

5    BY MS. PENG:

6   Q    Hello, sir, how are you?

7   A    I'm doing well.  How are you?

8   Q    Good.  So I noticed in your questionnaire that you said

9   you had some familiarity with Scott Jenkins based on what you

10  saw in the news.  So I was just curious if you could give us

11  more detail about what coverage you might have seen?

12  A    I just -- I just saw something on the news about the

13  Culpeper sheriff's department being in disarray, people were

14  firing, there was things going on.  But I was really just

15  trying to see if it was in my county, Fluvanna County.  Once I

16  kind of realized it wasn't Fluvanna County, I kind of didn't

17  really pay attention.  But I do remember seeing that and

18  hearing that.

19  Q    Gotcha.  And so that was the familiarity you were

20  referencing in the questionnaire?

21  A    Uh-huh.

22  Q    And does that -- do you think that impacts your ability to

23  be a fair impartial juror in this trial?

24  A    No.

25  Q    You hesitated there a little bit.  What --

USA v. Jenkins, 3:23cr11, 12/11/2024

1    A    Well, I mean, you know, it's there.  So but -- you know, I

2    get what you're saying.  You just need to not use that

3    information and use only the real information that you get here

4    to decide.  So I realize that, but it's easier said than done,

5    I guess.

6                MS. PENG:  Fair enough.  Thank you.  That's all I

7    have.

8                THE COURT:  Mr. Andonian?

9                MR. ANDONIAN:  Brief indulgence.

10                              EXAMINATION

11    BY MR. ANDONIAN:

12    Q    Good afternoon, sir.

13    A    Good afternoon.

14    Q    Just a quick follow-up on those questions.  When

15    specifically did you read the news coverage about the sheriff's

16    office being in disarray?  Was that recently or was that

17    sometime in the past?

18    A    It was before I got all the stuff to come to court.  So it

19    was sometime in the past.

20    Q    Okay.  If you had to kind of pinpoint a time frame, would

21    you be able to do that?

22    A    I don't think so -- not accurately, no.

23    Q    Okay.  That's fine.

24    A    Sorry.

25                MR. ANDONIAN:  No, no, not a problem at all.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          That's all I have.

2          THE COURT:  Thank you, Mr. Cohen.  Please do not

3    discuss what we've discussed here with your fellow potential

4    jurors.  Thank you very much.

5          All right.  Tyler Haislip, followed by Robert Taylor.

6          Come on up if you would, please, Ms. Haislip.

7    Ms. Haislip, thank you very much for being here today.  I'll

8    remind you you're under oath from this morning.  If there are

9    any questions that are of a particularly personal nature and

10   you wish to take up in private, you can make that request.

11   Thank you very much.

12         All right.  Mr. Andonian?

13         MR. ANDONIAN:  Thank you.

14                         EXAMINATION

15    BY MR. ANDONIAN:

16   Q    Good afternoon, Ms. Haislip.

17   A    Hey.

18   Q    Just a few questions about some answers you provided on

19   your questionnaire.  I want to start with the hardship.  It

20   sounds like you might have some concerns regarding your job --

21   A    Yes.

22   Q    -- around sales?  Can you just tell us a little bit more

23   about that?

24   A    I'm a dental sales rep.  So being out in the field selling

25   things is how I make my income.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Okay.  And if you're on -- if you were to be seated on

2  this jury in this case, which we're projecting to go

3  potentially through next Friday, the 20th, would that pose a

4  financial hardship?

5  A    I worry so, with it being the end of the year, office

6  getting ready to close for the holiday, they're doing some last

7  minute spending for their own tax purposes.  So I do -- I would

8  miss out on some of that.  So that does worry me a little bit.

9  Q    Would your concern or your worry about missing out on that

10 impact your ability to focus here if you were to be selected?

11 A    I would hope not.

12 Q    Do you want to explain that a little bit more?  It sounds

13 like maybe you've got some reservation.

14 A    I have a reservation on another end than that, like for

15 another reason than that, than just the job, than just work.

16 Q    Okay.  What reservations do you have?

17 A    I have attention deficit disorder, so I'm more worried

18 about the sitting, paying attention, actually listening to what

19 is being said.  That more so worries me about being able --

20 that worries me more than the stress at work.

21 Q    Okay.  Do you think -- and understanding this is a

22 sensitive area, do you feel that your -- the ADHD that you have

23 as you experience it, it would make it difficult to pay

24 attention in a setting like this?

25 A    Yes.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Okay.  You also indicated that you had either read or

2  heard about some of the allegations in this case; is that

3  correct?

4  A    Yes, sir.

5  Q    Can you just tell us what exactly you read or heard?

6  A    I saw an article online, and then in the news, but this --

7  it's been a while.

8  Q    Okay.  Based on whatever -- well, let me ask:  The news

9  that you read or heard, was -- did you form an opinion based on

10 reading that, positive or negative, about --

11 A    No, sir.

12 Q    Okay.  Do you think there would be any issue with you

13 being fair or impartial based on whatever it is that you read

14 or --

15 A    No, sir.

16 Q    And then finally, you indicated I believe that you had

17 some concerns about life experience with respect to kind of

18 understanding some of the concepts or some of the information.

19 Can you just tell us a little bit more about that?

20 A    Yeah.  And that tracked to the ADHD, just sitting,

21 absorbing information isn't my strong suit.

22 Q    Got it.

23        MR. ANDONIAN:  Okay.  I think that's all I have.

24 Thank you.

25        THE COURT:  Thank you very much.

USA v. Jenkins, 3:23cr11, 12/11/2024

1        Ms. Peng?

2                        EXAMINATION

3    BY MS. PENG:

4    Q    Hello, how are you?  So your ADHD -- are you on medication

5    for that?

6    A    I am.

7    Q    Okay.  And how long have you been on that medication?

8    A    Since I was early in high school.

9    Q    Understood.  And so with being on the medication in your

10   day-to-day life as a dental sales rep, are you able to focus

11   and pay attention --

12   A    Yes.

13   Q    -- kind of in that line of work?

14   A    Yeah.  If I'm staying active, moving, it's better.  I

15   concentrate better, and I'm also able to take my medicine at

16   the proper times during the day.

17   Q    And so the trial will be, you know, 9 to 6.  And there

18   will be breaks in between.  Does that help at all, or do you

19   think that the period of time that you'll be sitting, like a

20   couple of hours at a time, would be --

21   A    I think breaks will definitely be helpful, but extended

22   periods of time sitting, I will start to zone out, tune out.

23   Q    That happens to me too, frankly.

24   A    I think it happens to a lot of people.

25   Q    So I guess the question is:  Do you think you would be

USA v. Jenkins, 3:23cr11, 12/11/2024

1   able to -- you know, what we're trying to figure out, are you

2   going to be able to pay attention to the evidence?

3   A    I can try my best.

4            MS. PENG:  Okay.  Thank you.

5            THE COURT:  Ms. Haislip, just a couple of questions.

6   as it relates to your ADHD -- and I appreciate your candor in

7   that regard.  First of all, are you a college graduate?

8            PROSPECTIVE JUROR:  Yes.

9            THE COURT:  Okay.  Are there tools or tricks that you

10  use to kind of keep your concentration --

11           PROSPECTIVE JUROR:  Yes.

12           THE COURT:  -- that you used during school?

13           Tell me about those.

14           PROSPECTIVE JUROR:  Like I said, I was medicated.  I

15  never scheduled classes back to back if I could avoid it, and

16  just staying active too outside of like my job.  I stay active

17  doing things, which helps also.

18           THE COURT:  Like actively taking notes?  We allow

19  jurors to actively take notes.

20           PROSPECTIVE JUROR:  Uh-huh.

21           THE COURT:  I don't hold jurors' feet to the fire.

22  You don't have to sit in your chair.  If standing up and

23  stretching is something that helps you, I'm perfectly fine with

24  that.

25           PROSPECTIVE JUROR:  Okay.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  And if you let us know what your

2    medication schedule is, we would schedule breaks in a way to be

3    able to accommodate that.  You can also bring drinks and so

4    forth into --

5          PROSPECTIVE JUROR:  Okay.

6          THE COURT:  Would -- are those accommodations the

7    types of things that would allow you to be able to focus if you

8    are indeed selected?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Okay.  Mr. Andonian, any other questions?

11         MR. ANDONIAN:  No, Your Honor.

12         THE COURT:  Ms. Peng?

13         MS. PENG:  No.  Thank you.

14         THE COURT:  Thank you very much, Ms. Haislip.  Please

15   do not discuss what we've discussed here today.

16         All right.  Robert Taylor, followed by Martha Weiss.

17         Come on up if you would, please, Mr. Taylor.

18         All right.  Mr. Taylor, I remind you you remain under

19   oath from this morning.  And if you're asked any questions of a

20   personal nature that you would rather take up in private,

21   you're welcome to make that request.

22         PROSPECTIVE JUROR:  Yes, sir.

23         THE COURT:  All right.  Ms. Peng?

24                        EXAMINATION

25    BY MS. PENG:

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Hello, sir.

2  A    Yes, ma'am.

3  Q    So I have asked you some questions earlier, and I'm just

4  going to ask you some follow-up questions.

5       So the question I asked you earlier is about, you know,

6  were you more likely to believe the testimony of a convicted

7  criminal?

8  A    What was my answer in the --

9  Q    Oh, so I asked you about that.

10 A    Yeah.

11 Q    Do you remember?

12 A    No, ma'am, I don't remember.  I remember you asking me,

13 but I don't remember what I answered in the questionnaire.  But

14 I was thinking about it.  You know, if a criminal from the past

15 is sitting here testifying against somebody else, I don't feel

16 that he has a reason to lie, because unless he's gaining

17 something or losing something.  And if he's not losing

18 something, why would he lie?

19 Q    That's helpful.  Thanks for thinking about it and

20 clarifying.

21 A    Yes, ma'am.

22 Q    I think when we were talking earlier, you had said

23 something to the effect of, you know, whether you believe them

24 or not depends on which side they're on.  What did --

25 A    I was just rambling.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Okay.

2  A    Like I was on the spot.

3  Q    I'm sorry to put you on the spot.  Hopefully this is a

4  little bit more comfortable.

5       Okay.  And I think also one question I had was you had

6  indicated that you have a hard time trusting the news these

7  days; do you remember that?

8  A    Political.

9  Q    Okay.  Can you tell me a little more about why that is?

10 A    Just seems like everything was pushed to one side, that

11 everybody over here is doing bad and all these people over here

12 are doing good.  So I stopped watching the news.

13 Q    So you haven't seen any news about this case?

14 A    Oh, no.  Nelson County, we ship in sunshine.

15 Q    Okay.  Let me just ask you one more question.  So if

16 someone was a convicted criminal, and then they were testifying

17 for the government, and they were doing it in the hopes of

18 getting a more lenient sentence, how would you view the

19 testimony of that particular witness?

20 A    I would have to believe him, yes.

21 Q    You would have to believe him?

22 A    Uh-huh.

23 Q    Why is that?  I'm sorry to put you on the spot again.  If

24 you don't have an answer, that's fine.

25 A    I reckon it depends if it was offered to him as a reduced

USA v. Jenkins, 3:23cr11, 12/11/2024

1  sentence, let's say.  I'm going to offer you 30 days off of

2  your cell if you speak -- tell the truth, or -- I've just seen

3  so many movies with jailhouse snitches.  And it's hard to

4  really understand how I feel about that, is what I'm saying, I

5  reckon.

6  Q    So when you're watching the movies about jailhouse

7  snitches, for example, do you have a positive feeling towards

8  snitches, or do you --

9  A    Kind of neutral.

10 Q    Neutral?

11 A    Yes.

12 Q    Okay.  Any other thoughts you want to share on that

13 subject?

14 A    No, ma'am.

15         MS. PENG:  Okay.  Thank you.  That's all I have.

16         THE COURT:  All right.  Mr. Andonian?

17         MR. ANDONIAN:  No questions.

18         THE COURT:  All right.  Mr. Taylor, thank you very

19 much for being in.  Please do not discuss our conversation here

20 with your fellow potential jurors.

21         PROSPECTIVE JUROR:  Yes, sir.

22         THE COURT:  All right.  So Martha Weiss followed by

23 Kristin Southard.

24         Ms. Weiss, good afternoon.  Thank you very much for

25 being here.  I'll remind you you remain under oath from this

USA v. Jenkins, 3:23cr11, 12/11/2024

1    morning.  And also, if you're asked any potentially -- or

2    particularly personal questions you'd rather take up in

3    private, you're welcome to ask me to do so.  Thank you very

4    much.

5            All right.  Mr. Andonian?

6            MR. ANDONIAN:  Thank you, Your Honor.

7                          EXAMINATION

8    BY MR. ANDONIAN:

9    Q    Good afternoon, ma'am.  How are you?

10   A    Hi.  Fine, thank you.

11   Q    I just had a question about an answer you gave on your

12   questionnaire.  You indicated that you believed anybody who

13   accepts campaign donations has to be influenced whether they're

14   being honest or not.  Can you just elaborate on that a little

15   bit more and tell us what you meant by that?

16   A    Yeah.  I mean, I think if anybody accepts a donation,

17   whether or not they're honest, it's in the back of their mind.

18   And I think it can maybe subconsciously influence any decisions

19   they might make.

