USA v. Jenkins, 3:23-cr-11, 12/12/2024

1                    UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF VIRGINIA
2                    CHARLOTTESVILLE DIVISION

3    ************************************************************

4    UNITED STATES OF AMERICA,      CRIMINAL CASE NO.:  3:23-CR-11
                                    DECEMBER 12, 2024, 8:54 A.M.
5                                   CHARLOTTESVILLE, VIRGINIA
            Plaintiff,             JURY TRIAL, DAY 2
6    vs.

7    SCOTT HOWARD JENKINS,          Before:
                                    HONORABLE ROBERT S. BALLOU
8                                   UNITED STATES DISTRICT JUDGE
            Defendant.             WESTERN DISTRICT OF VIRGINIA
9
     ************************************************************
10
     APPEARANCES:
11

12   For the Government:           CELIA RUTH CHOY, ESQUIRE
                                   LINA PENG, ESQUIRE
13                                 DOJ-Crm
                                   Public Integrity Section
14                                 1301 New York Avenue NW, 10th Floor
                                   Washington, DC 20530
15                                 202-875-1557

16                                 MELANIE SMITH, ESQUIRE
                                   DOJ-USAO
17                                 Western District of Virginia
                                   255 West Main Street, Suite 130
18                                 Charlottesville, VA 22902
                                   434-293-4283

19

20

21

22   Court Reporter:   Lisa M. Blair, RPR, RMR, CRR, FOCR
                        255 West Main Street, Suite 304
23                      Charlottesville, Virginia  22902
                        434.296.9284

24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  APPEARANCES CONTINUED:

2  For the Defendant:          PHILIP ANDONIAN, ESQUIRE
                              JOSEPH P. CALEB, ESQUIRE
3                             Caleb Andonian PLLC
                              1100 H Street, NW, Suite 315
4                             Washington, DC 20005
                              202-953-9850
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1                          I N D E X

2  WITNESSES ON BEHALF OF THE GOVERNMENT:              PAGE

3  PETER SIEBEL

4   Direct Examination by Ms. Choy                        30
    Cross-Examination by Andonian                         85
5   Redirect Examination by Ms. Choy                     100

6  RICK RAHIM

7   Direct Examination by Ms. Smith                      107
    Cross-Examination by Mr. Caleb                       284
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1                    INDEX OF EXHIBITS

2  EXHIBITS ON BEHALF OF THE GOVERNMENT:

3          EXHIBIT:                 Marked      Received

4          301-325                    42          42

5          601-636                    42          42

6          701                        42          42

7          703-719                    42          42

8          723-727                    42          42

9          802                        42          42

10         429                        69          69

11         4                          71          71

12         102                       122         122

13         103                       137         137

14         729                       142         142

15         124                       146         146

16         120                       160         160

17         121                       165         165

18         730                       179         179

19         408                       183         183

20         433                       184         184

21         127                       186         186

22         720                       190         190

23         112                       197         197

24         722                       219         219

25         732                       223         223

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1                        INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE GOVERNMENT:

3         EXHIBIT:              Marked      Received

4         119                    226          226

5         731                    233          233

6         510                    236          236

7         439                    236          236

8         432                    239          239

9         108                    240          240

10        507                    242          242

11        508                    242          242

12        509                    242          242

13        446                    244          244

14        511                    246          246

15        447                    247          247

16        437                    253          253

17        114                    262          262

18        125                    266          266

19        115                    276          276

20        117                    280          280

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  (Proceedings commenced, 8:54 a.m.)

2         THE COURT:  Good morning, everybody.  We are back on

3  the record for day two of *United States v. Jenkins*.

4         First of all, let me thank everyone for being here.

5  There's one matter we've got to take up this morning.  I

6  received a note from one of the jurors regarding some medical

7  issues that they're having.  I want to address that with the

8  juror on the record, but since it relates to personal health

9  information and the health of the juror, I'm going to close the

10  courtroom to the public, not -- certainly not to the parties

11  and the attorneys and Mr. Jenkins -- so that we can have the

12  juror come in, talk with the juror about their health issues,

13  and whether they should be -- should otherwise be excused.

14         Any objection from the government?

15         MS. SMITH:  No, Your Honor.

16         THE COURT:  From the defendant?

17         MR. ANDONIAN:  No, Your Honor.

18         THE COURT:  So ladies and gentlemen, if you are not

19  with the trial team for one of the sides, if I could ask you to

20  step out while we address this personal health information, and

21  then come back on the record.  Thank you very much.

22         So the courtroom is closed with just the parties and

23  the defendant present.  I'm going to file into the record the

24  letter dated December the 11th on Teladoc Health letterhead,

25  signed by Henry Chang, Teladoc Physicians, PA.  I don't know

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1    whether that stands for professional association or, you know,

2    whether Mr. Chang is a PA, as I look at it more carefully.

3    That indicates that he needs to be excused from jury duty

4    through December the 30th.  So I've shown this to both parties

5    and will file it into the record.  Do you all need a copy for

6    your records?

7            MR. CALEB:  Yes, please.

8            THE COURT:  Okay.  So we'll make a copy so both of

9    you all have it for your records.  We're going to have

10   Mr. Belew come in and have him provide a little bit further

11   information as it relates to his condition.

12           Mr. Belew, good morning to you.  Come on up, please,

13   sir.  And what I'm going to do is probably have you just sit

14   over here and -- why don't we just have you sit in the witness

15   chair.  I'm sorry you're not feeling well today.

16           So Mr. Belew -- first of all, let me just put on the

17   record, you are James Belew, juror in this case, right?

18           MALE JUROR:  Yes.

19           THE COURT:  Okay.  Very well.  First of all, I'm

20   sorry that you're not feeling well today.  I do have the letter

21   from Teladoc Health requesting that you be excused from jury

22   duty from December the 11th through December the 30th.  The

23   reason we asked you to come in is that the letter doesn't tell

24   us anything about what your health condition is, and while I'm

25   mindful of your privacy issues, we have closed the courtroom.

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  We are creating a record, because it's important that we do so,

2  but we have closed the courtroom to the public and to the press

3  for purposes of this conversation.  But tell me a little bit

4  about what you've got going on, and what took you to the

5  doctor, if you could.

6          MALE JUROR:  I have anxiety.

7          THE COURT:  Okay.

8          MALE JUROR:  And I have a lot going on at home right

9  now.  And this -- I do not feel like I can be fair in doing

10 this.

11         THE COURT:  Okay.  Do you see anybody for your

12 anxiety?  Are you seeing any counseling at this point?

13         MALE JUROR:  No.

14         THE COURT:  Are you taking any medication for it?

15         MALE JUROR:  I am now.

16         THE COURT:  Okay.  Was that prescribed yesterday?

17         MALE JUROR:  Yes.

18         THE COURT:  Okay.  What was that medication, if I

19 could ask?

20         MALE JUROR:  It's Hydro something.

21         THE COURT:  That's okay if you don't recall.

22         MALE JUROR:  I cannot.  One of them starts with a P.

23         THE COURT:  Okay.  All right.  And as you know, we

24 spent a lot of time working our way through jurors and asked a

25 lot of questions because we want to know about conditions

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  before we make decisions about selecting a jury.

2           MALE JUROR:  Right.

3           THE COURT:  This didn't come up yesterday.  Can you

4  tell us a little bit about why?

5           MALE JUROR:  Well, I put on my questionnaire that my

6  wife and I care for my in-laws.

7           THE COURT:  Okay.

8           MALE JUROR:  We live next door to them.  They are in

9  their 90s.  My mother-in-law is on hospice.  She is severe

10 dementia and in a wheelchair.  We're the only caregivers for

11 her.  And this -- I changed my work schedule for work so I can

12 get home early afternoon to help with my wife to help care for

13 them.

14          THE COURT:  Okay.  Tell me a little bit about your

15 anxiety, if you can.

16          MALE JUROR:  What do you mean?

17          THE COURT:  Well, just kind of what brings it on and

18 how it manifests itself for you.

19          MALE JUROR:  Just stress.

20          THE COURT:  Are you worried about the stress of this

21 situation?

22          MALE JUROR:  I'm sorry?

23          THE COURT:  Are you worried about the stress of this

24 situation?

25          MALE JUROR:  Yes.  I don't feel like I can give -- be

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  fair.

2         THE COURT:  Okay.  All right.  Did you talk with any

3  of the other jurors about your situation?

4         MALE JUROR:  No, I did not.

5         THE COURT:  All right.  Ms. Peng, any questions?

6         MS. PENG:  Good morning, sir.  I'm sorry you're

7  feeling this way.  I just wanted to ask, yesterday while you

8  were seated in the jury, I was able to observe some physical

9  discomfort that you were experiencing.  Could you tell me a

10  little bit more about that, what you were feeling when you were

11  seated in the jury box yesterday?

12         MALE JUROR:  I feel physically ill right now, but the

13  other problem is sitting for long periods of time, I have bad

14  knees.

15         MS. PENG:  And you were feeling physically ill

16  yesterday in the jury box?

17         MALE JUROR:  Yes.

18         MS. PENG:  Thank you.

19         THE COURT:  Mr. Andonian?

20         MR. ANDONIAN:  Nothing, Your Honor.

21         THE COURT:  Mr. Belew, is there anything else you

22  want us to know?

23         MALE JUROR:  The other -- I mean, I have asthma.

24  That was part of what was -- the anxiety triggers that.

25         MS. PENG:  Oh, so did you experience an anxiety --

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  sorry -- an asthma attack yesterday?

2          MALE JUROR:  As we were leaving, yes.

3          THE COURT:  Yeah, I meant to mention -- and I told

4  the parties about it -- the CSOs had told me that they -- you

5  know, they saw you having some distress outside the

6  courtroom -- outside the courthouse yesterday evening, and you

7  indicated you thought you were having a panic attack; is that

8  fair?

9          MALE JUROR:  Yeah, the asthma and panic.

10          THE COURT:  The asthma brought it on?  Okay.  Do you

11  want to -- and I got your note.  There's no doubt about it.

12  The role of the juror, until you start to deliberate, is a

13  passive role, though you have to actively listen, but it's a

14  passive role.  Do you want to try to stay for a day and see

15  where you are?

16          MALE JUROR:  I don't think I can.  I don't think I

17  can be fair in this.  I've really given it a lot of thought

18  because I feel stupid.  I feel stupid being this way.

19          THE COURT:  Well, you shouldn't.  I mean, don't --

20          MALE JUROR:  I used to -- I used to represent the

21  bank in cases.  I used to certify documents.  I used to sit in

22  this chair -- not this one -- but you know, fairly often.  But

23  I think it's -- it's because of everything I have going on at

24  home.

25          THE COURT:  Okay.  All right.  Thank you very much.

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1   We're going to continue to have this conversation with the

2   lawyers, but thank you very much.  I'll let you go back out

3   through the back door with Ms. Melvin as I make a decision

4   about whether to release you.  If I do release you, Mr. Belew,

5   I want to thank you for your service, and I mean that

6   seriously.

7           MALE JUROR:  I'm sorry.

8           THE COURT:  Well, don't apologize, and -- nor should

9   you feel stupid, using your word.  Your emotions are real, and

10  frankly, on behalf of all the parties, I think I can speak for

11  them and say, I would rather have -- would rather have the

12  conversation yesterday, but I'd rather have it this morning

13  than when you're in the middle of deliberations.  And so I

14  appreciate you being candid in that regard.

15          MALE JUROR:  I was waiting to be called in yesterday,

16  because as the day progressed, it got worse.

17          THE COURT:  Okay.  All right.  Thank you very much.

18          MALE JUROR:  Thank you.

19          THE COURT:  The courtroom remains closed.  Mr. Belew

20  has left.

21          All right.  Ms. Peng?

22          MS. PENG:  The government would not oppose the Court

23  excusing him on the basis of his medical condition.  It doesn't

24  seem like he can concentrate with his anxiety and asthma

25  symptoms that he experienced yesterday and today.

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1      THE COURT:  Mr. Andonian?

2      MR. ANDONIAN:  I don't think we have any opposition

3  either, Your Honor.

4      THE COURT:  Okay.  Well, I think, you know, as much

5  as I would like -- I know everyone would like to have known

6  this yesterday, but it is what it is.  We can't -- can't change

7  history, but we can affect tomorrow, though.  You know, the

8  only option is you keep him, but then you're kind of wondering

9  if this is going to continue to be an ongoing problem or affect

10  the other jurors, which I think we have to think about that as

11  well.  Given everything that we discussed here on the record,

12  given Mr. Belew's description, I'm going to excuse him.  The

13  first alternate on the list would be Margaret Short.  She won't

14  know that, but she will now become -- she'll be substituted in

15  place of Mr. Belew, who I had listed as juror number 6.  And so

16  Ms. Short will be the first alternate used.

17      All right.  So we'll reopen the courtroom and then

18  I'll just put on the record what we've done, that we've excused

19  Mr. Belew.  And then are we otherwise ready to begin with

20  openings?

21      MS. SMITH:  The government is, Your Honor.

22      THE COURT:  All right.  Mr. Andonian or Mr. Caleb?

23      MR. CALEB:  We are.

24      THE COURT:  Okay.  Very well.  So let's let those

25  folks know that we're going to reopen the courtroom, and let

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1   everybody else come on in.

2          All right.  We're back on the record.  The courtroom

3   is open in *United States v. Jenkins*.  We have inquired of the

4   juror.  We've received a medical note.  One of the jurors has

5   developed a medical condition that is going to make it -- make

6   him unable to be able to proceed.  So I have excused Mr. Belew

7   as a juror in the case.  So we will be able to proceed -- since

8   we do have three alternates, we'll be able to proceed with the

9   next person as the alternate.  We have not advised any of the

10  jurors as to who the alternates are, but we still have a full

11  jury and we're ready to go.

12         So let's go ahead and bring in the jury and we'll

13  begin with opening statements.

14  (*Jury in, 9:09 a.m.*)

15         THE COURT:  You all please be seated.  Let the record

16  reflect the jury is present and seated.

17         Good morning, everybody.  Thank you very much for

18  being here.  I know I'm a little bit late.  We had one juror,

19  Mr. Belew, developed a medical condition overnight, and

20  unfortunately he was not able to continue to serve.  And so

21  he's been excused from your group, but I think all is going to

22  be well with him.

23         So like I explained to you yesterday, the first stage

24  of the trial is the opening statements.  We are ready to begin.

25  As well, you should have had notebooks or pads that have been

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  provided for you.  Whether you decide to take notes is up to

2  you, but ultimately let your memory be your guide as you go

3  through the process.

4           With that, Ms. Smith, would the government like to

5  make an opening?

6           MS. SMITH:  Yes, Your Honor.

7           THE COURT:  Go right ahead, please.

8           MS. SMITH:  Thank you.

9           Good morning.  May it please the Court, counsel,

10  ladies and gentlemen, this case is about a corrupt sheriff.  It

11  is about the defendant, Scott Jenkins, taking $80,000 in

12  bribes, and in exchange, giving out real law enforcement badges

13  with real law enforcement powers.  Nobody is above the law,

14  especially someone who is tasked with upholding the law.  On

15  three separate occasions, Scott Jenkins took an oath of office.

16  And on each occasion, he swore to faithfully -- excuse me -- he

17  swore to uphold the Constitution of the United States and the

18  Constitution of the Commonwealth of Virginia.  He also swore to

19  faithfully and impartially discharge all the duties incumbent

20  upon him.  But instead of faithfully and impartially

21  discharging those duties, he took bribes.  You will hear that

22  Scott Jenkins put the position of auxiliary deputy sheriff up

23  for sale, and he would take anywhere from $5,000 to $25,000.

24  And in exchange, he would make untrained civilians law

25  enforcement officers.  He would make them auxiliary deputy

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  sheriffs.

2       And you may be asking yourself:  What is an auxiliary

3  deputy sheriff?  They are very similar to a police officer or

4  sheriff's deputy.  Essentially, they are a volunteer sheriff's

5  deputy.  They have the same roles and responsibilities, and

6  under the Culpeper County sheriff's office rules, they require

7  the same training.  Auxiliary deputies can serve many

8  functions.  They can help at large community events with things

9  like crowd control.  They can help on security details.  They

10 even have the power to arrest.  And the only person with the

11 authority to appoint auxiliary deputy sheriffs was the

12 defendant, Scott Jenkins.

13      Now, this auxiliary program can be a legitimate

14 program.  It can be used to serve and protect the people of a

15 community like Culpeper.  And it can also help the sheriff's

16 office by increasing the number of deputies available to serve

17 at any time.  But you will hear that instead of using this

18 program to help his community, Scott Jenkins used it to help

19 himself.  Most of the bribe payers were wealthy businessmen

20 from northern Virginia with no ties to Culpeper County.  And

21 for a starting price of $5,000, Scott Jenkins would give them a

22 badge.  Now, why would someone pay $5,000 for a badge?  Some of

23 the bribe payers will tell you they saw it a little bit as a

24 trophy, something they could show off to their friends.  But

25 more importantly, they generally wanted it for two reasons.

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  Number one, they wanted to get out of speeding tickets if they

2  were pulled over, and number two, they believed that this badge

3  would allow them to carry a concealed handgun in all 50 states

4  without the proper permits.  The bribe process was almost

5  always the same.  The bribe payer would travel to Culpeper

6  County, get a tour of the sheriff's office, and have lunch with

7  the sheriff, Scott Jenkins.  They then would get sworn in as an

8  auxiliary deputy sheriff by the clerk of the court.  After the

9  swearing in, they would receive their badge from the defendant.

10  And at some point during their time in Culpeper, Scott Jenkins

11  would take the bribe.  Usually the bribe payer met Scott

12  Jenkins for the first time on that day of the swearing in.  And

13  that is because this was a sham program.  You will hear there

14  was no training, no vetting, no expectation they would actually

15  serve and assist the people of Culpeper County or the sheriff's

16  office.  Remember, they swore to the same oath of office as a

17  regular sheriff's deputy.  There was no need to faithfully and

18  impartially discharge any duties.  Their only duty was to get

19  the bribe money to the sheriff.

20      Scott Jenkins made these bribe payers believe that

21  they were making political contributions to his campaign.  But

22  you will hear that he was actually lining his own pockets.

23  Less than 15 percent of these bribes ever made it into his

24  reelection bank account.

25      Now, at the end of the trial, the judge will give you

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1   instructions on the law, and those instructions are

2   controlling.  But I'd like to give you a preview of what

3   bribery means, because that's what this case is about.  At its

4   core, bribery is a quid pro quo.  That is Latin for "this for

5   that."  It is a thing of value in exchange for an official act.

6   Now, that thing of value can be anything.  It can be cash.  It

7   can be a political contribution.  And that official act is an

8   act or a decision by a public official.  Here, the quid pro quo

9   was the bribe for the badge.  And I want you to keep that in

10  mind as you listen to the evidence in this case.  The bribe in

11  exchange for the badge.

12          You will hear about this scheme from Kevin Rychlik.

13  He will tell you about his long-standing corrupt relationship

14  with the sheriff.  Kevin Rychlik is also a businessman from

15  northern Virginia, and he will tell you how he helped the

16  sheriff facilitate this scheme.  He will tell you how Scott

17  Jenkins came to him and told him he needed to, quote-unquote,

18  build a war chest, and that he helped him do so.  Kevin Rychlik

19  would identify bribe payers and he would help facilitate and

20  set up the swearing in and the bribe payment amounts.  He will

21  tell you that this was all done at Scott Jenkins's direction

22  and with his knowledge.  You will also hear from some

23  additional bribe payers in this case who have pled guilty for

24  their roles in these crimes.  Two of those men are Rick Rahim

25  and Fred Gumbinner.  Rick Rahim is a convicted felon from

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  Fairfax County, Virginia.  He will tell you about his role in

2  this scheme and how he met the sheriff for the first time in

3  July of 2019.  He will tell you at this initial meeting he and

4  the sheriff hatched a plan.  He will tell you that in exchange

5  for giving significant amounts of money to the sheriff, Scott

6  Jenkins agreed to do two things for him:  One, he agreed to

7  help him restore his firearms rights, something he had lost

8  because he was a convicted felon; and two, he also agreed to

9  help him make -- to help make him an auxiliary deputy sheriff.

10 Now, there is nothing wrong with law abiding citizens owning

11 firearms.  That's a Constitutional right.  But that's not what

12 we're talking about here.  What we're talking about here is

13 paying bribes in order to bend the pools.  And Scott Jenkins

14 did just that.  Rick Rahim will tell you that over the course

15 of several months, he gave Scott Jenkins $25,000 in cash.  At

16 that initial meeting, he gave the sheriff an envelope stuffed

17 with cash.  A few months later, they met again, this time at a

18 steakhouse dinner, and once again he gave another envelope full

19 of cash to the sheriff.  The sheriff won reelection in November

20 of 2019, and at that point, he started helping Rick Rahim

21 restore his firearms rights.

22         Now, in order to restore your firearms rights, one

23 must file a petition in the county of their residence.  Rick

24 Rahim will tell you he was not a resident of Culpeper County.

25 But Scott Jenkins helped him falsify paperwork to make it look

USA v. Jenkins, 3:23-cr-11, 12/12/2024

like he was.  Rick Rahim will tell you how Scott Jenkins not
only helped him falsify paperwork, but he also pressured other
public officials, including the Commonwealth's Attorney and the
Circuit Court Judge of Culpeper County in order to push that
petition through.  Remember, Rick Rahim's quid was that money
he had given the sheriff, and now the sheriff had to come
through on the quo.  Eventually, Scott Jenkins's efforts paid
off and Rick Rahim's firearms rights were restored.  But he
didn't stop there.  He also made Rick Rahim an auxiliary deputy
sheriff.  There he is being sworn in.  Rick Rahim will tell you
how he received a badge, credentials.  He also received a
uniform for the Culpeper County sheriff's office and a firearm.

         You will also hear from Fred Gumbinner, who is an
associate of Rick Rahim's.  Fred Gumbinner will tell you about
making out a check for $20,000 to Rick Rahim's business
account, and that Rick Rahim took that money and paid it in
cash to the sheriff.  Fred Gumbinner was also sworn in as an
auxiliary deputy sheriff, but he had never met the sheriff at
the time.  In fact, he did not meet Scott Jenkins for almost
three years after his swearing in ceremony.  That's because
this was a sham program.  There was no real vetting, no
training.  Fred Gumbinner completed the only thing he needed to
do, paying that money to the sheriff.

         Now, this whole scheme came to light in 2021.  Kevin
Rychlik was being investigated for tax fraud.  And when he met

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1   with federal agents, he told them about this corrupt bribery

2   scheme.  The FBI began investigating, and they started sending

3   Kevin Rychlik in with a recording device on.  He continued to

4   meet with Scott Jenkins as he always did.  He continued to

5   recruit bribe payers; but this time he was wearing a wire.

6   Everything he was doing and saying was recorded, and everything

7   Scott Jenkins was doing and saying was recorded as well.  You

8   will get to see and hear these undercover audio and video

9   files, and you will see six additional bribe payers being sworn

10  in; four northern Virginia businessmen, once again with no ties

11  to Culpeper County, and two undercover FBI agents who posed as

12  bribe payers in order to get badges.

13          The northern Virginia businessmen will tell you about

14  getting sworn in.  They will tell you about the meeting getting

15  set up by Kevin Rychlik, traveling to Culpeper County, getting

16  sworn in, and receiving their badge from the sheriff.  They

17  will also tell you about paying the sheriff in exchange for

18  those badges.

19          The FBI agents will come before you and they will

20  talk to you about working in an undercover capacity.  They will

21  tell you they were sent in as bribe payers to make payments to

22  the sheriff, and in exchange, to get badges.  And they did just

23  that.  They will tell you that Scott Jenkins did not bat an eye

24  when they handed him cash.  One of the undercovers, who goes by

25  the name Mike when he testifies, posed as a convicted felon,

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  much like Scott Jenkins's co-defendant, Rick Rahim.  And he

2  will tell you that Scott Jenkins seemed to have no problem with

3  the fact that he was a felon being sworn in as a law

4  enforcement officer.

5         Now, a few of the men that you will hear from pled

6  guilty for their roles in these crimes, and a few of them have

7  also pled guilty to other crimes as well.  For instance, Rick

8  Rahim recently pled guilty to wire fraud and tax fraud,

9  unrelated to this case.  Kevin Rychlik also pled guilty to tax

10 fraud recently, also unrelated to this case.  But ladies and

11 gentlemen, you must keep in mind that these are the individuals

12 that Scott Jenkins chose to not only associate with, but to

13 swear in as law enforcement officers.  He chose to swear in

14 individuals who not only would pay him for a badge, but who

15 happened to be committing other crimes as well.

16        Now, defense may come up before you and say this was

17 all legitimate.  These were all legitimate political

18 contributions.  But even if they were legitimate political

19 contributions, they can still be a bribe because they were done

20 in exchange for a badge.  Remember, the bribe for the badge.

21 Additionally, Scott Jenkins's own words and actions contradict

22 that there was anything legitimate about this at all.

23        On the audio and video clips, you will see Scott

24 Jenkins discussing parts of this scheme.  And specifically, you

25 will hear him talk about ways to conceal the crimes.  For

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  instance, you will hear him tell Kevin Rychlik, his right hand

2  man, that the money can be funneled through other individuals

3  such as his brothers, Mike and Johnny Jenkins, or Kevin

4  Rychlik.  He will say that this way the money comes to him,

5  quote-unquote, clean.  You will also hear him tell Kevin

6  Rychlik to vary the amounts of the bribe payments.  He didn't

7  want them to be uniform.  Simply another way to conceal his

8  crimes.

9          You will also see Scott Jenkins's text messages.  And

10  in those messages, you will see him and Kevin Rychlik describe

11  various bribe payers, setting up the swearing-ins.  And on a

12  few occasions, even discussing the amount of money that was

13  coming in to Scott Jenkins.

14          You will also see the campaign records for the Scott

15  Jenkins re-election campaign.  Now, those campaign records list

16  everyone who is reported as making a contribution to his

17  political campaign.  What will be glaringly absent are any of

18  the individuals who paid their bribes in cash.  Scott Jenkins

19  only reported the bribe payers who gave him money via check.

20  He only reported the traceable funds.

21          You will also hear from the Special Agent Scott

22  Medearis, the case agent on this case, and he will tell you

23  about reviewing the financial records of Scott Jenkins.  From

24  his review, he saw that Scott Jenkins was personally spending

25  more money than he had, and that he was in debt.  He will also

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  tell you that after some of these bribe payments, there were

2  large cash deposits into Scott Jenkins's bank accounts, and

3  then large payments on his credit card accounts as well.

4         Finally, you will see Scott Jenkins attempt to cover

5  up his crimes.  In January of 2023, he called Kevin Rychlik and

6  told him to meet him at a Target parking lot.  When they

7  arrived, Scott Jenkins told him he had an ethics filing due,

8  and he suggested he didn't want to report the large amount of

9  cash he had taken.  This meeting was recorded.  You will hear

10  the men discuss the fact that he had the large amount of cash

11  and what to do about it.  And what Scott Jenkins decided to do

12  about it was to make sham firearms transactions.  He brought

13  with him four firearms, and he wanted Kevin Rychlik to complete

14  transfer paperwork showing that those bribe payers had actually

15  bought firearms from him, not badges.  You will hear the men

16  discuss the fact that firearms were never talked about with any

17  of the bribe payers, and that none of them actually bought

18  firearms from Scott Jenkins.  But he was trying to cover up his

19  tracks.

20         Ladies and gentlemen, it really is pretty simple.

21  Scott Jenkins used his position as sheriff to benefit himself

22  and to line his own pockets.  You will hear the same story over

23  and over again.  A bribe payer is identified.  They travel to

24  Culpeper County.  They are sworn in as an auxiliary deputy

25  sheriff.  They receive their badge from the sheriff.  In

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1   exchange, they give him a payment.  No one is above the law,

2   especially the very person who is tasked with upholding the law

3   like Scott Jenkins.  He took an oath to faithfully and

4   impartially discharge all the duties incumbent upon him.  As

5   chief law enforcement officer of Culpeper County, he was

6   supposed to serve and protect the people, but instead of

7   serving the people, the only person he chose to serve was

8   himself.

9           At the end of all the evidence in this case, the

10  United States will come back before you and we will ask that

11  you find Scott Jenkins guilty on all counts.  Thank you.

12          THE COURT:  Thank you, Ms. Smith.

13          Mr. Caleb?

14          MR. CALEB:  Thank you, Your Honor.

15          Ladies and gentlemen, what you just heard was the

16  government's spin.  And it's spin, ladies and gentlemen.  It's

17  spin on Scott Jenkins's intent and attempts to implement his

18  vision for Culpeper County while he was sheriff.  Ladies and

19  gentlemen, you certainly won't hear any credible evidence that

20  Mr. Jenkins accepted a bribe, and you won't hear any evidence,

21  credible evidence, that Mr. Jenkins was involved in a

22  conspiracy.  Ladies and gentlemen, Scott Jenkins did no such

23  thing, and Scott Jenkins is not guilty.

24          Now, during the course of this trial, you'll hear

25  that Scott Jenkins was a three-term sheriff in Culpeper County,

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1   serving from 2012 to 2023.  You'll hear that he had a platform.

2   You'll hear that he had an agenda.  Ladies and gentlemen,

3   you'll hear that at the top of his agenda were two things.

4   There was a strong border that he believed strongly in, and

5   there was also the Second Amendment right to bear arms.  These

6   are two things that he believed strongly in and that he came up

7   with creative ideas to implement his vision.  Ladies and

8   gentlemen, you'll hear that one of his creative ideas

9   pertaining to the Second Amendment had to do with the deputy

10  auxiliary program.  See, his idea was a response to what he

11  perceived to be a problem.  And the problem he perceived was

12  that there was legislation being passed in Virginia that was

13  limiting the rights of lawful gun ownership.  He thought that

14  was a problem.  So he came up with a solution, and his solution

15  was to expand the deputy auxiliary sheriff's program.

16  Expanding the deputy auxiliary sheriff's program would

17  accomplish two things.  First of all, it would allow the

18  sheriff's office to call upon additional people to help the

19  sheriff's office when the sheriff's office might need the help.

20  Additionally, it would create a pathway to legal gun ownership

21  in Virginia.  Ladies and gentlemen, so that was his creative

22  fix, ladies and gentlemen.  But yet, the government wants you

23  to think that there's a problem with that.  And we'll talk

24  about the reasons why that wasn't wrong.  But his idea, his

25  creative response, like I said, was creative, but it was -- it

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1    was provocative, it was an idea that people supported and they

2    supported with their time.  They supported his idea with their

3    service.  They supported his idea with their money.  They

4    supported because they believed in his vision.  They gave and

5    they gave big.

6            The government mentioned Mr. Jenkins wanting to build

7    his war chest.  That's right.  He doesn't deny that.  In fact,

8    Mr. Jenkins was a politician running for office, running

9    campaigns.  He needed money.  He needed money because money

10   increased his likelihood of success on the campaign.  Nothing

11   wrong with getting campaign contributions, ladies and

12   gentlemen.  And that's what he did.

13           Now, the government wants you to think that there was

14   something wrong with that because it's relying on evidence and

15   testimony from people that work for the government, people with

16   biases.  Not only that, they're going to bring to you witnesses

17   with motives to be in the government's good graces.

18           They mention Kevin Rychlik.  So I'll talk about him

19   for a second.  And you'll hear that Kevin Rychlik was an

20   individual who had his own problems.  He'll take the stand and

21   he'll tell you about his problems in the Eastern District of

22   Virginia.  He'll tell you that he was being investigated for

23   crimes, crimes that he committed and crimes that are separate

24   even from this case, ladies and gentlemen.  And he needed to

25   work something out.  He needed to save himself.  And he needed

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1   to save himself because he was exposed to serious jail time.

2   He was at risk of spending serious time in jail.  And

3   Mr. Rychlik didn't want to do that.  So what did he do?  He

4   came to the government and spun a tale that the government ran

5   with.  He spun a tale of conspiracy and bribery, ladies and

6   gentlemen.  You'll hear that Kevin Rychlik was desperate.  He

7   was desperate when he came to the government.  He was so

8   desperate, so desperate that he essentially became an

9   undercover agent.  He worked for the government.  He put on a

10  wire, he wore a secret camera, and he recruited people to

11  commit crimes, all to ingratiate himself with the government.

12  You might wonder what Kevin Rychlik got or expects to get in

13  return.  And I'll tell you, ladies and gentlemen.  You'll hear

14  that Kevin Rychlik expected a favor from the government.  He

15  expects that when he is sentenced in his case in the Eastern

16  District of Virginia and in the Western District of Virginia,

17  because he has two separate criminal cases going on, he expects

18  that the government will speak up on his behalf.  He expects

19  that the government will ask the judge for lenience on his

20  behalf because of what he's doing in this case.  And the

21  government mentioned the other people, and I mentioned the

22  people that Kevin Rychlik got involved in this case.  And some

23  of those people you'll hear about.  You'll hear about Fred

24  Gumbinner and you'll hear about Jim Metcalf, you'll hear about

25  Rick Rahim, and you'll hear about others.  And you'll hear that

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  these individuals -- and they'll testify, too, ladies and

2  gentlemen -- and you'll hear that they have said and they are

3  saying whatever they need to say because they are in trouble

4  too.  Everyone is trying to save themselves because everyone

5  has expectations that the government will do them a favor.  So

6  the government wants to bring up this term and apply it to

7  Mr. Jenkins.  But really, ladies and gentlemen, the quid pro

8  quo, the "this for that," the Latin phrase that the government

9  mentions, that's a phrase that applies to the government and

10 its relationship with the witnesses that will testify in this

11 case against Mr. Jenkins, the "this for that."  And you'll hear

12 that all of the witnesses that -- not all of the witnesses, but

13 a good deal of the witnesses that testify in this case against

14 Mr. Jenkins are witnesses who will have an expectation of quid

15 pro quo from the government.  They'll expect that in exchange

16 for their testimony on the stand on the days that they testify

17 and the work that they've done in this case to help the

18 government, they'll expect something in exchange.  And what

19 they'll expect is that the government will stand up on their

20 behalf when their sentencing day comes and ask for lenient

21 sentences on their behalf.  And ladies and gentlemen, that's

22 the real quid pro quo that's going on in this case.

23        So I'm going to ask you, ladies and gentlemen, to pay

24 attention to the evidence.  We picked you because we trust that

25 you guys will analyze and be very critical of the witnesses and

Siebel - Direct

1  the testimony that you hear from this witness stand.  We picked

2  you guys because we know and we're confident that you will keep

3  an open mind, and that you will evaluate the government's case

4  because it is the government's burden.  And we're confident

5  that once you've done that, and once you've analyzed the

6  evidence and the lack of evidence in this case, ladies and

7  gentlemen, you will return the only verdict that will be

8  consistent with what you've heard.  That is a verdict of not

9  guilty.  Thank you.

10          THE COURT:  Thank you, Mr. Caleb.

11          All right.  Let's call your first witness, please.

12          MS. CHOY:  Thank you, Your Honor.  The government

13  calls Peter Siebel.

14          THE COURT:  All right.  Peter Siebel.  Come on up, if

15  you would, please, sir.  We'll have you come right over here

16  with the CSO.  Right before you step up, Ms. Brown will swear

17  you in.

18          PETER SIEBEL, CALLED BY THE GOVERNMENT, SWORN

19          THE COURT:  Step right on up, have a seat.  Speak

20  into the microphone and answer counsel's questions, please.

21                      DIRECT EXAMINATION

22   BY MS. CHOY:

23  Q    Good morning.

24  A    Good morning, ma'am.

25  Q    Could you please introduce yourself to the members of the

Siebel - Direct

1  jury and spell your name for the record?

2  A    Yes, ma'am.  My name is Peter Siebel, and my last name is

3  spelled S-I-E-B-E-L.

4  Q    Mr. Siebel, did you previously serve as a deputy sheriff

5  in Culpeper County?

6  A    Yes, ma'am, I did.

7  Q    Who was the sheriff at the time that you served?

8  A    Scott Jenkins.

9  Q    Do you see Scott Jenkins here in this courtroom?

10  A    Yes, ma'am, I do.

11  Q    Could you please identify him by where he's sitting and an

12  item of clothing?

13  A    Yes, ma'am.  He's sitting there at the end of the table

14  with a blue suit and blue tie.

15        MS. CHOY:  Let the record reflect that Mr. Siebel has

16  identified the defendant, Scott Jenkins.

17        THE COURT:  It will be so reflected.

18   BY MS. CHOY:

19  Q    So Mr. Siebel, I'd like to start with a few questions

20  about your background.

21  A    Yes, ma'am.

22  Q    Where do you reside?

23  A    I reside in Orange County, Virginia.

24  Q    And where did you grow up?

25  A    I grew up in New York until I was about 16 years old, then

Siebel - Direct

1  Louisa County, Virginia.

2  Q    Did you attend college?

3  A    Yes, ma'am.

4  Q    Where did you go?

5  A    I went to Virginia Tech.

6  Q    Did you graduate?

7  A    No, ma'am.

8  Q    And at some point, did you join the Army?

9  A    I did.

10  Q    Roughly when was that?

11  A    1982.

12  Q    And while you were in the Army, did you serve in the

13  military police?

14  A    Yes, ma'am.

15  Q    And did you also serve in Operation Desert Storm?

16  A    Yes, ma'am.

17  Q    And at some point, did you leave active duty in the Army?

18  A    Yes, ma'am, I did.

19  Q    Roughly when was that?

20  A    That was July of 1991.

21  Q    And after leaving active duty, did you join the Army

22  Reserves?

23  A    Yes, ma'am, I did.

24  Q    And at some point, did you retire from the Army entirely?

25  A    Yes, ma'am, I did.

Siebel - Direct

1  Q    When was that?

2  A    Approximately February of 2004.

3  Q    So going back to after you left active duty, at that

4  point, did you join the Louisa County sheriff's office?

5  A    Yes, ma'am, I did.

6  Q    What was your position there?

7  A    I was a road deputy or a patrol deputy for the Louisa

8  County sheriff's office.

9  Q    Is that a sworn law enforcement position?

10 A    Yes, ma'am, it is.

11 Q    Could you please explain to the members of the jury what

12 it means to be a sworn law enforcement officer?

13 A    Yes, ma'am.  Well, you take an oath in front of the clerk

14 of the court to uphold the Constitution of the United States,

15 and in this case, the Constitution of Virginia, and uphold all

16 the laws therein and the local laws.  So it's your job to go

17 out and enforce those laws through your jurisdiction.

18 Q    And when you first became a sworn law enforcement officer,

19 did you receive training?

20 A    Yes, ma'am, I did.

21 Q    Could you briefly summarize the training you received?

22 A    Yes, ma'am.  I went through basic training at Central

23 Shenandoah Criminal Justice Training Center, which was located

24 in Waynesboro, Virginia at the time.  As I recall, it was about

25 11 weeks long, and it taught you a facet of things, laws, how

Siebel - Direct

1  to effect arrest, constitutionality, many different things, and

2  then also physical skills such as firearms and unarmed

3  self-defense.

4  Q    And after you served in Louisa County, did you serve in

5  other jurisdictions as well?

6  A    Yes, ma'am, I did.

7  Q    Which jurisdictions were those?

8  A    I left Louisa County and came to the City of

9  Charlottesville and served there for almost seven years.

10  Q    And did you serve in other jurisdictions as well?

11  A    Yes, ma'am, I did.

12  Q    Could you list them, please?

13  A    I went back to Louisa County after having served in

14  Charlottesville, went to Orange County, I took a brief

15  sabbatical from law enforcement and served as a contractor

16  overseas.  Then I came to the Culpeper town police department,

17  and ultimately to Culpeper County sheriff's office.

18  Q    And over the course of this law enforcement career, did

19  you receive periodic training?

20  A    Yes, ma'am.  We were required to have training at a

21  minimum of 40 hours every two years, but we had additional

22  training beyond that.

23  Q    And were you also required to periodically re-qualify with

24  your firearm?

25  A    Yes, ma'am.  The state requirements were a minimum of once

Siebel - Direct

1    a year, and depending upon the office and the department, it

2    could be as much as twice a year.

3    Q    Now, you mentioned both the Culpeper town police

4    department and the Culpeper County sheriff's office.  Are those

5    different law enforcement agencies?

6    A    Yes, ma'am, they are.

7    Q    Could you please explain to the members of the jury the

8    difference between those two agencies?

9    A    The town police is just that.  It's a town civil entity

10   that works under the auspices of the government of the Town of

11   Culpeper.  It is a civil organization, and it has jurisdiction

12   within the town.  The Culpeper County sheriff's office is a

13   Constitutional office that has authority over the entire county

14   to include the town.

15   Q    And what year did you join the Culpeper County sheriff's

16   office?

17   A    2015, ma'am.

18   Q    Who hired you?

19   A    Sheriff Jenkins.

20   Q    And at some point, did you retire from the Culpeper County

21   sheriff's office?

22   A    Yes, ma'am, I did.

23   Q    When was that?

24   A    That was April 30th, 2023.

25   Q    And are you currently employed?

Siebel - Direct

1  A    Yes, ma'am.  I'm employed part-time by the Culpeper County

2  office of the County Attorney.

3  Q    So I'd like to focus you in on the fall of 2022 when you

4  were still with the Culpeper County sheriff's office.

5  A    Yes, ma'am.

6  Q    What was your rank at that time?

7  A    I was the operations -- law enforcement operations major.

8  Q    What were your duties and responsibilities?

9  A    I had oversight of the law enforcement side of the office,

10 which included patrol.  It included the criminal investigations

11 division, the school resource officers.  I also had oversight

12 over records, training, which included accreditation.  I was

13 the Freedom of Information Act officer for the office.  And I

14 took care of expungements and subpoena duces tecums and other

15 duties assigned.

16 Q    And who was your supervisor?

17 A    It was Colonel Curtis Hawkins.

18 Q    What is his rank -- or was his rank?

19 A    He was the chief deputy, ma'am.

20 Q    And in some instances, did you also report directly to the

21 sheriff?

22 A    Yes, ma'am.

23 Q    Were you a member of the command staff?

24 A    Yes, ma'am.

25 Q    Could you explain what that is?

Siebel - Direct

1   A    The command staff was above the rank of lieutenant that

2   the sheriff had in his office -- that Sheriff Jenkins had in

3   his office -- to carry out his authority and duties in the

4   different divisions and areas that he was in charge of.

5   Q    So that's the leadership team of the office?

6   A    Yes, ma'am.

7   Q    Did there come a time when you were demoted in rank?

8   A    Yes, ma'am.

9   Q    Could you explain what happened?

10  A    Yes, ma'am.  It was at the end of November, beginning of

11  December of 2022 -- correction, '23, pardon me -- there was a

12  problem with the school resource officer division.  The

13  lieutenant that was in charge of it, there was a captain that

14  was next up the chain, myself, then the chief deputy, then the

15  sheriff.  The sheriff became agitated because the school

16  resource officers were not at every school every minute.  There

17  came a long, several-week investigation into that.  As we sat

18  there, I stood up, as the lieutenant had not, the captain had

19  not, nor the chief deputy, and took responsibility, because I

20  was in the chain of command.  Because of that, I was demoted.

21  Q    And what was your rank after you were demoted?

22  A    Lieutenant.

23  Q    So I'd like to talk a little bit more about the structure

24  and the functions of the Culpeper County sheriff's office.

25  A    Yes, ma'am.

Siebel - Direct

1  Q    Who's the head of the office?

2  A    Sheriff Jenkins was the head of the office.

3  Q    When did Sheriff Jenkins become the sheriff?

4  A    2012 -- January 1st, 2012.

5  Q    And did he have to run for reelection periodically?

6  A    Yes, ma'am, every four years in the State of Virginia.

7  Q    Was he, in fact, re-elected twice?

8  A    Yes, ma'am.

9  Q    And generally speaking, what are the functions of the

10 sheriff's office?

11 A    The sheriff's office is responsible for the courtrooms,

12 the courtroom security, prisoner transports, the jail, and in

13 our case, we were a full service sheriff's office.  We also had

14 the law enforcement function, which was the school resource

15 officers protecting the schools, the patrol division, the

16 officers in uniform 24 hours a day every day, and the criminal

17 investigations division, and then records and other functions

18 as well.

19 Q    As the sheriff, was Scott Jenkins ultimately responsible

20 for overseeing all those functions?

21 A    Yes, ma'am.

22 Q    And did he have authority to make decisions on behalf of

23 the sheriff's office?

24 A    Yes, ma'am.

25 Q    Did he make operational decisions?

Siebel - Direct

1   A      Yes, ma'am.

2   Q      Policy decisions?

3   A      Yes, ma'am.

4   Q      Employment decisions?

5   A      Yes, ma'am.

6   Q      Budget decisions?

7   A      Yes, ma'am.

8   Q      Staffing decisions?

9   A      Yes, ma'am.

10  Q      You testified earlier that in the fall of 2022 you were a

11  member of the command staff.  Was there another individual on

12  the command staff by the name of Mike Jenkins?

13  A      Yes, there was.

14  Q      Is he any relation to Scott Jenkins?

15  A      Michael Jenkins is Scott Jenkins's brother.

16  Q      And what was his rank at that time?

17  A      Lieutenant.

18  Q      And what role did he play?

19  A      He was in charge of the special events section, which

20  included different events that took place, the public

21  information officer aspect of the office, and duties assigned.

22  Q      Was there another individual on the command staff by the

23  name of Johnny Jenkins?

24  A      Yes, ma'am, there was.

25  Q      Is he any relation to the defendant, Scott Jenkins?

Siebel - Direct

1   A    He is Scott Jenkins's brother.

2   Q    And what was his rank at that time?

3   A    He was the judicial major, which means he was the major in

4   charge of the courts, transportations, and the jail.

5   Q    Did the sheriff's office employ deputy sheriffs?

6   A    Yes, ma'am.

7   Q    Roughly how many?

8   A    I believe there was 107.

9   Q    And are all the deputy sheriffs sworn law enforcement

10  officers?

11  A    Yes, ma'am.

12  Q    And are they salaried employees of the sheriff's office?

13  A    Yes, ma'am.

14  Q    If someone is appointed as a deputy sheriff and sworn in,

15  does that position expire at some point?

16  A    It would expire with the sheriff's term of four years, so

17  they would be re-sworn when the sheriff is re-sworn after

18  reelection or election.

19  Q    Are deputy sheriffs issued badges and credentials?

20  A    Yes, ma'am, they are.

21  Q    What are credentials?

22  A    The credential is an ID card, an identification card that

23  identifies you as a deputy of, in this case, the Culpeper

24  County sheriff's office.  And on the reverse side of it, it

25  would have your rank, your date of birth, and your physical

Siebel - Direct

1    identifier so somebody knows it was you.

2    Q    What do the badge and credentials signify to members of

3    the public?

4    A    That you are a sworn officer and you have the authority to

5    uphold the law, make arrests, and execute the various laws of

6    the Commonwealth and localities.

7    Q    Do sworn law enforcement officers have any special

8    authority with respect to carrying firearms?

9    A    Yes, ma'am.  Sworn law enforcement officers can carry a

10   firearm in places people can't that have permits.  So they can

11   carry anywhere in the Commonwealth, because even as we're off

12   duty, we are expected to act in a law enforcement capacity,

13   even beyond our jurisdiction.  So they can carry them all the

14   time and anywhere.  There was a federal law passed recently

15   that allows law enforcement in general to carry anywhere in the

16   United States, even when you retire, as long as you keep up

17   your qualifications and have the right credentials.

18   Q    So an individual who carries the badge and credentials can

19   carry a concealed weapon anywhere in the United States without

20   a permit?

21   A    Yes, ma'am.

22   Q    And is that true even if they're not on duty?

23   A    Yes, ma'am.

24   Q    And is that true even if they're not in uniform?

25   A    Yes, ma'am.

Siebel - Direct

1  Q    And you mentioned that's true even if they've retired?

2  A    Yes, ma'am.

3        MS. CHOY:  At this time, Your Honor, the government

4  is going to move in a series of exhibits that have been

5  stipulated to by the parties.

6        THE COURT:  Okay.

7        MS. CHOY:  Those Exhibits are 301 through 325, 601

8  through 636, 701, 703 through 719, 723 through 727, 743 through

9  747, and 802.

10       THE COURT:  All right.  These are not stipulations,

11 they're just exhibits without objection, correct?

12       MS. CHOY:  Correct.

13       THE COURT:  All right.  So admitted.

14       (Government Exhibits 301 through 325, 601 through

15 636, 701, 703 through 719, 723 through 727, 743 through 747,

16 and 802 marked and admitted)

17 BY MS. CHOY:

18 Q    Sir, I'd like to talk to you about the process of hiring

19 regular deputy sheriffs.

20 A    Yes, ma'am.

21 Q    Did you have any involvement in that process?

22 A    Yes, ma'am, I did.

23 Q    So I'd like you to walk us through step by step.  If

24 someone wants to become a deputy sheriff, what's the first step

25 that they would take?

Siebel - Direct

1   A    The first step that they would take would be fill out an

2   application.  We had an online application that would be the

3   start of the basis of the paperwork we would use to start

4   moving forward.

5           MS. CHOY:  And Ms. Fastenau, could you please pull up

6   Government's Exhibit 726, which is in evidence.

7           May I publish that to the jury, Your Honor?

8           THE COURT:  Yes.

9   BY MS. CHOY:

10  Q    Do you see that, Mr. Siebel?

11  A    Yes, ma'am, I do.

12  Q    What is this document?

13  A    That is -- that is the -- I'm sorry, ma'am, it keeps

14  flashing on my screen.  That is part of the personal history

15  statement that needs to be filled out by an applicant.

16  Q    So this is part of the application for a regular deputy

17  sheriff position?

18  A    Yes, ma'am.

19  Q    And what types of information does that application

20  request from the applicant?

21  A    There's all kinds of application there.  You're basically

22  putting your life history there.  It's your date of birth, your

23  education, personal references, where you've worked in the

24  past, military service.  It's a pretty comprehensive breakdown

25  of your life's history.  It's approximately 40 pages long that

Siebel - Direct

1  needs to be filled out.

2  Q    Thank you.

3        MS. CHOY:  And Ms. Fastenau, could you please pull up

4  Government's Exhibit 727, which is in evidence.

5  BY MS. CHOY:

6  Q    And Mr. Siebel, do you recognize this document?

7  A    Yes, ma'am, I do.

8  Q    What is it?

9  A    It's the cover sheet to the authorization for release of

10 personal information.

11 Q    And what is the purpose of this document?

12 A    Once we have them filling out their personal history

13 statement prior to us starting an investigation, they give us

14 permission to do that, to look into their criminal history, to

15 look into their personal history that they provided for us, to

16 make sure that what we are seeing is what we're getting.

17 Q    So continuing on with this application process, you

18 mentioned that an individual would submit the application, this

19 application process, and sign the release.  What would happen

20 next?

21 A    Once the application was taken in and was decided that

22 they were what we were looking for at the time for the

23 position, they would come in for an initial interview.  And

24 during the initial interview, we would talk to them about

25 themselves.  They would tell us about who they were, what they

Siebel - Direct

1   are, why did they want to be part of the sheriff's office, and

2   pretty standard information like that.  At the end of that

3   process, if it seems that they were the people that we were

4   looking for, a potential person to work in our office, then the

5   personal history packet would be released and get them to sign

6   the release so we could start the investigation.

7   Q    And you mentioned an investigation.  What would that

8   involve?

9   A    It would go back initially -- the personal history

10  statement, once it was returned and notarized, it would be

11  assigned to a detective or somebody specifically to start the

12  investigation of the individual, to see that the information

13  was true, and that it matched what was on the paper.  The

14  detective would bring somebody in, sit them down, and go

15  through it line by line and step by step to make sure

16  everything was good prior to starting.  At that point after

17  they notarized it, they would go back and look at their

18  references, check their educational backgrounds, check former

19  employers, and all the information there to see if it's, in

20  fact, true.

21  Q    And if someone passes that background investigation,

22  what's the next step?

23  A    We would -- we would explain that to the sheriff, and then

24  we would set up a second interview.

25  Q    Who would conduct that interview?

Siebel - Direct

1  A    Generally the sheriff.

2  Q    And who ultimately makes the decision about whether to

3  hire someone as a deputy sheriff?

4  A    In those days, Sheriff Jenkins.

5  Q    Did anyone else have that authority?

6  A    No, ma'am.

7  Q    Who has the authority to fire deputy sheriffs?

8  A    Sheriff Jenkins.

9  Q    Who sets deputy sheriffs' salaries?

10 A    Sheriff Jenkins.

11 Q    Who determines their rank?

12 A    Sheriff Jenkins.

13 Q    Who determines their assignments?

14 A    Sheriff Jenkins.

15 Q    Fair to say Sheriff Jenkins had a lot of power over deputy

16 sheriffs?

17 A    Yes, ma'am.

18 Q    Did the sheriff's office also employ civilians, meaning

19 folks who were not sworn law enforcement officers?

20 A    Yes, ma'am, we did.

21 Q    Roughly how many?

22 A    I would guess, ma'am, about 20.

23 Q    And who had authority to hire and fire those folks?

24 A    Sheriff Jenkins.

25 Q    So Mr. Siebel, while you were working at the sheriff's

Siebel - Direct

1  office under Sheriff Jenkins, how would you describe the

2  culture of that office?

3  A    The culture was one of fear and bullying.

4  Q    Could you explain what you mean by that?

5  A    Well, it came a time when I realized when I was there that

6  if you went afoul of the sheriff's wishes, you could catch a

7  lot of flack for it.  You'd be screamed at and yelled at and

8  hollered at.  There were people that were going around

9  recording each other.  It was just an uncomfortable spot,

10  because as a constitutional officer, he could change your

11  assignment, he could demote you, or he could fire you without

12  cause.  And it became uncomfortable with that.

13  Q    And what about Sheriff Jenkins's management style, how

14  would you characterize that?

15  A    He was very much a micro-manager.  He was into all the

16  details of every aspect of that office.

17  Q    And did he like to know what was going on in the office?

18  A    Yes, ma'am.

19  Q    When you worked in the office, did Sheriff Jenkins ever

20  give you advice about how to keep abreast of what was going on

21  at the office?

22  A    Yes, ma'am, he did.  The professional level advice that he

23  gave me, he told me I should have informants in every division

24  that could bring me back information or record things for you,

25  so you could know what was going on in the division.

Siebel - Direct

1  Q    Did he indicate whether that was something he himself did?

2  A    Yes, ma'am, he did.

3  Q    And did you follow that advice?

4  A    No, ma'am, I did not.

5  Q    Taking you back to the fall of 2022, how often were you in

6  communication with Sheriff Jenkins?

7  A    Fairly regularly.

8  Q    And how would you communicate with him?

9  A    Usually by text or telephone, sometimes in person when he

10  was in the office.

11 Q    Did Sheriff Jenkins communicate by e-mail?

12 A    No, ma'am.

13 Q    Did he tell you why not?

14 A    Yes, ma'am.  When I started my position as the FOIA

15  officer -- the Freedom of Information Act officer -- it was

16  brought to my attention that e-mails were discoverable, and

17  information e-mails could be put out into the public realm, and

18  he did not want that to happen.

19 Q    So if I'm hearing you correctly, Sheriff Jenkins, to your

20  understanding, didn't use e-mail because he didn't want members

21  of the public to see what he was communicating about?

22 A    Yes, ma'am.

23 Q    Did Sheriff Jenkins also like to control the dissemination

24  of information within the office?

25 A    Yes, ma'am.

Siebel - Direct

1  Q    Could you explain that?

2  A    He would tell us different things and tell us what level

3  they could go to, whether it was just for the command staff,

4  whether it was for captains, whether we should take this down

5  to the sergeants, the basic deputies, or whatever.  So

6  information flow was specifically done at his discretion and at

7  his direction.

8  Q    When you were working at the sheriff's office, would you

9  ever take any significant action without approval from Sheriff

10 Jenkins?

11 A    No, ma'am.

12 Q    Why not?

13 A    Because I'm afraid if I did I'd anger him and I'd either

14 be demoted or fired.

15 Q    Did you ever hear the sheriff use the term feasible

16 deniability?

17 A    Yes, ma'am, I did.

18 Q    Was that a term he used routinely?

19 A    Regularly.

20 Q    Regularly?  What did you understand him to mean by that?

21 A    Feasible deniability was the ability to separate himself

22 from a situation or an occasion.

23 Q    So could you provide a bit more context to when this term

24 would come up?

25 A    It would come up in conversation in the office, and it

Siebel - Direct

1   came up several times during staff meetings.

2   Q     So was it your understanding he was trying to create

3   feasible deniability?

4   A     Yes, ma'am.

5   Q     What types of activities would that be in relation to?

6   A     Well, hirings -- or not hirings -- but firings, and other

7   negative type actions within the office or outside the office.

8   Q     Did you ever have a conversation with Sheriff Jenkins

9   about his image?

10  A     Yes, ma'am.

11  Q     Could you tell us what you recall about that?

12  A     Yes, ma'am.  We sat in the office.  It was shortly after

13  Colonel Curtis Hawkins was promoted to chief deputy, and I was

14  promoted to the law enforcement major, and we discussed many

15  different aspects.  But the one that stuck in my mind was he

16  told me -- he told us that he had to be loved inside the office

17  and out, because he was the sheriff.  He then pointed over

18  Colonel Curtis Hawkins and said, he's going to be the next

19  sheriff, so he needs to be loved too, and you get to be the

20  asshole, pointing at me.

21  Q     What did you understand him to mean by that?

22  A     That I was going to take care of the unpleasant duties,

23  the dirty work.

24  Q     I'd like to shift gears now and talk about auxiliary

25  deputy sheriffs.

51

Siebel - Direct

1   A     Yes, ma'am.

2   Q     Are you familiar with that term?

3   A     Yes, ma'am.

4   Q     Are they sometimes called reserve deputies?

5   A     Yes, ma'am, that term is interchangeable.

6   Q     Are auxiliary or reserve deputies sworn law enforcement

7   officers?

8   A     Yes, ma'am, they're fully sworn.

9   Q     But are they paid?

10  A     No, ma'am.

11  Q     Are they issued a badge?

12  A     They are.

13  Q     Are they issued credentials?

14  A     Yes, ma'am, they are.

15  Q     Do they have law enforcement authority?

16  A     Yes, ma'am, they do.

17  Q     What is the purpose of the auxiliary deputy program

18  supposed to be?

19  A     The auxiliary deputy program is supposed to be able to

20  augment the organization that they're attached to and they're

21  sworn with, so they can help in times of shortages, at special

22  events, or whatever their needs are for, so it would help the

23  core group, because there's always a shortage of officers and

24  plenty of things to do.  So they were there to provide law

25  enforcement assistance, just not be paid for it.

Siebel - Direct

1  Q    Who has authority to appoint auxiliary deputies?

2  A    The sheriff does.

3  Q    Does anyone else have that authority?

4  A    No, ma'am.

5  Q    Who is ultimately responsible for overseeing the auxiliary

6  deputy program?

7  A    The sheriff was.

8  Q    And what about for training the auxiliaries?

9  A    The sheriff was.

10 Q    And ensuring that the program complies with the law?

11 A    The sheriff was.

12 Q    When you worked at the Culpeper County sheriff's office,

13 did it have an auxiliary deputy program?

14 A    Yes, ma'am, it did.

15 Q    And did it have a policy that governed that program?

16 A    Yes, ma'am, it did.

17 Q    Did you become familiar with that policy during your time

18 working in the office?

19 A    I did.

20         MS. CHOY:  Ms. Fastenau, could you please display

21 Government's Exhibit 723, which is in evidence.

22 BY MS. CHOY:

23 Q    Mr. Siebel, do you recognize this document?

24 A    Yes, ma'am, I do.

25 Q    What is it?

Siebel - Direct

1  A    It's general order 1-115 -- excuse me -- 1-15, which was

2  the Culpeper sheriff's general order that was the policy for

3  auxiliary deputies.

4  Q    Thank you.

5        MS. CHOY:  And Ms. Fastenau, could you please zoom in

6  on that box at the top half of the page?

7  BY MS. CHOY:

8  Q    So you mentioned this is a general order.  Could you

9  explain what that is?

10 A    Yes, ma'am.  They are orders that are issued by the

11 sheriff that is the way he wants us to operate as sworn

12 officers in the community and throughout our duties.

13 Q    What's the effective date of this general order?

14 A    January 1st, 2020.

15 Q    And does it indicate who approved it?

16 A    Yes, it does.  It says Scott H. Jenkins, Sheriff.

17       MS. CHOY:  Ms. Fastenau, could you please zoom in on

18 that first paragraph under the heading "policy?"

19 BY MS. CHOY:

20 Q    So in the middle of this paragraph it says, the reserve

21 deputy -- and that's the same as auxiliary, correct?

22 A    Yes, ma'am.

23 Q    Generally performs the same duties and has the same law

24 enforcement powers equivalent to those of a paid deputy.  The

25 same selection criteria will be applied to a reserve deputy

Siebel - Direct

1    applicant as for a full-time deputy.

2         Do you see that?

3    A    Yes, ma'am, I do.

4    Q    And then at the bottom of the page there's a paragraph

5    that says, "purpose."

6         And it says here, the purpose of the volunteer programs is

7    to augment the sheriff's office in operational and

8    administrative areas to maximize the availability of paid

9    staff.

10        Do you see that?

11   A    Yes, ma'am, I do.

12   Q    Is that your understanding of what that program is

13   supposed to be about?

14   A    Yes, ma'am.

15   Q    Let's turn to page 2.

16        And there's a section titled "definitions."  Could you

17   please read the definition of a reserve deputy?

18   A    Yes, ma'am.  It's a volunteer that has successfully

19   completed the requisite training and received certification in

20   law enforcement, jailer, court security, or civil process.

21   Q    And then there's also a section that's titled "procedure."

22   And below that there's a paragraph that says number 1-B,

23   applicants for reserve deputy.  So it says here that applicants

24   for the reserve deputy will go through the same hiring process

25   as that for paid officers.

Siebel - Direct

1      Do you see that?

2  A    Yes.

3  Q    And so is that referring back to that multistep process

4  that you were explaining earlier?

5  A    Yes, ma'am.

6  Q    And there's also a section about training requirements.

7      Do you see that?

8  A    Yes, ma'am.

9  Q    And there's a list of requirements that are labeled A

10 through F?

11 A    Yes, ma'am.

12 Q    And there's extensive requirements; is that right?

13 A    Yes, ma'am.

14 Q    How do those requirements compare to those of a paid

15 deputy?

16 A    They're the same.

17 Q    And then finally turning to page 3, please.

18      There's a paragraph number 4 titled "service

19 requirements."  And it says here that a minimum of 16 hours of

20 service time is required per month.

21      Do you see that?

22 A    Yes, ma'am.

23 Q    So is it fair to say that there were a lot of rules that

24 were governing this program in the sheriff's office?

25 A    Yes, ma'am.

Siebel - Direct

1          MS. CHOY:  And thank you, you can take that down,

2   Ms. Fastenau.

3   BY MS. CHOY:

4   Q    In your experience, Mr. Siebel, did the auxiliary program

5   at the Culpeper County sheriff's office follow those rules?

6   A    No, ma'am.

7   Q    So in practice, generally speaking -- we'll go into the

8   details -- but generally speaking, how did it function?

9   A    They were not there very often.  I didn't see them often

10  at all.  A couple would pop out on occasion at some special

11  events, but other than that, it didn't function as described.

12  Q    And were there individuals who came in without going

13  through the application process?

14  A    Yes, ma'am.

15  Q    And were there individuals who came in and they never came

16  back?

17  A    Yes, ma'am.

18  Q    Okay.  So let's dig into that in a bit more detail.

19         Did there come a time when you became involved in

20  processing paperwork for auxiliaries that Sheriff Jenkins

21  wanted to appoint?

22  A    Yes, ma'am, I did.

23  Q    Roughly when was that?

24  A    In the fall of 2022, roughly the end of August, beginning

25  of September.

Siebel - Direct

1   Q    Who assigned you to get involved in that process?

2   A    Sheriff Jenkins.

3   Q    And who told you how it was going to work?

4   A    Sheriff Jenkins.

5   Q    And who ultimately controlled the selection and swearing

6   in of those auxiliaries?

7   A    Sheriff Jenkins.

8   Q    Was there also an individual named Kevin Rychlik who was

9   involved in that process?

10  A    Yes, ma'am, there was.

11  Q    Who is Kevin Rychlik?

12  A    Kevin Rychlik is an auxiliary officer with the office that

13  held the rank of lieutenant.

14  Q    And based on your observations, did Kevin Rychlik have a

15  close relationship with Sheriff Jenkins?

16  A    Yes, ma'am, he did.

17  Q    What did you observe?

18  A    Well, he could contact the sheriff at his leisure on the

19  phone or through text, or talk to him.  He would come in the

20  office.  He had freedom of movement within our office.  I did

21  not observe that with others.

22  Q    How did you feel about Kevin Rychlik?

23  A    I was cautious with Kevin Rychlik because he was close to

24  the sheriff.  I did not want to make him angry because I

25  figured his anger would be conveyed back to Sheriff Jenkins.

Siebel - Direct

1  Q    Would you ever take an action on an auxiliary without

2  first getting Sheriff Jenkins's approval?

3  A    No, ma'am.

4  Q    So would you ever do anything on Kevin Rychlik's say-so

5  alone?

6  A    No, ma'am.

7  Q    Why not?

8  A    Because he's not the sheriff.

9  Q    So focusing you in on the fall of 2022, I'd like you to

10 walk us through the shortened process for those auxiliaries

11 that you were working on the paperwork for.

12 A    Yes.

13 Q    So for those people who came in in the fall of 2022, what

14 was the first step?

15 A    Well, the first thing that I saw was a texted

16 identification, a driver's license, some kind of ID, which

17 comes from Mr. Rychlik.

18 Q    And what would you do with that information?

19 A    At that point, I would verify with Sheriff Jenkins that

20 this was okay with him.

21 Q    And if it was, what would you do?

22 A    I would run a criminal history check, a driving history,

23 and what they call a local information network exchange, or a

24 LInX report, which would have people's names pop up in the

25 local police reports if they had been involved.

Siebel - Direct

1  Q    And so was there a personal history statement?

2  A    No, ma'am.

3  Q    Did they sign that waiver form?

4  A    No, ma'am.

5  Q    Was there an interview process?

6  A    I'm sorry, ma'am, I didn't hear --

7  Q    Was there an interview process?

8  A    No, ma'am.

9  Q    Was there any kind of psychological evaluation?

10 A    No, ma'am.

11 Q    Was there any kind of medical evaluation?

12 A    No, ma'am.

13 Q    And by the way, did the regular deputies have a

14 psychological or a medical evaluation?

15 A    Yes, ma'am.

16 Q    So other than that brief criminal history check that you

17 mentioned, was there any vetting at all done on these people?

18 A    No, ma'am.

19 Q    You didn't interview references?  There was no thorough

20 investigation?

21 A    No, ma'am.

22 Q    So if that person got approval to be sworn in, was there

23 paperwork that you would have to prepare?

24 A    Yes, ma'am.  I would go to one of the administrative

25 workers and ask them to have a swearing-in document prepared

Siebel - Direct

1  for that person as an auxiliary deputy.

2  Q    And what needs to happen to that swearing-in document?

3  A    Well, the first step, once it's prepared, it would have to

4  be signed by Sheriff Jenkins as his authority, and it would go

5  from there to the court, and the Circuit Court judge would have

6  to sign off on the bottom portion of it.

7  Q    And if the Circuit Court judge signed off, what would

8  happen then?

9  A    At that point, we would have that ready, I would contact

10 the sheriff or go through his executive assistant, and ask for

11 a date that everybody was available.  And then there would be

12 an appointment set up with the clerk of the court where they

13 could get sworn in.

14 Q    And did those folks also visit the office?

15 A    Yes, ma'am.

16 Q    And what would happen on those visits?

17 A    They would come in on the day of the swearing, Sheriff

18 Jenkins and Mr. Rychlik would take these folks on a brief tour

19 of the office.  Then they would go off and have lunch, and end

20 up at the clerk's office to be sworn.

21 Q    And was there additional paperwork that was supposed to be

22 filled out?

23 A    Yes, ma'am.  After somebody is sworn in, there's three

24 required documents for our office that was supposed to be done

25 annually:  An emergency contact sheet, a non-disclosure

Siebel - Direct

1  agreement, and a -- forgive me a second -- you had to say that

2  you knew what our general orders were, you had to acknowledge

3  our general orders.  And all three of those are supposed to be

4  done annually.

5  Q    And did these folks who were coming in in the fall of 2022

6  complete those forms?

7  A    No, ma'am.

8         MS. CHOY:  Ms. Fastenau, could you please bring up

9  Government's Exhibit 708, which is in evidence.

10  BY MS. CHOY:

11  Q    Can you see that?

12  A    Yes, ma'am.

13  Q    And what is this document?

14  A    That is an appointment order that has been filled out and

15  signed by Sheriff Jenkins and Judge Durrer, who is the Circuit

16  Court Judge in Culpeper County.

17         MS. CHOY:  Could you zoom in on the top half of that

18  page, please?

19  BY MS. CHOY:

20  Q    So is this the document you mentioned earlier that you

21  would prepare when Sheriff Jenkins wanted to appoint someone as

22  an auxiliary?

23  A    Yes, ma'am.

24  Q    And in the subject line, it says, appointment of auxiliary

25  deputy sheriff; is that right?

Siebel - Direct

1   A    Yes, ma'am.

2   Q    And who is this oath order for?

3   A    This is for James Metcalf.

4   Q    And it has a "to" field.  Who is it addressed to?

5   A    It's addressed to the Honorable Dale Durrer, the Judge of

6   the Circuit Court of Culpeper County.

7   Q    And could you please read the text of the oath order?

8   A    Yes, ma'am.  This is to certify that I have appointed the

9   above named persons as an auxiliary deputy sheriff of Culpeper

10  County, Virginia, pursuant to the provisions of section

11  15.2-1731 of the 1950 Code of Virginia as amended.

12  Q    And whose signature appears on that signature line that

13  says sheriff?

14  A    Sheriff Scott Jenkins.

15  Q    So is the sheriff's signature required before anyone gets

16  sworn in?

17  A    Yes, ma'am.

18  Q    Does anyone else have authority to sign this kind of

19  order?

20  A    No, ma'am.

21  Q    Then you mentioned that after the sheriff signs this order

22  it goes over to the clerk -- to the Circuit Court; is that

23  correct?

24  A    Yes, ma'am.

25          MS. CHOY:  Ms. Fastenau, could you please bring up

Siebel - Direct

1  709, which is in evidence.

2  BY MS. CHOY:

3  Q    Do you recognize this document?

4  A    Yes, ma'am, I do.

5        MS. CHOY:  Could you please blow up the top half of

6  that?

7  BY MS. CHOY:

8  Q    What is this document?

9  A    That is the oath and qualification that in this case the

10 auxiliary deputy swears to as a solemn oath and then signs it

11 to become sworn.

12 Q    And is this the same oath that regular deputies swear

13 except for the part that says auxiliary?

14 A    Yes, ma'am.

15 Q    And after this document is signed, is that person then

16 appointed as an auxiliary officially?

17 A    They are a sworn auxiliary, yes, ma'am.

18 Q    So you were testifying earlier --

19        MS. CHOY:  You can take that down.  Thank you,

20 Ms. Fastenau.

21 BY MS. CHOY:

22 Q    You were testifying earlier that in the fall of 2022

23 Sheriff Jenkins assigned you to process paperwork for a series

24 of auxiliaries?

25 A    Yes, ma'am.

64

Siebel - Direct

1    Q    And did you, in fact, process paperwork for a number of

2    individuals that fall?

3    A    Yes, ma'am.

4    Q    Did those individuals include James Metcalf?

5    A    Yes, ma'am, it did.

6    Q    Tom Cooper?

7    A    Yes, ma'am, it did.

8    Q    Philip Howell?

9    A    Yes, ma'am, it did.

10   Q    Rubar Sandi?

11   A    Yes, ma'am.

12   Q    Jerry McKee?

13   A    Yes, ma'am.

14   Q    And an individual by the first name of Mike or Michael?

15   A    Yes, ma'am.

16   Q    And for all of those individuals we just mentioned, did

17   any of those people go through the full application process?

18   A    No, ma'am, they did not.

19   Q    They went through that short process that you described

20   earlier?

21   A    Yes, ma'am.

22   Q    And did you discuss each of those individuals with Sheriff

23   Jenkins before they were sworn in?

24   A    Yes, ma'am.

25   Q    And did he personally approve each of them to be sworn in?

65

Siebel - Direct

1  A    Yes, ma'am.

2  Q    Did those individuals receive a badge?

3  A    Yes, ma'am.

4  Q    Did they receive sheriff's office credentials?

5  A    Yes, ma'am.

6  Q    And did those badge and credentials signify that they're

7  sworn law enforcement officers?

8  A    Yes, ma'am.

9  Q    Now, you reviewed the driver's licenses for those

10  individuals, right?

11  A    Yes, ma'am.

12  Q    Were any of them from Culpeper County?

13  A    No, ma'am.

14  Q    Do you recall where they were from?

15  A    The majority were from northern Virginia, and there were

16  several from out of state, such as Maryland and New Jersey.

17  Q    And to your knowledge, did any of them have any connection

18  to Culpeper County?

19  A    No, ma'am.

20  Q    Did any of them ever come back and get any training from

21  the sheriff's office?

22  A    No, ma'am.

23  Q    Did any of them ever show up and do volunteer work for the

24  sheriff's office?

25  A    No, ma'am.

Siebel - Direct

1   Q     None at all?

2   A     None at all.

3           MS. CHOY:  Ms. Fastenau, could you please bring up

4   723 again?  And could you please highlight page 2, paragraph

5   4-1-B.

6   BY MS. CHOY:

7   Q    So is it fair to say that this requirement that auxiliary

8   deputies go through the same hiring process was not followed?

9   A     Yes, ma'am, it was not followed.

10          MS. CHOY:  Could you please highlight 4-2, training

11  requirements?

12  BY MS. CHOY:

13  Q    Is it fair to say that this requirement was not followed?

14  A     Yes, ma'am, with one small exception.  A few of the

15  auxiliaries went through the firearms qualification.

16  Q    Were any of those the six individuals that we just

17  mentioned?

18  A     No, ma'am.

19  Q    So those six individuals didn't follow this training

20  requirement at all, to your knowledge?

21  A     No, ma'am.

22          MS. CHOY:  And could you please highlight paragraph

23  titled "service requirements."

24  BY MS. CHOY:

25  Q    Okay.  It says here that auxiliaries are supposed to give

Siebel - Direct

1  16 hours of service per month.  Is it fair to say that

2  requirement wasn't followed either?

3  A    No, ma'am.

4  Q    Did you talk to other people within the office about these

5  auxiliaries that you were processing?

6  A    No, ma'am.

7  Q    Why not?

8  A    Because I was told to be discreet about these, and it

9  wasn't something we wanted to talk about.

10 Q    Told by who?

11 A    Sheriff Jenkins.

12 Q    So he didn't want you to share information about this?

13 A    No, ma'am.

14 Q    Not even within the office?

15 A    No, ma'am.

16 Q    Now, you testified earlier that most of the time you

17 received the applicant's driver's license from Kevin Rychlik;

18 do you recall that?

19 A    Yes, ma'am, I do.

20 Q    Was there one auxiliary that you learned of directly from

21 Sheriff Jenkins?

22 A    Yes, ma'am, there was.

23 Q    Was that the individual by the first name of Mike?

24 A    Yes, ma'am, it was.

25 Q    How did you learn about that individual?

Siebel - Direct

1  A    Sheriff Jenkins -- we were in the main part of the office

2  near his office, and he called me over and showed me a picture

3  of a driver's license on his telephone.  He told me to take a

4  picture of that to do the same auxiliary process and to start

5  the paperwork.  And I took that picture with my phone, and then

6  I asked him about starting up this truncated background, and he

7  said it wasn't necessary, just have the order prepared.

8  Q    So let me break that down a bit.  He shows you an ID on

9  his phone?

10  A    Yes, ma'am.

11  Q    Why didn't he just text it to you?

12          MR. ANDONIAN:  Objection.  Calls for speculation.

13          THE COURT:  Well, if he had that conversation, you

14  need to lay a foundation for it.

15   BY MS. CHOY:

16  Q    Did he tell you why he didn't text it to you?

17  A    He just didn't want to send it.  He wanted me to take a

18  picture of it.

19  Q    And that's what he told you?

20  A    Yes, ma'am.

21  Q    And then you had a conversation about a background check?

22  A    Yes, ma'am.

23  Q    And I think I heard you say he told you not to run a

24  background check?

25  A    Yes, ma'am.  He said it wasn't necessary.

Siebel - Direct

1              MS. CHOY:  Ms. Fastenau, could you please bring up

2    Government's Exhibit 429.

3    BY MS. CHOY:

4    Q    Mr. Siebel, do you recognize this document?

5    A    Yes, ma'am, I do.

6    Q    What is it?

7    A    That is the photograph I took of Sheriff Jenkins's

8    telephone of that document, of that driver's license.

9              MS. CHOY:  The government moves Exhibit 429 into

10   evidence.

11             THE COURT:  Any objection?

12             MR. ANDONIAN:  No, Your Honor.

13             THE COURT:  So admitted.

14             (Government Exhibit 429 marked and admitted)

15             MS. CHOY:  May I publish it to the jury, Your Honor?

16             THE COURT:  Yes, ma'am.

17   BY MS. CHOY:

18   Q    So this is that photograph that you mentioned that you

19   took of Sheriff Jenkins's phone, displaying this individual,

20   Mike's, driver's license?

21   A    Yes, ma'am.

22   Q    And after you received that information, you did not run a

23   background check?

24   A    No, ma'am, I did not.

25   Q    And that was at Sheriff Jenkins's express direction?

Siebel - Direct

1  A    Yes, ma'am.

2  Q    And this photograph has been redacted.  Do you see that?

3  A    Yes, ma'am.

4  Q    Did you do those redactions?

5  A    No, ma'am.

6  Q    So someone else did?

7  A    Yes, ma'am.

8  Q    So Mr. Siebel, did you find it odd that Sheriff Jenkins

9  was asking you to process paperwork for all these folks to be

10 sworn in who had no connection to Culpeper County?

11          MR. ANDONIAN:  Objection, leading.

12          THE COURT:  Well, I'll allow it.  He can testify to

13 what he felt.

14          THE WITNESS:  Yes, ma'am, I thought it was unusual.

15 BY MS. CHOY:

16 Q    And did you have an understanding of whether Sheriff

17 Jenkins was receiving something in exchange?

18 A    Yes, ma'am.

19 Q    What was your understanding?

20 A    Contributions to his campaign.

21 Q    And do you recall having a conversation with Kevin Rychlik

22 about campaign contributions?

23 A    Yes, ma'am.

24 Q    Did Kevin Rychlik have a term he used for the sheriff's

25 campaign account?

Siebel - Direct

1    A    Yes, ma'am.  He called it the war chest.

2              MS. CHOY:  And Ms. Fastenau, could you please bring

3    up Government's Exhibit 4.

4    BY MS. CHOY:

5    Q    Are you able to see that?

6    A    It's not -- here it is.  Yes, ma'am.

7    Q    Do you recognize this recording just from seeing the first

8    slide of it?

9    A    Yes, ma'am.

10   Q    Okay.  Before today, have you had an opportunity to review

11   this entire video recording?

12   A    Yes, ma'am, I have.

13   Q    And is this recording a fair and accurate recording of a

14   conversation in which you participated?

15   A    Yes, ma'am, it is.

16             MS. CHOY:  The government moves Exhibit 4 into

17   evidence.

18             THE COURT:  Any objection?

19             MR. ANDONIAN:  Yes, Your Honor.  This is hearsay.

20             THE COURT:  Well, who took the video?

21             MS. CHOY:  It was recorded by Mr. Rychlik.

22             THE COURT:  And Mr. Siebel was part of it?

23             MS. CHOY:  Correct.

24             THE COURT:  All right.  I'll allow it.

25             (Government Exhibit 4 marked and admitted)

Siebel - Direct

1          MS. CHOY:  May I publish to the jury?

2          THE COURT:  Yes.

3          MS. CHOY:  Ms. Fastenau, could you please play the

4    first 17 seconds of this recording?

5                    (Audio playing)

6    BY MS. CHOY:

7    Q    Where was this recording made?

8    A    It was made in Colonel Curtis Hawkins's, the chief

9    deputy's office.

10   Q    And that individual with the blue shirt, who is that?

11   A    That's Colonel Hawkins, ma'am.

12   Q    And who are the other two participants to that

13   conversation?

14   A    Myself and Mr. Rychlik.

15   Q    And did you make this recording?

16   A    No, ma'am.

17   Q    At the time, did you know that you were being recorded?

18   A    No, ma'am.

19   Q    So was that you who entered the room?

20   A    Yes, ma'am.

21   Q    During the recording we saw?

22   A    Yes, ma'am, it was.

23   Q    And generally speaking, what are you discussing in this

24   conversation?

25   A    We said hello, and then Mr. Rychlik started to talk about

Siebel - Direct

1  the war chest.

2          MS. CHOY:  So Ms. Fastenau, could you please play to

3  1 minute and 41 seconds.

4                      (Audio playing)

5   BY MS. CHOY:

6  Q    So again, that term war chest, what do you take that to

7  mean?

8  A    His re-election fund.

9  Q    And there was a sort of discussion back and forth about 50

10 in the clip we just saw.  Could you explain what was going on

11 there?

12 A    Yes, ma'am.  Initially when Mr. Rychlik had talked about

13 the 50, I thought he was talking about 50 auxiliary deputies,

14 because one of the things that Sheriff Jenkins had talked about

15 publicly was deputizing a lot of people, because he has very

16 strong feelings about the Second Amendment.  So I thought he

17 was in the process of trying to deputize 50 auxiliaries, so I

18 was concerned about the logistics of that.  And then

19 Mr. Rychlik corrected me; it wasn't about the people.  When I

20 mentioned Mack, he was the person who was going to be

21 designated to take care of all this large auxiliary force if it

22 came in.  Mack was the former chief deputy in Culpeper County.

23 So that's what I thought he was talking about at first until he

24 said no, no, no, and mentioned the war chest.  Then I realized

25 he was talking about $50,000 for the war chest.

Siebel - Direct

1            MS. CHOY:  Ms. Fastenau, could you please continue

2    and stop at 4 minutes and 30 seconds.

3                          (Audio playing)

4     BY MS. CHOY:

5    Q    Now, you said in there words to the effect of, I go

6    through the pretense of doing the paperwork?

7    A    Yes, ma'am.

8    Q    Could you explain what you meant by that?

9    A    Well, that is that truncated process.  It is not a full-on

10   background check.

11   Q    And why is that a pretense?

12   A    Because the SOP and everything requires a full background

13   check.

14   Q    And when you said words to the effect of my neck gets

15   chopped off, he puts it back on, along those lines, what were

16   you conveying there?

17   A    Well, right there it was that if something went wrong for

18   the sheriff, that I would take the fall for it, that he would

19   cut my head off or blame it on a subordinate, but he would fix

20   it if he could.

21   Q    And why would someone need to take the fall?

22            MR. ANDONIAN:  Objection.  Calls for speculation.

23            THE COURT:  Well, I'll let him testify to what he

24   knows, what he believes.

25            THE WITNESS:  That way it protected him and his image

Siebel - Direct

1  out in the public and in the community and within the office.

2  So it wasn't him doing this, it was one of his subordinates; in

3  this case, me.

4   BY MS. CHOY:

5  Q    Does that go back to that term you were using earlier,

6  feasible deniability?

7  A    Yes, ma'am.

8  Q    Could you explain that?

9  A    Well, if somebody came and blamed me for this action of

10  putting these people in place, it was not him; and therefore,

11  he could deny it.  He kept himself layered away from it.

12  Q    So was that a way to distance himself from the bad acts

13  that were going on?

14  A    Yes, ma'am.

15        MS. CHOY:  Could you play to the end, please.

16                    (Audio playing)

17   BY MS. CHOY:

18  Q    So when Kevin Rychlik said in that clip he wants to build

19  up the war chest before the new quarter, what did you take that

20  to mean?

21  A    He wanted to get these contributions into the war chest

22  before the end of the quarter, which I took to mean December

23  31st, the first of the year.

24  Q    He being the sheriff?

25  A    Yes.

Siebel - Direct

1  Q    And when Kevin Rychlik said, we'll probably bring in four

2  or five now, four or five next quarter, what did you take that

3  to mean?

4  A    Of these auxiliaries that were going to give contributions

5  to the war chest.

6  Q    And so Chief Deputy Curtis Hawkins was sitting there for

7  that whole conversation, right?

8  A    Yes, ma'am.

9  Q    Is he someone who has a close relationship with the

10 sheriff?

11 A    He's his number two man.

12 Q    And did he seem at all surprised or alarmed to hear this

13 conversation?

14 A    No, ma'am, he didn't.

15 Q    Did you ever confront Sheriff Jenkins about this scheme

16 that's discussed on the video?

17 A    No, ma'am, I did not.

18 Q    Why not?

19 A    I was afraid to.

20 Q    What were you afraid of?

21 A    That I would be fired, demoted, or something.

22 Q    So in the clip we just saw, there was a reference to

23 someone named Rick?

24 A    Yes.

25 Q    Who is Rick?

Siebel - Direct

1   A    That's Rick Rahim.

2   Q    And who is he?

3   A    He is an auxiliary at the Culpeper -- or was an auxiliary

4   at the Culpeper County sheriff's office.

5   Q    And were you involved in the process of processing his

6   paperwork?

7   A    Not as an auxiliary, ma'am.

8   Q    So he became an auxiliary before that became your

9   responsibility; is that right?

10  A    Yes, ma'am.

11  Q    And are you aware that Mr. Rahim applied for a concealed

12  carry weapons permit in Culpeper County?

13  A    Yes, ma'am, I am.

14  Q    How do you know that?

15  A    I got a call from Sheriff Jenkins -- or a text, I can't

16  recall which it was -- asking me to get Mr. Rahim's application

17  for a concealed weapons permit out of the stack that we do,

18  because we had many, and take it over to the Commonwealth

19  Attorney to help expedite the process.

20  Q    And did you do that?

21  A    Yes, ma'am, I did.

22  Q    Had Mr. Jenkins ever asked you to help expedite anyone

23  else's concealed carry permit?

24  A    No, ma'am, he did not.

25  Q    Did he ever do that after that?

Siebel - Direct

1  A     No, ma'am, he did not.

2  Q     So just one time for Rick Rahim?

3  A     Just one time.

4  Q     And after you delivered that permit application, did you

5  have further communication with Sheriff Jenkins about that

6  issue?

7  A     Yes, ma'am, I did.

8  Q     And what was that about?

9  A     Over the next week or so several times he texted or called

10 asking what the status of that permit was.  He wanted to know

11 if it was through, could we push it through, could we get it

12 done.  So I in turn called Captain Bernie Feaganes, who was the

13 captain in charge of courtroom security who had a relationship

14 with the clerks, and asked him to check on it.  And he would

15 generally respond back to me that it wasn't finished yet, and I

16 would send that information back to the sheriff.

17 Q     So did that happen on multiple occasions?

18 A     Yes, ma'am.

19 Q     Had Sheriff Jenkins ever asked you to check on someone

20 else's concealed carry permit?

21 A     No, ma'am.

22 Q     And did he ever again after that?

23 A     No, ma'am.

24 Q     So just that one time?

25 A     Just the one time.

Siebel - Direct

1  Q    And did Sheriff Jenkins ever explain why Rick Rahim was

2  getting special favors?

3  A    No, ma'am, he did not.

4  Q    So I'd like to fast forward to January of 2023.  Did the

5  FBI come interview you about the matters that we've been

6  discussing here?

7  A    Yes, ma'am, they did.

8  Q    And during that interview, did you provide the FBI with a

9  voluntary consent to seize your cell phone?

10  A    Yes, ma'am.

11  Q    And that was your work phone?

12  A    Yes, ma'am.

13  Q    Were you concerned about turning your phone over

14  voluntarily?

15  A    Yes, ma'am, I was.  I was concerned that if I turned my

16  phone over voluntarily to the FBI that it would enrage Sheriff

17  Jenkins for having gone outside the agency with that.

18  Q    And so did the FBI agents provide you with a federal

19  warrant to seize your phone?

20  A    A subpoena, yes, ma'am.

21  Q    And that was for the purpose of demonstrating something to

22  Sheriff Jenkins?

23  A    Yes, ma'am.

24  Q    And after you were approached by the FBI, were you

25  contacted by someone about this matter, by an attorney?

Siebel - Direct

1  A    Oh, yes, ma'am, I was.  I got a text message from a

2  gentleman, I cannot remember his name at this point, but said,

3  hey, Lieutenant, I'm helping Scott Jenkins out; can you give me

4  a call.  I did not recognize the phone number nor the name.

5  Q    Did you raise that with Sheriff Jenkins?

6  A    Eventually, yes, ma'am.  I didn't know what to do with it.

7  So first I couldn't find the sheriff at the office, so I went

8  to his brother, Michael, and Michael told me it was okay to

9  call the man.  But at that point, Sheriff Jenkins walked in.

10 So I approached him and asked him about this particular name

11 and phone number.

12 Q    And what did Sheriff Jenkins say about it?

13 A    He told me it would be a great idea if I would do that.

14 He put his arm around me and said that would be an excellent

15 idea if you could contact him.

16 Q    And what did you understand him to be encouraging you to

17 do?

18 A    Is to call this lawyer to speak to him.

19 Q    And did you learn that that was a lawyer for Sheriff

20 Jenkins?

21 A    Yes, ma'am.

22 Q    And just to be clear, was that person one of the lawyers

23 in the courtroom today?

24 A    No, ma'am.

25 Q    And did you end up contacting him?

Siebel - Direct

1  A    I called him twice and left voice messages, but they never

2  returned my calls.

3  Q    So Mr. Siebel, just one more question.  Looking back now

4  with the wisdom of hindsight, how do you feel about the events

5  that we've discussed?

6  A    Terrible.  I spent a career as a major crimes

7  investigator.  And I saw a little piece of this here, and a

8  little piece of it there, and this -- and I stayed really busy

9  with my duties, and I never saw it for what it was.  So that's

10  going to bother me for the rest of my life.

11         MS. CHOY:  Thank you.

12         THE COURT:  All right.  Ladies and gentlemen, we've

13  been going for about an hour and a half.  Why don't we take our

14  morning break at this time.  It's about 11:35.  Why don't we

15  come back at 11:50 and we'll take up cross-examination as well.

16  So let me let the jury be excused.

17         MS. PENG:  Your Honor, I think it's 10, actually.

18         THE COURT:  10, excuse me.

19  (*Jury out, 10:37 a.m.*)

20         THE COURT:  Mr. Siebel, since you are on -- still on

21  the stand, you cannot have any discussion at all with anyone

22  about your testimony.

23         THE WITNESS:  Yes, Your Honor.

24         THE COURT:  Anything we need to take up at this point

25  for the government?

Siebel - Direct

1          MS. SMITH:  No, Your Honor.

2          THE COURT:  Anything for the --

3          MR. ANDONIAN:  No, Your Honor.

4          THE COURT:  Very well.  We'll stand in recess until

5     10:50.

6                         (Recess)

7          THE COURT:  All right.  We're back on the record --

8     you all please be seated.  We're back on the record in *United*

9     *States v. Jenkins* with the government present and defendant

10    present with counsel.  Are we ready for the jury, counsel?

11         MS. CHOY:  Could I just make two brief requests, Your

12    Honor?

13         THE COURT:  Yes, ma'am.

14         MS. CHOY:  The first is -- both for after this

15    witness steps down.  The first is the government requests that

16    Your Honor give the instruction about the use of the

17    transcripts and --

18         THE COURT:  Oh, I meant to do that.  And I'll do that

19    now, you know, before we start with the cross-examination as

20    well.  I meant to do that.  So thank you for reminding me.

21         MS. CHOY:  And the second is that Your Honor instruct

22    the jury that the government has been permitted to redact the

23    name of that undercover for his personal safety.

24         THE COURT:  Okay.  All right.  No objection to either

25    one of those?

Siebel - Direct

1          MR. ANDONIAN:  No, Your Honor.

2          THE COURT:  Okay.  All right.

3          MR. CALEB:  Indulgence, please.

4          THE COURT:  Yeah.

5          MR. ANDONIAN:  Yeah, I guess the only request --

6    sorry -- the only request -- we're fine with the Court

7    instructing the jury that the government had permission to

8    redact the name.  I guess personal safety starts injecting some

9    sort of --

10          THE COURT:  I'm just going to say he was an

11   undercover person, and his actual name and his picture is not

12   being shown in this trial.

13          MR. ANDONIAN:  That would be fine.  Thank you.

14          MS. CHOY:  Thank you.

15          THE COURT:  All right.  And then I meant to

16   mention -- and I don't think it's going to be an issue -- I let

17   you all sit down yesterday, which is perfectly fine.  I presume

18   you all are going to do everything from the podium as well.

19   And I know you split voir dire, but you're not splitting

20   witnesses, I presume, are you?

21          MR. ANDONIAN:  No, Your Honor.

22          THE COURT:  Okay.  Very well.  All right.  Let's go

23   ahead and bring the jury in.

24          Ms. Choy, what Exhibit number was that?  Was that

25   429?

Siebel - Direct

1          MS. CHOY:  Exhibit 4, Government's Exhibit 4.

2          Oh, I'm sorry, the redaction?  Correct.

3  (*Jury in, 10:58 a.m.*)

4          THE COURT:  Ladies and gentlemen, you all please have

5  a seat.  Let the record reflect the jury is present and seated.

6          Ladies and gentlemen, before we start with our

7  cross-examination, I've got three things for you.  First of

8  all, I see some of you are wearing coats and sweaters.  If the

9  temperature is uncomfortable in any way for you, please let us

10 know.  I can't guarantee that I can do anything about it, but I

11 can try to -- if it's too cold, try to warm it up.  If it's too

12 warm, try to cool it down.  I can't do both at the same time,

13 however.  So if we have a split allegiance, we'll try to see

14 where we are.  That's the first thing.

15         The second thing is, with respect to Exhibit 4, there

16 was a transcript of the audio.  There is an instruction in

17 connection with that.  The transcript or the subtitles of the

18 audio was admitted for the limited purpose of aiding you in

19 following the content of the conversation as you listen to the

20 recording, and also to aid you in identifying who the speakers

21 were.  You are instructed that whether the transcript correctly

22 or incorrectly reflects the content of the conversation or the

23 identity of the speakers is entirely for you to determine based

24 upon your own evaluation of the testimony you hear concerning

25 the preparation of the transcript and from your own examination

Siebel - Cross

1  of the transcript in relation to your hearing of the recording

2  itself as the primary evidence of its own contents.  And if you

3  should determine the transcript is in any way incorrect or

4  unreliable, you should disregard it to that extent.  I may give

5  the instruction throughout as you hear recordings, but that's

6  going to be true for all recordings, whether they be just

7  audio, or audio visual recordings.  The transcript is there as

8  an aid, but you are to rely upon as evidence what you see and

9  actually hear as well.

10        The third thing, ladies and gentlemen, with respect

11  to Exhibit 4 -- I'm sorry, with respect to Exhibit 429, which

12  was the redacted license, the license relates to an undercover

13  agent whose name and picture is not going to be shown during

14  the course of the trial.  And so that redaction was made by the

15  United States for that purpose and that purpose alone.

16        All right.  With that, Mr. Andonian, any

17  cross-examination?

18        MR. ANDONIAN:  Yes, Your Honor.  Thank you.

19                    CROSS-EXAMINATION

20  BY MR. ANDONIAN:

21  Q    Good morning, Mr. Siebel.

22  A    Good morning, sir.

23  Q    Mr. Siebel -- am I saying -- sorry, am I saying that

24  correct?

25  A    Siebel is correct, sir.

Siebel - Cross

1  Q    Siebel.  Mr. Siebel, in December of 2021, you were

2  promoted to major of the operations division of the Culpeper

3  County sheriff's office, correct?

4  A    Yes, sir.

5  Q    Okay.  In that position, you were essentially -- you

6  oversaw all law enforcement operations?

7  A    Yes, sir.

8  Q    Okay.  And it's fair to say it was a fairly high position

9  within the office?

10 A    Yes, sir.

11 Q    Okay.  Approximately a year later, in and around December

12 of 2022, you were demoted from that position?

13 A    Yes, sir.

14 Q    And you were demoted down to the rank of lieutenant?

15 A    Yes, sir.

16 Q    And that's a pretty big drop?

17 A    Yes, sir.

18 Q    Okay.  And you weren't happy about that demotion?

19 A    I was upset, sir.

20 Q    Right.  You were upset.  You lost stature or standing

21 within the department?

22 A    I think so, sir.

23 Q    You lost pay?

24 A    Yes, sir.

25 Q    And you were upset, and that decision, as you testified on

87

Siebel - Cross

1   direct, was Scott Jenkins's decision, correct?

2   A    Yes, sir.

3   Q    So you were upset at him about it?

4   A    No, sir, I wasn't.  I was upset for the circumstance of

5   what happened.  I wasn't angry at him.  I was thankful that I

6   still had a job.  But I was very disappointed that he wasn't

7   the man that I thought he was.

8   Q    You were disappointed in him in connection with that

9   demotion?

10  A    Yes, sir.

11  Q    You talked a little bit about the culture of the Culpeper

12  County sheriff's office on direct.  I think the words you used

13  were something to the effect of a culture of fear and bullying?

14  A    Yes, sir.

15  Q    You know that the sheriff is an elected official?

16  A    Yes, sir.

17  Q    I think you described it as a Constitutional office?

18  A    Yes, sir.

19  Q    And you understand that that means that the sheriff is

20  accountable to the people that elect him?

21  A    Yes, sir.

22  Q    And the sheriff is elected to a four-year term?

23  A    Yes, sir.

24  Q    And in that four-year term, the sheriff has the ability to

25  implement whatever agenda that sheriff has for the county?

Siebel - Cross

1  A    Yes, sir.

2  Q    And everybody serving in the sheriff's office, whether

3  it's a sworn deputy, a civilian employee, an auxiliary deputy,

4  all serves at the pleasure of that sheriff?

5  A    Yes, sir.

6  Q    Mr. Jenkins was a demanding boss?

7  A    Yes, sir.

8  Q    Mr. Jenkins had -- I think you talked a little bit about

9  one area, but Mr. Jenkins had agenda -- an agenda for his term

10 as sheriff -- or his terms as sheriff?

11 A    Yes, sir.

12 Q    One of them, I think you mentioned, was his -- because of

13 his Second Amendment views, was swelling the ranks of the

14 auxiliary deputy program?

15 A    Yes, sir.

16 Q    And Sheriff Jenkins at that time implemented his agenda,

17 as far as you're aware, to the best of his ability?

18 A    I don't know that, sir, what his reasons for what he was

19 doing were, on this one.

20 Q    You talked also a little bit about the way that you

21 communicated with Mr. Jenkins, and specifically the ways that

22 you didn't communicate with him, and that was through e-mail?

23 A    Yes, sir.

24 Q    And you stated that Mr. Jenkins had said to you that the

25 reason for that was because e-mails were potentially

Siebel - Cross

1  disclosable to the public?

2  A    Yes, sir.

3  Q    Okay.  And Mr. Jenkins said to you that he didn't -- or

4  something to the effect of he didn't want internal business of

5  the sheriff's office to potentially get out to the public?

6  A    Yes, sir.

7  Q    Mr. Jenkins, as the sheriff, you would agree, is a

8  politician?

9  A    Yes, sir.

10  Q    And as a politician, Mr. Jenkins had political enemies?

11  A    I could only assume that, yes, sir.

12  Q    And as a politician, Mr. Jenkins's actions would be under

13  scrutiny?

14  A    Yes, sir.

15  Q    You also testified that Mr. Jenkins -- about a

16  conversation you had regarding having informants in the office;

17  is that right?

18  A    Yes, sir.

19  Q    Okay.  And you, I think, stated that you did not follow

20  that suggestion?

21  A    No, sir, I did not.

22  Q    I want to talk a little bit now about the auxiliary deputy

23  program, or follow up about it.

24      Just broadly speaking, the auxiliary deputy program was

25  part of the Culpeper County sheriff's office, right?

Siebel - Cross

1   A    Yes, sir.

2   Q    And I think you testified on direct it was ultimately

3   Sheriff Jenkins at that time that directed the activities of

4   the auxiliary deputy program?

5   A    Yes, sir, to the best of my knowledge.

6   Q    Mr. Jenkins at that time had the sole authority to appoint

7   somebody as an auxiliary deputy?

8   A    Yes, sir.

9   Q    He had the sole authority to fire somebody, or remove

10  somebody as an auxiliary deputy?

11  A    Yes, sir.

12  Q    Same thing goes for full-time sworn paid deputies as well,

13  right?

14  A    Yes, sir.

15  Q    And same thing goes for the civilian members of the

16  office?

17  A    Yes, sir.

18  Q    The auxiliary deputy program under Scott Jenkins at that

19  time could be whatever Scott Jenkins wanted it to be, right?

20  A    Yes, sir.

21  Q    You were shown a general order that purported to govern

22  the auxiliary deputy program at the Culpeper County sheriff's

23  office; do you remember that?

24  A    Yes, sir.

25  Q    You know that at the top of the document -- you were shown

Siebel - Cross

1   this by the government on direct -- that the top of the

2   document where it said approved by, the name Scott Jenkins,

3   Sheriff, was typed into the document, correct?

4   A    Yes, sir.

5   Q    Okay.  You have no idea how that document was ultimately

6   created, right?

7   A    No, sir.

8   Q    You have no idea who actually drafted that document?

9   A    No, sir.

10  Q    You have no idea who actually assembled it in its final

11  form?

12  A    No, sir.

13  Q    And you have no idea who actually typed the name Sheriff

14  Scott H. Jenkins on the approved by line in the general order?

15  A    No, sir.

16  Q    As a general matter, general orders are -- for lack of a

17  better way of putting it -- kind of internal regulations for

18  how things work within the sheriff's office, right?

19  A    Yes, sir.  There's a policy by which we act in different

20  matters.

21  Q    Policy is a good way to put it.

22       And you know that the sheriff ultimately has the final say

23  on whether or not a general order is issued?

24  A    Yes, sir.

25  Q    And a sheriff can issue a general order, right?

Siebel - Cross

1  A    Yes, sir.

2  Q    A sheriff can revoke a general order?

3  A    Yes, sir.

4  Q    A sheriff can revise a general order?

5  A    Yes, sir.

6  Q    And the sheriff can do this at any point in time, right?

7  A    Yes, sir.

8  Q    For any reason at all?

9  A    Yes, sir.

10 Q    With respect to auxiliary deputies, you know that there

11 are different levels of auxiliary deputies, correct?

12 A    No, sir.  I knew there was one supervisory auxiliary

13 deputy, Mr. Rychlik, and everybody else was auxiliaries.

14 Q    Okay.  And that actually leads me to my next question.

15 Mr. Rychlik was the -- first of all, Mr. Rychlik was himself an

16 auxiliary deputy, right?

17 A    Yes, sir.

18 Q    And he had the rank of lieutenant?

19 A    Yes, sir.

20 Q    And as a lieutenant and an auxiliary deputy, Mr. Rychlik

21 was in charge of -- or oversaw the auxiliary deputy program

22 under Mr. Jenkins?

23 A    I can only make that assumption, sir.  I never saw it

24 function.

25 Q    You talked a little bit about a number of individuals in

Siebel - Cross

1  the fall of 2022 who ultimately became auxiliary deputies when

2  you were asked questions on direct.  You said that you never

3  did anything with respect to those individuals without first

4  clearing them by Mr. Jenkins; is that right?

5  A    Yes, sir.

6  Q    But the initial names that came to you, came to you from

7  Kevin Rychlik?

8  A    Yes, sir.

9  Q    And he would send you a picture of their driver's license?

10 A    Yes, sir.

11 Q    And he would then tell you to get the process going, or

12 words to that effect?

13 A    Yes, sir.

14 Q    And you understood that that meant that you should start

15 what I think you were describing as a truncated or shortened

16 background check or application process; is that right?

17 A    Yes, sir, but I would not start that process until I

18 checked that it was okay with the sheriff.

19 Q    Sure.  Once you got the name from Kevin Rychlik, you would

20 get a thumbs up, thumbs down from Sheriff Jenkins?

21 A    Yes, sir.

22 Q    And then you would begin the process?

23 A    Yes, sir.

24 Q    And the process was, you would get the driver's license

25 from Kevin Rychlik, right?

Siebel - Cross

1    A    Yes, sir.

2    Q    You would get the approval or the sign-off from Sheriff

3    Jenkins?

4    A    Yes, sir.

5    Q    You would run a background check?

6    A    A truncated one, yes, sir.

7    Q    Okay.  But you would run a background check of some sort?

8    A    Yes, sir.

9    Q    And the purpose of running the background check was to

10   determine whether or not there was criminal history associated

11   with that individual --

12   A    Yes, sir.

13   Q    -- right?

14        Okay.  And you had some assistance from an administrative

15   assistant within the Culpeper County sheriff's office to engage

16   in this process, right?

17   A    They filled out the actual swearing document once it was

18   approved, again, by the sheriff to do so.

19   Q    Once your truncated process had been completed, the next

20   step -- and maybe you just said it -- was the administrative

21   assistant within the sheriff's office would get the paperwork

22   in order?

23   A    Once we got the thumbs up from Sheriff Jenkins, and he

24   said go ahead and get the paperwork done, then I would approach

25   the administrative assistant --

Siebel - Cross

1  Q    Okay.

2  A    -- to get the paperwork done.

3  Q    I want to draw your attention to the video that we watched

4  where it involved you and Kevin Rychlik and I believe

5  Mr. Hawkins was in the room as well?

6  A    Yes, sir.

7  Q    First of all, Mr. Jenkins was not in the room during that

8  conversation?

9  A    No, sir, he was not.

10 Q    Mr. Jenkins never walked into the room at all?

11 A    No, sir.

12 Q    And you know, sitting here watching that video -- so I

13 understand at the time you didn't know you were being recorded,

14 but you understand now, watching this video of that meeting,

15 that Mr. Rychlik was recording the meeting?

16 A    Yes, sir.

17 Q    He was recording it with audio?

18 A    Yes, sir.

19 Q    And he was recording it with video?

20 A    Yes, sir.

21 Q    And the reason for that, as you now know, is because

22 Mr. Rychlik was working with the FBI, correct?

23 A    Yes, sir.

24 Q    At the time when you were having the conversation with

25 Mr. Rychlik in Mr. Hawkins's office, you didn't say to Mr.

Siebel - Cross

1    Rychlik, wait, wait, wait, this is -- this is unlawful

2    behavior, I'm not going to do it, right?

3    A    No, sir.

4    Q    At that time, you did not go back to your office and place

5    a call to law enforcement, right?

6    A    No, sir.

7    Q    You didn't talk to any law enforcement officials and voice

8    concerns about what you thought was illegal activity?

9    A    No, sir.

10   Q    You didn't tell anybody that you believed that there was

11   illegal activity going on that you were being asked to be a

12   part of?

13   A    No, sir.

14   Q    The first time that you started talking about illegal

15   activity -- and I'll bring you back to Ms. Choy's final

16   question -- with the benefit of hindsight, you testified that

17   this was something that you were going to regret or have to

18   live with for the rest of your life.  The first time that you

19   came to that realization is when the FBI approached you to ask

20   you questions about what was going on, and your role, right?

21   A    Partially, yes, sir.

22   Q    With respect to the contributions or the money that was

23   being put into -- to use Mr. Rychlik's words -- the war chest,

24   you had absolutely no involvement with -- with -- let's just

25   start with the collection of any money?

Siebel - Cross

1    A    No, sir.

2    Q    You had no involvement with the disbursement of that money

3    to any particular account?

4    A    No, sir.

5    Q    You never saw anybody giving money?

6    A    No, sir.

7    Q    You have no idea of the circumstances under which somebody

8    who did provide money provided that money?

9    A    No, sir.

10   Q    I want to turn to some questions that you were asked about

11   Mr. Rick Rahim's concealed carry permit process, or the

12   application process.

13        You were asked, or you testified on direct, at least, that

14   you were asked by Mr. Jenkins to follow up or check up on the

15   application to try to get it expedited; is that correct?

16   A    After he asked me to hand carry it over to the next step,

17   which would have been the Commonwealth Attorney's office.

18   Q    Okay.  So you hand carried it to the Commonwealth

19   Attorney's office?

20   A    Yes, sir.

21   Q    And you gave it to somebody at the Commonwealth Attorney's

22   office?

23   A    I gave it to the Commonwealth Attorney, Mr. Walther.

24   Q    Okay.  And you know Mr. Walther, correct?

25   A    Yes, sir, I do.

Siebel - Cross

1   Q    Okay.  And generally, Culpeper is -- you would agree it

2   would be fair to characterize Culpeper as a small county,

3   right?

4   A    Yes, sir.

5   Q    Okay.  After you handed the application to Mr. Walther,

6   you didn't have any other involvement with the application,

7   correct?

8   A    Only when Sheriff Jenkins called me several times or

9   texted me several times as to the status, which went over the

10  next week, week and a half.

11  Q    Sure.  I mean -- and I guess let me be more specific.

12  Putting aside -- and we'll get back to that in a moment,

13  checking on the status of the report, once you handed it off,

14  you didn't get it or do anything to it again after that?

15  A    No, sir.

16  Q    And you handed it to the Commonwealth's Attorney and it

17  was then in the Commonwealth's Attorney's hands?

18  A    Yes, sir.

19  Q    You don't know how long that application sat at the

20  Commonwealth's Attorney's office before somebody reviewed it,

21  right?

22  A    No, sir.

23  Q    So when Mr. Jenkins asked you to check on the status of

24  Mr. Rahim's concealed carry permit, you don't know the reason

25  behind Mr. Jenkins wanting you to do that, right?

Siebel - Cross

1  A    No, sir.

2  Q    And you don't have any idea what the relationship between

3  Mr. Rahim and Mr. Jenkins was at that time?

4  A    No, sir.

5  Q    And you have no idea how long Mr. Rahim's permit or his

6  application for the permit might have been sitting at the

7  Commonwealth's Attorney's office?

8  A    No, sir.

9  Q    Other than asking you to check on the status of

10 Mr. Rahim's concealed carry permit with the Commonwealth --

11 once you had dropped it off at the Commonwealth's Attorney's

12 office, Mr. Jenkins didn't ask you to do anything else with

13 respect to that application, right?

14 A    Not that I recall, no, sir.

15 Q    He didn't tell you to go over and break into the

16 Commonwealth's Attorney's office and find that application and

17 forge a signature or something?

18 A    No, sir.

19 Q    He didn't ask you to go over and stand over the

20 Commonwealth's Attorney and force him to fill out whatever

21 needed to be filled out, right?

22 A    No, sir.

23 Q    He asked you to check on the status?

24 A    Yes, sir.

25         MR. ANDONIAN:  Could I just have the Court's brief

                            Siebel - Redirect


 1   indulgence?

 2            THE COURT:  Yes, sir.

 3            MR. ANDONIAN:  Thank you.  I have nothing further,

 4   Your Honor.

 5            THE COURT:  All right.  Any redirect?

 6            MS. CHOY:  Yes, Your Honor.

 7            THE COURT:  Yes, ma'am.

 8                       REDIRECT EXAMINATION

 9    BY MS. CHOY:

10   Q    Hello again, Mr. Siebel.

11        On cross-examination, Mr. Andonian asked you some

12   questions about the auxiliary deputy program?

13   A    Yes, ma'am.

14   Q    Do you know how many auxiliary deputies there were?

15   A    No, ma'am, I don't.

16   Q    Did you ever see a list of those auxiliaries?

17   A    No, ma'am.

18   Q    To your knowledge, did such a list exist?

19   A    Yes, ma'am.

20   Q    Do you have access to it?

21   A    No, ma'am.

22   Q    Who did?

23   A    The sheriff and maybe the chief deputy.

24   Q    And did you see auxiliaries rendering service to the

25   office?

Siebel - Redirect

1  A    Very rarely.  I saw Mr. Rychlik on occasion show up for a

2  special event, and Mr. Rahim would ride at times, but other

3  than that, I don't recall seeing auxiliaries out there.

4  Q    And do you recall seeing any auxiliaries coming in to

5  receive training?

6  A    No, ma'am.

7  Q    And Mr. Andonian asked you some questions about general

8  order 1-15?

9  A    Yes, ma'am.

10 Q    That was the policy governing auxiliaries, correct?

11 A    Yes, ma'am.

12 Q    And he asked you some questions about Sheriff Jenkins's

13 name that appeared there?

14 A    Yes, ma'am.

15 Q    Do you have any reason to believe that Sheriff Jenkins did

16 not approve that order?

17 A    No, ma'am.

18 Q    Do you have any reason to believe that order was somehow

19 falsified?

20 A    No, ma'am.

21 Q    And was it your understanding while you were working there

22 that Sheriff Jenkins had approved that order?

23 A    Yes, ma'am.

24 Q    And did there ever come a time when that order was

25 revoked?

Siebel - Redirect

1  A    No, ma'am.

2  Q    And just generally speaking, did the sheriff's office

3  typically follow the general orders that were promulgated by

4  the sheriff?

5  A    Yes, ma'am.

6  Q    And so going back to that auxiliary program, I think you

7  said words to the effect of you never saw it function.  Could

8  you explain what you meant by that?

9  A    Well, I never saw the auxiliaries out in the field, or

10 very -- never is a -- but rarely I would see it.  The last time

11 I saw an auxiliary in the field during the Christmas parade of

12 2022, Mr. Rychlik was up in the command area.  That auxiliary I

13 saw.  There's a gentleman whose name I can't recall would

14 sometimes drive the command bus at an event.  Those are the

15 only auxiliaries I ever saw work, other than Mr. Rahim would

16 ride occasionally with one of the patrol supervisors or

17 deputies.

18 Q    So there were a couple of people who came in to work, but

19 were you aware that there were many more people who had been

20 sworn in?

21 A    Yes, ma'am.

22 Q    And the majority of those people never lifted a finger?

23 A    No, ma'am.

24 Q    And you testified on cross-examination that you would

25 receive names from Mr. Rychlik?

Siebel - Redirect

1  A    Yes, ma'am.

2  Q    Who told you that you were going to be getting names from

3  Mr. Rychlik?

4  A    Sheriff Jenkins.

5  Q    And who told you to swear those people in?

6  A    Sheriff Jenkins.

7  Q    Or rather to prepare documents for them to be sworn in?

8  A    Yes, ma'am.

9  Q    And Mr. Andonian asked you some questions about Sheriff

10  Jenkins's agenda and the Second Amendment that he supported.

11  And drawing you back to the fall of 2022 when you were involved

12  in the auxiliary process, at any time did Sheriff Jenkins tell

13  you that he was bringing people in because of some Second

14  Amendment agenda?

15  A    No, ma'am.  The Second Amendment agenda actually had taken

16  place sometime before that early on in his new term.  And it

17  was a very big thing, because he talked to us about it.  And

18  then Virginia was coming up with red flag laws about weapons,

19  so he was very big about the Second Amendment.  He had it

20  posted on stickers.  But it had been not contemporary to these

21  auxiliaries.

22  Q    So there were some laws that had come up early in his

23  term; is that right?

24  A    Yes, ma'am.

25  Q    And this was of concern to him.  Did those laws pass, to

Siebel - Redirect

1   your knowledge?

2   A      They did pass in the State of Virginia, ma'am.

3   Q      Did all of those laws pass?

4   A      That I don't know.  I know some of them did.

5   Q      And that was much earlier than this 2022 period we're

6   talking about?

7   A      Yes, ma'am.

8   Q      So by the time you got to 2022, was that still such a big

9   issue in the office?

10  A      It was part of his program, so we were all directed to

11  make that part of our program.  And so we were aware of it.

12  Q      And you testified on cross that the auxiliary program

13  could be whatever the sheriff wanted?

14  A      Yes, ma'am.

15  Q      Do you recall that?

16         Does the sheriff have to follow the law?

17  A      Yes, ma'am.

18  Q      Does that program have to follow the law?

19  A      Yes, ma'am.

20  Q      You also were asked on cross about whether you raised your

21  concerns about this conduct with any authorities; do you recall

22  that?

23  A      Yes, ma'am.

24  Q      And you testified that you didn't?

25  A      Yes, ma'am.

Siebel - Redirect

1   Q    Why not?

2   A    I saw little bits and pieces of this.  So I didn't see the

3   whole thing until this all evolved.  And seeing the bits and

4   piece of it, I'd go to the next thing I had to do, and the next

5   thing I had to do.  And as -- my thoughts, as the money was

6   coming into this war chest, there are federal laws and state

7   laws that require you to declare these monies.  I just thought

8   that would be it.  I'm a local cop.  I don't know what those

9   laws are, but I do know they exist, so you can't just have

10  money coming in without accounting for it and its expenditure.

11  So that's what I assumed was happening.

12  Q    And you were also asked on cross-examination about your

13  demotion?

14  A    Yes, ma'am.

15  Q    And your feelings about Sheriff Jenkins?

16  A    Yes, ma'am.

17  Q    Are you angry at Sheriff Jenkins?

18  A    No.

19  Q    What are your feelings towards Sheriff Jenkins?

20  A    Like I said, I'm very disappointed.  He was not the

21  person I thought -- I looked up to him as a leader, and really

22  thought he was going well, but then I watched different things

23  throughout.  And then when that happened, I was, I was

24  extremely upset at the beginning, but not with him, just with

25  the circumstances.  And then I became disappointed because he

Siebel - Redirect

1    was not who I believed he was those last years that I was

2    dedicated to him.

3              MS. CHOY:  Thank you.

4              THE COURT:  All right.  Thank you.  May this witness

5    be excused, or is he subject to re-call?

6              MS. CHOY:  He may be excused.

7              THE COURT:  All right.  So thank you very much,

8    Mr. Siebel.  You may be excused, but please do not discuss your

9    testimony as long as the case is pending.

10             THE WITNESS:  Yes, sir, Your Honor.

11             THE COURT:  Thank you very much.  Have a nice day.

12             THE WITNESS:  You as well.

13             THE COURT:  All right.  Let's call your next witness,

14   please.

15             MS. SMITH:  The government calls Rick Rahim.

16             THE COURT:  All right.  Rick Rahim.  Will we be able

17   to get all of his in by lunch?

18             MS. SMITH:  He is quite a lengthy witness, Your

19   Honor.

20             THE COURT:  So we may break?

21             MS. SMITH:  Yes.  And if -- are you going to

22   interrupt me at a certain point for the lunch break, or would

23   you like me to keep track of the time?

24             THE COURT:  Let's see where we are at 12:15.  I want

25   it to be a natural break in your examination.

Rahim - Direct

1        Mr. Rahim, come on up, if you would, please, sir.

2   Come right on up here to be sworn in.

3            RICK RAHIM, CALLED BY THE GOVERNMENT, SWORN

4            THE COURT:  Please have a seat and answer counsel's

5   questions.

6                    DIRECT EXAMINATION

7    BY MS. SMITH:

8   Q    Good morning.

9   A    Good morning.

10  Q    Could you please state your name and spell your last name

11  for the court reporter?

12  A    Rick Rahim, R-A-H-I-M.

13  Q    And where do you currently reside, Mr. Rahim?

14  A    Great Falls, Virginia.

15  Q    And how long have you resided in Great Falls?

16  A    Approximately 23 or 24 years.

17  Q    And where is Great Falls generally in Virginia?

18  A    Near Tysons Corner.

19  Q    Is that in northern Virginia?

20  A    Yes, ma'am, Fairfax County.

21  Q    And how are you employed?

22  A    I'm self-employed.

23  Q    And what types of businesses do you own or have you owned?

24  A    I've owned many businesses, mostly retail, selling on

25  Amazon, eBay, etc.

Rahim - Direct

1   Q    And could you give us some of the names of those

2   businesses?

3   A    BV Management, I've owned a chain of laser tag groups, a

4   few restaurants, QQQTrade.com, Simalgo [phonetic], stock

5   trading websites as well.

6   Q    And what does BV Management do?

7   A    BV Management is really just the main entity through which

8   I manage each of the other individual businesses.

9   Q    And what about Food Truck, LLC?

10  A    Food Truck, LLC was, as it sounds, a small company I

11  founded that had a couple of food trucks, and we literally sold

12  food out of trucks.

13  Q    And when were those businesses in operation?

14  A    Approximately five to six years ago.  Food Truck, LLC

15  operated for a couple of years.

16  Q    Are you a co-defendant in this case?

17  A    I am.

18  Q    Can you briefly tell the jury what actions you took that

19  caused you to be charged with federal crimes related to Scott

20  Jenkins?

21  A    I participated in bribing Mr. Jenkins in order to obtain

22  things like gun permits and being sworn in as a deputy.

23  Q    Who initially introduced you to Scott Jenkins?

24  A    A gentleman named Kevin Rychlik.

25  Q    And how do you know Kevin Rychlik?

Rahim - Direct

1  A    I have known Kevin approximately 20 years.  We met through

2  aviation.  I'm also a helicopter and airplane pilot.

3  Q    And you said you met him about 20 years ago?

4  A    Approximately, yes.

5  Q    And tell me a little bit more about your relationship with

6  Kevin Rychlik and how it evolved over time.

7  A    I wouldn't call us friends, but strong acquaintances, and

8  ultimately we had many business relationships.  I believe all

9  of them involved -- revolved around him needing money from time

10 to time, and I was one of his regular go-to lenders.

11 Q    At some point, Kevin Rychlik approached you about becoming

12 an auxiliary deputy in Culpeper County?

13 A    Correct.

14 Q    Who was sheriff at the time that you guys had this

15 conversation?

16 A    Scott Jenkins.

17 Q    When did this conversation occur?

18 A    Prior to the last election that he won, which is

19 approximately five years ago, five and a half years ago.

20 Q    2019?

21 A    Yes, ma'am.

22 Q    So did this conversation occur in the summer of 2019,

23 approximately?

24 A    Approximately, yes.

25 Q    And what did Kevin Rychlik tell you would be required in

Rahim - Direct

1    order for you to become an auxiliary deputy sheriff?

2    A    Money, friendship, loyalty.

3    Q    And who was that money and friendship and loyalty to?

4    A    Scott Jenkins, the sheriff.

5    Q    At the time that you had this conversation with Kevin

6    Rychlik, did you know Scott Jenkins?

7    A    No.  I'd never met him.

8    Q    Did you know anything about the Culpeper County sheriff's

9    office?

10   A    Not until I began researching it as a result of Kevin's

11   conversation.

12   Q    And did you have any connection to Culpeper County?

13   A    No.

14   Q    Did you know what an auxiliary deputy sheriff was?

15   A    Yes.

16   Q    And what did you believe it was?

17   A    A non-trained, non-professional, non-full-time person who

18   also was sworn in and is granted law enforcement power as a

19   deputy sheriff.

20   Q    You said they were sworn in as a deputy sheriff?

21   A    Yes.

22   Q    Did you believe that there would be certain requirements

23   or training as part of that program?

24   A    For me, no, if that's your question.

25   Q    Generally was there supposed to be training and other

Rahim - Direct

1    requirements?

2            MR. CALEB:  Objection.

3            THE COURT:  If he knows.  So lay a foundation of what

4    he knew.

5    BY MS. SMITH:

6    Q    Do you know whether or not generally an auxiliary deputy

7    is required to have certain training or other requirements?

8    A    Generally, I believe the answer is yes.

9    Q    And you said for you that was not required.  Why was that

10   not required for you?

11   A    I was to be one of those special friends who was loyal and

12   would receive this favor.

13   Q    That was a favor of Scott Jenkins's?

14           MR. CALEB:  Objection.

15           THE COURT:  Overruled.

16           THE WITNESS:  Yes.

17   BY MS. SMITH:

18   Q    And why were you interested in being the special friend of

19   Scott Jenkins or an auxiliary deputy sheriff?

20   A    Well, number one, because my friend Kevin requested, and I

21   wanted to help him, but more importantly, 30 years ago I became

22   a convicted felon through writing bad checks as a youth, and

23   therefore was precluded from legally owning a gun.  And Kevin

24   suggested that this sheriff could help me resolve that.

25           MR. CALEB:  Objection.

Rahim - Direct

1              THE COURT:  Well, let's go back and establish some

2   foundation before you get into that.

3   BY MS. SMITH:

4   Q    I asked you why you wanted to become an auxiliary deputy

5   sheriff, and you mentioned your past convictions.  So let's

6   kind of break this down a little bit.

7        So you were a convicted felon at the time; is that right?

8   A    I still am, yes.

9   Q    And you mentioned that Scott Jenkins could help you

10  resolve that issue.  What was your understanding of what that

11  entailed?

12  A    Twofold.  He had the ability to assist me in having my

13  firearms rights restored locally in Culpeper; and secondly, he

14  had the ability to swear me in as a law enforcement officer,

15  which would of course grant me additional powers in terms of

16  concealed carry and that sort of thing.

17  Q    And what was your understanding as to how he had the

18  ability to help you get your firearms rights restored?

19  A    Well, it was explained to me that he was the sheriff and

20  had relationships with --

21              MR. CALEB:  Objection.

22              THE COURT:  Rephrase it.

23  BY MS. SMITH:

24  Q    Who explained to you that Scott Jenkins could help you

25  with that?

Rahim - Direct

1  A    Mr. Jenkins and Mr. Rychlik.

2  Q    So initially -- let's talk about that first conversation

3  you had with Kevin Rychlik, and then we'll move on to your

4  first meeting with Scott Jenkins.

5       Initially, did you and Mr. Rychlik discuss Mr. Jenkins's

6  ability to get you your firearms rights restored?

7  A    Yes.

8  Q    And can you tell us about what Kevin Rychlik told you?

9  A    I have known Kevin -- just to give you the groundwork --

10 I've known Kevin for a long time, and he owned a gun store as

11 well.  So we had previously discussed my firearms rights, or

12 lack of them, over many, many years.  And so when he called me

13 or texted me and we started this conversation, he reminded me

14 that he was a sworn deputy in multiple counties, and suggested

15 that it was election time and this sheriff needed a lot of

16 support, and should I grant that support, he would certainly be

17 open to returning the favor if all went well.

18 Q    And when you use the term "support," what did you

19 understand that word to mean?

20 A    Most specifically, financial support.

21 Q    So money?

22 A    Yes.

23 Q    And was there anything -- any other reasons in particular

24 that you wanted a badge?

25 A    Yes.

Rahim - Direct

1   Q    Okay.  And why did you personally want a badge?  You

2   smiled.  Can you explain to me why you're smiling?

3   A    Well, we've talked about it.  I drive too fast.  And being

4   able to carry a deputy's badge puts one in the position to

5   almost always not receive a speeding ticket.

6   Q    Why is that?

7   A    It's called professional courtesy in the law enforcement

8   community.  So essentially cops don't write cops tickets.

9   Q    Were there any other benefits to being an auxiliary deputy

10  for you?

11  A    Yes.  I mean -- I'm sorry, I'm just trying to give you the

12  best answer I can.  The additional benefit is you're a sworn

13  law enforcement officer, which carries a lot of responsibility,

14  but also, you know, multiple privileges in terms of access to

15  events, and just courtesies, like we discussed.

16  Q    Did you have any understanding as to whether or not you

17  could carry a concealed weapon once your firearms rights were

18  restored?

19  A    Well, if I could break down that question for you, the

20  restoration of firearms rights in Virginia granted me the

21  ability to own and open carry a weapon; in other words, it's

22  legal to put it on your belt and walk around safely.  There

23  would have been another step in terms of applying for a

24  concealed carry permit after my firearms rights were restored.

25  Q    And if you were a sworn law enforcement officer, did you

Rahim - Direct

1   need that concealed handgun permit?

2   A    No, there is no such requirement.  A sworn law enforcement

3   officer can carry in all 50 states without a permit.

4   Q    Let's move on to that first time that you ever met Scott

5   Jenkins.  What happened?  How did you meet him?

6   A    Well, we had the conversation between myself and Kevin

7   Rychlik.  Kevin then arranged the meeting after talking over

8   specifics about the types of support, and how I could be

9   helpful in the election year.  And he then arranged a meeting

10  in Culpeper with the sheriff.

11  Q    And prior to your lunch and your meeting with Scott

12  Jenkins, did Kevin Rychlik discuss with you the amount of the

13  bribe payment that was required?

14  A    Yes.

15          MR. CALEB:  Objection.

16          THE COURT:  Well, let's rephrase it.  Counsel,

17  approach for a second.

18          (Sidebar commenced.)

19          THE COURT:  So we're at the intersection where I

20  presume you've established a conspiracy enough to get Rychlik's

21  statements in, or I give a cautionary instruction.  That's

22  where we are.  So we don't have any ongoing objections, the

23  word "bribe" has been used throughout.

24          MR. CALEB:  We have been selective with the

25  objections.

Rahim - Direct

1          MS. SMITH:  Your Honor, you know, Mr. Rahim has just

2     testified that he had conversations with Kevin Rychlik about

3     getting sworn in as a law enforcement officer in exchange for a

4     bribe.  That is an agreement and they are discussing that, and

5     so I think that we have set the foundation for those

6     co-conspirator statements to be moved in.  If Your Honor does

7     not believe that we have met that foundation, I would just ask

8     for a cautionary instruction for that to be admitted

9     conditionally subject to us closing all the loops.

10          THE COURT:  Do you want to address whether they've

11     established the existence of --

12          MR. CALEB:  I just think we're a ways away from that.

13     I don't believe that they have established an agreement between

14     Rychlik and Rahim.

15          THE COURT:  It doesn't have to be just between them.

16          MR. CALEB:  Anyone.  I don't think they've

17     established an agreement with anyone.  I don't think that

18     Rychlik's statements come in through this witness at this time.

19     I think the Court does have to make that finding.  I don't

20     think a foundation has been laid yet.

21          THE COURT:  Okay.

22          MS. SMITH:  Your Honor, he has discussed the

23     conversations he had.  He discussed the fact that Kevin Rychlik

24     talked about special friends of the sheriff getting sworn in

25     exchange for cash or payments, and that he was going to go meet

Rahim - Direct

1  the sheriff in order to do that.  So I think that the

2  conspiracy has been laid, that foundation.

3        THE COURT:  All right.  So I think the existence of a

4  conspiracy has been laid.  I will give a cautionary

5  instruction.  The reason I think the existence of a conspiracy

6  has been laid at this point is that Mr. Rahim testified without

7  any statements from Mr. Rychlik that his understanding that he

8  was paying money to become a special deputy as a, quote, loyal

9  friend, not to be sworn in -- I'm sorry, not to have to be

10  trained.  Also Mr. Siebel testified to the regular manner in

11  which the auxiliary deputies were being sworn in, which is also

12  evidence of the difference in the program for what was

13  otherwise required, and that was to raise money.  So I think

14  there's sufficient evidence that there is at least the

15  existence of a conspiracy, though slight at this point in time.

16        MR. CALEB:  The only thing I'll say in response is

17  that all the evidence of the benefits that he would receive

18  have come from -- I mean, and I know he hasn't said it, but

19  he's basically saying his understanding.  And his understanding

20  is presumably the statements of Kevin Rychlik, which at that

21  point -- I mean, at this point I don't think that those

22  statements are admissible.

23        MS. SMITH:  If I may, Your Honor, he also testified

24  that it was from Kevin Rychlik, a co-conspirator, but also the

25  defendant himself.  He said later on Scott Jenkins also told me

Rahim - Direct

1  that, and I backed up.  But he already started making

2  statements about Scott Jenkins, and that statement is

3  admissible by a party opponent.  And so that also gives rise to

4  showing that there's a conspiracy in existence.

5          THE COURT:  I think there's enough evidence that

6  there is existence of a conspiracy.  So I will give a

7  cautionary instruction at this point that statements of

8  co-conspirators -- the standard instruction.

9          MR. CALEB:  And so we won't continue objecting.

10          THE COURT:  I understand your objection.

11          MS. SMITH:  Thank you.

12          (Sidebar concluded.)

13          THE COURT:  So ladies and gentlemen, you have heard

14  and you will hear throughout in this case perhaps that there

15  are alleged co-conspirators that may have made certain

16  statements during and in furtherance of the alleged conspiracy.

17  Whether these statements were made, and if they were, what

18  weight you should give them, is entirely up to you.  In other

19  words, these are questions of fact properly left to a jury to

20  resolve.  In determining what weight to give this evidence, if

21  any, you should consider the credibility of the witnesses and

22  the totality of the circumstances surrounding the alleged

23  statements.  Whether the evidence is entirely credible,

24  partially credible, or not credible at all is entirely for you

25  to decide.

Rahim - Direct

1          With that, Ms. Smith, go right ahead.

2          MS. SMITH:  Thank you, Your Honor.

3   BY MS. SMITH:

4   Q    I believe the last question I asked you, Mr. Rahim, was

5   prior to your lunch with Scott Jenkins, did Kevin Rychlik

6   discuss with you the amount of the bribe payment?

7   A    Yes.

8   Q    And what did he tell you?

9   A    $15,000.

10  Q    Was that an initial payment?

11  A    That is the amount that I paid initially, yes.

12  Q    How explicit was your conversation with Kevin Rychlik

13  about this bribe payment?

14  A    It was a transaction no different than if, hey, Rick, I've

15  got a car, this is what it will cost you.  Let's go buy the

16  car.  It was very specific.

17  Q    Did you discuss what method you would make this payment?

18  A    I was instructed to bring cash.

19  Q    And who instructed you to bring cash?

20  A    Mr. Rychlik.

21  Q    Did he tell you why you were supposed to bring cash?

22  A    My recollection is that upon the -- and it made sense --

23  upon the instruction of Mr. Jenkins, cash would be the best --

24  that's how it was phrased -- because of my record as a

25  convicted felon.  So in other words, I was told it would be

Rahim - Direct

1   best not to have a check written from a convicted felon.

2   Q    What would be the problem with having a check from a

3   convicted felon?

4   A    As it was explained to me, it would have therefore had to

5   have been reported and become public what the source of funds

6   was.

7   Q    And that would be the sheriff receiving funds from a

8   convicted felon?

9   A    Yes.

10  Q    Now, prior to this meeting, did you send to Kevin Rychlik

11  any documents?

12  A    Yes.

13  Q    And what did you send him?

14  A    In anticipation of the meeting going well, Mr. Rychlik

15  assured me that Mr. Jenkins would be on board with assisting me

16  in getting my firearms rights restored.  So I prepared the

17  documents necessary for him to do that as quickly as possible

18  without having to type any documents himself.

19  Q    Let's talk a little bit about firearms restoration.  What

20  is the process as a felon when you're trying to get your rights

21  restored generally?

22  A    Sure.  So 20 -- almost 30 years ago, I became a convicted

23  felon through these bad checks.  And the process in Virginia,

24  the first step would be to get all of your rights restored by

25  the governor, except the governor does not restore firearms

Rahim - Direct

1  rights.  So I successfully did that probably ten years ago now,

2  and had all my rights, including my right to vote, restored by

3  the governor.

4       The next step then, would be that once you've accomplished

5  all of those things, you are required to apply to the Circuit

6  Court where you live and ask the court to grant you a

7  restoration of firearms.  And that's literally what it's

8  called, restoration of firearms rights.

9  Q    And so in preparation for your meeting, what did you

10 prepare for Scott Jenkins?

11 A    I prepared a document entitled "restoration of firearms

12 rights."

13 Q    And why did you prepare that with him in mind?

14 A    Well, as a business person, if you're trying to make

15 things easy for other people, you often prepare everything so

16 the least possible effort is required by them, which makes it

17 easier for them to help you accomplish your goals.

18 Q    And why did you believe that Scott Jenkins could help you

19 get your firearms rights restored?

20 A    Because Mr. Rychlik advised me he would.

21 Q    If I could show you what's been marked as Government's

22 Exhibit 102.

23          MS. SMITH:  And Ms. Fastenau, if you could just zoom

24 in on the top for me, please.  Thank you.

25 BY MS. SMITH:

Rahim - Direct

1   Q    Do you recognize this document?

2   A    I do.

3   Q    What is it?

4   A    It's an e-mail from me to Mr. Rychlik on July 27th of

5   2019.

6   Q    And before you go any further --

7            MS. SMITH:  Your Honor, the government would move to

8   admit Government's Exhibit 102.

9            THE COURT:  Any objection?

10           MR. CALEB:  No objection.

11           THE COURT:  So admitted.

12           MS. SMITH:  Permission to publish to the jury, Your

13   Honor?

14           THE COURT:  Yes, ma'am.

15           (Government Exhibit 102 marked and admitted)

16           THE COURT:  And Ms. Smith, while you're doing that,

17   take your microphone and put it over on the right side, because

18   that way your voice is -- projects over the microphone.  That

19   may --

20           MS. SMITH:  Thank you, Your Honor.  Is that better?

21           THE COURT:  I think that's going to work better.

22    BY MS. SMITH:

23   Q    Can we walk through this with the jury?  So it says

24   "from."  And who is this listed as being from?

25   A    Me.

Rahim - Direct

1   Q    Okay.  Is that your e-mail address?

2   A    Yes.

3   Q    RickRahim@AOL.com?

4   A    Correct.

5   Q    And to, who is that to?

6   A    Mr. Rychlik.

7   Q    And what is the date of this e-mail?

8   A    27th of July, 2019.

9   Q    And this was sent prior to your meeting with Scott

10  Jenkins?

11  A    Correct.

12  Q    And it says at the top, firearms -- I think this is a

13  misspelling -- retoration.  It should say restoration; is that

14  right?

15  A    I think it does say restoration.

16  Q    Yeah, at the top?

17  A    At the top, yes, ma'am.

18  Q    And what is the attachment included?

19  A    The attachment that we can't see here is the PDF of that

20  document that I told you I had prepared.

21  Q    And let's go to the body of the e-mail.  What did you say

22  to Mr. Rychlik?

23  A    See attached, it's literally a one-paragraph order, would

24  have been the rest of it.  And this was just subsequent to our

25  conversation that I would send him a copy of the order in

Rahim - Direct

1   advance.

2   Q    So did you and Mr. Rychlik discuss sending this order in

3   advance to him?

4   A    Yes.

5   Q    If we could now go to page 2 of this document, please.

6        What is page 2?

7   A    Page 2 appears to be the actual submission to the court

8   requesting the firearms restoration.

9   Q    Is this the petition you were just describing preparing in

10  anticipation of your meeting with the sheriff?

11  A    Yes, and it bears my signature.

12  Q    If we could zoom in on the top half of that page, please.

13       So what does this say?

14  A    It's entitled, "request for restoration of firearms

15  rights."  And comes now, me, pro se, request to be heard,

16  pursuant to Code of Virginia on the issue of restoration of

17  rights to possess firearms.  And it says in support of such

18  request, the petitioner, who is me, offers the following.

19  Q    And number 1 says the petitioner is a resident of Culpeper

20  County?

21  A    Correct.

22  Q    Was that accurate?

23  A    No.

24  Q    Why did you list yourself as a resident of Culpeper

25  County?

Rahim - Direct

1  A    I was advised the way Mr. Jenkins could help me was I

2  needed to be a resident of Culpeper County, which is where he

3  had authority.

4  Q    Because you can only get your firearms rights restored in

5  the county where you reside; is that correct?

6            MR. CALEB:  Objection to leading.

7            THE COURT:  Sustained.

8   BY MS. SMITH:

9  Q    Where can you get your firearms rights restored?

10  A    As I testified earlier, in the Circuit Court of the

11  jurisdiction in which you live.

12  Q    And you lived where at the time?

13  A    Fairfax County.

14  Q    Could Scott Jenkins help you get your firearms rights

15  restored in Fairfax County?

16  A    No.

17  Q    And why is that?

18  A    He had no authority nor, to the best of my knowledge,

19  political influence there.

20  Q    And if we could zoom out, please.

21       If we go down to paragraph number 8, and it says, in July

22  of 2019, the petitioner was interviewed by the Culpeper

23  sheriff's office and received a positive recommendation from

24  that department in support of this request.

25       Is that true at the time that you sent this?

1  A    I'd like to clarify.  I prepared this in advance of ever

2  having been in Culpeper County in any capacity, set aside

3  passing through.  I prepared this in advance in anticipation

4  that Mr. Jenkins would oblige.  So at the time I wrote it, it

5  was not true.

6  Q    You had never -- you were not interviewed; is that

7  correct, at the time that you wrote this?

8  A    Correct.

9  Q    Were you subsequently interviewed?

10 A    Not formally, but the sheriff blessed me.

11 Q    And then further down it says, respectfully submitted, and

12 is that your signature?

13 A    It is.

14 Q    And if we could now go down to page 3 of this document,

15 please.  And this is another page that you attach to your

16 e-mail; is that correct?

17 A    Yes.

18 Q    And what is this document?

19 A    This would be the second page traditionally.  So the first

20 page is where I request that the court order that my rights be

21 restored.  The second page traditionally in a court hearing is

22 -- just like I had prepared documents for Mr. Jenkins -- it's

23 traditional that you prepare the document for the judge to

24 simply sign to make his job efficient.

25      So the answer to your question is this is the order that I

Rahim - Direct

1   prepared ready-made for the judge's signature, should he

2   approve it.

3   Q    And what would happen once he signed this order?

4   A    It would go into immediate effect and I would have my

5   rights immediately restored.

6            MS. SMITH:  Thank you.  We can take that down,

7   Ms. Fastenau.

8   BY MS. SMITH:

9   Q    Did you have a meeting with Scott Jenkins on July 31st of

10  2019?

11  A    Yes.

12  Q    And where did this meeting occur?

13  A    In Culpeper County.

14  Q    And tell me about that meeting.  Who was there?

15  A    It was our introductory smile test.  I met Kevin Rychlik

16  at the sheriff's office and met Sheriff Jenkins as well.

17  Q    So you first met Mr. Jenkins at the sheriff's office?

18  A    In his personal office at the sheriff's office, yes.

19  Q    Did you guys have any discussions at that point?

20  A    It was several hours.  We went to lunch.  Over the course

21  of meeting him, going to lunch, and coming back to his office,

22  the conversations were very direct about it's an election year,

23  he needs lots of money and lots of help, he has a tough

24  opponent.  Knowing that I was going to this meeting, I had done

25  extensive research.  I came armed with data, poll data,

Rahim - Direct

1    demographics.  I knew how many voters there were, how many were

2    registered Republican versus Democrat.  I demonstrated to him

3    that I had taken his plight of re-election very seriously and

4    was prepared to help.  I know the question you're getting to is

5    did we discuss --

6              MR. CALEB:  Objection.

7              MS. SMITH:  Let me make sure I'm asking the

8    questions, okay?

9              THE WITNESS:  I apologize.

10    BY MS. SMITH:

11   Q    Thank you.  You said you guys discussed the fact that he

12   was up for re-election that year?

13   A    Yes.

14   Q    Did you tell him how you could help him with re-election?

15   A    Yes.

16   Q    And what did you tell Scott Jenkins?

17   A    I gave bullet points of the many ways I could help; number

18   one being campaign contributions from myself, number two being

19   hopefully soliciting campaign contributions from others I knew

20   in the business community, number three, I have a graphic

21   design background through business, I could certainly help him

22   with re-election materials.  I have a direct mail and marketing

23   background, so I could help him with postcards and posters and

24   billboards and that sort of thing.  I don't remember more

25   specifics of the first meeting, but I gave him a menu of all

Rahim - Direct

1   the ways I could be very helpful -- oh, social media.

2   Q    And you mentioned earlier that you had done a lot of

3   research into Scott Jenkins, his office, and Culpeper County

4   prior to this meeting.  Why did you do all that research?

5   A    The purpose of the meeting -- and again, this was from

6   conversations with Mr. Rychlik -- is to essentially have Scott

7   like me, right?  Kevin was confident because he had known me

8   for 20 years that it, you know, would be an instant, you know,

9   friendship.  But I came prepared to sell him on the assets that

10  I could bring to him.  And my way of doing that is showing

11  people that I take things seriously, and that I come armed with

12  information and specifics rather than just, you know, let's

13  just do this and get going.  I came armed with how specifics I

14  could bring to the table would be very helpful.

15  Q    Is that what you've done in your job generally as a

16  businessman?

17  A    It's what's required to be successful, yes.

18  Q    And you mentioned you wanted to sell yourself as an asset.

19  I'm not saying that exactly right, but generally speaking.  Why

20  was it important for Scott Jenkins to like you and for you to

21  sell yourself?

22  A    I think the answer is that it was important more to me

23  than probably -- my perception of how important it was may not

24  have been accurate, but I wanted to sell myself and really

25  become a part of his inner circle, and become trusted and

Rahim - Direct

1   valued by him.  Though money may have been enough, I chose to

2   take the high road and make myself the most valuable person

3   that Mr. Rychlik had delivered to Mr. Jenkins.

4   Q    And what were you hoping to gain out of that?

5   A    Mutual trust, respect, and loyalty, and of course the

6   things we've discussed already, firearms restoration and being

7   sworn in as a deputy, etc.

8   Q    During this meeting with Scott Jenkins, this initial

9   meeting, did he ask you whether you had any law enforcement

10  background?

11  A    No.

12  Q    Did he talk to you about any training you may have

13  received as -- for law enforcement purposes?

14  A    No.

15  Q    Did you ever fill out an application?

16  A    I don't believe I did.  Definitely not in the first

17  meeting.

18  Q    Were there any conversations about what, if any,

19  qualifications you had to be an auxiliary deputy sheriff?

20  A    None that I recall.

21  Q    And you went to lunch, and what happened after you guys

22  went to lunch?  Did you go back to the sheriff's office?

23  A    We did.

24  Q    And what happened once you were back in the sheriff's

25  personal office?

Rahim - Direct

1   A    We went back into Mr. Jenkins's office.  Kevin was still

2   present.  Kevin is also a business person, a very good

3   salesman, and had come with a mission.  And Kevin literally

4   opened the topic just ripping the band-aid off, okay, so -- I'm

5   paraphrasing Kevin here, but these were his exact words.  Okay,

6   Scott, what can we do to get Rick a tin.

7   Q    And what is a tin?

8   A    Meaning the tin badge that you carry in your wallet.  In

9   other words, make him a deputy.

10  Q    What was Scott Jenkins's reaction to that?

11  A    He was amenable, said he liked me, was excited to work

12  with me, was looking forward to the support I could give him

13  and was so glad that Kevin had brought me to him, because

14  again, he reiterated he was facing a very tough election from a

15  credible opponent.

16  Q    During this meeting, did you discuss the fact that you had

17  a felony record?

18  A    He was already well aware of it, and the answer is yes, we

19  definitely --

20  Q    How do you know he was well aware of it?

21  A    All right.  Let me back up.  Kevin told me he was well

22  aware of it.

23  Q    And then in that meeting it was brought up again?

24  A    Yeah.  Kevin used words such as, as you know, Rick does

25  have this problem.

Rahim - Direct

1  Q    And what was Scott Jenkins's reaction to finding out -- or

2  to the fact that you were a felon?

3  A    It was blown off.  It was 30 years ago, it wasn't violent.

4  Not a problem for me.

5  Q    Did you guys discuss whether or not you could legally

6  carry a firearm if you were a sworn deputy with a felony

7  background?

8  A    I don't know that we were that specific, but it was

9  definitely told to me by Mr. Jenkins that, you know, once

10  you're sworn in, carrying a weapon is not an issue.  In fact,

11  you can even, you know, go to New York City and get into clubs

12  with your badge.

13  Q    And did Mr. Jenkins tell you anything about when you could

14  get your firearms rights restored?

15  A    No specific dates were discussed; however, it was very

16  clear that it would be --

17          MR. CALEB:  Objection.

18          THE COURT:  Overruled.

19          THE WITNESS:  However, it was very clear that it was

20  contingent upon him being reelected first, so that he had the

21  authority.  He stated he wasn't swearing anybody new in prior

22  to the election.  So my expectation was that it would happen

23  very shortly after the election.

24  BY MS. SMITH:

25  Q    Did Scott Jenkins tell you anything -- any specifics about

Rahim - Direct

1  the process, or was anything like that discussed?

2  A    Not really.  It was my understanding from conversations

3  with Mr. Rychlik that he had the authority to --

4           MR. CALEB:  Objection.

5           THE COURT:  I'll let him testify to his

6  understanding.

7  BY MS. SMITH:

8  Q    And as you left that meeting with Scott Jenkins, what had

9  he agreed to do for you?

10 A    Essentially everything we discussed in the meeting, which

11 specifically was assist in the restoration of my firearms

12 rights, assist in -- in fact, he had the authority to issue a

13 concealed carry permit once my rights were restored -- and

14 swear me in as a deputy.

15 Q    What was your part of the agreement?

16 A    Well, initially I -- I had come prepared to pay him that

17 initial $15,000.  And I had, during the course of the meeting,

18 certainly promised him ongoing support in all of the other

19 aspects that we've discussed here today.

20 Q    When you're saying all the other aspects that we've

21 discussed, what are you referring to?

22 A    Meaning campaign support, working on the campaign,

23 soliciting other donations, graphic design, postcard design,

24 direct mail, social media, etc.

25 Q    Now, at some point during this meeting with Scott Jenkins,

Rahim - Direct

1  did you give him the firearms restoration petition and proposed

2  order?

3  A    My recollection is that I came with a packet, and I handed

4  him a packet, which certainly -- the answer is yes, among other

5  documents, yes.

6  Q    So you handed him a packet of documents?

7  A    Correct.

8  Q    And you said part of that packet was the proposed petition

9  and order for your firearms rights restoration?

10 A    Yes, the items we've looked at.

11 Q    Now, in the course of conversation about getting your

12 firearms rights restored, did it come to your attention that

13 someone else was involved in the process, apart from just the

14 judge of Culpeper County?

15 A    During that initial meeting, or subsequently?

16 Q    During that initial meeting, did you guys discuss having

17 to have someone else sign off on your petition for restoration?

18 A    Absent the judge, I don't think we had a further

19 conversation at that time.

20 Q    Later on, did you find out that someone else was involved

21 in the process?

22 A    I did.

23 Q    And who else is involved in restoring someone's firearms

24 rights?

25 A    So as we began that process after the election,

Rahim - Direct

1  Mr. Jenkins at some point advised me that the intermediary step

2  before getting it onto the judge's desk would be a sign-off

3  from the Commonwealth's Attorney.

4  Q    Did he tell you about his relationship with the

5  Commonwealth's Attorney?

6  A    Best friends, good buds, fellow Republican, great

7  relationship, he'll get him to do it, no problem.

8  Q    When he said he'll get him to do it, no problem, what was

9  he referring to?

10 A    The net effect was the guy will do me the favor.  I'll get

11 him to sign off on it so we can get it to the judge.

12 Q    After the meeting in Scott Jenkins's office, did you guys

13 go anywhere else?

14 A    On the initial date?

15 Q    Yes, sir.

16 A    After the meeting inside his office, the three of us

17 walked out to the parking lot, and Scott showed off his

18 unmarked sheriff's office pickup truck.

19 Q    And when you say the three of us, who are you referring

20 to?

21 A    Kevin Rychlik, myself, and Mr. Jenkins.

22 Q    What happened once you reached Scott Jenkins's pickup

23 truck?

24 A    Well, he showed off all the flashing blue lights, and then

25 he and I, meaning Mr. Jenkins and I, jumped into the inside of

Rahim - Direct

1  his pickup truck to show me the lights and sirens and that sort

2  of thing.

3  Q    Once you were in the pickup truck, what happened?

4  A    I handed him a manila envelope containing $15,000 in $100

5  bills.

6  Q    What did Mr. Jenkins do when you gave him that envelope

7  full of cash?

8  A    He was expecting it.  My recollection is that he lifted

9  his armrest, and said thank you, stuck it under there, and

10 shook my hand, and said he was looking forward to getting to

11 work with me.

12 Q    You said he was expecting it.  What made you believe he

13 was expecting that payment?

14 A    He didn't ask me what it was, and he didn't open it to

15 count it.

16 Q    Now, would you have given that $15,000 to the sheriff if

17 you didn't think you were getting something in return?

18 A    I didn't owe the man.  The answer is no.  Absolutely not.

19 Q    Now, after the meeting, did you send a follow-up e-mail

20 about your restoration of firearms rights?

21 A    Over the course of time, I sent several, yes.

22 Q    And do you remember sending an e-mail to Mr. Rychlik?

23 A    Many e-mails, yes.

24 Q    Was there one that you sent with a revised order after

25 this meeting?

Rahim - Direct

1  A    There might have been more than one, but the answer is

2  yes.

3  Q    If I could show you Government's 103.

4       And do you recognize this document?

5  A    Yes.

6  Q    And what is it?

7  A    It's an e-mail from me to Mr. Rychlik with that revised

8  order.

9       MS. SMITH:  Government would move to admit into

10 evidence Government's Exhibit 103.

11       THE COURT:  Any objection?

12       MR. CALEB:  No objection.

13       THE COURT:  So admitted and it may be published.

14       MS. SMITH:  Thank you, Your Honor.

15       (Government Exhibit 103 marked and admitted)

16  BY MS. SMITH:

17 Q    Okay.  Now that the jury can see it, what does it say in

18 the top -- what's the topic of the e-mail?

19 A    Draft order for sheriff.

20 Q    And then in the "from," who is it from?

21 A    It's from me.

22 Q    And who is it to?

23 A    Mr. Rychlik.

24 Q    And on the date it says what?

25 A    August 3rd, 2019.

Rahim - Direct

1  Q    And down below, it says, Kevin, here is the revised order

2  with a seen and agreed signature line for the CA.

3  A    Correct.

4  Q    What does CA refer to?

5  A    Commonwealth's Attorney.

6  Q    Why were you sending a revised order?

7  A    Upon instructions from Mr. Jenkins that the step, the

8  additional step, was missing; in other words, having the

9  Commonwealth's Attorney's office bless it prior to sending it

10 to a judge.  So on his instruction, I revised it to contain the

11 signature line for the Commonwealth's Attorney.

12 Q    And this occurred just a few days after your meeting with

13 the sheriff; is that correct?

14 A    I believe so, yes.

15 Q    Does this refresh your memory as to whether or not you

16 learned that the Commonwealth's Attorney was involved in the

17 process at that initial meeting?

18 A    It certainly helps me remember that it was probably

19 discussed in that initial meeting, yes.

20 Q    If we could turn to page 2 of this.  And then down below

21 it says seen and agreed?

22 A    Yes.

23 Q    Is that what you added after your initial meeting with the

24 sheriff?

25 A    Yes.

Rahim - Direct

1  Q    At some point after that initial meeting, did Scott

2  Jenkins ask you for a loan?

3  A    Yes.

4  Q    And when did he ask you for a loan, if you recall?

5  A    After the meeting we had that summer, but well prior to

6  his election in November.

7  Q    And how did this loan discussion come about?

8  A    I think it started with a text message asking me if I had

9  time to talk.  It may have been a phone call.

10 Q    And what did he tell you?

11 A    Essentially he needed to borrow some money.  The amount

12 ended up being $35,000.  The reason was that he was building a

13 new house, and had contracted with a home builder.  I guess he

14 already owned the land.  That house was a little behind

15 schedule, but was scheduled to close, meaning construction be

16 done, and he would move in sometime in December, maybe January,

17 but that they were close to completion of the home, and there

18 were some upgrades or -- and/or overruns in costs, and that he

19 needed to -- essentially he needed $35,000 for the builder to

20 get his house completed.  So it was coming up to an election.

21 The story was he has good credit.  He could certainly go get a

22 loan from his credit union, but he didn't want to have to look

23 like he was borrowing money right prior to his election.  It

24 was a publicity issue for him.  He would have rather kept it

25 private.  So could I lend him essentially a short-term loan

Rahim - Direct

1  which he would repay at settlement of his new house when his

2  construction loan was refinanced into a traditional mortgage

3  because the equity would be there at that time.

4  Q    When he asked you for a loan, what did you decide to do?

5  A    I had to say yes.  I was already in, hook, line, and

6  sinker, so I immediately said yes to him, and --

7  Q    And I'm sorry to interrupt you.  If you could just move a

8  little bit closer to the mic, and slow down a little bit, so

9  that I can make sure the court reporter can write down what

10 you're saying.

11 A    I apologize, Ms. Court Reporter.

12      I had to say yes, in my mind, so I immediately said yes

13 that I was happy to help.

14 Q    Why did you feel like you had to say yes?

15 A    Well, I was already deep into this process.  I wanted to

16 keep him happy for obvious reasons.  And on its face, there

17 seemed to be a business case, because I was going to collect

18 good interest, and there appeared to be real estate as actual

19 collateral.  So it was actually just without everything else

20 going on, probably a good business real estate loan.

21 Q    And how much did you end up loaning him?

22 A    As our community at that time -- meaning myself and other

23 friends -- often do, I decided to approach a friend and split

24 it.  So the loan request was $35,000.  I ended up splitting it

25 with another friend, who I've regularly done this sort of thing

Rahim - Direct

1   with, and he and I each individually financed 50 percent,

2   meaning I loaned $17,500 of the $35,000 loan.

3   Q    And who was this friend that helped finance the loan?

4   A    James Newberry.

5   Q    Were documents drafted to memorialize the loan?

6   A    Yes, a formal agreement was drafted.

7   Q    And who drafted those documents?

8   A    I did.  I had them pretty much copy and paste.  So I took

9   the existing documents we've used in the past and I edited them

10  for the facts specific to Mr. Jenkins.

11  Q    If we could turn to Government's Exhibit 729.

12       Do you recognize this document, sir?

13  A    I do.

14  Q    And what is it?

15  A    It's an addendum to the actual -- well, I believe it's an

16  addendum or a part two for the initial -- for the actual loan.

17  And it's -- basically, it's a confess judgment, which means I

18  wouldn't have to sue him if he didn't pay.  Now, I could be

19  wrong.  This could be page 1 of the agreement.

20  Q    If we could just flip through the agreement.

21  A    If you could just show me page 1, I can better clarify.  I

22  think this was the secondary document.

23       Oh, this does say page 1.  Okay.  So that's just the

24  beginning of that document.  Thank you.

25  Q    Okay.  Want to flip through and make sure it's -- and what

Rahim - Direct

1  is this document?

2  A    It's titled "secured confession of judgment promissory

3  note."  So it's the loan document that governed the amount

4  being loaned, the interest payments, the payment schedule, etc.

5  Q    And this was the loan for Scott Jenkins?

6  A    From myself and my partner to Scott Jenkins, yes.

7  Q    Is this an accurate copy of that loan document that you

8  drafted up?

9  A    It is.

10        MS. SMITH:  Your Honor, we would move into evidence

11  Government's 729.

12        THE COURT:  Any objection?

13        MR. CALEB:  No objection.

14        THE COURT:  So admitted, and may be published to the

15  jury.

16        MS. SMITH:  Thank you, Your Honor.

17        (Government Exhibit 729 marked and admitted)

18  BY MS. SMITH:

19  Q    If we could zoom in on the top half of the document,

20  please, page 1.

21        Okay.  And under principal amount, what was the principal

22  amount?

23  A    $35,000.

24  Q    And what was the date of this loan?

25  A    As of September 18th, 2019.

Rahim - Direct

1   Q     And for the first non-bolded paragraph on this page, does

2   it list the individuals involved in this loan?

3   A     Yes.

4   Q     And who is listed as the borrower?

5   A     Scott Howard Jenkins.

6   Q     And then under the holders, who are those people?

7   A     Myself and James Newberry.

8   Q     If we could zoom back out, please, going down to number 1,

9   it says, purpose of the loan.  Generally speaking, what was

10  memorialized in this document?

11  A     I mean, as I explained, he was borrowing money to complete

12  the new residential construction so that he could do a

13  traditional long-term loan and move into his new house.

14  Q     And then starting with loan proceeds from FSB at closing

15  will be sufficient to pay this loan in full, is that reflecting

16  what you recently told the jury about getting paid back when he

17  closed on his house?

18  A     Yes.  I crafted that language based on his assurance that

19  I would be paid a settlement, and that there would be

20  sufficient loan proceeds to make that happen.

21  Q     And then it goes on to say, borrower will include this

22  loan in the final HUD sheet and this note shall be paid in full

23  at closing.

24        What is that referring to?

25  A     That's language to protect myself and my partner, making

Rahim - Direct

1    sure that when you -- in real estate when you close a loan,

2    it's the duty of the title company, the mortgage insurance

3    company, and the realtors, to accurately list all the debts

4    required to pay it off, and then transfer a clear and

5    unencumbered title.  So that's pretty standard language that

6    says, hey, if he's going to pay us off when he refinances his

7    house, let's make sure our pay-off is included in the HUD sheet

8    and the funds are disbursed by the title company at closing.

9    Q    And those funds would be disbursed to you if it was

10   included on that HUD sheet?

11   A    50 percent to me and 50 percent to Mr. Newberry, yes.

12   Q    If we could now turn to page 7 of this document, please.

13        And whose signatures are down here?

14   A    Mr. Jenkins and a notary public.

15   Q    So this was a notarized document?

16   A    Correct.

17   Q    So you sent this document to Mr. Jenkins, and then did he

18   send it back to you?

19   A    Yes.

20   Q    With his signature?

21   A    Correct.

22   Q    And did you end up giving him both your half of the loan

23   and Mr. Newberry's half of the loan?

24   A    Immediately, yes.

25             MS. SMITH:  Your Honor, I do notice it's 12:15.  I am

Rahim - Direct

1  at a breaking point if the Court would like to break here, or I

2  can continue on.

3          THE COURT:  Ladies and gentlemen, it's you all's

4  preference.  Would you like to break for lunch now for an hour,

5  or go for about another 20 to 30 minutes?

6          JURORS:  Keep going.

7          THE COURT:  Let's keep going.  Let's go till about --

8  let's check back in between 12:30 and a quarter of 1.

9          MS. SMITH:  Okay.  I will try to keep track, Your

10  Honor.

11   BY MS. SMITH:

12  Q    After that initial bribe payment, did you make any other

13  bribe payments to Scott Jenkins?

14  A    Yes.

15  Q    And if I could pull up Government's Exhibit 124, please.

16      Do you recognize -- if we could zoom in just at the top so

17  he can get the phone numbers.

18      Do you recognize this document?

19  A    I do.

20  Q    And what is it?

21  A    It's a text message from Mr. Jenkins to me.

22  Q    And it was dated September 18th of 2019?

23  A    Yes, ma'am.

24          MS. SMITH:  Your Honor, we'd move into evidence

25  Government's Exhibit 124.

Rahim - Direct

1              THE COURT:  The whole document, or just this text?

2              MS. SMITH:  Oh, sorry.

3    BY MS. SMITH:

4    Q    If we could zoom out, I will ask, do you recognize the

5    rest of the text?

6    A    I do.

7    Q    Okay.  And you've seen this document before; is that

8    right?

9    A    Many times.

10             THE COURT:  And this is a one-page document?

11             MS. SMITH:  Ms. Fastenau, could you flip through

12   the --

13             THE COURT:  Or Mr. Caleb, do you know this document?

14             MR. CALEB:  I do, but -- and this entire exhibit?

15             MS. SMITH:  Yes, it's the entire exhibit.

16             THE COURT:  Any objection?

17             MR. CALEB:  No objection.

18             THE COURT:  All right.  So admitted and may be

19   published to the jury.

20             MS. SMITH:  Thank you, Your Honor.

21             (Government Exhibit 124 marked and admitted)

22    BY MS. SMITH:

23   Q    If we could go to page 1 and zoom in on the blue and green

24   bubble, please.  Thank you.

25        Who is the blue bubble with the phone number ending in

Rahim - Direct

1  5813?

2  A     I believe blue would be Mr. Jenkins -- wait, let me

3  just -- yes.

4  Q     And who is shown in green with the phone number ending in

5  0100?

6  A     Green would be a text from me to him.  Blue would be texts

7  from him to me.

8  Q     And it lists you as Daddy in the text message throughout.

9  What is that in reference to?

10 A     I have four beautiful children, and so I -- when they were

11 kids, I set my name to be Daddy because, you know, they would

12 know who -- who it is.

13 Q     And what is the date of that first blue bubble?

14 A     9-18-2019.

15 Q     And the text message starts with, Hey Rick.  If we could

16 go down to, I'll get those documents printed as soon as I get

17 home, and get you that rental back to you, so forth.  Really

18 appreciate the help.

19       What was Scott Jenkins referring to in this text message?

20 A     I believe this is a reference to the residential lease in

21 Culpeper County.

22 Q     And that was separate from the loan payment that you made?

23 A     Completely separate.  We haven't talked about that yet.

24 Q     Going back further down on page 1, the blue and green

25 bubble again, please -- oh, sorry, the second set.

Rahim - Direct

1    Again, who is this blue bubble from?

2  A    Again, from Mr. Jenkins to me.

3  Q    And what's the date of at least you receiving this

4  message?

5  A    September 19th.

6  Q    And it says, Hey Rick, hope not interrupting lunch, but I

7  got my wife to e-mail that paperwork after I got it notarized.

8        What was that in reference to?

9  A    If it was notarized, then I believe it would have been

10 the -- I don't want to be confused or misstate.  I believe

11 that's the loan agreement.

12 Q    That was the notarized loan agreement we just previously

13 saw?

14 A    I believe so, yes.

15 Q    And what was your response to him saying that he was going

16 to e-mail you that paperwork?

17 A    I acknowledged she had sent it and I had received it, and

18 suggested we meet up to give him the money.

19 Q    And when you say swap money, what are you referring to?

20 A    I think that was a play on words.  It really could have

21 read deliver your money to you.  There was no swap.

22 Q    He did not give you any money?

23 A    No.

24 Q    If we could turn to page 2, please, of this document.

25      For the first green bubble, what is the date of this text?

Rahim - Direct

1   A    Same date, 9-19-2019.

2   Q    And who is that from?

3   A    From me.  It doesn't say who it's to, but I can infer

4   Mr. Jenkins.

5   Q    All of these text messages are between you and Mr.

6   Jenkins?

7   A    Yes.  So that's my response to him, yes, ma'am.

8   Q    And you said, when we meet, give me the original signed

9   contract, please, and also the signed lease.  Lease does not

10  need to be notarized.

11       When you mention original signed contract, what were you

12  referring to?

13  A    The loan agreement with the original wet ink signature.

14  Q    And when you said signed lease, which was referenced in

15  the prior text we looked at --

16  A    Yes, ma'am.

17  Q    -- what is the signed lease?

18  A    That would be the lease that we separately discussed and

19  arranged between me and his brother so that I could establish

20  residency in Culpeper County and have an address in Culpeper

21  County.

22  Q    You just did quotes when you said established.  Why did

23  you do quotes?

24  A    So we could document a fake residence in Culpeper County.

25  Q    And how was Scott Jenkins going to help you document a

Rahim - Direct

1  fake residence in Culpeper County?

2  A    Well, we executed a lease so that there would be a paper

3  trail.

4  Q    Did he help arrange that lease with his brother?

5  A    I assume so, because I only dealt with Mr. Jenkins.

6  Q    If we could then move on to page 6 of this document,

7  please.  And let's do the first text message.

8       Is this another text from you to Scott Jenkins?

9  A    It is, same date, suggesting meeting for dinner.

10  Q    If we could move down to the next text message, please.

11      And this is another text message to Scott Jenkins.  It

12  says, and tell him yes to the billboard.  We'll take it.  And

13  this one too.  We've got to win this election.

14      What are you referring to in this text message?

15  A    So we had discussed either via text or by telephone the

16  fact that he had identified two billboards within Culpeper

17  County, meaning the big ones by the side of the road, where he

18  wanted to place election ads, but of course they were expensive

19  and he needed help with the money.

20  Q    And who was going to help him with that money?

21  A    The implication was me.

22  Q    Did you two agree to meet for dinner on September 19th of

23  2019?

24  A    We did.

25  Q    If we could move further in the document to page 8,

Rahim - Direct

1  please.  And if we could -- is there a way to zoom in on the

2  first blue bubble and the two green afterwards, please.  Thank

3  you.

4       Is that you guys agreeing to meet for dinner?  The blue

5  bubble is Scott Jenkins; is that right?

6  A    Sure, sounds great -- that's Scott answering my suggestion

7  to dinner.

8  Q    And then what did you respond to him with?

9  A    I made -- I suggested a restaurant and a time.

10  Q    And I want to just point out the time of the text messages

11  is in UTC; is that correct?

12  A    Correct, which I think is five hours ahead of Eastern Time

13  here.

14  Q    So if this says 8:08 p.m. UTC, this message was sent

15  sometime in the afternoon prior to dinner?

16  A    Roughly 3:00, depending on Daylight Savings, yes.

17            MR. CALEB:  Objection to the speculation.  If he

18  knows.

19            THE COURT:  I'll let him testify to what he knows

20  about it.  Jury can decide for themselves.

21  BY MS. SMITH:

22  Q    Did you two meet for dinner at Ruth's Chris Steakhouse on

23  September 19th?

24  A    Yes.

25  Q    Was anyone else at that dinner?

Rahim - Direct

1   A    No.  He came alone and I came alone.

2   Q    Do you remember what was discussed at that dinner?

3   A    The election, the campaign, his need for more money for

4   things like expensive billboards, just general state of the

5   election.

6   Q    At some point during that meeting, did you give Scott

7   Jenkins another bribe payment?

8   A    Yes.

9   Q    And what did you give --

10  A    Oh, I'm sorry.  I believe that same dinner is where I gave

11  him the check with the loan proceeds and we exchanged the

12  documents.

13  Q    Let's go through each one, one at a time.  So --

14  A    Sure.

15  Q    -- did you give him an additional bribe payment?

16  A    Yes.

17  Q    Was that separate and apart from the loan that you were

18  also providing him?

19  A    Correct.

20  Q    How did you give him that bribe payment?

21  A    Towards the end of the dinner, I handed him another

22  envelope with $10,000 in $100 bills.

23  Q    What was his reaction when you gave him that envelope of

24  cash?

25  A    Thanks, Rick, I really appreciate it, and put it in his

Rahim - Direct

1   pocket.

2   Q    And you just made a gesture of putting an envelope in the

3   breast pocket of your suit jacket; is that correct?

4   A    That's correct, yes.

5   Q    And what did you believe you were getting in exchange for

6   that $10,000?

7   A    I believed I had just cemented my entire wish list of

8   things we had discussed at the first meeting, meaning -- by

9   cemented, meaning I had assured success.

10  Q    And you mentioned you also on top of that $10,000 in cash

11  that you gave him, gave him loan proceeds; is that right -- or

12  excuse me, gave him two checks for the loan?

13  A    Yes.  I gave him $10,000 in cash, and I presented him with

14  the two checks for $17,500 each.

15        MS. SMITH:  If we could please pull up Government's

16  Exhibit 314, which is already admitted into evidence.

17        And permission to publish to the jury?

18        THE COURT:  It may be published.

19  BY MS. SMITH:

20  Q    And what is on this page 1 of Government's Exhibit 314?

21  A    Those are the two checks I gave him that night.

22  Q    If we could just zoom in on the first check, please.

23        And who is this check made out to?

24  A    That was to Scott Jenkins.

25  Q    And who was this check from?

Rahim - Direct

1    A    From my partner in this matter, James Newberry.

2    Q    And what is the date on this check?

3    A    September 19th, the date of the meeting.

4    Q    And under the "for" memo, what does it list?

5    A    Loan.

6    Q    If we could then look at the second check, please.

7         And who is this check from?

8    A    From my company that we discussed earlier, BV Management.

9    I own the company.

10   Q    And who is it to?

11   A    Mr. Jenkins.

12   Q    And again, what is the amount of this check?

13   A    The other $17,500.

14   Q    And what is the date?

15   A    The same date, 9-19.

16   Q    And under the memo, what does it say?

17   A    Loan proceeds.

18   Q    And whose signature is down below?

19   A    That's my signature.

20   Q    Why did you write this check from BV Management instead of

21   any personal account?

22   A    I think two reasons.  Number one, we had dealt earlier

23   with the appearance of impropriety, should I have written a

24   personal check.  But also because this was more of a standard

25   business transaction as well.

Rahim - Direct

1  Q    And these are the two loan checks --

2  A    I'm sorry.  And BV Management was the source of the funds.

3  Q    But BV Management is your company?

4  A    I owned it 100 percent.  I have full authority to use it

5  however I want.

6  Q    And these are copies of the two checks you gave to Scott

7  Jenkins on September 19th of 2019?

8  A    Yes, ma'am.

9  Q    Was this loan ever paid back?

10 A    Not to me.  It's my understanding that he did pay

11 Mr. Newberry's half back to him.

12 Q    And you said not to you.  Did you ever ask Mr. Jenkins

13 during this time period to pay back the loan once the house was

14 closed?

15 A    Not during this time period.

16 Q    And why did you not ask for him to pay back the loan?

17 A    Well, when we say during this time period, I want to make

18 sure I give you an accurate answer.

19 Q    Between 2019 and 2021.

20 A    Okay, fair enough.  So over two years, I didn't ask him

21 for the loan, because he had at that point helped me with a lot

22 of the things on that list.  We still had other things in

23 process.  And he's a man you just don't want to irritate.  And

24 I elected to just let the clock keep ticking so that I could

25 continue to enjoy the benefits of what he was producing for me.

Rahim - Direct

1   Q     You said he's a man you don't want to irritate.  What did

2   you mean by that?

3   A     That's my judgment.  It's just my sense that he's a very

4   good friend until you've angered him.

5   Q     Have you seen instances of that that inform that

6   impression?

7   A     I haven't seen instances, but sitting around drinking and

8   eating, I've had the stories told to me, but I've never

9   witnessed --

10              MR. CALEB:  Objection.

11              THE COURT:  Sustained.  I'll strike the last part of

12  that answer.

13              MS. SMITH:  Yes, Your Honor.

14  BY MS. SMITH:

15  Q     After those initial meetings with Scott Jenkins, the one

16  in Culpeper in July of 2019 and this September 2019 meeting at

17  Ruth's Chris, did you travel down to Culpeper again?

18  A     Many times.

19  Q     How frequently?

20  A     Leading up to the election, as often as two or three times

21  a week.

22  Q     And what were you doing during those trips?

23  A     I was genuinely working my rear end off doing all I could

24  to assist the campaign and ensure his success in being

25  re-elected sheriff.

Rahim - Direct

1  Q    And what things specifically did you do?

2  A    I had meetings with his campaign staff, I had meetings

3  with him.  In no particular order, I assisted with the

4  billboards, I assisted with graphic design for the billboards,

5  I came up with the idea of campaign postcards, I created the

6  graphic design in the final postcards, I helped in obtaining

7  mailing lists where the postcards were sent.  We all hate

8  robocalls at election time.  I helped Mr. Jenkins find a vendor

9  who would make those annoying robocalls with his voice and urge

10 people to go vote for him in the days leading up to the

11 election.  I helped him find souvenir pocket knives with his

12 name engraved on them as giveaways, things of that nature.

13 There were fliers, etc. -- I did quite a few things that -- you

14 know, I may be forgetting a few of them.

15 Q    And who paid for all those materials that you helped with?

16 A    Me.

17 Q    Was this on top of the $25,000 in cash you had already

18 given Scott Jenkins?

19 A    Yes.

20 Q    Did you provide any other items of value to Scott Jenkins

21 or the Culpeper County sheriff's office?

22 A    I was thinking as you said it.  I also purchased a high

23 end law enforcement full drone system for the sheriff's office.

24 I think it was approximately $7,000.

25 Q    And why did you give a drone to the sheriff's office?

Rahim - Direct

1  A    It actually was kind of exciting.  By this time, I had met

2  many of his trusted higher command staff.  I had learned that

3  several of them had been operating drones on law enforcement

4  missions, though they were personal drones, and that there had

5  been issues about if they needed a drone, it all depended on

6  whether such-and-such was home, and the drone was charged, and

7  that sort of thing.  So it was also suggested that because I'm

8  already a licensed pilot that I could become a pilot and get my

9  drone certificate and participate in that activity, which would

10 both be helpful to the county and fun for me.  So I offered to

11 help establish a formal drone department and I funded the

12 equipment.

13 Q    And was there someone specifically in the sheriff's office

14 that you gave that drone to?

15 A    Well, Bernie was in charge of the unofficial drone unit at

16 that time because they didn't own a drone, but Sheriff Jenkins

17 assured me he was very interested in establishing a formal

18 drone department, creating policy and the training, creating

19 certifications.  So the answer to your question is I had the

20 drone shipped directly to Captain -- to Bernie, who was a

21 captain at the time.

22 Q    Do you know Bernie's last name?

23 A    Feaganes, I believe -- I may be mispronouncing it.

24 Q    Feaganes?

25 A    Feaganes -- I'm sorry, Feaganes, yes.  I told you.

Rahim - Direct

1  Q    And how frequent was your contact with Scott Jenkins over

2  this time while you were helping him with the re-election

3  campaign?

4  A    Many times a week, sometimes many times a day.

5  Q    Was he aware of all the efforts you were doing on his

6  behalf?

7  A    Of course.  I was making sure he was aware and taking

8  credit for it.

9  Q    And why were you making sure he was aware?

10 A    Again, I was fulfilling that mission of being the most

11 valuable new player in his community of supporters.

12 Q    If we could turn to Government's Exhibit 120, please.

13      Do you recognize this document?

14 A    Yes.

15 Q    And if you want to zoom in on the green bubble as well,

16 please.

17      And what is this document?

18 A    This is communications between myself and Scott on that

19 date.  The exhibit -- I can't really read it, but I can

20 describe it to you -- where I went to work in helping him

21 solicit --

22 Q    Well, don't tell me what's in the document.

23 A    Okay.

24 Q    Do you recognize what this document is?

25 A    I do.

Rahim - Direct

1  Q    And what is this document?

2  A    It's communication between myself and Mr. Jenkins by text.

3            MS. SMITH:  I would move to admit Government's

4  Exhibit 120 into evidence at this time.

5            MR. CALEB:  No objection.

6            THE COURT:  No objection?  All right.  It may be

7  admitted, and published to the jury.

8            (Government Exhibit 120 marked and admitted)

9  BY MS. SMITH:

10 Q    If we could zoom in on the first two texts in this chain,

11 please.

12       Let's look at that green bubble.  Who is this from?

13 A    It's from me to -- it doesn't say it, but I believe it was

14 a group text between myself and Kevin Rychlik and Scott

15 Jenkins, although it appears to only have two recipients.

16 Q    If we go further down in the page, would that be helpful

17 for you to figure out who was on the message?

18 A    Yes, that does clarify -- let's see here.

19 Q    If we could turn to page 2 as well, please.

20       So who appears to be in this text chain?

21 A    You can correct me if I'm wrong.  It clearly appears

22 to only --

23            MR. CALEB:  Objection.  Well, withdrawn.

24            THE COURT:  Okay.  All right.

25            THE WITNESS:  It clearly appears to only be between

Rahim - Direct

1  myself and Mr. Jenkins.

2  BY MS. SMITH:

3  Q    And if we could go back to page 1, please, in that green

4  bubble.  And this is from you.  It says, "sirs."  Is that why

5  you believe that this message was between you --

6  A    Correct.  My vernacular, if I said sirs, I would have been

7  addressing both of them.

8  Q    Is it possible that later on in this set of texts that

9  Mr. Rychlik is part of the conversation as well?

10 A    Absolutely possible.  I don't think that's a typo I would

11 have made.  Now, it's possible I accidentally left him out, but

12 my intent was to address Kevin and Scott.

13 Q    And the first few pages of this text message appear to

14 only have texts from you and the sheriff?

15 A    The texts speak for themselves, yes.  I can't dispute

16 that, yes.

17 Q    But later on, Kevin Rychlik may be texting on this chain;

18 do you recall that?

19 A    Correct.  That happened often.

20 Q    And what did you say on October 1st of 2019?

21 A    In the green I said, sirs, Kevin asked me to really go to

22 work.  I've been busy getting you more donors.  I have 20K in

23 hand from friends for the campaign.

24 Q    And who is Kevin that you're referring to?

25 A    Kevin Rychlik, the same person we've been talking about.

Rahim - Direct

1  Q    And you said have 20,000 -- or 20K in hand from friends

2  for the campaign.  What are you referring to?

3  A    I was referring to a business associate and friend of mine

4  named Fred Gumbinner, who had at that point agreed to donate

5  $20,000 to Scott Jenkins in exchange for being sworn as a

6  deputy.

7  Q    If we could go down to the next -- the response to your

8  text message about that 20K.  What was Scott Jenkins's

9  response?

10 A    He appears to be ecstatic.  He says, whoa, I'm blown away.

11 I don't know what to say.

12 Q    And then he says, that def opens the doors wide on our TV

13 and news ads.

14      What was he referring to?

15 A    I apologize for leaving that out.  It was abbreviating

16 definitely.  So that definitely opens the doors wide on our TV

17 and news ads.  So it was more confirmation about -- I don't

18 think whining is an appropriate word, but I'm going to say the

19 fact that he was constantly whining to me about how expensive

20 the campaign was and had become.  So the implication was, I

21 need more money.

22 Q    And what were these TV and news ads for?

23 A    For his campaign, sheriff election of Scott Jenkins.

24 Q    If we could go further on down in this page.

25      And who is this text message from?

Rahim - Direct

1   A      It's from Scott to me.

2   Q      And what's the date of this text message?

3   A      October 1st.

4   Q      And what is he telling you in this text message?

5   A      Billboards up today too guys.

6   Q      And are those referring to the campaign billboards we've

7   been discussing?

8   A      Yes.  Meaning too as in also, not two as in the number

9   two.

10  Q      If we could turn to page 3 of this document, please.

11  Okay.  And zoom in on -- what does that appear to be?

12  A      That's a photograph of one of the two billboards that went

13  up.

14  Q      And who sent these two photographs?

15  A      Mr. Jenkins.

16  Q      And who did he send them to?

17  A      To me.

18  Q      And if we could turn to page 8 of this document, please.

19         Are these larger pictures of those pictures we just looked

20  at that Scott Jenkins sent you?

21  A      I believe those are the same pictures, just blown up.

22  Q      What was Scott Jenkins's reaction to your efforts?

23  A      I mean, in the moment, Scott was beside himself thrilled,

24  happy, giddy, excited.  I truly believe he had never had

25  somebody give him as much financial support and other support

Rahim - Direct

1   than me.

2   Q    If we could turn to page 5 of this text chain, please.

3   And the last blue text on the bottom, is this a text message

4   from Scott Jenkins to you?

5   A    It is, on the same day.

6   Q    And what does he say to you?

7   A    Can't possibly thank you enough.

8        Reinforces what I just told you.

9   Q    If we could pull up Government's Exhibit 121.

10       Do you recognize this document?

11          MS. SMITH:  And if we could just flip through the

12   document, Ms. Fastenau, so he can see.

13          THE WITNESS:  I mean, it appears to be more text

14   messages between us.

15   BY MS. SMITH:

16   Q    Are those text messages between you and Scott Jenkins?

17   A    Yes.

18   Q    And is this just a subset, again, of some of the text

19   messages you've had over the -- your time period with him?

20   A    We had many, many text messages over many, many years,

21   yes.

22          MS. SMITH:  If we could move into evidence

23   Government's Exhibit 121, please.

24          THE COURT:  Any objection?

25          MR. CALEB:  No objection.

Rahim - Direct

 1              THE COURT:  So admitted, and may be published to the

 2   jury.

 3              (Government Exhibit 121 marked and admitted)

 4    BY MS. SMITH:

 5   Q    If we could turn to page 2, and if we could zoom in on the

 6   first two messages, please.

 7         And who is in the blue in this message chain?

 8   A    That's me to Scott Jenkins.

 9   Q    And what's the date of this text message?

10   A    October 30th, right before the election.

11   Q    And you said, by the way, we'll need to have you record

12   your outbound robocall.

13         Are these the robocalls you were referring to earlier?

14   A    They are.

15   Q    And what does Scott Jenkins say in response?

16   A    He replies that he's happy to help do it any time I need,

17   and would make himself available.

18              MS. SMITH:  And then if we go further down on that

19   page, please, Ms. Fastenau.

20   BY MS. SMITH:

21   Q    And who is this text message from?

22   A    From me to Scott.

23   Q    And what are you saying in this text message?

24   A    This is just in furtherance of getting the robocalls

25   completely ready and ready to go out.  So it was -- I had --

Rahim - Direct

1  again, in the spirit of always doing everything so other people

2  don't have to do anything, I had written several suggested

3  scripts for him.  I had obtained phone numbers and services and

4  contracted for the calls to go out, and I just needed him to

5  confirm details, such as agree the script was fine as written,

6  or edit it, and talk about the caller ID to be used, and how it

7  would appear on people's phones when they received the

8  robocall.

9  Q    So these text messages were being sent at the same time

10  you were helping with your election efforts for Scott Jenkins?

11  A    Yes.  These were sent over several days leading up to the

12  election on behalf of his campaign.

13  Q    Let's turn to the mailers you discussed.  Can you tell the

14  jury about your involvement in the mailers for Scott Jenkins's

15  2019 re-election campaign?

16  A    My recollection is that I suggested postcards as well to

17  all registered voters in Culpeper County, and I helped source

18  mailing services, and ultimately, I designed the postcards and

19  -- of course with his approval.

20  Q    If we could turn to page 5 of Government's Exhibit 121.

21       If we could look at the green bubble, please.

22       And who is this text message from?

23  A    From Scott to me.

24  Q    And what does this picture appear to be of?

25  A    It appears -- can you zoom in on it at all?

Rahim - Direct

1  Q     Were these the mailers you were just discussing?

2  A     Could we see the back?  I'm not trying to be difficult.

3  Q     I have blown-up photos of it if that's --

4  A     I believe this is separate, that these were hand-out

5  fliers, like that, you know, you would be standing on the

6  street saying vote for Scott Jenkins, vote for Scott Jenkins.

7  And the reason I say that is they don't appear to be a postcard

8  with a blank area for a mailing label and a postage paid in the

9  -- whatever the word is -- indicia.  I don't believe those were

10 the postcards.  But I did design them and help produce them.

11 Q     And page 6 is another photo.  And what does that appear to

12 be, if you can tell?

13 A     Definitely appears to be the fliers.

14 Q     Okay.  So these are the fliers that you sent -- or that

15 you designed to be sent out?

16 A     Yeah, we did not mail those.  We designed them and had

17 them printed for distribution.

18 Q     If we could turn to page 32 of this document.

19       Are those blown-up photos of what we just looked at?

20 A     Yes.

21 Q     Does that help you with whether or not they were the

22 mailers or the fliers?

23 A     It does.  It appears to be the fliers.

24 Q     So those are the fliers you designed?

25 A     I believe so, yes.  I definitely designed them.  The only

Rahim - Direct

1  question is whether they are the postcards or the fliers.  And

2  they appear to be the fliers.

3  Q    If we could turn back to page 7 of this document, please.

4       In the green bubble in the middle of the page, is this in

5  reaction from Scott Jenkins to you after seeing the pictures --

6  after seeing those fliers?

7  A    Yes, ma'am.

8  Q    And what did he say to you?

9  A    As usual, thank you so much, man.

10 Q    What is the date of this text message?

11 A    November 3rd.

12 Q    In relation to Election Day, when was this?

13 A    This was many years ago.  I don't recall whether that was

14 the Tuesday, or the election might have been the 4th, 5th, or

15 as far out as the 7th.  I don't know.

16 Q    But it's close in time --

17 A    It was very close to Election Day, if not Election Day.

18 Q    And as you were working on the campaign, did you get a

19 sense of who was in charge of the campaign?

20 A    No.

21 Q    You did not?

22 A    Let me explain that answer.  There was no clear campaign

23 with a specific person in charge.  I almost was in charge of

24 it.  Ultimately, everything I did to help, I ran by Mr. Jenkins

25 and he approved.  I never took any action without his full

Rahim - Direct

1  knowledge and approval.  But I was never introduced to a

2  campaign manager or even a team of campaign people.

3  Q    And every action you took on behalf of the campaign you

4  discussed with Scott Jenkins prior to doing so?

5  A    100 percent, yes.

6  Q    Now, in total, approximately how much do you think you

7  spent just on the election?

8  A    Thousands more, not counting the drone and the cash and --

9  I mean, knives, postage -- thousands, if not several tens of

10 thousands.

11 Q    And during your time working on this re-election campaign,

12 did Scott Jenkins make statements about what he would do for

13 you post-election?

14 A    Yes.  I mean, we continued upon that path of like, you

15 know, looking forward to helping you out the way you're helping

16 me.

17 Q    And what was your understanding of Scott Jenkins's promise

18 and whether it was in direct relation to all of the money and

19 the things you were doing for him?

20 A    Favorite child, and in addition -- favorite child, that's

21 just my phrase -- sworn in as a deputy, firearms rights

22 restored, concealed carry permit, department-issued weapons,

23 the full gamut.

24 Q    And was that related to all the money and the efforts that

25 you had done for him?

Rahim - Direct

1    A    Those things were not going to happen if I hadn't done all

2    those things.

3    Q    Did Scott Jenkins win re-election in November of 2019?

4    A    He did.

5    Q    And how did you feel about that win?

6    A    Very happy.

7    Q    And why is that?

8    A    Had he lost, I would have just had blown all that money

9    with no -- with no result.  So when he won, I -- in effect, I

10   won as well.

11         MS. SMITH:  Your Honor, I think we're at a good

12   stopping point, if I may.

13         THE COURT:  All right.  So ladies and gentlemen, it

14   is 12:45.  Let's take an hour for lunch.  Sometimes it may be

15   difficult to squeeze in an hour here in Charlottesville.  Try

16   to be back to be ready to go at 1 -- yeah, 1:45 -- Ms. Peng's

17   going to keep me straight -- or as close thereafter, if you end

18   up going up the mall and it takes a little bit longer.  Then

19   we'll get our afternoon underway.

20         I will remind you as you break for lunch, please do

21   not discuss the case, please do not begin to develop any

22   impressions.  Wait until all the evidence is in and you've been

23   given the final instructions, before you have any discussions

24   regarding the case.  Don't speak among yourselves, don't speak

25   with any others, and if anyone does try to talk to you about

Rahim - Direct

1   the case, please let me know.  But otherwise, I hope you have a

2   nice lunch.  And we'll allow the jury to recess.

3   (*Jury out, 12:47 p.m.*)

4           THE COURT:  All right.  You all please have a seat.

5   So Mr. Rahim, as you go to lunch, you are -- your testimony is

6   not complete, you cannot have any discussions with anyone about

7   the case, especially the lawyers, about the case at all.  So

8   please just remember that.  Otherwise, is there anything we

9   need to address on behalf of the government?

10          MS. SMITH:  I have just one issue I wanted to bring

11  to the Court's attention.  Once we come back for lunch, I

12  believe that there will be a firearm -- it has been rendered

13  safe -- that I will be showing to Mr. Rahim, and I just wanted

14  to talk through the best procedures with the Court.

15          THE COURT:  Okay.  What I've typically done -- and

16  now are you going to have him handle the firearm at all, or --

17          MS. SMITH:  I can, if that's okay with Your Honor, or

18  I can just show it to him and have him identify it.

19          THE COURT:  Sometimes I have had jurors get a

20  little -- not wonky -- but I have had jurors not want a firearm

21  to be handled by a witness.  Unless there's a need for him to

22  be able to handle it, what I would do is simply show it to him,

23  have him identify it before we -- the firearm comes out, or

24  when it does, I'll tell the jury it has been rendered safe, and

25  that, you know, they need not worry about how it's handled.

Rahim - Direct

1          MS. SMITH:  Thank you, Your Honor.

2          THE WITNESS:  Your Honor, can I just clarify?  Am I

3   allowed to talk to my attorney at lunch about the testimony, or

4   no?

5          THE COURT:  You're not allowed to talk about your

6   testimony at all.

7          THE WITNESS:  Not even to my own attorney?

8          THE COURT:  That's correct.

9          THE WITNESS:  Yes, sir, I understand.

10          THE COURT:  All right.  Anything else we need to

11   address from the defendant's standpoint?

12          MR. ANDONIAN:  No, Your Honor.

13          THE COURT:  All right.  Very well.  Stand in recess

14   until 1:45.

15                         (Recess)

16          THE COURT:  All right.  We're back on the record in

17   the matter of *United States v. Jenkins*.  The government is

18   present by its counsel.  The defendant likewise is present by

19   counsel.

20          I'm going to do two things before I see if you all

21   have anything before we bring the jury in.  First of all, as

22   we're making objections, if you all could stand up, I think

23   it's going to help Ms. Blair.  It's going to help me to make

24   sure that I focus.  And -- so actually, it's three things.

25          Secondly, the reason I moved the microphone, or I had

Rahim - Direct

1  you move the microphone over, is we did get a note from the

2  jury, and it specifically related to you, Ms. Choy.  You're

3  soft-spoken.  So I had Ms. Brown turn the microphone up as you

4  were doing your redirect.  But I think that what was actually

5  happening is the microphone was on the other side, and your

6  voice -- our voices were going that way.  I think it's going to

7  take care of itself.

8          Over on this side, you all cause feedback because

9  you're so loud.

10          MR. ANDONIAN:  That tracks.

11          THE COURT:  But we'll figure it out.  This courtroom

12  has always been a little bit wonky on trying to get it right.

13  But if we can just be aware, the microphones are for really the

14  jury and for Ms. Blair to make sure we get a record.

15          And then the last thing is, when I give the jury a

16  time, I want us to be as timely to that as possible, because

17  even though they're back there laughing now, so -- which is a

18  good sign.  You want a jury to be comfortable with each other,

19  which is nice the first day, that they're -- I could hear them

20  laughing.  But let's try to be ready to go at that appointed

21  time.

22          MR. ANDONIAN:  Apologize, Your Honor.

23          THE COURT:  Oh, you know, I've heard more horror

24  stories from jurors going, what in the heck are they doing?  So

25  a lot of times juries are waiting because we're working, and

Rahim - Direct

1  it's hard for them to understand that.

2          So -- all right.  With that, Ms. Smith, do we need to

3  address anything before we bring the jury in?

4          MS. SMITH:  No, Your Honor.

5          THE COURT:  Mr. Caleb, anything we need to address?

6          MR. CALEB:  No, thank you.

7          THE COURT:  All right.  Let's go ahead and bring the

8  jury in.

9  (*Jury in, 1:53 p.m.*)

10         THE COURT:  Ladies and gentlemen, please have a seat.

11         All right.  The jury is present and seated.

12         All right.  Ladies and gentlemen, I hope you had a

13 nice lunch.  We're here for our afternoon run.  We'll go until

14 3:30, quarter of 4, and then we'll take a break, and then come

15 back and get our evening in.  We'll be done before 6 or

16 wherever there's a natural break somewhere shortly before that.

17         Ms. Smith, please proceed.

18         MS. SMITH:  Thank you, Your Honor.

19  BY MS. SMITH:

20 Q   I believe when we last left we were discussing the fact

21 that Scott Jenkins had just won re-election in November of

22 2019.  Is that what you recall?

23 A   Yes.

24 Q   After Scott Jenkins won re-election, did the subject of

25 firearms rights and the restoration of yours come up?

Rahim - Direct

1   A    Yes.

2   Q    And we have touched on this briefly previously, but I'd

3   like to go through it in a little more detail.  How does one go

4   about restoring their firearms rights?

5   A    You apply to the Circuit Court in the county where you

6   reside and ask the judge to grant those rights, which depending

7   on the county, can be easier or harder.

8   Q    And why do you say depending on the county it can be

9   easier or harder?

10  A    I think each county sets its own rules as to its judgment

11  and opinions of a particular applicant.

12  Q    And in this case, in what county did you file your

13  restoration of firearms rights?

14  A    Culpeper County.

15  Q    And why Culpeper?

16  A    Because Scott Jenkins was going to assist me -- in fact,

17  did assist me in navigating that process.

18  Q    You mentioned earlier that you had discussed with Scott

19  Jenkins prior to the election about what he would do to help

20  you with your firearms rights.  Were there other conversations

21  about that subsequent to that -- I mean, sorry -- after that?

22  A    Yes.  Multiple.

23  Q    And what did he tell you he would do for you?

24  A    Well, just to refresh your memory, there were three

25  specific items, which was restore -- or assist me in restoring

Rahim - Direct

1  the firearms rights.  After that, the next step would have been

2  concealed carry permit, and then in addition, swearing me in as

3  a deputy sheriff.

4  Q    And you just mentioned three things.  Was that the order

5  in which those things were going to be done?

6  A    Not necessarily.  We didn't write a checklist of this, and

7  then that, and then the next thing, but those were the three

8  items.

9  Q    Did the concealed handgun permit and being sworn in as an

10 auxiliary deputy sheriff -- were they predicated upon you

11 getting your firearms rights restored?

12 A    No.  A sheriff -- my understanding and my reading of

13 Virginia Code -- can swear in anybody and has the authority to

14 do it regardless of their restoration of rights.

15 Q    But he did decide to do that restoration of firearms

16 rights first?

17 A    Yes.

18 Q    And why did you not file in your actual county of

19 residence, Fairfax County?

20 A    Because Mr. Jenkins made it mission assured by going

21 through --

22                    (Reporter clarification)

23 A    Bad choice of words.  That he could get it done for me.

24 Q    And at the time when you applied to get your firearms

25 rights restored, where were you living?

Rahim - Direct

1  A    Fairfax County.

2  Q    Were you a resident of Culpeper County?

3  A    No.

4  Q    Now, prior to filing your petition for restoration of

5  firearms rights, let's talk about in more detail the steps you

6  took to attempt to make it look like you were a resident of

7  Culpeper County.

8       First, you mentioned that there was a fake lease that you

9  entered into; is that right?

10 A    Yes.

11 Q    And whose suggestion was it for you to rent a room from

12 Scott Jenkins's brother?

13 A    Mr. Jenkins.

14 Q    And when you discussed this plan to rent a room, who was

15 present for that conversation?

16 A    I don't specifically recall.  Without making a mistake, I

17 can only assure you it was me and Mr. Jenkins.  I think there

18 were others present.

19 Q    Was Mike Jenkins there?

20 A    I would be guessing, but I think so.

21 Q    But you're not sure?

22 A    I can't recall with certainty, no.

23 Q    Was there an understanding about whether or not you would

24 sleep or live there at all?

25 A    There was no understanding and no -- I mean, the general

Rahim - Direct

1   understanding was I likely would not, but I was welcome to,

2   should I want to.

3   Q    And so in order to facilitate this, there was that signed

4   lease for a farmhouse that was owned by Mike Jenkins; is that

5   correct?

6   A    Correct.

7   Q    And where was that farmhouse located?  Do you recall the

8   county?

9   A    Culpeper County.

10  Q    And who sent you the lease for that property?

11  A    I don't recall.  It was a Jenkins brother.  I'm not sure

12  which of them, but I believe it was Scott Jenkins.  I could be

13  mistaken.

14  Q    How much was the lease for?

15  A    I prepaid the lease for either three or six months, and I

16  believe it was $500 a month.  I could be mistaken.  If you have

17  the lease, you would have an accurate...

18  Q    And so you said you had a lease.  If we could pull up

19  Government's Exhibit 730.

20       Do you recognize this document?

21  A    I do.

22  Q    And what is it?

23  A    It is the lease for that property we've been discussing.

24  Q    And how are you able to recognize that -- if we could just

25  flip through --

Rahim - Direct

1   A    I believe I prepared it.

2          MS. SMITH:  Move to admit into evidence Government's

3   730, please.

4          THE COURT:  Any objection?

5          MR. CALEB:  No objection.

6          THE COURT:  So it will be admitted, and you may

7   publish to the jury.

8          (Government Exhibit 730 marked and admitted)

9   BY MS. SMITH:

10  Q    If we could just stay on page 1, please, and we can zoom

11  in on the first third of the standard lease agreement.

12       And you said this is the lease that you entered into with

13  Mike Jenkins?

14  A    Correct.

15  Q    And what's the date of this lease?

16  A    September 18th, 2019.

17  Q    And under -- between -- by and between an individual known

18  as Michael Lee Jenkins; is that correct?

19  A    Yes.

20  Q    And then it has your name listed, Rick Rahim, as the

21  tenant?

22  A    Correct.

23  Q    If you go to offer to rent, it says, the landlord hereby

24  rents to the tenant subject to the following terms and

25  conditions of the agreement, an apartment with the address of

Rahim - Direct

1  8367 Sperryville Pike, Culpeper, Virginia.

2       Is that the address of where you were supposed to rent

3  that room?

4  A    Yes.

5  Q    If we could zoom out and go down to the lease term,

6  please.

7       What was the term of this lease?

8  A    It was a fixed period between September 18th of '19 and

9  March 17th of 2020.  The quick math is six months for that.

10 Q    Why was it for this time period?  Was there anything --

11 any reason for it?

12 A    Well, it was short-term to -- with the end goal to

13 accomplish the goal of getting me my firearms restoration.  So

14 there would have been no need for a longer-term lease.

15 Q    Because you wouldn't need to show that you were a Culpeper

16 resident after you got your firearms rights restored?

17 A    Correct.

18 Q    And if we could go farther down for rent, please, still on

19 page 1.

20      And is this listing the rent amount per month?

21 A    It does.

22 Q    And that is $500 a month?

23 A    Correct.

24 Q    If we could then turn to page 6, please.

25      And what was the date that this was executed?

Rahim - Direct

1  A    September 18th, 2019.

2  Q    Zoom in on that last -- thank you.

3       And page 7, and what -- well, whose signatures are these?

4  A    Mike Jenkins's and mine.

5  Q    And again, how involved was Scott Jenkins in helping

6  establish this fake lease between you and his brother, Mike

7  Jenkins?

8  A    Fully involved.  I never negotiated anything with Mike

9  Jenkins.

10 Q    So everything that was contained in this agreement was

11 negotiated between you and the sheriff?

12 A    Yes.

13 Q    Have you ever been to this property?

14 A    Not the inside.

15 Q    So you've only seen the outside?

16 A    Correct.

17 Q    What is the property like?

18 A    It's a farmhouse on a large plot of land.  I believe it's

19 family-owned land that's probably generational.

20 Q    Did you pay Mike Jenkins for the purported rent for this

21 farmhouse?

22 A    I prepaid the entire term, as I recall, in the amount of

23 $3,000, which would have been six times the $500 per month.

24 And I believe the check was to Mike Jenkins.

25 Q    Why did you pay for a property you did not intend to live

Rahim - Direct

1  in?

2  A    Again, to further the establishing of the fake residence

3  in Culpeper County.

4  Q    If we could turn to what's already been admitted as

5  Government's Exhibit 317, please.

6       Do you recognize this document?

7  A    I do.

8  Q    And it's from BV Management?

9  A    Correct.

10 Q    Again, that's your company?

11 A    It is.

12 Q    And it's pay to the order of Michael Jenkins?

13 A    Correct.

14 Q    What's listed in the memo line?

15 A    Six months of rent.

16 Q    And again, what's the date of this check?

17 A    The same date, September 18th of 2019.

18 Q    If we could turn to Government's Exhibit 408, please.

19      Do you recognize this?

20 A    That's the property in question.

21 Q    Is this a fair and accurate depiction of what the property

22 looked like?

23 A    Yes.  I didn't spend much time there, but yes, I believe

24 it is.

25           MS. SMITH:  The government would move into evidence

Rahim - Direct

1   Government's Exhibit 408.

2           THE COURT:  Any objection?

3           MR. CALEB:  No objection.

4           THE COURT:  So admitted.  It may be published to the

5   jury.

6           (Government Exhibit 408 marked and admitted)

7    BY MS. SMITH:

8   Q    So this is the property that you purported to rent a room

9   at?

10  A    Correct.

11  Q    And that's the one that's on Sperryville Pike?

12  A    Correct.

13  Q    In Culpeper?

14  A    Yes, ma'am.

15  Q    If we could now turn to Government's Exhibit 433.

16       Do you recognize this exhibit?

17  A    Yes.  It appears to be an aerial shot of the same

18  property.

19  Q    Is that a fair and accurate depiction of the Sperryville

20  Pike farmhouse?

21  A    Yes.

22           MS. SMITH:  And we'd move to admit into evidence

23  Government's 433, please.

24           THE COURT:  Any objection?

25           MR. CALEB:  No objection.

Rahim - Direct

1          THE COURT:  So admitted, and may be published to the

2   jury.

3          (Government Exhibit 433 marked and admitted)

4   BY MS. SMITH:

5   Q    So is this more of a zoomed-out photo of that farmhouse?

6   A    Yes, ma'am.

7   Q    And again, you said you had never been -- and you still

8   have never been -- inside this property?

9   A    Correct.

10  Q    What did Scott Jenkins tell you about the room you were

11  supposedly renting?

12  A    There was a time when I believe he sent a text describing

13  it just so I would have a general -- I guess in his mind he

14  wanted me to have the general ability to describe, if you were

15  to walk into the house, where you would locate the room that I

16  was supposedly renting.

17  Q    Why was that important?

18  A    Mr. Jenkins felt it would be important, I can only assume,

19  to make sure that --

20          MR. CALEB:  Objection.

21          THE COURT:  Sustained.

22   BY MS. SMITH:

23  Q    Do you know why he told you about the room and about the

24  house?

25  A    To make sure I could accurately describe the home were I

Rahim - Direct

1   questioned.

2   Q    What other steps did you take to establish that false

3   residency?

4   A    I did two other things that I can recall.  I registered to

5   vote in Culpeper County using that address, and I registered

6   several of my vehicles with DMV to Culpeper County as well.

7   Oh, and the third thing is I changed my mailing address with

8   DMV for my driver's license to Culpeper County.

9   Q    And again, this was all to further make it look like you

10  were a Culpeper County resident?

11  A    Yes, ma'am.

12  Q    Was Scott Jenkins aware of all the steps you were taking

13  to do that?

14  A    Yes, ma'am.

15  Q    Did you discuss with him some ideas as to how to make it

16  look like you were a Culpeper resident?

17  A    We discussed all of those ideas, yes.

18  Q    You mentioned you changed your voter registration.  Did

19  you in fact vote in the Culpeper election in 2019?

20  A    I did.

21  Q    I'm going to turn your attention to Government's Exhibit

22  127, please.  If we could zoom in the first few texts, please.

23       Do you recognize Government's Exhibit 127?

24  A    I do.

25  Q    And what is it?

Rahim - Direct

1   A     Text messages between myself and Scott Jenkins.

2   Q     And that's from October of 2019?

3   A     Yes, ma'am.

4          MS. SMITH:  We would move into evidence Government's

5   Exhibit 127.

6          THE COURT:  Any objection?

7          MR. CALEB:  No objection.

8          THE COURT:  So admitted, and may be published to the

9   jury.  Thank you.

10         (Government Exhibit 127 marked and admitted)

11  BY MS. SMITH:

12  Q     If we could look at page 1, that first text in green,

13  please.  Who is this text message from?

14  A     It's from me.

15  Q     And what is the date of this text message?

16  A     October 3rd.

17  Q     2019?

18  A     '19.  I'm sorry.

19  Q     And it looks like there's a photograph in this text

20  message; is that true?

21  A     True.

22  Q     What does that photograph appear to be?

23  A     It's a picture of the actual absentee ballot that I

24  received from Culpeper County.

25  Q     And then what did you ask of Scott Jenkins?

Rahim - Direct

1  A    I asked him who he wanted me to vote for on every line of

2  the ticket.

3  Q    Because did you know anyone else in Culpeper County on the

4  ballot?

5  A    I had no understanding of the local politics and I had

6  made no effort to find out.

7  Q    If we could move on to the next text message, please, in

8  blue.

9       Is this Scott Jenkins's response to you?

10  A    It is.

11  Q    And what's the date of this text message?

12  A    Same day, October 3rd, 2019.

13  Q    And what did he list in his response to you?

14  A    I believe it was a strict Republican ticket of who he

15  wanted me to vote for.

16  Q    And so every single name that's in this text message, were

17  those individuals who were on the Culpeper ballot?

18  A    That's my recollection.  He was telling me which boxes to

19  tick on my ballot.

20  Q    Do you know who Paul Walther is?

21  A    I believe he was a Commonwealth's Attorney at the time.

22  Q    And when it says Jenkins in all caps and exclamation, who

23  is he referring to?

24  A    That would be Sheriff Jenkins for re-election.

25  Q    If we could please turn to page 3 of this exhibit.

Rahim - Direct

1      It looks like you sent another photo to Scott Jenkins on

2  October 3rd, 2019.  Is that what's depicted here?

3  A    Yes.

4  Q    And what did you -- how is this ballot different than the

5  other ballot?

6  A    Without seeing the zoomed-in, my recollection is that it

7  showed that I had checked off those same boxes.

8  Q    Okay.  If we could turn to page 5 then, please.

9  A    That would be the zoomed-in version, yes.

10  Q    Are these two pictures the zoomed-in photographs of what

11  we just looked at with the jury?

12  A    Yes.

13  Q    And the first photograph is of the empty ballot; is that

14  right?

15  A    Correct.

16  Q    And then the second one?

17  A    The filled-out ballot in accordance with the instructions

18  given to me.

19  Q    And again, were you a resident of Culpeper County in

20  October of 2019?

21  A    I was never a resident.

22  Q    But you still voted in the election?

23  A    I did.

24  Q    Now, turning to your firearms rights petition further, did

25  Scott Jenkins tell you how he was going to help get your

Rahim - Direct

1   firearms rights restored?

2   A    Yes.

3   Q    And did you guys talk about that in person as well as via

4   text message?

5   A    Yes to both.

6   Q    If we could turn back to what's already been admitted at

7   Government's Exhibit 121, and turn to page 9, please.

8        Let's look at the text message dated November 14th, 2019.

9   Who is this text message from and who is it to?

10  A    From Scott to me.

11  Q    It says, okay, so I just got brief procedural.  Text me

12  when you get near town.  I'll meet you down by courthouse.

13  We'll have to walk it in to clerk to assign it a number and

14  then I have a deputy walk it over to Paul's office for them to

15  run history, etc. attached to it for Paul to then take to the

16  judge.

17       What is Scott Jenkins referring to in this text message?

18  A    He's telling me -- I believe this is the day that I went

19  to Culpeper.  He's telling me what we were going to do that day

20  to further the processing of the restoration of rights.

21  Q    And who is Paul?

22  A    The Commonwealth Attorney.

23  Q    And did you file your petition on that same day, November

24  14th, 2019?

25  A    Yes.

Rahim - Direct

1   Q    And did you travel to Culpeper to do so?

2   A    Yes.

3   Q    And when you got to Culpeper, did you meet with anyone

4   before you filed it?

5   A    Scott Jenkins.

6   Q    Did he go with you to the clerk's office to file that

7   paperwork?

8   A    He drove and accompanied me to the clerk's office.

9   Q    And the petition that you filed, who prepared it?

10  A    I did.

11  Q    If we could turn to Government's Exhibit 720, please.

12       Do you recognize this document?

13  A    I do.

14  Q    And what is it?

15  A    It is the cover sheet for filing of that petition.

16  Q    This is the filed version; is that right?

17  A    Yes, ma'am.

18           MS. SMITH:  Government would move to admit

19  Government's Exhibit 720.

20           THE COURT:  Any objection?

21           MR. CALEB:  No objection.

22           THE COURT:  All right.  It will be admitted, and may

23  be published to the jury.  Thank you.

24           MS. SMITH:  Thank you, Your Honor.

25           (Government Exhibit 720 marked and admitted)

Rahim - Direct

1  BY MS. SMITH:

2  Q    If we could stick to page 1 for right now.  You said this

3  is the cover sheet.  Is this something that you filled out at

4  the clerk's office?

5  A    Yes.

6  Q    And for the plaintiff, who is listed?

7  A    The word plaintiff threw me off --

8  Q    Underneath --

9  A    -- no, I understand.  I am listed.

10 Q    So you are listed.  And then what is this in reference to?

11 A    Reference to -- it says restore firearms rights.

12 Q    And that's in Culpeper County; is that right?

13 A    Yes.

14 Q    If we could go down to the bottom, what's the date of this

15 filing?

16 A    November 14th, 2019.

17 Q    The same day as those texts where Scott Jenkins was

18 telling you what the procedure was going to be?

19 A    Correct.

20 Q    And it lists your name and a phone number.  Whose phone

21 number is that?

22 A    That's my personal cell.

23 Q    And then the e-mail address?

24 A    It's my personal e-mail.

25 Q    Why did you not list an address on this form?

Rahim - Direct

1    A    I probably misread it.  It says address/telephone number,

2    and I was rushing because I had Mr. Jenkins beside me.  So now

3    that I read more carefully, it says address/telephone.  I read

4    it as telephone and obviously just filled in my telephone.

5    Q    So there was no reason for you to not include the address?

6    A    No, because we were already faking it everywhere else.

7    Q    And then whose signature is that there?

8    A    That's my signature.

9    Q    If we could turn to page 2, please.

10        And what is this document?

11   A    It's entitled, "request for restoration of firearms

12   rights."

13   Q    And this is a document that we have seen previously; is

14   that right?

15   A    It is.

16   Q    This is what was sent back in July of 2019?

17   A    Yes.

18   Q    A copy of it was.  And is that your signature down at the

19   bottom?

20   A    No.  It's actually the signature of Jason Pelt.

21   Q    And who is Jason Pelt?

22   A    It's the attorney who originally helped me craft -- draft

23   the document -- sorry, I was searching for the word -- and who

24   ultimately prepared it for me when I was instructed that it

25   needed an attorney's signature by Mr. Jenkins.

193

Rahim - Direct

1  Q    So you originally drafted this petition yourself; is that

2  right --

3  A    Correct.

4  Q    -- the one that we saw previously?

5  A    Correct.

6  Q    And then you said you were instructed to have an attorney.

7  Can you tell the jury a little bit more about that?

8  A    As part of these conversations about the process in

9  Culpeper County, Mr. Jenkins told me that he had been advised

10 at some point that my original petition solely signed by me was

11 not acceptable, and that it needed to be prepared by an

12 attorney.

13 Q    So did you find an attorney to sign this petition?

14 A    I did.

15 Q    Was the contents of this petition the same as what you had

16 previously drafted?

17 A    Yes.

18 Q    And after you filed this petition with the clerk's office,

19 what happened?

20 A    After I filed -- I'm just trying to get the date -- there

21 were many dates involved.  After I filed --

22 Q    And let me stop you there.  On that date after you filed

23 it, did you take the paperwork anywhere else?

24 A    Yeah, that's where I was going.  I just wanted to make

25 sure that I didn't mix up dates.

Rahim - Direct

1    After I filed, Mr. Jenkins was with me, we then walked out

2    of the courthouse.  The Commonwealth Attorney's office is in a

3    building next door.  He took the file with the time stamp from

4    the clerk and advised me to just wait outside.  And I believe I

5    waited in his vehicle.  And he went inside to the

6    Commonwealth's Attorney's office with the paperwork.

7    Q    And why did he go to the Commonwealth Attorney's office

8    with that paperwork?

9    A    His intent was to get it signed off on or perfect making

10   sure it got onto a pile on the judge's desk for signing.

11   Q    How long did the process end up taking for you to get your

12   firearms rights restored?

13   A    I'm just looking for the date.  This was October, I think.

14   Q    If we could go back to page 1, please, of Government

15   Exhibit --

16   A    I can see the time stamp there.  November -- and I think

17   we finally didn't get it done until the following year.  So

18   five to six months before I actually had a restoration in hand.

19   I could be off by a few months.

20   Q    Why was there a delay in getting that paperwork processed?

21   A    So when he -- the day I went to do this with Mr. Jenkins,

22   we filed it, he walked it over to the Commonwealth's Attorney's

23   office.  He came back out shortly thereafter and advised me

24   that, you know, it's still their job to run, like, wanted --

25   you know, a standard background check in case you're wanted or

Rahim - Direct

something.  And I had been assaulted by an elderly neighbor
whose -- I don't want to slander anybody -- but a very elderly
crazy neighbor assaulted myself and one of my children, and he
ended up filing a restraining order against me, which I did not
fight because I didn't want contact with him, although he had
come on our property for the assault.  Long story short, I
didn't fight the restraining order because I wanted separation.
As a condition of that restraining order, I had no idea I was
prohibited from possessing a firearm during the period of that
restraining order; therefore, we had to wait until that
restraining order expired.  I think it was April of that coming
year.  So we had to wait a few months for that to expire.

Q    So that was April of 2020?

A    I believe so, yes.

Q    So you had a delay from November to April of 2020 for
something unrelated to this paperwork; is that fair?

A    Unknown to me, and certainly that part of it was not
Mr. Jenkins's fault, and he didn't have that knowledge either.

Q    And then in April of 2020, what was going on that caused
further delay?

A    I was wondering -- I think you're referring to COVID.

Q    I just want to make sure that your -- if my answer -- if
my question is not precise, just let me know, and I can ask it
a different way.

        So in April of 2020, that expired; is that right,

Rahim - Direct

1  the restraining order?

2  A    I was then again eligible to have my -- excuse me -- I was

3  eligible at that point to have my rights restored because that

4  restraining order had automatically expired without any

5  violations.

6  Q    Was your -- were your firearms rights restored right after

7  the expiration of that restraining order?

8  A    Not right after, meaning a matter of days, but it

9  ultimately was.

10 Q    Was there something going on globally that affected your

11 firearms rights petition?

12 A    Yes, ma'am.  We were in the middle of COVID-19 that had

13 just started that March, and almost all courts across the

14 country were closed due to COVID.

15 Q    And how did that affect your petition?

16 A    It was the -- specifically the policy of Culpeper County

17 courts to not be taking up civil matters or more minor criminal

18 matters because of the risks of COVID in person.

19 Q    Now, during this delay, were you in contact with Scott

20 Jenkins about your petition?

21 A    Very regularly, yes.

22 Q    If we could turn to Government's Exhibit 112.

23      Do you recognize this document?

24 A    Yes, it's more of the same communications between myself

25 and Scott.

Rahim - Direct

1  Q    And again, is this a subsection of a much larger text

2  conversation between you and the defendant?

3  A    Yes.  It's pieces of the same long string of texts.

4         MS. SMITH:  The government would move to admit

5  Government's Exhibit 112.

6         THE COURT:  Any objection?

7         MR. CALEB:  No objection.

8         THE COURT:  All right.  So admitted, and may be

9  published to the jury.

10         MS. SMITH:  Thank you, Your Honor.

11         (Government Exhibit 112 marked and admitted)

12   BY MS. SMITH:

13  Q    If we could turn to page 11 of this document, please, and

14  go to the green text at the top of the page dated July 7th of

15  2020.

16      Who is this text from?

17  A    Again, from Scott to me.

18  Q    And what does Scott Jenkins say to you in this text

19  message?

20  A    This is one of many, many almost daily updates from Scott

21  letting me know what action he's taken on that particular day,

22  where things stand, and what the progress was in attempting to

23  get my firearms rights restored.

24  Q    So as of July of 2020, you still did not have your

25  firearms rights restored?

Rahim - Direct

1  A    Correct.

2  Q    And it says, new judge hasn't done any that just sign off

3  and weren't on court docket.

4       Who is this new judge he's referring to?

5  A    I don't recall his name, but there had recently been a new

6  judge brought into Culpeper County.

7  Q    And he's talking about things to get signed off.  Do you

8  know what he was referring to?

9  A    He was referring specifically to my restoration of

10 firearms rights.

11 Q    And Scott Jenkins goes on to say, wants to talk to Paul

12 about it for now, and for future proceedings.

13      Who is the Paul he is referring to?

14 A    The Commonwealth's Attorney.

15 Q    And the defendant goes on to say, good thing is that he

16 didn't seem too concerned about sliding one in during the

17 judicial emergency period.  I'm headed over to catch Paul.

18      What is he referring to when he says sliding one in?

19 A    So in most counties, to my knowledge, no in-court hearing

20 is required.  This can be procedural in judge's chambers if the

21 Commonwealth Attorney agrees to the restoration of firearms

22 rights.  And so Scott was attempting to accomplish that even

23 during COVID, which had effectively shut things down.

24      Now, the context of this is that he's saying this new

25 judge has never actually done this.  It wasn't a concern

Rahim - Direct

1    necessarily about mine, but that this judge had never done this

2    process before where he came from.  So Scott is referring to

3    this whole thing being new to him, and that the judge wanted to

4    talk to the Commonwealth's Attorney about what the process

5    could be for mine and for all in the future.

6    Q    Because they both -- the Commonwealth's Attorney and the

7    Circuit Court Judge -- were involved in the restoration of your

8    firearms rights; is that correct?

9    A    That's correct.

10   Q    If we could turn back to what's already been admitted as

11   Government's Exhibit 121, page 14.  And turn to the blue bubble

12   on the bottom.

13        And what's the date of this text message?

14   A    July 10th of 2020.

15   Q    And who is this from?

16   A    From me to Scott.

17   Q    And what did you say to Scott in this text?

18   A    This was me politely tapping him on the shoulder, saying

19   hey, I haven't heard anything since Tuesday, and me urging him

20   to tend to it, and asking him, can today be my day.

21   Q    If we could turn to page 15, that first message at the

22   top.

23        Is this Scott Jenkins's response to you?

24   A    It is.

25   Q    And he -- what does he say to you?

Rahim - Direct

1   A    He's encouraging me and letting me know that he's hopeful

2   to get something done at 10:00 today.

3   Q    And is -- I'm sorry, I did not mean to interrupt you.

4   A    That's all right.  Go ahead.

5   Q    Is Paul the Commonwealth Attorney?

6   A    Yes.  And now we know the name -- at least the first name

7   -- Dale is the new judge.

8   Q    So he's telling you -- he's giving you an update of what

9   he's doing to help get your petition?

10  A    Correct.

11  Q    If we could turn to the bottom of page 15, please, that

12  green message.

13       Is this another text from Scott Jenkins to you?

14  A    It is, on the same day, July 10.

15  Q    And what did he say?

16  A    If I don't get something done today, I might need bail.

17  So he's jokingly saying he's trying to --

18            MR. CALEB:  Objection.

19            THE COURT:  Sustained.  He can testify as to what he

20  believed it to be, but --

21  BY MS. SMITH:

22  Q    And what did you believe him to be telling you?

23  A    He was -- I believed it to be a joke that he was going to

24  be overly aggressive to accomplish the goal.

25  Q    And when he's referring to getting something done, is that

Rahim - Direct

1   still in reference to your petition?

2   A    It's only in reference to my petition.  There was nothing

3   else on the table.

4   Q    If we could turn to page 16, please, the top green

5   message.  This is from July 13th, 2020, a few days later.

6        Is this a message from Scott Jenkins to you?

7   A    It is, on July 13th.

8   Q    And what is he telling you here?  Could you summarize it

9   for the jury, please?

10  A    This is just a status update on his daily attempts to get

11  the Commonwealth Attorney to get this on the judge's desk, and

12  what steps he's trying to take today.

13  Q    So this is him keeping you apprised of what he's doing to

14  try to get this done?

15  A    Correct.

16  Q    Turning to the next page, please, page 17, the first two

17  green bubbles.  Are these additional text messages from Scott

18  Jenkins to you?

19  A    Yes, ma'am.

20  Q    In the message on the top that's dated July 13th, 2020 at

21  2:57 p.m, what does he tell you?

22  A    Quote, I feel horrible every day it's been taking.

23  Q    And then what was the next message that he sent to you a

24  few minutes later?

25  A    This is -- paraphrasing -- this is him telling me he's

Rahim - Direct

1    really, really trying to get this done.  And I think he's

2    emphasizing that he feels bad.  He's really, really, really

3    trying to do this, and it's been a challenge for him, but he's

4    reassuring me that he's on it.

5    Q    And he says, I never ask people for favors really.

6         Do you know what he was referring to when he said that?

7    A    Well, if we read on, he says, I'm always doing them for

8    other people.  So he's trying to say that, you know, he feels

9    the world is one way against him at the moment on this issue,

10   and he always helps people when they ask, and now he's asking

11   and people seem to be not very helpful back to him.  I think

12   he's kind of coming out with some frustration at this point

13   because he's used to getting his way on everything.

14   Q    He goes on to say, I asked --

15        MR. CALEB:  Objection.  I'm sorry, move to strike

16   that last comment, Your Honor.

17        THE COURT:  Overruled.  He's testifying as to what he

18   -- make sure you phrase the questions as to what Mr. Rahim is

19   concluding from these, rather than what Mr. Jenkins

20   specifically is intending, because I think he's entitled to

21   testify to how they land on him, but not to testify regarding

22   Mr. Jenkins's specific thought process.

23        MS. SMITH:  Understood, Your Honor.  Thank you.

24    BY MS. SMITH:

25   Q    When Scott Jenkins says, I've asked more from you than

Rahim - Direct

1   anyone else since I can't remember when, what was your

2   impression that he was referring to?

3   A    I think he had -- my interpretation is he had two goals.

4   Number one, he sincerely appreciated everything I've done for

5   him, and I do believe that.  But number two, he was also using

6   that as a way to explain that it's not done yet and he's really

7   trying.  So I think it was sincerely telling me -- it was his

8   way of apologizing for it taking so long.

9   Q    What was your understanding when he was discussing what he

10  had asked of you -- what had he asked of you?

11  A    I mean, again, I feel that I was the -- I hate to say it

12  this way -- I was the most valuable member of his re-election

13  that he's ever had in his life.  I feel that I was the most

14  loyal person, and also the one who spent the most money to help

15  him get reelected.  And I really believe that he recognized

16  that.  So that's how I interpreted that.

17  Q    If we could turn to page 20, please, and that first green

18  text.

19       Is this, again, part of the same text message thread?

20  A    Yes, ma'am.

21  Q    And this one is dated July 15th of 2020?

22  A    It is.

23  Q    Is this another example of Scott Jenkins telling you what

24  he was trying to do for your petition?

25  A    Yes, ma'am.

Rahim - Direct

1   Q    Could you summarize for the jury generally what he's

2   telling you he's going to do?

3   A    I'm just scanning it real quick.

4        It's his timeline for the day and his strategy for the

5   day, and how he intends to hopefully overcome any challenges

6   today.  It's him showing me that he's making this a priority in

7   his life.

8   Q    And at the beginning of the text message when he says, I

9   have to catch Paul, is that, again, referring to Paul Walther?

10  A    Yes.

11  Q    And then he goes on to say, called clerk, they're giving

12  me August 25th at 11 a.m. as first available on court docket.

13       What was your impression as to what he was referring to?

14  A    Well, at this point, I was aware that he had been told --

15  and I don't know by who -- that it needs to get put on the

16  docket.  No, I do know by who, by Paul, I believe -- that it

17  needs to get put on the docket and --

18            MR. CALEB:  Objection.

19            THE COURT:  Well, he can -- I'm going to allow him to

20  testify to what Mr. Jenkins is telling him that he needs to do.

21  It informs his actions afterwards.  You may answer the

22  question.

23            THE WITNESS:  I worded it poorly.  Mr. Jenkins told

24  me that Paul instructed him that the only way Paul would be

25  comfortable signing off on this would be if it was handled in

Rahim - Direct

1   open court, but that he would not object to it going through,

2   so long as it was handled in the courtroom.

3    BY MS. SMITH:

4   Q    So when he's referencing August 25th for the court docket,

5   what was that in relation to, that open court hearing?

6   A    Yeah, so the progress Scott had accomplished was he had

7   now overcome any objection by the Commonwealth's Attorney.  He

8   told me the Commonwealth's Attorney had approved this process

9   so long as it was done in court and not simply in chambers.  So

10  Scott's next step was to get us a quick court date.  And my

11  recollection is that this was still COVID, and he actually

12  pulled a favor to get even August 25th, which was 40 days from

13  the date of this text.  But he did at least accomplish getting

14  a date where this would be done, which at that time was August

15  25th.

16  Q    And at the last two lines of this text message it says, no

17  big thing either way for a local attorney to do.  I haven't

18  called the attorney yet till I can nail down the day.

19       Did Scott Jenkins also tell you about having to get a

20  local attorney to help you with this petition?

21  A    He did.  The attorney I had used was not in Culpeper

22  County.  He was in a different part of Virginia.  So

23  Mr. Jenkins told me that the other condition from Paul -- or

24  from the clerk, I'm not sure -- was that it had to be submitted

25  by a local attorney.  I knew no local attorneys, so Mr. Jenkins

Rahim - Direct

1  let me know that he had arranged a favor from a friend who was

2  an attorney in this capacity, however they knew each other --

3  however he knew that attorney, he had gotten an attorney to do

4  it.  And all I had to do was call the attorney and make the

5  arrangements.

6  Q    So as of July 15th of 2020, Scott Jenkins had helped get

7  the Commonwealth Attorney to sign off on your petition; is that

8  correct?

9  A    That's what he told me, yes.

10  Q    And he also had tried to get a date for your hearing?

11  A    Yes.

12  Q    And now he was also going to get you a local attorney to

13  help get this done?

14  A    Yes.

15  Q    If we could turn to page 21, please, of this document, and

16  the bottom green text.

17      Is this another text message that was sent on July 15th of

18  2020 by Scott Jenkins to you?

19  A    Yes.

20  Q    Can you please read that first paragraph of the text?

21  A    I'm in office now, just talked to the assistant Travis

22  directly.  Doesn't really have any question, other than

23  residency, like I'd said.  He's going to check with Paul during

24  court recess period to see what can be done when, and see if he

25  can do it without hearing preferably just as Paul had promised.

Rahim - Direct

1  Q    What was he referring to about questions about residency;

2  do you know?

3  A    Mr. Jenkins told me that he had overcome any objections at

4  the Commonwealth's Attorney's office, save for the fact that my

5  personal Facebook page said that I resided -- said accurately

6  that I resided in Great Falls -- excuse me -- Great Falls,

7  Virginia.

8  Q    And who was assistant Travis?

9  A    I believe he was one of -- or an assistant to the

10 Commonwealth's Attorney.

11 Q    And so is he telling you in this text message that the

12 Commonwealth's Attorney's office had questions about your

13 residency?

14 A    Yes.

15 Q    And then down below he says, I briefly answered some

16 questions on you having voter registration and vehicles here.

17 And he said he may need to get those copies for file, but can't

18 have me be intermediary, but get from you or attorney.

19      How did you interpret that part of the text?

20 A    The way I took it was they had questions, he addressed

21 them, and that he had overcome their objections.

22 Q    Now, you mentioned having to get a new attorney at Scott

23 Jenkins's direction.

24      If we could turn to page 22 of this Exhibit, please, the

25 top green text.

Rahim - Direct

1    Q    What is the date of this text message, Mr. Rahim?

2    A    July 23rd.

3    Q    Of 2020?

4    A    Yes, ma'am.  I'm sorry.

5    Q    And who was this from?

6    A    From Scott to me.

7    Q    Was this more of Scott Jenkins telling you about the

8    process to get your firearms rights restored?

9    A    It is.

10   Q    Now, Scott Jenkins at one point says, I'd contacted that

11   local attorney to be prepared to handle it on that August 25th

12   date if necessary.  His name is Rex Edwards with the local firm

13   of Davies & Barrell.  Rex just needs a short phone conversation

14   with you, and asked if you can contact his secretary to

15   schedule a call.

16        What was this in reference to?

17   A    The requirement that he conveyed to me that a local

18   attorney file the papers.

19   Q    And so was this Rex Edwards the local attorney he found

20   for you?

21   A    Yes, ma'am.

22   Q    Did you end up hiring Rex Edwards?

23   A    My answer is yes and no.  I ended up -- Rex Edwards ended

24   up assisting me.  I never hired him.  I never met him.  He

25   never sent me a bill.  He simply did it as a favor to a friend.

Rahim - Direct

1   But I had phone calls with him.  He prepared the papers and

2   accomplished the goal.

3   Q    Was there a particular reason that Scott Jenkins told you

4   as to why you should use Rex Edwards?

5   A    Well, I think the text outlines it, and he says

6   specifically that he chose Rex because he and Paul, meaning the

7   Commonwealth's Attorney, go way back as friends, and also the

8   judge is a friend of Rex's.  So apparently he was the right

9   person with the right relationships to push it through.

10  Q    If we could go down to the next text message, please.

11       Is this a text message from Scott Jenkins to you?

12  A    Yes.

13  Q    And again, just setting up a phone call here?

14  A    Yes.

15  Q    And if we could continue on to the next text messages.

16       Is that just you responding?

17  A    Yes.

18  Q    If we could turn to page 23.  Is this a text message from

19  you to Scott Jenkins?

20  A    Yes.

21  Q    On July 24th of 2020?

22  A    Yes, ma'am.

23  Q    Is this you telling Scott Jenkins that you had scheduled a

24  call with this local attorney?

25  A    It is.

Rahim - Direct

1   Q    If we could keep reading down those text messages.

2        Is that Scott Jenkins's response to you?

3   A    Yes.

4   Q    And then go to the next message from Mr. Jenkins.  This

5   message is from July 27th of 2020?

6   A    Yes.

7   Q    And it's from Scott Jenkins to you?

8   A    Yes.

9   Q    Could you please read to the jury what this text message

10  says?

11  A    I know you have your call -- I'm going slow for the court

12  reporter.  I know you have your call, and if it -- and if comes

13  up or asked it's 70 acres, 50 open with rolling hills of hay

14  fields and the rest in hardwoods.  Old white farmhouse and barn

15  is used as part of the annual Halloween fundraiser event for

16  sheriff Christmas program.  Plenty room to run a SHERP, etc.

17  Q    What property is he describing for you here?

18  A    The family farmhouse.

19  Q    Is that the Sperryville property that you have the fake

20  lease for?

21  A    Correct.

22  Q    And he says, I know you had your call.

23       What was that call in reference to?

24  A    I believe it's referring to the call -- in fact, it's

25  responding to my pointing out that I have a call scheduled with

Rahim - Direct

1  Rex for purposes of him submitting the restoration of firearms.

2  Q    And why did he describe to you this farmhouse?

3  A    So that I could credibly answer any questions that may

4  come up about my residency there.

5  Q    Because again, you were not living there?

6  A    I've never been inside to this date.

7  Q    Now, at some point after this text message of July 27th,

8  2020, did you have to go to court about your restoration of

9  firearms rights?

10  A    Yes.

11  Q    And was that hearing finally set for September 22nd of

12  2020?

13  A    Yes.

14  Q    Was the date of that hearing changed and moved up?

15  A    Yes.

16  Q    And why was the date of that hearing moved up?

17  A    I wasn't present, but it was certainly to accommodate me,

18  and it was accomplished, to the best of my knowledge, through

19  Scott Jenkins exerting friendships, authorities, and

20  relationships.

21  Q    Did Scott Jenkins tell you that he was going to move the

22  hearing date up so you could get your firearms rights restored

23  sooner?

24  A    He did.

25  Q    If we could turn to Government's Exhibit 121, page 25,

Rahim - Direct

1  please.  And go to the first green text.

2      This is a text message from August 11th of 2020; is that

3  right?

4  A    Yes.

5  Q    And it's from Scott Jenkins to you?

6  A    Yes.

7  Q    And in this, he tells you the 25th of August date is the

8  only one day a month they can do the hearing.  I don't want to

9  call Rex, so I'm waiting for Travis to call me back now to see

10 if he's seen or heard anything between Rex and Paul.

11 A    Correct.

12 Q    What is Scott Jenkins telling you in this text message?

13 A    That so far he's been unsuccessful in moving the date from

14 August 25th any further, but he's making it clear it's still a

15 work in progress.

16 Q    And Rex is that local attorney you had hired?

17 A    Correct.

18 Q    And is Travis that Assistant Commonwealth Attorney that he

19 sent you a text message about previously?

20 A    Yes.

21 Q    If we could move to page 26, please, that first green text

22 message.  This is a text from the same day, August 11th, 2020?

23 A    Yes, ma'am.

24 Q    And who is it from?

25 A    From Scott to me.

Rahim - Direct

1  Q    And what does he tell you in this text message?

2  A    I'll read it.  Okay, good.  He's at least aware that I'll

3  try so I'll personally go to the judge -- it's a typo, but he

4  means, in the morning, soon as he arrives in the parking lot.

5  Q    And who is that judge he's referring to?

6  A    I believe it's the one who I can't recall the name we

7  discovered, but it's the only judge that would -- it's a small

8  county.  Culpeper County really, to the best of my knowledge,

9  only has one judge in the position of the Circuit Court that

10  would be doing these.  So it's that same attorney we talked

11  about -- excuse me, the same judge we talked about.

12  Q    And so he's telling you he's going to personally go to

13  that judge?

14  A    It sounds like he's going to ambush him in the parking lot

15  first thing in the morning.

16  Q    If we could go to the next text message, please.

17       And is this another message he sent to you on August 11th

18  of 2020?

19  A    Yes, ma'am.

20  Q    And it's from Scott Jenkins to you?

21  A    Yes.

22  Q    And he said, you have -- he says to you, you have my word

23  I'm going to get an actual favor finally from them or I'll be

24  in the doghouse.

25       What does -- what was your impression the actual favor

Rahim - Direct

1  was?

2  A    Getting me my restoration of firearms.

3  Q    And who is them?

4  A    Everybody, the judge, the Commonwealth's Attorney, the

5  clerk of the court, the assistant Travis, Rex the attorney.  He

6  was turning all the knobs.

7  Q    And this was part of the agreement you had with him that

8  in exchange for what you had done and the money you had

9  provided that he would do this for you?

10  A    This is his attempts or him showing me his attempts to

11  honor the commitments he had made to me in exchange for what I

12  did, yes.

13  Q    Did Scott Jenkins go to the judge?

14  A    I don't know for sure, but I believe he did.

15  Q    Is that what he told you?

16  A    Yes.

17  Q    If we could turn to page 28 of this document, please.  In

18  the first green text message, is this a message from Scott to

19  you -- Scott Jenkins to you, excuse me?

20  A    Yes, ma'am.

21  Q    And it's on August 13th of 2020?

22  A    Yes.

23  Q    And he tells you, Rex is available tomorrow at 9:30.

24  Apparently you are needed to be here in case there's a

25  question.  Just to confirm before I call judge, are you good?

Rahim - Direct

1   A    Yes.

2   Q    What was your impression of what he was asking you?

3   A    Specifically, he managed to get this on the docket for the

4   very next day, I believe.  He's asking to confirm whether I can

5   appear in court at 9:30 that morning.

6   Q    And if you could please zoom in on the next two text

7   messages.

8        What was your response to him?

9   A    I am good.  Will be early.

10  Q    And what does he tell you?

11  A    I'll confirm.

12  Q    And when he says, I'll confirm, was it your understanding

13  he was going to confirm with the judge that you could be there

14  for court the next day on August 14th of 2020?

15  A    Yes.

16        MS. SMITH:  If we could turn to page 29,

17  Ms. Fastenau, and that first green text message.

18  BY MS. SMITH:

19  Q    And this is a message on the same day, August 13th of

20  2020?

21  A    Yes.

22  Q    And again, from Scott Jenkins to you?

23  A    Correct.

24  Q    So he had just told you he was going to call the judge.

25  What does he tell you after that?

Rahim - Direct

1    A    It's pretty clear he's had a conversation with the judge,

2    and the judge instructed him to have Rex, my attorney that

3    represented me, just call and confirm with the Commonwealth's

4    Attorney, Paul, that we're all prepared to go at 9:30 in the

5    morning so there would be no hold-ups.

6    Q    So this, again, is Scott Jenkins facilitating moving up

7    that hearing date; is that right?

8    A    It looks like he had accomplished all the objectives, yes.

9    Q    Now, while all of this was happening, were you worried

10   that someone was going to find out that you weren't actually a

11   resident of Culpeper County?

12   A    No.

13   Q    Why not?

14   A    It was pretty clear that Mr. Jenkins had coordinated all

15   the parties from all the branches of government, and everybody

16   understood what was going on, and it was a shoe-in at that

17   point.  It was openly discussed in these text messages.

18   Q    Had you also done things to try to combat that?

19   A    I don't understand the question.

20   Q    Thank you.  The question was not clear.

21        Did you take certain actions and have discussions to make

22   sure that it would never become a question as to whether or not

23   you were a real resident?

24   A    I mean, I think you're asking me just to reaffirm that I

25   had done things like register to vote, register vehicles, do a

Rahim - Direct

1  lease, and that sort of thing.  So if that's your question, the

2  answer is yes, I did all those things.  If you're asking if

3  there was something new we haven't talked about yet, I don't

4  believe there was anything else.

5  Q    But you discussed with Scott Jenkins the property?

6  A    Yes.

7  Q    And all the things we've already just gone over?

8  A    Correct.  He lined up all the facts with me and we had

9  lined up all the appearances so that it should pass muster with

10 everybody's blessing.

11 Q    So you aligned your stories?

12 A    That's exactly the words I would use, yes.

13 Q    If we could turn to page 31, the first blue --

14      Okay.  Is this a text from you to Scott Jenkins?

15 A    Yes.

16 Q    And this is on August 14th of 2020; is that right?

17 A    Yes.

18 Q    And in this message you say, FYI, if it comes up with

19 Mike, I sleep there four to five nights a week while I search

20 for land to build on?

21 A    Yes, ma'am.

22 Q    Is this an example of you aligning your story with Scott

23 Jenkins?

24 A    This is a perfect example of making sure everybody is on

25 board with the same story.

Rahim - Direct

1 Q    And who is Mike?

2 A    The brother that did the lease.

3 Q    Now, you said you did end up appearing in court on August

4 14th, 2020, in the Circuit Court of Culpeper County?

5 A    Correct.

6 Q    What happened when you got to court that day?

7 A    I waited my turn.  I was called to the witness stand.  I

8 swore under oath that I was a resident of Culpeper County.  The

9 whole thing took maybe three minutes, and the judge then signed

10 my restoration of firearms rights.

11 Q    So there was a hearing?

12 A    Yes.

13 Q    And the only issue was whether or not you were a resident?

14 A    Correct.  I was asked to affirm that in court.

15 Q    And under oath, you swore that you were a Culpeper County

16 resident?

17 A    I did.

18 Q    But you, in fact, were not?

19 A    Correct.

20 Q    And why did you do that?

21 A    Number one, I was instructed to do so by Mr. Jenkins, and

22 number two, I willingly went along with it because it was the

23 way to accomplish my goal.

24 Q    If we could turn to Government's Exhibit 722.

25      Do you recognize this document?

Rahim - Direct

1   A    Yes.

2   Q    And what is it?

3   A    It is a signed order from that same date by the judge

4   restoring my firearms rights.

5          MS. SMITH:  Your Honor, I would move to admit into

6   evidence Government's Exhibit 722.

7          THE COURT:  Any objection?

8          MR. CALEB:  No objection.

9          THE COURT:  So admitted, and may be published to the

10  jury.

11         (Government Exhibit 722 marked and admitted)

12  BY MS. SMITH:

13  Q    So your firearms rights were restored after that hearing;

14  is that right?

15  A    Correct.

16  Q    And is this the order from the Court?

17  A    Yes.

18  Q    And you see In Re:  Rick Tariq Rahim?

19  A    Yes.

20  Q    And let's -- if we could go to the whereas the Court did

21  conduct a hearing.  Is that just showing that that was -- there

22  was a hearing on that date?

23  A    Yes.

24  Q    If we could go further down, please.  And then it says,

25  now therefore it is hereby ordered that the petition is granted

Rahim - Direct

1  so that Rick Tariq Rahim is hereby permitted to possess or

2  carry a firearm, ammunition for a firearm, or a stun weapon,

3  entered this 14th day of August 2020.  And then is it signed by

4  the judge?

5  A    It is.

6  Q    Now, after your firearms rights were restored, did you

7  immediately get sworn in as an auxiliary deputy?

8  A    No.

9  Q    Why not?

10  A    That conversation had been ongoing.  This is now August

11  14th of 2020, which is roughly ten months after the election.

12  I had at this point I think mentally given up on being sworn as

13  a deputy.  And I believed it to be true.  I had been told by

14  Kevin Rychlik, you know, via Scott Jenkins, that they were

15  still working on a legal way to accomplish that, but they were

16  still running into dead ends.  I had become comfortable with

17  the fact that I may never be sworn as a deputy on this date.

18  I'm rambling now.  I forget your exact question.  But the

19  answer to your question is no, I did not immediately get sworn

20  in as a deputy.

21  Q    You said that they were trying to figure out a legal way

22  for you to be sworn in as a law enforcement officer.  Why was

23  there an issue with you legally being a sworn law enforcement

24  officer?

25  A    Well, the story had flip-flopped, because when I first met

Rahim - Direct

1  Mr. Jenkins, swearing me in was never going to be a problem.

2  But then the story became, we don't think we can legally do it.

3  And believe me, I didn't -- if it couldn't legally be done, I

4  didn't want to, because that would open up a pandora's box of

5  bigger criminal issues.

6      So we had multiple conversations about whether it was

7  possible.  And to that date, I had been told that they ran it

8  all the way up to Richmond and to, you know, whatever

9  Virginia's version of NCIC is, and they were still working on

10  it, but it didn't look promising, so...

11  Q    Was the issue that you were a felon?

12  A    Yes.  I'm sorry.  I thought that was obvious.

13  Q    So the problem was that you were a felon, and there became

14  roadblocks to getting you sworn in as an auxiliary deputy

15  sheriff?

16  A    Correct.

17  Q    So once there had been roadblocks, did you end up applying

18  for something else with the Culpeper County Clerk's office?

19  A    Yes.

20  Q    And what did you apply for?

21  A    The same day that I was granted the restoration of

22  firearms, I then immediately went to the clerk's office with

23  that order in hand, which Scott had hand delivered to me right

24  from chambers while court was still open, and I used that to

25  apply for a concealed carry permit.

Rahim - Direct

1  Q    And did Scott Jenkins know you were applying for the

2  concealed handgun permit?

3  A    Absolutely.

4  Q    And how did he know?

5  A    He told me what to do -- how to get it done.

6  Q    If we could turn to Government's Exhibit 732.

7       Sir, do you recognize this document?

8  A    Yes.

9  Q    And what is it?

10 A    If we go back to page 1, I can read you the title.  It's

11 the --

12                  (Reporter clarification)

13 A    It is my signed application for a concealed handgun

14 permit.

15 Q    And if you could just make sure that you're speaking

16 slowly so --

17 A    I'm sorry.

18 Q    -- that the court reporter can take down everything you're

19 saying.

20      And this was filled -- this cover page was filled out by

21 you?

22 A    Yes.

23           MS. SMITH:  I would move to admit Government's

24 Exhibit 732, Your Honor.

25           THE COURT:  Any objection?

Rahim - Direct

1          MR. CALEB:  No, Your Honor.

2          THE COURT:  All right.  So admitted, and may be

3  published to the jury.

4          (Government Exhibit 732 marked and admitted)

5   BY MS. SMITH:

6  Q    And if we could zoom in on the first few boxes, please.

7       And this says at the top, "application for concealed

8  handgun permit;" is that right?

9  A    Yes.

10  Q    And to the right of that title, it says, resident permit?

11  A    Correct.

12  Q    It's darkened; is that right?

13  A    Yes.

14  Q    So this is you filling in that you were a resident of

15  Culpeper County?

16  A    Yes.

17  Q    And under 1 for full legal name, whose name is listed?

18  A    Mine.

19  Q    And then it has other identifying information, such as

20  your date of birth.  What is the residential address?

21  A    The farmhouse in Culpeper County we've previously

22  referenced.

23  Q    And so that's that fake lease residence; is that right?

24  A    Correct.

25  Q    If we could then go down to the bottom of that, please.

Rahim - Direct

1    And whose signature is that?

2  A    Mine.

3  Q    And what's the date of this document?

4  A    August 14th, 2020.

5  Q    And then if we turn to page 4 of this packet, what is

6  this?

7  A    This is the certificate sent to me by Kevin Rychlik

8  attesting that I had achieved firearms training class, which is

9  a requirement for a concealed carry permit.

10 Q    Why is Kevin Rychlik listed as the training director of

11 Security Associates?

12 A    He owns the company, so he can make any title he wants for

13 himself.

14 Q    And what does Security Associates do, if you're aware?

15 A    To my knowledge, they are a security company that provides

16 both armed and unarmed guards to private properties, as well as

17 firearms training classes such as the one referenced here.

18 Q    And you testified that it was a requirement that you

19 complete firearms training.  Did you actually complete firearms

20 training at Kevin Rychlik's business?

21 A    No.  Mr. Rychlik sent this to me unsolicited.

22 Q    And this is on the 14th day of August, 2020?

23 A    Yes.

24 Q    So the same day you're applying for your concealed handgun

25 permit is the date of this alleged training?

Rahim - Direct

1   A      Correct.

2   Q      And again, when you filed this concealed handgun permit,

3   you were still not a resident of Culpeper County?

4   A      I was never a resident of Culpeper County.

5   Q      What, if anything, did Scott Jenkins tell you when you

6   told him you applied for the concealed handgun permit?

7   A      Could you repeat the question so I make sure I understand?

8   Q      What, if anything, did Scott Jenkins tell you when you let

9   him know that you had applied for that concealed handgun

10  permit?

11  A      Well, he told me it was already approved and going to the

12  top of the desk with his -- I forget the division that handles

13  it -- but internal affairs, or -- I think criminal

14  investigations division -- that all the right people knew that

15  it goes to the top of the pile and gets approved immediately.

16  So he let me know that it was lined up and approved before it

17  landed on somebody's desk.

18  Q      So he told you that he was going to help get it processed

19  and approved; is that your understanding?

20  A      Yes.

21  Q      Now, in order to get a concealed handgun permit, what is

22  your understanding of the process as to who in the -- who needs

23  to approve it?

24  A      I really don't have an understanding as to the specific

25  title, but more generically, the sheriff's office needs to

Rahim - Direct

1   approve it.

2   Q    Does the Commonwealth Attorney's office have to approve

3   it?

4   A    I don't know.

5   Q    What about the clerk's office, do they just -- do they

6   process it after it's been granted?

7   A    I believe they process it, but I don't believe they're

8   involved in approving it.

9   Q    If we could turn to Government's Exhibit 119.

10        Do you recognize this document?

11   A    It's more of the same text message chain.

12   Q    And who is -- who are the parties to this text message?

13   A    Myself and Scott Jenkins.

14        MS. SMITH:  Move to admit into evidence Government's

15   Exhibit 119.

16        THE COURT:  Any objection?

17        MR. CALEB:  No objection.

18        THE COURT:  So admitted, and it may be published to

19   the jury.

20        MS. SMITH:  Thank you, Your Honor.

21        (Government Exhibit 119 marked and admitted)

22    BY MS. SMITH:

23   Q    If we could turn to page 5, please.  And who is in green?

24   A    Scott -- green is Scott sending messages to me.

25   Q    And what is the date of that first text message at the top

Rahim - Direct

1   from August 27th of 2020?

2   A    Yes, that's the correct date.

3   Q    And this is from Scott to you?

4   A    Correct.

5   Q    And he says to you, good morning, sir, the application

6   isn't at courthouse.  It's over at CA office, headed to

7   courthouse for judge.

8        What is your understanding as to what application he is

9   talking about?

10  A    My understanding of this message is confirmation that his

11  office had immediately processed and approved my concealed

12  carry application.  I guess in reading this, the next stop

13  would have been the Commonwealth's Attorney's office, most

14  likely for a signature, which had been pre-arranged, and that

15  then it would go to the clerk's office -- I'm sorry -- and I

16  don't think it needed to go back to the judge, but I'm not

17  sure.  Ultimately, the point was that it was expedited and

18  already on its way back to the clerk to issue a concealed carry

19  permit.

20  Q    And when he says Deputy CA Russ Rabb had yours on top of

21  stack as he returned this morning, is that -- is Russ Rabb in

22  the Commonwealth's Attorney's office?

23  A    I believe so, yes.

24  Q    And again, he's referring to your application for a

25  concealed handgun permit?

Rahim - Direct

1   A     Correct.

2   Q     And then he says he will get them -- he will get it to the

3   court this afternoon?

4   A     Yes.

5   Q     Get them to him after court?

6         Okay.  So is this an example of Scott Jenkins letting you

7   know that he's continuing to work to get this processed?

8   A     Yes.

9   Q     Okay.  If we could move on to page 9, please.  And the

10  green text message from Scott Jenkins at the bottom at 2:10 on

11  September 3rd of 2020, who is this message from?

12  A     From Scott to me.

13  Q     And what is he telling you in this message again?

14  A     His latest update about having checked yesterday

15  afternoon, and they were headed to the judge's secretary, and

16  then up to the clerk.  My guess is they'll process them through

17  today and be calling you and others that its complete.

18        He's updating me that it seems to be very close to

19  completion.

20  Q     Another example of him continuing to work on your behalf

21  to get this pushed through?

22  A     Correct.

23  Q     If we could go to the next page, page 10, please.  Go to

24  the blue text on top.

25        Is this a message from you to Scott Jenkins?

Rahim - Direct

1   A    Yes.

2   Q    And this is from September 3rd of 2020?

3   A    Yes.

4   Q    And you say, because they required a self-addressed

5   stamped envelope and when I applied she told me they would just

6   be mailed.  I obviously used the Sperryville address for mail.

7       What are you referring to in this text message?

8   A    I'm letting him know that my understanding of the process

9   was they just mail the permit once it's issued, and that it

10  would be obviously going to the Sperryville address.  But

11  because he was the sheriff and ran the sheriff's office, and

12  the deputies in the sheriff's office pretty much ran the

13  courthouse, I'm asking him here if it's possible for a deputy

14  to swing by the clerk's office and pick it up for me.

15  Q    Why couldn't you just pick it up from the Sperryville

16  address?

17  A    Oh, I could have.  But that would just be inconvenient for

18  me and add a few days for mail.

19  Q    And it would be inconvenient because you didn't actually

20  live there?

21  A    Correct.

22       MR. CALEB:  Objection.

23  BY MS. SMITH:

24  Q    Would it be inconvenient because you didn't live there?

25  A    Yes.

Rahim - Direct

1        MS. SMITH:  Sorry.  I thought there was an objection

2   so I reworded it.

3   BY MS. SMITH:

4   Q    If we could turn to page 11, that green text in the middle

5   of the page, continuing on with this text message conversation

6   between you and the sheriff; is that right?

7   A    Yes, ma'am.

8   Q    And what's the date of this text message, please?

9   A    September 4, 2020.

10  Q    And this is from Scott Jenkins to you?

11  A    Yes.

12  Q    And he says, well hopefully your permit is in the mail or

13  it might be a few days.

14       Again, is this him telling you the progress he's trying to

15  make for you?

16  A    Yes.

17  Q    And he says in the next line, I tried having Pete, my CID

18  captain, who oversees any type of backgrounds such as permits,

19  check on it yesterday.

20       Who is Pete?

21  A    CID I think is criminal investigations division.  And from

22  the e-mail, he's a captain, so he's a high ranking official in

23  the sheriff's office.

24  Q    He's someone that works for the sheriff's office?

25  A    Correct.

Rahim - Direct

1  Q    And then he goes on and says, so this morning we have

2  Bernie give it a try.  Bernie gets along with everyone.

3       Do you know who Bernie is?

4  A    I do.  I know Bernie.  He is the -- or he was the captain

5  in charge of the courthouse at the time.

6  Q    So what is he telling you in this text message?

7  A    He's telling me that now that we've accomplished

8  everything, I'm just working hard to physically get the permit

9  issued and in your hands as quickly as possible.

10 Q    And after he mentions Bernie trying, does he go on to say,

11 so I tried myself a bit ago?

12 A    Yes.

13 Q    What was your understanding of what he was telling you he

14 had tried?

15 A    To go to the courthouse and pick up a permit for me.

16 Q    So again, he's trying to get this done on your behalf?

17 A    Yes.

18 Q    And then the last sentence of this text message says, I'll

19 have Mike check mailbox at farm.

20      What is he referencing there?

21 A    His brother would check the mail I used -- the address I

22 used in Culpeper, to see if it came in the mail.

23 Q    That Sperryville property?

24 A    Yes, ma'am.

25 Q    Then if we could go to page 18, please, in the green box

Rahim - Direct

1    at the top of the page, another text message between the

2    defendant and yourself?

3    A    Yes.

4    Q    This one is on September 10th of 2020?

5    A    Correct.

6    Q    Still didn't have your concealed handgun permit yet?

7    A    Not yet.

8    Q    And he tells you, nothing, Mike is checking each day after

9    mail run.  Let me see if he's checked yet this afternoon.

10        What did you understand this to mean?

11   A    They were simply waiting for it to show up in the mail and

12   they're checking the mailbox for me every day.

13   Q    Was this an ongoing conversation that you had with Scott

14   Jenkins during this time period?

15   A    Yes.

16   Q    The text messages that we just went through, were those

17   all the messages sent about this, or just --

18   A    I'm sure --

19   Q    -- a sample?

20   A    I'm sure there were many more within the same message.

21   We're trying, we're trying, it's coming soon.

22   Q    If we could turn to Government's Exhibit 731, please.

23        Do you recognize this document?

24   A    I do.

25   Q    And what is it?

Rahim - Direct

1  A    It's the concealed handgun permit that I was issued.

2  Q    And so this is the concealed --

3           MS. SMITH:  Sorry, move into evidence Government's

4  Exhibit 731, please.

5           THE COURT:  Any objection?

6           MR. CALEB:  No objection.

7           THE COURT:  So admitted, and may be published to the

8  jury.

9           (Government Exhibit 731 marked and admitted)

10  BY MS. SMITH:

11  Q    So is this the permit that you applied for that was the

12  topic of all of those text messages we just went through?

13  A    Yes, ma'am.

14  Q    And what was your understanding that this permit gave you

15  the right to do?

16  A    In the Commonwealth of Virginia, it gave me the right to

17  carry a concealed firearm.  In addition, it gave me the right

18  in any other state that had reciprocity.

19  Q    And the address listed is the 8367 Sperryville Pike.

20  Again, is that the property that was in that fake lease?

21  A    Yes.

22  Q    Now, at some point, did you receive an identification card

23  from the Culpeper County sheriff's office?

24  A    Yes.

25  Q    Why did you receive an identification card?

Rahim - Direct

1  A    As we discussed previously, we were still -- they were

2  still having issues figuring out how to swear me in formally as

3  a deputy.  As a stop gap measure, Mr. Rychlik's suggestion, the

4  sheriff issued me an identification card that merely identified

5  me as a helicopter pilot, but not a sworn deputy, although the

6  identification card was the same as a deputy sheriff's

7  identification card would appear.

8  Q    And why did you want an identification card?

9  A    Again, in case I was pulled over on the side of the road,

10 you know, so that I would have something credible for

11 professional courtesy to hopefully get out of any speeding

12 ticket.

13 Q    What type of identification card did you end up getting

14 initially?  You said the helicopter identification card?

15 A    Yes, ma'am.

16 Q    Did you ever fly helicopters for the Culpeper County

17 sheriff's office?

18 A    Not specifically for the office, although there were --

19 the answer is no.

20 Q    Did Culpeper County sheriff's office even own any

21 helicopters?

22 A    No.

23       MS. SMITH:  Your Honor, if I could have permission to

24 approach the witness, please?

25       THE COURT:  Yes.

235

Rahim - Direct

1          MS. SMITH:  I'm going to be showing him what's been

2   marked as Government's Exhibit 510.

3          THE COURT:  Make sure Mr. Caleb has seen that.

4          MS. SMITH:  Yes, Your Honor.

5   BY MS. SMITH:

6   Q    Do you recognize that?

7   A    I do.

8   Q    And what is it?

9   A    It's the identification card we just discussed.

10         MS. SMITH:  Your Honor, at this point, the government

11  would move into evidence Government's Exhibit 510.

12         THE COURT:  Any objection?

13         MR. CALEB:  No objection.

14         THE COURT:  So admitted, and may be published -- do

15  you have a photograph of it, or is that the --

16         MS. SMITH:  We do, Your Honor.  I can also pass it

17  around to the jury to publish.

18         THE COURT:  If you have a photograph, we can pull it

19  up and they can see it just on the -- save a little bit of

20  time.

21         MS. SMITH:  If you give me a minute, Your Honor, I

22  thought we did, but we may not.  It may just be -- let me see.

23  There we go, Government's Exhibit 439, Your Honor.

24         THE COURT:  So this is -- what's shown on the screen,

25  ladies and gentleman, is 439, which is the same as the

Rahim - Direct

1  original, which is 510.

2          No objection to 439; is that right, Mr. Caleb?

3          MR. CALEB:  No, Your Honor.

4          THE COURT:  One and the same.  Very well.  So that

5  will be admitted as well.

6          (Government Exhibits 510 and 439 marked and admitted)

7   BY MS. SMITH:

8  Q    Did you have any conversations with Scott Jenkins about

9  getting this helicopter identification card?

10 A    Yes.

11 Q    And what type of conversations did you guys have?

12 A    Well, Mr. Jenkins made it clear he was giving me the next

13 best thing to be sworn as a deputy.  I was issued a badge with

14 it as well, and -- it was clear I wasn't a sworn deputy, but he

15 assured me that should he get a phone call from a state trooper

16 or a county police officer on the side of the road saying I

17 have Rick Rahim here who says he's with the department, he

18 assured me that he would take the steps and say the things that

19 would likely result in my not getting a speeding ticket.

20 Q    So essentially he told you he would vouch for you if you

21 were --

22 A    That's the word --

23 Q    -- pulled over?

24 A    Yes, that's --

25 Q    Make sure that I finish my question before you answer,

Rahim - Direct

1  please, sir.

2      Did he essentially say he would vouch for you?

3  A    Yes.  I wish I had found that word.

4  Q    Now, were you actually eventually sworn in as an auxiliary

5  deputy sheriff on May 27th of 2021?

6  A    Yes.

7  Q    How did that come about?

8  A    It was sort of a shock.  I got a phone call or a text -- I

9  don't recall -- from Kevin Rychlik, asking if I was ready to

10 get sworn in.  And I was surprised, and I said, I thought you

11 guys said we couldn't do it.  And the answer I was given was,

12 well, we found out that as long as you don't have access to --

13 again, if I'm using the acronym wrong -- I think he said NCIS,

14 meaning the criminal computer system -- that as long as we

15 don't grant you access to this computer system, we can legally

16 swear you in as a deputy.  So I was invited I think to come the

17 next day, and I came down and got sworn in as a deputy.

18 Q    And you went and you were sworn in by the clerk of the

19 court; is that right?

20 A    In Culpeper County, yes.

21 Q    And who was there for your swearing in?

22 A    The clerk swore me in.  Scott Jenkins was there.  I

23 believe both of his brothers were there.

24 Q    And if we could turn to what's already been admitted as

25 Government's Exhibit 705.

Rahim - Direct

1    Do you recognize this document?

2  A    I do.

3  Q    Is this the oath and qualification for auxiliary deputy

4  sheriff?

5  A    Yes.

6  Q    And that first paragraph says that I, Rick Tariq Rahim, do

7  solemnly swear or affirm that I will support the Constitution

8  of the United States and the Constitution of the Commonwealth

9  of Virginia, and that I will faithfully and impartially

10  discharge all the duties incumbent upon me as an auxiliary

11  deputy sheriff of the County of Culpeper; is that right?

12  A    Yes.

13  Q    And it says that it's commencing on January 1st of 2021

14  and expiring on December 31st of 2023?

15  A    Yes.

16  Q    And whose signature is below that oath of office?

17  A    Mine.

18  Q    And further down, is that the clerk's office signature?

19  A    Correct.

20  Q    And the date was May 27th of 2021?

21  A    Correct.

22  Q    If we could turn to Government's Exhibit 432, please.

23    Do you recognize this?

24  A    I do.

25  Q    And what is it?

Rahim - Direct

1   A    It's the clerk in the white shirt swearing me in --

2   Q    Sorry, let me -- what just generally is this?

3   A    It's a photograph of the swearing in event.

4   Q    Is this a true and accurate depiction of your swearing in

5   ceremony?

6   A    Yes.

7         MS. SMITH:  If the government could now move to admit

8   Government's Exhibit 432.

9         THE COURT:  Any objection?

10        MR. CALEB:  No objection.

11        THE COURT:  So admitted.

12        (Government Exhibit 432 marked and admitted)

13  BY MS. SMITH:

14  Q    Now let's talk through the photo.  You said this is a

15  photograph of your swearing in.  Who is the individual in the

16  white shirt on the left of the photo?

17  A    I don't think he's the Clerk of the Court, but a clerk of

18  the court.

19  Q    And then who is the gentleman that is facing that

20  gentleman in the white coat with the -- or the white shirt,

21  rather, with the blue mask and the blue shirt, and his hand

22  raised?

23  A    That's me.

24  Q    So is this you being sworn in?

25  A    Yes.

Rahim - Direct

1  Q    And then over to the right of the photo, who is the

2  gentleman that you can see with the blue mask on his face?

3  A    Sheriff Jenkins.

4  Q    And then if we could turn to Government's Exhibit 108.

5       Do you recognize this?

6  A    I do.

7  Q    And what is this?

8  A    It's a text message from Scott to me with a different

9  angle of that same photograph.

10          MS. SMITH:  And if we -- we can move to admit

11  Government's Exhibit 108, please.

12          THE COURT:  Any objection?

13          MR. CALEB:  No objection.

14          THE COURT:  So admitted, and may be published to the

15  jury.

16          (Government Exhibit 108 marked and admitted)

17  BY MS. SMITH:

18  Q    And if we could zoom in on that photograph, please.

19       So again, this is just a different angle of your swearing

20  in ceremony?

21  A    Correct.

22  Q    And Scott Jenkins sent you this photograph?

23  A    Yes.

24  Q    Did you receive an auxiliary deputy badge and

25  identification card?

Rahim - Direct

1    A    Yes.

2    Q    And who did you receive that from?

3    A    Scott Jenkins.  Scott Jenkins was present, but from

4    Bernie, who is the captain who issues all the ID cards.  I

5    received the badge from Scott Jenkins.

6    Q    If we could just make sure you're speaking in the mic,

7    please.

8    A    I apologize.  I received the ID card from a captain, and I

9    received the badge from Mr. Jenkins.

10    Q    And if I could show you Government's Exhibit 507, 508, and

11    509.

12            MS. SMITH:  Your Honor, may I have permission to

13    approach the witness?

14            THE COURT:  Yes, ma'am.

15            MS. SMITH:  Thank you.

16            THE COURT:  You can move about freely in the

17    courtroom.

18            MS. SMITH:  Okay.  Thank you, Your Honor.

19     BY MS. SMITH:

20    Q    Do you recognize Government's Exhibit 507, 508, and 509?

21    A    Yes.

22    Q    And what are these items?

23    A    This was the identification card and badges issued to me

24    by the sheriff's office.

25    Q    And is that identification card the one that you got after

Rahim - Direct

1  you were admitted as an auxiliary deputy sheriff?

2  A    This was the card I was issued immediately after the

3  photograph of when I was sworn.

4          MS. SMITH:  And Your Honor, at this time the

5  government would move into evidence Government's Exhibit 507,

6  508, and 509.

7          THE COURT:  Any objection?

8          MR. CALEB:  No objection.

9          THE COURT:  So admitted, and may be published to the

10 jury.  Do you have photographs of these that can be --

11         MS. SMITH:  I don't, Your Honor, but if possible, I

12 would like to at least pass around those two badges for the

13 jury to see up close, if that's all right.

14         THE COURT:  You may.

15         MS. SMITH:  Thank you.

16         THE COURT:  And if you can substitute out photographs

17 so they can go back into the jury room.

18         MS. SMITH:  Okay.

19         (Government Exhibits 507, 508, and 509 marked and

20 admitted)

21         MS. SMITH:  Your Honor, we are going to pull up

22 Government's Exhibit 439, which is a photograph of the

23 helicopter pilot and one of the badges.

24         THE COURT:  And that's -- the badge itself is 510,

25 correct?

Rahim - Direct

1          MS. SMITH:  Yes, Your Honor.

2          MR. CALEB:  I'm sorry, can you say that again?

3          THE COURT:  So 510 is the badge issued that shows

4    helicopter pilot as a position, and 439 is the photograph of

5    that.

6          MS. SMITH:  Your Honor, I think I misspoke.  510 is

7    the helicopter ID, 509 is the badge, and then 508 is the

8    additional badge having to do with the auxiliary deputy.

9          THE COURT:  And 507 is the auxiliary deputy ID?

10         MS. SMITH:  Correct, Your Honor -- no, it's the

11   badge, I'm sorry.  507 is the badge, 508 is the ID, 509 is

12   another badge, and 510 is the helicopter ID.

13         THE COURT:  Right.  And just to be clear, 439 is the

14   photograph of the helicopter ID?

15         MS. SMITH:  Yes, Your Honor, with a badge.  And if I

16   could show the witness Government's Exhibit 446.

17   BY MS. SMITH:

18   Q    Do you recognize that?

19         THE COURT:  It's not up.

20         MS. SMITH:  Oh, it's not up yet?

21         THE WITNESS:  Now I see it.  Yes.

22   BY MS. SMITH:

23   Q    And is that a true and accurate depiction of the auxiliary

24   deputy sheriff's badge and --

25   A    Yes.

Rahim - Direct

1  Q    -- identification card?

2  A    Sorry.  Yes, it's the same items you've shown me.

3         THE COURT:  And just so we're clear, this is also 507

4  and 508 basically?

5         MS. SMITH:  Yes, Your Honor.

6         THE COURT:  And that's 436?

7         MS. SMITH:  446, Your Honor.

8         THE COURT:  446.  Okay.

9         MS. SMITH:  And if I could move that into evidence,

10 Your Honor.

11        THE COURT:  No objection, Mr. Caleb?

12        MR. CALEB:  No objection.

13        THE COURT:  All right.  So admitted, and that may be

14 published to the jury.

15        MS. SMITH:  Thank you.

16        (Government Exhibit 446 marked and admitted)

17        THE COURT:  Have the badges gotten all the way

18 through yet?  They're still working their way through.  All

19 right.  Very well.

20  BY MS. SMITH:

21 Q    Were you issued any other equipment from the Culpeper

22 County sheriff's office?

23 A    Yes.

24 Q    What were you issued?

25 A    Many uniform items and a weapon.

Rahim - Direct

1  Q    You said you were issued a weapon?

2  A    Correct.

3        MS. SMITH:  Your Honor, at this time, I would like to

4  show Mr. Rahim Government's Exhibit 511, which is a firearm

5  that has been rendered safe.

6        THE COURT:  And that's going to be moved into

7  evidence?

8        MS. SMITH:  Yes, Your Honor.

9        THE COURT:  Any objection to that, Mr. Caleb?

10       MR. CALEB:  No objection.

11       THE COURT:  All right.  It will be admitted into

12  evidence.  And ladies and gentlemen, before -- as is always the

13  case, before any firearm is ever brought in the courtroom and

14  before any firearm is ever shown has a piece of evidence, our

15  United States marshal handles the firearm and renders it safe.

16  And so even though the firearm is here, it has been rendered

17  safe, and a special agent has it, and can show it to Mr. Rahim.

18       MS. SMITH:  Thank you, Your Honor.  Special Agent

19  Clouser, could you please approach the witness and show him

20  Government's Exhibit 511?

21  BY MS. SMITH:

22  Q    Do you recognize that?

23  A    It is either the exact weapon I was issued or the exact

24  model of weapon I was issued.

25  Q    It appears to be the firearm you were issued by the

Rahim - Direct

1   Culpeper County sheriff's office?

2   A    Yes.

3          MS. SMITH:  Your Honor, at this point, we would move

4   into evidence Government's Exhibit 511.

5          THE COURT:  All right.  That will be admitted.  And

6   is there a photograph of that as well?

7          (Government Exhibit 511 marked and admitted)

8          MS. SMITH:  Yes, Your Honor.  That's the next exhibit

9   I was going to ask.

10          THE COURT:  All right.  Thank you, Special Agent

11   Clouser.

12          MS. SMITH:  Could he just walk in front of the jury

13   with it open, Your Honor, so they can see it, please?

14          THE COURT:  Sure.

15          MS. SMITH:  Thank you, Special Agent Clouser.

16          If we could pull up Government's Exhibit 447.

17    BY MS. SMITH:

18   Q    Is this a true and accurate photograph of the firearm you

19   received from the Culpeper County sheriff's office and that is

20   Government's Exhibit 511, Mr. Rahim?

21   A    Yes.

22          MS. SMITH:  I would move that into evidence, Your

23   Honor.

24          THE COURT:  Any objection?

25          MR. CALEB:  No objection.

Rahim - Direct

1          THE COURT:  So admitted, and may be published to the

2   jury.

3          (Government Exhibit 447 marked and admitted)

4    BY MS. SMITH:

5   Q    Mr. Rahim, when did you receive this firearm?

6   A    I don't recall the exact date, but it was shortly after

7   being sworn in.

8   Q    And who did you ask for the firearm and uniform and all

9   the other items you received?

10  A    I don't recall asking.  I recall having them issued.

11  Kevin Rychlik facilitated the uniform portion.  The firearm was

12  issued at the order of the sheriff, Scott Jenkins.

13  Q    You said the firearm was ordered at the order of the

14  sheriff, Scott Jenkins.  How do you know that he ordered it?

15  A    I was there when he said, let's get him a weapon, and I

16  was walked down the hall to the armorer.

17  Q    You walked down the hall to the --

18  A    To the armorer.

19  Q    If you could just make sure you're speaking into the

20  microphone.  Thank you.

21         Did you subsequently take responsibility for your role in

22  these crimes and plead guilty in this case?

23  A    Yes.

24  Q    And did you plead guilty to Counts One and Two, conspiracy

25  to commit federal programs bribery, and honest services mail

Rahim - Direct

1  fraud?

2  A    Yes.

3  Q    Why did you plead guilty?

4  A    Because I did these things.

5  Q    Did you enter into a plea agreement with the government?

6  A    Yes.

7  Q    And were you originally charged with two additional counts

8  of honest services fraud and one county of bribery?

9  A    Yes.

10  Q    As part of your plea agreement, did the government agree

11  to dismiss those charges at your sentencing?

12  A    Yes.

13  Q    Also as part of your plea agreement, are you agreeing to

14  cooperate with the government?

15  A    Yes.

16  Q    What, if any, promises or agreements did the government

17  make in exchange for your cooperation?

18  A    My agreement makes no promises beyond the plea agreement

19  that we signed.

20  Q    And what -- what was in the plea agreement; do you recall?

21  A    It's my duty to testify truthfully and accurately here.

22  And should I do that, then I would be eligible for

23  consideration of a reduced sentence.

24  Q    Have you been sentenced yet?

25  A    No.

Rahim - Direct

1  Q    Who will decide your sentence?

2  A    The Court.

3  Q    Are you hoping to receive a reduced sentence based on your

4  cooperation?

5  A    Of course.

6  Q    But have any promises or representations to you been made

7  about whether or not there will be a reduced sentence from the

8  Court?

9  A    No.

10 Q    And your obligation is simply to testify truthfully; is

11 that correct?

12 A    Correct.

13 Q    Now, if you were to fail to testify truthfully today,

14 would you lose the benefits of your plea agreement?

15 A    I believe I would, yes.

16 Q    And could you be charged with further crimes, including

17 perjury?

18 A    I could, yes.

19 Q    Now, apart from this case and your guilty plea to some of

20 the charges involved, do you have other criminal cases pending

21 in other courts?

22 A    The Eastern District of Virginia.

23 Q    And have you pled guilty to felonies in the Eastern

24 District of Virginia as well?

25 A    Yes.

Rahim - Direct

1  Q    Are those Eastern District of Virginia felonies related to
2  this case?
3  A    No.
4  Q    What did you plead guilty to?
5  A    Without using the exact words, because I don't want to
6  misspeak, failure to pay income tax and investment fraud.
7  Q    And do you know approximately how much you are agreeing
8  that you failed to pay over in taxes?
9  A    Yes.  I made many millions of dollars and I owe many
10 millions in tax.
11 Q    And what about the wire fraud, is that over a million
12 dollars as well?
13 A    Yes.
14 Q    And generally, when it comes to those two cases, what did
15 you plead guilty to doing?
16 A    To making a lot of money and not following along paying
17 the tax I owed, and to selling automatic trading bonds that
18 failed and did not work as represented.
19 Q    Are you facing a prison sentence for those crimes --
20 A    Yes.
21 Q    -- in the Eastern District of Virginia?
22 A    Sorry.  Yes.
23 Q    Are there any agreements between you and the Eastern
24 District of Virginia U.S. Attorney's office related to your
25 cooperation in this case?

Rahim - Direct

1    A    I tried, but the answer is no, they're completely

2    separate.

3    Q    So there's no agreement as to anything involving your

4    cooperation here for that other -- those two other cases?

5    A    Correct.

6    Q    Have I or any other attorney related to your bribery

7    charges here in the Western District of Virginia made any

8    promises or representations about your cooperation?

9    A    No.

10   Q    I want to turn now to what happened after you were sworn

11   in as an auxiliary deputy sheriff.

12        Were you given any training by the Culpeper County

13   sheriff's office?

14   A    Minimal, if you would call it -- minimal, excuse me -- if

15   you would call it training.

16   Q    Why do you say minimal, if you would call it training?

17   What are you referring to?

18   A    At my request, I was allowed to go to the gun range

19   several times with the training officer and practice shooting,

20   for lack of a better word.  And I often rode along as an

21   auxiliary deputy in uniform with very qualified good men and

22   women in the department.  But the fact that I rode along with

23   them and received instruction and education during that process

24   was not a formal training program of any sort.

25   Q    Did you ask to do ride-alongs?

Rahim - Direct

1   A    Yes.

2   Q    Why did you want to do ride-alongs?

3   A    Fun, something different, and learning.  I learned a lot.

4   Q    What was your understanding as to whether or not other

5   auxiliary deputy sheriffs were doing those types of things such

6   as ride-alongs or shooting at the range?

7   A    I think many probably shot at the range.  To the best of

8   my knowledge, very few, if any, ever did ride-alongs, save

9   Mr. Rychlik himself.  He was a qualified police officer, so he

10  didn't have to ride along, but he did -- he did go on patrol as

11  well.

12  Q    So apart from yourself and Mr. Rychlik, you were unaware

13  of any other auxiliary deputies working in an official capacity

14  on behalf of the sheriff's office?

15  A    Correct.

16  Q    What about any events or security details; were you

17  involved in any of those?

18  A    I was invited to -- well, I shouldn't say invited --

19  offered or asked to participate in several, and I believe I

20  participated in most of the ones that I was asked to.

21  Q    Was one of those things a Presidential security detail?

22  A    Yes, it was.

23  Q    And who asked you to participate in that?

24  A    Sheriff Jenkins.

25  Q    And what was involved in being part of that Presidential

Rahim - Direct

1  security detail?

2  A    I was armed, I wore a uniform, and I worked with a very

3  heavy and extensive detail.  It was almost all hands on deck as

4  we protected President Biden when he flew in by helicopter to

5  Culpeper County Airport and gave a speech within Culpeper

6  County.

7  Q    If we could pull up Government's Exhibit 437, please.

8       Do you recognize this?

9  A    I do.

10 Q    Is it a true and accurate depiction of you and Scott

11 Jenkins at that Presidential security detail?

12 A    Yes, ma'am.

13      MS. SMITH:  Your Honor, at this time we would move

14 into evidence Government's Exhibit 437.

15      THE COURT:  Any objection?

16      MR. CALEB:  No objection.

17      THE COURT:  So admitted, and may be published to the

18 jury.

19      (Government Exhibit 437 marked and admitted)

20 BY MS. SMITH:

21 Q    Who is on the left side of this page?

22 A    On my left is Scott Jenkins -- excuse me, if I'm looking

23 at the picture --

24 Q    I was not clear.  As you're looking at the picture, who is

25 on the left of this page?

Rahim - Direct

1                    (Overlapping speakers)

2   A    In the cowboy hat is Scott Jenkins.

3   Q    That's an easier way.  Thank you.

4        And who is on -- who does not have a cowboy hat on?

5   A    The guy with no hair is me.

6   Q    Thank you.  And this was taken where?

7   A    At the Culpeper County sheriff's office.

8   Q    Was this part of the Presidential security detail?

9   A    This was during the early a.m. briefing in advance of the

10  arrival of the President of the United States.

11  Q    And I see that you have a firearm on your hip?

12  A    Correct.

13  Q    Is that the firearm in Government's 511 that we just

14  recently looked at?

15  A    Yes.

16  Q    Now, earlier you mentioned you wanted a badge to get out

17  of traffic tickets.  Did you ever use that auxiliary deputy

18  badge or any badge to try and do just that?

19  A    In the course of several years, I was probably pulled over

20  five or six times, and each time successfully avoided a traffic

21  ticket.

22  Q    And so were you pulled over multiple times outside of

23  Culpeper County?

24  A    I was never pulled over inside of Culpeper County, yes.

25  Q    What did you do during those traffic stops to get out of

Rahim - Direct

1  your ticket?

2  A    Simply polite and respectful, and if you'd like me to walk

3  you through the process, I mean -- ultimately I identified

4  myself as a deputy and was given professional courtesy.

5  Q    Did you tell Scott Jenkins about being pulled over and

6  showing your badge?

7  A    I was instructed by Scott Jenkins as to the routine way to

8  do so.

9  Q    So he was aware of what you planned on doing and what you

10  eventually did?

11  A    Well, I never planned on getting pulled over, but yes, he

12  was aware of the use of the badge for traffic tickets.

13  Q    What you planned on doing if you were pulled over is

14  probably more precise.

15  A    Correct.  Yes, ma'am.

16  Q    Now, at some point, did the FBI subpoena you and request

17  the badges, identification cards, uniform, and firearm that you

18  received from Scott Jenkins?

19  A    Yes.

20  Q    And after you were indicted by the government, did you

21  meet with the government?

22  A    Several times.

23  Q    And who did you meet with?

24  A    I don't recall names, but most of the faces are here.

25  Q    You met with the attorneys for the government and the FBI

Rahim - Direct

1  agents; is that fair to say?

2  A    Correct.

3  Q    Now, when you initially met with the government, was that

4  pursuant to a proffer agreement?

5  A    Yes.

6  Q    What is a proffer agreement as you understand it?

7  A    It's an agreement between myself and the government that

8  you would share with me information and I would share with you

9  information regarding my case.

10 Q    Now, after you initially met with the government and you

11 had been indicted, were you pulled over?

12 A    Yes.  Several times.

13 Q    And where were you pulled over specifically?

14 A    North Carolina.

15 Q    Is that on the Outer Banks?

16 A    Yes.

17 Q    Can you tell the jury what happened when you were pulled

18 over in the Outer Banks?

19 A    I still had a badge, though I turned one in to the

20 government.  Out of habit, I was -- I was doing 55 or 60 miles

21 an hour in a 35 or 40 very early on a Sunday morning driving

22 home from the beach, no traffic.  I was pulled over for

23 speeding with radar.  As was my habit, I let them know that I

24 was a deputy sheriff, and the conversation was maybe 30

25 seconds.  I was asked to slow down, and we exchanged greetings

Rahim - Direct

1   and went on our way.

2   Q    What happened after you left that initial traffic stop?

3   A    There's no humor in it, but funny enough, in the very next

4   county, five minutes later, I was pulled over again for roughly

5   the same speed and roughly the same speed limit, and the same

6   events unfolded the same way.

7   Q    Did you show your badge at that second traffic stop?

8   A    Yes, identical to the first stop.  It was quick and

9   uneventful.

10  Q    Sorry.  I don't want to talk over you.

11       You said it was quick?

12  A    And uneventful, yes.

13  Q    Now, this was after you had already been subpoenaed to

14  turn in your badges and identification cards; is that right?

15  A    Correct.

16  Q    So you had kept one of your badges?

17  A    I had turned in the badge and did have another one in the

18  vehicle that I hadn't thought of at the time.  So the answer is

19  yes, I still had a badge.

20  Q    Why did you continue to use your auxiliary deputy badge

21  after you had been federally indicted and after you had met

22  with the government?

23  A    Extremely bad judgment.  There's no excuse.

24  Q    But you have since turned that badge in?

25  A    Correct.

Rahim - Direct

1  Q    Turning back to the swearing in of other individuals, did

2  Scott Jenkins ever ask you to find other individuals who would

3  make financial payments in exchange for a bribe?

4  A    Several times.

5  Q    Could you tell the jury about those conversations you had

6  with Scott Jenkins?

7  A    Well, I think we reviewed some text messages, but the net

8  effect -- and keep in mind that Kevin Rychlik was the driver of

9  most of this.  The net effect was the constant hammering that

10 running an election is very expensive.  It costs a lot of

11 money.  And the way to win is to spend a lot more money than

12 your opponent.  And it was strongly not just encouraged, but

13 urged to bring in other wealthy people who could donate.

14 Q    And who urged you to bring in other wealthy people?

15 A    Both Scott and Kevin Rychlik.

16 Q    And did these conversations begin shortly after you first

17 met Scott Jenkins in 2019?

18 A    I think it's fair to say even before I met Scott Jenkins,

19 yes.  They were immediate -- or immediate, excuse me.

20 Q    Did you bring in any business associates to be sworn in as

21 auxiliary deputy sheriffs?

22 A    I did bring one other, yes.

23 Q    And who was that?

24 A    Fred Gumbinner.

25 Q    And how do you know Fred Gumbinner?

Rahim - Direct

1  A    I had known Fred probably three to five years prior to

2  meeting Mr. Jenkins as a business associate and occasional

3  poker player at regular poker games.

4  Q    Were you involved in business dealings with him?

5  A    Yes.

6  Q    Can you tell the jury a little bit about that?

7  A    Fred runs various investment groups where like-minded

8  friends with a little bit of money invest in high-risk

9  speculative type -- investing in startup businesses, kind of

10  like Shark Tank, only very small size.  I was a part of that

11  group with Fred for a couple of years.  And I had both invested

12  my money with Fred, and ultimately Fred -- actually his group

13  invested in one of my businesses as well.

14  Q    When did you approach Fred Gumbinner about getting sworn

15  in as an auxiliary deputy?

16  A    Pretty immediately after Kevin facilitated the

17  introduction at Kevin's urging.

18  Q    And so that was in summer or early fall of 2019?

19  A    Correct, a few months before the election.

20  Q    And that's the election that was in November of 2019; is

21  that correct?

22  A    Correct.

23  Q    And how did you help facilitate Fred Gumbinner's

24  swearing-in?

25  A    It was very transactional.  You know, Fred knew I was --

Rahim - Direct

1  knew what I was doing and that I was getting involved with the

2  sheriff's office, and I suggested that there were opportunities

3  for him as well.  Fred at one time was a very wealthy guy.  I

4  haven't talked to him for a couple of years, but -- and I knew

5  that this would check a box for him.  So I presented the

6  opportunity to him that he could do something similar if he

7  wanted to donate heavily to the sheriff, and I was sure the

8  sheriff would gladly swear him in.

9  Q    You said you knew it would check a box for him.  What did

10 you mean by that?

11 A    Meaning having something that most people don't have.  I'm

12 trying to find the right words.  In other words, something cool

13 to have.

14 Q    Did he think it would be something cool to have?

15 A    Yeah, he put a pretty heavy price on it, so yes.

16 Q    Did you explain to Fred Gumbinner how he could get a

17 badge?

18 A    Yes, through donation to the sheriff.

19 Q    And what did you tell him he had to do with this donation?

20 Did you tell him about how much it would have to be?

21 A    Yeah -- the answer is yes, I'm sorry.  I was just

22 rethinking the conversation.  Yes, I did.

23 Q    And how much did you tell him he had to pay Scott Jenkins

24 for a badge?

25 A    $20,000.

Rahim - Direct

1  Q    Did you tell Fred Gumbinner that you had made a similar

2  payment?

3  A    Yes.

4  Q    However, at this point when you were having this

5  conversation with him, you had not received your badge yet; is

6  that correct?

7  A    Correct.  This was still before the election and before

8  Scott actually won the re-election.  So this was prior to Scott

9  having done me any favors.

10 Q    And why did you believe you could help Fred Gumbinner get

11 a badge when you hadn't received yours yet?

12 A    Because I trusted Kevin Rychlik.  I had known him 20

13 years.  I know he had badges in multiple counties.  And

14 further, because I knew that Fred Gumbinner, to the best of my

15 knowledge, had a very clean criminal record so it would be a

16 non-issue for him.

17 Q    He didn't have the felony issues that you had?

18 A    Correct.

19 Q    Did Fred Gumbinner agree to pay for a badge?

20 A    Yes.

21 Q    If we could pull up Government's Exhibit 114.

22      Mr. Rahim, do you recognize this?

23 A    Yes.

24 Q    What is this document?

25 A    This is my response to Fred Gumbinner by e-mail regarding

Rahim - Direct

1  the $20,000.

2  Q    When you say donation, you mean the money that was going

3  to go to the sheriff for the badge?

4  A    We were calling it a donation at that time, yes.

5         MS. SMITH:  Your Honor, we'd move to admit into

6  evidence Government's Exhibit 114, please.

7         THE COURT:  Any objection?

8         MR. CALEB:  No objection.

9         THE COURT:  So admitted, and may be published to the

10  jury.

11         (Government Exhibit 114 marked and admitted)

12  BY MS. SMITH:

13  Q    If we could start at the bottom of this e-mail thread,

14  what is the date of this e-mail?

15  A    September 27th, 2019.

16  Q    And who is this e-mail from?

17  A    It's from Fred to me.

18  Q    And it says, Rick, please call me this morning to discuss

19  specifics/logistics for getting the $20K donation done.

20      What is he referring to in that sentence?

21  A    He's following up on the conversation we had about if you

22  want to be a deputy, I can make it happen for you.  It's going

23  to cost you 20,000, just let me know.

24  Q    And then he goes on to say, only tweak from my end is

25  clarifying that it applies for as long as in office, and

Rahim - Direct

1   there's a paren, i.e., no need for quote-unquote annual or

2   periodic tweaking.

3       What was your understanding that Fred Gumbinner was

4   referring to in that second sentence?

5   A    Fred is the man who always negotiates these -- he writes

6   contracts for a living.  He is an attorney.  So this is him

7   just making sure he understands that 20,000 gets him a badge

8   for the full term of Mr. Jenkins's re-election period

9   without -- he was trying to make sure it wasn't 20,000 a year.

10  Q    And then if we go to the top of this e-mail chain, who is

11  the response from?

12  A    From me to Fred.

13  Q    And what's the date of this e-mail?

14  A    Same date, an hour later.

15  Q    So September 27th, 2019.  And who is it to?

16  A    To Fred Gumbinner.

17  Q    And then what do you say to him in that first line?

18  A    Fred, there is no tweaking or contracts.

19  Q    And the next line says, this is an election year and our

20  candidates need the most support right now before November.

21      What are you telling Fred Gumbinner?

22  A    Well, that's just the setup for the next paragraph, if you

23  don't mind, I'm basically telling him, hey, the heavy money is

24  now.  And then I go on to say, if you don't mind, in the next

25  paragraph, that non-election years we try to build their kitty,

Rahim - Direct

1  but it's a much smaller dollar amount, you know, in subsequent

2  years.

3  Q    So you're telling him the election years we give the

4  sheriff more money, and then later on we give smaller amounts?

5  A    Yeah, keep his feet wet every year, yes.

6  Q    You say call me any time, better conversation by phone

7  than e-mail?

8  A    Correct.

9  Q    Why did you prefer having conversations on the phone?

10  A    Because Fred would exchange 50 e-mails in one day and

11  would be trying to negotiate every period and comma you write.

12  Q    At some point, did Fred Gumbinner make a bribe payment to

13  Scott Jenkins?

14  A    Yes.

15  Q    And were you involved in that transaction?

16  A    I facilitated it.

17  Q    And how did you facilitate that bribe payment to the

18  sheriff?

19  A    Fred wrote me a check.  I then converted it to cash from

20  my safe and delivered it to Mr. Jenkins.

21  Q    If we could turn to Government's Exhibit 308, which is

22  already admitted, and turn to page 3, please.  Zoom in on

23  the -- thank you.

24      What is this?

25  A    This is the check from Fred Gumbinner to one of my

Rahim - Direct

1  companies.

2  Q    And it says Food Truck Company.  That's one of your

3  companies?

4  A    Correct.

5  Q    Why did Fred Gumbinner write you a check?

6  A    Because Mr. Gumbinner is always looking for an angle, and

7  my assumption is that he intended to use the check to my

8  company as some sort of tax benefit as an investment, versus a

9  non-deductible bribe or contribution to a campaign.

10  Q    And again, I'm sorry to remind you again, but make sure

11  you're talking into that microphone.

12  A    I'm so sorry.

13  Q    Thank you.  So he wrote it to your company?

14  A    Correct.

15  Q    And what's the date of this check?

16  A    October 1, 2019.

17  Q    And it's for $20,000?

18  A    Yes.

19  Q    Is that the amount you told Fred Gumbinner he had to pay

20  for the badge?

21  A    Yes.

22  Q    And what is in the memo line?

23  A    It's hard to read, but it looks like -- I'm sure it says

24  LLC investment.

25  Q    And why did he write LLC investment?  Was this an actual

Rahim - Direct

1  investment in your company?

2  A    No.

3  Q    But that was for tax reasons, as you previously mentioned?

4  A    I can't speak to Fred's -- we really didn't discuss the

5  memo line.  But it was his habit to make sure everything he did

6  in life had a business reason.

7  Q    And then that's his signature on the bottom right?

8  A    Yes.

9  Q    And did you end up giving that $20,000 to Scott Jenkins in

10 cash?

11 A    Very quickly, yes.

12 Q    If we could turn to Government's Exhibit 125, please.

13      Do you recognize this text chain?

14 A    Yes.

15 Q    If we could also look at the second blue -- who is this

16 text message between?

17 A    From Scott to me.

18         MS. SMITH:  If we could move into evidence

19 Government's Exhibit 125, Your Honor.

20         THE COURT:  Any objection?

21         MR. CALEB:  No objection.

22         THE COURT:  So admitted, and may be published to the

23 jury.

24      (Government Exhibit 125 marked and admitted)

25  BY MS. SMITH:

Rahim - Direct

1  Q    So these are text messages between you and Scott Jenkins?

2  A    Correct.

3         MS. SMITH:  Moving to page 3 of this document, the

4  text at the very top of the page, please, Ms. Fastenau.  It's

5  in green.

6  BY MS. SMITH:

7  Q    Who is this text message from?

8  A    From me.

9  Q    And it's on October 2nd of 2019?

10 A    Correct.

11 Q    Is that the day after the check that we just looked at was

12 dated?

13 A    I believe so.

14 Q    And what are you saying to Scott Jenkins in this text

15 message?

16 A    We're making dinner plans.

17 Q    So you guys are arranging to meet up sometime?

18 A    Correct.

19 Q    And it's for dinner in Reston or Tysons?

20 A    Correct.

21 Q    Is that in northern Virginia?

22 A    Correct.

23 Q    And I forgot to ask you, is Fred Gumbinner also from

24 northern Virginia as well?

25 A    Yes.

Rahim - Direct

1   Q    And if we could see Mr. Jenkins's response, please.

2        And his response is on October 2nd, 2019, so the same day?

3   A    Correct.

4   Q    And what does he tell you about meeting up?

5   A    He confirms that 6:00 will work.

6   Q    So he confirms that you guys are going to meet for dinner?

7   A    Yes.

8   Q    If we could turn to page 6 of this text message exchange,

9   and that top text on October 2nd of 2019.

10       Is this from you to Scott Jenkins?

11  A    Yes.

12  Q    It says, works for me, let's do Jackson's.

13  A    Correct.  That's the name of the restaurant.

14  Q    Is that a restaurant in northern Virginia?

15  A    Yes.

16  Q    And then further down -- and the next text message you

17  sent is an address.  What is that address for?

18  A    The restaurant address.

19  Q    So this was you giving the restaurant address to Scott

20  Jenkins?

21  A    Correct.

22  Q    What was the purpose of this dinner meeting?

23  A    My recollection is that I was going to hand him $20,000

24  from Fred Gumbinner.

25  Q    With the understanding that Fred Gumbinner would be sworn

Rahim - Direct

1  after this payment was made?

2  A    Yes.

3  Q    Did you two have dinner on October 2nd of 2019?

4  A    Yes.

5  Q    And at that dinner, did you give that $20,000 to Scott

6  Jenkins on behalf of Fred Gumbinner?

7  A    Yes.

8  Q    Did Scott Jenkins know what that money was for?

9  A    Absolutely.

10 Q    And how do you know that he knew that?

11 A    We discussed it, and I had even -- we had even gone so far

12 as Kevin Rychlik had already asked for Gumbinner's ID to

13 start -- I believe -- I don't want to misremember.  Both Scott

14 Jenkins and I and Kevin Rychlik had discussed what that $20,000

15 would earn for Fred Gumbinner.

16 Q    So you three had a conversation about what that money was

17 for?

18 A    Correct.

19 Q    And what was that money for?

20 A    Fred Gumbinner was to be sworn in and get a badge.

21 Q    Now, along with the $20,000 that you gave to Scott Jenkins

22 on behalf of Fred Gumbinner, did you give him any additional

23 money that night, October 2nd of 2019?

24 A    I believe I may have given him $1,000 extra as well.

25 Q    And who was that $1,000 from?

Rahim - Direct

1   A     From a good friend of mine named Dave Kidwell.

2   Q     If we could turn back to Government's Exhibit 308, page 2.

3         And what is this that we're looking at?

4   A     The check from Dave to my company.

5   Q     And this is the $1,000 that you gave Scott Jenkins on

6   October 2nd along with that Gumbinner payment?

7   A     Correct.

8   Q     And it says to BV Management.  That's your business,

9   right?

10  A     Correct.

11  Q     Then it says, good luck, in the memo line?

12  A     Yes.

13  Q     What was the purpose of David Kidwell giving you $1,000?

14  A     Very good lifelong friends.  He was simply doing me a

15  favor at my request.

16  Q     And what was --

17  A     There was no promise to him.  There was no reciprocity.

18  Q     So there was no agreement as to him getting anything in

19  exchange for this money?

20  A     Strictly a favor, and a very small dollar amount for a

21  friend.

22  Q     What was the favor that you asked of Mr. Kidwell?

23  A     To donate money so that I could look good in Scott

24  Jenkins's eyes and raise more money.

25              MS. SMITH:  Thank you.  We can pull that down,

Rahim - Direct

1  Ms. Fastenau.

2         THE COURT:  Ms. Smith, we're closing in on two hours.

3  I don't know how much more you have left, or whether we should

4  take a break at this point.

5         MS. SMITH:  I have a few -- I have a few more things

6  to cover, Your Honor.  It won't be lengthy, but we can take a

7  break now and let everyone stretch their legs.

8         THE COURT:  Why don't we take a break, ladies and

9  gentlemen, until 4:00.  And then we'll come back at 4, and then

10  we'll make a final run through our -- so I will remind you,

11  please do not discuss the case amongst yourselves or begin to

12  draw any conclusions at all.  The time for that will be after

13  all the evidence is in and you've been instructed.

14         So with that, I'll let the jury be excused.

15  (*Jury out, 3:49 p.m.*)

16         THE COURT:  You all please have a seat.  So Mr.

17  Rahim, first of all, during your break, again, do not discuss

18  your testimony with anyone, including your lawyer.

19         Also, as the jury came back out from lunch, I'm going

20  to put this into the record, I was handed a note that says,

21  what does co-defendant mean, question mark?  Rick Rahim was

22  introduced as a co-defendant.  Will there be a separate trial

23  for him at another time, question mark?  Also, why are we not

24  allowed to consult a dictionary or reference materials?

25         I raise it now in case any of the counsel want to do

Rahim - Direct

1    anything with respect to that.

2            Also, I do intend to give the jury this instruction

3    when they come back in.  I'm not going to touch the

4    co-defendant issue at all, but I do think that I should address

5    their question as to why they can't go do extra research.

6            MR. CALEB:  I'm sorry, Your Honor, may I approach on

7    something before you proceed?

8            THE COURT:  Yes.

9                    (Sidebar commenced)

10           MR. CALEB:  The witness is on the stand.  I don't

11   want him to be influenced by the Court's instructions about the

12   jury.

13                   (Sidebar concluded)

14           THE COURT:  So Mr. Rahim, you can go ahead and step

15   out of the courtroom while we finish this last piece.

16                (Witness left the courtroom)

17           MR. CALEB:  I'm sorry to interrupt, Your Honor.

18           THE COURT:  No, it's good instinct, Mr. Caleb.  I

19   think in the end it's ultimately not going to matter, but I

20   appreciate you raising that.

21           I intend to instruct the jury -- or here's what I

22   propose to instruct the jury.  I do think they need some

23   instructions.  I will instruct you at the conclusion of the

24   case on the law which will control your deliberations.  The

25   instructions will include definitions for many of the terms

Rahim - Direct

1    used throughout the trial.  You are not allowed to conduct any

2    independent research as you consider the case.  This ensures

3    that you are guided only by the evidence that is presented in

4    court, and my instructions, and the defendant has the

5    opportunity to rebut all evidence and arguments against him.

6    That last part comes from a Fourth Circuit case as to why, for

7    example, dictionaries are not allowed.  But I do think that if

8    there are folks in the jury room that want to at least look up

9    a word; what does honest services fraud mean, what does bribe

10   mean, or whatever it may be, then we want to stop that now.

11           Any objection to what I intend to offer, Ms. Smith?

12           MS. SMITH:  No, Your Honor.

13           THE COURT:  Mr. Caleb?

14           MR. CALEB:  No, Your Honor.

15           THE COURT:  Okay.  All right.  So I will give them

16   that instruction when they come back out.

17           And with that, Kelly, we'll put that into the record,

18   the jury question.

19           All right.  Anything else we need to address?

20           MS. CHOY:  Not from the government, Your Honor.

21           THE COURT:  All right.  We'll stand in recess until

22   4:00.  Thank you.

23                            (Recess)

24           THE COURT:  We are back on the record in the matter

25   of *United States v. Jenkins*.  Let the record reflect the

Rahim - Direct

1  government is present by its counsel.  The defendant likewise

2  is present by counsel.

3         Anything we need to bring up before we bring the jury

4  in?

5         MS. SMITH:  Not from the government, Your Honor.

6         THE COURT:  Mr. Caleb, nothing you need?

7         All right.  Let's go ahead and bring the jury on in.

8  (*Jury in, 4:04 p.m.*)

9         THE COURT:  You all please have a seat.  Let the

10  record reflect the jury is present and seated.  Ladies and

11  gentlemen, let me give you one instruction before we begin.  I

12  got your note, and what I can instruct you at this time is that

13  at the conclusion of the trial, I will instruct you on the law

14  which will control your deliberations.  Those instructions will

15  include definitions regarding many of the terms that are used

16  throughout the trial.  You're not allowed to conduct any

17  independent research as you consider the case or while the case

18  is being tried.  This ensures that you're guided only by the

19  evidence that's presented in court and through my instructions,

20  and provides for a fair trial for all.  So that's my response

21  to your -- and as I will instruct you at the conclusion of the

22  case, a lot of times when I -- when you get questions back, I

23  can only give but a certain amount of information back to you.

24  But for now, that's the instruction that I'll provide to you,

25  and I will remind you that you can't do any independent

Rahim - Direct

1   research outside of what is brought to you here by way of

2   evidence, and what I instruct you with respect to the law at

3   the conclusion of the case.

4           All right.  Ms. Smith, continue on, please.

5           MS. SMITH:  Thank you.

6    BY MS. SMITH:

7   Q    Mr. Rahim, I want to turn back to your efforts to help get

8   Mr. Gumbinner sworn in as a Culpeper County auxiliary deputy as

9   well.  At some point, did you introduce Fred Gumbinner to Kevin

10  Rychlik?

11  A    Yes.

12  Q    And why did you make that introduction?

13  A    It was a mutual introduction because Kevin was soliciting

14  money, and Fred was willing to donate it or pay it in exchange

15  for a badge.

16  Q    And again, Kevin Rychlik was soliciting money on behalf of

17  the sheriff?

18  A    Yes.

19          MS. SMITH:  If we could turn to Government's Exhibit

20  115, please.  And Ms. Fastenau, could you just turn to the next

21  page or two as well, please?  Thank you.

22  BY MS. SMITH:

23  Q    Do you recognize this document?

24  A    Yes.

25  Q    And what is it?

Rahim - Direct

1    A    It's a transcript of chat messages.

2    Q    This is a chat message between who?

3    A    Can you zoom in again so I can make sure?  Thank you.

4         Yes.  It's a three-way chat between myself, Kevin Rychlik,

5    and Fred Gumbinner.

6              MS. SMITH:  Your Honor, the government would move

7    into evidence Government's Exhibit 115.

8              THE COURT:  Any objection?

9              MR. CALEB:  No objection.

10             THE COURT:  So admitted, and may be published to the

11   jury.

12             (Government Exhibit 115 marked and admitted)

13   BY MS. SMITH:

14   Q    Is this the text message thread in which you introduced

15   Fred Gumbinner to Kevin Rychlik?

16   A    Yes.

17   Q    And let's start at the top.  This looks like it's a text

18   message from you.  It says, Kevin and Fred, please meet each

19   other.

20   A    Correct.

21   Q    When was that text message sent?

22   A    Two days before Christmas, the same year as the election,

23   2019.

24   Q    And you go on to say, Fred -- or excuse me -- Kevin, Fred

25   is a close friend who helped me provide all the recent support

Rahim - Direct

1  for our great sheriff.  Fred, Kevin is the sergeant in charge

2  of the Culpeper auxiliary.

3      When you referenced recent support for our great sheriff,

4  what were you referring to?

5  A    The $20,000 that Fred paid.

6  Q    You go on to say, as we discussed, I'm asking Kevin to get

7  your paperwork started in becoming an auxiliary in Culpeper.

8  Our goal would be to have Fred possibly sworn in this coming

9  January.

10     Is that what that says?

11 A    Yes.

12 Q    How does Kevin Rychlik respond to your request?

13 A    His exact words are, consider it done.

14 Q    Later on, does Fred Gumbinner join the conversation and

15 respond to the texts?

16 A    Yes.

17 Q    And what does he say at 9:04 a.m.?

18 A    He says, that would be great.  I'm around the rest of the

19 year.  You pick the time and place, please.  Let me know what I

20 need to have with me.  I'd just like to try to avoid rush hour

21 traffic if at all possible.

22 Q    Did Fred Gumbinner eventually get sworn in as an auxiliary

23 deputy sheriff in Culpeper County?

24 A    Yes.

25 Q    Do you recall approximately when that was?

Rahim - Direct

1  A    It took a few months, but it got done.

2  Q    What caused the multiple-month delay?

3  A    To this date, I'm really not sure.  Any answer I provide

4  you would be what Kevin told me, and not necessarily the real

5  reasons.  So I'm not sure.

6  Q    You just know there was a delay?

7  A    Yes.

8  Q    What was your reaction to that delay?

9  A    I became increasingly frustrated as I, Kevin, and the

10 sheriff weren't living up to the commitments made to Fred

11 Gumbinner.

12 Q    But Fred Gumbinner was eventually sworn in?

13 A    Correct.

14 Q    Do you know if he ever received any training from the

15 Culpeper County sheriff's office?

16 A    I don't believe so, but I have no knowledge.

17 Q    Did he ever qualify with a firearm?

18 A    I don't believe so, no.

19 Q    Did Fred Gumbinner ever use his badge to try to receive

20 any benefits that you're aware of?

21 A    Only once that I'm aware of.

22 Q    And how did he try to receive a benefit using his badge?

23 A    Fred was in Florida -- keeping in mind that this was the

24 year of COVID, and vaccines were just coming out, and hard to

25 get.  In fact, this was the time period the vaccines were only

Rahim - Direct

1  being made available to first responders or those who were

2  already very sick.  In Florida, the rules were a little more

3  relaxed, but Fred called me or texted me from Florida asking if

4  he would qualify as a first responder to try to jump the line

5  and get his COVID vaccine.

6  Q    When you found out that Fred Gumbinner was trying to do

7  that, what did you do?

8  A    I believe I ran it by both Scott and Kevin, and was told,

9  no problem at all.  And then I relayed to Fred, go on ahead,

10 we'll be happy to vouch for you if need -- anybody needs to

11 call the sheriff's office.

12 Q    If we could pull up Government's Exhibit 117, please.

13      Do you recognize this exhibit?

14 A    Yes.

15 Q    Okay.  And what is this exhibit?

16 A    This is the text message kind of outlining what I just

17 discussed with you.

18 Q    And who is on this text message chain?

19 A    It looks like Scott and Kevin, just as I recalled.

20          MS. SMITH:  Your Honor, at this time, the government

21 moves into evidence Government's Exhibit 117.

22          THE COURT:  Any objection?

23          MR. CALEB:  No objection.

24          THE COURT:  So admitted, and it may be published to

25 the jury.

Rahim - Direct

1        (Government Exhibit 117 marked and admitted)

2   BY MS. SMITH:

3   Q    Now, in blue, is that your text message to the sheriff and

4   Kevin Rychlik?

5   A    Yes.

6   Q    And what do you say?

7   A    I'm advising them both that he will likely be using

8   credentials to get his COVID flu shot, and giving them a heads

9   up in case any verification call comes in.

10  Q    This was you giving an FYI to them?

11  A    Yes.

12  Q    And you even say, so he may be using -- excuse me -- so he

13  may be showing creds if asked?

14  A    Correct.

15  Q    And those creds are the Culpeper County sheriff's office

16  auxiliary deputy badge?

17  A    Yes.

18  Q    And what was Kevin Rychlik's response?

19  A    All good there.

20  Q    Do you recall if Scott Jenkins ever objected to that being

21  done?

22  A    I don't think he chimed in, but Kevin was in his chain of

23  command and had the authority to approve it.

24  Q    What was your understanding as to whether or not when

25  Kevin Rychlik made a decision if Scott Jenkins was aware that

Rahim - Direct

1  he was making that decision?

2  A    I'm not privy to specific arrangements they had.

3            MR. CALEB:  Objection.

4            THE COURT:  Well, he's answered -- he said he doesn't

5  know anyway, he's not privy to --

6            MR. CALEB:  That objection was in anticipation of him

7  continuing that answer.

8            THE COURT:  Right.  If you can lay a better

9  foundation, we'll see where we go.

10           MS. SMITH:  Thank you, Your Honor.

11   BY MS. SMITH:

12  Q    I want to turn now to after you were sworn in as an

13  auxiliary deputy sheriff, did you continue to have contact with

14  Scott Jenkins?

15  A    Yes.

16  Q    And how frequently was that?

17  A    Less frequent -- in fact, certainly less frequent than

18  prior to the election when he needed me.  But he was accessible

19  to me if I needed.

20  Q    Did you occasionally still have dinner with Scott Jenkins?

21  A    Absolutely.

22  Q    Was there a time when Scott Jenkins and his brothers came

23  up to northern Virginia and had dinner with you?

24  A    More than once.

25  Q    And on one occasion, was this with Scott Jenkins and

Rahim - Direct

1  Michael and Johnny Jenkins, and they ended up driving you home

2  from the restaurant?

3  A    I remember that evening, yes.

4  Q    Can you tell the jury about the circumstances of that

5  dinner and why you ended up being driven home?

6  A    We met at a restaurant in Reston.  I had too many shots of

7  tequila, and I chose not to drive, and asked them to drive me

8  home for safety.  Thus, they drove my car home and got me home

9  safely.

10 Q    What happened when you got to your house in Great Falls?

11 A    Mr. Jenkins used that as an opportunity to have a very

12 private conversation with me.

13 Q    And how did he use that as an opportunity to have a

14 private conversation with you?

15 A    He wanted to let me know that -- he led with, it's not a

16 problem, I've already handled it, but I got a call from the

17 state police wanting to know about your concealed carry permit.

18 I told them -- I'm quoting him now -- I told them it's no big

19 deal, the sheriff's office is satisfied with it, and we issued

20 his permit and we have no concerns.  It was a one-minute

21 conversation.

22 Q    But he told you about getting a complaint from the

23 Virginia State Police?

24 A    Yes.

25 Q    About your concealed handgun permit?

Rahim - Direct

1    A    Correct.

2    Q    Prior to him telling you this information, did he make any

3    statements as to whether or not you could have your cell phone

4    present for that conversation?

5    A    He directed us all to put our cell phones in one of the

6    vehicles, and we walked away from the vehicle.  The implication

7    was in case anybody is listening.

8    Q    Did that seem odd to you?

9    A    Yes, but he's the boss.  I did what he said.

10   Q    During the time you were trying to get the auxiliary

11   deputy sheriff status and then after you were sworn in, did

12   Scott Jenkins ever say that deputizing you was part of a Second

13   Amendment agenda?

14   A    Not directly, but he chose to be a very public figure on

15   that topic, and it's safe to infer that I was part of that

16   agenda.

17   Q    But did he deputize you because of a -- to an agenda, or

18   did he deputize you because you had given him substantial

19   amounts of money?

20            MR. CALEB:  Objection.

21            THE COURT:  Sustained.  Rephrase the question.

22   BY MS. SMITH:

23   Q    What was your agreement as to why he deputized you?

24   A    In our agreement, we never discussed the Second Amendment

25   either prior to being sworn in or after.

Rahim - Cross

1  Q    And did you give him money because you supported him

2  politically, or because you wanted to get something from him?

3  A    I think the honest answer is both, but the priority was

4  getting something from him.

5  Q    And that was the basis of your agreement with him?

6  A    Yes.  And I supported him politically because that was the

7  ends to the mean.

8  Q    Because if he was not reelected, you could not become an

9  auxiliary deputy sheriff?

10 A    Correct.

11        MS. SMITH:  No further questions at this time, Your

12 Honor.

13        THE COURT:  All right.  Any cross-examination?

14        MR. CALEB:  Yes, sir.

15        Your Honor, am I free to move about?

16        THE COURT:  The problem is the microphones.  So as

17 long as you speak up loudly enough and everyone can hear you,

18 I'm okay with it, but Ms. Blair may bring you back to the

19 podium very quickly.

20        MR. CALEB:  Fair enough.

21                      CROSS-EXAMINATION

22  BY MR. CALEB:

23 Q    Okay.  Mr. Rahim, you're a businessman?

24 A    Yes.

25 Q    And you're a pretty successful businessman, correct?

Rahim - Cross

1    A    Some would say so.  Some would say I'm a failure.

2    Q    I'm sorry?

3    A    Some would say yes, some would say no.

4    Q    Okay.  But you know how to negotiate a deal, don't you?

5    A    I believe so.

6    Q    And you've made -- part of your business is making deals,

7    correct?

8    A    Yes.

9    Q    You've made deals in business, right?

10   A    Yes.

11   Q    And you've made other deals, correct, outside of business,

12   right?

13   A    I don't understand the question.

14   Q    Well, you've made other deals outside of business,

15   correct?

16   A    Give me an example of a deal outside of business, please.

17   Q    You made a deal with the government?

18   A    Yes.

19   Q    And in fact, the deal you made with the government has to

20   do with those guilty pleas that you entered, right?

21   A    Yes.

22   Q    And so I'm going to talk about these deals that you made

23   with the government, and I'm going to start with the one you

24   made with the government in this case.

25        So in this case, you pled guilty to one count of

Rahim - Cross

1  conspiracy, correct?

2  A    Yes.

3  Q    You also pled guilty to one count of honest service wire

4  and mail fraud, correct?

5  A    Yes.

6  Q    And before I keep going, these deals you made with the

7  government, these were documented, right?

8  A    Yes.

9  Q    Meaning they were in writing?

10 A    Yes.

11 Q    And these were documents that you signed, correct?

12 A    Yes.

13 Q    And before signing these documents, also called plea

14 agreements, you read these agreements, correct?

15 A    Yes.

16 Q    And you were assisted by counsel, right?

17 A    Yes.

18 Q    And counsel is located in the courtroom today, right?

19 A    Correct.

20 Q    Now, going back to this first deal -- this deal, not the

21 first deal -- this deal that you negotiated with the government

22 in regards to this case, the plea agreement, this was a plea

23 agreement where you've already said you pled guilty to one

24 count of conspiracy, and one count of honest service wire and

25 mail fraud, but those weren't the only charges that you were

Rahim - Cross

1  charged with in this case, correct?

2  A    Correct.

3  Q    And just to be clear, in this case, before you pled, you

4  had co-defendants?

5  A    Yes.

6  Q    All right.  And co-defendants are people that you're

7  charged along with, correct?

8  A    I believe so.  I'm not a lawyer, but yes.

9  Q    I'm sorry?

10 A    I believe so.  I'm not a lawyer, so you're asking me for a

11 definition, but I think the answer is yes.

12 Q    I'm not asking you for a definition.  You were aware that

13 you were charged along with other people, correct?

14 A    Correct.

15 Q    And you are aware that those other people are called your

16 co-defendants, right?

17 A    Yes.

18 Q    Okay.  So co-defendants are people that you are charged

19 along with, correct?

20 A    Okay.  Yes.

21 Q    Right?  No confusion there, right?

22        MS. SMITH:  Objection, Your Honor.

23        THE COURT:  He's on cross.  I'll let him -- I'll let

24 him explore.

25  BY MR. CALEB:

Rahim - Cross

1   Q    No confusion there, right?

2   A    No confusion.

3   Q    Okay.  So in addition -- so let's be clear.  This case

4   that you were charged in, in this case the honest service wire

5   and mail fraud and the conspiracy counts, those are not the

6   only counts that you were charged with, correct?

7   A    Yes.  We've established that.

8   Q    I'm sorry?

9   A    Yes.

10  Q    Okay.  And so, because you're good at making deals, you

11  were able to get some of the counts that you were charged

12  with -- you were able to get the government to dismiss some of

13  those counts, correct?  Let me withdraw that question.

14       The government did not require you to plead to every count

15  in the indictment that you were charged with?

16  A    I can agree to that, yes.

17  Q    Okay.  And so amongst the charges that you did not have to

18  plead to were three additional counts of honest service wire

19  fraud, correct?

20  A    I'm not arguing with you, but I know what I pled to.  I

21  don't recall the original indictment.  It was a very lengthy

22  document.  So the indictment speaks for itself.  I'm not

23  arguing, but I don't recall the uncharged or the dropped cases.

24  I don't want to misspeak.  I don't have knowledge or memory of

25  the charges that were dropped because they were no longer

Rahim - Cross

1  directed to me.  I'm not arguing with you.  I'm just saying I

2  don't want to say yes to something that may not be correct.

3  Q    You would agree if there were additional charges that you

4  were charged with and those charges were dropped, those would

5  have been benefits to you, correct?

6  A    Yes.

7  Q    Okay.  And so you agree that there were several charges

8  charged in the indictment that you did not plead to, correct?

9  A    Yes.

10 Q    Okay.  And you believe that once -- you agree that once

11 those charges were dropped, that was a benefit that you

12 received, correct?

13 A    Yes.

14 Q    All right.  So let's talk about what you actually -- well,

15 let me -- before I move on, those charges that were dropped --

16 so those charges that you did not end up having to plead to,

17 you would also agree that those charges carried jail time?

18 A    Yes.

19 Q    And by not having to plead to those offenses, that is jail

20 time that you don't have to worry about, correct?

21 A    Correct.

22 Q    And that's part of the deal that you struck with the

23 government, right?

24 A    Yes.

25 Q    Do you know how much jail time was dropped as a result

Rahim - Cross

1  of -- of you not having to plead to the offenses -- the

2  additional offenses in the indictment?

3  A    I don't recall.  It was explained to me at some point

4  quite a while ago.

5  Q    But it was a benefit to you?

6  A    Again, yes.

7  Q    All right.  Let's talk about what you actually pled to.

8  You actually pled to conspiracy.  And conspiracy, you would

9  agree, carries a maximum jail sentence of five years?

10  A    If that's the law, yes.  That's how it was explained to

11  me.

12  Q    I'm sorry?

13  A    That's how it was explained to me, yes.

14  Q    Okay.  But you remember that, right?

15  A    I remember having that explained to me.

16  Q    Five years is what your exposure is on conspiracy,

17  correct?

18  A    Yes.

19  Q    All right.  And so, in addition to five years' maximum

20  sentence, you could also be sentenced to a term of supervised

21  release of three years, correct?

22  A    If you say so, yes.

23  Q    Sir, I'm asking what you say.  You signed the agreement.

24     Is your understanding -- isn't it your understanding that

25  you could be sentenced to three years' maximum supervised

Rahim - Cross

1  release in connection with the conspiracy charge that you pled

2  guilty to?

3  A    Counsel, I understand you want to get a rise out of me,

4  but I just don't recall those specifics.  That deal was made

5  quite awhile ago on the advice of counsel.  I made it

6  willingly.  But you're asking me to give you answers as if I'm

7  a trained lawyer that understands the law fully.  I'm not that

8  smart.  I'm telling you that the charges were dropped and I'm

9  telling you that I received benefit, but you keep wanting to

10  argue with me about:  Is it true this is it true that?  I don't

11  know, sir.  If you'd like to put the law in front of me, I'll

12  be happy to read it out loud.  I'm not arguing with you but, I

13  can't tell you with certainty that I know this either.

14  Q    You're not a trained lawyer, but you are a defendant that

15  has pled guilty, correct?

16  A    Yes.

17  Q    Okay.  And you're also a defendant that has signed a plea

18  agreement, correct?

19  A    Correct.

20          MR. CALEB:  Indulgence, please.

21          (Pause.)

22          Your Honor, for these purposes I would like to

23  approach.

24          THE COURT:  You can move about the courtroom however

25  you like.

Rahim - Cross

1        So Mr. Rahim, from time to time Mr. Caleb may need to

2   present some things to you, and I'm going to let him approach

3   you as he needs to, all right?

4        THE WITNESS:  Thank you.

5    BY MR. CALEB:

6   Q    Mr. Rahim, I'm approaching with what is marked Defense

7   Exhibit Number 1.  If you could just take a look at the first

8   two pages of that document and just let us know if your memory

9   has been refreshed concerning the amount of time that you're

10  exposed to for the conspiracy.

11  A    Sure.  I believe the document is accurate.  So whatever it

12  states is the exposure that we discussed.

13  Q    Okay.  So for the offense of conspiracy, you're facing a

14  maximum term of supervised release of three years, correct?

15  A    Correct.

16  Q    And before I go any further, sir, Defense Exhibit 1 is

17  your plea agreement, correct?

18  A    It has my initials and signature on it, so yes.

19  Q    Yes?

20  A    Yes.

21  Q    As you said, your signature is on the bottom of -- your

22  initials are on the bottom of each page?

23  A    Yes.

24  Q    It's a 16-page document?

25  A    I'll take your word for it, yes.

Rahim - Cross

1   Q    Page 1 of 16 is the first page?

2   A    Yes.

3   Q    Okay.  All right.  And so for the offense of conspiracy --

4   I'm sorry, for the offense of honest service wire and mail

5   fraud --

6            THE COURT:  So Mr. Caleb, actually the easiest way to

7   do this is if you pull the ELMO out and be able to show it

8   through the overhead projector.  Ms. Brown is going to show

9   you.  That's going to be able to keep you at the -- you're hard

10  to hear as you do get away from the...

11           And then Ms. Brown can control the video screen like

12  she does with everything else.  So this will be shown just to

13  counsel and the witness at this time.

14           MS. SMITH:  And Your Honor, if I could just be clear.

15  Is he just refreshing the witness's memory; is that correct?

16           MR. CALEB:  You know what, Your Honor, at this point,

17  I'm impeaching.

18           THE COURT:  Yeah, he's putting the plea agreement in

19  front of him just to confirm.  So -- well, it's technically

20  refreshing his memory.

21           MS. SMITH:  And if he's refreshing the witness's

22  memory, he can look at the document, but then the document

23  needs to be taken away.

24           MR. CALEB:  I'm impeaching, Your Honor.

25           THE COURT:  Right.  So if it's to refresh his

Rahim - Cross

1   recollection, you can show him the document and then remove it.

2   And if that refreshes his recollection -- if it doesn't refresh

3   his recollection, then it may be a past recollection.  Since he

4   signed the document, you may have to put the document in.

5   BY MR. CALEB:

6   Q    I'll just move along.

7        Well, you've already answered that you agree that the

8   maximum period for supervised release is three years on the

9   conspiracy, right?

10  A    Yes.

11  Q    And the maximum fine you're facing on the conspiracy count

12  is a maximum fine of $250,000, correct?

13  A    Yes.

14  Q    Now, you also pled to honest service wire fraud, right?

15  A    Yes.

16  Q    And that offense carries even more time than a conspiracy

17  charge, doesn't it?

18  A    I believe so.

19  Q    In fact, it carries a maximum jail sentence of 20 years?

20  A    I believe so.

21  Q    Are you sure?

22  A    You have the document that would refresh my memory.

23  Q    Sir, you signed the document.  Are you sure?

24       MS. SMITH:  Objection, Your Honor.  This is getting

25  really argumentative.

Rahim - Cross

```
 1          THE COURT:  So I'll sustain the objection.  He said
 2  he didn't recall.  If you want to stick the document in front
 3  of him and see if it refreshes his recollection, then you can
 4  do so.
 5   BY MR. CALEB:
 6  Q    Count Two -- I'm showing you Defense 1 again and directing
 7  your attention to
 8  A    I do see that your statement was accurate, and I agree
 9  with you.
10  Q    Okay.  Twenty years?
11  A    Yes.
12  Q    And that offense or that count also carries a maximum
13  period of supervised release of three years?
14  A    Yes.
15  Q    And it also carries a maximum fine of $250,000?
16  A    Yes.
17  Q    So all in, your exposure for the crime that you pled
18  guilty to in this case, in the case you have -- the case that
19  you've pled guilty to in the Western District of Virginia, your
20  exposure, adding up the fines, is a maximum fine of $500,000?
21  A    That's a fair statement, yes.
22  Q    A maximum of six years' supervised release?
23  A    Yes.
24  Q    And a maximum term of jail of 25 years?
25  A    Yes.
```

Rahim - Cross

1  Q    And sir, it would be accurate to say that you don't want

2  to go to jail?

3  A    Yes.

4  Q    And you certainly don't want to do 25 years in jail?

5  A    Correct.

6  Q    Sir, you mentioned living in Great Falls at one point.  Do

7  you still live in Great Falls?

8  A    Yes.

9  Q    And you own a home in Great Falls actually?

10  A    Yes.

11  Q    You also own a home in North Carolina, correct?

12  A    Yes.

13  Q    You own -- still own a Tesla?

14  A    Yes.

15  Q    Actually, two Teslas?

16  A    Correct.

17  Q    Own a 2016 Cadillac Escalade?

18  A    Correct.

19  Q    Own a helicopter still?

20  A    Haven't for years.

21  Q    Still own the SHERP?

22  A    Haven't for years.

23  Q    And other cars -- you own other cars, vehicles, correct?

24  A    Correct.

25  Q    And it's fair to say that if you were sentenced to any

Rahim - Cross

1  jail time, as an initial matter, you wouldn't be able to enjoy

2  the comfort of your home, right?

3  A    Yeah, that's fair to say.

4  Q    You'd be locked away in a cell?

5  A    That's obvious.

6  Q    I'm sorry, is that a yes or no?

7  A    That's obvious, yes.

8  Q    Okay.  And so -- and you also wouldn't be able to enjoy

9  the use of your cars, right?

10 A    Right.

11 Q    And you enjoy your cars and your home, right?

12 A    I enjoy my home.  Cars are expendable.

13 Q    And so, sir, you're actually -- and the government

14 mentioned this briefly -- but you are what is called a

15 cooperating witness, correct?

16 A    I'm not saying no, but I have never had anybody tell me

17 that's the definition of who I am.  So I don't have enough

18 knowledge to answer that in either direction.  I don't believe

19 the plea agreement makes that statement.

20 Q    I'm sorry?

21 A    I don't believe the plea agreement makes such a statement.

22 If I'm wrong, I'm happy to correct myself.

23 Q    Well, you did say that you're testifying here in hopes

24 that the government will speak up on your behalf at sentencing,

25 right?

Rahim - Cross

1    A    Yes.

2    Q    And that is what your testimony -- that is why you're

3    providing testimony, correct?

4    A    In part, yes.

5    Q    I'm sorry?

6    A    In part, yes.

7    Q    Well, you didn't volunteer to testify?

8    A    I'm required to testify.

9    Q    As a part of your agreement?

10   A    If I had no agreement, I would still be required to

11   testify, if called by the government.

12   Q    Is that your understanding?

13   A    My understanding is that I could be subpoenaed at any time

14   as a witness, regardless of my legal standing.

15   Q    You're familiar with the term a 5K motion?

16   A    I'm familiar with the term "5K letter."  I'm not familiar

17   with the word "motion."

18   Q    And a 5K letter is -- a 5K letter is something that you

19   would like to get from the government?

20   A    I hope to earn one, yes.

21   Q    And you would like to get that because -- and you

22   understand that you can only get the 5K letter if the

23   government determines -- or if the determination is made that

24   you -- you provided substantial assistance to the government?

25   A    I don't agree with that characterization.  I think I'm

Rahim - Cross

1  required to testify truthfully and fully and honestly, and then

2  it's up to the government to determine whether I did that.

3  Q    You said -- okay.  Let me -- going back to your plea

4  agreement, Defense Exhibit 1, I'll show you -- and maybe this

5  will refresh your recollection.  Just directing your attention

6  to page 5 of 16, section 3, the second line, can you read that

7  second line?

8         MS. SMITH:  Objection, Your Honor.  Is he asking for

9  him to silently read it as a refresh?  This has not been

10 admitted into evidence.

11        THE COURT:  It hasn't been put into evidence.  If you

12 want to use it to refresh -- ask him a question first.  The

13 document needs to come into evidence, and then you can ask him

14 whatever you want about it, or if you're using it for

15 refreshing his recollection --

16        MR. CALEB:  Well, Your Honor, at this point I just

17 move Defense Exhibit 1 into evidence, Mr. Rahim's plea

18 agreement.

19        THE COURT:  Any objection?

20        MS. SMITH:  We would object.  It's hearsay.  It is a

21 contract.  It's not his statement.  He has signed it, but it is

22 not admissible as evidence.

23        THE COURT:  Well, he has signed it, hasn't he?

24        MS. SMITH:  He has, Your Honor.

25        THE COURT:  I'll admit it as Defendant's Exhibit 1,

Rahim - Cross

1  but I'm not going to allow the highlighted version of it.

2          MR. CALEB:  I'm sorry?

3          THE COURT:  I'm not going to allow the highlighted

4  version of it.

5          MR. CALEB:  That's why I didn't initially want to.

6  Okay.  So -- and I'll provide another copy.

7   BY MR. CALEB:

8  Q   Okay.  So directing your attention to Defense Exhibit 1,

9  page 5.

10          THE COURT:  Let's get the document into evidence

11  first.

12          MR. CALEB:  I'm sorry?

13          THE COURT:  Let's get the document into evidence.  Do

14  you have the version to come into evidence?

15          MR. CALEB:  Your Honor, I would have to get another

16  copy.

17          THE COURT:  All right.  You can provide it

18  afterwards.  Go ahead.

19          MR. CALEB:  May I proceed?

20          THE COURT:  We'll get it at the end of the day.

21   BY MR. CALEB:

22  Q   Again directing your attention to page 5 of 6 of Defense

23  Exhibit Number 1, section 3.  And I'm reading now from the

24  second sentence in section 3.  I understand, even if I fully

25  cooperate with law enforcement -- right, so the understanding

Rahim - Cross

1    is that based on this agreement, you will be cooperating with

2    law enforcement, correct?

3    A    I think it's fair to say that if I cooperate -- if we read

4    it fully it says if I cooperate, I understand the government

5    makes no promise that I will be rewarded.

6    Q    Okay.  But you are cooperating?

7    A    I believe I'm cooperating, yes.

8    Q    So you also agree part of this agreement has an element of

9    you cooperating, right?

10   A    Yes.

11   Q    Okay.  And if you cooperate -- again, we're clear that the

12   government hasn't made you any guarantees, but you are

13   cooperating expecting some lenience from the government,

14   correct?

15   A    I would use the word hoping, not expecting.  It's been

16   made clear I can expect nothing.

17   Q    Are you saying you don't expect anything from the

18   government?

19   A    The document that you put in front of me says that I don't

20   expect anything.

21   Q    What I'm asking is what you expected?

22   A    I'm hoping.  I'm hoping that the government will show some

23   mercy to me.

24   Q    And you -- and with this 5K agreement, you're hopeful that

25   you won't do any jail time, right?

Rahim - Cross

1   A     Well, of course, yes.

2   Q     Even though you're -- you've admitted that -- at least

3   even based on this agreement, you're looking at you could be

4   sentenced -- well, your maximum exposure is 25 years?

5   A     Yes, we've agreed on that.

6   Q     And so that 25 years -- you're even hopeful that you won't

7   have to do any of it?

8   A     Always hopeful.

9   Q     Because, as you understand it, that is a possibility?

10  A     That would be a worst-case scenario.  I don't think it's a

11  possibility.

12  Q     I'm sorry, what would be a worst-case scenario?

13  A     That would be a worst-case scenario and I do not think

14  it's a possibility.  There are sentencing guidelines that have

15  been fully explained to me.  I think 25 years, as you know,

16  falls way outside of any reasonable sentencing guidelines.

17  Q     Maybe I should be a little more clear.  The maximum

18  exposure is 25 years; you agree with that?

19  A     I agree that's the maximum.

20  Q     And you are hopeful that you will not do 25 years?

21  A     I also agree with that statement.

22  Q     You are hopeful that you won't do any time?

23  A     Absolutely.

24  Q     Okay.  And in order for you to get the government to speak

25  up for you, you agree that the government has to be satisfied

Rahim - Cross

1   with you, right?

2   A    That's correct.

3   Q    And you want the government to be satisfied with you?

4   A    Of course.

5   Q    Let me ask you:  You pled guilty in this case back in I

6   want to say -- was it April -- April of this year?

7   A    I will speculate the document -- I agree that the date on

8   the document would be accurate.

9   Q    Okay.  I'll show you the date on the document again.

10  April?

11  A    I agree.

12  Q    Okay.  And so since April, you've met with the

13  prosecution.  You met with the government, correct?

14  A    Yes.

15  Q    How many times have you met with them?

16  A    Two or three.  I'm not really sure.

17  Q    And you met with the agents as well, the case agents?

18  A    Those meetings with the government included some agents,

19  but they were not separate meaning either/or.  It was always

20  together.

21  Q    So two or three meetings with the government accompanied

22  by case agents?

23  A    I assume they're case agents.  I haven't asked everybody's

24  titles, but I think that's correct.

25  Q    And at those meetings you discussed your testimony?

Rahim - Cross

1    A    Yes.

2    Q    So you knew what the government was going to ask you when

3    you came to testify today?

4    A    I knew what to expect.  They could have asked me questions

5    or not asked me questions.

6    Q    So you knew -- okay.  Let me break it down.

7         You said you knew who to expect from the government in

8    terms of questions?

9    A    Yes.

10   Q    And you knew what they wanted to hear from you too?

11   A    Yes.  They wanted to hear the truth.

12   Q    They wanted to hear what you told them, correct?

13        So when you initially spoke to the government, they

14   wanted -- you knew that they liked what you said and they

15   wanted to keep hearing that, correct?

16   A    Sir, I want to just clarify the record that at all times

17   I've only given them --

18   Q    Sir, that's a yes or no.

19            THE COURT:  Let him -- he's answering the question.

20   Let him go ahead and finish.

21            THE WITNESS:  The only expectation and the only

22   agreement I have with the government is that I must testify

23   fully and truthfully, which I have done, which I am doing.  And

24   at the end of the day, I hope they will reward me for that.

25   But I am not providing answers that I think the government

Rahim - Cross

1  wants, which is what your question implies.

2   BY MR. CALEB:

3  Q    But you have no problem lying under oath, right?

4  A    Absolutely not.  I mean, excuse me, let me correct that.

5  Absolutely no, I do have a problem lying here under oath.

6  Q    You've done it before?

7  A    Sir, we can -- I can absolutely admit I've done it before.

8  Q    Okay.  That was the question.

9  A    However, I have too much at stake here to do it.

10 Q    All right.  Let's move on from that April plea.

11      You also pled in the Eastern District of Virginia,

12 correct?

13 A    Correct.

14 Q    You pled twice in the Eastern District of Virginia?

15 A    Correct.

16 Q    So you pled to willful failure to pay -- to account for

17 and pay taxes, right?

18 A    Correct.

19 Q    And in that case you're looking at a maximum sentence of

20 five years, right?

21 A    Correct.

22 Q    $250,000 -- a fine of $250,000 or twice the gross gain or

23 loss, right?

24 A    Correct.

25 Q    And also you pled in -- and that was on March 15, 2024,

Rahim - Cross

1    correct?

2    A    I don't recall, but I'm sure your date is correct.  It

3    sounds right.

4    Q    So you entered a plea on March 15, 2024, and you also

5    entered a plea on August 23rd, 2024, right?

6    A    Correct.

7    Q    And on August 23rd, 2024, you pled guilty to a single

8    count of wire fraud?

9    A    Correct.

10   Q    And in that case you're looking at a maximum penalty of 20

11   years in jail, right?

12   A    Correct.

13   Q    And in those cases you're being -- not being prosecuted in

14   the Western District, but you are being prosecuted by the

15   United States Department of Justice, right?

16   A    Yes.

17   Q    And also in that case the monetary fine is a fine of up

18   to -- I'm sorry, the greater of $250,000 or twice the gross

19   gain or loss?

20   A    Yes.

21   Q    And in that August -- in that wire fraud case, the total

22   loss was approximately 1.7 million?

23   A    Yes.

24   Q    Okay.  So I want to talk about some areas you discussed

25   with the government about your relationship with Mr. Jenkins.

Rahim - Cross

1      You met Mr. Jenkins in September of 2019, correct?

2  A    I thought it was earlier, but on or about, yes.

3  Q    At that point when you guys met, you became friends?

4  A    Yes, it's fair to say we became casual friends.

5  Q    Well, you spent time together, right?

6  A    Yes.

7  Q    Had dinner together?

8  A    Yes.

9          MR. CALEB:  So I'd like to start with -- I want to

10  start with -- if I could have Exhibit 103.

11         MS. SMITH:  Government's Exhibit 103?

12         MR. CALEB:  Yes.

13   BY MR. CALEB:

14  Q    So Exhibit 103 is a document that you testified -- so

15  first of all, the first page is an email, correct?

16  A    Yes.

17  Q    Okay.  And then -- and attached to the email is an order,

18  right?

19  A    That's my recollection.  I'm not seeing the attachment,

20  but I believe so.

21         MR. CALEB:  Can we scroll to the order, please.

22  Q    That's the order?

23  A    Yes.

24  Q    That's an order that you drafted?

25  A    Yes.

Rahim - Cross

1  Q    And Mr. Jenkins, to be clear, had no input in you drafting

2  that order?

3  A    Not at the time that I drafted it.

4  Q    So speaking about this order, and he did not have any

5  input in you drafting that order, correct?

6  A    Correct.

7  Q    And that's an order that you drafted -- if I'm recalling

8  correctly -- before you even met Mr. Jenkins, right?

9  A    Yes.

10 Q    And in the email that the order accompanies, Mr. Jenkins

11 isn't even on that email, correct?

12 A    Again, I'm not seeing the to-and-from part.  I can't see

13 that page on my screen.

14 Q    The email that you just reviewed?

15 A    Sir, what I'm looking at on my screen is the draft order.

16 I'm not looking at the email.  So I can't confirm that.

17 Q    Okay.  So you need to see the cover page?

18 A    Yeah, I need to see the email.  I'm looking at the draft

19 order on my screen right now.

20 Q    That email, the draft order with the sheriff?

21 A    It is only between me and Kevin Rychlik.

22 Q    And Mr. Jenkins -- you have no reason to believe

23 Mr. Jenkins even knew about that draft order, right?

24 A    That's not a fair characterization.  He's not included on

25 the email.

Rahim - Cross

1    Q    Right.  So the email was not sent to him?

2    A    That's correct.

3    Q    And you have no reason -- based on this email, no reason

4    to believe that Mr. Jenkins saw the draft order?

5    A    I absolutely disagree with that.

6             MR. CALEB:  I want to go to -- may I have Exhibit

7    104, please.

8    Q    This is an exhibit that you went over with the government,

9    and I want to direct you to the green bubble.  That's you,

10   correct?

11   A    I believe it is.  The screen I'm looking at, I can't read

12   the letters, but I think green is me and blue is the other

13   person.

14        Thank you.  I'm looking at the blow-up of green now, and

15   it only shows from me and what I wrote.

16   Q    Okay.  And in that text message you state, Kevin asked me

17   to really go to work, right?

18   A    Correct.

19   Q    You don't say that Mr. Jenkins asked you to go to work,

20   right?

21   A    Right.  That's what the email -- that's what the message

22   says.

23             MS. SMITH:  Objection, Your Honor.  I believe that

24   Government's Exhibit 104 has not been admitted.

25             THE COURT:  It's not in evidence at this point in

Rahim - Cross

 1   time.  It's not being published to the jury at this point, but

 2   it's not in evidence at this point.

 3          MR. CALEB:  But he's testified about it, right?

 4          THE COURT:  But it's not in evidence is the point.

 5          MR. CALEB:  We're not showing it to the jury and he's

 6   testified about it.

 7          MS. SMITH:  But you're having him testify about what

 8   the substance of the exhibit is, and it's not in evidence yet.

 9          MR. CALEB:  Right.  We can take it down.

10    BY MR. CALEB:

11   Q    You texted Mr. Rychlik and Mr. Jenkins saying that Kevin

12   asked you to go to work, right?

13   A    Yes, that's what -- that's what was written, yes.

14   Q    Okay.  And in that same text thread -- and you've been

15   asked about these on direct.  In that text thread you talked

16   about having $20,000 in hand from friends of the campaign?

17   A    Correct.

18   Q    And that 20K in hand you've testified was a reference to,

19   if I'm not mistaken, money you got from Fred Gumbinner?

20   A    Yes.

21   Q    When you texted Mr. Rychlik and Mr. Jenkins about having

22   20K in hand, you didn't tell Mr. -- in that text, sir, you

23   didn't tell Mr. Jenkins who the 20,000 was from?

24   A    I don't believe that text message had his name.

25   Q    Okay.  And you didn't tell Mr. Jenkins how you got the

Rahim - Cross

1   20,000?

2   A    I disagree with that characterization.  I think I made it

3   clear that I had solicited money on his behalf from a friend.

4   Q    Okay.  But you didn't say the source of the money?

5   A    I think we've established I didn't state the name of the

6   person at that time.

7   Q    Okay.  And you didn't say when you got the money?

8   A    I think the implication is that I'm reporting to them that

9   I've obtained the money on the date that I obtained it.

10  Q    No.  You didn't say when you got the money?

11  A    No, I didn't say the date that I got the money.

12  Q    And you didn't say in that message or any message what was

13  required or requested -- if anything -- of Mr. Jenkins for that

14  money?

15  A    Untrue.  I said that in many messages.  If you'd like to

16  isolate that message, I can agree.  But when you say or any

17  other message, that's false.

18  Q    I'm asking about this message, the message where you

19  communicated that you had got $20,000 from friends of the

20  campaign?

21          MS. SMITH:  Objection, Your Honor.  We're discussing

22  an exhibit that's not in evidence.

23          THE COURT:  Well, he's showing him a specific

24  message.  Mr. Rahim remembers that specific message.  But he

25  also qualified that in other messages, which was part of the

Rahim - Cross

1    question as well, he answered that.  Let's rephrase the

2    question.

3            MS. SMITH:  If Mr. Caleb wants to show the exhibit

4    that was admitted, that's fine.

5            MR. CALEB:  Court's brief indulgence.

6            (Pause.)

7     BY MR. CALEB:

8    Q    So in the message that you saw, Mr. Jenkins was not -- you

9    didn't say the source of the money, right?

10   A    Not in that message, no.

11           MR. CALEB:  May I have 115, please, Government's

12   115 -- actually, 116.

13           MS. SMITH:  Your Honor, I don't believe Government's

14   116 has been admitted.

15           THE COURT:  116 not in evidence.

16           MR. CALEB:  I'm sorry, the Court's indulgence.  I

17   just need a second to look through my notes for something.

18           THE COURT:  All right.

19           (Pause.)

20           MR. CALEB:  Okay.  I'm sorry, 120.  May I have 120,

21   please.

22    BY MR. CALEB:

23   Q    All right.  So that's the one that was admitted.

24       So Mr. Rychlik asked you to -- Mr. Rychlik asked for you

25   to go to work, right?

Rahim - Cross

1  A    I'm not being difficult.  Can we zoom into that part?  You

2  can see I've got brand new glasses.  I just can't read.

3  Q    Okay.  Kevin asked me to really go to work.  I've been

4  busy getting you more donors.  Have 20K in hand from friends

5  for the campaign.

6        And again, in this message you do not say to -- you didn't

7  say to anyone where that money came from, right?

8  A    Correct.

9  Q    And that was a message that was sent on October 1st, 2019?

10 A    Yes, but I'd just like to amend my answer that I did say

11 it came from friends of the campaign.  I did not specifically

12 name a person, but generally it's clear I was soliciting money

13 for the Scott Jenkins campaign.

14 Q    And that message indicates the money is for the campaign

15 and not for anything else, correct?

16 A    That's correct.

17 Q    Okay.  Now I want to go to -- this is -- so I want to go

18 to -- if I could have, please, Government's Exhibit 730.

19        Okay.  In Government's Exhibit 730, that's the lease that

20 you referenced, right?

21 A    Yes.

22 Q    Okay.  And during your examination when you were being

23 asked questions by the government, you were talking about --

24 first of all, this lease -- you prepared this lease, correct?

25 A    Correct.

Rahim - Cross

1  Q    And this lease was one of the measures that you were

2  taking to establish residency in Culpeper County?

3  A    Yes.

4  Q    And so this lease is -- it's labeled "standard lease,"

5  right?

6  A    Yes.

7  Q    And it's a lease that you signed, right?

8  A    Yes.

9  Q    And it's a lease that you -- it's a lease for property

10 that does not belong to -- it's not an agreement between you

11 and Mr. Scott Jenkins, right?

12 A    I disagree with that.

13 Q    Okay.  This lease -- well, actually, let me -- let me ask

14 you this way:  Have you read this lease?

15 A    I furnished the lease.

16 Q    Have you read this lease?

17 A    Yes.  Not only did I read it, I prepared it.  I was the

18 preparer of the lease.

19 Q    You prepared the lease.

20      In the lease -- nowhere in the lease is Mr. Scott Jenkins

21 named in the lease, correct?

22 A    That's correct.

23 Q    So this -- but the lease does contain your name, correct?

24 A    Yes.

25 Q    And the lease also contains Mike Jenkins's name, correct?

Rahim - Cross

1  A    Yes.

2  Q    And the agreement -- the lease agreement is between you

3  and Mike Jenkins, correct?

4  A    Yes.

5  Q    Not between you and Scott Jenkins, correct?

6  A    Also correct.

7  Q    And one of the terms of the lease was -- first of all, it

8  was a six-month lease, right?

9  A    Yes.

10 Q    And you -- you testified that you paid rent, correct?

11 A    Yes.

12 Q    Well, you said you paid up front, right?

13 A    Yes.

14 Q    This lease is -- and you said you prepared the lease.  You

15 prepared the lease to be a legally binding document, correct?

16 A    That's fair to say.

17 Q    And so it's a real lease, correct?

18 A    Yes.

19 Q    The lease was for that property at 8364 Sperryville Pike,

20 right?

21 A    Correct.

22 Q    Since the lease was legally binding for that property, you

23 had legal access to the property, correct?

24 A    I think I could have demanded it, but I didn't so much as

25 have a key.

Rahim - Cross

1  Q    Well, it's a property that you had legal access to,

2  correct?  You had a lease for it, right?

3  A    I had a lease for it, but I did not have access to the

4  property.

5  Q    But you had an address and a leased property in Culpeper

6  County, Virginia?

7  A    Yes, that's what the lease says.

8  Q    Okay.  And you also registered cars there, correct?

9  A    Correct.

10 Q    In Culpeper County?

11 A    Correct.

12 Q    You also registered to vote in Culpeper County?

13 A    Correct.

14 Q    And, in fact, you did vote in Culpeper County?

15 A    Correct.

16 Q    Before you -- and so you did these -- you took these

17 actions -- registering to vote, entering a lease, registering

18 vehicles in Culpeper County -- with the intention of

19 establishing residency, correct?

20 A    Yes.

21 Q    And you took those actions because based on your

22 knowledge, those were actions that were necessary to establish

23 residency?

24 A    In part, yes.

25 Q    Okay.  But that's why you took those actions?

Rahim - Cross

1  A    Only in part.  The rest of the part is I was instructed by

2  Kevin and the sheriff that these were the steps necessary so

3  that they could perfect my restoration of firearms rights.

4  Q    Okay.  That aside, we're talking about residency.

5  Residency was a component of your rights being restored, right?

6  A    Yes.

7  Q    Okay.  So let's just deal with the residency requirement.

8  You took the steps of establishing residency -- again, leasing

9  the property, your car and voting -- registering to vote, those

10 actions were taken for establishing residency?

11 A    Yes.  Yes.  Yes.  I answered yes to that same question

12 four times.

13 Q    Okay.  And so you established residency?

14 A    I attempted to establish residency.

15 Q    So is it your testimony that you did not establish

16 residency?

17 A    It is my testimony that for the purposes of the fraudulent

18 firearms rights, I did not legally establish residency.  I

19 purported to be a resident.  I was not a legal resident.  And

20 that's the truth.

21 Q    And the steps to requiring residency you fulfilled, right?

22 A    No.  I never lived there.  I wasn't entitled to vote

23 there.  I never was a resident, and I never should have been

24 granted firearms restoration or a concealed carry permit in

25 that county.  I pretended to be a resident, sir, but I was not

Rahim - Cross

1   legally a resident.

2   Q    Legal residence is a determination made based on

3   fulfilling certain obligations, correct?

4              MS. SMITH:  Objection, Your Honor.

5              THE COURT:  Well, he's used the term "legal

6   residence" so I'll let him explore what he understands that to

7   be on cross-examination.

8              Go ahead.  Rephrase the question, if you could,

9   please.

10  Q    Okay.  So legal residence is -- there are certain things

11  you have to do to establish legal residence, correct?

12  A    I'm not being argumentative, but I want to make the

13  distinction.  The only reason I required legal residence was to

14  fulfill the requirements for these firearms rights; therefore,

15  I've done a lot of reading and I've signed a plea agreement and

16  I'm facing jail time because I illegally faked a residence.  So

17  no, respectfully, I am here because I did not establish legal

18  residence.  I did commit a fraud.  And I will not say yes, I

19  established legal residence when I pled guilty to having not

20  established a legal residence.  I can't say yes and perjure

21  myself.

22  Q    Well, wasn't it a requirement, for your firearms rights to

23  be restored, to establish legal residence?

24             MS. SMITH:  Objection, asked and answered.

25             THE WITNESS:  Well, I'll let him explore as to what

Rahim - Cross

1 he means, if he understands what the requirements are.  I'll

2 let him answer.

3 Q    So you went through the task of fulfilling certain

4 requirements because it was your understanding that that was

5 necessary to establish residency, right?

6 A    I went through the tasks as part of attempting to

7 establish residency, which I never lawfully established.  That

8 much I can agree to.

9 Q    Okay.  So it's your understanding that you did not -- so

10 it's your understanding that registering to vote, entering a

11 lease agreement and agreeing to lease a property and

12 registering your cars was not enough to establish residency?

13 A    Not only was it not enough, but you already pointed out

14 here in court that I pled guilty to having fraudulently done

15 those things, and that they were not lawful.  I cannot perjure

16 myself and say now that:  Oh, yes, I established legal

17 residence, because if I had, I would not be charged with a

18 crime and I would not have pled guilty.  I must answer

19 truthfully here.  I will not change my answer on this subject.

20 Q    So where in your plea agreement does it say that you

21 illegally established residency.

22     Is that what you're saying?

23 A    No.  I was charged with a crime, the majority of which

24 revolves around how I obtained firearms restoration.  I pled

25 guilty to fraudulently obtaining that.  And I'm not going to

Rahim - Cross

1  now stand here and not take responsibility for my acts.  As

2  you've pointed out, I have a duty to tell the truth.  I'm

3  owning it and I'm telling you -- I understand you're saying I

4  did try to establish residency.  I grant you that.  I tried my

5  hardest.  Notwithstanding, here I am as a co-defendant facing

6  jail, as you've pointed out.  And the only thing I have left is

7  that I must testify truthfully.  I never established legal

8  residency, or I would not have been charged with a crime.  I'm

9  sorry.  I'm not going to agree to that statement.

10            MR. CALEB:  All right.  May I have, please,

11  Government's Exhibit 127.

12  Q    On direct examination, you were shown this exhibit.  Do

13  you remember this exhibit?

14  A    I recall, yes.

15  Q    And this is the exhibit where I guess you were going to

16  vote -- by the way, you haven't been -- you haven't been

17  charged with voter fraud, correct?

18  A    Correct.

19  Q    So -- and you're aware that is a crime, right?

20  A    Yes.

21  Q    And you don't -- it's not your understanding that you will

22  be charged with voter fraud?

23            MS. SMITH:  Objection, Your Honor.  This was a local

24  election.  This was not a federal crime.

25            THE COURT:  The question is he has not been charged,

Rahim - Cross

1  period, with voter fraud.  He can answer that question.

2   BY MR. CALEB:

3  Q    And the answer is no?

4  A    Yes, sir.  I already answered no.

5  Q    Okay.  And so back to this exhibit, on direct you were

6  asked -- you were asked -- well, what you said was that in this

7  message you asked -- I guess you said you asked Mr. Jenkins who

8  he wanted you to vote for?

9  A    Yes.  That's exactly what the message said.

10 Q    Is it?

11 A    Yes.

12 Q    Can you read that message?

13 A    If you blow it up, yeah.  I can't read it on my screen

14 right now.

15        MR. CALEB:  Would you expand that first message, the

16 first green bubble.

17 Q    So you didn't ask Mr. Jenkins who he wanted you to vote

18 for?

19 A    What we've blown up doesn't -- yes, I did.  The answer

20 came from Jenkins.  He was part of that.

21 Q    No.  My question is:  You did not ask Mr. Jenkins who he

22 wanted you to vote for?

23 A    I disagree.  That's not truthful.  I texted three people

24 and asked who to vote for -- excuse me, two people and asked

25 who to vote for.  Mr. Jenkins was one of them.  I was asking

Rahim - Cross

1  Mr. Jenkins.  And if we read further, Mr. Jenkins is the one

2  that provided the answer.

3  Q    Well, isn't what -- so if I'm reading this correctly,

4  isn't what you said:  Help me fill out my absentee ballot?

5  A    Yes.  I'm asking them to tell me who to vote for.

6  Q    You asked for help, right?

7  A    As much as you'd like to parse my words and twist them

8  into something that wasn't intended, no.  I was clearly

9  asking -- and any layperson can read the entirety of this

10 message -- I was clearly asking who to vote for, and I was

11 clearly given an answer of who to vote for, and I clearly then

12 did vote for those people.  There's no way to spin this, sir.

13 Q    Okay.  That's fine.  What I'm asking you is what your

14 message says, not what you meant to say.

15 A    I'm telling you what my message says.  That's the way we

16 talk.

17 Q    Your message does not say:  Who should I vote for?

18 A    No.  My message says, Help me fill out my absentee ballot

19 so I vote for all our friends.

20 Q    Okay.  So you asked Mr. Jenkins and the other person on

21 the thread to help you, correct?

22      Correct?

23 A    Yes, that's a technical reading of my request, to tell me

24 who to vote for.

25          MR. CALEB:  All right.  Back to -- all right.  Back

Rahim - Cross

1  to Government's Exhibit -- it looks like 115.  If you could go

2  down some.

3  Q    All right.  So you testified on direct that this was a

4  transcript of a group chat.  Do you remember that testimony?

5  A    I do.

6  Q    And the date for this group chat is 12-23-2019, right?

7  A    Yes.

8  Q    Okay.  And this group chat is -- this is the chat -- this

9  is -- as I understand it -- the first time that you introduced

10 Mr. Rychlik to Fred Gumbinner?

11 A    Correct.

12 Q    And that's December 23, 2019?

13 A    Correct.

14 Q    And you would agree that the check that you said that

15 Mr. Gumbinner wrote was dated October 1, 2019?

16 A    I can't agree to that without seeing the check.

17 Q    I'm sorry?

18 A    I can't agree to that without seeing the check.

19 Q    You've seen --

20 A    I apologize, I haven't memorized everything I've seen.  I

21 apologize.  I need to see the check to agree to the date.  I'm

22 not being difficult, but I'm not going to lie.  If I don't

23 know, I'm supposed to say I don't know.

24 Q    Okay.  So I think the check -- okay.  May I have

25 Government's -- I believe it's 307, but one second.

Rahim - Cross

1        All right.  So you're saying you don't know the date of

2   the check?

3   A    No.  I'm sorry.

4   Q    Let me move on.  So the introduction between Gumbinner

5   and -- when you introduced Gumbinner to Rychlik -- and you

6   already agree that that happened in December of 2019 -- that's

7   when -- is that essentially when the ball got rolling -- is

8   that your testimony when -- first of all, the first

9   introduction happened between Gumbinner and -- I don't know --

10  anyone from the sheriff's office?

11  A    I believe that's accurate, yes.

12  Q    And so if the introduction happened in December, it would

13  be accurate to say that if the check to Mr. -- I'm sorry, the

14  check that Mr. Gumbinner wrote was to your business, right?

15  A    Yes.

16  Q    Okay.  And what you're saying is you don't recall when he

17  wrote you that check?

18  A    Yes, that's what I've said.

19  Q    But you're saying that that check was written for -- it's

20  your testimony that the purpose of that check was for him to be

21  deputized?

22  A    Yes.

23           MR. CALEB:  I need to find that exhibit, Your Honor.

24  Brief indulgence.

25           THE COURT:  Are you looking for the $20,000 check,

325

Rahim - Cross

1  Mr. Caleb?

2              Is that 307?  Is that Government's Exhibit 307?

3              MS. SMITH:  Yes, Your Honor.

4              THE COURT:  It's Government's 307.

5              MR. CALEB:  Okay.  May I have Government's 307.  Is

6  there a second -- thank you.  And if you could just enlarge

7  that, please, the check.  Thank you.

8   BY MR. CALEB:

9  Q    Okay.  And so the date on that check is October 1, 2019?

10 A    Correct, which is not the date that you asked me to read.

11 Q    I'm sorry?

12 A    It's a different date than you asked me to read.

13 Q    Okay.  But it was October 1, 2019, right?

14 A    That is the accurate date, yes.

15 Q    Okay.  And so you're saying that a check was written

16 for -- and so your understanding is that Mr. Rychlik, in terms

17 of initiating the deputy auxiliary program, Mr. Rychlik is --

18 he was the person that initiated that process, right?

19 A    He was appointed by the sheriff as the then-sergeant in

20 charge of the auxiliary program.  So yes, through the chain of

21 command, he is the one that would have initiated it, but it

22 would have required the sheriff's approval.

23 Q    And so when you say you wanted to, let's say, get

24 Mr. Gumbinner deputized as an auxiliary deputy, that was a

25 process that you took to Rychlik to get started?

Rahim - Cross

1   A    Negative.

2   Q    Negative?

3   A    I had many dinners and lunches and conversations with the

4   sheriff about the express purpose of the $20,000, and the

5   expectation and promises I had made after the election.

6   Q    Okay.  So what you're saying is that the check was written

7   on October 1st, 2019.  And the first time that you introduced

8   Mr. Rychlik to Mr. Gumbinner was the 23rd of December, right?

9   A    Correct.

10  Q    And the check was for -- it's your testimony that the

11  check was -- first of all, the check was written out to you,

12  correct?

13  A    To my company, yes, which is in effect me, yes.

14  Q    To your company.

15       And not to Sheriff Jenkins?

16  A    No.

17  Q    Not to his campaign?

18  A    No.

19  Q    Okay.  So as far as we know, this check was for what it

20  said, an investment in your company?

21  A    No.  The only testimony and information you have is that

22  the check was for Sheriff Jenkins in exchange for a badge.  You

23  have no other information that contradicts that.  I'm not going

24  to let you put words in my mouth.

25  Q    I'm sorry, the check contradicts that, correct?

Rahim - Cross

1  A    No.  I was a recipient of the check and I've testified as

2  to the purpose of the check.  Feel free to bring up other

3  witnesses that can contradict me.

4  Q    Sir, I just need you to answer the question I'm asking.

5  A    I've answered the question, sir.  The check was for

6  Sheriff Jenkins.  And the expectation as a result of the check

7  was for a badge.

8  Q    Well, the check --

9  A    I'm sorry, but I'm not going to agree to any other

10 twisting of the intent of the money.

11 Q    Well, I'm asking you to look at what is -- to testify

12 about what's written on the check in the exhibit.

13 A    The check speaks for itself.

14 Q    Okay.  So the check was written to your company, right?

15 A    Yes.

16 Q    And Mr. Jenkins didn't tell you that he -- so Mr. Jenkins

17 didn't tell you that he would give Fred Gumbinner a badge?

18 A    That's false.  He did.

19 Q    He didn't tell you a price for a badge?

20 A    He knew he was receiving $20,000, and agreed to give

21 Mr. Gumbinner a badge in exchange for that sum of money.

22 Q    The 20,000 was actually an amount that you made up,

23 correct?

24 A    It's an amount that I negotiated on behalf of the sheriff.

25 Q    Well, to be clear, the sheriff didn't ask you to negotiate

328

Rahim - Cross

1    anything on his behalf?

2    A    The sheriff asked me to raise funds for him.  Sir, if I

3    brought him $50,000, the sheriff would have accepted that as

4    well.  I brought him what I could.

5    Q    Because he wanted donations, right?

6    A    Correct.

7    Q    And so -- and just for context, I think you testified

8    earlier that you met Sheriff Jenkins in September of 2019,

9    right?

10   A    On or about.  I think it was earlier.

11   Q    Okay.  And this check, you would agree, was October 1 of

12   2019.  So a month approximately after you met Sheriff Jenkins?

13   A    Correct.  I got to work.

14   Q    I'm sorry?

15   A    I got to work.  I started delivering.

16   Q    Okay.  And so, by getting to work -- and you testified

17   that Sheriff Jenkins wanted -- needed -- well, asked -- or

18   appreciated your support, right?

19   A    All of the above.  He wanted, needed, and asked for my

20   support, yes.

21   Q    And appreciated it?

22   A    And appreciated it.

23   Q    And this support came in the form of you doing work for

24   him, essentially operating as a campaign manager?

25   A    In addition to the large sums of cash I obtained for him,

Rahim - Cross

1  yes.

2  Q    Well, one of the -- one of your roles was to obtain

3  donations, correct?

4  A    I had no official roles, but it's fair to say that I did

5  obtain donations.  I had no title and no role was assigned.

6  Q    Now, you testified that the initial meeting that you had

7  with Sheriff Jenkins took place -- well, I think you said you

8  guys kind of traveled around, but you testified about a -- I

9  believe a $15,000 payment?

10 A    I did.

11 Q    And your testimony was that no one was there when that

12 happened, right?

13 A    That's not my testimony.  My testimony was that Kevin

14 Rychlik was there, and he was within five or ten feet of us.

15 Q    So you said that you gave Mr. Jenkins money inside of a

16 car?

17 A    Correct.  Mr. Rychlik was standing directly outside.  They

18 were not tinted windows.

19 Q    So your testimony is that Mr. Rychlik was not in the car,

20 correct?

21 A    That's correct, yes.

22 Q    So we're left to take your word for it that that actually

23 happened?

24 A    No.  There are two other people that are aware of what

25 happened.

Rahim - Cross

1   Q    There was no one else in the car, correct?

2   A    Sir, Scott Jenkins and Kevin Rychlik were there.  I'm sure

3   you can solicit their testimony as well.

4   Q    Sir, I'm asking you:  There was no one else in the car,

5   correct?

6   A    No, that's not correct.  Mr. Jenkins was in the car, as

7   was I.

8   Q    No one else other than you and Mr. Jenkins were in the

9   car, correct?

10  A    Correct.

11  Q    Okay.  And so, we are -- the ladies and gentlemen of the

12  jury are stuck with believing you that that actually

13  happened -- that that exchange actually happened?

14  A    It's what happened.  Everybody has to decide whether to

15  believe me or not.

16  Q    There's no -- you have no evidence that that happened,

17  correct?

18  A    No, I don't have a receipt.

19  Q    I want to talk to you about the loan.  You actually loaned

20  Sheriff Jenkins money, right?

21  A    Right.

22  Q    And it was a loan, right?

23  A    Yes.

24  Q    There was a written agreement?

25  A    Yes.

Rahim - Cross

1  Q    And that was actually one of the -- I guess one of your

2  many businesses was to loan money, right?

3  A    Yes.

4  Q    And this was a loan for -- it was -- it was real estate

5  related.  I think it was to complete a build on a property?

6  A    Yes.

7  Q    And that loan, you would agree, was -- I think you -- I

8  think the word you used was a good real estate deal?

9  A    On its face if I had been paid back, yes, it was.

10  Q    But that's what happens in business, right?  Sometimes you

11  don't get paid back?

12  A    I've never had a partner get paid his full 50 percent

13  because he wasn't a sworn deputy and wasn't a friend and been

14  stiffed on my half of the same exact deal.  So no, it's not

15  normal.

16  Q    What I mean is that it was an investment, right, on your

17  part?  That's why you called it a good real estate deal?

18  A    It was more than investment, but it's fair to say it was

19  also an investment.  It was an investment in Scott Jenkins and

20  my relationship with him.

21         THE COURT:  Mr. Rahim, let me get you to slide closer

22  to the microphone.

23         THE WITNESS:  I apologize.

24         THE COURT:  Are you all able to hear?

25   BY MR. CALEB:

Rahim - Cross

1  Q    But the reason why you called it a good real estate deal

2  is because you thought it was a good investment?

3  A    It was much easier to swallow because it appeared to be

4  essentially risk-free, yes.

5  Q    And the other gentleman that was a part of that deal was a

6  Mr. Newberry?

7  A    Correct.

8  Q    And Mr. Newberry -- so that was just like your business

9  partner in that deal?

10 A    He was a person I brought in to take half the risk.

11 Q    And Mr. Jenkins had no connection to Mr. Newberry?

12 A    No.

13 Q    And then there was another incident where -- actually,

14 strike that.

15      That loan, I think you testified that you were -- I think

16 the word -- you said you didn't want to ask for repayment?

17 A    Correct.

18 Q    You did, though?

19 A    I'm just sorting in my head the first time that I even

20 addressed the issue, and I believe it was after my indictment.

21 Q    So you expected to be paid back?

22 A    I still expect to be paid back.  I haven't been paid back,

23 though he paid my partner.

24          MR. CALEB:  Indulgence, please.

25          (Pause.)

Rahim - Cross

1  BY MR. CALEB:

2  Q    Okay.  So you said that you never -- I'm sorry, I think

3  you said that you did not -- are you familiar with VASAR?

4       (Reporter clarification.)

5  A    V-A-S-A-R.  It's an acronym.

6  Q    And VASAR is -- and are you familiar with Culpeper Air

7  Number One -- Air One?

8  A    No.

9  Q    Are you familiar with a chopper that Culpeper County

10  sheriff's office had?

11  A    No.

12  Q    In your work as -- in your role as deputy auxiliary

13  sheriff, you did do work, correct?

14  A    Yes.

15  Q    You did ride-alongs, right?

16  A    That was my testimony.

17  Q    You went for training, for firearms training?

18  A    I went to the shooting range.  I don't think anybody would

19  categorize it as any sort of formal training.  I did shoot with

20  the captain who generally does train the SWAT team.

21  Q    So you shot with a captain that trains at the shooting

22  range?

23  A    That's correct.

24  Q    And that's not training?

25  A    No, it's not training.  It was never characterized as

Rahim - Cross

1    training.  I was never recognized for receiving training.

2    Q    And other than that, you also participated on the detail

3    with the president, right?

4    A    Yes.

5    Q    You wore your uniform?

6    A    Yes.

7    Q    And that was in your capacity as a deputy auxiliary

8    sheriff?

9    A    Yes.

10   Q    You weren't aware -- you weren't -- what was your rank?

11   A    Deputy sheriff.

12   Q    You weren't in the upper chain of command?

13   A    No.

14   Q    You weren't involved in any administration, right?

15   A    No.

16   Q    You didn't make assignments?

17   A    No.

18   Q    You didn't -- you weren't briefed?

19   A    Well, if the context was the presidential protection, we

20   were all briefed by the joint task force of both the Culpeper

21   County sheriff's office and the Secret Service.  So it's false

22   to say I wasn't briefed.

23   Q    So you were briefed in the context of the detail with the

24   president.

25        What about -- but you weren't briefed in the context of

Rahim - Cross

1  the overall administration of the duties of the Culpeper County

2  sheriff?

3  A    Again, not being argumentative, but your characterization

4  is wrong.  Every time I worked a shift, I attended briefings,

5  which were standard practice at the beginning of every shift.

6  So before going on any patrol or any detail, I disagree.  I

7  state that I was briefed just like every other deputy on duty.

8  Q    So you were briefed?

9  A    Yes.

10 Q    Okay.  And so you were briefed every time you went on a

11 shift?

12 A    If I joined the shift at the beginning of the shift, the

13 answer is yes.

14 Q    And so when you went on a shift, that was in connection to

15 your role as a deputy auxiliary sheriff?

16 A    Correct.

17 Q    And so, you did participate as a deputy auxiliary sheriff?

18 A    Yes.

19 Q    But you don't know what other -- in other words, you

20 didn't take care of scheduling other deputies, right?

21 A    As I stated, no.  No administrative tasks.

22 Q    Okay.  So you don't know what other deputies' shifts were?

23 A    In the entirety of the department, no.  I became friends

24 with many deputies and was privy to their shifts, but as an

25 administrator over the entire department, absolutely not.

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1   Q    You aren't aware of how often other -- you weren't --

2   since you weren't aware -- since you weren't involved in

3   scheduling, you also weren't aware how often other auxiliary

4   deputies served?

5   A    I disagree with that.

6   Q    You have no firsthand knowledge of that?

7   A    My knowledge that none others ever worked would be not

8   firsthand.  It would be hearsay.

9            MR. CALEB:  Okay.  Your Honor, I think that's all I

10   have.

11            THE COURT:  Thank you, Mr. Caleb.

12            Any redirect, Ms. Smith?

13            MS. SMITH:  No redirect, Your Honor.

14            MR. CALEB:  I'm sorry.

15            THE COURT:  Hang on.  Maybe not so fast, Ms. Smith.

16            (Pause.)

17            THE COURT:  Is that all?

18            MR. CALEB:  Yes.

19            THE COURT:  No redirect?

20            MS. SMITH:  No redirect, Your Honor.

21            THE COURT:  May Mr. Rahim be excused or is he subject

22   to re-call?

23            MS. SMITH:  He can be excused.

24            THE COURT:  Mr. Rahim, you may be excused.  Thank you

25   very much for being here.  You're not subject to re-call, but

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1    please do not discuss your testimony with any other witnesses

2    at this point in time.

3            THE WITNESS:  Yes, Your Honor.

4            THE COURT:  Ladies and gentlemen, this seems like an

5    appropriate time for us to call it a day.  Thank you very much

6    for your attention today.  We will start bright and early

7    tomorrow morning at 9 o'clock.  I'll ask you to be here again

8    at 8:45.

9            Along with my good wishes for safe travels to and

10   from and a nice evening, I will also send with you a reminder

11   of my instructions not to discuss the case with anyone, not

12   allow anyone to try to discuss the case with you.  Please do

13   not discuss the case amongst yourselves or begin to formulate

14   any thoughts or opinions about the evidence until all the

15   evidence is in and you've gotten the final instructions and

16   closing arguments of the lawyers.

17           With that, I hope you all have a nice evening and we

18   will see you all tomorrow morning bright and early.  Thank you

19   very much.

20   **(Jury out, 5:42 p.m.)**

21           THE COURT:  You all please have a seat.

22           Okay.  I've overpromised and will under-deliver.  I

23   don't completely have all the instructions yet.  So they're not

24   coming to you tonight.  Please don't stand with bated breath by

25   your email waiting for those, but we'll have those finished up

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1    tomorrow morning.  We'll get them to you and then we'll talk

2    about a time when we want to get back together.

3         What do we have on tap tomorrow -- or who do we have

4    on tap is better stated for tomorrow?

5         MS. SMITH:  Your Honor, we have quite a few

6    witnesses.  We actually had additional witnesses ready to go

7    today, but they are -- most of them are quite short.  I don't

8    have the list in front of me, but I will make sure that I send

9    it to defense counsel and the court reporter by 8 p.m.

10        THE COURT:  I know tomorrow is Friday, but I'd still

11   like to be able to stick to the same schedule, make it a full

12   and complete day.  I know some folks may have some travel plans

13   to go back to home or not, but I'd still like to make it as

14   much of a complete day as possible.

15        Let me just address a couple of things.  And I'll

16   address this, Mr. Andonian and Mr. Caleb, to you all:  My

17   pretrial order requires exhibits to be exchanged and uploaded

18   onto Box.  Even if you didn't want to exchange exhibits,

19   uploading exhibits into Box would not have been available to

20   the defendants -- I mean, to the government, rather.  So if you

21   have exhibits that you want to use, get them into Box so that

22   they can be pulled up and shown in a fairly efficient way to

23   the witness.  I recognize that from time to time paper

24   documents become necessary during cross because something comes

25   up you didn't necessarily anticipate, but that's what the ELMO

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1  is for.  It was my mistake to let you start moving around and

2  showing that because I had forgotten about the ELMO.  That's

3  the reason I sent you back to that.

4             MR. CALEB:  Your Honor, that's my fault.  The exhibit

5  I had was a Government exhibit.  I actually thought that I was

6  going to be admitted by the government.

7             THE COURT:  Maybe.  If you have any other exhibits

8  you know you're going to be using, upload them into Box.

9             And if you all have an agreement with the government

10  that you can use Ms. Fastenau as your IT person, that's fine by

11  me, but at some point she may take a break during

12  cross-examination.  And so you've got to figure out how you're

13  going to show your exhibits if she's not available.  You may

14  have an agreement with the government.  If you do, that's fine,

15  but I'm going to let you all work that out amongst yourselves.

16  That's where we are on that.

17             Is there anything else that we can think of that we

18  may need to deal with?  Like I said, I'll have the instructions

19  to Ms. Curry-Ledbetter first thing in the morning.  She'll do

20  her magic.  We'll get those to you by lunch tomorrow.  And

21  they're going to be over-inclusive.  There will be some things

22  that we may ultimately want to take out so that we can make

23  them more efficient.

24             Anything else we need to address, Ms. Smith?

25             MS. SMITH:  No, Your Honor.

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1          THE COURT:  Mr. Andonian, Mr. Caleb?

2          MR. CALEB:  No, thank you.

3          THE COURT:  All right.  Very well.  So we'll -- like

4   I said, I'm going to be here tomorrow morning.  If you all can

5   be here no later than 8:45, maybe a little bit earlier in

6   case -- we never know what is going to come up on a bingo card

7   that may be a little bit unexpected.  So we can deal with that

8   so we can start right at 9 o'clock and be able to go through

9   the day.

10          Very well.  We'll stand adjourned for the day.

11   (Proceedings adjourned, 5:46 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/12/2024

1                      C E R T I F I C A T E

2       I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11      I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14      /s/ Lisa M. Blair                Date: December 12, 2024

15

16

17

18

19

20

21

22

23

24

25