20   Q    Okay.  Given that the allegations in this case involve

21   contributions to campaigns and that involve -- of that nature,

22   do you think your views about people who accept campaign

23   donations would make it hard for you to be fair and impartial

24   hearing the facts of the case?

25   A    I don't think so.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    When you say you don't think so, do you -- I know this is

2  hard to quantify, right?  I mean, are you -- are you fairly

3  certain?  Are you very certain?  Are you somewhat certain that

4  you'd be able to be fair and impartial?

5  A    I'm very certain I could be fair.

6            MR. ANDONIAN:  That's all I have.

7            THE COURT:  All right.  Thank you very much.

8            Ms. Peng?

9            MS. PENG:  No questions.  Thank you.

10           THE COURT:  All right.  Ms. Weiss, thank you very

11  much for being here.  I'll ask you not to discuss your -- what

12  we've discussed here today with your fellow potential jurors.

13           PROSPECTIVE JUROR:  Thank you.

14           THE COURT:  All right.  Robert -- or I'm sorry,

15  Kristin Southard.  And I believe, Ms. Peng, that will bring us

16  to the end of your list, the government's list.

17           MS. PENG:  That's correct.

18           THE COURT:  Ms. Southard, come on up, if you would,

19  please.  And Mr. Galleo, we'll just go straight down the

20  defendant's list from there.

21           Ms. Southard, good afternoon.  Thank you very much

22  for being here.  Thank you very much for your patience today.

23  I'll remind you you remain under oath from this morning.  If

24  there are any questions that are particularly personal that

25  you'd rather take up in private, you can make that request if

USA v. Jenkins, 3:23cr11, 12/11/2024

1  we get to that point.

2           PROSPECTIVE JUROR:  Okay.

3           THE COURT:  Thank you very much.

4           All right.  Ms. Peng?

5                          EXAMINATION

6   BY MS. PENG:

7  Q    Hello, how are you?

8  A    Good.  How are you?

9  Q    Good.

10      So let me ask you this.  You live in Culpeper?

11 A    I live in Madison County.

12 Q    And that's --

13 A    It's right on the line.  Culpeper is right like -- Madison

14 is right after Culpeper.

15 Q    Got it.  Okay.  And so have you heard any news or coverage

16 about this particular trial?

17 A    I probably read an article way back when it first came

18 out.  But recently, no, I haven't heard much at all.

19 Q    Okay.  And on your questionnaire, I believe you indicated

20 that you had a slightly unfavorable view of the DOJ/FBI; is

21 that true?

22 A    I don't remember saying -- I mean, I don't remember that,

23 honestly.

24 Q    Okay.  Is that true, though?

25 A    No, it's not true.  No.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Okay.  That's good.

2  A    No.  Maybe I was nervous.  I don't know.

3  Q    Okay.  So do you have, you know, views one way or the

4  other about the FBI or the DOJ?

5  A    Oh, no, not at all, no.

6           MS. PENG:  Okay.  That's all I have.  Thanks.

7           THE COURT:  All right.  Thank you.

8           Mr. Andonian?

9           MR. ANDONIAN:  Thank you.

10                         EXAMINATION

11  BY MR. ANDONIAN:

12  Q    Good afternoon, ma'am.

13  A    Good afternoon.

14  Q    Just one other question.  You also indicated that you had

15  a relative that worked for the Culpeper County sheriff's office

16  it looks like from 1995 through 2016?

17  A    Yes.

18  Q    First of all, was that a close relative that you talk to?

19  A    It was actually my husband's aunt.  We got married eight

20  years ago.  Really don't have much contact with her at all

21  honestly, but I just wanted to document it on the

22  questionnaire.

23  Q    Sure.  No, we appreciate that.  So just to make sure I'm

24  closing the loop on the questions, though, have you had any

25  conversations with her about her experiences?

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A    Oh, absolutely not.

2  Q    Okay.

3  A    Uh-uh.

4           MR. ANDONIAN:  Brief indulgence?

5           THE COURT:  Yes.

6   BY MR. ANDONIAN:

7  Q    Do you have any -- I had also had in my notes that you had

8  indicated a slightly unfavorable view of the Department of

9  Justice or the FBI.  And so let me just make sure the other

10 part of that question, which is, if you had any opinions about

11 criminal defense attorneys.  Do you have any strong views one

12 way or another about --

13 A    No, sir, not at all.  Not at all.

14          MR. ANDONIAN:  Okay.  Thank you.  I have nothing

15 further.

16          THE COURT:  All right.  Thank you, Ms. Southard.  You

17 may step down.  Please do not discuss our conversation here

18 with your fellow potential jurors.

19          PROSPECTIVE JUROR:  Thank you.

20          THE COURT:  All right.  Jaclyn Patrizia.

21          Ms. Patrizia, come on up, if you would, please,

22 ma'am.

23          All right.  Ms. Patrizia, thank you very much for

24 being here.  I'll remind you you're under oath from this

25 morning.  If any question is particularly personal and you wish

USA v. Jenkins, 3:23cr11, 12/11/2024

1    to take it up in private, you can make that request at the

2    appropriate time.

3              PROSPECTIVE JUROR:  Okay.  Thank you.

4              THE COURT:  All right.  Mr. Andonian?

5              MR. ANDONIAN:  Thank you, Your Honor.

6                        EXAMINATION

7       BY MR. ANDONIAN:

8    Q    Good afternoon, ma'am.

9    A    Hi.

10   Q    I had just a couple questions about an answer you gave

11   earlier this morning, and then a couple of answers from your

12   questionnaire.  You mentioned -- I'll just start with hardship.

13   You mentioned in your questionnaire that you had -- and I'm

14   sorry, you unfortunately lost your car recently?

15   A    Yes.

16   Q    That makes it difficult to get to and from court.  Is that

17   still the case?

18   A    No.  I purchased a car Monday in preparation for this.

19   Q    Oh, okay.  Congratulations.

20   A    Thank you.

21   Q    Earlier this morning you mentioned another possible

22   hardship, and that was that you had to pick your daughter up,

23   and that if we were running nine-hour days, that that would be

24   difficult?

25   A    Yes.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Can you just tell us a little bit more about that?  I

2  mean, I guess specifically, would you be able to find coverage,

3  or are you the person that has to be there to get your

4  daughter?

5  A    I'm the primary person that can consistently pick her up.

6  And she can only stay there for nine hours.  And because she is

7  3, she needs a car seat.  So even if I was able to find someone

8  like a couple days a week, it would be difficult to manage

9  getting a car seat to or from that person.

10 Q    Okay.  So would you say that given your schedule in

11 picking up your daughter and the schedule the Court would be

12 likely to follow, that it would be difficult for you to sit on

13 a jury that would go through next -- potentially next Friday?

14 A    It would be very difficult.

15 Q    Would that -- apart from the difficulty in and of itself,

16 would you be -- find yourself preoccupied worrying about timing

17 such that you would have a hard time focusing?

18 A    Yeah, today I was very worried about it.  So I had to run

19 to my car and try to figure out how to get her picked up today.

20 Q    You also indicated -- and this is my last question -- that

21 you had some exposure to news coverage about the case, and you

22 had formed an opinion about Mr. Jenkins's guilt based on that;

23 is that correct?

24 A    That's correct.

25 Q    Can you just tell us a little bit about that, I guess what

USA v. Jenkins, 3:23cr11, 12/11/2024

1  the news exposure was, and what your feelings are now?

2  A    Yeah.  I think my father-in-law is the one who told me

3  about it.  And I'm sorry, the way he was talking about it, he

4  was kind of in a joking way, like oh, man, can you believe

5  this, in the sense that like he was guilty.

6  Q    And do you hold that view based on that conversation with

7  your father-in-law that Mr. Jenkins is guilty?

8  A    Well, I respect his views, especially because he was a

9  practicing attorney.  But I know that I can look at the case --

10  the evidence that's presented and just make a decision based on

11  that.

12  Q    Okay.  So you don't think that your feelings based on what

13  you heard about the case would make it hard for you to be fair

14  and impartial?

15  A    I don't think so.  I mean, I think we all have biases that

16  we try to suppress, but I think I could do it.

17          MR. ANDONIAN:  Brief indulgence.

18  BY MR. ANDONIAN:

19  Q    Sorry, just one follow-up to that.  You mentioned because

20  you respect your father-in-law because he's an attorney.  Was

21  he making the comments that he made about this case and your

22  takeaway that, you know, he was implying that he was guilty,

23  was that because your father-in-law had some specific knowledge

24  either of the case or, you know, as a criminal lawyer himself,

25  such that he had some analysis that was --

USA v. Jenkins, 3:23cr11, 12/11/2024

1  A    Yeah, my husband was a criminal defense attorney, and he

2  was an attorney.  And we were out to dinner one night, and they

3  were talking about it together kind of in a joking way.

4              MR. ANDONIAN:  Okay.  Thank you.  That's all I have.

5              THE COURT:  Thank you very much.

6              Ms. Peng?

7              MS. PENG:  Sorry, I have --

8              THE COURT:  Hey, not quite so fast, Ms. Patrizia.

9                          EXAMINATION

10  BY MS. PENG:

11  Q    No worries.  So I know that it's like a hard -- it's a

12  huge imposition to serve on a jury.  I thought I heard you say

13  earlier that there might be some arrangements and you would

14  have to like figure them out.  Is that true?

15  A    I mean, really honestly thinking about it, there's really

16  no one else that can consistently pick her up.  I answered in a

17  way that like I would want that to be a fact.  I would hope

18  that I could do that.  But thinking about it more, I can't

19  think of anybody that can pick her up consistently for eight

20  days.

21  Q    Got it.  And your husband works, and with his work

22  schedule he can't potentially do a couple of days?

23  A    Right.  He has meetings that have already been scheduled

24  that can't be canceled.

25              MS. PENG:  Thank you.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          THE COURT:  Ms. Patrizia, let me just ask you a

2   couple questions.  You said your father-in-law was an attorney.

3   Is he retired?

4          PROSPECTIVE JUROR:  He's retired now.

5          THE COURT:  Does he have a practice here in

6   Charlottesville?

7          PROSPECTIVE JUROR:  No.  He practiced in Washington

8   D.C. mostly, but --

9          THE COURT:  What type of practice did he have?

10         PROSPECTIVE JUROR:  He was a managing partner at Paul

11  Hastings.

12         THE COURT:  Okay.  So primarily commercial work?

13         PROSPECTIVE JUROR:  I think.

14         THE COURT:  And your husband is still a practicing

15  attorney?

16         PROSPECTIVE JUROR:  He is, yes.

17         THE COURT:  And where does he practice?

18         PROSPECTIVE JUROR:  In Charlottesville.

19         THE COURT:  Okay.  What type of practice does he

20  have?

21         PROSPECTIVE JUROR:  He mostly does estate planning

22  now, some business formation.

23         THE COURT:  Okay.  So he's not a trial attorney?

24         PROSPECTIVE JUROR:  No.  His partners are.

25         THE COURT:  All right.  If you are selected as a

USA v. Jenkins, 3:23cr11, 12/11/2024

1 juror, as much as your lawyer father-in-law and husband may

2 want to ask, you know, you can't have any discussions with them

3 about the nature of the case and the evidence as long as the

4 case is pending.

5          PROSPECTIVE JUROR:  Okay.

6          THE COURT:  And you can follow that?

7          PROSPECTIVE JUROR:  Yes, I understand that.

8          THE COURT:  Okay.  Very well.  Thank you very much.

9          My questions prompt anything further, counsel?

10          MS. PENG:  No, Your Honor.  Thank you.

11          THE COURT:  All right.  Thank you.  Ma'am, please do

12 not discuss what we've discussed here today with your fellow

13 potential jurors.

14          PROSPECTIVE JUROR:  Thank you.

15          THE COURT:  All right.  Kira Memery.

16          All right.  Ms. Memery, thank you, ma'am, for being

17 here.  I'll remind you you're under oath.  If there are any

18 questions that are particularly personal in nature and you wish

19 to take up in private, you can make that request at the

20 appropriate time.

21          PROSPECTIVE JUROR:  Okay.

22          THE COURT:  Thank you very much.

23          All right.  Mr. Andonian?

24          MR. ANDONIAN:  Thank you, Your Honor.

25                         EXAMINATION

USA v. Jenkins, 3:23cr11, 12/11/2024

1   BY MR. ANDONIAN:

2   Q    Good afternoon, Ms. Memery.

3   A    Hi.

4   Q    I just had a few questions based on your responses on the

5   questionnaire.  You indicated that you had been exposed to some

6   news coverage about this case; is that correct?

7   A    Yes, very minimal, though.

8   Q    Can you just tell us a little bit about what that coverage

9   was?

10  A    I think that when I got the letter for jury duty and was

11  reading about it, like I remembered seeing just like some

12  headlines about it.  I don't know that I ever read an article.

13  I just knew -- like it was familiar to me when I saw the case,

14  that I had heard about it or seen something, but --

15  Q    Okay.  I think you also answered on your questionnaire

16  that -- and I'm paraphrasing, not purporting to quote -- but

17  that it was a -- you know, a shame that an elected official,

18  you know, kind of engaged in the conduct that was alleged and

19  that you might have formed an opinion that he was probably

20  guilty?

21  A    I -- yes.  So -- well, first of all, I did -- I filled out

22  my form, e-mailed it, mailed it, but then this morning they

23  didn't have it, so I was like rushing through.  So I might have

24  to elaborate on things.  So yeah, I think -- I think I've just

25  been in a general state of like of about lots of things about

USA v. Jenkins, 3:23cr11, 12/11/2024

1   humanity lately.  And so like when I see stuff like that, I

2   think -- if I'm being very honest -- my first impression is

3   like, darn, like, you know, we've got these people that are

4   leaders, and you know, and this is another thing coming up

5   where somebody didn't act in integrity.  So yes, I mean, if I'm

6   being very honest, that is my first impression when I see a

7   headline like that, is like, shoot, here we are again with some

8   other bad news about somebody that was supposed to be in a

9   position to do good things, you know, so -- for what it's

10  worth, yeah.

11  Q    That's helpful.  I appreciate that.  Do you think that

12  your views or your feelings that you just described would make

13  it hard for you to be fair and impartial if you were selected?

14  A    I mean, I think not necessarily just that.  I don't know.

15  I thought about that a lot.  I do think that it's hard for me

16  to get to a place of being like very neutral, especially just

17  the very little bit I know about the case.  I feel pretty

18  strongly about like safe gun ownership and, you know, the need

19  for some reform there.  So just knowing that that's like a

20  small part from what I do know, I do think that that -- you

21  know, I have formed opinions and probably feel strongly about

22  those things where it would be challenging for me to like put

23  all of that aside and be completely open-minded.

24  Q    Okay.  And you think it would be -- it sounds like it

25  might be challenging to put that aside, even if you were

USA v. Jenkins, 3:23cr11, 12/11/2024

1  instructed by the judge that you were to consider only the

2  evidence, or follow the law as he provides it to you; is that

3  fair to say?

4  A    I mean, I would do my best, and I understand the

5  importance of doing that.  So yeah, I would do my very best to

6  do that.

7  Q    Do you -- so -- and I know this is -- I'm kind of prying

8  into, you know, deep feelings, and it's maybe hard to answer,

9  but you sound somewhat hesitant.  Do you think it would be

10  likely that you could put those feelings aside and be fair and

11  impartial?  Do you think it's somewhat likely?  Do you --

12  A    Yeah, I think it's likely, but you know, there are certain

13  things that I feel pretty strongly about that I would like

14  worry that I wouldn't be able to completely abandon those

15  things.  So yes, I think it's likely.  I don't know that I'm

16  the best, like, option.  I don't know that -- yeah, I'm not --

17  Q    Okay.  Do you -- and I guess just to fully close the loop,

18  as you sit here today, do you think Mr. Jenkins, in fact, did

19  what the government is alleging that he did?  Have you formed

20  an opinion, kind of that ultimate opinion?

21  A    Oh, no.  I mean, I have no idea.

22        MR. ANDONIAN:  Okay.  I think that's all I have.

23  Thank you very much.

24        THE COURT:  Thank you very much.

25        Ms. Peng?

USA v. Jenkins, 3:23cr11, 12/11/2024

1                                EXAMINATION

2    BY MS. PENG:

3    Q    Hi, how are you doing?

4    A    Good, thanks.

5    Q    So just to follow up on the last thread, so you don't have

6    any opinion, sitting here today, about Mr. Jenkins's guilt or

7    innocence; is that what you said?

8    A    No.

9    Q    Okay.  And so you understand the judge will instruct you

10   that all defendants are presumed innocent until the government

11   can prove with evidence in the courtroom that he's guilty

12   beyond a reasonable doubt.  And is that something you can

13   follow?

14   A    Yes.

15   Q    And so -- and I also -- I think you -- I heard you say

16   that -- you know, I appreciate your candor about all of the

17   things that you are thinking about, but you are likely able to

18   at least keep an open mind with respect to evidence presented

19   in this courtroom, you know, irregardless of your opinions

20   regarding other issues that may not be at issue in this case?

21   A    Yes.

22            MS. PENG:  Okay.  Thank you.

23            THE COURT:  Let me ask you a couple questions,

24   Ms. Memery.  First of all, I appreciate you being here and

25   staying with us throughout the day.

USA v. Jenkins, 3:23cr11, 12/11/2024

1            The way I sometimes will put the question for those

2    that are sworn in to be jurors to well and truly try the case

3    based upon the evidence that comes in and the instructions is

4    that -- can you set aside some of your views regarding

5    larger -- larger issues, gun ownership, or gun reform -- one

6    way or the other, and make a decision based solely upon the law

7    and the evidence in this particular case?

8            PROSPECTIVE JUROR:  I -- I think so.

9            THE COURT:  And one way to look at that is this:  Is

10   that as I indicated to you, the defendant has no burden of

11   proof in this case.  And you can't consider if the defendant

12   chooses to remain silent or not.  The government has the burden

13   of proof in the case.  Do you understand that?

14           PROSPECTIVE JUROR:  Yes, sir.

15           THE COURT:  And so the question that would be put to

16   you is that if the government doesn't prove its case, can you

17   return a verdict in favor of the defendant, even if you don't

18   like the actions that you believe the defendant engaged in?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  You can?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Okay.  All right.  Thank you very much.

23           Mr. Andonian, any further questions?

24           MR. ANDONIAN:  No, Your Honor.

25           THE COURT:  Ms. Peng?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MS. PENG:  No.  Thank you.

2          THE COURT:  All right.  Thank you.  And Ms. Memery,

3  please don't discuss what we've discussed here today with your

4  fellow potential jurors.

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Thank you very much.

7          All right.  Marsha Peterson.

8          MR. ANDONIAN:  Your Honor, I actually think we can

9  skip Ms. Peterson.

10          THE COURT:  Ms. Peterson?  All right.  Mr. Galleo,

11  let's bring in Brandon Bilyard.

12          Mr. Bilyard, come on up, if you would, please, sir.

13          All right.  Mr. Bilyard, first of all, thank you very

14  much for being here.  I will remind you you're under oath from

15  this morning, and that if there are any particularly personal

16  questions that are asked of you that you may wish to take up in

17  private, you can make that request at the appropriate time.

18          All right.  Mr. Andonian?

19          MR. ANDONIAN:  Thank you.

20                              EXAMINATION

21  BY MR. ANDONIAN:

22  Q   Good afternoon, Mr. Bilyard.  I just had a question.  I

23  understand after filling out your questionnaire there was some

24  information that you wanted to supplement regarding a new job

25  and caretaking responsibilities that you have.  If you could

USA v. Jenkins, 3:23cr11, 12/11/2024

1  just talk to us about those?

2  A    I help take care of my special needs brother, and I just

3  started a new security job -- well, I started training for it,

4  but I officially start it next week.

5  Q    Okay.  Would sitting -- if you were to be selected for

6  this jury that's -- for the trial that's expected to go up

7  until potentially next Friday, would either your -- the

8  caregiving you provide to your brother or the new job, would

9  that -- would the trial pose a problem for you?

10 A    It would create a hardship for me, yeah.

11 Q    Okay.  And would that be on both fronts?

12 A    More so the job than the caretaking part, because I help

13 my dad take care of him.

14 Q    Okay.  And the job would be -- would the trial interfere

15 with like your new work hours, or would it just be -- you know,

16 I guess I'll just ask that question?

17 A    Yeah, because I work during the day.

18 Q    And in terms of helping your dad take care of your

19 brother, is that something that, if you -- putting the job

20 aside for a second, if you were to be seated on this jury,

21 would there be a hardship, given that you would be unavailable

22 for, you know, a big chunk of the day?  Would that

23 independently cause a hardship?

24 A    Taking care of him?

25 Q    Yeah, in terms of taking care -- I guess it would leave

USA v. Jenkins, 3:23cr11, 12/11/2024

1  your dad by himself for the majority of the day?

2  A    Yeah.  I help take him to appointments and just make sure

3  he's doing okay most of the time.  But yeah, it would leave him

4  alone.

5  Q    Okay.  And would that create a hard -- I mean, for you,

6  would that create a hardship?  Would you be worried about --

7  A    Yeah.

8        MR. ANDONIAN:  Okay.  Thank you very much.  I don't

9  have anything else.

10        THE COURT:  Ms. Peng?

11                    EXAMINATION

12  BY MS. PENG:

13  Q    Just one question.  I think on your questionnaire you had

14  indicated that you have a somewhat unfavorable view of the DOJ

15  and of the defense; is that right?

16  A    I mean, I don't really have an opinion on it.

17  Q    So do you have an opinion on either side one way or the

18  other?

19  A    No.

20  Q    Do you remember filling out that you thought you were

21  somewhat unfavorably inclined?

22  A    (No verbal response).

23        THE COURT:  You're shaking your head no.

24  BY MS. PENG:

25  Q    Oh, I'm sorry.  You have to say yes or no.

USA v. Jenkins, 3:23cr11, 12/11/2024

1   A    I'm sorry.  No.

2               MS. PENG:  No?

3               Okay.  Thank you.

4               THE COURT:  Mr. Bilyard, let me just ask you a real

5   quick question here.  You're starting a new job.  You

6   indicated you -- do you have to go through a training program

7   for that?

8               PROSPECTIVE JUROR:  Yes.

9               THE COURT:  All right.  Is that -- and the training

10  program starts next week?

11              PROSPECTIVE JUROR:  No.  I've already started it.

12  I'm missing today for this.

13              THE COURT:  Okay.  So is it just one day of training?

14              PROSPECTIVE JUROR:  It's a week.

15              THE COURT:  A week-long training?  All right.  If you

16  don't go through the training program, are you pushed back for

17  when you can start the job at another time, or would you be

18  able to pick up and go forward?

19              PROSPECTIVE JUROR:  No, I have to finish training

20  before I start the actual job.

21              THE COURT:  Is the training only offered at certain

22  times, or --

23              PROSPECTIVE JUROR:  Yeah, I think they only do it

24  during certain times of the month.

25              THE COURT:  Okay.  When would be the next training

USA v. Jenkins, 3:23cr11, 12/11/2024

1  that's available?

2          PROSPECTIVE JUROR:  Monday, because I'm on this

3  today, so they're making an exception for Monday.

4          THE COURT:  Okay.  But if you're on the jury, you'll

5  be here next week.  When would be the next training available

6  after that?

7          PROSPECTIVE JUROR:  I would have to look it up.  I

8  don't -- I'm not sure.

9          THE COURT:  Okay.  Likely after Christmas, I presume?

10          PROSPECTIVE JUROR:  Probably.

11          THE COURT:  Maybe after the first of the year?

12          PROSPECTIVE JUROR:  Uh-huh.

13          THE COURT:  Okay.  All right.  Thank you.

14          Prompt any further questions, Mr. Andonian, Ms. Peng?

15          MR. ANDONIAN:  No.

16          MS. PENG:  No.

17          THE COURT:  All right.  Thank you.

18          Thank you, Mr. Bilyard.  Please do not discuss our

19  conversation here today with your potential fellow jurors.

20          All right.  Karson Byers.

21          Counsel, my thought is that we take a break after we

22  get through this group of three, and make sure we've finished

23  all of our individual voir dires, and then we'll figure out

24  where we are.

25          Mr. Byers, come on up, if you would, please.

USA v. Jenkins, 3:23cr11, 12/11/2024

1           All right.  Mr. Byers, as you have a seat, first of

2    all, thank you very much for being here.  I will remind you

3    you're under oath from earlier this morning.  If you're asked

4    any potentially personal questions -- or particularly personal

5    questions that you want to take up in private, you can make

6    that request at the appropriate time.  Thank you.

7           Mr. Andonian?

8           MR. ANDONIAN:  Thank you.

9                         EXAMINATION

10   BY MR. ANDONIAN:

11   Q    Good afternoon, Mr. Byers.  I had a question about an

12   answer you gave on your questionnaire.  And if I have this

13   wrong, please feel free to correct me.  But I believe you

14   indicated that you would be more likely to credit a witness who

15   had been convicted previously of a crime.  Can you just tell us

16   a little bit about that answer?

17   A    I feel like most people more likely would learn from I

18   guess mistakes than most, but obviously there's still some that

19   don't.  But I feel like more people are going to learn and be

20   more honest.

21   Q    Okay.  So the fact that they had been convicted of

22   something makes it more likely that they would have learned

23   from their mistakes and that this time around they're being

24   truthful?

25   A    Yeah, in my opinion.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MR. ANDONIAN:  Okay.  Thank you.  That's all I have.

2          THE COURT:  All right.  Ms. Peng?

3          MS. PENG:  Just one question.

4                        EXAMINATION

5   BY MS. PENG:

6   Q    I think you indicated on your questionnaire that you have

7   no issues with a law enforcement officer being prosecuted if

8   there's a proper and thorough investigation.  Do I have that

9   right?

10  A    That's correct.

11  Q    Can you just tell me what you mean by -- in your mind -- a

12  thorough and proper investigation?

13  A    Just treating them like anyone else really, just properly

14  go through -- just pretend like they're not even a cop, they're

15  just someone normal.

16          MS. PENG:  Understood.  Thank you.

17          THE COURT:  All right.  Thank you very much.

18  Mr. Byers, you may step down.  Please do not discuss your

19  conversation here with your potential fellow jurors.

20          Mary Reed.

21          All right.  Ms. Reed, thank you very much for being

22  here.  I'll remind you you're under oath from earlier this

23  morning.  And if you're asked any questions that are

24  particularly personal that you'd like to take up in private,

25  you can make that request at the appropriate time.  Thank you

USA v. Jenkins, 3:23cr11, 12/11/2024

1  very much.

2          Mr. Andonian?

3          MR. ANDONIAN:  Thank you, Your Honor.

4                         EXAMINATION

5   BY MR. ANDONIAN:

6  Q    Good afternoon, Ms. Reed.

7  A    Good afternoon.

8  Q    Ms. Reed, I have a few questions for you about the answers

9  you gave on your questionnaire.

10  A    Sure.

11  Q    Let me just start with the one -- you indicated that you

12  voted for the new Culpeper County sheriff because you felt that

13  there needed to be some change.  Can you just talk to us a

14  little bit about that, specifically what?

15  A    Sure.  Well, very honestly, I believe in term limits,

16  period.  I'd love to see them all over the country.  So

17  frankly, I feel when someone is in office for an extended

18  period of time -- and I happen to know one of the people

19  Sheriff Jenkins was running against from his work in the town,

20  and I had a lot of respect for, and I figured this might be a

21  good change.

22  Q    Okay.  Did you have any negative feelings --

23  A    No.

24  Q    -- about Mr. Jenkins?

25  A    No.

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Q    Okay.  So it was just you felt --

2  A    I believe in term limits.

3  Q    Time enough.  Okay.  Gotcha.  Gotcha.

4       I think you indicated that you had been exposed to some

5  press coverage about this case or the allegations in this case?

6  A    Sure.

7  Q    Can you just tell us what that -- what you heard?

8  A    Sure.  I get an e-mail edition of the Culpeper

9  Star-Exponent, and I read there I think for the first time

10 about these charges, and I read the article, put it aside, and

11 didn't think too much more about it.

12 Q    Did anything about what you read in that article give you

13 any negative impression or negative feelings about Mr. Jenkins?

14 A    Oh, not particularly.  I have lived long enough to know

15 that I don't believe everything I read in the paper.

16 Q    Okay.  Do you have any concerns about your ability to be

17 fair and impartial if you were to be selected?

18 A    No.  I have no problems.

19        MR. ANDONIAN:  That's all I have.  Thank you.

20        THE COURT:  Thank you, Mr. Andonian.

21        Ms. Peng?

22                     EXAMINATION

23  BY MS. PENG:

24 Q    Yes.  Hi.  How are you?

25       I think you indicated in your questionnaire that you have

USA v. Jenkins, 3:23cr11, 12/11/2024

1  been a juror on a prior case back in the '90s?

2  A    Uh-huh.

3  Q    Can you tell us a little bit about what that experience

4  was like?

5  A    I think it was the '90s.

6  Q    Okay.

7  A    I was living in Montgomery County.  I've been on two --

8  well, I never was selected on the second one for lots of

9  reasons.  But I was living in Montgomery County, Maryland.  I

10  was summoned and selected to be on a jury to hear a charge --

11  and I don't know if it was civil or criminal, I have to -- it's

12  not a detail I recall -- of a young man accused of stabbing

13  another young man outside of a restaurant, bar, etc.  And it

14  was essentially two gangs who got into a feud, and this one

15  young man was accused of stabbing another young man.  He was

16  injured, but it was not fatal.  And it seemed to be, based on

17  all the evidence that came out, it seemed to be a brawl.  And

18  it was not clear to me or the other jurors who stabbed who.

19  And he was acquitted based on that, because it was truly a

20  gang, two gangs.  And when you're in the middle of a gang riot,

21  it is hard to know who threw the first punch.

22  Q    That's remarkable memory for a case --

23  A    Well, I nicknamed it the thugs versus the hooligans or

24  something in my own personal --

25  Q    Understood.  Would you say that serving on that jury was a

USA v. Jenkins, 3:23cr11, 12/11/2024

1  positive or a negative experience?

2  A    It was generally positive.  I learned a lot about the jury

3  process.  Learned it requires a great deal of patience.

4  Q    Well, thank you for that in advance.

5           THE COURT:  As you have learned today.

6           PROSPECTIVE JUROR:  I also was asked to be on a jury

7  in Las Vegas, Nevada where I was -- when I was there working.

8  I don't think I mentioned this because I was not selected, but

9  it was going to be a very long, involved federal case.  And it

10 was the middle of a merger of two power companies, and I

11 happened to be the merger chairman -- or person.  And my CEO

12 asked for permission for me not to be there.  So I was excused

13 based on my job duties at the time.

14  BY MS. PENG:

15 Q    And those are your two experiences?

16 A    Yes.

17           MS. PENG:  Okay.  Thanks very much.

18           THE COURT:  All right.  Thank you very much,

19 Ms. Reed.  Please do not discuss what we've discussed here

20 today with your fellow potential jurors.

21           PROSPECTIVE JUROR:  Okay.

22           THE COURT:  All right.  Susan Thomas.

23           Come on up, Ms. Thomas.

24           Thank you very much for being here, Ms. Thomas.  I'll

25 remind you you're under oath.  If there are any particular

USA v. Jenkins, 3:23cr11, 12/11/2024

1    questions that are asked that are particularly personal in

2    nature that you may ask to take those up in private if you wish

3    to do so.

4            All right.  With that, Mr. Andonian?

5            MR. ANDONIAN:  Thank you.

6                         EXAMINATION

7     BY MR. ANDONIAN:

8    Q    Good afternoon, ma'am.

9    A    Hello.

10   Q    I just have one question about your potential exposure to

11   information about this case through the media.  Have you read

12   any articles or anything?

13   A    (No verbal response).

14   Q    Okay.  Was it just -- you just saw a headline?

15   A    I must have -- well, almost entirely my news exposure is

16   from places on -- that I look at on my phone, and I flip

17   through the different headlines and read articles that interest

18   me.  I didn't read about this case because I don't live in that

19   county, and so it was -- it didn't particularly interest me, so

20   I haven't read anything.

21   Q    Okay.  And so you don't have any views of Mr. Jenkins?

22   A    No, sir.

23            MR. ANDONIAN:  Okay.  Thank you.  That was all I had.

24            THE COURT:  Ms. Peng?

25            MS. PENG:  No.  Thank you.

USA v. Jenkins, 3:23cr11, 12/11/2024

1        THE COURT:  Thank you, Ms. Thomas.  Please do not

2   discuss what we discussed here today with your potential fellow

3   jurors.

4        And Elizabeth Bailey.

5        Ms. Bailey, thank you very much for being here and

6   for your patience today.  I will remind you you are under oath.

7   And if you are asked any questions that are particularly

8   personal in nature that you wish to take up in private, you can

9   make that request at the appropriate time.

10        PROSPECTIVE JUROR:  Okay.

11        MR. ANDONIAN:  Thank you, Your Honor.

12                        EXAMINATION

13   BY MR. ANDONIAN:

14   Q    Good afternoon, Ms. Bailey.

15   A    Good afternoon.

16   Q    Just a couple of questions based on answers that you gave

17   either earlier this morning or from your questionnaire.  And

18   I'll just start with your brother-in-law, who died under

19   sheriff's custody a handful of years ago.  And I'm sorry to

20   hear about that.

21        Was that experience -- did that experience in any way

22   shape or form opinions that you have about sheriff's offices

23   generally?  I guess I'll start there, and then I'll work my way

24   more specific.

25   A    No, I wouldn't say generally.  Specifically for in

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Fitzgerald, Georgia, yes.

2  Q    Okay.  Does that experience in any way influence how you

3  feel about the Culpeper County sheriff's office here in

4  Virginia?

5  A    Honestly, it's isolated specifically to the locality that

6  he was in.

7  Q    Okay.  You also indicated on your questionnaire that you

8  had a very favorable view of the Department of Justice and the

9  FBI, and a somewhat favorable view of criminal defense

10  attorneys.  Can you just talk us through that a little bit?

11  A    Aren't I like everyone else?  Come on.

12  Q    Right.  Right.

13  A    No, I mean, I -- well, I'm a retired federal employee.  I

14  have a high esteem for federal employees in general.  I tend to

15  feel like most federal employees strive hard to do a good job.

16  And I think just in general, I think it's -- you know, I'm not

17  unique in thinking that there are a lot of lawyers who are out

18  to make a lot of money.  And, you know, they -- generally

19  speaking -- I mean, not just from my perspective, but I mean,

20  it's just a joke that, you know, lawyers, you know, are

21  considered not trustworthy people.  I mean, if you're -- you

22  know, they're right there with used car salesmen.  No offense

23  to all of you all.

24        MS. PENG:  None taken.

25        MR. ANDONIAN:  None taken.

USA v. Jenkins, 3:23cr11, 12/11/2024

1           PROSPECTIVE JUROR:  You know what I'm saying.  So

2    it's hard to not generalize.  Do I know, you know, esteemed

3    lawyers who are, you know, very upstanding citizens?  Most

4    certainly.  Anyone can be.  You can have slimy lawyers too.  So

5    I mean, there's just -- there's the gamut.  It's just kind --

6    it's more of a generalization than it is I have a specific

7    angst against some particular type of attorney or attorneys in

8    general, if that makes sense.

9    BY MR. ANDONIAN:

10   Q    Appreciate that.  That does.  And I guess just to close

11   the loop on that, is there anything about your views about the

12   DOJ and the FBI on the one hand, and lawyers I guess more

13   broadly speaking on the other, that would make it hard for you

14   to be fair and impartial in this case, given that you've got

15   the Department of Justice on the one hand, and you've got a

16   couple of lawyers on the other --

17   A    Slimy lawyers -- just kidding.

18   Q    Right.

19   A    No.  No.  Certainly not, no.

20

21           MR. ANDONIAN:  That's all I have.  Thank you very

22   much, ma'am.

23           THE COURT:  Thank you, Mr. Andonian.

24           Ms. Peng?

25           MS. PENG:  No questions.  Thank you.

USA v. Jenkins, 3:23cr11, 12/11/2024

1        THE COURT:  Thank you very much, Ms. Bailey.  You may

2   step down.  Please do not discuss what we discussed here with

3   your potential fellow jurors.

4        Mr. Andonian, does that now exhaust your list?

5        MR. ANDONIAN:  Yes, Your Honor.

6        THE COURT:  I think we've exhausted everybody.  So

7   first of all, I know Ms. Dill was one of the people that you

8   all had agreed could be excused.  We are hitting her witching

9   hour, which was 4 o'clock.  I'd like the CSOs to be able to

10  pull her quietly aside and allow her to leave.  The reason I

11  ask her to be pulled quietly aside is if it looks like I

12  excused one person in front of everybody else, they're going to

13  want to know what else has happened.

14       So any objection to that, Ms. Peng?  Mr. Andonian?

15       MS. PENG:  No objection, Your Honor.  And there is

16  another juror I think who falls into that night vision category

17  as well, Ms. Chisholm.  So perhaps she could be included.

18       THE COURT:  And Ms. Chisholm was on you all's agreed

19  list as well?

20       MS. PENG:  Yes.

21       THE COURT:  So Ms. Dill and Ms. Chisholm, Mr. Galleo,

22  if you all can just pull them quietly aside and tell them that

23  they would be free to go.

24       So what my thought is -- I know we have to take up

25  strikes for cause -- you all need to collect your thoughts.

USA v. Jenkins, 3:23cr11, 12/11/2024

1   You may be able to agree upon which ones you have or not.  I do

2   want to get the jury back in here as quickly as possible so we

3   can do peremptory.  I don't think we're going to get openings

4   done today.  It would be my guess by the time we bring the

5   jury -- by the time we go through strikes for cause -- they can

6   just come right on through.

7              (Prospective jurors enter the courtroom.)

8              THE COURT:  Ms. Dill and Ms. Chisholm, you all come

9   on up, if you would, please.  If I could get you all both just

10  to stand there.  First of all, thank you all both for being

11  here.  I know it's been a long day for you and I appreciate

12  your patience.  We also understand that we're hitting the

13  witching hour for you all with respect to driving.  Just so

14  that you all will know and you can complete the circle, you've

15  been excused from jury service.  So you're not going to be

16  selected for this particular jury.  We're going to get our jury

17  selected today, but I didn't want to make that announcement in

18  front of everyone else because they're going to want to know

19  why they can't go.  We brought you in here because we know you

20  have to get on the road before the weather and the light gets

21  to be too bad for you.  But thank you very much.  You've served

22  an incredibly important role.  Thank you very much.

23             (Prospective jurors left the courtroom.)

24             Do you all need any more than ten minutes?  Can we

25  come back at 4:10.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MS. PENG:  For for-cause challenges, Your Honor?

2          THE COURT:  Four our for-cause challenges and then

3   we're going to go straight into peremptories.  We'll bring the

4   jury back in for the peremptories, because once we have the

5   peremptories I'm going to select them, release everyone else.

6   And then I'll swear the jury, give them their preliminary

7   instructions.  We'll see where that time is, but by the time

8   they take a break or whatever -- how long would you anticipate

9   your opening being?

10         MS. SMITH:  My opening is 20 minutes, Your Honor.

11         THE COURT:  Mr. Andonian, Mr. Caleb?

12         MR. CALEB:  Shorter than that.

13         THE COURT:  We'll see where we are.  I mean, if we

14  can do an opening and still be done by 5:30, fantastic.  If

15  not, this may let you be able to get to your meeting or at

16  least come in late.

17         MR. CALEB:  I canceled it.

18         THE COURT:  Well, I appreciate that.  Let's take a

19  break until 4:10 and then we'll go through the for-cause

20  challenges.

21         (Recess.)

22         THE COURT:  All right.  So let me -- first of all,

23  we're back on the record in the matter of *United States versus*

24  *Jenkins.*  The government is present by its counsel.  The

25  defendant likewise is present, along with the benefit of

USA v. Jenkins, 3:23cr11, 12/11/2024

1    counsel.

2              Prior to the individual questioning of the proposed

3    jurors, the parties agreed to the for-cause strikes of the

4    following, and so I will grant those motions:  Charmaine Dill,

5    Tessa Chisholm, Ana Bowler, Dawn Brunk, Patrick Betz, Jeffrey

6    Ford and Richard Harris.  So we will strike those as well, and

7    they will come off of our random list which I've got here

8    somewhere.

9         Ms. Peng, any other for-cause challenges as it

10   relates to the potential venire?

11        MS. PENG:  Yes, Your Honor.  We have three additional

12   ones that both parties have agreed upon.

13        THE COURT:  Okay.

14        MS. PENG:  So that's Powell, Bilyard and Jeffrey

15   Blauvelt.

16        THE COURT:  So Jeffrey Blauvelt and then Brandon

17   Bilyard and Carolyn Powell.  So I will grant those as well.  So

18   they will come off as well.

19        Any other for-cause challenges?

20        MS. PENG:  Yes.  For the government, Frank Krick.

21   This is the gentleman who indicated that he would have to take

22   long naps during the day, and that during the course of the

23   trial he foresees having to do that.  So I think for that

24   reason he should be a hardship excuse.

25        THE COURT:  Mr. Andonian?

USA v. Jenkins, 3:23cr11, 12/11/2024

1          MR. ANDONIAN:  No objection.

2          THE COURT:  No objection.  All right.  I'll grant

3  Frank Krick.

4          MS. PENG:  We have a for-cause challenge on behalf of

5  Jo Gilmore on the basis she can't be fair and impartial.  This

6  is the individual who voted for Jenkins after allegations of

7  him came out.  Upon questioning, she indicated that she would

8  have a difficult time setting her beliefs aside.  In fact, she

9  did not believe that she should sit on the jury if she was the

10  government.  She indicated she wasn't sure which agents could

11  be trusted.  Although ultimately when pressed she did say she

12  could be fair and impartial, I think her level of distrust of

13  both the FBI and the prosecution team warrants a for-cause

14  dismissal.

15          THE COURT:  All right.  Mr. Andonian?

16          MR. ANDONIAN:  Your Honor, I think there was

17  certainly some back and forth with her about her views about

18  the FBI, but both I and Your Honor asked her if she could be

19  fair, if she could follow -- most importantly, follow the

20  Court's instructions, which would include considering only the

21  evidence in the case and not, you know, injecting personal

22  views about the matter.  And so although she certainly has

23  opinions, there are plenty of other people that have opinions

24  that we haven't struck for cause.  And the most important

25  metric that the Court has been going off of has been:  Can they

USA v. Jenkins, 3:23cr11, 12/11/2024

1   be fair and impartial and follow the Court's instructions?

2   Again, she answered multiple times yes to those questions.  So

3   we would oppose.

4           THE COURT:  All right.  So as it relates to

5   Ms. Gilmore, first of all, just so that we have the standard on

6   the record -- l won't repeat it each time -- the general rule

7   is that actual bias or disqualification must be demonstrated

8   before removing a juror for cause.  Relevant inquiry is whether

9   the juror can be fair and impartial in deciding the case based

10  upon the facts and the law presented.  I'll refer to *Person*

11  *versus Miller,* which is 854 F.2d 656, and then *United States*

12  *versus Cabrera-Beltran,* 660 F.3d 742, which is a Fourth Circuit

13  2011 case.  The other is a Fourth Circuit 1998 case.

14          Ms. Gilmore indicated that she did not trust the FBI,

15  believed that the FBI had spied on the Catholic church in

16  Richmond.  She voted for Mr. Jenkins.  The fact that she did

17  that to me is one way or the other.  Believed he would be a

18  good sheriff.  You know, she was -- it is close with respect to

19  her because she clearly likes Mr. Jenkins, but I put the

20  question to her if the government proves its case, can she find

21  him guilty, and she said that she could, indicating that I

22  think that she can make a decision based upon the law presented

23  and the facts in this case.  So I'm going to deny the

24  government's motion as it relates to Ms. Gilmore.

25          MS. PENG:  The next one for the government is Amanda

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Long.  This is the individual who has substantial connections

2  and personal relationships with multiple individuals who are

3  current or former employees of Culpeper County, which is the

4  entity that's very much going to be at issue in this case.  You

5  know, several individuals were interviewed in connection with

6  the investigation.  One -- two people were on the government --

7  well, she's friends with Judge Durrer's wife; Valerie Lamb is

8  involved in this case; David Jenkins and Ortiz was, in fact --

9          THE COURT:  She's like the mayor of Culpeper.  She

10  knows everybody.

11          MS. PENG:  And again, it's a matter of degree I think

12  in these situations.  She did indicate she could try to put all

13  that aside, but her level of connection with all of these

14  involved parties the government believes is -- does warrant her

15  to be excused from sitting in this particular case.

16          THE COURT:  Mr. Andonian?

17          MR. ANDONIAN:  Your Honor, I think it's the same

18  concept.  Yes, she knows a lot of people.  She's the mayor of

19  Culpeper.  But she was very clear that even despite some

20  personal discomfort with being involved in this case given the

21  people that she knows, that she could still be fair and

22  impartial.  She could follow the Court's instructions.  We're

23  talking about a small town.  It's going to be hard to eradicate

24  familiarity with people, even if it's a lot of people.  Again,

25  the metric that matters is:  Can she be fair and impartial?

USA v. Jenkins, 3:23cr11, 12/11/2024

1  Can she decide the case on the facts that are presented here?

2  And she said yes.

3        THE COURT:  Well, one of the risks that you always

4  have with anyone who has been an elected official, been in the

5  news, is that many people know them.  Someone who works in the

6  government is going to know many different people.  And

7  certainly Ms. Long fits into that category.  But she was -- you

8  know, she was quite candid.  She could be unbiased and it would

9  not influence her decision, the fact that she knows all these

10  folks.  And so I think she was rehabilitated, and I'm going to

11  overrule the government's motion as it relates to Ms. Long.

12        MS. PENG:  Our next person is Kimberley McDaniel.  I

13  think our concern is, you know, she openly admitted that she

14  made misrepresentations on her jury questionnaire in order to

15  get out of jury service.  So we have serious concerns that

16  she's going to be able to follow the Court's instructions.

17  Just the very fact that she gave untruthful information, as she

18  admitted to you, I think warrants her to be excused from this

19  jury.

20        THE COURT:  Mr. Andonian?

21        MR. ANDONIAN:  I mean, Your Honor, I understand that

22  position.  She was forthcoming about it.  She -- I mean, not

23  everybody -- I mean, I think many people would like to not be

24  on jury duty and many people potentially come up with reasons

25  to try to get out.  She at least owned up to it.  But she

USA v. Jenkins, 3:23cr11, 12/11/2024

1   otherwise answered questions about -- she said the case is

2   based on the facts.  What's right is right and wrong is wrong.

3   She certainly could follow the Court's instructions.  You know,

4   I guess I wouldn't reward her efforts to shirk jury duty and

5   instead credit her answers to the questions -- again, the

6   questions matter.

7           THE COURT:  Well, as it relates to Ms. McDaniel.  I

8   read her questionnaire, and I know Ms. Peng made a motion -- or

9   mentioned her earlier today.  I came in inclined to think that

10  she probably is a for-cause strike.  As I listened to her, I

11  thought maybe not.  And then she was candid that despite the

12  fact that she provided answers on her questionnaire under

13  penalty of perjury, that she admittedly said things that are

14  not true and that are completely contrary to what she said here

15  today.  And so I've got questions as to whether she is truly

16  impartial in that regard.  And so I'm going to grant the

17  government's motion as it relates to Ms. McDaniel and I'll

18  strike her for cause.

19          MS. PENG:  The next one is Timothy Falls.  This is

20  the gentleman who had I think a significant series of health

21  issues.  He mentioned on his questionnaire that he would need

22  frequent bathroom breaks, and he has had a long history of

23  association with Mr. Jenkins.

24          THE COURT:  He has the bionic back.

25          MS. PENG:  Right.  So I think based on the -- and,

USA v. Jenkins, 3:23cr11, 12/11/2024

1    you know, I think we were able to observe that he has some

2    difficulty with movement even in the courtroom today.  So we

3    would excuse him on the basis of hardship.

4             THE COURT:  Mr. Andonian?

5             MR. CALEB:  Court's indulgence.

6             THE COURT:  I'm sorry, Mr. Caleb.

7             MR. ANDONIAN:  I guess we have the same position,

8    just not to sound like a broken record.  I mean, he -- you

9    know, he also did say it would be uncomfortable, but he would

10   make it work.  The Court can accommodate his need to take

11   breaks.  And he ultimately said that, you know, he would listen

12   to the evidence and be fair and impartial.  And so --

13            THE COURT:  Well, I think that Mr. Falls -- I thought

14   that the parties may actually agree as a hardship.  But as to

15   cause, I don't think there's grounds to strike him for cause.

16   he does have a long relationship in which he knew Mr. Jenkins,

17   but that's not our standard.  Our standard is can he be fair

18   and impartial, and I believe he answered those questions

19   forthrightly in that regard.  And so I will -- I will overrule

20   the government's motion as it relates to Mr. Falls.

21            MS. PENG:  Just to clarify, Your Honor is overruling

22   the motion on the hardship grounds also, because that's the

23   basis of our --

24            THE COURT:  Yes.  Yes.

25            MS. PENG:  Thank you.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          The last person we have is Chris Stapler.  This is

2    the gentlemen who we questioned during the open voir dire.  He

3    said he was unemployed, his spouse is unemployed, and that it

4    would pose a significant hardship for him to serve on the jury.

5          THE COURT:  All right.  Any objection to Mr. Stapler?

6          MR. ANDONIAN:  No, Your Honor.

7          THE COURT:  So I'll grant Mr. Stapler on hardship,

8    agreement of the parties.

9          No others for the government, Ms. Peng?

10         MS. PENG:  That's right.  Thank you.

11         THE COURT:  Mr. Andonian?

12         MR. ANDONIAN:  Yes, Your Honor.  Our first one that

13   we have not already covered is Karina Monroy -- I'm sorry.  I'm

14   just flipping --

15         THE COURT:  Kira Memery?

16         MR. ANDONIAN:  No.  Karina Monroy.

17         THE COURT:  Oh, yeah.  She is -- she's the student.

18         MR. ANDONIAN:  Correct.  So our primary argument is

19   that she's a full-time graduate student at George Washington,

20   she works 30-plus hours a week, and she's in the middle of

21   finals.  She has she said multiple final papers and art

22   projects that are due this week.  She said the trial pushing

23   into next week would be problematic as well.  So that's reason

24   number one.

25         Reason number 2 is she also talked about how it would

USA v. Jenkins, 3:23cr11, 12/11/2024

1    be -- her bias about law enforcement would come up.  She read

2    some -- or had some exposure to the facts of the case online.

3    She said in her questionnaire she doesn't like Mr. Jenkins's

4    politics.  She's very critical elected officials.  I mean,

5    again, it would be hard for her to be fair and impartial.  But

6    to be clear, it's both that and the fact that she's a full-time

7    student.

8            THE COURT:  Right.  Ms. Peng, if she had sent in a

9    request to be excused, I would have granted it on the student

10   basis, but she didn't, because I think I excused some other

11   students who were in the middle of finals.

12           MS. PENG:  Fair enough, Your Honor, although I would

13   point out that she did answer that she could find coverage for

14   her work.  So if that's the case, it's essentially she's

15   substituting the 30 hours that she would have worked for jury

16   duty.  So the rest of the time could be made up with the papers

17   and so forth that she's in.  She's not actively in the middle

18   of classes.  So I don't think she qualifies for a hardship

19   excuse.  And on the other basis, she said she had no trouble

20   being fair and impartial.

21           THE COURT:  Well, again, on the for cause -- and she

22   didn't seek a hardship basis in many respects.  So on the for

23   cause, she indicated that she can be fair, can be impartial.

24   So on that basis I'm going to overrule the defendant's

25   objection.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          Anything else, Mr. Andonian?

2          MR. ANDONIAN:  Yes, Your Honor.  Sorry.  Brief

3  indulgence.

4          The next we had was Tyler Haislip.

5          THE COURT:  Yes.

6          MR. ANDONIAN:  You know, she did -- this is the

7  individual with ADHD.  I know she talked about ways that she

8  could cope with it, but when I asked her if it would be

9  difficult given the length of time that we're going to be

10 spending each day and the length of the case, she seemed pretty

11 resolute that it was going to be very challenging for her.  If

12 the solution is we take lots of breaks, she's able to get up

13 and move around, that starts working to the detriment of our

14 timing, other jurors potentially.  And so on that basis, we

15 would ask that she be excused for cause.

16         THE COURT:  Ms. Peng?

17         MS. PENG:  Your Honor, you know, she's been dealing

18 with this condition for a number of years.  She has a fairly

19 demanding job, it seems like, or she's gone through college, as

20 Your Honor asked her.  She's perfectly able to function in her

21 daily life when she's controlled by medication, and certainly

22 we are going to be taking breaks regardless.  And when

23 questioned by Your Honor about whether those particular

24 accommodations would allow her to serve, she answered

25 unequivocally yes.  And so I think she's the best person who is

USA v. Jenkins, 3:23cr11, 12/11/2024

1   the judge of how she's able to serve.

2           THE COURT:  So I think, Ms. Haislip indicated that

3   she does have some tools or tricks that she uses to manage her

4   ADHD with respect to medication.  Certainly she can take it on

5   the appropriate schedule while serving on jury duty.  I believe

6   there's accommodations that the Court frankly is obligated to

7   make available to somebody with a medical condition.  So I will

8   overrule the motion as it relates to Ms. Haislip.

9           MR. ANDONIAN:  Very well, Your Honor.

10          The next person we had was Jaclyn Patrizia.

11  Ms. Patrizia was the one who had mentioned this morning --

12          THE COURT:  She was looking for coverage for her

13  child.

14          MR. ANDONIAN:  For her daughter, and was more certain

15  this afternoon that she was really the only viable option.  So

16  on that basis we would ask she be excused for cause.

17          THE COURT:  Ms. Peng?

18          MS. PENG:  You know, I think this is a close call.

19  At the same time, her husband is an attorney.  This is not

20  someone who is on a single-household income.  Initially she

21  said she could find out about arrangements.  I'm not sure she

22  took steps to find that out.  I would just submit to the Court

23  that, you know, there is impositions made on everyone when they

24  have to serve jury duty.  So I think under all the

25  circumstances, it sounds like she could find alternative

USA v. Jenkins, 3:23cr11, 12/11/2024

1   arrangements from her family members.

2            THE COURT:  All right.  As it relates to Patrizia

3   Ms. Patrizia, I think it falls in -- I think she did send in,

4   if I remember correctly, a hardship request that I denied.  I'm

5   not positive.  But as I stated, and the reason that I start

6   jury selection the way I do, is that it is a civic duty.  And

7   that duty sometimes comes with sacrifices that folks have to

8   make.  So I'm going to overrule the motion as it relates to

9   Ms. Patrizia.

10           MR. ANDONIAN:  The final one we had was Kira Memery.

11           THE COURT:  All right.

12           MR. ANDONIAN:  Your Honor, this is just -- she

13   indicated that she had been exposed to news coverage.  She felt

14   it was another person in power who had done something to

15   violate the public trust, thought Mr. Jenkins was probably

16   guilty.  And despite the questioning that was put to her by the

17   government and Your Honor, it sounded like she was just not

18   going to be able to put her biases aside.  So for that basis,

19   we would challenge her for cause.

20           THE COURT:  Ms. Peng?

21           MS. PENG:  I disagree with that, actually.  I think

22   under questioning Ms. Memery indicated that she very much could

23   keep an open mind.  And she stated on repeated occasions, I

24   believe, that she had no opinion with respect to Mr. Jenkins's

25   innocence or guilt as of this moment, which is precisely what

USA v. Jenkins, 3:23cr11, 12/11/2024

1  we want jurors to come in having the mindset of.  And her

2  exposure to whatever news sources was quite minimal.  So I

3  don't think she qualifies for for cause.

4          THE COURT:  My notes indicate she said it's hard to

5  get to a place where she can be fair.  I think, given her

6  hesitation and my recollection of her answers, I'm going to

7  grant the motion and strike Ms. Memery.

8          Anything further, Mr. Andonian?

9          MR. ANDONIAN:  No, Your Honor.

10          THE COURT:  Okay.  All right.  So Ms. Brown is going

11  to put together our strike list.

12          Counsel, you all have the same random list I do.  If

13  I look through the strikes that have been granted and then go

14  to the first 28 that have not been granted, we should get down

15  through juror number 35.  See if you all agree with that.

16          Maybe the easier way to do it is this way:  As I go

17  through the random list, I have strikes of juror number 2,

18  juror number 4, juror number 10, juror number 18, juror number

19  22, 25, and 34.

20          MS. PENG:  34 was denied, Your Honor.  It was

21  overruled.

22          THE COURT:  That's right, it was denied.

23          So we'll go through.  It should be the first 28.  It

24  will then take us through juror 34, if you all are in agreement

25  with that.

USA v. Jenkins, 3:23cr11, 12/11/2024

1           MS. PENG:  The government agrees with that.

2           THE COURT:  Mr. Andonian?

3           MR. ANDONIAN:  Yes, Your Honor.

4           THE COURT:  I then take -- for three alternates, I

5    then take the next seven.  I've got strikes for juror number

6    41, juror number 42, and we should go through juror number 43

7    for our strikes.

8           Are we in agreement, Ms. Peng?

9           MS. PENG:  We agree.

10          THE COURT:  Mr. Andonian?

11          MR. ANDONIAN:  Yes, Your Honor.

12          THE COURT:  So the way it's going to work is I

13   believe we're going to have different colored pencils.  You

14   already have them.  We have a red for the government and blue

15   for the defendant.  Make your strikes -- G1, D1, so forth and

16   so on.  The government gets six.  The defendant gets ten.  And

17   we've given you the strike order, I believe, that you all

18   should have that.

19          Once you've gotten through the strikes of 12 -- and

20   I'm going to draw a line down through 34 -- you all come up so

21   that we can confirm who the 12 are.  And we'll just do that

22   with the white noise up here.  I am going to bring the jury

23   back in.  I want you all to be able to see the jurors as we're

24   making our peremptory strikes.  And then after that, unless you

25   have objections while you're up here, we'll do the last four

USA v. Jenkins, 3:23cr11, 12/11/2024

1   strikes so that we have our alternates.  And we'll just do that

2   here at the bench, okay?  So.

3          Are we ready for the jury?  Are we ready for the

4   venire?

5          MR. ANDONIAN:  Yes.

6          THE COURT:  All right.  Let's bring the venire in.

7   They should be coming back in in alphabetical order.

8   **(Jury in, 4:41 p.m.)**

9          THE COURT:  Ladies and gentlemen, please be seated.

10         You can go ahead and let them start striking.

11         So ladies and gentlemen, first of all, let me thank

12  you for your patience for being here.  I kept you out of the

13  rain all day, right?

14         Let me indicate a little bit of what we've been doing

15  and what's going on now.  Since we were last together, we had

16  to take up a number of matters by asking some questions of each

17  of you individually.  I want to thank you all for your patience

18  as you waited for us to do that, but actually it made things

19  much more efficient for us to be able to do it that way.  And

20  please don't feel offended if you were brought in, and don't

21  feel offended if you were not brought in.  It's a way for the

22  lawyers to make sure that they do their job on behalf of their

23  clients to understand who each of you are so that they can make

24  what are called peremptory strikes.  The peremptory strikes --

25  and that's what they're doing now -- you will notice that we

USA v. Jenkins, 3:23cr11, 12/11/2024

1  have more of you than we need.  We could not select a jury

2  without bringing in more people than we absolutely need.  And

3  that means necessarily that I've had to take each of you away

4  from your work, your family, your daily activities, those

5  things that are near and dear to your heart.  I thank you for

6  letting me do that because the service that you provide by

7  being here and being willing to show up and being willing to

8  serve allows us to be able to pick a jury that's going to be

9  able to hear this case over the course of the next seven to

10 eight days.  And I want to thank you in that regard.

11       The lawyers are now going through what are called

12 peremptory strikes where they can strike folks from the jury

13 list for no cause given.  It lets us be able to narrow it down

14 to the number of jurors that we need in this particular case.

15 If you're not selected, don't either jump for joy or hang your

16 head low.  What I mean by that is this:  I know all of you --

17 or many of you -- thought golly, I've got to spend a day in

18 federal court in Charlottesville, and that's a burden.  But I

19 hope that even though you've spent more time sitting on your

20 hands probably than you have sitting in here, I hope that you

21 will find the process to be something that you understand the

22 importance from a civic duty standpoint, because since I became

23 a judge 13 years or so ago -- and I tried cases for 20 years

24 before I became a judge involving jurors.  And I never fully

25 appreciated until I became a judge the true embrace that our

USA v. Jenkins, 3:23cr11, 12/11/2024

1  citizens give once they step into the box and they raise their

2  hand and they swear to well and truly try the case, and the

3  true embrace that each of you have given as you've answered the

4  questions.  You've answered the questionnaires that we sent to

5  you.  You've been here on time and you've shown up and answered

6  the questions that have been put to you, and I thank you very

7  much in that regard.  So each of you, whether you're selected

8  or not, should walk out of here with your heads held high, and

9  I hope each of you will walk out of here with a little bit of a

10 positive experience understanding the importance of the job

11 that jurors have in that regard.

12        So as the lawyers go back and forth making their

13 strikes, let me give you a little bit of the history of the

14 Western District of Virginia.  Going way, way back actually,

15 what we know as Virginia was one big district.  It's now two

16 districts, the Eastern District and the Western District.  The

17 Eastern District starts actually just east here of

18 Charlottesville and goes up to DC and all the way down to

19 Tidewater.  The Western District is really very long.  It goes

20 all the way up to Harrisonburg all the way up to Greene County,

21 all the way up to Shenandoah County.  So it almost is

22 touching -- almost is touching Maryland -- it may actually be

23 touching Maryland, certainly touching West Virginia up there,

24 and it stretches all the way down to Lee County.  And if you

25 pull a map out, if you're really curious when you get home,

USA v. Jenkins, 3:23cr11, 12/11/2024

1  pull a map out and start looking at the longitudinal lines, you

2  realize that from maybe 45 minutes outside of DC all the way to

3  Lee County is west of Cincinnati.  That's how big our district

4  is.  And the Western District used to be what is now West

5  Virginia, and there was only one judge that sat in all of what

6  is now the Western District at that time.  Ultimately there was

7  another judgeship that was created, and that's the way it was

8  primarily through the 1900s into 1970 when there were two

9  additional judgeships that were created.  So now we have four

10  active judgeships.

11      And so a federal judge is typically nominated by a

12  president, confirmed by the Senate, and they will sit until

13  they decide either to retire or take senior status or not.

14  Those that choose to take senior status can still sit on a case

15  and hold a full and active docket.  So the judges that we have

16  in our district now, our most senior judge is the first woman

17  judge that we had here, most senior active judge, and that's

18  Elizabeth Dillon.  She was nominated and confirmed in 2014, and

19  she became our chief judge this summer at the July 4

20  naturalization ceremony over in Monticello.  And Judge Dillon

21  is the first woman to serve as a district judge here in the

22  Western District of Virginia, and obviously then the first

23  chief judge that she has served here in the Western District of

24  Virginia.

25      Our next most senior district judge is a fellow by

USA v. Jenkins, 3:23cr11, 12/11/2024

1  the name of Thomas Cullen.  Judge Cullen was appointed in 2018.

2  He was then the sitting United States attorney as well, and he

3  sits in Roanoke, as does Judge Dillon, and where I sit

4  primarily as well.

5      And then I became a district judge in March of last

6  year.  Before that I was a magistrate judge for 11 years,

7  sitting primarily in Roanoke.

8      And our newest judge sits right here in

9  Charlottesville.  But since this case was already assigned to

10 me when Judge Yoon came on -- Judge Yoon was confirmed by the

11 Senate back in February, but she had to wait until Judge

12 Urbanski took senior status in July, and then she was sworn in.

13 And she sits just across the hall as well.  Judge Yoon is the

14 first Korean American judge here in the Western District of

15 Virginia, the first minority judge in the Western District of

16 Virginia.

17     Our senior judges are our most senior judge is Judge

18 Moon, who sits over here.  He hears criminal cases, and he sits

19 in Lynchburg.  He hears all the cases in Lynchburg.  Judge Moon

20 has been a judge since before most of us were born, I think.

21 My father was a circuit court judge, and he and Judge Moon

22 served together back in -- I think Judge Moon was appointed a

23 circuit court judge in the early '70s, and they became friends

24 at that time.  I knew Judge Moon.  He then went on to the state

25 Court of Appeals in the '80s.  And then he was confirmed as a

USA v. Jenkins, 3:23cr11, 12/11/2024

1   district judge in the 1990 time frame or so, and has been a

2   district judge and became a senior judge in 2010.  So he's been

3   a judge for most of his life, and he sits in Lynchburg and

4   here.

5           Judge Jones sits down primarily in Abingdon.  Judge

6   Jones was a long, long-time member of the Virginia General

7   Assembly, served on the state School Board, and became a

8   district judge in 1998 until he became -- until he went on

9   senior status in 2022, and I was appointed to fill his seat.

10  Judge Jones still handles a full civil docket over in Abingdon.

11  He's moved down to Durham where his wife is from, but he comes

12  up to Abingdon probably three or four times a month and sits

13  full time up there.

14          And then our most recent senior judge is Mike

15  Urbanski.  And Judge Urbanski was initially a magistrate judge.

16  He was appointed as a magistrate judge in 2004, I believe it

17  was, and served as a magistrate judge until he was appointed as

18  a district judge in 2011, and I took his spot as a magistrate

19  judge.  But he served as a district judge from 2011 until July

20  of this year, and at that point in time he took senior status.

21  He was our chief judge for seven years as well, and ably

22  managed us through all that COVID gave to us during that time

23  as well.

24          We also have three magistrate judges.  The magistrate

25  judges, a lot of people don't know what they do, but really if

USA v. Jenkins, 3:23cr11, 12/11/2024

1  you ever meet a magistrate judge in federal court, you should

2  hug them because they're the ones that do all the work.  They

3  really are.  They handle all the initial criminal appearances

4  for folks shortly after they're arrested.  They handle all the

5  discovery disputes in civil cases.  So if people haven't

6  produced all the documents that somebody wants or answered all

7  the questions in a deposition or whatever, they run to the

8  magistrate judge, and they manage all of that as well.

9         And most importantly, what the magistrate judges do

10 is they handle a lot of mediations or settlement conferences.

11 That was one of the things that I enjoyed the most.  So in a

12 civil lawsuit, say someone sued someone from another state from

13 an automobile accident, most cases are resolved rather than

14 tried.  And most cases go through a mediation process.  And one

15 of the things that our court offers -- and most federal courts

16 offer -- is a free mediation process.  It's typically run by

17 the magistrate judge.  So the parties and their lawyers will

18 come in and sit down and they'll spend a day mediating back and

19 forth.  That's one of the most enjoyable things that a

20 magistrate judge does, because it gives them an opportunity to

21 meet folks just like you all who may find themselves in the

22 middle of a lawsuit, and then they have an opportunity to find

23 a way to resolve the case short of going to trial.  I've always

24 said magistrate judges do 90 percent of the work and get about

25 two percent of the credit for the work that gets handled here

USA v. Jenkins, 3:23cr11, 12/11/2024

1   in federal court.  So if you ever have an opportunity to meet a

2   magistrate judge, thank them for the service that they provide.

3        You're probably wondering how in the world -- where

4   are all of our courthouses -- or maybe you're wondering, but

5   I'm going to tell you anyway as we fill our time.

6        So until -- I guess was it last year, Kelly?  I think

7   until last year we had seven courthouses spread throughout the

8   Western District of Virginia.  They were here in

9   Charlottesville, up in Harrisonburg, over in Lynchburg and

10  Danville, Roanoke, Abingdon and Big Stone Gap.  How many of you

11  know where Big Stone Gap is?  Just a few of you.  So basically,

12  go west.  You go all the way down to Abingdon and then you turn

13  right on 58 and you go and you'll run into Big Stone Gap.  From

14  Roanoke where I sit, it takes almost four hours to get there.

15  And it was an older courthouse that didn't have nearly the foot

16  traffic through it as our other courthouses do.  And the

17  courthouse needed a lot of upgrading, and it was difficult to

18  hold certain types of trials in that courthouse.  And so we

19  made the decision to close that division and combine it with

20  Abingdon, which is not without some heartache.  I know some of

21  you all have driven for an hour and-a-half or so to get here,

22  but some of the folks that sit in Abingdon come from as far

23  away as two to two and-a-half hours to come sit as well.  So

24  that can be quite a challenge for some of those folks.  But the

25  Abingdon division basically then holds court for all the

USA v. Jenkins, 3:23cr11, 12/11/2024

1   counties from Wytheville west.  If you look at the map of

2   Virginia, Wytheville west is a big, big geographical area.  The

3   Roanoke division basically has everything from Wytheville up to

4   Roanoke and up to Covington as well.  The Danville division has

5   Martinsville across the south side.  And then Lynchburg goes

6   over -- I can't remember the county that's just -- I guess

7   Lynchburg goes over to Amherst, because Nelson is here in

8   Charlottesville division.  Charlottesville takes us over to the

9   Eastern District, and then Harrisonburg really stretches way up

10  into northern Virginia and into Greene County as well.

11          Since we only have seven judges, we drive a lot.  And

12  so until Judge Yoon came on, I would hear cases in Roanoke,

13  Charlottesville and Abingdon.  And now I hear half the criminal

14  docket over in Abingdon and in Roanoke, and I have a few cases

15  still left up here.  But I love coming to Charlottesville.

16  It's where I went to law school.  It's where I went to

17  undergraduate.  My parents went here.  When I was a first-year

18  undergrad, all my brothers and sisters were here.  So

19  Charlottesville is a little bit like a second home for me.  I

20  really do enjoy coming up here.

21          I'll age myself a little bit.  Those of you all that

22  know Charlottesville, you know, from Hydraulic Road north, when

23  I was here, the only thing between Hydraulic Road and

24  Greenbrier was the post office.  That was it.  There was

25  nothing and now it's completely -- completely filled up as

USA v. Jenkins, 3:23cr11, 12/11/2024

1  well.  Really not much went past the shopping center out at Rio

2  Road.  And so it has changed a lot.  I don't recognize a lot of

3  it when I come back up here.  We spend a fair amount of time on

4  the road, but frankly, I enjoy coming to other courthouses.  I

5  enjoy going to other places as well.

6          So let me -- the only portraits we have here -- so

7  sitting up there is Harry Michael.  Harry Michael, for those of

8  you who are old enough, will remember that Harry Michael was a

9  member of the General Assembly.  I think he ran for lieutenant

10 governor in the mid '70s unsuccessfully, and then he was

11 appointed as a district judge by President Carter, and sat here

12 in Charlottesville until he took senior status in 1998.

13         The interesting story is that Judge Jones -- who I

14 told you is one of our senior status judges -- when Judge

15 Michael was confirmed, there were only two federal district

16 judgeships.  They were held by Judge Dalton and Judge Turk, and

17 then two additional judgeships were created in 1978 and 1979.

18 And Judge Michael and Judge Jones at that time were nominated

19 to those spots.  And then you will recall that's when the

20 Iranian hostage crisis situation arose at the time that the

21 shah of Iran was overthrown, and I think it was 25 or so

22 Americans were taken hostage for over a year.  And then

23 President Reagan was elected in 1980.  At that point in time

24 there were -- I'm going to finish telling our story -- and at

25 that point in time neither Judge Michael nor Judge Jones had

USA v. Jenkins, 3:23cr11, 12/11/2024

1  been confirmed.  Judge Michael was confirmed.  He was allowed

2  to go on through, and Judge Jones was not.  So his nomination

3  fell through.  And then fast forward.  When Judge Michael took

4  senior status, Judge Jones was appointed by President Clinton

5  at that time to fill that spot.

6          So if you all can bear with me for just one second.

7  Counsel, if you all can come on up.

8          (Sidebar commenced.)

9          THE COURT:  I want to confirm who we have as our

10  jurors, our 12, and then we'll go ahead and strike.

11          I've got Diana Walker -- these are our 12:  Diana

12  Walker, Shawn Mitchell, Kelly Rhoden, Susan Thomas, Bobbie

13  Relken, James Belew, Cody Bryant, Christine Estes, Dora Smith,

14  Emily Walker, Sherrie Frazier, and Lisa Choi.

15          Is that who the government has?

16          MS. PENG:  Yes.

17          THE COURT:  Is that who the defendants have?

18          MR. ANDONIAN:  Bradley Cohen, was he --

19          THE COURT:  Bradley Cohen is the government --

20          MR. ANDONIAN:  I missed that, sorry.

21          MS. PENG:  Your Honor, are you going to announce --

22  like tell the alternates that they're alternates or tell them

23  at the end?  So we haven't struck the alternates yet.

24          THE COURT:  We're going to strike them right now, and

25  then we'll know who the alternates are, but they will not know.

USA v. Jenkins, 3:23cr11, 12/11/2024

1   We get to tell them as they go out to deliberate.  They will

2   not go back into the jury room.

3           So with that, we will strike from juror 35, Tyler

4   Haislip, down through juror 43, Amanda Long.  Each of you get

5   two strikes.  We'll go one and one, one and one.

6           MS. SMITH:  Can I say one thing since we're on the

7   topic of alternates.  So once the 12 go back, are those

8   alternates going to still stay under in case something happens

9   during deliberations?

10          THE COURT:  Yes.  We tell them they can go home, but

11  be prepared to come back, if necessary.

12          MS. SMITH:  Not discuss the case, that type of thing?

13          THE COURT:  Yes.

14          MS. SMITH:  Thank you for clarifying.

15          THE COURT:  Did you all bring your pens up?

16          One and one, one and one.

17          The government struck Amanda Long, correct?

18          MS. SMITH:  Yes, Your Honor.

19          THE COURT:  So our alternates will be Margaret Short,

20  Jaclyn Patrizia, and Stacie Dowdy.  Is that who the government

21  has?

22          MS. CHOY:  Yes, Your Honor.

23          THE COURT:  Is that who the defendant has?

24          MR. ANDONIAN:  Yes, Your Honor.

25          THE COURT:  So it's five after.  What I propose that

USA v. Jenkins, 3:23cr11, 12/11/2024

1  we do is let everybody go.  We'll bring them up.  We'll swear

2  them.  My inclination is that I've got maybe ten minutes of

3  instructions.  I'm going to let them decide whether they want

4  to hear openings.  I'll tell them openings could take 45 to 50

5  minutes.  My guess is we'll probably let them go.

6          MS. SMITH:  It's been a long day.  I think it makes

7  sense to go tomorrow.

8          THE COURT:  So I'll just let them go.  I do want to

9  give them their instructions so they get the whole thing of

10 don't listen to anybody.

11         MS. PENG:  Thank you, Your Honor.

12         MR. ANDONIAN:  Could you include about the lawyers

13 appearing to ignore them in the hallways?

14         THE COURT:  Yes.

15         (Sidebar concluded.)

16         THE COURT:  So ladies and gentlemen, we do have a

17 jury at this time.  So at this point in time I'm going to turn

18 you over to the hands of Ms. Brown.

19         THE CLERK:  Ladies and gentlemen, I will now call the

20 names of the jurors who are to serve in this case.  As your

21 names are called, please come forward and take your seats in

22 the jury box.  Those whose names are not called should remain

23 seated until excused by the Court.

24         Diana Veronica Walker, Shawn Holden Mitchell, Kelly

25 Marie Rhoden, Susan Thomas, Bobbie Swaringen Relken, James

                    USA v. Jenkins, 3:23cr11, 12/11/2024

1   Lawrence Belew, Jr., Cody Daniel Bryant, Christine Crute Estes,

2   Dora Shelton Smith, Emily Hobgood Walker, Sherrie Lynn Frazier,

3   Lisa Michelle Choi, Margaret Conway Short, Jaclyn Woodyatt

4   Patrizia, Stacie Lee Dowdy.

5            Ladies and gentlemen, please stand and raise your

6   right hands to be sworn.

7            Do you and each of you solemnly swear that you will

8   well and truly try the issue in the United States versus Scott

9   Howard Jenkins and a true verdict render according to the law

10  and the evidence?

11           ALL JURORS:  Yes.

12           THE COURT:  Ladies and gentlemen, for those of you

13  that have been summonsed here today for jury service and have

14  not been chosen to serve will be dismissed at this time.  It

15  may well be that the clerk will call you for another panel at a

16  later time, but we won't need you for today.

17           Hang on just a second, please.  I get to get one more

18  thanks in.

19           Again, I want to take this opportunity to express the

20  Court's appreciation for your presence today.  I know it's been

21  a long day and it may have been inconvenient for you -- for

22  some, if not all of you.  And I know your daily routine has

23  been disrupted.  But I tell you again, we could not have

24  selected a jury without each of you being here and

25  participating.  The jury system is one of the oldest and most

USA v. Jenkins, 3:23cr11, 12/11/2024

1  valuable aspects -- valued aspects of our legal procedure.

2  Service on a jury panel such as you performed here today, is

3  one of the highest civic duties of government, whether federal

4  or state, that you can be called upon to perform.  Your

5  presence here today -- by your presence here today, you've made

6  an important contribution to our nation, to your state, and to

7  your community.  On behalf of the Court, all the court

8  officers, each of the parties, and all the people here in the

9  Western District, I thank you at this time and excuse you from

10 any further participation in the case.  Now I'll allow you to

11 be dismissed.  And again, thank you very much for being here.

12          (Pause.)

13          You all please have a seat.

14          So ladies and gentlemen, thank you all again.  Here's

15 the process.  It's a quarter after 5.  I'm going to get you out

16 of here as quickly as I can.  There's some preliminary

17 instructions that I must give every jury before we begin.  I

18 want to give those to you today and then dismiss you, because

19 there's some instructions that are embedded in that with

20 respect to how to handle the inevitable questions that you're

21 going to get tonight and other nights as well.  So I want to

22 give those to you.  That way when we come back here tomorrow

23 morning, we're going to hit the ground running.  And we're

24 going to start right up with the opening statements and move

25 straight into the case as well.  So let me give you those

USA v. Jenkins, 3:23cr11, 12/11/2024

1    instructions.

2            I will tell you this:  That when you come back in,

3    our CSO is going to get you acquainted with the jury room here

4    this afternoon.  You can go straight to the jury room.  We will

5    start promptly at 9 o'clock.  You're not wedded to the seats

6    that you're in.  Some juries stay in the exact same seats.

7    Some it's a mystery, whichever time they come in, as to where

8    they're going to be seated.  It's up to you all as well.  So

9    let me give you these preliminary instructions.

10           First of all, no objection to the jury having been

11   seated; is that right, from the government's standpoint?

12           MS. PENG:  That's correct, Your Honor.

13           THE COURT:  Mr. Andonian?

14           MR. ANDONIAN:  Correct, Your Honor.

15           THE COURT:  Very well.

16           Members of the jury, now that you've been sworn, I'll

17   give you some preliminary instructions to guide you in your

18   participation of the trial.  It will be your duty to find from

19   the evidence what the facts are.  You, and you alone, are the

20   judges of the facts.  You will then have to apply those facts

21   to the law as the Court will give it to you.  You must follow

22   that law, whether you agree with it or not.  Nothing that the

23   Court may say or do during the course of the trial is intended

24   to indicate or should be taken by you as indicating what your

25   verdict should be.

USA v. Jenkins, 3:23cr11, 12/11/2024

1          The evidence from which you will find the facts will
2     consist of the testimony of witnesses and documents and other
3     things received into the record as exhibits, and any facts that
4     are agreed or stipulated to or that the Court may instruct you
5     to find.  Certain things are not evidence and must not be
6     considered by you.  I'll list those for you now.  One,
7     statements, arguments, and questions by lawyers are not
8     evidence.  Two, objections to questions are not evidence.
9     Lawyers have an obligation to their client to make an objection
10    when they believe that the evidence being offered is improper
11    under the rules of evidence.  You should not be influenced by
12    the objection or by the Court's ruling on it.  If the objection
13    is sustained, ignore the question.  If it is overruled, treat
14    the answer just like any other.  If you are instructed that
15    some item of evidence is received for a limited purpose only,
16    you must follow that instruction.  Three, testimony that the
17    Court has excluded or told you to disregard is not evidence and
18    must not be considered.  Four, anything you may have seen or
19    heard outside the courtroom is not evidence and must be
20    disregarded.  You are to decide the case solely on the evidence
21    presented here in the courtroom.
22          There are two kinds of evidence, direct and
23    circumstantial.  Direct evidence is direct proof of a fact,
24    such as testimony of an eyewitness.  Circumstantial evidence is
25    proof of facts from which you may infer or conclude that other

USA v. Jenkins, 3:23cr11, 12/11/2024

1   facts exist.  I will give you further instructions on these, as

2   well as other matters, at the end of the case.  But have in

3   mind that you may consider both kinds of evidence.

4          It will be up to you to decide which witnesses to

5   believe, which witnesses not to believe and how much of any

6   witness's testimony to accept or to reject.  I will give you

7   some guidelines for determining the credibility of witnesses at

8   the end of the case.

9          As you know, this is a criminal case.  There are

10  three basic rules about criminal cases that you must keep in

11  mind.  First, the defendant is presumed innocent until proven

12  guilty.  The indictment against the defendant brought by the

13  government is only an accusation and nothing more.  It is not

14  proof of guilt or anything else.  The defendant, therefore,

15  starts out with a clean slate.  Second, the burden of proof is

16  on the government throughout the case.  The defendant has no

17  burden to prove his innocence or to present any evidence or to

18  testify, since the defendant has the right to remain silent.

19  The law prohibits you, in arriving at your verdict, from

20  considering that the defendant may not testify.  Third, the

21  government must prove the defendant's guilt beyond a reasonable

22  doubt.  Bear in mind that in this respect a criminal case is

23  different from a civil case.  I will give you detailed

24  instructions on the law at the end of the case, and these

25  instructions will control your deliberations and decision.

USA v. Jenkins, 3:23cr11, 12/11/2024

1         Now a few words about your conduct as jurors.  First,

2    I instruct you that during the trial you are not to discuss the

3    case with anyone, or to permit anyone to discuss it with you.

4    Until you retire to the jury room at the end of the case to

5    deliberate on your verdict, you simply are not to talk about

6    the case.  Second, do not read or listen to anything touching

7    on this case in any way.  If anyone should try to talk to you

8    about it, bring it to the Court's attention promptly.  Third,

9    do not try to do any research or make any investigation on the

10   case on your own.  You as jurors must decide this case based

11   solely on the evidence presented here within the walls of this

12   courtroom.  You should not consult dictionaries or reference

13   materials, search the Internet, websites, blogs, or use any

14   electronic tools to obtain information about this case or to

15   help you to decide it.  Please do not try to find out

16   information from any source outside the confines of this

17   courtroom.  If there is publicity about this trial, you must

18   ignore it.  The use of cell phones, the Internet, and other

19   technology are not allowed while court is in session.  You must

20   not use these tools to communicate electronically with anyone

21   about the case.  This includes your family and friends.  You

22   may not communicate with anyone about the case on your cell

23   phone, through email or text messaging, or through any blog,

24   website, or Internet chatroom, or by way of any social

25   networking website, including Facebook, X, LinkedIn, YouTube,

USA v. Jenkins, 3:23cr11, 12/11/2024

1   or whatever the particular social website of the day is.  If

2   you have access to a cell phone, iPad or other technology, you

3   may not use it to access the Internet, your email, or any

4   social networking or other websites while you are in court or

5   on a break from court.

6          Finally, do not form an opinion until all evidence is

7   in.  Keep an open mind until you start your deliberations at

8   the end of the case.  If you wish, you may take notes.  And

9   we'll provide notepads and pens for you all in the morning.

10  Even though the court reporter is making a stenographic copy of

11  everything that is said, a typewritten copy of the testimony

12  will not be available to you for use during your deliberations.

13  On the other hand, the exhibits that come into evidence may be

14  available to you during deliberations, and I'll give you

15  further guidance on that at the end of the case.

16         If you do take notes, be careful not to get so

17  involved in note-taking that you become distracted and miss

18  part of the testimony.  Your notes are to be used only as aids

19  for your memory.  And if your memory should later be different

20  from your notes, you should rely upon your memory and not your

21  notes.  Any notes that you take are for your own personal use.

22  They're not to be given or read to anyone else.  And when you

23  leave the room at the end of the day, your notes must be left

24  in the jury room.  If you do not take notes, rely upon your

25  independent memory of the testimony.  Whether or not you choose

USA v. Jenkins, 3:23cr11, 12/11/2024

1  to take notes, remember, it is your own individual

2  responsibility to listen carefully to the evidence.  You cannot

3  give this responsibility to someone who is taking notes.  We

4  depend upon the judgment of all members of the jury.

5          The trial will begin in the morning.  First the

6  government will make an opening statement, which is simply an

7  outline to help you understand the evidence as it comes in.

8  Next, the defendant's counsel may -- but does not have to --

9  make an opening statement.  Opening statements are neither

10  evidence nor arguments.  Next, the government will present its

11  witnesses, and counsel for the defendant may cross-examine

12  them.  Following the government's case, the defendant's counsel

13  may, if they wish, present witnesses whom the government may

14  then cross-examine.  After all the evidence is in, the

15  attorneys will make their closing arguments to summarize and

16  interpret the evidence for you, and the Court will give you

17  instructions of law.  You will then retire to deliberate.

18          We'll proceed along the following schedule:  First

19  court will begin promptly at 9:00 a.m.  For that reason I ask

20  that everyone be here by 8:45 each morning so that we can be

21  ready to start promptly at 9:00 a.m.  I will take a 15-minute

22  morning and afternoon recess generally around 11 and 3:15,

23  depending upon where we are in the evidence at that time.  I'll

24  generally break for one hour for lunch between 12:30 and 1, and

25  we'll wrap up the evening typically sometime between 5:30 and 6

USA v. Jenkins, 3:23cr11, 12/11/2024

1   o'clock.

2          Speaking of breaks, raise your hand, let us know and

3   let the court staff know if you need an additional break.  We

4   don't want you to be uncomfortable.  If another break is

5   necessary, let us know.  Importantly, if you find that your

6   attention is lagging or you're getting sleepy, please let me

7   know so that we can take a break for a cup of coffee or for a

8   soft drink to help you keep focused.

9          Throughout the trial, the lawyers may come in and out

10  of the courtroom.  They do this for many different reasons, but

11  typically it is to make sure that the next witness is ready or

12  that they are prepared for the next witness themselves.  This

13  allows the trial to proceed much more efficiently.  And I have

14  given them specific permission to come and go in and out of the

15  courtroom as necessary.

16         Now, a couple of guides with respect to when you all

17  leave to go home this evening.  So let me just give you this

18  additional instruction, and with it, it will apply not only

19  during this break, but also when you go home.  So first of all,

20  we're about to break for the evening.  Remember, until the

21  trial is over, do not discuss the case with anyone, including

22  your fellow jurors, members of your family, people involved in

23  the trial, or anyone else, and do not allow others to discuss

24  the case with you.  This includes discussing the case on the

25  Internet chatrooms or other Internet blogs, bulletins, emails,

USA v. Jenkins, 3:23cr11, 12/11/2024

1   text messaging or other social website.  If anyone tries to

2   communicate with you about the case, please let me know about

3   it immediately.  Do not read, watch, or listen to any news

4   reports or other accounts about the trial or anyone associated

5   with it, including any online information.  Do not do any

6   research such as consulting dictionaries, searching the

7   Internet or using other reference materials, and do not make

8   any investigation about the case on your own.  Keep an open

9   mind until all the evidence has been presented and you have

10  heard the arguments of counsel, my instructions on the law and

11  the views of your fellow jurors.  If you need to speak with me

12  about anything, simply give a signed note to the CSO or any of

13  the other court staff.

14          Now, a couple of final words as well.  You're going

15  to get home and people are going to say:  Tell me about the

16  case.  You're going to get home -- whether it be a spouse, a

17  friend, whatever it may be -- tell me about the case.  Judge

18  Ballou said I can't talk about it.  You're going to get

19  pressed.  Just simply say, it is a criminal case.  I can't talk

20  at all about it.  If news reports come on, leave the room.  If

21  you see anything in the newspaper, do not read the article.  If

22  you see a headline, skip past it.  If anyone tries to talk to

23  you about the case, please let me know.  It is important that

24  you all remain a clean slate, and the only information you get

25  from here.

USA v. Jenkins, 3:23cr11, 12/11/2024

1      You may see people out on the street.  You may see

2  lawyers walking around the courtroom, around the courthouse

3  during breaks.  They are specifically instructed by me to

4  ignore you.  Don't be offended if a lawyer walks past you and

5  it appears that they don't even see you.  They are told not to

6  even acknowledge you.  And you all should do the same as well.

7  And don't be offended by that also, because it's very important

8  that you are a group amongst yourselves who are going to decide

9  the case.

10      With that, ladies and gentlemen, it is 5:30.  Like I

11  said, we're going to start tomorrow morning promptly at 9

12  o'clock, if all of you can try to be here by 8:45.  That way we

13  will be ready to go promptly, and we'll start with the opening

14  statements as well.

15      With that, I'm going to wish you all safe travels

16  home tonight and safe travels back in the morning.  Again, I

17  want to thank you -- I'll say it throughout, I truly do mean

18  it -- thank you very much for your service.  This has been a

19  long day and a lot of waiting, but tomorrow we will get to the

20  case.  And I very much thank you for your service on behalf of

21  not only the court staff here, but also on behalf of each of

22  the parties and all the people here in the Western District of

23  Virginia.  I thank you very much for your service.

24      With that, we'll allow you all to be excused.  Go

25  back with the CSO so you'll know where the jury room is and

USA v. Jenkins, 3:23cr11, 12/11/2024

1  then you're free to go.

2  **(Jury out, 5:32 p.m.)**

3          THE COURT:  You all please be seated.  We'll start

4  tomorrow morning promptly at 9 o'clock, Ms. Smith, with your

5  opening statement.

6          Otherwise, is there anything else we need to take up

7  on behalf of the government this evening?

8          MS. PENG:  Nothing from the government.  Thank you.

9          THE COURT:  Mr. Andonian?

10          MR. ANDONIAN:  Nothing from us.

11          THE COURT:  I will be here tomorrow morning probably

12  well before 8:30, but certainly by 8:30.  I'll be ready to go

13  at 9.  If I need to come up for us to be able to start at 8:45

14  if there's anything that comes up, you all just let Ms. Brown

15  or the CSOs know so we can start early.  And frankly, if

16  everyone gets here at 8:45 and they're ready to go and it's

17  8:50 and you all are ready to go, let's start.  I think they've

18  had a long day and I think they're going to be ready to get to

19  work.

20          With that, thank you all very much.  I appreciate

21  your good efforts today.  We're going to again work on our jury

22  instructions.  Hope to get those to you tomorrow evening so

23  that you can have our view.  Less is more as it goes to jury

24  instructions.  There are a lot right now.

25          Very well.  So we'll stand in recess for the evening.

USA v. Jenkins, 3:23cr11, 12/11/2024

1   (Proceedings adjourned, 5:34 p.m.)

USA v. Jenkins, 3:23cr11, 12/11/2024

1                    C E R T I F I C A T E

2      I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10 understanding.

11     I further certify that the transcript fees and format

12 comply with those prescribed by the Court and the Judicial

13 Conference of the United States.

14     /s/ Lisa M. Blair              Date: December 11, 2024

15

16

17

18

19

20

21

22

23

24

25