USA v. Jenkins, 3:23cr11, 12/13/2024

```
1               UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF VIRGINIA
2                 CHARLOTTESVILLE DIVISION


3   *************************************************************


4   UNITED STATES OF AMERICA,    CRIMINAL CASE NO.:  3:23-CR-11
                                 DECEMBER 13, 2024, 8:56 A.M.
5                                CHARLOTTESVILLE, VIRGINIA
            Plaintiff,           JURY TRIAL, DAY 3
6   vs.

7   SCOTT HOWARD JENKINS,        Before:
                                 HONORABLE ROBERT S. BALLOU
8                                UNITED STATES DISTRICT JUDGE
            Defendant.           WESTERN DISTRICT OF VIRGINIA

9   *************************************************************

10
    APPEARANCES:
11

12  For the Government:          CELIA RUTH CHOY, ESQUIRE
                                 LINA PENG, ESQUIRE
13                               DOJ-Crm
                                 Public Integrity Section
14                               1301 New York Avenue NW, 10th Floor
                                 Washington, DC 20530
15                               202-875-1557

16                               MELANIE SMITH, ESQUIRE
                                 DOJ-USAO
17                               Western District of Virginia
                                 255 West Main Street, Suite 130
18                               Charlottesville, VA 22902
                                 434-293-4283

19

20

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                     255 West Main Street, Suite 304
23                   Charlottesville, Virginia  22902
                     434.296.9284
24

         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25  TRANSCRIPT PRODUCED BY COMPUTER.
```

USA v. Jenkins, 3:23cr11, 12/13/2024

1  APPEARANCES CONTINUED:

2  For the Defendant:            PHILIP ANDONIAN, ESQUIRE
                                 JOSEPH P. CALEB, ESQUIRE
3                                Caleb Andonian PLLC
                                 1100 H Street, NW, Suite 315
4                                Washington, DC 20005
                                 202-953-9850
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23cr11, 12/13/2024

1                    I N D E X

2  WITNESSES ON BEHALF OF THE GOVERNMENT:          PAGE

3  TRAVIS OWENS

4   Direct Examination by Ms. Peng                    7
    Cross-Examination by Mr. Andonian                24
5
    JENNIFER WEAKLEY
6
    Direct Examination by Ms. Smith                  29
7   Cross-Examination by Mr. Caleb                   43

8  SYLVIA RENNINGER

9   Direct Examination by Ms. Smith                  49
    Cross-Examination by Mr. Andonian                57
10
   DALE DURRER
11
    Direct Examination by Ms. Smith                  60
12  Cross-Examination by Mr. Andonian                75
    Redirect Examination by Ms. Smith               82
13
   DAVID MYERS
14
    Direct Examination by Ms. Peng                   85
15  Cross-Examination by Mr. Andonian               100

16 BERNARD FEAGANES

17  Direct Examination by Ms. Choy                  105
    Cross-Examination by Mr. Caleb                  130
18
   CARSON BEARD
19
    Direct Examination by Ms. Peng                  139
20
   JAIME TRAVIS
21
    Direct Examination by Ms. Choy                  151
22  Cross-Examination by Mr. Caleb                  157

23 FREDRIC GUMBINNER

24  Direct Examination by Ms. Choy                  162
    Cross-Examination by Mr. Caleb                  193
25  Redirect Examination by Ms. Choy               213

USA v. Jenkins, 3:23cr11, 12/13/2024

1                    I N D E X (Continued)

2   WITNESSES ON BEHALF OF THE GOVERNMENT:                PAGE

3   DAVID JONES

4    Direct Examination by Ms. Peng                       217
     Cross-Examination by Mr. Andonian                   244
5    Redirect Examination by Ms. Peng                    247

6   CHAD MCKNIGHT

7    Direct Examination by Ms. Smith                      248
     Cross-Examination by Mr. Andonian                   262

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23cr11, 12/13/2024

1                        INDEX OF EXHIBITS

2   EXHIBITS ON BEHALF OF THE GOVERNMENT:

3          EXHIBIT:                 Marked      Received

4          740                        19           19

5          738                        36           36

6          739                        38           38

7          734                        53           53

8          728                        66           66

9          123                        69           69

10         110                        94           94

11         111                       122          122

12         128                       127          127

13         431                       181          181

14         512                       182          182

15         513                       183          183

16         438                       183          183

17         36                        190          190

18  EXHIBITS ON BEHALF OF THE DEFENSE:

19         EXHIBIT:                 Marked      Received

20         2                        203          203

21

22

23

24

25

USA v. Jenkins, 3:23cr11, 12/13/2024

 1  (Proceedings commenced, 8:56 a.m.)

 2          THE COURT:  Good morning, everybody.  We are here for

 3  day three of *United States v. Jenkins*.  Let the record reflect

 4  the government is present by its counsel.  The defendant

 5  likewise is present along with the benefit of counsel.  Hope

 6  everyone is well this morning.  Anything we need to address

 7  from the government's standpoint this morning?

 8          MS. CHOY:  No, Your Honor.

 9          THE COURT:  Mr. Andonian, Mr. Caleb, anything we need

10  to address from the defense standpoint?

11          MR. ANDONIAN:  Nothing at this time, Your Honor.

12          THE COURT:  Okay.  My plan today, absent everyone

13  raising a great hue and cry to the contrary, is to try to get a

14  full day in.  I think that will inure to our benefit next week.

15  I know you've got a bunch of witnesses today, so we'll move

16  through them as quickly as we possibly can.  And Ms. Brown

17  tells me -- I know you all are going to be moving a lot of

18  exhibits in today as well.  During the breaks, rather than

19  waiting for the end of the day, it may be wise just to take a

20  couple of minutes to make sure that we have what you all have

21  moved in, and anything the defendant moves in as well, so that

22  -- because I'm afraid if we start doing it at 5:30 in the

23  evening that there may be some questions.

24          All right.  So who is going to be our first witness

25  today?

Owens - Direct

1          MS. CHOY:  Travis Owens.

2          THE COURT:  Travis Owens?  Okay.  Let's go ahead and

3  bring the jury in.

4  (*Jury in, 9:01 a.m.*)

5          THE COURT:  Have a seat.  Good morning to you.  Hope

6  you all had a nice evening.  We adjusted the thermostat.  To

7  what extent that's going to bring greater comfort remains to be

8  seen.  And we understand that we've resolved the squeaky chair.

9  So we hope that that will help as well.

10          So we're ready to continue with the government's

11  presentation of evidence.  Thank you all very much for being

12  here, and I appreciate your attention.

13          Ms. Choy, call your next witness -- or Ms. Peng.

14          MS. PENG:  The United States calls Travis Owens.

15          THE COURT:  Mr. Owens, come on up, if you would,

16  please, sir.

17       TRAVIS OWENS, CALLED BY THE GOVERNMENT, SWORN

18          THE COURT:  Go ahead, Ms. Peng.

19          MS. PENG:  Thank you.

20                        DIRECT EXAMINATION

21   BY MS. PENG:

22  Q    Good morning, Mr. Owens.

23  A    Good morning.

24  Q    Where are you currently employed?

25  A    Culpeper Commonwealth Attorney's office.

Owens - Direct

1  Q    And what is your position at that office?

2  A    I'm the Deputy Commonwealth Attorney.

3  Q    How long have you been a Deputy Commonwealth Attorney?

4  A    Since 2020.

5  Q    Since 2020?

6  A    Yes.

7  Q    Can you briefly describe the structure of that office?

8  A    As of now, we have eight attorneys.  There is the elected

9  Commonwealth Attorney, who is Russell Rabb.  There is two

10 deputies, and five assistants.

11 Q    Who was the Commonwealth Attorney during the 2019 to 2020

12 time period?

13 A    That would have been Paul Walther.

14 Q    Prior to being a Deputy Commonwealth Attorney, were you in

15 a different position?

16 A    I was the assistant -- I guess the Senior Assistant

17 Commonwealth Attorney from 2016 to 2020 in Culpeper.

18 Q    And what were your responsibilities in that role?

19 A    I was responsible for creating the calendar, for mentoring

20 the younger or newer attorneys.  I handled the Circuit Court

21 docket, the General District Court docket, as well as the

22 juvenile docket, as well as I had the highest caseload of cases

23 throughout the office.

24 Q    What kinds of cases would those generally be?

25 A    I more or less specialized in violent crimes and narcotics

Owens - Direct

1  cases, drug distributions, but we'd handle anything from

2  traffic matters through murder cases.

3  Q    And so the Commonwealth Attorney's office handles --

4  prosecutes criminal matters?

5  A    Yes.

6  Q    To be clear, you're not the same office as the United

7  States Attorney's office in this case?

8  A    Correct.  We do it all on the state level.  You do it on

9  the federal level.

10  Q    And in the course of your job, have you had an opportunity

11  to interact with Scott Jenkins when he was sheriff?

12  A    Yes.

13  Q    Can you tell me about that?

14  A    From -- when I joined the office in January of 2016, Scott

15  Jenkins was the sheriff of Culpeper County, and throughout

16  the -- I guess the next eight years, we would interact on a

17  professional basis.

18  Q    What kind of interactions would those be?

19  A    I provided training to law enforcement on a local and

20  regional level, and he would come to those trainings.  I would

21  see him at search warrants when I was out with the narcotics

22  unit executing search warrants.  I would just generally see him

23  around town.  Culpeper is still a relatively small

24  jurisdiction.

25  Q    So it would be fair to say that you interacted with him

Owens - Direct

1    here and there on a professional basis?

2    A    Yes.

3    Q    Now, does the Commonwealth Attorney's office also handle

4    what are called firearms restoration petitions?

5    A    Yes.  Part of the Commonwealth Attorney's Duties under the

6    Code are to do quasi-civil, quasi-criminal matters, and one of

7    those matters is the firearm restitutions -- or firearm

8    restorations.

9    Q    How many of these restoration petitions have you come

10   across in your time at the Commonwealth Attorney's office?

11   A    We probably do two to four a month, give or take.

12   Q    And so in your time there, could you estimate how many

13   you've handled?

14   A    I would probably say somewhere in the neighborhood of --

15   I'd say about 100, give or take.  There's an ebb and flow.  I

16   had two this past Tuesday.  So it kind of comes and goes.

17   Q    Can you tell us what the process is, and specifically,

18   what the Commonwealth Attorney's office rule is in processing

19   these petitions?

20   A    So once a petition is filed with the Circuit Court, the

21   petition is served to our office.  A file is then made.  It's

22   reviewed by the attorney, and then it's put into a holding

23   pattern until the case is docketed.

24   Q    And prior to such a petition being filed, does the

25   petitioner have to have other rights restored?

Owens - Direct

1  A    They have to have their civil rights restored by the

2  governor.  And the governor is able to restore basically

3  everything but the firearms rights.

4  Q    And once they get their civil rights restored, then are

5  they permitted to petition for their firearms restoration?

6  A    They are permitted to petition at that point in time.

7  It's not an automatic granting, but they are able to petition

8  once they have their civil rights restored.

9  Q    And where are they allowed to petition?

10 A    They are able to petition either in the jurisdiction or

11 the county that they were convicted of the felony, or the

12 jurisdiction or county in which they reside.

13 Q    And so if someone files a petition in Culpeper County,

14 they either have to have the prior conviction be in Culpeper

15 County, or reside there?

16 A    Correct.  And that's one of the processes when we are

17 going through I guess the initial evaluation of the file once

18 it's created; we check to make sure that it meets the threshold

19 procedural requirements.

20 Q    What does it mean for someone to reside in Culpeper

21 County?

22 A    They have to live in Culpeper County or live in whatever

23 jurisdiction they're filing in.

24 Q    Does that mean physically live there?

25 A    Yes, they have to basically live their lives in that

Owens - Direct

1    jurisdiction for some point in time, either they sleep there or

2    live there, whatever -- they have connections where they

3    actually live in that jurisdiction.

4    Q    Let's say somebody signed a lease for a location in

5    Culpeper County --

6    A    Okay.

7    Q    -- but they never physically reside at that location.  Do

8    they have a residence in Culpeper County?

9    A    I would not --

10             MR. ANDONIAN:  Your Honor --

11             THE COURT:  Rephrase the question in light of how he

12   views residency for purposes of firearm restorations.

13    BY MS. PENG:

14   Q    Well, in terms of a firearms restoration petition, if

15   somebody had a lease in Culpeper County, but you discovered

16   that they don't physically live in Culpeper County, would you

17   consider them to have satisfied the residence requirement for

18   the purposes of the petition?

19             MR. ANDONIAN:  Objection, Your Honor.

20             THE COURT:  I'm going to allow him to answer that.

21             THE WITNESS:  I would not, based upon that situation.

22   BY MS. PENG:

23   Q    Now, once you have a petition come across your desk, can

24   you walk us through what it is that you review in your role?

25   A    So when the files are created by the secretary, there is

Owens - Direct

1    the material that was filed with the court, which is the

2    petition, a copy of the form of the governor's restoration of

3    civil rights.  The secretaries at that point would go through

4    and run or pull off the VCIN machine the criminal history of

5    the defendant.  And that's the extent of what the file

6    generally would have looked like in 2018, 2019.  It's changed

7    slightly now.

8    Q    And would the Commonwealth Attorney's office ever oppose

9    any firearms restoration petitions?

10   A    I have opposed numerous firearm restoration petitions.

11   Q    So what bases would lead you to file -- or to oppose a

12   petition?

13   A    If they don't meet one of the procedural requirements,

14   such as not having their civil rights restored, or not living

15   in Culpeper, or if it was a violent felony that they were

16   convicted of, if they're still on probation, or good behavior

17   from that felony.  And depending upon the nature of the felony,

18   I don't believe that certain felons should have their firearm

19   rights back.

20   Q    And once you've reviewed a petition, where does it go?  Is

21   there always a hearing?

22   A    Yes.  Once the petition has been reviewed, the file is put

23   in, we have these like bookshelf type things in the back of the

24   office, it would be given to the Circuit Court secretary to

25   file to wait for it to be docketed by the defendant or by the

Owens - Direct

1    defense attorney.

2    Q    Is there always a court hearing even if the Commonwealth

3    Attorney does not oppose the petition?

4    A    In my experience, there's always been a hearing on these

5    matters, yes.

6    Q    In open court before the Circuit Court?

7    A    Yeah, same in Culpeper as well as in another jurisdiction

8    when I worked there.

9    Q    All right.  I'm going to direct your attention to around

10   November of 2019.  Well, let me rephrase.  Do you recall

11   receiving a petition for restoration of firearms for an

12   individual named Rick Rahim?

13   A    Yes.

14   Q    How is it that you recall this particular petition?

15   A    When I first reviewed the file, there were some very

16   interesting or I guess concerning issues with what I saw in the

17   paperwork.  And as I dug more into the file that I had, there

18   were more concerning issues that arose.

19            MS. PENG:  Ms. Fastenau, could you pull up what's

20   already been admitted as government Exhibit 720.

21    BY MS. PENG:

22   Q    Mr. Owens, do you recall what Exhibit 720 is?

23   A    I'm looking at it on the screen now.  This appears to

24   be -- so with all civil files there is a cover sheet that's

25   filed with the petitions.  This is -- this appears to be the

Owens - Direct

1  cover sheet for the firearm petition that was filed by Mr.

2  Rahim.

3  Q    Can you flip to the next page, please.

4       So would this have been in the file that you would have

5  reviewed?

6  A    That would have been one of the documents, yes.

7  Q    Now, do you see there in paragraph 1 of this petition it

8  says the petitioner is a resident of Culpeper County?

9  A    Yes.

10  Q    Is this something that drew your attention?

11  A    When I was going through this material, I noticed that

12  that was in there, yes.

13  Q    I'll ask you a little bit more about that in a second, but

14  can you blow up paragraph 8.

15       So this says in July 2019, petitioner essentially received

16  a positive recommendation from the Culpeper sheriff's office.

17  Is this paragraph unusual in terms of these petitions?

18  A    In all the petitions I've seen, this is the only one that

19  I can recall that has this type of recommendation in it.

20  Usually the sheriff's office would not be involved in a

21  restoration of firearm rights.  I've never known them to be,

22  other than in this case.

23  Q    You can take that down.

24       So you were just saying that there was something unusual

25  about this particular application that drew your attention.

Owens - Direct

1  Can you tell me a little bit more about that?

2  A    So when I reviewed the criminal history -- the way the

3  criminal histories work, they're all based upon fingerprints.

4  And part of the criminal history is the individual's address.

5  And it's the address of when you were convicted of the most

6  recent crime.  So based upon the address on the criminal

7  history, it was somewhere in -- Fairfax, somewhere in northern

8  Virginia.  So that wasn't a Culpeper resident in regards to

9  that.  I also noticed that the -- the convictions were from

10  Arlington, which, once again, is not Culpeper County.  So at

11  that point, I ran the DMV record of the defendant, because I

12  had the information to run it.  And when I ran the DMV record,

13  it did show a Culpeper address, but the Culpeper address was an

14  address that I recognized.

15  Q    Where did you recognize the address to be?

16  A    I thought that was the address of -- there was a

17  fundraiser that occurred several years prior to that, I think

18  it was called the Deadwood Haunted Forest -- like it was a

19  fundraiser that was put on by the sheriff's office in the years

20  prior to that.

21  Q    And what kind of location was it, if you recall?

22  A    To the best of my knowledge, that was -- it was on the

23  back wooded area of a farm that was owned by the Jenkins

24  family, someone in the Jenkins family.

25  Q    Did you take any other steps to look into the residence of

Owens - Direct

1  this particular petitioner?

2  A    Once I thought I recognized the address, I Googled the

3  address, and saw that the Sperryville Pike address was, in

4  fact, the haunted trail address.  I also then went through and

5  looked at what the other address was on the DMV, which was -- I

6  think it was Great Falls or somewhere up in northern Virginia.

7  I also noticed that the -- I think the petition for firearm

8  rights had been filed in November of 2019, but the address

9  change on the DMV record was -- I think it was February of

10 2020.  So it was after the petition had been filed.

11 Q    I see.  So the address had been changed after the petition

12 was filed?

13 A    Yes, which once again kind of drew my attention because

14 the paragraph 1 that you had previously referenced was a

15 resident of Culpeper County, but it appeared at least by DMV

16 the official residency they would have been possibly that

17 February -- February something of 2020.

18 Q    Now, did you write a memorandum to the Commonwealth

19 Attorney at the time, Paul Walther --

20 A    Yes.

21 Q    -- documenting the steps you took to look into this

22 residency issue?

23 A    Yes.  I put it in the file.

24 Q    And what was the purpose of informing Mr. Walther about

25 what you looked into?

Owens - Direct

1  A    It wasn't necessarily so much informing Mr. Walther, just

2  putting something in the file.  And at that point, there had

3  not been a precipe or docketing motion, so I didn't know when

4  that file was going to be coming up for the hearing, and

5  whether it was going to be myself, Mr. Rabb, or Mr. Walther, or

6  someone else doing the hearing.  I wanted to make sure the

7  information I had discovered was inside the file.

8  Q    You wanted to document the steps you took to look into the

9  residence?

10  A    Yes, because if I had already done the work, I didn't want

11  one of my colleagues to have to go do the same thing.

12          MS. PENG:  Ms. Fastenau, could you pull up for

13  Mr. Owens Government Exhibit 740.

14  BY MS. PENG:

15  Q    Do you recognize what this document is?

16  A    That's the memo that I wrote.  The typed is what I wrote

17  on October -- I'm sorry -- on April 27th.

18  Q    And is this a fair and accurate representation of that

19  memo?

20  A    Yes.

21          MS. PENG:  Your Honor, I move 740 into evidence at

22  this point.

23          THE COURT:  Any objection?

24          MR. ANDONIAN:  Yes, Your Honor.  Objection, hearsay.

25          THE COURT:  Well, it's his own words.

Owens - Direct

1          MR. ANDONIAN:  It's still hearsay.

2          THE COURT:  Well, the declarant is here.  I'll allow

3     it.  The declarant is here to be able to talk about it and to

4     be able to cross-examine him on it, so it's not hearsay.

5          MS. PENG:  May it be published to the jury, please?

6          THE COURT:  Yes.

7          (Government Exhibit 740 marked and admitted.)

8      BY MS. PENG:

9     Q    So Mr. Owens, you talked to us about this a little bit

10    already, but can you just summarize what you documented in this

11    memo in terms of the steps you took?

12    A    Once I had reviewed the file that would have been created

13    by the secretaries, I went through and typed up the information

14    that I found, basically just identifying that the -- one

15    address was in Great Falls, the other one was the Sperryville

16    Pike address.  It sounded familiar to me, so I Googled it.

17    That was the address of the Deadwood Haunted Trail.  My thought

18    that one of the sheriff's brothers lived there, and that the

19    restoration was filed November -- I guess it's November 14th --

20    but the address change did not occur until February of 2020.

21    Q    And you also noted here it looks like that the address in

22    Great Falls is a 12,000 foot -- square-foot place valued at

23    4.38 million.  Why did you note that in your memo?

24    A    When I Googled both addresses, the Falls Church -- or the

25    Great Falls address -- there was a relatively large and

Owens - Direct

1   expensive house.  The farmhouse that's at Sperryville Pike --

2   I'd say it's probably an early 20th century farmhouse.  It's a

3   country house.  It's nothing -- if I had a house that was worth

4   4 and-a-half million dollars, I probably wouldn't move from

5   that to a smaller farmhouse.  It was just something else I

6   found interesting.

7   Q    Fair enough.  Now, I see that looks like there's a sticky

8   note on the lower right-hand corner.  Who wrote this note?

9   A    That was written by Patricia Jenkins.

10  Q    How do you know it was written -- who is Patricia Jenkins?

11  A    Patricia Jenkins from 2016 to -- I guess December 31st,

12  2023, was the executive secretary of our office.  She was also

13  the wife of Scott Jenkins.

14  Q    And how do you know that Patricia Jenkins wrote this note

15  to you?

16  A    I've seen her handwriting thousands upon thousands of

17  times in Circuit Court files.

18  Q    And do you have any understanding of why Patricia Jenkins

19  would have left this note on this memo?

20  A    I would say -- the memo is -- the memo as well as the

21  sticky note and file came back to me at a later point in time.

22  After I drafted the memo, I took the file and gave it to Tricia

23  -- or Patricia, Ms. Jenkins -- because she was the one who was

24  in charge of the Circuit Court files.  I presume she put it

25  away, as would have been normal course.  At some point in time,

Owens - Direct

1   I got this file back with a sticky note on it.

2   Q    And typically when you submit a memo and when you say it

3   came back to you, who does it go to before it comes back to

4   you?

5   A    In Circuit Court cases, it would go to the Circuit Court

6   secretary, which was Patricia, or Tricia.  So I would have put

7   it in her mailbox.

8   Q    So you don't know what might have prompted Patricia

9   Jenkins to leave you this note?

10  A    I have suspicions, but I do not know.

11  Q    But did you in fact call Scott Jenkins after you received

12  this note?

13  A    Yes, I called him upon receiving the note.

14  Q    And did you have a conversation with him?

15  A    I did.

16  Q    Can you tell us about that?

17  A    The only thing I remember from the conversation is what I

18  have in my handwritten note, which is below the typed part that

19  you're highlighting there, is that Scott says he leased the

20  property in fall of 2019.

21  Q    So that's your handwriting?

22  A    That's my handwriting, yes.

23  Q    And you would have made this note after you had a

24  conversation with Scott Jenkins?

25  A    That would have been after I typed the memo in the file.

Owens - Direct

1   That would have been after I spoke to Scott -- or Mr. Jenkins,

2   whenever he called -- or whenever I spoke to him.

3   Q    Did you have any reason to question what Scott Jenkins

4   told you about the property being leased?

5   A    Not necessarily.  I've been a prosecutor for 17 years, and

6   the vast majority of what I do on a daily basis deals with the

7   credibility of law enforcement.  And unlike what people see on

8   TV sometimes, law enforcement's investigation, they testify,

9   and the defendant or someone else says the opposite.  Then it

10  comes to an issue of weighing credibility.  Based upon a sworn

11  member of law enforcement telling me that they leased the

12  property in 2019, there was no reason for me to question what

13  he was telling me.  I took it for the truth at that point.

14  When law enforcement -- and part of the ethical I guess job

15  requirements of law enforcement is if you lie or if you are

16  dishonest, you're put on what's called a *Brady* list.  It's an

17  exculpatory list that from that point on any time you're

18  involved in a case, it needs to be disseminated that this law

19  enforcement officer lied, in any case going forward.  In most

20  jurisdictions, if an officer is put on the *Brady* list, they can

21  no longer work as law enforcement, and they're usually

22  terminated at that point.  So I had a law enforcement officer

23  tell me that he rented the property -- or leased the property.

24  I took him at his face value.

25  Q    You can take that down.

Owens - Direct

1    Did you have any discussions subsequently with anybody

2  else about this particular petition that you recall?

3  A    I imagine I probably spoke to Mr. Rabb, who was the one

4  whose docket it came up.

5  Q    Do you recall having any conversations with Paul Walther

6  about this petition?

7  A    I probably talked to him at some point in time, but I

8  don't remember the content of it.

9  Q    So you mentioned Mr. Rabb.  Was he the one who ultimately

10  showed up to the hearing regarding this petition?

11  A    I think it was in August of -- August of 2020 I believe

12  was the hearing date.

13  Q    And did you make any recommendations to Mr. Rabb regarding

14  what the Commonwealth position would be at this hearing?

15  A    I don't know if I necessarily made any recommendation.  I

16  would have told him that I made a note in the file, and to go

17  through and review the note, and probably that Scott called me

18  and said he leased the property.

19  Q    Did you tell Mr. Rabb he should do anything additional to

20  verify Mr. Rahim's residency at the hearing?

21  A    I know that there was still in essence the question as far

22  as whether he was a resident of that address.  I believe he was

23  questioned during the hearing in regards to whether he resided

24  there or not.

25  Q    Are the petitioners behind these petitions always present

Owens - Cross

1   at hearings?

2   A    If they are not present, the petition would be dismissed

3   in court, yes.

4   Q    And was the Rahim petition ultimately granted?

5   A    Yes, it was granted sometime in August of 2020, I believe.

6   Q    Now, besides the Rick Rahim petition, have you ever had

7   any other conversations with Scott Jenkins about any other

8   petitioner for firearms restoration?

9   A    No.

10  Q    And besides the Rick Rahim petition, have you ever had any

11  conversations with anyone at the sheriff's office about any

12  other petitioners?

13  A    Not for firearm restorations, no.

14  Q    Besides the Rick Rahim petition, during all the time

15  you've been at the Commonwealth Attorney's office, have you

16  been aware of the sheriff personally being involved in any

17  other petitions?

18  A    No.

19          MS. PENG:  That's all I have for now.

20          THE COURT:  All right.  Thank you.

21  Cross-examination?

22          MR. ANDONIAN:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24   BY MR. ANDONIAN:

25  Q    Good morning, Mr. Owens.

Owens - Cross

1  A     Good morning.

2  Q     Must be a little weird sitting on that side of the

3  courtroom.

4  A     I'm usually sitting over there, yes.

5  Q     Mr. Owens, let me ask you just starting from I guess the

6  end of all of this.  Mr. Rahim's petition was ultimately heard

7  in Circuit Court?

8  A     Yes.

9  Q     There was a representative of the Commonwealth's

10 Attorney's office at that hearing?

11 A     Mr. Rabb was there, yes.

12 Q     Mr. Rabb.  To the best of your knowledge, because the

13 petition was granted based on what you said, the petitioner

14 and/or his attorney was present?

15 A     Yes.

16 Q     And whatever questioning or whatever information the court

17 wanted, as far as you're aware, that was -- that was provided

18 at that hearing?

19 A     Yes.  He was put under oath and said he lived at that

20 address, is my understanding.

21 Q     Just taking one step back from the court proceeding, in

22 order for that court proceeding to have happened, the

23 Commonwealth's Attorney's office ultimately had to do whatever

24 it needed to do with the petition, right?

25 A     More or less once we get it, we research, make sure

Owens - Cross

1    it's -- whether it's a viable petition or not, and then wait

2    for it to be docketed by either the pro se defendant or by the

3    attorney.

4    Q    Okay.  And that process happened with Mr. Rahim's

5    petition?

6    A    Yes.

7    Q    You said earlier in your testimony that you have on

8    occasion -- or maybe more than on occasion -- opposed a

9    petition for restoration of rights?

10   A    Yes.

11   Q    You did not oppose Mr. Rahim's petition?

12   A    Well, I wasn't in court that day.  So we didn't file a

13   response to his pleadings.

14   Q    Well, okay.  That's fair enough.  You didn't tell Mr. Rabb

15   to oppose Mr. Rahim's petition?

16   A    No.  I simply addressed the concerns and what was outlined

17   in the memo and the conversation with Scott Jenkins.

18   Q    Okay.  You were asked -- Ms. Peng asked you a question

19   toward the end of your direct testimony about other firearms

20   restoration petitions, and your involvement with the sheriff's

21   office or with Mr. Jenkins.  Just to make sure it's clear, you

22   reached out to Scott Jenkins in this case to clarify the

23   address issue, right?

24   A    I did not reach out initially.  There was the sticky note

25   that was on the file, and I would have called him back based

Owens - Cross

1  upon the sticky note -- or the yellow note.

2  Q    But you're the one who placed the phone call upon getting

3  the file back with the yellow note on it?

4  A    Yes, based upon the request to call him back -- or to call

5  him.

6  Q    Okay.  You talked about looking up Mr. Rahim's DMV

7  records, and you indicated that according to what you pulled up

8  from the DMV, Mr. Rahim had not changed his residence to

9  Culpeper until sometime in February of 2020?

10 A    I think it was February 13th, is what I had on the memo.

11 Q    Okay.  You don't know -- you don't work -- let me just

12 start with some general.

13      You don't work at the DMV?

14 A    No.

15 Q    You're not involved in any way in processing paperwork

16 that goes through the DMV?

17 A    No.

18 Q    You don't know when the DMV made an entry of a particular

19 record in their system?

20 A    I just know what was on the printed DMV record when it was

21 pulled.

22 Q    When you looked it up?

23 A    Yes.

24 Q    Okay.  Mr. Rahim's petition was filed sometime toward the

25 end of 2019, right?

Owens - Cross

1   A    That's the date of the date stamp, yes.

2   Q    Yeah.  You didn't actually get the file and review it

3   until sometime in the spring of 2020, the following year?

4   A    I imagine I would have reviewed it around when I did the

5   memo, which was -- I think it was April 20-something.

6   Q    Okay.  And so that's a five-month-ish gap between the

7   filing and when you actually --

8   A    Yes.

9   Q    -- looked at it?

10          MR. ANDONIAN:  If I could just have one brief

11  indulgence.

12          THE COURT:  Yes, sir.

13   BY MR. ANDONIAN:

14  Q    One other question.

15       It's fair to say that you knew Scott Jenkins, you were

16  familiar with Scott Jenkins?

17  A    Yes.

18  Q    And that was -- you testified on direct you knew him from

19  around -- around town through your professional connections,

20  right?

21  A    Yes.

22  Q    There was an occasion, though, where you invited

23  Mr. Jenkins to a holiday party that you were hosting, right?

24  A    Yeah, I invited -- I think it was either 2016 or 2017, and

25  there was an office party, and his wife worked at the office,

Weakley - Direct

1    so he came with Patricia.

2                 MR. ANDONIAN:  Okay.  I think that's all I have.

3    Thank you.

4                 THE COURT:  All right.  Thank you.  Any redirect?

5                 MS. PENG:  No, thank you, Your Honor.

6                 THE COURT:  And may this witness be excused?

7                 MS. PENG:  Yes.  Thank you.

8                 THE COURT:  Mr. Owens, thank you very much for being

9    here today.  Please do not discuss your testimony.  You're free

10   to go.  Have a nice day.

11                All right.  Ms. Smith?

12                MS. SMITH:  The government calls Jennifer Weakley.

13                THE COURT:  Jennifer Weakley.

14                Ms. Weakley, come on up if you would, please, ma'am.

15   Ms. Brown is going to get you sworn in.

16        JENNIFER WEAKLEY, CALLED BY THE GOVERNMENT, SWORN

17                THE COURT:  We'll get you to step right on over here

18   to the witness box.  And Ms. Weakley, if you can slide up to

19   the microphone and speak right into it, that's going to help us

20   immensely.  Thank you very much.

21                All right.  Ms. Smith, go right ahead.

22                MS. SMITH:  Thank you, Your Honor.

23                          DIRECT EXAMINATION

24    BY MS. SMITH:

25   Q    Good morning.

Weakley - Direct

1    A    Good morning.

2    Q    Can you please state your name and spell your last name

3    for the court reporter?

4    A    It's Jennifer Weakley, W-E-A-K-L-E-Y.

5    Q    And Ms. Weakley, where are you employed?

6    A    Culpeper County Circuit Court.

7    Q    And how long have you been employed with the Culpeper

8    County Circuit Court Clerk's office?

9    A    For about 25 years.

10   Q    What does the clerk's office do?

11   A    We do several different things.  We do things from

12   marriage licenses, divorce records, criminal, civil -- there's

13   like over 800 duties at the clerk's office.

14   Q    And is one of the things you do help with things such as

15   the restoration of firearms rights and the processing of those

16   petitions?

17   A    Correct.  That would be some of our counter work.

18   Q    You said counter work.  What does that mean?

19   A    That's when the public comes in and we assist the public

20   over the counter.

21   Q    And what is your position at the clerk's office?

22   A    I'm currently Chief Deputy Clerk.

23   Q    And what does it mean to be Chief Deputy Clerk?

24   A    Just kind of supervise and assist the younger ones, answer

25   any questions.  If they're waiting the counter and they can't

Weakley - Direct

1  answer a question, a lot of times they'll come to me, and I'll

2  just assist them.

3  Q    And back in 2019, what was your position at the clerk's

4  office?

5  A    Deputy clerk.

6  Q    And what's the difference between being a deputy clerk and

7  being a chief deputy clerk, if there is one?

8  A    Maybe just a little more responsibility.  I fill in more

9  if the clerk is not there, as chief deputy.

10  Q    Is the clerk above you in the hierarchy in the clerk's

11  office?

12  A    Yes.

13  Q    And who is the clerk?

14  A    Carson Beard.

15  Q    You mentioned that the clerk's office is part of the

16  process for restoring one's firearms rights.  Can you just talk

17  briefly about the clerk's office involvement in that process?

18  A    So when someone wants their firearm rights back, they come

19  to the office.  They have to prepare the petition.  We don't

20  have fill-in-the-blank forms for that.  So they'll come in with

21  that, and we'll just take the petition as presented, collect

22  the filing fee for it, and then we're to send a copy to the

23  Commonwealth.

24  Q    And does that packet eventually make its way back to the

25  clerk's office?

Weakley - Direct

1  A    Yes.   The Commonwealth would determine if they need a

2  hearing or not on that.

3  Q    And if there's a hearing, what happens?

4  A    It would go before the judge.

5  Q    And after that hearing, do you get the order if there is

6  one that's given?

7  A    Yes.   The civil clerks -- we kind of divide up our duties

8  in the office.   So one of the ladies who does more of the civil

9  processing will do that.

10 Q    And if someone's rights are restored at that hearing and

11 you get a court order, what does the clerk's office do once you

12 receive that order?

13 A    So once we receive the order back that's been entered by

14 the judge, then we will send it out to the individual who

15 petitioned, and we have a manual that we go by.   So I believe

16 it goes to the state police and Commonwealth and so forth.

17 Q    Is that the Virginia State Police?

18 A    Yes.

19 Q    And why does it go to the Virginia State Police?

20 A    They have a firearms transaction center that they keep

21 track of whose rights have been restored, so that when someone

22 goes to buy a gun, they can process that.

23 Q    And back in 2019 and 2020, how did you send that

24 information to the Virginia State Police, or VSP?

25 A    I'm not 100 percent sure, because I wasn't processing the

Weakley - Direct

1  orders at that time.  I'm not sure if we interfaced with them

2  electronically or if it was mailed.  It would have been one or

3  the other.  It would have either went electronically or been

4  mailed to them.

5  Q    And is that something that you would keep track of in your

6  records, whether or not it was mailed or sent electronically?

7  A    It would be documented on the order when the copy was

8  provided.

9  Q    Now, are you familiar with the restoration of firearms

10  rights for someone named Rick Rahim?

11  A    Yes, ma'am.

12  Q    Now, how are you familiar with Rick Rahim's petition?

13  A    I took that petition.

14  Q    When you were serving at the clerk's office?

15  A    Yes.

16  Q    Prior to receiving Mr. Rahim's firearms rights paperwork,

17  had you ever met him before?

18  A    No, I had not.

19  Q    Did you know him at all?

20  A    No, I did not.

21  Q    If we could pull up what's already been admitted at

22  Government's Exhibit 720.

23       Do you recognize this document?

24  A    Yes.

25  Q    And Ms. Weakley, is this Rick Rahim's petition to restore

Weakley - Direct

1  his firearms rights?

2  A    That's the cover sheet for it.

3  Q    It's a multi-page document; is that right?

4  A    Yes.

5  Q    And did you personally receive this petition?

6  A    I did.

7  Q    And how do we know that?

8  A    Because I signed off on it as accepting it.

9  Q    If we could zoom in on that stamp on the right.

10       Okay.  I know it's kind of to the side, but what does that

11  say?

12  A    It's dated, because we were required to put the date and

13  the time, and then my signature on it.

14  Q    So it says November 14th, 2019, and then beneath it,

15  that's your signature?

16  A    Yes.

17  Q    Does this petition stick out in your memory?

18  A    It does.

19  Q    And why does the filing of this petition stick out in your

20  memory?

21  A    Because Sheriff Jenkins walked in with Mr. Rahim that day,

22  and we don't generally see him in our office.  And then there

23  were some issues because when they came in, I had asked if they

24  were going to serve it, if they wanted it served, or if we were

25  just going to send a copy over, and they said they would just

Weakley - Direct

1  take the copy over.  But then we ended up getting a return of

2  service back with the sheriff's stamp on it.  So then I had to

3  collect the $12 fee for it.

4  Q    Let's kind of break that down a little bit.  You said that

5  Sheriff Scott Jenkins accompanied Rick Rahim?

6  A    Yes.

7  Q    How frequently did you see Scott Jenkins in the clerk's

8  office?

9  A    Maybe a handful of times, not very often.

10  Q    And is that in your 25 years of service you'd only seen

11  him a handful of times?

12  A    Yes.

13  Q    And what was his demeanor like when he came with Mr. Rahim

14  to file the petition?

15  A    He was fine, normal to me, friendly.

16  Q    But just his presence alone was out of the ordinary?

17  A    Yes.

18  Q    When someone files a petition for the restoration of

19  firearms rights, does the clerk's office give them a receipt?

20  A    Yes.

21  Q    I'm going to show you what's been marked as Government's

22  Exhibit 738.

23       And do you recognize this document?

24  A    Yes.

25  Q    Is it kept in the ordinary course of business with the

Weakley - Direct

1   clerk's office?

2   A    It is.  It's kept in the file.

3   Q    And is this something that you prepared back on November

4   14th of 2019?

5   A    Yes.  When I collected the money, I would have wrote the

6   receipt.

7           MS. SMITH:  Your Honor, the government moves to admit

8   Government's Exhibit 738.

9           THE COURT:  Any objection?

10          MR. CALEB:  No objection.

11          THE COURT:  So admitted, and may be published to the

12  jury.

13          MS. SMITH:  Thank you, Your Honor.

14          (Government Exhibit 738 marked and admitted.)

15   BY MS. SMITH:

16  Q    So how do we know that this receipt is what was connected

17  with the filing of Rick Rahim's petition?

18  A    Every receipt we write is given a case number, and it's

19  electronically generated out of our register.

20  Q    So for the date, it says November 14th of 2019; is that

21  correct?

22  A    Yes.

23  Q    And then it says, cashier, JLW.  Who does that stand for?

24  A    That would be my initials.  Every individual who writes a

25  receipt in our office, their initials are used.

Weakley - Direct

1  Q    And then case comments, it says, Rahim, Rick Tariq

2  v. Restore Firearms Rights.  Is that referencing that he was

3  moving to restore his firearms rights?

4  A    That's correct.  We style the case with the plaintiff

5  being the individual and then the defendant we do reference

6  restore firearm rights.

7  Q    So would this receipt be given to the petitioner, in this

8  case, Rick Rahim?

9  A    Yes.

10 Q    Does the clerk's office also keep an internal copy of a

11 receipt?

12 A    Yes, in our system now and back then, it crosses

13 electronically over to our case file.

14 Q    And why do you keep an internal receipt?

15 A    For audit purposes.

16 Q    If we could pull up Government's Exhibit 739.

17       Do you recognize this document?

18 A    I do.

19 Q    And what is it?

20 A    It's a copy of the receipt with my notes on it.

21 Q    And is this internal receipt kept in the ordinary course

22 of business at the clerk's office?

23 A    It is in our file.

24       MS. SMITH:  Your Honor, I'd move to admit

25 Government's Exhibit 739.

Weakley - Direct

```
 1              THE COURT:  Any objection?

 2              MR. CALEB:  Hearsay.  Just the hearsay, Your Honor.

 3              THE COURT:  Well, she's available to be

 4  cross-examined on what she -- what she did and what she saw.

 5  So I will allow it, and it may be published to the jury.

 6              MS. SMITH:  Thank you, Your Honor.

 7              (Government Exhibit 739 marked and admitted.)

 8   BY MS. SMITH:

 9  Q    So is this receipt the exact same thing that we just

10  looked at, except for one difference?

11  A    Yes, it is, except I added notes to it.

12  Q    Okay.  If we could zoom in on the notes.

13       How do you know those are your notes?

14  A    Because I typed them in.  I initialed it.

15  Q    That's your initials down in the corner?

16  A    Yes.

17  Q    And do you recall typing these notes on this business

18  record?

19  A    I do, because of the issue with the service.

20  Q    And what did you write in your receipt?

21  A    Do you want me to read what I wrote?

22  Q    Yes, please.

23  A    Okay.  It was 11-14-19.  Mr. Rahim came into the office

24  with Sheriff Scott Jenkins to file this under the direction of

25  Paul Walther, Commonwealth Attorney, who told them they must
```

Weakley - Direct

1  first come to our office and get a number, then bring it to his

2  office.  Mr. Rahim did not want service since they were going

3  directly to the Commonwealth's office after our office.  The

4  case number was assigned, and they took the copy for the

5  Commonwealth, along with the order for the Commonwealth's

6  endorsement.

7  Q    And why did you decide to take notes on this filing of the

8  petition?

9  A    Because we got the service back.  And just to make a

10 note -- because normally we send the service, and they were

11 taking the service over there.

12 Q    And it says that Mr. Rahim came in with Sheriff Scott

13 Jenkins.  Was there a specific reason you were documenting

14 that?

15 A    I think because the Commonwealth had sent them over to our

16 office, because normally the person just starts with our

17 office, but evidently they had been to the Commonwealth first.

18 Q    So typically it gets filed with the clerk's office?

19 A    Right.

20 Q    But in this instance, they had gone to the Commonwealth

21 Attorney's office first?

22 A    Correct.

23 Q    Okay.  But they were sent to you guys?

24 A    Right.  It was kind of out of order.

25 Q    Did you also note that Scott Jenkins was present because

Weakley - Direct

1  it was out of the ordinary?

2  A    I may have.  I guess because they went to the Commonwealth

3  first.

4  Q    At some time, was the petition granted?

5  A    Yes.

6  Q    And does the clerk's office receive the order from the

7  court?

8  A    Yes.

9  Q    If we could pull up what's already been admitted as

10 Government's Exhibit 722, please.

11      Is this the order granting Rick Rahim's firearms rights?

12 A    Yes.

13 Q    Once the clerk's office received this order, what happened

14 next?  Is it processed through the clerk's office?

15 A    It would have been processed, yes.

16 Q    And if we could turn to page 2, please.

17      And down below, what is that stamp?

18 A    The -- that's the certification of a true record from our

19 office.

20 Q    And who is Sylvia Renninger?

21 A    She is one of the other deputy clerks within our office.

22 Q    And is that showing that she received this document and

23 processed it?

24 A    It shows she certified it, yes.

25 Q    And then if we could also pull up the copy mailed.

Weakley - Direct

1   A    Yes.

2   Q    What does this reflect?

3   A    That reflects when it went to the Virginia State Police.

4   Q    And is it shown that it was mailed on August 17th of 2020?

5   A    That's correct.

6   Q    At some time, did Rick Rahim apply for a concealed carry

7   handgun permit in the Culpeper clerk's office?

8   A    He did.

9   Q    Were you involved with the processing of that petition?

10  A    Not in the process of the application.

11  Q    Do you have any knowledge about the application?

12  A    Yes.

13  Q    How do you have knowledge of that?

14  A    Office chatter.  There was some concern that he may not

15  have been a --

16           MR. CALEB:  Objection.

17           THE COURT:  Sustained.  It's hearsay.

18   BY MS. SMITH:

19  Q    I'm going to rephrase my question.  Did there come a time

20  where you started getting inquiries about that application?

21  A    Yes.

22  Q    Can you tell us about those inquiries you received?

23  A    Once the application was filed within our office, there

24  were deputies that were coming over to inquire if the

25  application was ready.

Weakley - Direct

1          MR. CALEB:  Objection.  Hearsay.

2          THE COURT:  Well, to the extent that it goes to

3   explain her next actions, I will allow it.

4   BY MS. SMITH:

5   Q    And so you said deputies.  Which deputies were coming over

6   and inquiring about the status of that?

7   A    Deputy Feaganes and Deputy Fox.

8   Q    And how often were they coming to inquire about the

9   status?

10  A    Pretty much every day.

11  Q    Had you ever had anyone from the sheriff's office check on

12  the status of concealed carry --

13  A    No.

14  Q    -- permits?

15  A    No.

16  Q    It had never happened in your 25 years of working in the

17  clerk's office?

18  A    No.

19          MS. SMITH:  Your Honor, if I could just have a brief

20  moment.

21  (Pause)

22   BY MS. SMITH:

23  Q    Just one additional question.  So we just went through

24  that order.  If we could just pull up Government's Exhibit 722.

25          I think you testified -- page 2, please -- you testified

Weakley - Cross

1   earlier that typically the order would be sent either via mail

2   or electronically to Virginia State Police.  Does this notation

3   on the file refresh your recollection that it was mailed?

4   A    Yes.

5   Q    And again, it was mailed on August 17th of 2020?

6   A    Correct.

7              MS. SMITH:  Thank you.  No further questions, Your

8   Honor.

9              THE COURT:  All right.  Any cross?

10             MR. CALEB:  Yes.

11             THE COURT:  Yes, Mr. Caleb, go right ahead, please.

12                        CROSS-EXAMINATION

13    BY MR. CALEB:

14   Q    Good morning, Ms. Weakley.

15   A    Good morning.

16   Q    Just a couple of questions for you.  So you said you

17   were -- you've been employed at the Culpeper County Circuit

18   Court for 25 years, right?

19   A    Yes, sir.

20   Q    Okay.  And just to be clear, Mr. Jenkins has not been --

21   was not the sheriff of Culpeper County for 25 years?

22   A    No, he was not.

23   Q    So in fact, you're aware that he was sheriff from 2013 to

24   2019?

25   A    Correct.

Weakley - Cross

1  Q    And so, when -- so we're dealing with a period of about --

2  I'm sorry -- as of 2019, Mr. Jenkins would have been sheriff

3  from 2013 to 2019, so a period of about six years?

4  A    Yes, sir.

5  Q    Okay.  So in the six years that you worked at the Culpeper

6  County Circuit Court and Mr. Jenkins was sheriff, your

7  testimony is that --

8        THE COURT:  He was sheriff until 2023, I believe,

9  wasn't he?

10        MR. CALEB:  I'm sorry?

11        THE COURT:  Wasn't he sheriff until 2023?

12        MR. CALEB:  Yes.

13        THE COURT:  Okay.

14   BY MR. CALEB:

15  Q    So my question is -- I'm not dealing with 2023.  I'm

16  talking about as of 2019.  So from 2013 to 2019, Mr. Jenkins

17  would have been sheriff for about six years?

18  A    Right.

19  Q    Okay.  And so, during that six-year period, your testimony

20  is that you saw Mr. Jenkins about a handful of times, correct?

21  A    Correct.

22  Q    And that was -- when you saw him, he was obviously in the

23  Circuit Court, but he was there and he was accompanying

24  someone, correct?

25  A    Or in passing.

Weakley - Cross

1  Q    Okay.  But you don't know what his business was

2  necessarily when you saw him?

3  A    No; except of course the day he came in with Mr. Rahim, he

4  was bringing Mr. Rahim in.

5  Q    And that's the only time that he actually interacted with

6  you, correct?

7  A    Correct.

8  Q    And during that period -- and now we're talking about that

9  discrete six-year period -- you were working -- I think you

10 called it window -- at the window?

11 A    At the front counter.

12 Q    At the front counter.

13 A    We all worked the front counter, yes.

14 Q    Okay.  And so that assignment kind of rotated, right?

15 A    It's just whoever got up to wait on the next customer

16 coming in.

17 Q    And that day that Mr. Jenkins was with Mr. Rahim was a day

18 that you happened to get up --

19 A    Correct.

20 Q    -- and go to the counter, correct?

21 A    Right.

22 Q    And so if you didn't get up and go to the counter, you

23 wouldn't necessarily know whether Mr. Jenkins was at the

24 counter, correct?

25 A    We all see the counter.  My desk was facing the counter.

Weakley - Cross

1  I could see everybody who came in whenever they came in.

2  Q    Okay.  And so -- and you obviously didn't work every

3  single day during that six-year period, correct?

4  A    Correct.

5  Q    Okay.  Took some days off?

6  A    Yes.

7  Q    Vacation?

8  A    Yes.

9  Q    Called in sick?

10 A    Very seldom.

11 Q    Okay.  But you did?

12 A    Yes.

13 Q    So you wouldn't know whether or not Mr. Jenkins came to

14 the window more than a handful of times during that six-year

15 period, right?

16 A    Yes.

17 Q    Okay.  And still on that same line, with Mr. Jenkins on

18 that particular day that he was there with Mr. Rahim, I think

19 you testified already you don't know Mr. Rahim, right?

20 A    I do not.

21 Q    And you don't -- but you do know Mr. Jenkins, right?

22 A    I do.

23 Q    Okay.  And you knew Mr. Jenkins -- you went to high school

24 together?

25 A    We did.

Weakley - Cross

1  Q    Okay.  And you don't know whether or not Mr. Jenkins and

2  Mr. Rahim were friends?

3  A    No.

4  Q    You don't know the nature of their relationship at all?

5  A    I do not, no.

6  Q    Okay.  And you described that day that his demeanor was

7  regular?

8  A    Yes.

9  Q    And finally, you said I think on the occasion that he came

10 with Mr. Rahim, and also you said that it was -- okay.

11     You said that on the occasion he came with -- that Sheriff

12 Jenkins came with Mr. Rahim, it was -- that's something you

13 took note of, correct?

14 A    Correct.

15 Q    And you also said that it was not regular to have

16 Mr. Jenkins accompany anyone at -- when they were trying to get

17 their firearms restored -- rights restored?

18 A    Correct.

19 Q    Okay.  But notwithstanding the irregularity of those two

20 circumstances, you weren't prompted to take any action?

21 A    No.

22 Q    You didn't call anyone and make a report?

23 A    No.

24 Q    You didn't put a note in your file that it was odd?

25 A    I did make a note.

Weakley - Cross

1   Q    That it was odd?

2   A    I didn't say it was odd.  I just made a note.

3   Q    Saying that it happened, right?

4   A    Right.

5   Q    You took note of it?

6   A    Right.

7   Q    Okay.  But took no other action?

8   A    No.

9   Q    Because you didn't think any other action was necessary?

10  A    No.

11           MR. CALEB:  All right.  Court's indulgence.

12           That's all I have.

13           THE COURT:  Thank you, Mr. Caleb.

14           Any redirect?

15           MS. SMITH:  No, Your Honor.

16           THE COURT:  All right.  Thank you very much.

17           Ma'am, thank you very much for being here, and you

18  are free to go.  And I appreciate your time today.  Please do

19  not discuss your testimony.

20           THE WITNESS:  All right.

21           THE COURT:  Thank you.

22           All right.  Call your next witness.

23           MS. SMITH:  Your Honor, the government calls Sylvia

24  Renninger.

25           THE COURT:  Sylvia Renninger.

Renninger - Direct

1       Come on up if you would, please, Ms. Renninger.

2         SYLVIA RENNINGER, CALLED BY THE GOVERNMENT, SWORN

3         THE COURT:  Step right on over here to the witness

4    box.  And Ms. Renninger, if you can just speak into the

5    microphone, it will help us all.

6         And with that, Ms. Smith, go right ahead.

7         MS. SMITH:  Thank you, Your Honor.

8                    DIRECT EXAMINATION

9    BY MS. SMITH:

10   Q    Good morning.

11   A    Good morning.

12   Q    Could you please state your name and spell your last name

13   for the court reporter?

14   A    Sylvia Renninger, R-E-N-N-I-N-G-E-R.

15   Q    Ms. Renninger, where are you employed?

16   A    The Culpeper Circuit Court Clerk's office.

17   Q    And how long have you been employed at the Culpeper County

18   clerk's office?

19   A    About 12 and-a-half, 13 years.

20   Q    And what is your position?

21   A    Deputy Clerk.

22   Q    And what are your duties and responsibilities as deputy

23   clerk?

24   A    I assist the public.  I write receipts for the clerk's

25   office.  I do concealed handgun permits, and court orders.

Renninger - Direct

1  Q    And what was your position back in 2020?

2  A    I took the concealed handgun permits and processed those.

3  It's basically the same.

4  Q    Could we talk through the process generally of how one

5  applies for a concealed handgun permit?

6  A    So normally the person comes in, they give us the

7  application, we write their receipts.  We then -- I'm not sure

8  how to describe it.  So we get it -- after we've written their

9  receipt, they get put on the process book for the sheriff's

10 office to pick up to do a background check.  It then goes to

11 the Commonwealth Attorney's office.  Then they sign off on it,

12 if there's anything attached to it saying that they should or

13 shouldn't have one.  It comes back to our office.  We then send

14 it to the judge.  The judge either grants it or denies it.

15 Then it comes back for final processing and us to mail out the

16 permit, if they've been granted.

17 Q    So once it comes -- after it goes through that entire

18 process and it comes back to your office, if it's granted, you

19 said you then send it out in the mail?

20 A    Yes, we then print it, and it goes out in the mail.

21 Q    And how long does this process typically take?

22 A    Now it's a little bit different than it used to be.  Now

23 I'm averaging about 25, 30 days.

24 Q    And back in 2020, about how long was it taking?

25 A    It was taking pretty close to the 45 days the statute

Renninger - Direct

1  allowed, because there was so many of them.

2  Q    Can an individual apply for a concealed handgun permit in

3  any county in the Commonwealth of Virginia?

4  A    No, it must be where you reside.

5  Q    Were you involved in Rick Rahim's concealed handgun permit

6  processing?

7  A    I was.

8  Q    How were you involved?

9  A    I was the one that had to process the application and mail

10  out the permit once it was granted.

11  Q    Do you know Rick Rahim?

12  A    Personally, no.

13  Q    Had you ever met him prior to him coming to the clerk's

14  office to process this?

15  A    I don't believe so.

16  Q    I'm going to show you what's been marked as Government's

17  Exhibit 732.  It's already been admitted into evidence.

18      Do you recognize this document?

19  A    That's the first page of the application.

20  Q    And this was for Rick Rahim's concealed handgun permit?

21  A    Yes, it was.

22  Q    If we could go to page 2, please, and zoom in on that

23  stamp.

24      What is this stamp indicating?

25  A    That is the -- what we call the validation.  That is where

Renninger - Direct

1  it gets stamped once we have written the receipt for it showing

2  that they've paid, their case number, and when it was done.

3  Q    And who took this application?

4  A    Me.

5  Q    And is that your signature down below?

6  A    It is.

7  Q    After Rick Rahim filed this packet with the clerk's

8  office, it was then sent off to complete that process you just

9  described; is that right?

10  A    Yes.

11  Q    And if we could pull up Government's Exhibit 734.

12       Do you recognize this document, Ms. Renninger?

13  A    That's the for page of the application, which was also the

14  court order.

15  Q    So this was a court order for Rick Rahim's application?

16  A    It was.

17  Q    And is this order kept in the ordinary course of business

18  in the clerk's office?

19  A    It is.

20       MS. SMITH:  Your Honor, we'd move into evidence

21  Government's Exhibit 734.

22            THE COURT:  Any objection?

23            MR. ANDONIAN:  No objection.

24            THE COURT:  So admitted, and may be published to the

25  jury.

Renninger - Direct

1          MS. SMITH:  Thank you.

2          (Government Exhibit 734 marked and admitted.)

3          MS. SMITH:  So if we could zoom in on the middle,

4    please, Ms. Fastenau.

5    BY MS. SMITH:

6    Q    And it says application of Rick Rahim; is that right?

7    A    Yes.

8    Q    And above that it says Circuit Court.  Is that Culpeper

9    County?

10   A    Yes.

11   Q    And then it says it was filed on August 17th of 2020; is

12   that right?

13   A    Yes.

14   Q    And then for the permit issued, was it granted or denied?

15   A    It was granted.

16   Q    If we could zoom back out, please.

17        And how do we know it was granted?

18   A    The judge checked the granted box, and then he endorsed it

19   and put the date on it.

20   Q    So that was September 2nd of 2020?

21   A    Yes.

22   Q    And then once you received this order from the Court, what

23   do you do?

24   A    Then I continue processing it, and I create a concealed

25   handgun permit, and then it gets mailed out.

Renninger - Direct

1   Q    And who does it get mailed out to?

2   A    The individual that applied, the applicant.

3   Q    And how do you know where to send that permit?

4   A    There is an address on the application.

5   Q    So wherever they put their address as is where you send it

6   to?

7   A    Correct.

8   Q    Does this concealed handgun permit application stick out

9   in your mind?

10  A    It does.

11  Q    And why does it do that?  Why does it stick out in your

12  mind?

13  A    It was checked upon numerous times throughout the course

14  of him applying.

15  Q    When you say checked upon, what do you mean?

16  A    There were officers that came and checked the status of it

17  numerous times.

18  Q    And what office were those officers from?

19  A    The sheriff's office for Culpeper.

20  Q    Was it unusual for deputies from the sheriff's office to

21  come and inquire about the status of a concealed handgun

22  permit?

23  A    It was.

24  Q    In your experience, had that ever happened before?

25  A    Just one or two times.

Renninger - Direct

1  Q    And can you tell me about those other times?

2  A    One I want to say that it was a -- the last name was

3  Tharpe or Thorpe, and the other time was Nick Freitas.

4  Q    But otherwise, this had never happened before?

5  A    Correct.

6  Q    And how many concealed handgun permits do you process

7  every month?

8  A    Every month, probably 100 or so.

9  Q    And again, only a handful of times?

10 A    Yes.

11 Q    Did you -- were you also asked about the status of the

12 application outside of work as well?

13 A    Yes.

14 Q    Can you tell the jury about that?

15 A    That was at my current day care provider at that time, the

16 husband was an employee of the sheriff's office, and he had

17 asked what the status was when I was picking up my daughter.

18 Q    How did this constant inquiry make you feel?

19 A    A little nervous and uncomfortable.

20 Q    Why did it make you feel uncomfortable?

21 A    Because concealed handgun permits are also confidential.

22 They're not supposed to be discussed unless it's in the act of

23 law enforcement.

24 Q    Now, during August to September of 2020, the time of Rick

25 Rahim's application, were you processing a lot of concealed

Renninger - Direct

1   handgun permits?

2   A    I was.

3   Q    And how was the clerk's office handling the backlog at

4   that time?

5   A    We were just doing as many as we could at once, and we had

6   to go in the order that we received them, because I didn't -- I

7   couldn't have the dates surpassing the dates that I was

8   processing, if that makes sense.

9   Q    Can you explain that a little more for me?

10  A    So if the judge signs 20 applications on the 2nd, I

11  couldn't send applications he had signed on the 5th or 6th out

12  before I did the 2nd, because I was going to get too far

13  behind.

14  Q    So you were processing based on whatever was coming to you

15  first?

16  A    Correct.

17  Q    And you mentioned it's by statute how long you have to

18  process this paperwork; is that right?

19  A    Correct.

20  Q    And statute, that's a state law?

21  A    Correct.

22  Q    With this continued questioning by deputies of the

23  sheriff's office, what impression did you get regarding what

24  you were being asked to do?

25  A    I felt like they were trying to ask me to move his up in

Renninger - Cross

1   the -- I had to have it processed faster.

2   Q    And did you do that?

3   A    No.

4   Q    Why not?

5   A    Because I'm not allowed to.  I also spoke with the clerk

6   at the time and asked what she recommended, and she had said

7   that we were following the statute, and we were going with the

8   normal procedure.  We were not changing it.

9   Q    And who was the clerk at the time?

10  A    Janice Corbin.

11  Q    And has that changed since 2020?

12  A    It has.

13  Q    And who is the clerk of court now?

14  A    Carson Beard.

15         MS. SMITH:  No further questions, Your Honor.

16         THE COURT:  All right.  Any cross?

17         Yes, sir, Mr. Andonian?

18         MR. ANDONIAN:  Thank you, Your Honor.

19                       CROSS-EXAMINATION

20   BY MR. ANDONIAN:

21  Q    Good morning, Ms. Renninger.

22  A    Good morning.

23  Q    Just a few questions for you.

24       The one or two times that you testified about when the

25  sheriff accompanied individuals to the clerk's office or was

58

Renninger - Cross

1   involved in some way in the concealed carry permit process, you

2   mentioned somebody with the last name of Tharpe?

3   A    Yeah, it was either Tharpe or Thorpe.  I don't remember

4   their first name.

5   Q    Okay.  And Nick Freitas?

6   A    Correct.

7   Q    And the sheriff -- that was not Mr. Jenkins that

8   accompanied either one of those individuals, right?

9   A    Not that I recall, no.

10  Q    Just piggy-backing on Ms. Smith's final questions, when it

11  came to Rick Rahim's application for a concealed carry permit,

12  as far as you're aware, it went through all of the channels

13  that it needed to go through before it got to you to actually

14  create the permit and mail it out, correct?

15  A    It did, yes.

16  Q    And that includes up to and including the judge getting

17  the petition, right?

18  A    Correct.

19  Q    And then the judge actually signing off on it, right?

20  A    Correct.

21  Q    And the judge can sign off -- as far as you're aware, the

22  judge can sign off or the judge can deny it?

23  A    Correct.

24  Q    And in this case, the judge granted it?

25  A    Correct.

Renninger - Cross

1  Q    And then after the judge granted it, it came back to you,

2  right?

3  A    Correct.

4  Q    And then you, as you testified, you prepared the actual

5  concealed carry permit itself?

6  A    Yes.

7  Q    And then you mailed that out to Mr. Rahim, right?

8  A    Correct.

9  Q    And that was at the address Mr. Rahim had put down in the

10 petition?

11 A    Yes.

12 Q    You did not do -- that is the process that you follow for

13 any concealed carry permit application, right?

14 A    Right.

15 Q    You didn't do anything different with Mr. Rahim's?

16 A    Correct.

17 Q    And that's even though there were inquiries from deputies

18 about the status of his application?

19 A    Correct.

20          MR. ANDONIAN:  Brief indulgence, Your Honor.

21          THE COURT:  Yes, sir.

22          MR. ANDONIAN:  Nothing further, Your Honor.

23          THE COURT:  All right.  Thank you.

24          Any redirect?

25          MS. SMITH:  No, Your Honor.

Durrer - Direct


1            THE COURT:  All right.  Thank you.  May she be

2    excused?

3            MS. SMITH:  Yes, Your Honor.

4            THE COURT:  All right.  Thank you very much.

5    Ms. Renninger, you're free to go.  Please do not discuss your

6    testimony at all.  And I appreciate you being here today.

7            Call your next witness, please.

8            MS. SMITH:  Dale Durrer, Your Honor.

9            THE COURT:  Dale Durrer.

10           Mr. Durrer, come on up if you would, please, sir.

11           DALE DURRER, CALLED BY THE GOVERNMENT, SWORN

12           THE COURT:  Come right on over here, Judge Durrer,

13    and have a seat.

14                    DIRECT EXAMINATION

15     BY MS. SMITH:

16    Q    Good morning.

17    A    Good morning.

18    Q    Can you please introduce yourself to the jury?

19    A    I can.  My name is Dale Durrer.  I am a Circuit Court

20    Judge in the 16th Judicial Circuit in the Commonwealth of

21    Virginia.  I serve on the adjunct faculty at three different

22    law schools, American University, George Washington University,

23    at Catholic University.  And I'm the co-author of the seventh

24    edition of an evidence case book, the federal rules of evidence

25    and common law evidence.

Durrer - Direct

1   Q     Thank you for that background.  Can we talk a little bit

2   about your time as a judge.  How long have you been a Circuit

3   Court judge?

4   A     I've been a Circuit Court judge since July 1st, 2018.  And

5   prior to that, I was a District Court judge from July 1st, 2013

6   to June 30th, 2018.

7   Q     And are you assigned to Culpeper County Circuit Court?

8   A     Correct.  The 16th Judicial Circuit goes from the City of

9   Charlottesville to Culpeper County, as far east as Goochland.

10  There are six of us.  And we elect a Circuit Court judge, or a

11  Chief Judge, who doles out the assignments.  For the first two

12  years of my Circuit Court judgeship, I had Orange and Madison

13  County, and in July of 2020, I was reassigned to Culpeper

14  County.

15  Q     As part of your duties as Circuit Court judge, do you

16  review and rule on restoration of firearms petitions?

17  A     Yes, ma'am, I do.

18  Q     And in what county does someone file their restoration of

19  firearms petition?

20  A     Yes, ma'am.  Under Virginia law, specifically 18.2-308.2,

21  the statute requires that you file the privilege for

22  restoration in the county that you reside in, or the town that

23  you reside in.

24  Q     And as part of your duties as Circuit Court judge, do you

25  approve or deny these petitions for restoration of firearms?

Durrer - Direct

1  A    I do.  Under Virginia law, the governor restores the other

2  civil rights that are removed by a felony conviction.  The

3  legislature has left it in the hands of the Circuit Court judge

4  to determine whether someone should have their firearms rights

5  restored.  And that's something that falls within the purview

6  of the Circuit Court judge.

7  Q    If someone was not a resident of Culpeper County or their

8  prior convictions were not based in Culpeper, would you grant

9  that petition?

10  A    I couldn't under Virginia law, because the requirement

11  under 18.2-308.2 is that the petitioner reside in the county

12  where the petition is filed.

13  Q    Were you involved in the restoration of firearms rights

14  for Rick Rahim?

15  A    I recall that case, yes, ma'am.

16  Q    And why do you recall that case?

17  A    I recall that case because on or about August 13th, 2020

18  at approximately 2:20 p.m, I received a telephone call from

19  Scott Jenkins, the then-sheriff of Culpeper County.  And I

20  recognized the number; it was the same number that every

21  sheriff of Culpeper County has had since I began practicing

22  law.  And he indicated to me that Mr. Rahim was represented by

23  Rex Edwards, and the Commonwealth had agreed to enter an order

24  restoring Mr. Rahim's right to possess a firearm.  The

25  difficulty is we were in the throes of the pandemic.  It's

Durrer - Direct

1  August of 2020.  We'd suspended jury trials, and were sort of

2  fitting things in as we can.  And the next hearing date for

3  that was going to be somewhere on or around September 22nd,

4  2020.  And then Sheriff Jenkins asked me if I could perhaps

5  move it up sooner, because it was an agreed order.  And my

6  policy is -- for restoration of firearms applications -- there

7  always has to be a hearing in open court where the public can

8  inspect the process.  And I indicated to the sheriff if there's

9  an agreed order and if the Commonwealth is prepared to go

10  forward, then we can put it on the criminal docket the next

11  morning.

12  Q    Let's break that down a bit.  Now, you mentioned that you

13  received a phone call on August 13th of 2020 from Scott

14  Jenkins.  How well did you know Scott Jenkins?

15  A    I had known Scott Jenkins since the summer of 1990.  His

16  older brother, Johnny Jenkins, and I, worked on the Virginia

17  Department of Transportation survey crew in Culpeper County

18  during the summer of 1990.  And that's where I first met him.

19  Q    And what type of relationship did you have with Scott

20  Jenkins?

21  A    I had a good relationship with him.  His wife served as --

22  or worked with me as my paralegal when I was in the Culpeper

23  County Commonwealth's Attorney's office.  I had known Scott,

24  Johnny, and Mike, as well as their parents, for a number of

25  years.

Durrer - Direct

1  Q    Was it mostly a professional relationship?

2  A    I would say it was a professional relationship, but I

3  mean, I also considered them friends.  I spent every working

4  day with Scott's wife, Patricia.  She was someone who assisted

5  me in the duties I had as a state prosecutor.  So I got to know

6  them fairly well.

7  Q    And did you also know Rex Edwards?

8  A    I do.  I know Rex Edwards very well.  I've known Rex

9  Edwards since 1995, when I served as a legislative aide for

10 Delegate Butch Davies, who is one of Mr. Edwards's -- or was

11 one of Mr. Edwards's law partners.  After I graduated from law

12 school in 2000, I was an associate attorney at Davies Barrell

13 Will Lewellyn & Edwards in Culpeper, and Rex was a partner

14 there, and supervised me during the 2.5 years that I was an

15 associate attorney there.

16 Q    Now, given this history you have with Scott Jenkins, was

17 it odd to you that he was calling you about the restoration of

18 firearms rights for someone?

19 A    I was somewhat vexed for several reasons.  One,

20 Mr. Edwards has been practicing law since 1989.  He is a

21 well-respected, well-thought-of attorney, as is Paul Walther,

22 the Commonwealth's Attorney of Culpeper County at the time.  So

23 that struck me as a bit odd.  The second thing that sort of

24 struck me as a bit odd is it viscerally perhaps appeared to be

25 the unauthorized practice of law under 59.1-3404 of the

Durrer - Direct

1   Virginia Code.  So those two things sort of -- sort of struck

2   me as odd.

3   Q    If we could pull up Government's Exhibit 728, please.

4       Now, in order to have something placed on the docket, what

5   typically needs to be filed?

6   A    Generally what happens, if it's something that is 30

7   minutes or less, we devote two days each month to hearing

8   criminal and civil motions.  And they're almost always the

9   second and fourth Tuesdays of each month.  So if it's 30

10  minutes or less, then no one has to go through chambers to get

11  a hearing date.  You file the precipe, as is in front of me

12  with Trial Exhibit 728.  And Mr. Edwards probably estimated

13  five minutes over for the hearing that usually would take about

14  ten minutes.

15  Q    And you said that this is a precipe?

16  A    Correct.

17  Q    What is it in relation to?

18  A    This is a precipe that Mr. Edwards filed on or about

19  August 13th, 2020 to place the matter of the restoration of

20  Mr. Rick Tariq Rahim's firearms rights on the next motions day

21  docket that we had, which would have been September 20th, 2020

22  at 11 a.m -- I apologize -- 9 a.m. to 11 a.m. are criminal

23  matters.  This is a civil matter.  So at 11 a.m. I deal with

24  restoration of firearms rights, expungements, restoration of

25  the privilege to operate a motor vehicle.  And then at 1:30

Durrer - Direct

1  p.m. we deal with an entirely civil docket.

2  Q    And is this precipe, it's a court filing; is that correct?

3  A    Yes, ma'am, that's correct.  I recognize the signature of

4  the deputy clerk who filed it.  At the time, Janice Corbin was

5  the Circuit Court Clerk, but it is filed on or about August

6  13th, 2020 in the afternoon.

7  Q    And it's kept in the court's file --

8  A    Yes, ma'am.

9  Q    -- for the case?

10  A    Correct.

11        MS. SMITH:  Your Honor, we would move to admit as

12  Government's Exhibit 728, please.

13        THE COURT:  Any objection?

14        MR. ANDONIAN:  No objection.

15        THE COURT:  So admitted, and may be published to the

16  jury.

17        MS. SMITH:  Thank you, Your Honor.

18        (Government Exhibit 728 marked and admitted.)

19  BY MS. SMITH:

20  Q    And I think you've covered a lot of what is in this

21  document, sir, but you said that this was filed on August 13th

22  of 2020; is that right?

23  A    Correct.  It appears to be filed on August 13th, 2020, at

24  3:39 p.m. Eastern Standard Time.

25  Q    And just now that the jury is able to see this document,

Durrer - Direct

1  if we could pull up the text.

2      What is Mr. Edwards asking to happen?

3  A    What Mr. Edwards is asking to happen is typical of what

4  any attorney who is requesting some sort of relief is.  It's a

5  precipe, it's placed on the docket.  There is notice given to

6  the opposing side.  In this case, under Virginia law it would

7  be the Commonwealth's Attorney's office.  And that lets

8  everyone know that the case is set for a hearing on or about

9  that date or time.

10 Q    And so in this case, it would be on September 22nd of

11 2020; is that correct?

12 A    Yes, ma'am, that's correct.

13 Q    Later during the day of August 13th of 2020, did you

14 receive a phone call from the defendant, Scott Jenkins?

15 A    I did.  And I recall that phone call occurring at about

16 2:15, 2:20 p.m.

17 Q    And why do you recall the time -- or how are you able to

18 recall the time?

19 A    It's just -- I had finished a fairly busy criminal docket

20 that morning that dealt with plea agreements, that dealt with

21 probation revocation proceedings, and I believe I had a civil

22 docket at 1:30 that I had just luckily finished a lot sooner

23 than I thought I was going to finish.  And so I was probably

24 signing a bunch of orders that had piled up.  So I just -- I

25 just remember the phone call.

Durrer - Direct

1  Q    And what did Scott Jenkins ask you to do?

2  A    Scott Jenkins indicated during that phone call that there

3  was an agreed order to restore Mr. Rahim's firearms rights,

4  that they were having trouble getting a prompt hearing.  They

5  didn't have a hearing until -- I want to say September 22nd,

6  2020.  And I remember asking him, well, is it an agreed order?

7  Has everybody agreed to it?  Because I sign consent orders all

8  the time.  The only exception is for a restoration of the

9  privilege to carry a firearm, I generally do those in open

10 court in case the Commonwealth has any questions, in case they

11 raise an objection, just to make sure that the public can see

12 and inspect that process of restoring that Constitutional

13 right.

14 Q    And after this phone call with Scott Jenkins, was there a

15 follow-up text message?

16 A    Yes, there was.  And my recollection is the text message

17 occurred somewhere around 2:40 p.m., and the sheriff --

18 then-sheriff -- indicated that it was Rick Rahim and everybody

19 was ready to go forward.  And I recall responding somewhere

20 along the lines of:  Make sure that the Commonwealth is

21 prepared to go forward, and I'm happy to add it to the docket,

22 given that I didn't think it would take very long, it appeared

23 to be an agreed order, it appeared to be a consent order.  And

24 we were really treading water during the pandemic, and we were

25 trying to deal with as many things as we could, because we

Durrer - Direct

1  weren't doing jury trials at that time.

2  Q    If we could pull up Government's Exhibit 123, please.

3      Do you recognize this document?

4  A    Yes, ma'am, I do.

5  Q    And what is Government's Exhibit 123?

6  A    This is a text message string from 540-718-5813, which has

7  always been the cellular telephone number of the Culpeper

8  County Sheriff, whoever that was.

9  Q    And who is this text message exchange between?

10 A    This is a text message exchange between Scott Howard

11 Jenkins and myself.

12 Q    And did you provide this text message to the FBI?

13 A    I did.

14         MS. SMITH:  Your Honor, the government would move

15 into evidence Government's Exhibit 123.

16         THE COURT:  Any objection?

17         MR. ANDONIAN:  No objection.

18         THE COURT:  All right.  So admitted, and may be

19 published to the jury.

20         MS. SMITH:  Thank you.

21         (Government Exhibit 123 marked and admitted.)

22         MS. SMITH:  If we could zoom in on that first part --

23 thank you, Ms. Fastenau.

24 BY MS. SMITH:

25 Q    And what is the date of this message?

Durrer - Direct

1  A    Yes, ma'am.  It's August 13th, 2020 at about 2:47 p.m.

2  Q    And the first message that's in lighter gray, who is

3  speaking there?

4  A    That is Scott Jenkins.

5  Q    And it says, yes, sir, Rex is available tomorrow at 9:30.

6  The client name is Rick Rahim.

7       Who is Rex that's being referred to?

8  A    Rex Lumier [phonetic] Edwards, Jr., the senior partner at

9  Davies Barrell Will Lewellyn & Edwards.  Their office is

10 located directly across from the courthouse in Culpeper County.

11 Q    And is this in reference to the conversation that you had

12 previously had on the phone with him?

13 A    Yes, ma'am.  The conversation came first, as I recall, and

14 then the text message came second.

15 Q    And then what did -- who said something in response?  Who

16 is in the darker gray?

17 A    The darker gray is my response to it, which says, if the

18 Commonwealth is ready to go forward tomorrow, that's fine.

19 Just double-check to make sure that they are prepared to go

20 forward.

21      And I wanted to do that because the judicial canons allow

22 for *ex parte* conversations about scheduling matters as long as

23 every side is informed of it, that they know about it, and no

24 one is caught off guard.

25 Q    You used the term *ex parte*.  What does *ex parte* mean?

Durrer - Direct

1  A    *Ex parte* is a Latin phrase for in essence contacting the

2  judge without giving the adversarial side a notice or an

3  opportunity to be heard.

4  Q    And that's typically forbidden; is that right?

5  A    It is typically forbidden.  There are some exceptions to

6  it.  Many times I will have an attorney come to me and say, I'm

7  here with the permission of opposing counsel, and we want to

8  run this by you, and I have my -- his permission or her

9  permission to do that, and it generally relates to things like

10 scheduling, or if it's a trial, making sure that we have the

11 appropriate televisions and electronic apparatus to move

12 forward.

13 Q    Thank you.  Turning back to that hearing, did the hearing

14 occur on August 14th, 2020 as requested by Scott Jenkins?

15 A    Correct.  It was -- it was somewhat unusual, because

16 this -- Mr. Rahim's petition is a civil petition, and the 9:00

17 docket on August 14th was primarily a criminal docket.  But

18 because of the two concerns I had previously, I wanted to make

19 sure that whenever this hearing occurred, it occurred when we

20 had a court reporter there to transcribe it.

21 Q    You mentioned you had two concerns.  What concerns did

22 you --

23 A    Well, the first concern was the unauthorized practice of

24 law.  And the second concern was -- and I didn't really raise

25 this with the sheriff at the time -- why is he so interested in

Durrer - Direct

1  this person's petition to have their firearms rights restored.

2  Q    So it struck you as odd?

3  A    It struck me as odd.

4  Q    Had he ever called you about someone's petition for

5  firearms rights restoration?

6  A    No.

7  Q    Did he ever after this time?

8  A    No.

9  Q    Now, at the hearing, was Rick Rahim present?

10 A    Correct.

11 Q    And he was placed under oath?

12 A    Correct.  I apologize for interrupting you.  I always let

13 the Commonwealth call the docket, because they have a better

14 sense of what's going to take less time or more time.  And

15 Deputy Commonwealth's Attorney Russell Rabb presided over that

16 docket, and I recall he called the Rahim case first.

17 Q    And was there an issue of residency at that short hearing?

18 A    There was.  Mr. Rabb indicated that -- and this is when I

19 sort of first became aware this really wasn't an agreed

20 order -- he had indicated that generally he didn't object to

21 the petition, save the residence requirement.  And I recall --

22 I said, well, one way to solve that is just to place Mr. Rahim

23 under oath subject to penalty of perjury, and have him tell us

24 where he's been residing.

25 Q    And did that happen?

Durrer - Direct

1  A    It did.  And if I recall correctly, Mr. Rahim indicated

2  that he had been residing in the County of Culpeper without

3  interruption since September of 2019.

4  Q    And did you end up granting his petition for restoration

5  of firearms rights?

6  A    I did.  The Commonwealth took no position on the petition,

7  which is typical.  And I have a -- sort of a philosophical

8  checklist that I go through.  And if I recall, Mr. Rahim's

9  prior felony convictions were in the 1990s.  They were not

10 crimes of violence.  They were not crimes involving the

11 possession with the intent to sell, give, or distribute

12 Schedule I or II substances.  They didn't involve violence.

13 He'd completed the period of supervised probation, good

14 behavior, had no evidence that there was restitution owing to a

15 victim.  And then-Governor McAuliffe I recall had restored his

16 other civil rights sometime around 2015 or 2016.

17 Q    Had you had known he was not a resident of Culpeper

18 County, would you have granted the petition?

19 A    No.

20 Q    I want to move on to one additional topic.  Are you

21 involved in the appointment or the swearing -- excuse me -- of

22 the granting of auxiliary deputy sheriffs?

23 A    I'm involved in the extent that the deputy sheriffs as

24 well as the then auxiliary sheriffs have to be sworn in either

25 by the Circuit Court judge or by the Circuit Court clerk.  So

Durrer - Direct

1  there is always some sort of turnover, no matter who's the

2  sheriff.  And there are new deputies coming in, some deputies

3  retiring, leaving for whatever reason.  But all of those forms

4  come across my desk for judicial signature.

5  Q    And so you sign those appointment orders --

6  A    I do.  And --

7  Q    Sorry.  Just let me make sure I can finish my question for

8  the court reporter.

9      Are you involved and you signed the appointment that Scott

10 Jenkins, at the time, the sheriff, would send to your office?

11 A    Correct.

12 Q    And do you do any vetting of those individuals that he is

13 appointing as auxiliary deputy sheriffs or deputy sheriffs?

14 A    I do not.  I consider them fairly routine in the sense

15 that the separation of powers gives a great amount of

16 discretion to the executive branch and the sheriff in terms of

17 who he or she would appoint as a deputy sheriff.  So at that

18 time, I did not do any vetting.  I later requested pretty

19 strongly that the sheriff provide some sort of personal

20 affirmation that he had fully investigated and had vetted

21 people before he wanted to appoint them as a deputy sheriff.

22 Q    When did you start requiring that?

23 A    I want to say that was spring of 2023, if my memory serves

24 me correctly.

25 Q    And why did you start doing that?

Durrer - Cross

1    A    Just because everything that had happened.  And I was

2    concerned about people that were being appointed as deputy

3    sheriffs and as auxiliary deputies, many of whom didn't live in

4    Virginia.  They lived in places as far-flung as Arizona, New

5    Mexico, and Texas, and that struck me as odd.

6              MS. SMITH:  No further questions, Your Honor.

7              THE COURT:  Thank you very much.  Mr. Andonian?

8              MR. ANDONIAN:  Thank you.

9                        CROSS-EXAMINATION

10    BY MR. ANDONIAN:

11    Q    Good morning, Judge.

12    A    Good morning.

13    Q    I've got to ask, do you have the taking care of business

14    cufflinks on today?

15    A    I do not, although I listened to Elvis this morning on my

16    way up here.

17    Q    All right.  Just a handful of questions for you.

18    A    Sure.

19    Q    You've known Scott Jenkins for a long time?

20    A    Yes, sir.  Since 1990.

21    Q    And you talked a little bit about your knowledge and your

22    kind of friendship with the family, but specifically, you

23    considered -- and I'm going now back to the 2020 time frame --

24    you considered Scott Jenkins a friend?

25    A    At that time, yes, sir.

Durrer - Cross

1   Q    And you obviously had each other's cell phone numbers?

2   A    Correct.

3   Q    When Scott Jenkins called you on August 13th of 2020 to

4   inquire about Mr. Rahim's petition hearing, you took the call?

5   A    I did.

6   Q    And you had a conversation with Mr. Jenkins?

7   A    I did.

8   Q    You didn't hang up the phone?

9   A    I did not.

10  Q    Okay.  And when Mr. Jenkins texted you later that

11  afternoon, you responded to his text?

12  A    I did.

13  Q    And we saw the text on the screen, and you, in fact, said,

14  make sure the Commonwealth's Attorney is ready, something to

15  that effect?

16  A    Make sure the Commonwealth is prepared to go forward, yes,

17  sir.

18  Q    You didn't say, stop texting me, right?

19  A    No.

20  Q    Given that you've known Mr. Jenkins for as long as you

21  have, you're familiar with some of his political views, right?

22  A    I am.

23  Q    And you know that he is a strong proponent of the Second

24  Amendment?

25  A    He is.

Durrer - Cross

1  Q    And you know that in his time as sheriff, he has actually

2  not opposed the restoration of firearm rights for nonviolent

3  felons, right?

4            MS. SMITH:  Objection, Your Honor, as to relevance.

5            THE COURT:  I'll let him explore on it.

6            Well, actually, aren't we going beyond the scope of

7  direct?  If you want to take him on as your witness, you can.

8            MR. ANDONIAN:  I don't think this is beyond the scope

9  of direct, Your Honor.  This is -- I don't know if you want us

10 to approach, or --

11           THE COURT:  You all come on up.

12           (Sidebar commenced.)

13           MS. SMITH:  Your Honor, I have two objections.  My

14 first objection is relevancy, but it also is beyond the scope

15 of direct.  I asked no questions about 2A, no questions about

16 his political leanings, or anything about that.  So I don't

17 think this is proper cross-examination.

18           MS. CHOY:  I think I would add an objection to

19 hearsay to the extent he asked --

20           (Reporter clarification.)

21           MS. SMITH:  Additionally, Ms. Choy said that we are

22 objecting to hearsay.  He cannot get statements by the

23 defendant in.  It's not an admission by a party opponent.

24           MR. ANDONIAN:  So I'm not -- just taking these in

25 reverse order, I'm not eliciting specific statements for the

Durrer - Cross

1  truth of the matter asserted.  I'm just asking if he's familiar

2  generally with Mr. Jenkins's political views.  He's already

3  answered yes.

4          With respect to relevance, the government has now

5  with the third or fourth witness made a big deal about how

6  unusual it was for Mr. Jenkins to have any involvement in the

7  petition for restoration of firearms rights, and I'm just

8  simply with one or two questions exploring whether or not

9  Mr. Jenkins as a general matter was favorable or didn't oppose

10  the restoration of rights for nonviolent felons.  It's just

11  going to show that his involvement in this particular

12  process -- it's relevant to show that it wasn't as unusual as

13  the government has now repeatedly tried to make it appear to

14  be.

15          MS. SMITH:  Your Honor, all the witnesses testified

16  that it was odd and it was irregular.  And that's because he

17  was doing a favor for Rick Rahim.  And he is trying to

18  back-door in statements by the defendant, which is not

19  admissible.  And so I would ask that he not be able to go down

20  this line of questioning.

21          THE COURT:  So I'll let you explore whether

22  Mr. Jenkins's involvement in the restoration process, whether

23  it be with Mr. Rahim or any other people, was relevant, or

24  whether he has an overarching political view or view of the

25  Second Amendment is not relevant.  But I'll let you explore any

Durrer - Cross

1   other times that he's been involved in the process or actions

2   that he's taken in the process.  I think that is fair game and

3   that door is open.  But whether he has views outside of being

4   involved in the process aren't relevant.  I'll let you explore

5   that.

6           MS. SMITH:  So that was granted, Your Honor?

7           THE COURT:  The motion to the objection to the

8   question was sustained.

9           MS. SMITH:  Thank you.

10          (Sidebar concluded.)

11          THE COURT:  All right.  Go right ahead, Mr. Andonian.

12          MR. ANDONIAN:  Thank you, Your Honor.

13   BY MR. ANDONIAN:

14   Q    If I could just have one moment to get back to my...

15        Judge Durrer, just getting back to the hearing on

16   Mr. Rahim's petition to restore his firearms rights, you talked

17   a little bit about the normal -- kind of in the normal course

18   of things there are certain days of the month that are set

19   aside for motions such as a petition for restoration of

20   firearms rights, right?

21   A    Yes, sir.

22   Q    In this case, Mr. Rahim's petition was heard on an off

23   day, not one of those regular motions days, right?

24   A    Not a dedicated motions day on a second or fourth Tuesday,

25   that's correct.

Durrer - Cross

1  Q    That's what it was.

2  A    Yes, sir.

3  Q    But you scheduled or allowed the hearing to be scheduled

4  on the day that it actually happened, on August 14th, correct?

5  A    I did.

6  Q    And I think you said on direct you were -- at that point,

7  because the pandemic was relatively kind of new and still

8  unfolding, you were fitting things in where you could using

9  your judgment, right?

10  A    We were in the throes of the eighth or ninth installment

11  of the Virginia judicial emergency declared by the Chief

12  Justice of the Virginia Supreme Court.  So we didn't do jury

13  trials.  We were -- didn't begin them until sometime in 2021.

14  So it was very much of kind of a triage kind of operation,

15  making sure that we could meet the needs of the public while we

16  dealt with the pandemic.

17  Q    Okay.  At that hearing, the Commonwealth's Attorney was

18  present?

19  A    The deputy Commonwealth's Attorney.

20  Q    Deputy --

21  A    Yes, sir.  Russell Rabb.

22  Q    Right.  And Mr. Rahim was there?

23  A    He was.

24  Q    And you talked about how Mr. Rahim was placed under oath?

25  A    He was.

Durrer - Cross

1    Q    And Mr. Rahim answered questions regarding his residency?

2    A    He did.

3    Q    And at the end of that hearing, the Commonwealth -- the

4    deputy Commonwealth Attorney did not object to the granting of

5    the petition?

6    A    Generally, the Commonwealth's Attorney will not take a

7    position.  They will either object to the granting of the

8    restoration or they will generally just say we leave it to the

9    court's discretion.

10   Q    Okay.  And in that case, that's essentially what the

11   deputy Commonwealth's Attorney did?

12   A    He did.

13   Q    Okay.  And you ultimately granted the petition?

14   A    Ultimately, yes, sir.

15   Q    Okay.  You also talked about on direct your involvement I

16   guess on the paperwork side of auxiliary deputy sheriffs for

17   Culpeper County; do you recall that?

18   A    I do.

19   Q    And your involvement is that the paperwork associated with

20   onboarding auxiliary deputies comes across your desk for

21   signature?

22   A    It does.

23   Q    Okay.  And you testified on direct that there were things

24   about the auxiliary deputy paperwork that you found unusual; is

25   that correct?

Durrer - Redirect

1   A    Later on, yes, sir.

2   Q    And some of it I think you testified was that there were

3   individuals that didn't reside in Culpeper?

4   A    Correct.

5   Q    And some of what you found odd was the volume of

6   applications or the volume of paperwork related to auxiliary

7   deputies, right?

8   A    Correct.  It was inconsistent with what I had seen in the

9   other counties that I'd presided in, Orange, Madison, and

10  Greene County.

11  Q    So in comparison to those other counties, there were a lot

12  more auxiliary deputy paperwork that was coming across your

13  desk in Culpeper, right?

14  A    Yes.

15          MR. ANDONIAN:  Court's brief indulgence.

16          THE COURT:  Yes.

17          MR. ANDONIAN:  Nothing further.

18          THE COURT:  Any redirect?

19          MS. SMITH:  Briefly, Your Honor.

20                    REDIRECT EXAMINATION

21   BY MS. SMITH:

22  Q    Hello again.

23  A    Yes, ma'am, good morning.

24  Q    You were asked on cross about your conversations, text

25  messages, calls with Scott Jenkins.

Durrer - Redirect

1        In the course of your professional duties, is it typical

2   for the Circuit Court judge and the sheriff of Culpeper County

3   to have phone calls?

4   A    It's very common.  And I speak with the current sheriff

5   fairly regularly, the chief of police fairly regularly, because

6   Virginia law has changed such that if there has to be the

7   execution of a nighttime search warrant, you have to make a

8   good faith effort to find a Circuit Court judge before you can

9   do that.  So I get a fair amount of phone calls and visits,

10  even at my home, from law enforcement officers either wanting a

11  search warrant or needing the nighttime authorization for a

12  search warrant.

13  Q    So it's fair to say there's a decent amount of

14  communication between yourself and the sheriff or the sheriff's

15  office?

16  A    Absolutely.

17  Q    And absent the request by Scott Jenkins to move up Rick

18  Rahim's hearing to August 14th of 2020, would you have moved

19  that hearing date up?

20  A    I would not have.

21              MS. SMITH:  No further questions, Your Honor.

22              THE COURT:  All right.  Thank you very much.

23              May Judge Durrer be excused?

24              MS. SMITH:  He may be excused, Your Honor.

25              THE COURT:  Thank you very much.

Durrer - Redirect

1              THE WITNESS:  Thank you all very much.

2              THE COURT:  Please do not discuss your testimony,

3    Judge Durrer.

4              All right.  Ms. Smith -- probably not, hope springs

5    eternal -- do you have a ten-minute witness, or is now the

6    right time for a break?

7              MS. SMITH:  We do have a ten-minute witness, Your

8    Honor.

9              Oh, she's not here yet.  Never mind.  Sorry.  I

10   thought she was.

11             THE COURT:  You do not have a ten-minute witness?

12             MS. SMITH:  I'm sorry, Your Honor.  No.  My

13   apologies, Your Honor.

14             THE COURT:  Ladies and gentlemen, why don't we take

15   this time for our mid-morning break.  It is 10:35 and we will

16   break until 10:50.

17             I will remind you, please do not discuss the case or

18   begin to formulate any opinions until after the case is over.

19             With that, I'll excuse the jury.

20   (*Jury out, 10:38 a.m.*)

21             THE COURT:  Anything we need to address from the

22   government's standpoint before we break?

23             MS. SMITH:  No, Your Honor.

24             THE COURT:  From the defendant's standpoint?

25             MR. ANDONIAN:  No, Your Honor.

Myers - Direct

 1          THE COURT:  All right.  We'll stand in recess until

 2   10:50.  Thank you all very much.

 3   (Recess)

 4          THE COURT:  We are back on the record in the matter

 5   of *United States v. Jenkins*.  The government is present by its

 6   counsel.  The defendant is present along with the benefit of

 7   counsel as well.

 8          Anything from the government's perspective we need to

 9   bring up before we call the jury in?

10          MS. CHOY:  No, Your Honor.

11          THE COURT:  From the defendant's perspective?

12          MR. ANDONIAN:  No, Your Honor.

13          THE COURT:  All right.  Let's bring the jury in if we

14   can, please.

15   **(***Jury in, 10:55 a.m.***)**

16          THE COURT:  Ladies and gentlemen, please have a seat.

17   Thank you all very much for being here.

18          Let's call our next witness, please.

19          MS. PENG:  The United States calls David Myers.

20          THE COURT:  David Myers.

21          Come on up, Mr. Myers, and we'll get you sworn right

22   here.

23          DAVID MYERS, CALLED BY THE GOVERNMENT, SWORN

24          THE COURT:  Go ahead and have a seat right on over

25   here, Mr. Myers.

Myers - Direct

1           Mr. Myers, if at any point in time you need a break,

2    you just let us know.  Make sure you talk into the microphone.

3           THE WITNESS:  Thank you, Your Honor.

4           THE COURT:  Thank you very much.

5           All right.  Ms. Peng, go right ahead, please.

6                      DIRECT EXAMINATION

7    BY MS. PENG:

8    Q    Good morning, Mr. Myers.

9    A    Good morning.

10   Q    Could you please state your full name and spell your last

11   name for the jury?

12   A    David Byron Myers, last name is M-Y-E-R-S.

13   Q    Were you at some point employed as a deputy at the

14   Culpeper sheriff's office?

15   A    Yes, I was.

16   Q    Could you tell us when that was?

17   A    From January 2012 until I was retired from a line of duty

18   injury in -- that occurred in 2021.  In April of 2021, I

19   retired from -- in December of 2022.

20   Q    I'm sorry, did you say you were medically retired from the

21   office in 2022?

22   A    Yes.

23   Q    And is that why you have the pillow assisting you today?

24   A    Yes, I have chronic regional pain syndrome and I have

25   other issues and things going on with me, yes.  It was a line

Myers - Direct

1  of duty injury, so I was retired from -- through the office

2  through line of duty retirement.

3  Q    Thanks for being here today.

4       Just briefly, can you tell me what kind of roles you had

5  in the Culpeper sheriff's office?

6  A    I was a patrol deputy, I was a community relations

7  officer --

8                        (Reporter clarification)

9  A    I worked as a patrol officer, I worked as a community

10 relations officer, as a school resource officer, and in the

11 criminal investigations division as investigator.

12 Q    Prior to being with the Culpeper sheriff's office, what

13 did you do?

14 A    I was employed in -- as a sales service representative at

15 an industrial company in Culpeper.

16 Q    Now, are you familiar with the defendant, Scott Jenkins?

17 A    I am.  Yes, I am.

18 Q    How long have you known him?

19 A    I've known him since the mid '90s.

20 Q    Did you go to school with him?

21 A    I went to school with his brother, and I knew him through

22 his brother.  We're all similar ages, but I'm kind of in

23 between the two of them.

24 Q    Were you friends with him outside of work at the Culpeper

25 sheriff's office?

88

Myers - Direct

1  A    I have been.

2  Q    Do you interact with him socially?

3  A    No.

4  Q    Would you --

5  A    Are we speaking currently or are we speaking --

6  Q    Before.  Since you've known him --

7  A    Occasionally I would interact with him outside the office,

8  yes.

9  Q    Okay.  Have you ever considered him a friend?

10  A    Yes.

11  Q    Now, did you assist with Scott Jenkins's campaign for

12  sheriff?

13  A    I did.

14  Q    How did you assist him?

15  A    Generally just through political events where he would

16  need assistance with doing presentations or whatnot, at the

17  events in preparing the -- preparing -- I don't know, slides or

18  whatnot, for his campaign events and some of the fundraisers

19  and whatnot that he would -- that he had with his campaign in

20  years past.

21  Q    How many of his campaigns did you help with?

22  A    All of his campaigns.

23  Q    So when was the first one?

24  A    I'm sorry, let me fix that.  The last campaign that he

25  lost, I did not help with that.

Myers - Direct

1  Q    So how many campaigns did you help with him on?

2  A    That would have been his -- he had one unsuccessful

3  campaign, and then his three successful campaigns.  So I guess

4  that would have been -- I guess that would be four, if I'm

5  counting right.

6  Q    Fair to say you were involved in all of them except the

7  last one?

8  A    Yes.

9  Q    Now, did he ask you at some point to help specifically

10  with campaign finance reporting?

11  A    Yes.

12  Q    Can you tell me about what he asked you to do?

13  A    His accountant oftentimes had trouble getting ahold of him

14  and having communications with him.  And initially what I was

15  asked to do was -- before they had electronic filing for the

16  campaign finance reports, he would ask me to go pick up from

17  his accountant's office the campaign finance report and take it

18  to the -- to the registrar's office to have that submitted.

19  And then I didn't -- I ceased to have to be able to do that at

20  whatever point in the late -- it was sometime probably around

21  1990 -- I'm sorry, probably around 2019 that, you know, I had

22  to file them on paper -- you could file them electronically.

23  And then his accountant began just filing them for him.  So I

24  ceased to have to do that.  At that point, though, I still had

25  communications between his accountant -- his accountant -- and

Myers - Direct

1   when I say his accountant, his accountant is David Jones, but

2   it was his agency, and there were two ladies there that I had

3   the most contact with.  I had very little contact with his

4   actual accountant, but they were his assistants.  And basically

5   just working as a conduit of information between his -- the two

6   ladies there, Jenny and Donna, for if they had questions for

7   him specifically, they would contact me and I would then

8   contact him and pass information back and forth between the two

9   of them for questions.

10  Q    Okay.  Let me ask you a couple of follow-up questions

11  about that.

12       So you stated that the Scott Jenkins campaign had an

13  accountant?

14  A    David Jones, yes.

15  Q    That's the name of the accountant?

16  A    Yes, that's his -- I can't recall the actual name.  I

17  think it was Jones -- whatever the name of the accounting

18  agency was.

19  Q    And that was the firm that helped with filing campaign

20  finance reports?

21  A    That was the firm that was responsible for preparing all

22  of his campaign finance reports, yes.

23  Q    And you said that you helped with passing along

24  information to that accountant firm; is that right?

25  A    From -- directly from Scott, yes.

Myers - Direct

1  Q    Okay.  And so what type of information would you relay

2  from Scott Jenkins to the accounting firm?

3  A    Just in a general -- it would be if the accountant had a

4  question for him in particular, either I need to --

5  specifically I would say probably that it would involve if

6  there was a question as far as a check, who the check would be

7  attributed to; in other words, he would have donations

8  sometimes that may come, and the accountant would specifically

9  -- early on would ask me, I need the address for this person

10 because it's not on the check, or I need the name of the -- if

11 it was a business, that I need the name of the person who was

12 written on the business account, so that he would -- so that

13 the accountant would know who to attribute it to in the

14 campaign finance report.

15 Q    So when you're talking about checks, you're talking about

16 checks that were political donations to the Scott Jenkins For

17 Sheriff campaign?

18 A    Yes.

19 Q    And when you're referring to information, you're talking

20 about gathering additional information from Scott Jenkins so

21 that it could be reported by the accountant?

22 A    Yes.  And it was generally from the accountant asking a

23 question, and that I need this information, and then I would

24 pass that question on to Scott.  Scott would give me the

25 answer, and then I would pass that information back on to his

Myers - Direct

1  accountant.

2  Q    Okay.  So just so I'm clear, what are some examples of the

3  information you would be asked to follow up on from the

4  accounting firm, and that you would then get from Scott

5  Jenkins?

6  A    Again, just what comes to most mind would be a question of

7  -- as far as a couple of checks, who they were to be accounted

8  to.  And the questions often would be about also making sure

9  what time -- when is the campaign finance report -- Scott may

10 have asked me -- may have asked me, when is my report due, and

11 can you follow up with the accountant and make sure that

12 they've got everything that they need to be able to get that

13 campaign finance report done and submitted on time.

14 Q    And how would you typically communicate with Scott Jenkins

15 regarding --

16 A    Text.

17 Q    -- these matters?

18 A    Text.

19 Q    Text message?

20 A    It was 98 percent text, yes.

21 Q    Did you communicate with anybody else on the campaign

22 aside from Scott Jenkins regarding that kind of information?

23 A    No.

24 Q    And so who did you relay that information that you got

25 from Scott Jenkins to at the accounting firm?

Myers - Direct

1  A    That would be -- either be Jenny or Donna after Jenny

2  left.

3  Q    And Jenny and Donna are employed by the David Jones firm?

4  A    Yes, ma'am.

5  Q    Did you also have communication with David Jones himself?

6  A    Not that I recall, him directly, no.

7  Q    Now, Mr. Myers, have you had any education or training in

8  accounting or finances in your background?

9  A    No, ma'am.

10 Q    Do you know why Scott Jenkins asked you to help him with

11 campaign finance reporting?

12 A    My understanding is that it wasn't specifically asked

13 about for the campaign finance reporting, but that he had at

14 one point early on -- had a date that was missed for one of the

15 campaign finance reports to be submitted, and he ended up

16 having to pay a fee because the deadline was missed for it, or

17 something along those lines, that a date was missed by the

18 person that was doing it for him previously.  And he then asked

19 me to handle it, I guess because he trusted -- he knew that I

20 generally did things on time and took care of things

21 appropriately.

22 Q    And you had known him for a long time up until that

23 point --

24 A    Yes.

25 Q    -- is that right?

Myers - Direct

1        Let me pull up Exhibit 110, please.

2        Mr. Myers, do you recognize what's being shown as

3   Government Exhibit 110?

4   A    I do, yes.

5   Q    What is it?

6   A    It's a text message between myself and Scott from my

7   phone.

8            MS. PENG:  Your Honor, I'd like to move Government

9   Exhibit 110 into evidence.

10            THE COURT:  Any objection?

11            MR. ANDONIAN:  No objection.

12            THE COURT:  So admitted, and may be published to the

13   jury.

14            (Government Exhibit 110 marked and admitted.)

15   BY MS. PENG:

16   Q    Now, can you walk us through what we're looking at here,

17   Mr. Myers?

18   A    This would be an example of -- I can't read the name on

19   the check specifically --

20   Q    I'm sorry, before you get there, is this a screenshot of

21   text messages you had with Scott Jenkins?

22   A    Yes.  This is a screenshot from I believe my phone.

23   Q    And on the left-hand side, that's you?

24   A    On the left-hand side is Scott, on the right-hand side is

25   me.

95

Myers - Direct

1  Q    I apologize.  Go ahead.  Explain to us what we're seeing

2  here.

3  A    So Scott sent me a picture of -- what I understood when he

4  sent me a picture of a check like that, it would usually be

5  saying I just deposited this into my campaign account, and I

6  know that the accountant is going to ask specifically --

7  because I could look at the check and see, well, there's no

8  name.  It's a business check, and there's no address.  I know

9  the accountant is going to need a name and an address for the

10  check for who to attribute it to in the campaign finance

11  report.  So that is reflected exactly in my message to Scott,

12  which says, do you have a name and address for that donation

13  deposit that should be listed in the campaign report.  And

14  that's Scott's response back, let me get the address.

15  Q    So is this an example of the type of communication you

16  were discussing earlier --

17  A    Yes.

18  Q    -- in terms of getting follow-up information from Scott

19  Jenkins?

20  A    Yes.

21  Q    So in this case, he sent you a check, and then you had

22  additional follow-up questions that he then provided for you?

23  A    Yes.

24  Q    And so how many times do you recall this type of follow-up

25  happening between you and Scott Jenkins?

96

Myers - Direct

1  A    It would be -- it would be a guesstimate, because I really

2  don't know, but I would say it's less than ten, more than five

3  times.

4  Q    In all of the campaigns you've worked on?

5  A    Yes.  Most of the time I think when the checks came in

6  they had enough information on it for the accountant to be able

7  to figure it out.  It was only if the accountant specifically

8  didn't -- so he didn't send me copies of every check for every

9  donation made into the campaign account, if that's a better way

10  to -- it wasn't every single check that was deposited was sent

11  to me to somehow send to the accountant.  It was just on the

12  occasion that he would take a check, and I guess that he may

13  know that the accountant is going to ask about that particular

14  check.  I'm not quite sure the actual reason behind each time

15  that he would send a check to me, but I know from looking at

16  the campaign finance reports after they were prepared and when

17  I would be able to look at them before I sent them to the --

18  before I took them into the registrar's office, that I could

19  see that there were checks and donations made from people that

20  I hadn't received copies of.  So in other words, if he had 50

21  or 60 or 100 donations on his campaign, I never received 50 or

22  60 or 100 copies of checks by text from him.

23  Q    I see.  So it's fair to say that whatever donations you

24  were aware of came directly from Scott Jenkins?

25  A    Yes.

Myers - Direct

1    Q    If he didn't send you additional donations that he might

2    have gotten, then you don't know about them?

3    A    Yes.

4    Q    Can we zoom in on that check, please?

5         Can you see who this check is written from?

6    A    It says it's made from Yona Systems Group, Incorporated.

7    Q    And what is the amount of the check?

8    A    $5,000.

9    Q    Do you have any idea what Yona Systems Group is?

10   A    I do not.

11   Q    Now, in terms of the information that was provided to you

12   by Scott Jenkins, did you ever try to do anything to verify

13   whether that information was accurate?

14   A    No, ma'am.

15   Q    Why not?

16   A    I took Scott at his -- that he was telling me the truth

17   about whatever it was.  Again, I was a conduit for information.

18   If he -- I asked him a question, he answered it, and I then

19   provided that to the accountant.

20   Q    Now, you had discussed that you hadn't had any training

21   regarding campaign finance reporting.  But in the course of,

22   you know, relaying this information to the accountant, did you

23   gain an understanding of what type of information was required

24   to be reported?

25   A    Just that it needed to have -- from the accountant, it

Myers - Direct

1   would tell me that she needed to have a name, if it was for a

2   business, she needed to have an address for the person, that

3   she needed to have that information to be able to put it into

4   the campaign finance report.  So I was aware from her telling

5   me that.

6   Q    And from following up with Scott Jenkins to get that

7   information?

8   A    Yes.

9   Q    Now, you discussed earlier that there might be donations

10  you weren't aware of that Scott Jenkins didn't tell you about;

11  is that right?

12  A    Yes.

13  Q    Now, did you have access to any of the campaign's bank

14  accounts?

15  A    No, ma'am.

16  Q    Did you ever physically handle any donations in cash or

17  check?

18  A    No, ma'am.

19  Q    Did you ever deposit any donations into the campaign bank

20  account --

21  A    No, ma'am.

22  Q    -- on behalf of the campaign?

23  A    No, ma'am.

24  Q    Did you conduct any financial transactions on behalf of

25  the campaign?

Myers - Direct

1    A    No, ma'am.

2    Q    Were you aware of anyone besides Scott Jenkins who made

3    deposits or controlled the campaign's bank account?

4    A    No, ma'am.

5    Q    Besides yourself, was there anyone else you were aware of

6    helping Scott Jenkins with the campaign finances for the

7    required filings?

8    A    The person before me would have been Bernie Feaganes, to

9    the best of my understanding, that handled them before me.

10   Q    And so when did you start handling --

11   A    I could not -- it would be a guess to give you that date.

12   It was -- it was within his first term, so it would have been

13   between -- because the finance reports were due even -- it

14   wasn't just an election year thing.  He had to have them as he

15   was running each time that he would have to submit a report

16   periodically through the four years.  So it would have been in

17   that first term, I believe, that he missed one of the reports,

18   and it was at that point.  And I can't recall the exact year

19   even.

20   Q    Would it have been after 2010?

21   A    Yes.  Yes.

22   Q    So after 2010, you were in charge of the -- you know,

23   being a conduit of the information, would you say?

24   A    I was asked to do that, yes.

25   Q    And you, in fact, did do that job?

Myers - Cross

1   A    Yes.

2   Q    And I think I heard you say earlier -- but I just want to

3   confirm -- was there anyone else besides Scott Jenkins that

4   provided you with the information you then relayed to the

5   accountant?

6   A    No.

7           MS. PENG:  That's all I have for now.  Thank you.

8           THE COURT:  Thank you very much.

9           Any cross-examination, Mr. Andonian?

10          MR. ANDONIAN:  Thank you.

11                          CROSS-EXAMINATION

12  BY MR. ANDONIAN:

13  Q    It's still morning.  Good morning, Mr. Myers.

14  A    I'm sorry?

15  Q    I said it's still morning.  I was just checking.

16       Good morning, Mr. Myers.

17       Mr. Myers, just a few questions.  You talked about the

18  jobs that you had while you were employed by the Culpeper

19  County sheriff's office, and one of them was a patrol officer;

20  is that right?

21  A    Yes.

22  Q    And that means you just -- you were out patrolling the

23  streets, responding to calls --

24  A    Yes.

25  Q    -- things of that nature?

Myers - Cross

1      You were also a school resource officer; is that correct?

2   A    Yes.

3   Q    And that means you would staff the various public schools

4   in the area during the day?

5   A    Yes.

6   Q    You were also a community relations officer; is that

7   right?

8   A    Yes.

9   Q    Can you just describe a little bit about what that duty

10  entailed?

11  A    Basically handled doing presentations around for community

12  events.  I was also in charge of Project Lifesaver, as well as

13  several of the other programs, but Project Lifesaver was the

14  big responsibility of the community relations officer too as

15  well.  It's a program to help locate people that may have --

16  they can wear a tracking bracelet that allows the office to

17  track somebody with cognitive disabilities in the event that

18  they get lost.

19  Q    Okay.  And then you also mentioned that you were an

20  investigator with the criminal investigation division?

21  A    Yes, sir.

22  Q    And is that -- can you just describe generally your

23  responsibilities?

24  A    Just general investigations, as far as following up on

25  patrol, would take reports, and then they would get passed on

Myers - Cross

1  to the CID, and CID would then handle the follow-up

2  investigations, and hopefully subsequent successful

3  prosecutions.

4  Q    Okay.  So it's fair to say that your time at the Culpeper

5  County sheriff's office, you were doing I guess what I'll just

6  call police work, right?

7  A    Yes.

8  Q    This role that you've described in helping Mr. Jenkins

9  with the campaign, acting as -- to use your word -- a conduit,

10 that wasn't an official role, right?

11 A    No.

12 Q    That was something that you were doing because you were a

13 trusted friend of Mr. Jenkins?

14 A    Yes.

15 Q    And in that role, you were kind of doing whatever needed

16 to be done for the campaign as Mr. Jenkins directed or

17 instructed you?

18 A    Yes.

19 Q    You talked a little bit about, you know, some of that

20 involved preparing PowerPoint presentations?

21 A    Yes.

22 Q    And then to go back to what you described as being a

23 conduit, you were the go-between between Mr. Jenkins on the one

24 hand and representatives of the campaign's accounting firm on

25 the other hand; is that correct?

Myers - Cross

1   A    Yes.

2   Q    As Ms. Peng asked you on direct, you don't have any formal

3   training in campaign finance work, right?

4   A    No, sir.

5   Q    That means you don't have any formal training or education

6   in campaign finance law?

7   A    No, sir.

8   Q    You don't have any training in campaign finance kind of

9   mechanics, I guess --

10  A    No, sir.

11  Q    You talked about -- I'll try to phrase this not in a

12  asking you to confirm a negative -- but when Mr. Jenkins would

13  send you -- as we saw in the exhibit that was on the screen in

14  Government's 110 -- Mr. Jenkins would -- there were a handful

15  of times he would send you a check -- or a picture of a check,

16  I should say -- and you would ask him for information about

17  that check that you needed to relay to the accountant, correct?

18  A    Yes.

19  Q    But you also testified that Mr. Jenkins didn't do that for

20  every check that Mr. Jenkins's campaign received, right?

21  A    Yes.

22  Q    And that would be the same for any type of contribution

23  that the campaign received?

24  A    Yes.

25  Q    And I think you answered this, but I just want to make

Myers - Cross

 1   sure I'm clear.  After you essentially took over this informal

 2   role from Bernie Feaganes, there was nobody else

 3   contemporaneous with you that was kind of serving as this

 4   conduit; it was just you --

 5   A    To my knowledge, yes.

 6   Q    -- to your knowledge?

 7          MR. ANDONIAN:  If I could just have a brief

 8   indulgence.

 9          THE COURT:  Yes, sir.

10    BY MR. ANDONIAN:

11   Q    Just one last question.

12        Mr. Myers, in this role of kind of being a conduit helping

13   the campaign in whatever ways, you had access to Mr. Jenkins's

14   county e-mails, correct?

15   A    Yes.

16          MR. ANDONIAN:  I don't have anything further, Your

17   Honor.

18          THE COURT:  All right.  Thank you.  Any redirect?

19          MS. PENG:  No, thank you, Your Honor.

20          THE COURT:  May this witness be excused?

21          MS. PENG:  Yes.

22          THE COURT:  Mr. Myers, thank you very much for being

23   in.  Please do not discuss your testimony.  Take good care.

24   Thank you.

25          Ms. Choy, call your next witness, please.

Feaganes - Direct

1          MS. CHOY:  The government calls Bernard Feaganes.

2          THE COURT:  Bernard Feaganes.

3          Mr. Feaganes, come on up, please, sir.

4      BERNARD FEAGANES, CALLED BY THE GOVERNMENT, SWORN

5                    DIRECT EXAMINATION

6   BY MS. CHOY:

7   Q    Good morning, Mr. Feaganes.

8   A    Good morning.

9   Q    Could you please introduce yourself to the members of the

10  jury and spell your name for the court reporter?

11  A    Bernard Feaganes, B-E-R-N-A-R-D, F-E-A-G-A-N-E-S.

12  Q    Thank you.  Mr. Feaganes, where are you from originally?

13  A    Culpeper, Virginia.

14  Q    And what's your educational background?

15  A    High school with law enforcement training.

16  Q    Where do you live now?

17  A    Culpeper, Virginia.

18  Q    And how are you currently employed?

19  A    Prince William County sheriff's office as a deputy

20  sheriff.

21  Q    What are your duties and responsibilities in that

22  position?

23  A    I'm a bailiff in the Juvenile & Domestic Relations Court.

24          THE COURT:  Mr. Feaganes, can I get you to slide up a

25  little bit and talk into the microphone?

Feaganes - Direct


1          THE WITNESS:  Yes.

2          THE COURT:  Thank you very much.

3    BY MS. CHOY:

4    Q    Thank you.  I keep having to remind myself to speak into

5    the microphone too.

6          Did you previously serve as a deputy sheriff in the

7    Culpeper County sheriff's office?

8    A    I did.

9    Q    When did you first go to work in the Culpeper County

10   sheriff's office?

11   A    I first went to work at the sheriff's office in May of

12   1997.  I left for a period of time in 2007 through 2011.

13   Q    Let me pause you there.  Who was the sheriff during that

14   first stint in Culpeper?

15   A    The first stint was Roger Mitchell and Lee Hart.

16   Q    And then you were saying you left at some point?

17   A    I left in 2007, went to Prince William County for -- I had

18   a growing family.  I needed the money, and they paid better, so

19   I went up there for a few years, and then I came back to

20   Culpeper in January of 2012.

21   Q    And when you came back to Culpeper, did you rejoin the

22   Culpeper County sheriff's office?

23   A    I did.

24   Q    And that was in January of 2012?

25   A    Yes, ma'am.

Feaganes - Direct

1    Q    Who hired you that second time around?

2    A    Sheriff Scott Jenkins.

3    Q    And how long did you serve under Sheriff Scott Jenkins?

4    A    12 years.

5    Q    I can't do the math in my head.  When did you leave?

6    A    It would have been January 31st of 2023.

7    Q    At the time you left the Culpeper County sheriff's

8    office --

9    A    I'm sorry, December 31st, 2023.

10   Q    Thank you for that.

11        At the time you left the Culpeper County sheriff's office,

12   what was your rank?

13   A    Captain.

14   Q    And where were you assigned at that time?

15   A    Culpeper County courthouse.

16   Q    What were your duties and responsibilities?

17   A    To oversee the daily operations of the courts and the

18   security of the courts.

19   Q    And were you supervising other deputies?

20   A    Yes.

21   Q    How many?

22   A    It varied between 12 and 14.

23   Q    Before you were assigned to the courthouse, were you

24   assigned to a different role?

25   A    I was.  I was assigned to different roles throughout the

Feaganes - Direct

1    years, yes, ma'am.

2    Q    Could you just list a few of the other roles that you held

3    before you were at the courthouse?

4    A    I was a sergeant at the courthouse in 2012, and then I did

5    community services, community relations, school resource, and

6    then for a short time I was over at the admin office in charge

7    of the admin staff.

8    Q    And in the course of your time in Culpeper, did you become

9    familiar with the term auxiliary deputy sheriff?

10   A    I did.

11   Q    Just briefly, what is that?

12   A    It's a volunteer position as a -- for individuals to come

13   and be sworn as deputies and serve in a volunteer status.

14   Q    So those are sworn law enforcement officers?

15   A    Yes.

16   Q    But they serve as volunteers, you said?

17   A    Yes.

18   Q    And just generally speaking, what's your understanding of

19   the purpose -- or the intended purpose -- of the auxiliary

20   deputy program?

21   A    Just to provide extra resources to the office when needed.

22   Q    As part of your job, did you help process paperwork

23   related to swearing in auxiliary deputies?

24   A    I didn't process the paperwork for the swearing-in, no.

25   Q    Did you have a role with respect to auxiliary deputies?

Feaganes - Direct

1    A    With some of them, yes, ma'am.

2    Q    And what was your role?

3    A    It would be passing out background packets to have them

4    filled out and returned.  Once I went over to the court, I

5    would often -- when somebody was scheduled to come in to be

6    sworn in -- walk them up to the clerk's office for them to be

7    sworn in.  For a short time, we had the ID machine at the

8    courthouse.  Once they were sworn in, I would issue them an ID

9    and then send them about their way, wherever they needed to go.

10   Q    So approximately what was the time period in which you

11   were working in this role with respect to auxiliaries?

12   A    I don't remember the exact start date.  I would say

13   somewhere along around maybe 2016, 2017, up through -- up

14   through 2022 into 2023.

15   Q    And was there someone else who was involved in that

16   process named Kevin Rychlik?

17   A    He was one of the auxiliary deputies.

18   Q    And how did you meet Kevin Rychlik?

19   A    Through the office, through Sheriff Jenkins.

20   Q    Did you observe Scott Jenkins interacting with Kevin

21   Rychlik?

22   A    In passing, yes.  You know, he was -- he would come in the

23   office.  I mean, they would go do their thing.  That was my

24   observation of their interactions.

25   Q    And based on your observations, did Kevin Rychlik appear

Feaganes - Direct

1   to have a close relationship with Sheriff Jenkins?

2   A    Yes.

3   Q    And during that time frame when you were -- had some role

4   regarding the auxiliaries, did there come a time when Scott

5   Jenkins instructed you to sort of help with swearing in a

6   number of individuals who had been recommended by Kevin

7   Rychlik?

8   A    Yes.

9   Q    And did those individuals include someone named Rick

10  Rahim?

11  A    Yes.

12  Q    Someone named Fredric Gumbinner?

13  A    Yes.

14  Q    Mark Cummings?

15  A    Yes.

16  Q    Mike Duggins?

17  A    Yes.

18  Q    Haval Dosky?

19  A    Yes.

20  Q    Tim Robinson?

21  A    Yes.

22  Q    So you were involved in the swearing-in process with them?

23  A    I can't say that I was at the swearing-in for all of them,

24  but I remember the names and remember having -- you know,

25  either giving them a packet or having some sort of interaction

Feaganes - Direct

1  with them, but I can't say that I was at each one of their

2  swearing-ins, but I could have been.  It wouldn't have been

3  uncommon for me to have been there since I worked in the

4  courthouse.

5  Q    And to the best of your knowledge, was each of those

6  individuals sworn in as an auxiliary deputy sheriff?

7  A    To my knowledge.

8  Q    And before you took any action regarding an auxiliary,

9  would you check with Sheriff Jenkins first?

10 A    Yes.

11 Q    Would you ever take any action without checking with

12 Sheriff Jenkins first?

13 A    No.

14 Q    Could an auxiliary be sworn in without Sheriff Jenkins's

15 approval?

16 A    No, not to my knowledge.

17 Q    And the individuals we just mentioned, did you have any

18 understanding of where they were from?

19 A    I knew most of them were from out of Culpeper.

20 Q    How did you know that?

21 A    I knew most of them were from northern Virginia.  I knew

22 they were friends with -- most of them were friends with Kevin,

23 and just in passing, hearing them talk.  You know, if I

24 received a background packet from them, I may have seen the

25 address on it.  But that's...

Feaganes - Direct

1  Q     And so you saw some of their background packets.  Did you

2  also observe some of their driver's licenses?

3  A     Yes.

4  Q     Is that how you knew generally where they were from?

5  A     Yes.

6  Q     And to the best of your knowledge, did any of those

7  individuals reside in Culpeper County?

8  A     Not to my knowledge.

9  Q     Did you form any impression of these individuals?

10 A     I knew they were wealthy individuals, just in passing, you

11 know --

12 Q     How did you know that?

13 A     -- hearing them talk.  They would come in the courthouse,

14 in the office, just hearing them talk about their cars and

15 their aircraft, and just different things led me to believe

16 that they were wealthy individuals.

17 Q     Now, you mentioned an individual named Fredric Gumbinner.

18 After he was sworn in, did you ever see him again?

19 A     Not to my knowledge.

20 Q     He never came back and volunteered with the office?

21 A     Not to my knowledge.  I don't -- Mr. Gumbinner, I don't

22 know that I ever met him personally.  I may have if he came to

23 get sworn in, but I don't recall ever meeting him personally.

24 Q     And to the best of your knowledge, did he ever come back

25 and get any kind of training at the office?

Feaganes - Direct

1    A    Not to my knowledge.

2    Q    How about Mark Cummings, did you ever see him again?

3    A    Not to my knowledge.

4    Q    Mike Duggins?

5    A    No, not to my knowledge.

6    Q    Haval Dosky?

7    A    No, ma'am.

8    Q    Tim Robinson?

9    A    I think Tim may have come back with Kevin once, but I

10   can't say for sure.  I think he may have come back with him

11   once that I saw, but I don't recall.  He may have come with him

12   for an event that we had where they brought the helicopter in,

13   but other than that, I don't recall ever seeing him again.

14   Q    Did you ever see him perform any volunteer work for the

15   office?

16   A    Not other than if he -- I think he was the guy with Kevin

17   that brought the helicopter in to one event that we were

18   sponsoring.

19   Q    So all of these individuals were sworn in, and with that

20   one possible exception, you never saw them again; is that fair?

21   A    No, ma'am.  I saw Kevin and -- I saw Kevin and Rick again,

22   but not the other two, the other gentlemen.

23   Q    Okay.  Thank you for that clarification.

24        Did you find it odd that so many wealthy individuals from

25   northern Virginia were being sworn in as auxiliaries and then

Feaganes - Direct

1  most of them you didn't see again?

2  A    Yeah, I guess you could say it was odd.

3  Q    Did you ever confront Sheriff Jenkins about that?

4  A    No, ma'am.

5  Q    Why not?

6  A    He was the sheriff, and it wasn't my place to confront

7  him.  We just didn't -- we didn't confront him about things

8  like that.

9  Q    Working under Sheriff Jenkins, what was his management

10 style?

11 A    In the early years, it was -- it was good.  As time went

12 on, things changed.  We stayed in our place and did what we

13 were told to do, and generally didn't -- didn't question him.

14 Q    Why didn't you question him?

15 A    That was just an understanding in the office, and with

16 him, that you do what you're told, and basically you keep your

17 mouth shut.  You do your job, do what you're told, and that's

18 just the way it was.

19 Q    How would you describe the culture of the office under

20 Sheriff Jenkins?

21 A    The last several years, it was tense.

22 Q    It was tense?

23 A    Yes, ma'am.

24 Q    Did you ever observe Sheriff Jenkins chastising a deputy?

25 A    Yes.

Feaganes - Direct

1   Q    Did you ever observe him losing his temper with a deputy?

2   A    Yes.

3   Q    Was that a regular occurrence?

4   A    When I was at the admin office, yes.  Once I moved to the

5   court side, I tried to stay away as much as I could.

6   Q    Did Sheriff Jenkins like to keep tight control over what

7   was happening in the office?

8   A    Yes.

9        MR. CALEB:  Objection.

10  BY MS. CHOY:

11  Q    Did he like to know what was going on in the office?

12       MR. CALEB:  Objection.

13       THE COURT:  Hang on a second.  Try to -- these are

14  broad, general questions.  Let's rephrase them and try to make

15  them more specific so that we can understand what's going on.

16       MS. CHOY:  Certainly.

17   BY MS. CHOY:

18  Q    So while you were working at the office, was it your

19  experience that deputies would look to Sheriff Jenkins for

20  leadership?

21  A    Yes.

22  Q    Would they take actions, in your experience, without

23  consulting with Sheriff Jenkins?

24       MR. CALEB:  Objection.

25       THE COURT:  Overruled.

Feaganes - Direct

1            THE WITNESS:  I guess it depended on what the action

2    was.  If it was a daily -- a day-to-day decision, no, but

3    any -- anything that would be considered I guess a major

4    decision went before him.

5    BY MS. CHOY:

6    Q    Thank you.  So earlier you were mentioning someone named

7    Rick Rahim.  How did you meet him?

8    A    Through Sheriff Jenkins.

9    Q    And who is he?

10   A    I met him through -- I guess do you want me to explain how

11   I came to know him, I guess?

12   Q    Please.

13   A    So the sheriff came to me and said that he had a donor

14   that wanted to donate a drone to the office, and asked to look

15   up some different drones that would be suitable for the office.

16   And once I did that, I was introduced to Rick Rahim as the

17   donor -- or a potential donor -- of a drone to the office.

18   Q    Okay.  So it came to your attention that Rick Rahim may be

19   donating a drone to the office?

20   A    Correct.

21   Q    Did you have discussions with Rick Rahim about that drone?

22   A    Yes.

23   Q    And did you also discuss this potential donation with

24   Scott Jenkins?

25   A    Yes.

Feaganes - Direct

1  Q    What did Scott Jenkins tell you about that potential

2  donation?

3  A    That Rick wanted to donate a drone to the office, and we

4  looked up some different options, and I provided a drone

5  package to the sheriff that was -- would have been suitable for

6  the office.

7  Q    What do you mean when you say a drone package?

8  A    Well, the drone, the controller, the batteries -- the

9  package, the unit, I guess I should say.

10 Q    So this -- when you say drone, is this an aerial device of

11 some sort?

12 A    It is.  It's a remote aerial device.

13 Q    And so did Rick Rahim, in fact, donate a drone to the

14 sheriff's office?

15 A    He did.

16 Q    Did there come a time when you were required to report

17 that donation to the Culpeper County Board of Supervisors?

18 A    Yes.

19 Q    And why was that?

20 A    We were trying to get the certificate of authorization

21 from the Federal Aviation Administration, and they required

22 certain documents, one of them being a letter from, in our

23 case, the County Attorney, saying that we were an authorized

24 law enforcement agency that -- it was part of the application

25 process to the FAA to have this letter from the County

Feaganes - Direct

1  Attorney.

2  Q    Okay.  Let me pause you for a sec.  What is the FAA?

3  A    The Federal Aviation Administration.

4  Q    So there came a time when you had to file paperwork with

5  the FAA?

6  A    Yes.

7  Q    And was that required to operate this drone?

8  A    It was required to operate the drone outside of the normal

9  parameters of the drone laws.

10 Q    And why is it that the FAA paperwork required you to

11 report the donation to the Culpeper County Board of

12 Supervisors?

13 A    Well, the -- when we needed the letter from the County

14 Attorney, the County Attorney wouldn't -- couldn't provide a

15 letter for a piece of equipment that didn't belong to the

16 county, that wasn't registered as county property.

17 Q    Okay.  And so did you discuss that requirement with Scott

18 Jenkins?

19 A    I did.

20 Q    And what did he tell you to do?

21          MR. CALEB:  Objection to the leading.

22          THE COURT:  Overruled -- well, overruled.  You can

23 answer the question.

24          THE WITNESS:  We discussed it, and it was reaffirmed

25 that Rick wanted to remain anonymous.  And I remembered from

Feaganes - Direct

1   years past a previous sheriff trying to do anonymous donations,

2   and that it went through a process, and was determined that it

3   wasn't allowed.  So I reminded him that anonymous donations --

4   we couldn't do it because of what had happened before.  And at

5   that point the statement was made, well, then it's yours.

6   Q    Okay.  So you're discussing with Sheriff Jenkins the

7   requirement to report the donation to the Board of Supervisors;

8   is that right?

9   A    That we couldn't do it as an anonymous donation.

10  Q    And it can't be done as an anonymous donation.

11       And at some point, I think you said Scott Jenkins said,

12  then it's yours?

13  A    The statement was made, it's yours.

14  Q    What did you take him to mean by that?

15  A    You know, initially, I didn't know what to think, but you

16  know, it's -- saying that it's yours means that you're giving

17  it to me.  And I wasn't about to take it as my personal

18  property.

19  Q    And how would that relate to the reporting to the Culpeper

20  County Board of Supervisors?

21  A    So at some point between that conversation and -- I don't

22  remember who was in the office, or who filed the paperwork at

23  the time.  It was at a time when we had the administrative

24  financial person changed several times during that time period.

25  But at some point, it was added onto the Board of Supervisors'

Feaganes - Direct

1    docket, and was listed as a donation to the sheriff's office

2    from me.

3    Q    Okay.  So it came to your attention that this drone had

4    been reported to the Board of Supervisors as a donation from

5    you; is that right?

6    A    Yes.

7    Q    Do you know how that happened?

8    A    I don't recall the exact how it happened.  I do know that

9    I told them that when it was said, it's yours, I don't want it,

10   it's not mine, it belongs to the county, I don't want anything

11   to do with it.  But the process of it going to the board, I

12   don't recall the exact process of how it got to the board

13   minutes.

14   Q    Okay.  So somehow it gets reported as coming -- as a

15   donation from you instead of from the true donor, right?

16   A    Correct.

17   Q    And the true donor was who?

18   A    Rick Rahim.

19   Q    So that statement to the Board of Supervisors, was that

20   true?

21   A    No.

22   Q    Did there come a time when Scott Jenkins directed you to

23   make an ID card for Rick Rahim?

24   A    Yes.

25   Q    What did he direct you to do?

Feaganes - Direct

1  A    There was a sample card from another -- I think it was

2  another law enforcement agency, I don't remember exactly where

3  it was from -- that stated something to the effect of

4  helicopter pilot and a member of the Culpeper County sheriff's

5  office, something to that effect, recognized as a helicopter

6  pilot from the Culpeper County sheriff's office, with a picture

7  of Rick Rahim on it.

8  Q    So he showed you a sample; is that right?

9  A    Yes.

10 Q    And what did he ask you to do?

11 A    To create something similar to that.

12 Q    And did you, in fact, do that?

13 A    I did.

14        MS. CHOY:  Ms. Fastenau, could you please pull up

15 Government's Exhibit 111?

16 BY MS. CHOY:

17 Q    Can you see that, Mr. Feaganes?

18 A    Yes, ma'am.

19 Q    Do you recognize this document?

20 A    I do.

21 Q    Without revealing its contents, what is it?

22 A    It's a photo of the ID that was made for Rick Rahim.

23 Q    And is that in the context of a broader document?

24 A    It's in the context of a text message.

25 Q    And who is this text message from?

Feaganes - Direct

1  A    It's between myself and Scott Jenkins.

2          MS. CHOY:  The government moves Exhibit 111 into

3  evidence.

4          THE COURT:  Any objection?

5          MR. CALEB:  No objection.

6          THE COURT:  So admitted, and it may be published to

7  the jury.

8          (Government Exhibit 111 marked and admitted.)

9   BY MS. CHOY:

10  Q    So Mr. Feaganes, who are these text messages on the left

11  from?

12  A    On the left would be Scott Jenkins.

13  Q    And who are the text messages on the right from?

14  A    Me.

15  Q    So directing you to that first message at the top of the

16  page, that's dated October 22nd, 2020; is that correct?

17  A    Correct.

18  Q    And that's a message from Scott Jenkins to you?

19  A    Yes, ma'am.

20  Q    And Scott Jenkins says, you had time to lay out an ID for

21  Rick yet; is that right?

22  A    Yes, ma'am.

23  Q    And that's a reference to that request he made of you to

24  lay out an ID for Rick?

25  A    Yes, ma'am.

Feaganes - Direct

1  Q    Okay.  Could you please read your response?

2  A    Yes, sir, I'll send you a pic shortly.

3  Q    And below that, there's a picture.  What is that picture

4  of?

5  A    That's a picture of the layout of the card for Rick Rahim.

6  Q    Could you please read the text on that ID card?

7  A    Culpeper County Sheriff's Office, this certifies that Rick

8  A. Rahim is a member of this office, helicopter pilot position,

9  Scott H. Jenkins, Sheriff, with his signature above it.

10 Q    Is this a standard ID for the Culpeper County sheriff's

11 office?

12 A    No, ma'am.

13 Q    So you made it specially for Rick Rahim?

14 A    Yes, ma'am.

15 Q    And how did you know what to put onto that card?

16 A    From the sample that was provided.

17 Q    Who provided that sample?

18 A    The sheriff did.

19 Q    Does the Culpeper County sheriff's office own a

20 helicopter?

21 A    Not to my knowledge.

22 Q    Could you flip to page 2, please?

23      And directing you to those first four text messages on

24 this page, the date is November 17th, 2020; is that right?

25 A    Yes, ma'am.

Feaganes - Direct

1   Q    In that first message at the top of the page, Scott

2   Jenkins says, have you made that ID for Rick you designed.

3       Do you see that?

4   A    Yes, ma'am.

5   Q    Could you read the response, please?

6   A    Yes, sir, I sent you a pic a few weeks ago for approval.

7   If that's okay, I can print it any time.

8   Q    And then Scott Jenkins replied, yes please, make one and

9   I'll deliver.

10      Do you see that?

11  A    Yes, ma'am.

12  Q    Had Scott Jenkins ever asked you to make a custom-designed

13  ID for anyone else?

14  A    Not to my recollection.

15  Q    Did he tell you why he was giving Rick Rahim a special

16  favor?

17  A    No, ma'am.

18          MS. CHOY:  You can take that down, thank you,

19  Ms. Fastenau.

20  BY MS. CHOY:

21  Q    Did there come a time when Rick Rahim applied for a

22  concealed carry permit?

23  A    Yes, ma'am.

24  Q    And did Scott Jenkins give you any instructions with

25  respect to that application?

Feaganes - Direct

1    A    Around the time that the application was made, he asked me

2    to go see the clerk of the court and ask if it could be

3    fast-tracked or expedited.

4    Q    And did you do that?

5    A    I did.

6    Q    Had Scott Jenkins ever asked you to expedite anyone else's

7    application for a concealed carry permit before?

8    A    Not that I recollect.

9    Q    And did the clerk's office agree to expedite his

10   application?

11   A    No.

12   Q    After that application was filed, did Scott Jenkins give

13   you any further directions with respect to that application?

14   A    He called and/or texted several times thereafter asking me

15   to go up and check the status of the application.

16   Q    And did you do so?

17   A    I did.

18   Q    How many times did you do it, roughly?

19   A    Gosh, I would say more than five.  I don't recall the

20   exact number, but it was pretty much weekly from the time that

21   the application was submitted.

22   Q    Do you recall the reaction of the clerk's office personnel

23   to your visits?

24   A    I do.

25   Q    Can you describe that, please?

Feaganes - Direct

1    A    They weren't happy with it.  It was made very clear the

2    first time I went up and asked if it could be expedited that --

3    the Clerk of the Court at the time, she said that she didn't do

4    favors and expedite applications for anyone, including --

5            MR. CALEB:  Objection.

6            THE COURT:  Sustained.  It's now into hearsay.

7    BY MS. CHOY:

8    Q    You don't need to tell us what they said --

9    A    Yes, ma'am.

10   Q    -- just their reaction generally.

11   A    Became frustrated.

12           MS. CHOY:  Ms. Fastenau, could you please pull up

13   Government's Exhibit 128, and could you blow up that blue

14   bubble so that Mr. Feaganes can see it?

15   BY MS. CHOY:

16   Q    Do you recognize this document, Mr. Feaganes?

17   A    I don't remember that specific message, but I see that it

18   is to my cell phone and somebody else's -- several other -- at

19   least one other cell phone number that I don't recognize.

20   Q    Do you recognize any of the other participants in this

21   text chain other than yourself?

22   A    Myself, the sheriff, and I don't know who that 7274 number

23   is.

24           MS. CHOY:  The government moves Exhibit 128 into

25   evidence.

Feaganes - Direct

1          THE COURT:  Any objection?

2          MR. CALEB:  No objection.

3          THE COURT:  So admitted, and may be published to the

4   jury.

5          (Government Exhibit 128 marked and admitted.)

6          MS. CHOY:  Ms. Fastenau, could you please flip down

7   to page 8 and blow up that first blue bubble?

8   BY MS. CHOY:

9   Q    Mr. Feaganes, who is this text message from?

10  A    That's from Sheriff Jenkins.

11  Q    And who is it to?

12  A    It's to myself and this other number ending in 7274, but

13  I'm not sure who that is.

14  Q    And is it dated September 4th, 2020?

15  A    Yes, ma'am.

16  Q    What is Sheriff Jenkins conveying to you in this text

17  message?

18  A    It's asking if I'm working if I could check on Rahim's

19  concealed carry permit to see if it's been mailed out, because

20  he's trying to make some handgun purchases, and he can't do it

21  without it.

22  Q    Okay.  And where it says CCW, is that his concealed carry

23  permit?

24  A    It is.

25  Q    What does that stand for?

Feaganes - Direct

1   A    Concealed carry weapon, I believe.

2   Q    And the next blue bubble, could you pull that up, please?

3        Is that your response?

4   A    Yes, it's from me -- so yes, that would be my response.

5   Q    And did you indicate -- what did you indicate here in your

6   response?

7   A    Yes, I checked -- Jan -- who was the Clerk of the Court at

8   the time -- said they were processing them as fast as possible,

9   and the Code says that she shall mail it, and that she would

10  not allow anyone to pick it up, and that I would follow up --

11  Q    Okay.

12  A    -- I will continue to follow up.

13  Q    Thank you.

14          MS. CHOY:  And Ms. Fastenau, could you please turn to

15  page 9, and highlight that last blue bubble on the page?

16  BY MS. CHOY:

17  Q    Mr. Feaganes, is this another text message from Sheriff

18  Jenkins to you?

19  A    It is to me and that other number that I don't recognize.

20  Q    And is it dated September 15th, 2020?

21  A    Yes, ma'am.

22  Q    And Sheriff Jenkins says, if possible could one of you

23  inquire about status on Rick's permit, if it's been mailed,

24  because he's had some trouble with his mail getting delivered

25  to next-door neighbors; is that right?

Feaganes - Direct

1   A    Yes.

2   Q    Is this another example of Sheriff Jenkins asking you to

3   check on Mr. Rahim's application?

4   A    Yes.

5        MS. CHOY:  And Ms. Fastenau, could you please turn

6   back to page 1, and highlight the blue bubble.

7   BY MS. CHOY:

8   Q    Is this another text message from Sheriff Jenkins to you?

9   A    Yes, to me and the other number that I don't recognize.

10  Q    And is it dated September 24th, 2020?

11  A    Yes.

12  Q    And what's Sheriff Jenkins asking you to do here?

13  A    Would you like me to just read it?

14  Q    Sure.  Thank you.

15  A    Any way y'all can sneak a visit to Jenny at clerk's office

16  to tell her Rick Rahim's CCW application we're wondering if

17  it's mailed yet.  He's made a deal on a high end multiple gun

18  purchase if he gets his CCW, and it's been about 30 days and

19  seller is impatient with market way it is right now.  He's a

20  big LE supporter, so trying to check on it.

21  Q    So in a nutshell, what's he asking you to do here?

22  A    To go check on that permit again to see if it's been

23  completed.

24  Q    Had Scott Jenkins ever asked you to check on the status of

25  anyone else's permit?

Feaganes - Cross

1  A    I don't recall anyone else.

2  Q    And did he ever tell you why Rick Rahim was getting

3  special treatment?

4  A    No, ma'am.

5          MS. CHOY:  Thank you.

6          THE COURT:  All right.  Any cross?

7          MR. CALEB:  May I?

8          THE COURT:  Yes, sir.

9                      CROSS-EXAMINATION

10  BY MR. CALEB:

11  Q    Good -- is it afternoon yet?

12          THE COURT:  We've still got about ten more minutes

13  left.

14  Q    Good morning.

15  A    Good morning, sir.

16  Q    A few questions for you.  First of all, with the deputy

17  auxiliary program, you testified that's a volunteer program,

18  right?

19  A    To my knowledge, yes, sir.

20  Q    Okay.  And your role with these -- the applications for

21  the deputy auxiliary program you would describe as pretty

22  limited?

23  A    It varied.  I wasn't involved in all of them.  It would

24  just be as the sheriff requested.  You know, some I didn't -- I

25  wasn't involved in all of them.

Feaganes - Cross

1   Q    Okay.  And just so we're kind of oriented to time, you're

2   describing not being involved with all of those applications

3   during your tenure at the office from 2012 to --

4   A    Correct.

5   Q    -- '23?

6   A    Correct.

7   Q    Okay.  Now, you -- on direct, you were asked questions

8   about -- you were given some names of several individuals that

9   were described as wealthy businessmen?

10  A    Correct.

11  Q    And so just to make sure we're clear on timing here, when

12  you were involved -- at that point, where you described being

13  involved in the auxiliary deputy program, you were -- and now

14  I'm orienting you specifically to the time frame when you

15  observed the wealthy businessmen.  Are you oriented?

16  A    Yes, sir.

17  Q    Okay.  That was -- that was while you were stationed at

18  the courtroom, correct?

19  A    Both; before I went to the courts and after.

20  Q    Have you -- okay.  So do you know -- can you tell us what

21  time frame, when you went to the court?

22  A    I went to the court in -- right at the beginning of COVID,

23  right before the COVID shutdowns.  So I don't remember the

24  exact date.  I'm going to say between January and March of

25  2020.

Feaganes - Cross

1   Q    So you went to the court, and -- so when you say you went

2   to the court, that means, for clarity, you were stationed at

3   the court?

4   A    Correct.

5   Q    And to be clear, the court is at a separate location from

6   the sheriff's office, correct?

7   A    Correct.

8   Q    And so the time period where you were at the court

9   building, you -- where you were working or stationed at the

10  court building, it would be correct to say that you were not

11  working or stationed at the sheriff's office, right?

12  A    Not at the administrative building, correct.

13  Q    Okay.  And -- at the administrative building, you said?

14  A    Not at the sheriff's admin office, not at the sheriff's

15  headquarters.  I was not stationed there.  I was stationed at

16  the courthouse.

17  Q    And you were stationed at the courthouse, that was where

18  you worked full-time?

19  A    Correct.

20  Q    And so it would also be fair to say -- or accurate to say

21  that while you were stationed at the court building, you

22  wouldn't have been aware of what was going on at the

23  administrative building, correct?

24  A    For the most part, no.

25  Q    And you wouldn't have been in a position to observe

Feaganes - Cross

1    whether any of those businessmen came and went from the

2    administrative building?

3    A    Correct.

4    Q    You wouldn't have been able to observe whether any of

5    those businessmen offered their services at the administrative

6    building?

7    A    Correct.

8    Q    You wouldn't have been in a position to know -- and again,

9    we're talking about while you were at the court building from

10   2020 to 2023, correct?

11   A    Yes, sir.

12   Q    Okay.  During that time period, you would not have been in

13   a position to know whether any of those individuals were

14   volunteering for -- in their roles as auxiliary deputies?

15   A    Correct.

16   Q    When you talked about Mr. Jenkins -- you were asked

17   questions about his management style.  Fair to say he was a

18   tough boss?

19   A    At times.

20   Q    He could be a tough boss?

21   A    Yes, sir, at times.

22   Q    But Mr. Jenkins has -- in terms of his dealings with you,

23   it's never been your experience that he's asked you to do

24   something illegal?

25   A    Not to my knowledge.

Feaganes - Cross

1  Q    Okay.  And -- all right.  You were shown -- you were asked

2  questions about Mr. Rahim in his capacity as being -- well, I

3  guess you said you made an identification form?

4  A    Correct.

5  Q    And you were shown an identification that said pilot?

6  A    Correct.

7  Q    So you and Mr. Rahim were friends, correct?

8  A    We were acquaintances in the beginning.  If you'd like me

9  to elaborate, I will.

10 Q    No.  I'll ask the questions.

11 A    Okay.

12 Q    So you were -- you wouldn't describe yourself as being

13 friends with Mr. Rahim.  The word you used is acquaintances?

14 A    I would say more of an acquaintance than a friend.

15 Q    Okay.  And so you know as an acquaintance that Mr. Rahim

16 did have a helicopter?

17 A    Yes.

18 Q    And you actually flew on the helicopter with Mr. Rahim?

19 A    I did one time.

20 Q    And you flew on the helicopter with Mr. Rahim because

21 Mr. Rahim took you to dinner?

22 A    It was a group of people.  It was not just he and I.  It

23 was a group of people, and I didn't know anyone else in the

24 group.

25 Q    So you were amongst Mr. Rahim's guests on his helicopter?

Feaganes - Cross

1   A    I was.

2   Q    That went to dinner, correct?

3   A    Correct.

4   Q    And you also -- you've also been to dinner with Mr. Rahim

5   an additional time, correct?

6   A    One other time.

7   Q    And what was while you guys were both on vacation?

8   A    We --

9   Q    Let me ask you a different question.  Both of you -- both

10  you and Mr. Rahim were vacationing in North Carolina, correct?

11  A    Correct.  But not together.

12  Q    Not together.  But you did have dinner together?

13  A    Correct.

14  Q    And so you're familiar with the program -- the VASAR

15  program?

16  A    Yes, sir.

17  Q    And that is a program -- it's essentially an air support

18  program?

19  A    Correct.

20  Q    And that program required pilots?

21  A    Yes.

22  Q    Mr. Rahim was a pilot?

23  A    I don't know that he was a pilot for VASAR.

24  Q    Well, he flew a helicopter?

25  A    Yes.

Feaganes - Cross

1  Q    All right.  Now, in your role as a deputy with the

2  Culpeper County sheriff's office, it was common for deputies to

3  use personal gear at times, correct?

4  A    Referring to?

5  Q    Well, fair.  So if a deputy had a pair of binoculars that

6  was their own -- it was their own personal pair of binoculars,

7  that deputy could use those binoculars for work-related tasks,

8  correct?

9  A    I suppose so.

10 Q    Is that something that you know of?  I'm just asking.  If

11 you don't, you don't.

12 A    I mean, personally, yes, I carried some personal

13 equipment.  I can't speak for anyone else.

14 Q    Okay.  But that -- okay.  So it wasn't against the rules

15 for a deputy to use personal equipment in their capacity as a

16 deputy -- a deputy sheriff?

17 A    I'm sorry.  I'm not sure how to answer that.

18 Q    Let me ask you this:  In the situations where you used

19 your personal equipment -- and I'm taking it that you used it

20 in your role as a deputy, correct?  Am I right?

21 A    Yes, sir.

22 Q    In those instances, you didn't believe you were doing

23 anything improper or wrong, correct?

24 A    No, sir.

25 Q    You testified -- or you were shown on direct some

Feaganes - Cross

1  exhibits.  And they were text messages that -- between you and

2  Mr. Jenkins and another number.

3      Do you remember that?

4  A    I do.

5  Q    And you also testified that -- I think you said that

6  Mr. Jenkins was asking you to fast-track Mr. Rahim's concealed

7  carry permit?

8  A    He was asking me to go ask the clerk of the court to

9  fast-track.

10 Q    So he wanted you to do that on Mr. Rahim's behalf,

11 correct?

12 A    It was on the sheriff's behalf.  I guess maybe you could

13 consider it Mr. Rahim's behalf, but it was on the sheriff's

14 behalf.

15 Q    Okay.  So in any event, your understanding of the reason

16 or the motivation for Mr. Jenkins asking -- wanting Mr. Rahim's

17 application fast-tracked was because Mr. Rahim had a high-end

18 deal for a gun that was pending, and he needed that permit,

19 correct?

20 A    According to the text, yes.

21         MR. CALEB:  Court's indulgence?

22         THE COURT:  Yes.

23  BY MR. CALEB:

24 Q    So you also had experience piloting a drone, correct?

25 A    I do.

Feaganes - Cross

1  Q    And you've used your own drone, in fact, for the official

2  business of the sheriff's office, correct?

3  A    I did.

4  Q    And you didn't -- obviously that didn't get you in

5  trouble, correct?

6  A    No, sir.

7  Q    And you didn't see a problem with that?

8  A    No, sir.  I flew within the confines of the Federal

9  Aviation Department, also had a license.

10          MR. CALEB:  Brief indulgence?

11          THE COURT:  Uh-huh.

12          MR. CALEB:  Nothing further.

13          THE COURT:  Thank you very much.

14          Any redirect?

15          MS. CHOY:  No, Your Honor.

16          THE COURT:  And may this witness be excused?

17          MS. CHOY:  Yes, he may.

18          THE COURT:  All right.  Thank you.

19          Mr. Feaganes, thank you very much for being here.

20  Appreciate your time today.  Please do not discuss your

21  testimony with anyone.

22          THE WITNESS:  Yes, sir.  Thank you.

23          THE COURT:  All right.  Let's call our next witness,

24  please.

25          MS. PENG:  The United States calls Carson Beard.

Beard - Direct

1          THE COURT:  Carson Beard.

2          Come on up, if you would, please, Mr. Beard.  We're

3   going to get you sworn in here.

4          CARSON BEARD, CALLED BY THE GOVERNMENT, SWORN

5          THE COURT:  Please have a seat over here.  Mr. Beard,

6   as you sit down, I'm going to have you slide up and speak into

7   the microphone so that we can pick up your voice today.  Thank

8   you very much.

9          THE WITNESS:  Yes, sir.  Thank you.

10          THE COURT:  Go right ahead, Ms. Peng.

11          MS. PENG:  Thank you.

12                     DIRECT EXAMINATION

13   BY MS. PENG:

14   Q    Hello, sir.  Would you state your name and spell your last

15   name for the jury, please?

16   A    My name is Carson Beard, B-E-A-R-D.

17   Q    Where are you currently employed?

18   A    I'm the Clerk of the Culpeper County Circuit Court.

19   Q    Is that an elected position?

20   A    It is.

21   Q    And what are your general responsibilities as the Clerk of

22   Court?

23   A    Well, we have over 800 duties prescribed by the Code,

24   marriage licenses, concealed handgun permits, land recordings,

25   felony cases, the list goes on and on.

Beard - Direct

1  Q     Lots of duties regarding paperwork, basically?

2  A     Yes.

3  Q     When were you elected to the Clerk of Court?

4  A     I was elected in March of '21.

5  Q     And what did you do before that?

6  A     I was a deputy clerk in the courtroom, and then I became

7  chief deputy in 2020.

8  Q     Is one of the clerk's office's responsibilities processing

9  restoration of firearms petitions?

10 A     Correct, yes.

11 Q     And just at a very high level, what does the clerk's

12 office do?

13 A     Well, someone who comes in to file the petition, we take

14 it, we file it.  It's usually docketed at the attorney or the

15 petitioner's request.

16 Q     Are you familiar with the petition of an individual named

17 Rick Rahim?

18 A     I am.

19 Q     How are you familiar with that particular application?

20 A     I remember it mainly -- not when it was necessarily

21 filed -- but I remember when it was attempted to be set for a

22 hearing.

23 Q     Were you a clerk in the courtroom at the time?

24 A     I was.

25 Q     Did you observe that proceeding?

Beard - Direct

1  A    I did.

2  Q    And what do you recall about that proceeding?

3  A    I remember that it was set very quickly.  We gave the

4  attorney a motions day.  Apparently that wasn't soon enough,

5  and the next thing I knew, it was on the docket like the next

6  day.

7  Q    Do you know how it came to be that it got expedited and

8  put on the docket the very next day?

9  A    I don't know the specific details, but I know the judge

10 said to set it on the docket.

11 Q    And what happened at the hearing, if you recall?

12 A    I believe the Commonwealth was Mr. Rabb, Russell Rabb.  He

13 didn't know much about it, I believe that's what he indicated.

14 And he had some questions to the petitioner as to his address.

15 Q    Do you recall what happened after that?

16 A    I know that the petitioner testified that he lived in

17 Culpeper County.  I don't remember what else was necessarily

18 done, but after that, the petition was granted and an order was

19 entered.

20 Q    And was that petition then filed by the clerk's office?

21 A    The petition was filed by the petitioner.

22 Q    Order --

23 A    The order was then, yes, processed by the clerk's office.

24 Q    Now, with respect to Rick Rahim, are you also familiar

25 with the concealed carry weapons permit that he applied for?

Beard - Direct

1    A    I am.

2    Q    How are you familiar with that?

3    A    I know that shortly thereafter -- I don't know how long --

4    but he filed to get his CHP.

5    Q    Do you recall any particularities about that process in

6    your capacity in the clerk's office?

7    A    I don't really recall too much about the CHP.  That's

8    mainly processed by one of the other deputy clerks in my

9    office, Sylvia.  I don't know too much about the CHP.

10    Q    But you know that that was filed --

11    A    I do.

12    Q    -- after some point?

13    A    I do.

14    Q    Now I want to turn to the topic of auxiliary deputies.

15    A    Uh-huh.

16    Q    What is the clerk's office role when it comes to the

17    appointment of auxiliary deputies?

18    A    Well, we don't have much of a role.  We basically receive

19    an order from the sheriff's office saying that the sheriff has

20    appointed so-and-so to be an auxiliary deputy.  That order then

21    goes to the judge, who then enters the order.  And after that's

22    entered, I usually set up the oath.

23    Q    So someone from the clerk's office administers the oath to

24    the newly appointed deputy?

25    A    Yes.  And that was mainly me, once I became clerk.

Beard - Direct

1    Q    And so did you personally swear in individuals appointed

2    by Sheriff Jenkins?

3    A    I did.

4              MS. PENG:  Ms. Fastenau, could you pull up what's

5    already been admitted as Government's Exhibit 706.

6    BY MS. PENG:

7    Q    Now, Mr. Beard, could you describe to the jury what we're

8    looking at here?

9    A    That is the order I was talking about of the appointment

10   of it looks like several auxiliary deputies.

11   Q    And do you see that one of the names on there is Fredric

12   Gumbinner?

13   A    I do.

14   Q    And what is the portion on the bottom of this page?

15   A    The portion at the bottom is basically the court's part

16   that they sign.

17   Q    Is that signed after the individual takes the oath that

18   you were discussing?

19   A    No, it is signed before.

20   Q    And who signs that?

21   A    The judge.  That's Judge Whitlock's signature.

22             MS. PENG:  Can we go to the -- Exhibit 708, please?

23             THE COURT:  Hang on a second.  Can you take a look

24   back at that signature?  You said it's Judge Whitlock?

25             THE WITNESS:  That's correct.  It's Judge Susan L.

Beard - Direct

1   Whitlock's signature.

2   BY MS. PENG:

3   Q    And that's in 2020?

4   A    That's correct.

5             THE COURT:  Okay.  All right.

6   BY MS. PENG:

7   Q    Can we go to Exhibit 708, please.

8        Now, is this another example of one of these appointment

9   orders you were discussing?

10  A    That's right.

11  Q    And who is this appointment for?

12  A    It looks like James Metcalf.

13  Q    And who is the judge that signed the appointment order?

14  A    That is Judge Durrer's signature.

15  Q    What is the date of this?

16  A    He entered it on September 6, 2022.

17  Q    Can we go to Exhibit Number 709, which has already been

18  admitted as well.

19       And what is it that we're looking at here?

20  A    That is the oath.

21  Q    Is that the oath that's administered by the clerk's

22  office?

23  A    That's correct.

24  Q    And whose signature -- whose signature appears at the very

25  top?

Beard - Direct

1  A    That is Mr. Metcalf's signature.

2  Q    And whose signature appears on the bottom of this exhibit?

3  A    That would be my signature.

4  Q    And so is this the document that is signed after the

5  swearing-in?

6  A    That's correct.

7  Q    You can take that down.

8       Now, you mentioned earlier that you had personally sworn

9  in several individuals appointed by Sheriff Scott Jenkins?

10 A    That's correct.

11 Q    Is there a process that is generally followed for those

12 swearing-in ceremonies that you can recall?

13 A    Well, pretty much the order would come over from the

14 sheriff's office.  After the order was entered or sometimes at

15 the same time, I would try to schedule the oath just to get it

16 on my calendar, and then they'd come in.  I would swear them in

17 in the records room in my office, and that was about it.

18 Q    Is there anybody that would accompany these individuals to

19 be sworn in?

20 A    Yes.  There were -- they were always accompanied.  I can't

21 remember exactly.  Again, there was a guy who was there for

22 every one.  I still can't remember his name, but he was there

23 for pretty much every one.

24 Q    So you recall a gentleman who was there with the swearing

25 of the deputy -- auxiliary deputies that Sheriff Jenkins

Beard - Direct

1  appointed?

2  A    That's correct.  It was my understanding he was in charge

3  of them.  I don't know.

4  Q    And so do you do anything before you administer the oath

5  to these individuals?

6  A    I check their ID, yes.

7  Q    Did you swear in an individual named Rick Rahim as an

8  auxiliary deputy?

9  A    I did.

10 Q    Can we pull up what's already been admitted Exhibit 432.

11      Do you recognize anybody in this photograph, Mr. Beard?

12 A    Yes, that would be myself, Mr. Rahim, that looks like Pete

13 Siebel in the corner, Sheriff Jenkins there on the side.  I

14 can't see the other individual.

15 Q    Let me just walk through.  So Mr. Rahim is the individual

16 facing you who we see with your back facing us?

17 A    That's correct.

18 Q    And so let's start -- who is the gentleman in the black

19 mask to the right?

20 A    Pete Siebel.

21 Q    Who is Pete Siebel?

22 A    He worked for the sheriff's office.  I'm not sure what his

23 official title was, but he did work for the sheriff's office.

24 Q    And who is the gentleman to his right?

25 A    That's the sheriff.

Beard - Direct

1  Q    And did you identify someone else in the tan jacket?

2  A    I can't see -- it's cut off.  I don't know who --

3  Q    You can't tell?

4  A    I can't see their face, so I don't -- I can't -- I don't

5  know.

6  Q    Now, did you check Mr. Rahim's identification in

7  accordance with your practice prior to swearing him in?

8  A    I did.

9  Q    Why did you do that?

10 A    Well, I have to confirm his identity, but I also remember

11 it was just out of curiosity's sake, and it was at -- in that

12 petition for restoration of firearms.  So I wanted to see his

13 ID.

14 Q    What did you notice when you looked at it?

15 A    I recall it was not a Culpeper address.

16 Q    Now, in addition -- you can take that down, thank you.

17      In addition to swearing auxiliary deputies, does the

18 clerk's office also administer oaths to sheriffs who are

19 elected?

20 A    Yes.

21 Q    Can we pull up what's already been admitted as Government

22 Exhibit 719, please.

23      Mr. Beard, do you recognize what this is?

24 A    That is an oath given by the former clerk, Janice Corbin,

25 to Scott Jenkins.

Beard - Direct

1   Q    Could you just read for us that first paragraph that's

2   signed by Mr. Jenkins?

3   A    You want me to read the whole paragraph?

4   Q    Yeah.

5   A    I, Scott H. Jenkins, do solemnly swear or affirm that I

6   will support the Constitution of the United States and the

7   Constitution of the Commonwealth of Virginia, and that I will

8   faithfully and impartially discharge all of the duties

9   incumbent upon me as the Sheriff of Culpeper County for a term

10  of office commencing on January 1, 2012, and expiring on

11  December 31, 2015, according to the best of my ability.

12          MS. PENG:  Is there a second page to that exhibit,

13  Ms. Fastenau?

14  BY MS. PENG:

15  Q    And is this another oath of office that Scott Jenkins took

16  for his second term?

17  A    That would be correct.

18  Q    And what term does that cover?

19  A    January 1, 2016, and expiring on December 31, 2019.

20  Q    Now, in the course of -- you can take that down.  Thank

21  you.

22          In the course of your duties as the Clerk of Court, are

23  you familiar with the Culpeper County, Virginia Code of

24  Ordinances?

25  A    Yes, the ordinances, technically a copy has to be filed

Beard - Direct

1  with the clerk.  Now they're online, so that satisfies that

2  requirement.

3  Q    Now, generally speaking, what is the Virginia Code of

4  Ordinances for Culpeper County?

5  A    Well, it would be Culpeper County ordinances, so it's

6  basically your local rules and laws regarding the locality.

7  Q    And who passes those ordinances?

8  A    That would be the Board of Supervisors.

9  Q    Can we pull up what's already been admitted as Government

10 Exhibit 725.

11     Mr. Beard, do you recognize what Exhibit 725 is?

12 A    Yes.  That would be the Culpeper County Ordinances.

13 Q    And can you just read the particular section designated

14 9-81?

15 A    Establishment, is that correct?

16 Q    Yes.

17 A    The sheriff's office is hereby authorized to establish,

18 equip, maintain, and develop operating procedures for an

19 auxiliary deputy sheriff force.  The sheriff shall develop

20 operating procedures for an auxiliary deputy force.

21 Q    And can you also read for us section 9-83?

22 A    Appointment and training of auxiliary deputies.  A, the

23 sheriff shall have the authority to appoint as auxiliary

24 deputies as many persons of good character as he deems

25 necessary, not to exceed 15 percent of the paid force, and

Beard - Direct

1  their appointment shall be revocable at any time by the

2  sheriff.  Any auxiliary deputy appointed by the sheriff shall

3  meet the training requirements established by the deputy of

4  criminal justice services under Virginia Code Section 9.1-101,

5  and as amended, and any other applicable Virginia law.

6  Q    Can we go to page 2, please.

7       Would you please read section 9-86?

8  A    Powers and immunities of auxiliary deputies.  The members

9  of the auxiliary deputy force, when called into service by the

10 sheriff, shall have all the powers and immunities of constables

11 at common law.  Auxiliary deputy sheriffs are not authorized to

12 carry concealed weapons except for limited times and purposes

13 as specified by the sheriff.

14 Q    Can we go to the next page, please.

15      Could you please read 9-91?

16 A    Eligibility requirements.  Auxiliary deputies must be

17 United States citizens and meet all requirements established by

18 the sheriff and Virginia law.

19 Q    And then the last one, 9-92, please.

20 A    Conflict of interest.  Applicants for auxiliary deputy

21 positions must not be employed in any position that would

22 constitute a conflict of interest, as determined by the sheriff

23 and Virginia law.

24         MS. PENG:  Thank you.  That's all I have.

25         THE COURT:  Thank you, Ms. Peng.

Travis - Direct

1          Mr. Caleb?

2          MR. CALEB:  No questions for this witness, Your

3   Honor.

4          THE COURT:  All right.  Thank you very much.

5          Mr. Beard, thank you very much for being here today.

6   You're free to go.  Please do not discuss your testimony at all

7   while the case is pending.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Thank you.

10         All right.  Let's call your next witness, please.

11         MS. CHOY:  Thank you, Your Honor.  The United States

12  calls Jaime Travis.

13         THE COURT:  Jaime Travis.

14         Ms. Travis, come on up if you would, please, ma'am.

15         I'm going to get you to come on up here.  Ms. Brown

16  is going to swear you in.

17         JAIME TRAVIS, CALLED BY THE GOVERNMENT, SWORN

18         THE COURT:  Please step right over here.  Ms. Travis,

19  as you sit down, pull yourself up to the microphone and speak

20  into the microphone so that we can kindly hear your voice.

21         Ms. Choy, go right ahead, please.

22                    DIRECT EXAMINATION

23   BY MS. CHOY:

24  Q    Good afternoon, Ms. Travis.  Could you please introduce

25  yourself to the members of the jury and spell your name for the

Travis - Direct

1  court reporter?

2  A    Yes.  I am Jaime Travis.  It's J-A-I-M-E, T-R-A-V-I-S.

3  Q    Thank you.  Ms. Travis, how are you employed?

4  A    I am a full-time deposit operations manager at Blue Ridge

5  Bank.

6  Q    As a deposit operations manager, what are your duties and

7  responsibilities?

8  A    I manage my team and the processes which we employ.  We

9  basically run and handle everything to do with deposits done to

10 accounts, check presentations, returns, adjustments, we do

11 debit card.  We do pretty much everything in the back office.

12 Q    How long have you held that position?

13 A    I have been in that position about almost two years.

14 Q    And before that, did you hold a different position at Blue

15 Ridge Bank?

16 A    Yes, I was team lead for the same department, and I've

17 been in that one for about three years.

18 Q    So in total, you've been at Blue Ridge Bank for about five

19 years?

20 A    Yes.

21 Q    Where is your office located?

22 A    In Richmond, Virginia.

23 Q    In the course of your employment, have you become familiar

24 with how Blue Ridge Bank processes deposits of checks?

25 A    Yes.

Travis - Direct

1  Q    So I'd like you to walk us through that process.  So if a
2  customer walks into a Blue Ridge Bank branch and presents a
3  physical check, what does the teller do with that check?
4  A    The teller will bring up the customer's account, and then
5  what they do is they run the check through a scanner that is on
6  their desk, and the scanner presents the image of the front and
7  back of the check along with the deposit ticket.  And then that
8  is -- the image is then sent electronically to the data center.
9  Q    Okay.  So the teller creates a scanned image of the check,
10 and then can you explain in a bit more detail what happens to
11 that scanned image?
12 A    Yes.  It goes in an electronic file for presentation.  It
13 goes to the data center.  The data center will, from there,
14 take the file of the checks presented that day and send that
15 out to the Fed.  The Fed then issues out those checks in a file
16 as well to the payer's bank.
17 Q    And the data center that you mentioned --
18        THE COURT:  Explain who the Fed is so that we know
19 who the Fed is.
20        THE WITNESS:  What what is?
21        THE COURT:  You mentioned the Fed.
22        THE WITNESS:  The Federal Reserve.
23 BY MS. CHOY:
24 Q    And you also mentioned a data center.  Could you explain
25 what that is?

Travis - Direct

1  A    The data center is basically where our electronic files

2  are held and sorted and then processed out.

3  Q    Does that data center have a name?

4  A    I'm not sure about that.

5  Q    Does Blue Ridge Bank contract with a company called Jack

6  Henry & Associates?

7  A    Yes, that is our core system.

8  Q    And what is Jack Henry & Associates?

9  A    It's a core banking system that houses and runs all of our

10 transactions.

11 Q    And would that check image that's created by the teller be

12 transmitted to Jack Henry & Associates?

13 A    Yes.

14 Q    And would that check image then be housed on Jack Henry &

15 Associates' server?

16 A    Yes.

17        MR. CALEB:  Objection to the leading.

18        THE COURT:  Don't -- let's not lead at this point.

19        MS. CHOY:  I'll rephrase.

20  BY MS. CHOY:

21 Q    Do you have an understanding of what happens to that check

22 image?

23 A    Yes.

24 Q    Do you have an understanding of where it would be housed?

25 A    Yes.

Travis - Direct

1  Q    And where is that?

2  A    It's housed in our data center on the server, which feeds

3  into another back office tool that we use where we can pull the

4  images.

5  Q    And who controls or owns that server that houses the check

6  image?

7  A    Jack Henry.

8  Q    So that's not a server that is owned by -- is that a

9  server that's owned by Blue Ridge Bank?

10 A    Correct.

11 Q    Is it a server that's owned by Blue Ridge Bank?

12 A    No.  It's owned by Jack Henry.

13 Q    Do you have an understanding of where Jack Henry is

14 located?

15 A    Well, it has multiple locations.

16 Q    Do you have an understanding of where those are?

17 A    There's multiple ones.  It depends on what you're looking

18 for.  I guess for data center we have -- we have the one in

19 Allen, Texas, which is our main data server that everything

20 goes to.  Then we have backups.  I believe one is in Missouri.

21 Q    And has that process been the same for the entire time

22 that you have worked at Blue Ridge Bank?

23 A    To my knowledge, yes.

24         MS. CHOY:  Ms. Fastenau, could you please bring up

25 Exhibit 310, which is already in evidence.  And could you

Travis - Direct

1  please zoom in on the top half.

2  BY MS. CHOY:

3  Q    So Ms. Travis, looking at this document, are you able to

4  tell what it is?

5  A    Yes.

6  Q    What is it?

7  A    It is an image of a transaction that was run that shows

8  the deposit ticket that was created and the check that was

9  presented.

10 Q    And does this document indicate where that check was

11 presented?

12 A    It does in the -- on the deposit ticket on the left-hand

13 side, it tells you which branch.

14 Q    And what does it indicate?

15 A    It looks like Culpeper.

16 Q    So based on your understanding of how this process works,

17 would this check have been scanned at that Culpeper branch?

18 A    Yes.

19 Q    And would that image then have been uploaded to the Jack

20 Henry system?

21 A    Yes.

22 Q    And to your knowledge, does Jack Henry have any locations

23 or data centers within the Commonwealth of Virginia?

24 A    No.

25           MS. CHOY:  Nothing further.

Travis - Cross

1          THE COURT:  Mr. Caleb?

2          MR. CALEB:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. CALEB:

5    Q    Okay.  So let me get this straight.  A customer comes into

6    a bank in Virginia, right?

7    A    Uh-huh.

8    Q    Yes?

9    A    Yes.

10   Q    Okay.  Because that's where Blue Ridge is located?

11   A    Yes.

12   Q    That's where you work?

13   A    For the most part, yes.  We have some in North Carolina,

14   but yes.

15   Q    But we're speaking specifically about --

16   A    In Virginia.

17   Q    -- Virginia, right?

18   A    Yes.

19   Q    And that's where you work?

20   A    Right.

21   Q    And so someone comes to the teller, they deposit a check,

22   right?

23   A    (No verbal response).

24   Q    Yes?

25   A    Yes.  I'm sorry.

158

Travis - Cross

1    Q    Just for the court reporter.

2         And so at the front, there's a computer?

3    A    Yes.

4    Q    And the check is scanned into the computer, right?

5    A    Yes.  It's a separate scanner and it runs through.

6    Q    The scanner is located at --

7    A    The teller station.

8    Q    At the teller station in the branch?

9    A    Uh-huh.

10   Q    Yes?

11   A    Yes.

12   Q    In Virginia?

13   A    Yes.

14   Q    Okay.  And so -- and this data center you're discussing,

15   not -- this data center is not a place that you visited, right?

16   A    No.

17   Q    You don't know anything about this data center, correct?

18   A    Not physically, no.

19   Q    And what you do know is just because you've kind of -- I

20   guess you've asked around; it's not something you know from

21   your personal knowledge?

22   A    So when we -- in deposit operations, we get alerts, and

23   everything -- when something happens with the data center, if

24   it needs to be backed up or anything like that.  Plus we have

25   had meetings with Jack Henry, and they refer to the data center

Travis - Cross

1   there.

2   Q    But this isn't something that you're personally acquainted

3   with?

4   A    I've never physically been there, no.

5          MR. CALEB:  No further questions.

6          THE COURT:  Any redirect?

7          MS. CHOY:  No, Your Honor.

8          THE COURT:  All right.  Thank you very much for being

9   in, Ms. Travis.  Please do not discuss your testimony.  Thank

10  you.

11         Do you have a ten-minute witness that can take us

12  to --

13         MS. CHOY:  I think our next witness will be a bit

14  longer, Your Honor.

15         THE COURT:  Okay.  So ladies and gentlemen, I think

16  this probably sounds to be about the right time to take our

17  lunch break.  It is 12:30.  Let's try to be back at 1:30.  I

18  will remind you, do not discuss the case with anyone or amongst

19  yourselves, or begin to formulate any opinions at all.  With

20  that, take your coat; I think it's still cold outside.  And you

21  all have a nice lunch if you decide to go out.

22         Stand in recess until 1:30.

23  (*Jury out, 12:30 p.m.*)

24         THE COURT:  All right.  You all please have a seat.

25  Who do we have this afternoon?

Travis - Cross

1            MS. SMITH:  Your Honor, we have a few additional

2    witnesses.  The government actually wanted to speak with you

3    about that.  We have Fred Gumbinner, David Jones, and Chad

4    McKnight.  We've been moving a little quicker than we

5    anticipated.  We anticipate that to be about two and a half to

6    three hours of testimony, which would put us around 4:30 or 5.

7    Our next witness is a significantly long witness, and so we

8    wanted to --

9            THE COURT:  Who is your next witness after that?

10           MS. SMITH:  Kevin Rychlik.

11           THE COURT:  Okay.

12           MS. SMITH:  And so I know you said you didn't want to

13   start someone at the end of the day.  So we were curious as to

14   whether or not we should just end with Mr. McKnight.

15           THE COURT:  So if we did that -- and I appreciate --

16   because I do like to keep the jury kind of up to speed as to

17   where we are -- where does that put you all, do you think, with

18   respect to being able to finish your case next week?  Where

19   would you expect it to be?

20           MS. SMITH:  By the end of Tuesday, Your Honor.

21           THE COURT:  By the end of Tuesday?

22           MS. SMITH:  Maybe at the beginning of Wednesday, but

23   given how fast we've been able to move and given the longer

24   days, I think Wednesday morning would be a safe bet.

25           THE COURT:  It would be fair to me to be able to then

Travis - Cross

1  tell the jury that given the way things are moving along, maybe

2  we'll get through a little bit early this afternoon, but we

3  should be ahead of schedule still for next week?

4          MS. SMITH:  I think we'll be on schedule, Your Honor.

5          THE COURT:  We'll be on schedule.  All right.  And to

6  the extent the defendant decides to put on any evidence, you'll

7  be ready to go by Wednesday morning?

8          MR. ANDONIAN:  Yes, Your Honor.

9          THE COURT:  Okay.  So that would get everything in,

10 we would hope, then, by the end of the day on Wednesday, with

11 the idea maybe we can instruct the jury on probably Thursday

12 morning and get the case to them.

13          Okay.  Fair enough.  Yeah, that will be fine.  I

14 mean, if you were going to tell me that it was going to push us

15 late, I would say no.  But since it leaves us on schedule at

16 worst, I think we can -- that will work just fine.

17          Anything else we need to address, Ms. Smith?

18          MS. SMITH:  No, Your Honor.

19          THE COURT:  Mr. Andonian, Mr. Caleb?

20          MR. ANDONIAN:  No, Your Honor.

21          THE COURT:  Very well.  We'll stand in recess till

22 1:30.  Thank you.

23          (Recess)

24          THE COURT:  We're back on the record in the matter of

25 *United States v. Jenkins*.  Let the record reflect the

Gumbinner - Direct

1  government is present by its counsel.  The defendant likewise

2  is present along with the benefit of counsel.

3         Anything we need to take up from the government's

4  standpoint before we bring the jury in?

5         MS. CHOY:  No, Your Honor.

6         THE COURT:  How about from the defendant's

7  standpoint?

8         MR. ANDONIAN:  No, Your Honor.

9         THE COURT:  All right.  Let's go ahead and bring the

10 jury in.

11 **(***Jury in, 1:33 p.m.***)**

12        THE COURT:  Ladies and gentlemen, please have a seat.

13        The record will reflect the jury is present and

14 seated.

15        Ladies and gentlemen, welcome back from lunch.  So in

16 talking with counsel, we remain on schedule, so I'm very

17 pleased with that.  I'm hopeful that, you know, you all may get

18 an opportunity for a sunset this afternoon, if we're diligent

19 with our work.

20        So with that, let's have the government call their

21 next witness.

22        MS. CHOY:  Thank you, Your Honor.  The government

23 calls Fredric Gumbinner.

24        THE COURT:  All right.  Fredric Gumbinner.

25     FREDRIC GUMBINNER, CALLED BY THE GOVERNMENT, SWORN

Gumbinner - Direct

1              THE COURT:  Have a seat right over here,

2    Mr. Gumbinner.  As you sit down, I'll have you slide up to the

3    microphone and make sure you speak into the microphone so we

4    can pick up your voice.

5              THE WITNESS:  Okay.

6              THE COURT:  All right.  Thank you.

7              Go right ahead, Ms. Choy.

8                      DIRECT EXAMINATION

9    BY MS. CHOY:

10   Q    Good afternoon, Mr. Gumbinner.  Could you please introduce

11   yourself to the jury and spell your name for the record?

12   A    My name is Fred Gumbinner.  Fredric, F-R-E-D-R-I-C,

13   Gumbinner, G-U-M-B-I-N-N-E-R.  Good afternoon.

14   Q    Mr. Gumbinner, where are you from originally?

15   A    Originally from Tarrytown, New York.

16   Q    And where do you reside now?

17   A    Currently in Bluffton, South Carolina, as of earlier this

18   month.  Prior to that, Fairfax, Virginia.

19   Q    How long did you reside in Fairfax, Virginia?

20   A    From 1990 until the end of -- December 3rd of this year.

21   Q    What is your educational background?

22   A    I have a bachelor of arts from Colgate University and a

23   law degree from the University of Michigan.

24   Q    Were you charged in connection with this case?

25   A    Yes, I was.

Gumbinner - Direct

1  Q    And before you were charged in this case, what was your

2  occupation?

3  A    Combination of business consultant, advisor, and lawyer.

4  Q    Did you own businesses?

5  A    Yes, I've owned and run a number of different businesses.

6  Q    Generally speaking, what was the nature of those

7  businesses?

8  A    Most of them relate to providing the financing for early

9  stage startup companies, real estate projects, providing

10 funding and financing to other companies.

11 Q    And you mentioned you were also an attorney.  What kind of

12 law did you practice?

13 A    Corporate finance and energy work, energy contract.

14 Q    Mr. Gumbinner, let's talk a bit about why you're here.

15 You mentioned that you were charged in this case.  Did you

16 plead guilty to a felony in connection with this case?

17 A    Yes, I did.

18 Q    What did you plead guilty to?

19 A    I pled guilty to one count of violating Code Section 666,

20 which is bribery of a program that receives federal funding.

21 Q    And was your guilty plea based on payment that you made to

22 the defendant, Scott Jenkins?

23 A    Yes.

24 Q    What was the amount of that payment?

25 A    I paid $20,000 to an intermediary for the benefit of

Gumbinner - Direct

1   Sheriff Jenkins and his campaign.

2   Q    You mentioned an intermediary.  Who was that?

3   A    The intermediary's name was Tariq -- Rick Rahim.

4   Q    And was that -- did you expect anything in exchange for

5   that payment?

6   A    Yes, I did.

7   Q    What did you expect?

8   A    A variety of things, including that Sheriff Jenkins would

9   deputize me as a deputy in Culpeper County.

10  Q    Have you been sentenced yet in this case?

11  A    No, I have not.

12  Q    Did you enter a plea agreement with the government?

13  A    Yes, I did.

14  Q    And as part of your plea agreement, did you agree to

15  testify truthfully when called upon to do so, including at this

16  trial?

17  A    Yes.

18  Q    And did you meet with me and other prosecutors and agents

19  to prepare for your testimony?

20  A    Yes, I have.

21  Q    And you were originally charged with more than just that

22  one count of federal programs bribery; is that right?

23  A    Correct.  I was indicted for more than that, correct.

24  Q    What other offenses were you indicted for?

25  A    There was a conspiracy charge, I believe violation of

Gumbinner - Direct

1   honest services, and maybe additional counts of 666 violations.

2   Q    As part of your plea agreement, did the government agree

3   to dismiss those additional charges at your sentencing?

4   A    Yes.

5   Q    And what else are you hoping that the government will do

6   as a result of your cooperation?

7   A    I hope that they will provide a recommendation for a

8   sentence reduced from the sentencing guidelines for the crime.

9   Q    Is that why you agreed to cooperate?

10  A    That is one of the reasons, yes.

11  Q    Do you understand that whether you get any credit for your

12  cooperation and how much credit you may or may not get doesn't

13  depend at all on the outcome of this case, meaning whether the

14  defendant is found guilty?

15  A    That is my understanding, yes.

16  Q    What's your obligation under your plea agreement?

17  A    My obligation is to provide honest testimony, tell the

18  truth, and cooperate.

19  Q    Who will decide your sentence?

20  A    The judge will be the ultimate determiner of the ultimate

21  sentence.

22  Q    Has anyone made you any promises about whether or not

23  you're going to get a reduced sentence from the judge?

24  A    No one has.

25  Q    So you testified earlier that you made a $20,000 payment

Gumbinner - Direct

1  to Scott Jenkins in exchange for becoming a deputy.  So I'd

2  like to walk you through those events.

3      Approximately when did you first hear about the

4  possibility of becoming an auxiliary deputy in Culpeper County?

5  A    In early 2019.

6  Q    How did you hear about that opportunity?

7  A    From Rick Rahim.

8  Q    And how are you acquainted with Rick Rahim?

9  A    I met him originally in connection with some poker games,

10 private poker games, and then through various discussions, we

11 both contemplated and pursued a number of business

12 arrangements.

13 Q    Roughly how long have you known him?

14 A    Since around the beginning of 2019.

15 Q    And what was the nature of your relationship with him?

16 A    It was a combination of social, primarily related to

17 private poker games, but also a number of business

18 transactions, several.

19 Q    And what was the nature of those business transactions?

20 A    Some involved looking at various investments, but the

21 biggest one was companies of mine providing loans to one of his

22 companies, BV Management.

23 Q    So how did the topic of becoming an auxiliary deputy come

24 up?

25 A    In Mr. Rahim's offices he has various photos and

Gumbinner - Direct

1  slideshows of him associating with luminaries, and I think one

2  of those was him with Sheriff Jenkins.  And just pursuant to

3  numerous meetings with him, it came up that he was involved

4  with Sheriff Jenkins and he was a good friend of him, and he

5  suggested that he could exert his influence with the sheriff to

6  provide folks with deputy badges.

7  Q    Were you interested in becoming a deputy?

8  A    Yes, I was.

9  Q    Why?

10 A    A variety of reasons.  I had known two associates from

11 about 20 years ago who had deputy badges, and they had told me

12 back in about 2000 they got those deputy badges by providing

13 contributions and support to a sheriff in southern Virginia.

14 And they indicated, or I believe that --

15           MR. CALEB:  Objection.

16           THE COURT:  Well, yeah, I think we're getting into

17 hearsay at this point.

18  BY MS. CHOY:

19 Q    Yeah, there's no need to tell us what anyone else told

20 you.

21      My question was, why were you interested in becoming a

22 deputy?

23 A    I thought it would be cool.  I thought it would be --

24 going to become part of another club.  And I often have a

25 little bit too much of a lead foot while driving, so a comfort

Gumbinner - Direct

level, given what my understanding that with being a member of

law enforcement, one could get professional courtesy if stopped

for traffic violations.

Q    And did you have an understanding of what powers or

authorities came with being an auxiliary deputy?

A    My belief and understanding is that as a auxiliary deputy

or deputy, one would have the full powers to do whatever a law

enforcement person could do, such as issuing tickets,

providing -- literally that it was tantamount to being a formal

deputy.

Q    And you mentioned earlier that Mr. Rahim referenced his

relationship with Sheriff Jenkins.  What did he tell you about

that relationship?

A    He -- this is going back to 2019.  So I'm trying to recall

as best as I can.  It included things like he socialized with

him, he provided various helicopter services and/or rides to

youths in Culpeper County.  My understanding was he was

involved with search and rescue activities, along with, I

believe, other individuals.  I believe he also said he had

various financial relationships with the sheriff.

Q    And did Mr. Rahim tell you that he had supported the

sheriff financially?

A    Yes, he did.

Q    What did he tell you?

A    He said he provided various support.  He helped -- helped

Gumbinner - Direct

1   or planned to help with the sheriff's re-election through

2   putting out billboard ads, maybe getting radio spots,

3   campaigning with and for him.

4   Q    Did he indicate whether he had given any money to the

5   sheriff?

6   A    At that point in time, I -- I do not recall specifically

7   at that point in time.  Later on at different points it was my

8   understanding that he did, yes.

9   Q    And did Mr. Rahim tell you what you would have to do to

10  become deputized?

11  A    He said I would have to support the sheriff, make a

12  contribution to his re-election campaign.

13  Q    Did you and Rahim discuss an amount of that contribution?

14  A    Yes.  Mr. Rahim said that it would require a $20,000

15  contribution.

16  Q    And did you think that money was going to the campaign or

17  to Scott Jenkins personally?

18  A    I believed that all or a portion of it was to go to one or

19  both of those.

20  Q    And at that time, had you ever met Scott Jenkins?

21  A    No, I had not.

22  Q    Had you ever heard of him before he came up with Rick

23  Rahim?

24  A    No, I did not -- had not.

25  Q    And do you have any familiarity with his policy agenda?

Gumbinner - Direct

1  A    I do now, but at the time I did not.

2            MS. CHOY:  So Ms. Fastenau, could you please bring up

3  Government's Exhibit 114, which is already in evidence.

4  BY MS. CHOY:

5  Q    Do you recognize this document, Mr. Gumbinner?

6  A    Yes.

7  Q    What is this document?

8  A    It is an e-mail from Mr. Rick Rahim to me from September

9  of 2019.

10  Q    And is there another e-mail that's below that?

11  A    Yes.

12  Q    And what is that e-mail?

13  A    That's an e-mail from me to Mr. Rahim about this matter.

14  Q    So directing you to that bottom e-mail on the page, was

15  that sent on September 27th, 2019?

16  A    Yes.

17  Q    And you said, Rick, please call me this morning to discuss

18  the specifics/logistics for getting the 20K donation done.

19        What was that 20K donation you were referring to?

20  A    That was the $20,000 that Mr. Rahim said was required for

21  me to give him in order in part for me to get deputized by the

22  sheriff.

23  Q    And then you said, only tweak from my end is clarifying

24  that it will apply for as long as in office, no need for annual

25  or periodic tweaking.

Gumbinner - Direct

1    Can you explain what you meant by that?

2  A    Yes.  Sometimes in discussing or negotiating things with

3  Mr. Rahim, things are not always very clear.  So I was trying

4  to clarify that if I did this, it would be a one-time payment,

5  and that Mr. Rahim and/or the sheriff would not come back to me

6  for annual or other -- other contributions.

7  Q    And directing you to the e-mail that's above that, is that

8  the reply from Rick Rahim?

9  A    Yes, it is.

10  Q    And what is he conveying to you in this reply?

11  A    He said, notwithstanding what I said, he was saying that

12  there is no changes, and the key thing is getting support to

13  him right now as soon as possible for his initial elections.

14  Then he creates a possibility that he might be coming back to

15  me for more in the future.

16  Q    And did you ultimately agree to that deal?

17  A    I did not respond to that, but I did agree and I did make

18  the $20,000 payment to Rahim.

19  Q    Okay.  So let's go through that payment.  Where did that

20  payment occur?

21  A    I was in Mr. Rahim's office in Great Falls, Virginia.

22  Q    And when was that; do you recall?

23  A    On or about October 1st of 2019.

24  Q    And what do you recall about that meeting?  What happened?

25  A    When we were at the meeting, I asked Mr. Rahim how he

Gumbinner - Direct

1  wanted the payment, and he said I should give a check to one of

2  his Amazon-related companies called Food Truck Company.

3          MS. CHOY:  Ms. Fastenau, could you please bring up

4  307, which is in evidence, and flip to the second page.  And

5  could you please zoom in on the check image.

6  BY MS. CHOY:

7  Q    Do you recognize this, Mr. Gumbinner?

8  A    Yes, I do.

9  Q    What is it?

10  A    It is the check that I wrote and gave to Mr. Rahim related

11  to this matter.

12  Q    And what's the date on that check?

13  A    October 1st, 2019.

14  Q    And what's the amount?

15  A    $20,000.

16  Q    And who is it made out to?

17  A    Food Truck Company, LLC.

18  Q    And I think you mentioned earlier that's one of

19  Mr. Rahim's businesses; is that right?

20  A    Yes.

21  Q    But this money wasn't really intended for Food Truck

22  Company, LLC, was it?

23          MR. CALEB:  Objection.

24          THE COURT:  Rephrase.

25    BY MS. CHOY:

Gumbinner - Direct

1  Q    Let me rephrase.

2       Who was the real intended recipient of this money?

3  A    The intent was Rahim was going to use this to provide

4  funds in support for Sheriff Jenkins and his re-election.

5  Q    And what is written on that memo line?

6  A    LLC investment.

7  Q    Did you write that?

8  A    Yes, I did.

9  Q    And is this really an LLC investment?

10  A    No.  It was not.

11  Q    And what is it?  What is it really?

12  A    This was the funds I was giving to Rahim for the benefit

13  of Sheriff Jenkins.

14  Q    And what's the check number of this check?

15  A    I believe 1169 or 1159.

16       MS. CHOY:  Ms. Fastenau, could you go back to page 1,

17  please, and could you zoom in on the top of the page, please.

18  BY MS. CHOY:

19  Q    So do you recognize this document, the first page?

20  A    Yes.

21  Q    What is the first page of this document?

22  A    I'm sorry, I don't understand the question.

23       MS. CHOY:  Lauren, could you show us the --

24  Ms. Fastenau, could you show us the top part showing -- yeah,

25  there you go.

Gumbinner - Direct

1  BY MS. CHOY:

2  Q    So do you recognize what this document is pulled from?

3  A    I believe this is something that was pulled from an

4  account statement or summary from one of my bank accounts.

5  Q    And does it indicate when check 1169 was withdrawn from

6  your account?

7  A    September 2nd -- sorry, 10/2 -- October 2nd, 2019.

8  Q    Thank you.

9         MS. CHOY:  And Ms. Fastenau, you can pull that down.

10  BY MS. CHOY:

11  Q    So what was the purpose of this payment vis-à-vis Scott

12  Jenkins?

13  A    The payment was to help Rahim further establish his

14  credibility and stature with Jenkins in order to provide

15  additional funds for his re-election.  And whether it was going

16  to be cash to him or to his election and/or to pay for

17  billboards or other advertisements, the purpose of it was that

18  it was to go to furthering the re-election.

19  Q    Did you expect something in exchange for that payment?

20  A    Yes.  I hoped or expected to, among other things, become

21  deputized in Culpeper County.

22  Q    Would you have made that payment if you could not become

23  deputized?

24  A    No.

25  Q    And did you think you'd be able to get the badge without

Gumbinner - Direct

1   giving a payment?

2   A     No.

3   Q     So did you understand that it was an exchange?

4   A     Yes.

5   Q     And again, did you support Mr. Jenkins's policy agenda?

6   A     No.

7   Q     So this payment didn't have anything to do with his policy

8   agenda?

9              MR. CALEB:  Objection.

10             THE COURT:  Leading.  Rephrase.

11  BY MS. CHOY:

12  Q     I'll just move on.

13        Do you know what Rick Rahim actually did with that money?

14  A     No.

15  Q     But at some point, did you hear back from Rick Rahim about

16  getting sworn in?

17  A     Yes, I did.

18  Q     And at that point, did another individual get involved?

19  A     Yes.

20  Q     Who?

21  A     I believe he's a lieutenant, but Kevin Rychlik.

22             MS. CHOY:  And Ms. Fastenau, could you please pull up

23  Government's Exhibit 115, which is in evidence, and could you

24  flip to page 2, please.

25  BY MS. CHOY:

Gumbinner - Direct

1  Q    Do you recognize this document, Mr. Gumbinner?

2  A    I believe this is a series of text messages involving Rick

3  Rahim, Kevin Rychlik, and myself.

4  Q    And what's the date of that text message exchange?

5  A    December 23rd, 2019.

6  Q    So a couple months later; is that fair?

7  A    Correct.

8  Q    And directing your attention to the first text message on

9  the page, Mr. Rahim says, Kevin and Fred, please meet each

10 other; is that right?

11 A    Yes.

12 Q    And then Mr. Rychlik says, good morning, Fred?

13 A    Yes.

14 Q    Is that right?

15      And then Rahim continues, Kevin, Fred is the close friend

16 who helped me provide all the recent support for our great

17 sheriff.

18      What did you mean -- what did you understand Mr. Rahim to

19 mean by support?

20 A    I believed it related to the financial contribution that I

21 gave to Rahim for the sheriff.

22 Q    And then Mr. Rahim continued, our goal would be to have

23 Fred possibly sworn in this coming January; is that right?

24 A    Correct.

25 Q    Did you end up getting sworn in that January?

Gumbinner - Direct

1    A    No, I did not.

2    Q    But did you eventually get sworn in?

3    A    Yes, I did.

4    Q    Do you recall when that was?

5    A    I believe it was in March or April of 2020.

6    Q    So I'd like you to walk us through the events of that day.

7    So first of all, did you meet Scott Jenkins that day?

8    A    No, I did not.

9    Q    At the time you got sworn in as an auxiliary deputy, had

10   you ever met Scott Jenkins?

11   A    No.

12   Q    So he swore you in without ever meeting you?

13   A    I'm sorry, when you say he swore me in --

14   Q    He allowed you to be sworn in without meeting you?

15   A    Correct, yes.

16            MR. CALEB:  Objection.

17            THE COURT:  Overruled.  Go ahead.

18   BY MS. CHOY:

19   Q    Did you have to interview for that position?

20   A    No.

21   Q    Did you have to provide a resumé?

22   A    No.

23   Q    Did they check any references?

24   A    I have no idea.

25   Q    Did you ever hear about them checking any references?

Gumbinner - Direct

1  A     No.

2            MR. CALEB:  Objection.

3            THE COURT:  Overruled.  He's already answered.

4  BY MS. CHOY:

5  Q     Did they ask you for your -- about your qualifications?

6  A     No.

7  Q     And do you have any law enforcement experience?

8  A     No.

9  Q     Do you have any military experience?

10 A     No.

11 Q     Do you have any law enforcement training?

12 A     No.

13 Q     Do you have any firearms training?

14 A     No.

15 Q     So going back to the day you were sworn in, what happened

16 that day?

17 A     Rahim and Rychlik arranged for me to meet them at the

18 sheriff's office, which I did.  I met them, met some other

19 people in the sheriff's department, and then we drove over to

20 an official building in Culpeper.  I believe it could be the

21 courthouse or administrative building.  There I signed some

22 additional paperwork and got sworn in.  And then we -- sorry,

23 then we went back to the -- I believe it was the sheriff's

24 office, and at that point I got a photograph taken and an ID

25 card produced, and several of us went out to lunch.

Gumbinner - Direct

1   Q    Who attended that lunch; do you recall?

2   A    I believe it was another Jenkins, the son of another

3   Jenkins, at least one or two of the other people in the

4   sheriff's office, Rick Rahim, and Kevin Rychlik.

5           MS. CHOY:  And Ms. Fastenau, could you please pull up

6   Government Exhibit 707.  And this is already in evidence.

7           Could you highlight the top half of that page,

8   please.

9   BY MS. CHOY:

10  Q    Do you recognize this document, Mr. Gumbinner?

11  A    Yes.

12  Q    What is it?

13  A    It is an oath and qualification for auxiliary deputy

14  sheriffship.

15  Q    And that's the oath that you swore?

16  A    Yes, it is.

17  Q    And is that your signature?

18  A    Yes, it is.

19          MS. CHOY:  Ms. Fastenau, could you please bring up

20  Government's Exhibit 431.

21  BY MS. CHOY:

22  Q    Do you recognize this document?

23  A    Yes.

24  Q    Generally speaking, what is it?

25  A    It's a photograph taken with me and I believe another

Gumbinner - Direct

1  Jenkins out of the Culpeper sheriff's office, taken --

2  Q    You can stop right there.  Is this a fair and accurate

3  depiction of the scene of that sheriff's office at that time?

4  A    Again, I don't think that was the sheriff's office.  I

5  think it was the other building.

6  Q    The other building?

7  A    Yes.

8          MS. CHOY:  The government moves Exhibit 431 into

9  evidence.

10         THE COURT:  Any objection?

11         MR. CALEB:  No objection.

12         THE COURT:  All right.  So admitted, and it may be

13  published to the jury.

14         (Government Exhibit 431 marked and admitted.)

15  BY MS. CHOY:

16  Q    So remind us what day was this taken?

17  A    That same day, March 6th, I believe.

18  Q    And who do you believe that person is that you're standing

19  with?

20  A    I thought it was another law enforcement officer of

21  Culpeper County, I believe a brother of Sheriff Scott Jenkins.

22  Q    You can take that down, thank you.

23         So Mr. Gumbinner, that day did you receive your badge?

24  A    Yes, I did.

25  Q    And did you receive your credentials?

Gumbinner - Direct

1   A    Yes, I did.

2   Q    I'm showing you what's been marked as Government's Exhibit

3   512.  Do you recognize that?

4   A    Yes.

5   Q    What is that?

6   A    It's the badge I received.

7          MS. CHOY:  The government moves Exhibit 512 into

8   evidence.

9          THE COURT:  Any objection?

10          MR. CALEB:  No objection.

11          THE COURT:  So admitted, and may be published to the

12   jury.

13          (Government Exhibit 512 marked and admitted.)

14          THE COURT:  Do you want to pass that down, Ms. Choy,

15   or just get them both in?

16          MS. CHOY:  I'll get these both in.

17    BY MS. CHOY:

18   Q    And I'm showing you what's been marked as Government's

19   Exhibit 513.  Do you recognize that?

20   A    Yes, I do.

21   Q    What is that?

22   A    This is the ID card that was provided to me at the

23   sheriff's office, identifying me as a deputy sheriff in

24   Culpeper County.

25          MS. CHOY:  The government moves Exhibit 513 into

Gumbinner - Direct

1    evidence.

2            THE COURT:  Any objection?

3            MR. CALEB:  No objection.

4            THE COURT:  So admitted, and may be published to the

5    jury.

6            (Government Exhibit 513 marked and admitted.)

7            MS. CHOY:  And Ms. Fastenau, could you please pull up

8    438?

9    BY MS. CHOY:

10   Q    Can you see that?

11   A    Yes.

12   Q    What is this?

13   A    That's a photo of the badge I received, and the ID badge

14   received -- the badge that I received and the ID badge that I

15   received.

16           MS. CHOY:  Government moves 438 into evidence.

17           THE COURT:  Any objection?

18           MR. CALEB:  No objection.

19           THE COURT:  All right.  So admitted.  May be

20   published to the jury.

21           (Government Exhibit 438 marked and admitted.)

22    BY MS. CHOY:

23   Q    So Mr. Gumbinner, during this period when you were

24   interacting with Mr. Rahim and Mr. Rychlik, did you have any

25   belief about their relationship to the sheriff?

Gumbinner - Direct

1   A    Yes.

2   Q    What was your impression of their relationship to the

3   sheriff?

4   A    A combination of things.  As mentioned earlier, Mr. Rahim

5   had said he had a combination of both a social and professional

6   relationship with the sheriff vis-à-vis Mr. Rychlik, who I

7   thought was a lieutenant.  Guess he may be a sergeant.  But

8   that Mr. Rychlik was part of the Culpeper County law

9   enforcement team involved in a number of things, including

10  search and rescue activities, helicopter services.  And

11  Mr. Rychlik was presented to me as the principal driver behind

12  the sheriff's VIP program.

13  Q    And did you have any understanding of whether Mr. Rahim

14  and Mr. Rychlik had authority to act on the sheriff's behalf?

15  A    I absolutely believed that Mr. Rychlik did.  And I was

16  under the impression from Mr. Rahim's statements that he had

17  various authority.

18  Q    What led you to believe that?

19  A    From Mr. Rahim's standpoint, a combination of his

20  statements and vis-à-vis Rychlik.  When I met with Mr. Rychlik,

21  I believe he had a Culpeper County vehicle when we met at

22  Silver Diner -- I'm sorry, Culpeper County sheriff's vehicle.

23  Q    And did those individuals -- you were dealing with them in

24  the context of getting sworn in as an auxiliary, correct?

25  A    Yes.

Gumbinner - Direct

1  Q    And you were in fact sworn in as an auxiliary, correct?

2  A    Yes.

3  Q    And after you became an auxiliary, did you receive any

4  training?

5  A    No, I did not.

6  Q    Did you have to qualify with the use of a firearm?

7  A    No.

8  Q    Were you ever called in for service?

9  A    No.

10 Q    Did you ever assist with any events?

11 A    No.

12 Q    Did you ever help respond to any emergencies?

13 A    No.

14 Q    Did you ever participate in search and rescue operations?

15 A    No.

16 Q    Did you do anything at all for the sheriff's office?

17 A    No.

18 Q    And other than a lunch in January of 2023, which we'll get

19 to in a sec, did you ever go back to Culpeper?

20 A    Not to my recollection -- or no -- yes, I visited

21 Mr. Rychlik's store on two occasions.

22 Q    Is Mr. Rychlik's store in Culpeper?

23 A    It was either in Culpeper or Manassas.  I don't recall

24 now.  Sorry.

25 Q    Did you ever use your badge for anything?

Gumbinner - Direct

1   A    Yes.

2   Q    Tell us about that.

3   A    A couple of things.  I asked if I could use the badge to

4   get a COVID vaccine early as a first responder.  I tried to --

5   Q    Let me pause you there.  Who did you ask?

6   A    Rahim and Rychlik.

7   Q    And did you get a response?

8   A    I think their response was you can try.

9   Q    And did you represent yourself as a first responder in

10  order to get a COVID vaccine?

11  A    I tried to, yes.

12  Q    And what was the second thing you were about to say?

13  A    I also one time had an expired placard for disability

14  parking.  It was expired by about a week.  And I parked in a

15  handicap space, and was issued a citation for that.  When I

16  learned that the issuing law enforcement person was also a

17  deputy, I indicated to her that I was a deputy in Culpeper

18  County.

19  Q    And did that get you out of the ticket?

20  A    No.

21  Q    And what was the other occasion you mentioned?

22  A    On two occasions, although I was TSA pre-cleared at the

23  time, occasionally the airlines do not mark the boarding pass

24  correctly, so I still went into the TSA pre line trying to get

25  through airport security on two occasions.  In one instance,

Gumbinner - Direct

1  the TSA person allowed me to continue through.  On another

2  occasion, the TSA representative sent me back to the other

3  line.

4  Q    And were there any other occasions when you used that

5  badge?

6  A    Yes.  The other occasion was one time driving along the

7  beltway there was a bad traffic jam, and I was nauseous and had

8  some potential diarrhea issues, so to avoid or to expedite

9  getting off to an exit, I went in the breakdown lane to pass by

10  the traffic, and while doing so, I passed a police officer and

11  I held up my badge to the window for that officer when I drove

12  past.

13  Q    And did that officer pull you over?

14  A    No.

15  Q    So did you eventually meet Scott Jenkins?

16  A    Yes, I did.

17  Q    When did that occur?

18  A    January of 2023.

19  Q    And so was that several years after you got sworn in?

20  A    Correct.  I was sworn in in March of 2020.

21  Q    And by the way, let me go back to that.  You got sworn in

22  March of 2020, but you paid the money to Rick Rahim I think it

23  was October of 2019; is that right?

24  A    Correct.

25  Q    Do you have an understanding of why there was that lag in

Gumbinner - Direct

1  time?

2  A     Part of it would have been for Sheriff Jenkins to get

3  reelected in November.  But besides that, I do not know the

4  reason for the gap.

5  Q     Okay.  So let's go back to when you met Scott Jenkins.

6  Can you tell us about that occasion?

7  A     Lieutenant Rychlik -- or Sergeant Rychlik set up a

8  meeting, and we met and had lunch in January of 2023.

9  Q     Where did that lunch occur?

10 A     At a restaurant in Culpeper.

11 Q     And so who was present for that lunch?

12 A     I believe it was just Kevin Rychlik, Sheriff Jenkins, and

13 myself.

14 Q     And you were talking earlier about your belief that Kevin

15 Rychlik could act on Scott Jenkins's behalf.  Did anything

16 about that lunch affect that belief?

17 A     More prior to that lunch, I knew that Rychlik had arranged

18 for other people to, quote, join the, quote, VIP program and

19 get deputized along with contributions made to Sheriff Jenkins.

20 Q     Now, at that lunch, did the topic of Rick Rahim come up?

21 A     Yes, it did.

22 Q     And did the topic of Rick Rahim's residency in Culpeper

23 come up?

24 A     Yes.

25 Q     What do you recall about that discussion?

Gumbinner - Direct

1  A    At the time, I had -- or one of my companies had a

2  multi-million-dollar judgment against Rick Rahim in connection

3  with one of the business transactions --

4  Q    So let me just pause you for a sec.  The question was,

5  what do you recall about the conversation at lunch?  What

6  happened at that lunch?  Let me focus you in on that.

7  A    At that lunch we were talking about Rick Rahim's assets,

8  and the discussion was that Rick Rahim claimed that he had

9  residency in Culpeper, that he had vehicles located in Culpeper

10 County.

11         MS. CHOY:  Ms. Fastenau, could you please pull up

12 Government's Exhibit 36, and could you please just play the

13 first 6 seconds of this recording.

14         (Audio playing)

15 BY MS. CHOY:

16 Q    Do you recognize this recording?

17 A    Yes, I do.

18 Q    Before today, have you had an opportunity to review the

19 entire recording?

20 A    Yes, I have.

21 Q    And is this a fair and accurate recording of the

22 conversation in which you participated?

23 A    Yes, it is.

24         MS. CHOY:  The government moves Exhibit 36 into

25 evidence.

Gumbinner - Direct

1           THE COURT:  Any objection?

2           MR. CALEB:  No objection.

3           THE COURT:  It will be admitted.

4           And ladies and gentlemen, I will remind you again

5    that while you're going to have a transcript that's going to be

6    shown, you are to rely upon what you hear as the evidence.  The

7    transcript is only there as your aid, but the evidence is the

8    audio recording and to the extent there's any video.

9           So go right ahead, please, Ms. Choy.

10          (Government Exhibit 36 marked and admitted.)

11   BY MS. CHOY:

12   Q    Whose voice did you hear on that recording?

13   A    Sheriff Scott Jenkins.

14          MS. CHOY:  Ms. Fastenau, could you please play it to

15   the end.

16          (Audio playing)

17   BY MS. CHOY:

18   Q    Did you recognize any of the other voices on that

19   recording?

20   A    Yes.  Myself and Kevin Rychlik.

21   Q    And what did you understand Scott Jenkins to be saying

22   about Mr. Rahim's residency in that clip we just heard?

23   A    That he was surprised that Rahim was still claiming that

24   he was a resident of Culpeper County.

25   Q    Now I'd like to talk about someone named Tom Cooper.  Are

Gumbinner - Direct

1  you familiar with that person?

2  A    Yes, I am.

3  Q    What's your relationship to Tom Cooper?

4  A    I have known Tom Cooper since the early 2000s.  We have

5  both a social and multiple professional relationships.

6  Q    And after you got your badge, did you show it to Tom

7  Cooper?

8  A    Yes, I did.

9  Q    Did you tell Tom Cooper how you obtained that badge?

10  A    Yes, I did.

11  Q    What did you tell him about that?

12  A    I told him that through Rick Rahim, by supporting the

13  sheriff, that enabled me to get sworn in and receive a deputy

14  badge.

15  Q    And did you tell him what powers or authorities the badge

16  conveyed?

17  A    I told him it enabled me to act with all the authority

18  that any deputy could have, including, according to Rick

19  Rahim's information to me, it could allow someone to have a

20  concealed carry of a firearm across all 50 states in the United

21  States.

22  Q    Did Tom Cooper express interest in getting a badge for

23  himself?

24  A    Yes, he did.

25  Q    And did you take any steps to facilitate that?

Gumbinner - Direct

1  A    Yes.  I introduced him to Kevin Rychlik.

2  Q    And did you and Mr. Cooper have -- and Mr. Rychlik have a

3  conversation about getting Mr. Cooper deputized?

4  A    Yes.

5  Q    What occurred in that conversation?

6  A    Explaining to Tom that Mr. Rychlik was the main guy for

7  administering the VIP program for people to contribute or

8  support Sheriff Jenkins in exchange for being deputized.

9  Q    And you mentioned support.  What do you mean by that word?

10  A    According to Rahim, it could be a combination of things,

11  whether directly providing cash and/or providing things like

12  billboards for re-election, paying for radio ads, paying for

13  leaflets or other things that could help in his re-election.

14  Q    And was a level of support discussed with Mr. Cooper?

15  A    Yes.

16  Q    And what was discussed?

17  A    Kevin Rychlik said that, you know, $20,000 was way too

18  much, that $5,000 would be sufficient.

19  Q    And did Mr. Cooper agree to that?

20  A    My understanding is yes.

21  Q    Did Mr. Cooper eventually get sworn in, to your knowledge?

22  A    Yes.

23  Q    And did you attend that?

24  A    No, I did not.

25  Q    Did Mr. Cooper tell you whether he'd made a payment to

Gumbinner - Cross

1   Scott Jenkins in exchange for that badge?

2          MR. CALEB:  Objection.

3          THE COURT:  I'll allow it.

4          THE WITNESS:  Mr. Cooper did tell me that he made a

5   $5,000 payment to Mr. Jenkins.

6          MS. CHOY:  Thank you.

7          THE COURT:  Cross-examination?

8          MR. CALEB:  I'm sorry, indulgence.

9                        CROSS-EXAMINATION

10   BY MR. CALEB:

11  Q    Good afternoon, Mr. Gumbinner.

12  A    Good afternoon, sir.

13  Q    So to begin, you used a term a couple of times during your

14  direct examination, you said VIP program.  Do you remember

15  that?

16  A    Yes.

17  Q    And that's a term that was used by Rick Rahim or Kevin

18  Rychlik?

19  A    Absolutely by Kevin Rychlik, and I believe by Rahim, but

20  absolutely by Kevin Rychlik.

21  Q    Not by Scott Jenkins?

22  A    Not to my knowledge.

23  Q    And the payment that you said you made, that was a payment

24  that was made to Rick Rahim, correct, to one of his companies?

25  A    Correct.

Gumbinner - Cross

1  Q     And you didn't make that payment to Scott Jenkins?

2  A     Not directly, no.

3  Q     And I'll get to that in a second.  You say not directly.

4  You didn't meet Scott Jenkins until 2023 you said, right?

5  A     That is accurate.

6  Q     And so your understanding of what Rick Rahim did I guess

7  in relationship to the Culpeper County sheriff's office was

8  that he was a deputy auxiliary, correct?

9  A     That, or I thought that he may have had a higher rank.

10 Q     And when you say you thought he might have had a higher

11 rank, you're speaking of when you first met him?

12 A     I'm not sure exactly at what point in time.

13 Q     When you first met Mr. Rahim -- okay.  So even if he had a

14 higher rank, your understanding was that he worked with the

15 auxiliary deputy program, right?

16 A     That he worked with and supporting Sheriff Jenkins.

17 Q     Okay.  And so you saw him -- a picture of him with a

18 uniform on, correct?

19        MS. CHOY:  Objection.  Mischaracterizes the

20 testimony.

21        THE COURT:  Well, he's on cross.

22        THE WITNESS:  No, I did not say I saw him in uniform.

23 At some point in time, Mr. Rahim did show me on hangers several

24 uniforms.

25 BY MR. CALEB:

Gumbinner - Cross

1  Q    Okay.  And so with his work as an auxiliary deputy, you

2  testified on direct that you understood that he worked with

3  search and rescue?

4  A    That is what Mr. Rahim indicated to me, yes.

5  Q    And that's what you understood one of his roles to be?

6  A    Yes.

7  Q    And something about giving kids a ride -- or rides to

8  youth?

9  A    I believe that either he or -- he and/or Rychlik had

10  helicopters, either owned them or had access to them, and one

11  of the things they did in the Culpeper community was give

12  helicopter rides to youths.

13  Q    So my questions right now are specific to Mr. Rahim.

14  A    Okay.

15  Q    And so your understanding was that Mr. Rahim was active

16  with the search and rescue program at the Culpeper County

17  sheriff's office, correct?

18  A    Active with the office, one component of which was search

19  and rescue.  He also indicated that he did ride-along things.

20  Q    And this was -- this understanding that you gained from

21  Mr. Rahim, this was all before you -- before you wrote a check

22  to his company, right?

23  A    I'm not 100 percent sure of the timing, because my

24  knowledge -- my knowledge in 2019 was different than my

25  knowledge in 2020, and different than my knowledge today.

Gumbinner - Cross

1  Q    That's fair.  So safe to -- so 2020 -- we're now in 2024.

2  Safe to say or accurate to say that you don't remember some

3  things?

4  A    Yes.

5  Q    And you don't remember certain details, right?

6  A    You have to be a little more specific.

7  Q    No.  I mean, I'm asking if you remember all the details?

8  A    All the details of everything of 65 years of my life, no,

9  I do not.

10 Q    No, my question was between 2020 and 2024, the time you're

11 testifying, it would be accurate to say that you don't remember

12 all of the details pertaining to this case, which is what

13 you're testifying about?

14 A    If you have a specific question for me, I will try and

15 answer as detailed as I can.

16 Q    That was a specific question.  You don't recall all the

17 details pertaining to this case, correct?

18 A    Correct.

19 Q    All right.  So when the conversation between you and

20 Mr. Rahim took place about making a donation to the sheriff's

21 office, you -- this conversation was between you and Mr. Rahim,

22 correct?

23 A    I'm sorry, could you repeat the question?

24 Q    Are you having trouble hearing me?

25 A    No.  I -- I didn't hear your question well enough, if you

Gumbinner - Cross

1  can repeat it, please.

2  Q    Sure.  So the conversation between you and Mr. Rahim about

3  your involve -- you getting involved with the Culpeper County

4  sheriff's office as a deputy auxiliary, that conversation was

5  exclusively -- that initial conversation was exclusively

6  between you and Mr. Rahim?

7  A    No, I did not say that.

8  Q    Is that not the case?

9  A    I had in excess of 25 meetings with Mr. Rahim during 2019.

10  A number of those could have been at poker games.  So there

11  would have been half a dozen people present.  A number of them

12  were in his office, where another associate of mine, Nick Vico,

13  was present.  So different conversations, there could have been

14  different people in attendance.

15  Q    All right.  So it would be accurate to say that

16  Mr. Jenkins wasn't amongst those people that could have been

17  present during those conversations that you initially had with

18  Mr. Rahim?

19  A    Correct.

20  Q    And it would also be accurate to say that Mr. Jenkins

21  didn't give you a dollar amount that you would have to donate

22  to the Culpeper County sheriff's office?

23  A    Mr. Rahim said that the $20,000 was non-negotiable, and it

24  would be insulting to go back to Mr. Jenkins to ask for a

25  lesser amount.

Gumbinner - Cross

1  Q    Okay.  So that's what Mr. Rahim said.  What I'm ask -- my

2  question to you, sir, is Mr. Jenkins did not tell you that you

3  were required to pay a $20,000 donation?

4  A    Correct.  I had not met with or spoken to Mr. Jenkins

5  until January of 2023.

6  Q    And similarly, Mr. Jenkins didn't convey to you any terms

7  associated with your donation to the Culpeper County sheriff's

8  office, correct?

9  A    Mr. Jenkins did not.  Correct.

10 Q    Mr. Jenkins also didn't tell you that you would get

11 anything from the Culpeper County sheriff's office in exchange

12 for a $20,000 donation, including a deputy auxiliary badge?

13 A    Correct.

14 Q    And that would also include an identification card,

15 correct?

16 A    Correct.

17 Q    And you testified on direct -- and I believe you might

18 have mentioned it just now -- your initial -- the first time

19 you ever met Mr. Jenkins was in 2023, correct?

20 A    Mr. Scott Jenkins?

21 Q    Mr. Scott -- thank you for that correction -- Mr. Scott

22 Jenkins?

23 A    Correct.

24 Q    And then when you actually made the payment or wrote the

25 check to Mr. Rahim, you testified that you -- so you met with

Gumbinner - Cross

```
 1  Mr. Rahim in his office in -- was it Great Falls, Virginia?

 2  A    Correct.

 3  Q    And when you met with him, you asked Mr. Rahim how -- what

 4  form of payment or how he should -- how you should convey the

 5  payment, correct?

 6  A    Correct.

 7  Q    And when you asked Mr. Rahim how he should convey -- you

 8  should convey the payment, you were asking whether he wanted

 9  cash or a check?

10  A    No.

11  Q    You were just asking how he wanted the check made out --

12  who he wanted the check made out to?

13  A    Correct.

14  Q    And he told you to make it out to his company, correct?

15  A    Correct.

16  Q    Not to Scott Jenkins?

17  A    Correct.

18  Q    Not to the campaign of Scott Jenkins?

19  A    Correct.

20  Q    Not to Scott Jenkins For Sheriff?

21  A    Correct.

22  Q    And you testified that it was your impression that you

23  couldn't get a badge without that payment.  Remember that?

24  A    Okay.

25  Q    It was your understanding that you couldn't get a badge
```

Gumbinner - Cross

1    without that payment, correct?

2    A    Yes.

3    Q    And that understanding was based exclusively on words from

4    Mr. Rahim, right?

5    A    Combination of words from Mr. Rahim, and what I knew about

6    the two gentlemen back in 2000.

7    Q    Well, the two gentlemen back in 2000 had nothing to do

8    with the Culpeper sheriff's office, correct?

9    A    Correct.

10   Q    And they also had nothing to do with Scott Jenkins,

11   correct?

12   A    To the best of my knowledge, correct.

13   Q    And so when -- your impression or your idea that you

14   couldn't get the badge without -- the badge for the Culpeper

15   County sheriff's office without a payment, that was based

16   exclusively on Mr. Rahim's representations to you?

17   A    Correct.

18   Q    Representations that may have been true or may have been

19   false, correct?

20   A    Yes.

21   Q    And you also -- and now we're still talking about pre-2023

22   meeting with Scott Jenkins.  You also testified that the

23   reasons you thought that Mr. Rahim and Mr. Rychlik were able to

24   act on the sheriff's behalf was, one -- well, I'm sorry, as it

25   pertained to Mr. Rahim, the reason why you thought that

Gumbinner - Cross

1  Mr. Rahim could act on the sheriff's behalf back in 2020 was

2  because Mr. Rahim said so, correct?

3  A    Yes, that was part of it.

4  Q    And as it pertains to Rychlik, you believed that Rychlik

5  could act on Mr. Jenkins's behalf because he drove a Culpeper

6  County vehicle?

7  A    He drove a Culpeper County sheriff vehicle, and when I

8  first met him in either December of 2019 or early 2020, I

9  believe he may have been in uniform, and he told stories about

10 doing search and rescue and/or helicopter type activities with

11 Culpeper County.

12 Q    Okay.  And so that's the totality of the information that

13 you used to rely on to believe that both Mr. Rahim and

14 Mr. Rychlik could act on Sheriff Jenkins's behalf?

15 A    As I mentioned, for some reason I thought or believed that

16 Rychlik was a lieutenant with the Culpeper County sheriff

17 department.

18 Q    All right.  And you testified -- well, you testified that

19 you pled guilty in this case, correct?

20 A    Yes.

21 Q    And you are -- and you pled guilty pursuant to a plea

22 agreement, correct?

23 A    Yes.

24 Q    Now, I'm showing you what's been marked for purposes of

25 identification at this point as Defense Exhibit 2.

Gumbinner - Cross

1            THE COURT:  We'll get it on your screen,

2    Mr. Gumbinner.

3     BY MR. CALEB:

4    Q    Mr. Gumbinner, that's a -- directing your attention to the

5    bottom of page 1 of 12 of Defense Exhibit 2, those are your

6    initials, correct?

7    A    Yes.

8    Q    And this is a 12-page document, correct?

9    A    I believe so.

10   Q    On the -- well, at the bottom it says page 1 of 12?

11   A    Correct.

12   Q    And at the top of the document, United States v. Fredric

13   Gumbinner, plea agreement?

14   A    Yes.

15   Q    And also at the back, page 12 of 12, your signature

16   appears?

17   A    Yes.

18            MR. CALEB:  Your Honor, I'd like to move Defense

19   Exhibit 1 into evidence.

20            THE COURT:  Is that 1 or 2?

21            MR. CALEB:  I'm sorry, 2.

22            THE COURT:  Any objection?

23            MS. CHOY:  No objection.

24            THE COURT:  So admitted, and may be published to the

25   jury.

Gumbinner - Cross

1              (Defense Exhibit 2 marked and admitted.)

2              THE COURT:  And if you could -- those need to be

3    uploaded into Box, 1 and 2.

4     BY MR. CALEB:

5    Q    Directing your attention to the plea agreement, Defense

6    Exhibit 2, in this agreement, you pled to one count of bribery,

7    correct?  And that was Count Nine of the indictment?

8    A    Correct.

9    Q    And you agree that that count, that offense, carries a

10   maximum of ten years in prison?

11   A    Yes.

12   Q    In addition, it carries a maximum term of supervised

13   release of three years?

14   A    Yes.

15   Q    And a penalty of $250,000?

16   A    Potential penalty, yes.

17   Q    And so that was what you pled guilty to, but you were

18   indicted on several other offenses, correct?

19   A    Correct.

20   Q    You were charged -- you were indicted on one charge of

21   conspiracy, right?

22   A    Yes.

23   Q    And so that charge of conspiracy -- or the conspiracy is

24   not reflected in this document, but you -- you discussed --

25   you're aware of the penalties that you were facing had you not

Gumbinner - Cross

1  accepted this plea offer, right?

2  A    I know that they were greater than what is in the plea.

3  Q    Okay.  And in fact, conspiracy --

4           MS. CHOY:  Objection, Your Honor.

5           THE COURT:  Counsel approach.

6           (Sidebar commenced.)

7           MS. CHOY:  Your Honor, I believe this came up in the

8  context of the deposition, and Your Honor's ruling was that he

9  could be asked about the maximum penalty for the count that he

10 pled to, but not to other counts.  Also, we shared the concern

11 that you expressed at that time that this is a back door to

12 introducing the penalties for the offenses to which the

13 defendant is charged, which is improper.

14          MR. CALEB:  Your Honor, I think this is absolutely

15 proper.  This is a benefit that he received from the

16 government.  And by entering a guilty plea and by not having to

17 face charges on these other offenses, he is not -- as a benefit

18 that the government has extended, he is not exposed to all this

19 additional jail time.  So it's absolutely relevant.

20          MS. CHOY:  I think it's fine to introduce the fact

21 that we agreed to dismiss certain other charges, but the

22 probative value of the maximum sentence is very minimal because

23 as Your Honor knows, no one gets maximums and that's not a sort

24 of legitimate benefit if it's not a realistic possibility.  And

25 meanwhile, the danger of prejudice is very high because it's

Gumbinner - Cross

1   injecting this issue that's improper for the jury to consider.

2   So we would ask to exclude it under 403.

3       MR. CALEB:  The final thing I'll say is it just goes

4   to his bias at this point.  If the government has extended him

5   such a benefit, I mean, it's arguable that he's biased towards

6   the government because he got this great benefit from the

7   government.  He's no longer looking at all this other time that

8   he could have gotten but for the agreement.

9       THE COURT:  So what I'll let you put in is the

10  charges that were dismissed are absolutely fine.  They're laid

11  out in the plea agreement.  I'm not sure they're specifically

12  laid out, but it says the other charges will be dismissed.

13      MR. CALEB:  They're not.

14      THE COURT:  You can identify the charges will be

15  dismissed and he faced a substantial penalty, but not the

16  specific amount.  And here's the reason why, is that it is

17  potentially misleading when -- to say someone faces a maximum

18  penalty.  They're certainly arraigned on that, but the sentence

19  that someone faces is a combination of the sentencing

20  guidelines in addition to -- which are determined through a

21  myriad of factors, as we all know -- and then the application

22  of 3553 factors.  And there is no mandatory minimum here.

23  There is no -- there are maximums.  And so whether that maximum

24  is a realistic number is very difficult to -- no one really

25  knows until you have a presentence report.  But you can say you

Gumbinner - Cross

1  faced a substantial amount of other penalties, including

2  substantial jail time and fines.  But I'm not going to let

3  you -- at this point in time, I'm not going to let you put a

4  number as to what those are.

5          MR. CALEB:  I accept that, Your Honor.  I accept

6  that.

7          MS. CHOY:  Thank you.

8          (Sidebar concluded.)

9          THE COURT:  Mr. Caleb?

10          MR. CALEB:  Thank you.

11  BY MR. CALEB:

12  Q    So we were discussing the charges that were dismissed as a

13  part of your plea agreement.  And so you were -- I think we

14  covered that you were charged originally in your indictment

15  with one count of conspiracy, correct?

16  A    I believe so.

17  Q    That was a count of the indictment that the government has

18  agreed to dismiss in exchange for your plea agreement, right?

19  A    I believe that is accurate.

20  Q    And your understanding is that that count, the count of

21  conspiracy, carries jail time, correct?

22  A    I did not focus on it.

23  Q    You didn't focus on jail time?

24  A    No, I did not focus on what potential penalties might be

25  associated with the other counts.

Gumbinner - Cross

1  Q    Okay.  So -- but you are aware that they carry jail time.

2  You might not have focused on it, but you're aware?

3  A    Yes.

4  Q    And significant jail time?

5  A    I did not focus on it.

6  Q    Understanding that, but you are aware that the offense

7  carries significant jail time?

8         MS. CHOY:  Objection.  Asked and answered.

9         MR. CALEB:  Not answered.

10        THE COURT:  I'll let him --

11        THE WITNESS:  I'm aware that virtually any crime

12  carries potential jail time.

13  BY MR. CALEB:

14  Q    But you are aware of the serious nature of the offenses to

15  which you -- of which you are charged, right?

16  A    I am aware that they are felonies.

17  Q    And you're aware that there's -- that you are facing

18  serious charges?

19  A    Yes.

20  Q    You pled to an offense, bribery, that carries a maximum

21  penalty of ten years, right?

22  A    Yes.

23  Q    That's serious.  Ten years is serious jail time?

24  A    Yes.

25  Q    You also are aware that for the offense of bribery to

Gumbinner - Cross

1  which you pled, there's a maximum penalty of $250,000?

2  A    Yes.

3  Q    And a maximum -- and the maximum term of supervised

4  release of three years?

5  A    Yes.

6  Q    In addition to having Count One of your indictment --

7  having the agreement that the government would dismiss Count

8  One of the indictment pursuant to this plea offer, the

9  government also agreed to dismiss other charges that you were

10 charged with in the indictment?

11 A    I believe so.

12 Q    Several others, correct?  Four, to be exact?

13 A    I did not focus on the other counts.

14 Q    So you get your indictment, right -- you got charged,

15 correct, in connection with this case?

16 A    Yes.

17 Q    You got your indictment, right?

18 A    Yes.

19 Q    You reviewed your indictment, right?

20 A    Yes.

21 Q    The indictment contains several counts, right?

22 A    Yes.

23 Q    You absorbed the indictment and understood what you were

24 charged with, correct?

25 A    I did not focus on the other counts.

Gumbinner - Cross

1  Q    Okay.  So the other -- the plea agreement in this case

2  didn't happen until November of 2023, correct?

3  A    Yes.

4  Q    You were indicted before November of 2023, correct?

5  A    Yes.

6  Q    Okay.  So when you -- that time in between the time you

7  entered -- the time that you agreed on the plea with the

8  government and the time you were indicted, are you saying you

9  didn't focus on the counts in the indictment?

10 A    There were additional counts, yes.

11 Q    Okay.  And so you focused on them, correct?

12 A    Help me understand what you mean by focus.

13 Q    Sir, you used the word focus.  You knew what you were

14 charged with, correct?

15 A    I knew I was charged with multiple counts, correct.

16 Q    Okay.  And so is your testimony here you didn't really pay

17 attention to what you were charged with?

18 A    I'm saying I did not focus on the other counts.

19 Q    You didn't focus on the other counts until you entered the

20 plea; is that what your testimony is?

21 A    My testimony is that I understand that I was charged with

22 multiple counts.  We did a plea agreement where I pled guilty

23 to one count of violation of 666.

24 Q    Okay.  That was in November of 2023, correct?

25 A    If you can pull up the document again, if you go to the

Gumbinner - Cross

1  signature page, there's a date.

2  Q    Sure.  Actually, it's October of 2023.

3  A    Thank you.  Yeah, October of 2023, not November.

4  Q    Okay.  That's fine.

5       Sir, you don't want to go to jail, correct?

6  A    No.

7  Q    And the way for you to avoid -- well, actually, this plea

8  is -- you're a cooperating witness, correct?

9  A    Under the plea agreement, I'm required to cooperate and

10 tell the truth.

11 Q    Okay.  So you're a cooperating witness?

12 A    I don't know the definition of cooperating witness.

13 Q    You cooperate with the government?

14 A    Yes.

15 Q    You have to testify today in order to get a benefit from

16 the government?

17 A    I do not know if that's required.

18 Q    So your understanding is that you could have decided not

19 to testify and the government would still show benefit towards

20 you?

21 A    I can't answer what the government chooses to do or not

22 do.

23 Q    But you know what you had to do to hold up your end of

24 this bargain, correct?

25 A    The plea agreement says that I must cooperate, and I'm

Gumbinner - Cross

1   abiding by what I must do.  I cannot speak on what the

2   prosecution or the government decides they will do or not.

3   Q    Okay.  We'll get to that.  But your role, what you have to

4   do in order to cooperate, is to testify, correct?

5   A    Could you pull up the plea agreement again, please?

6   Q    Well, what's your understanding, sir?

7   A    That I'm required to cooperate.

8   Q    And part of cooperating is testifying, correct?

9   A    I would have to look at the document to answer.

10  Q    Well, you're testifying because -- you're testifying

11  pursuant to your agreement with the government, correct?

12  A    That is one of the reasons.

13  Q    All right.  And you understand that one of -- so we talked

14  about this time, all of this -- the potential penalties you

15  could face.

16       Now, let's be clear.  The ten years.  You're familiar with

17  the voluntary sentencing guidelines, correct?

18  A    Could you repeat the question, please?

19  Q    Are you familiar with the voluntary sentencing guidelines?

20  A    I'm familiar with the sentencing guidelines.  I'm not sure

21  what the voluntary sentencing guidelines means.

22  Q    Okay.  That's fine.

23       And so you understand that pursuant to your plea

24  agreement, the government can file what's called a 5K letter on

25  your behalf, correct?

Gumbinner - Cross

1   A    Yes.

2   Q    And the 5K letter is a letter basically that the

3   government writes -- can decide to write on your behalf to

4   advocate for a lesser sentence for you in front of your

5   sentencing judge?

6   A    I believe that they can, yes.

7   Q    And that's actually what you want the government to do?

8   A    Absolutely.

9   Q    Because you don't want to go to jail, right?

10  A    Correct.

11  Q    And you need something from the government, right -- or

12  you want something from the government, which is the 5K letter?

13       You want a 5K letter from the government?

14            THE COURT:  Put it in the form of a question.

15  BY MR. CALEB:

16  Q    Correct?

17  A    Oh.  Yes.  I thought you were making a statement.

18  Q    And in order to get that 5K letter from the government,

19  you have to please the government, correct?  The government has

20  to be happy with you?

21  A    The government has made no promises to me.  My

22  understanding, it's in their discretion on what they do or

23  don't do.

24  Q    So discretion --

25  A    Regardless of what I do.

Gumbinner - Redirect

1   Q    So discretion means that it's their choice, right?

2   A    Correct.

3   Q    And their -- your understanding or your desire is to

4   make -- is for them to make the choice to speak up on your

5   behalf and ask for leniency for you, correct?

6   A    Absolutely.

7   Q    And that's why you're testifying today?

8   A    That is one of the reasons, yes.

9           MR. CALEB:  No further questions.

10          THE COURT:  Any redirect?

11          MS. CHOY:  Yes, Your Honor.

12          THE COURT:  Yes, ma'am.

13                  REDIRECT EXAMINATION

14   BY MS. CHOY:

15   Q    Hello again.

16   A    Hello.

17   Q    So on cross-examination, Mr. Caleb was asking you

18   questions about --

19          MS. CHOY:  We don't need it just yet.  Thank you.

20   Q    -- he was asking you questions about your belief that

21   Mr. Rahim and Mr. Rychlik could act on behalf of the sheriff;

22   do you recall that testimony?

23   A    Yes.

24   Q    And you had testified earlier that Mr. Rahim told you that

25   if you paid $20,000 you could get a badge; is that accurate?

Gumbinner - Redirect

1   A    Yes.

2   Q    And in fact, did you pay $20,000?

3   A    Yes.

4   Q    And in fact, did you get a badge?

5   A    Yes.

6   Q    And you testified earlier that Mr. Rychlik represented

7   that if Tom Cooper paid $5,000, he could get a badge; do you

8   recall that?

9   A    Yes.

10  Q    And in fact, did Tom Cooper pay $5,000?

11  A    To the best of my knowledge, yes.

12  Q    And did Tom Cooper get the badge?

13  A    Yes.

14  Q    So did those representations turn out to be accurate?

15  A    Yes.

16  Q    Now, let's just turn to your plea agreement.  So Mr. Caleb

17  asked you on cross-examination about the statutory maximum

18  penalty that you're facing; do you recall that?

19  A    Yes.

20  Q    Do you have an understanding of whether defendants in the

21  federal system typically get maximum penalties?

22          MR. CALEB:  Objection.

23          THE COURT:  Well, you opened the door.  He can be --

24  explore it as to what he understands his -- as to what his

25  understanding is.

Gumbinner - Redirect

1  BY MS. CHOY:

2  Q    You may answer.

3  A    Several things.  My lawyers have told me that --

4  Q    Don't tell me anything about what your lawyers have told

5  you.  And let me focus you on the question.  Do you have an

6  understanding of whether defendants in the federal system

7  typically get maximum penalties?

8  A    My understanding is that they do not.

9  Q    Do you have an understanding of how sentences are

10 calculated?

11 A    I believe so.

12 Q    And is there something called sentencing guidelines?

13 A    Yes.

14 Q    And is it your understanding that those guidelines play a

15 role in sentencing?

16 A    Yes.

17 Q    What's your understanding of the role that they play?

18 A    My understanding is that they are guidelines, but given

19 recent case law's interpretation, the judge can consider

20 numerous factors, including past criminal record, character,

21 collateral consequences already suffered, like sentences to

22 other people in order to come down with a fair and just

23 sentence for the actions committed.

24 Q    And do you have an understanding of whether your own

25 guidelines range is below that ten-year maximum?

Gumbinner - Redirect

1  A    I believe it is.

2  Q    And do you have an understanding of whether those counts

3  that were dismissed or that the government has agreed to

4  dismiss, does that affect your guidelines range at all?

5  A    Not at this point, no.

6  Q    And now could we please pull up Defense Exhibit 2.  Oh,

7  it's already up.  Could you please turn to page 11, and there's

8  a paragraph that begins, "if I comply."

9       And it says here, if I comply with my obligations under

10  the plea agreement, the United States will move, at sentencing,

11  that I be dismissed as a defendant in any remaining counts.

12       Do you see that?

13  A    Yes, I do.

14  Q    Could you please turn to page 9 at paragraph 9, the header

15  paragraph.

16       Does this set forth your obligations?

17  A    Yes.

18  Q    Is one of your obligations that you will testify

19  truthfully?

20  A    Yes.

21  Q    And did you also acknowledge here that you understand that

22  it's a felony offense to make false statements to law

23  enforcement agents or to testify falsely?

24  A    Yes.

25  Q    Could you please turn to page 4, and pull up substantial

Jones - Direct

1  assistance.

2       And it says here, I understand even if I fully cooperate

3  with law enforcement, the United States is under no obligation

4  to make a motion for the reduction of my sentence.

5       Do you see that?

6  A    Yes.

7  Q    Is that consistent with your understanding of the

8  agreement between you and the United States?

9  A    Yes.  As I said, it was in their discretion.

10 Q    Did you testify truthfully here today?

11 A    Yes.

12          MS. CHOY:  Nothing further.

13          THE COURT:  Thank you.  And may this witness be

14 excused?

15          MS. CHOY:  Yes.

16          THE COURT:  Mr. Gumbinner, thank you very much for

17 being here today.  Please do not discuss your testimony with

18 other witnesses as long as the matter is pending.  Thank you.

19          Let's call our next witness, please.

20          MS. PENG:  The United States calls David Jones.

21          THE COURT:  David Jones.

22          Mr. Jones, come on up if you would, please, sir.

23 Come right on up here and we'll get Ms. Brown to swear you in

24 and we'll get you in the witness box.

25          DAVID JONES, CALLED BY THE GOVERNMENT, SWORN

Jones - Direct

1        THE COURT:  And Ms. Peng, can you close up the ELMO

2   so that -- thank you.

3            Go right ahead, Ms. Peng.

4            MS. PENG:  Thank you.

5                    DIRECT EXAMINATION

6    BY MS. PENG:

7   Q    Sir, could you state your full name and spell your last

8   name, please?

9   A    David Mitchell Jones, J-O-N-E-S.

10  Q    What is your occupation, Mr. Jones?

11  A    I am a certified public accountant.

12  Q    Is that CPA for short?

13  A    CPA, yes.

14  Q    And do you own your own firm?

15  A    I do.  I have two other partners.

16  Q    What is the name of your firm?

17  A    The Jones Group, CPAs and Consultants.

18  Q    How many years have you been a CPA?

19  A    Almost 40.

20  Q    That was a long time ago, but what kind of training or

21  education have you had in relation to becoming a CPA?

22  A    So I attended Bridgewater College and got a four-year

23  degree there.  In addition to that, I had various CPE courses

24  going forward, along with immediately starting with a CPA firm,

25  the same one I'm with now.  And at that time, shortly after

Jones - Direct

1  that, there was a test that we take, the CPA exam.  I passed

2  that back in 1988, I believe.  I've been certified from that

3  moment forward.

4  Q    Does that certification have to be renewed from time to

5  time?

6  A    Don't have to retake the test, but there are requirements

7  each year as far as CPE.  In addition, we're also members of

8  the national and state CPA organizations that provide various

9  guidelines and requirements that we also have to follow.

10  Q    So in terms of your firm, can you generally describe what

11  types of clients you have?

12  A    Generally our firm is a full-service CPA and accounting

13  type firm.  Mostly what we do is we're heavy in tax returns of

14  all types, mainly individuals, but also a lot of corporations,

15  partnerships, estates, trusts, but we also prepare financial

16  presentations for businesses.  We do consultations both from a

17  financial standpoint but also from a tax standpoint with --

18  with also small businesses.  A lot of individuals are tied to

19  small businesses.

20  Q    Where is your firm located?

21  A    So it's located near the center of Culpeper, 400 Southwest

22  Court.  And it's just as you come off of 29 into Culpeper.  So

23  right outside the town limits.

24  Q    And where are the majority of your clients located?

25  A    Majority of our clients are Culpeper, but we do service

Jones - Direct

1   probably the four-county area, Madison County, Orange County,

2   Fauquier County, Rappahannock County.  We have clients there

3   also.

4   Q    And have you done accounting work for political campaigns?

5   A    Yes.

6   Q    Around how many?

7   A    I would say four to five over a period of years.

8   Q    Can you just very briefly describe what types of campaigns

9   were the ones you worked on?

10  A    So mainly it was sheriff campaigns.  I think probably four

11  campaigns, two different people.  And I think the other two

12  were clerk of the court.  Same presentation, just different --

13  different offices.

14  Q    And generally speaking, what did you do for those

15  campaigns?

16  A    The first time I did it, I was actually the treasurer, and

17  I maintained the records, and also prepared all the election

18  reports.

19  Q    In the course of doing that work, did you become familiar

20  with the rules for reporting for campaign financing in the

21  State of Virginia?

22  A    Yes.

23  Q    Are those rules set by the Virginia Department of

24  Elections?

25  A    They are.

Jones - Direct

1  Q    And based on your work and experience around those

2  campaigns, what is your understanding of why those reporting

3  rules are in place?

4  A    So those rules are in place to provide the public

5  transparency and to track an election cycle, and make sure that

6  the candidate and the candidate's campaign is following the

7  various election rules, but also to provide the public clarity

8  as to what their activities are inside the campaign, which is a

9  requirement by the State Board of Elections.

10 Q    Did you assist with filing campaign finance reports for

11 Scott Jenkins For Sheriff?

12 A    Yes.

13 Q    How did that come to be?

14 A    I think that came to be by a friend of ours who made --

15 let Mr. Jenkins know that I had done that, and we got together

16 and I agreed to help with his campaign reports.

17 Q    So a friend of yours introduced you to Mr. Jenkins?

18 A    Yes.

19 Q    And how many of his campaigns did your firm assist with

20 campaign reporting for?

21 A    I think three.

22 Q    So all three of his campaigns that he ran in?

23 A    Yes.

24 Q    Would that have started in around 2015?

25 A    I believe so, yes.

Jones - Direct

1  Q    And besides helping with his campaign, are you acquainted

2  with Mr. Jenkins socially?

3  A    Socially, yeah.

4  Q    Can you briefly describe how you're acquainted in that

5  way?

6  A    So generally we've been to different events and seen each

7  other there.  And when we first set up the election -- I think

8  we had maybe a couple of meetings to set up the election

9  registration, and that type of thing, but generally we would

10 see each other at different functional events in the community.

11 Q    Were you paid for your work on his campaigns?

12 A    No.  It was pro bono.

13 Q    You did it pro bono?

14 A    Yes.

15 Q    Which means for free?

16 A    For free, sorry.  For free.

17 Q    And why did you do that?

18 A    It was something that I felt -- it was a referral by a

19 very good friend of mine, and it was just something I felt

20 compelled to do just from a civic standpoint.

21 Q    Now, I'm going to ask you more specifically about the

22 Scott Jenkins For Sheriff campaign in a second, but generally

23 speaking, in the State of Virginia, what is required to be

24 reported in terms of campaign finance?

25 A    So it is really a full receipts and disbursements type

Jones - Direct

report, made with a lot more detail than what would normally be

shown on some other type of report, mainly because there are

requirements that if you have donors over a certain dollar

limit, you have to have their actual individual information.

So it tracks monies in, incoming donations in, loans in, and

those amounts need a certain amount of detail according to the

Board of Elections.  In addition to that, all disbursements

need to be tracked as to what they are for, who the vendor is,

who they're paying the money to.  And also a reconciliation of

that has to be done currently.  And there are multiple reports

that are filed during each cycle, probably around five to six

different dates of reporting.  And each -- so you have a

current report, and then you have a summary report that

summarizes the whole campaign as you go along, but it's really

meant to provide clarity and transparency to the general

public.

Q    So let me ask you a couple of follow-up questions.  I

heard you say that the rules require that contributions over a

certain dollar amount must be reported with a certain amount of

detail; is that right?

A    That's right.

Q    Okay.  And does that include cash donations, as well as

donations by check?

A    Correct, yes, it does.

Q    And do you know what is the limit over which those

224

Jones - Direct

1  contributions would have to be reported?

2  A    $100.

3  Q    That's $100?

4  A    $100, yes.

5  Q    And do the reporting requirements make a distinction in

6  terms of what has to be reported, whether the donation is made

7  in cash or in check?

8  A    As far as the donation report, I think that's the first

9  schedule.  It doesn't really distinguish.  It's over $100.  It

10  goes on that section as to whether it's cash or a check.  If

11  it's less than $100, then there's no location that it goes.

12  Q    So regardless of whether a contribution is made in cash

13  form or in check form, if it is over $100, then there are

14  reporting requirements for the forms?

15  A    Yes.  So same reporting requirements would be for a check

16  versus a cash over -- cash donation over $100, which would be

17  name, address of that donor, and their occupation, if there is

18  one.

19  Q    And based on your experience as an accountant, from an

20  accounting perspective, is it more difficult to report on cash

21  contributions versus check contributions?

22  A    It can be, because cash has an inherent risk to it.  With

23  a check, you have an automatic trail, so you have a copy of a

24  document.  With cash, you really need to have some type of

25  controls in place, or accounting system that can help you

Jones - Direct

1    account for those cash donations, as to whether there's

2    multiple ones that are under $100.  Once get $100, then you

3    need to make sure that that information is collected from that

4    donor so that you can make the proper recording of that.  So

5    that's the main thing, is tracking each donation so that you

6    can make sure that -- because if they're under $100, you don't

7    have to gather that information.  If it's over 100, you do.

8    Q    Now, I heard you say that checks are easier to track

9    because there's an automatic trail.  What do you mean by that?

10   A    An automatic trail, what that means is that you've got the

11   check, you can easily record that.  When you put that in the

12   bank, there's another check -- not a check, but a balance, I

13   guess you would call it -- because when you look at a deposit

14   slip, the check is delineated on that.  It gets canceled by the

15   bank, and you can also get copies of it.  That information also

16   will roll through the bank statement and you'll have detail

17   there.  So it gives you multiple lines of trail to track that

18   one donation.  If it's cash, it's just one number inside of a

19   larger number on the bank statement.

20   Q    So if I write you a check, there will be a record of that

21   in my bank account, as well as your bank account once you cash

22   it?

23   A    Correct.

24   Q    Now, I heard you also mention in-kind donations.  Do those

25   also have to be reported on the campaign finance reports?

Jones - Direct

1   A    They do.

2   Q    And what is an in-kind donation?

3   A    So in-kind donation is some type of supply or service that

4   was donated to the campaign -- advertising, somebody provides

5   an event where they provide supplies for that event, something

6   of that nature, that the campaign doesn't actually contract

7   with or write a check for.

8   Q    Would that include someone paying for robocalls on behalf

9   of the campaign?

10  A    I would say so, yes.

11  Q    And what about a billboard, you know, advertising for the

12  campaign?

13  A    Yes.

14  Q    And so in terms of the rules, if the cost of those in-kind

15  contributions exceed $100, do they also have to be reported on

16  the reports?

17  A    Yes.

18  Q    All right.  Now, you discussed this a little bit, but is

19  it fair to say that generally when you're doing the reports for

20  a particular campaign, you're trying to balance the bank

21  account of that particular campaign?

22  A    Yes.

23  Q    And just give me a little more detail on what you mean by

24  that.

25  A    So with any instance for us, that is a -- that is a check

Jones - Direct

1   for us.  So basically, even though a lot of times these

2   campaigns don't coincide with the bank statement, we have -- we

3   take the bank statement from the bank, and we make sure that

4   everything -- that we have an account for everything that has

5   occurred on that bank statement.  So that bank statement then

6   has to -- we have to match that bank statement to the summary

7   in the campaign report and make sure we haven't left anything

8   off.  And that's how we can check to say, hey, we don't quite

9   have all the information if that were to happen, we can go back

10  and make sure that we've got all the -- all the donations.  If

11  there are any expenses -- sometimes there are bank charges,

12  those types of things.  So we have to make sure that everything

13  gets on that campaign report.  That goes through that bank

14  statement.

15  Q    Okay.  So I'm not an accountant, so tell me if I'm wrong

16  about this.  So essentially you're tracking the money coming

17  into the campaign finance account, the money going out, and

18  you're reconciling that to make sure that the balance is

19  accurate at each of the reporting period; is that fair?

20  A    That is a requirement, yes.

21  Q    Now, when you take on a new client -- I think you

22  discussed this a little bit -- for campaign finance reporting,

23  is it your practice to explain to them the rules around what

24  needs to be reported?

25  A    Yeah.  Generally what we'll do is kind of give them an

Jones - Direct

1  idea of the amount of information that's required because it's

2  more than say some other business, as far as reporting, because

3  you need to collect a lot of information.  That's why when they

4  receive check donations that makes it easy too; usually the

5  address is right there, of that particular donor.  So you have

6  -- you inform them of the need to collect that, and to make

7  sure that when you do, that you have a full amount of

8  information that's needed for that -- that particular report.

9  Q    So you need to provide that explanation because you rely

10  on them to then provide you the information that gets reported

11  on the reports?

12  A    Yes.  Uh-huh.

13  Q    And now, when you took on Scott Jenkins as a client -- or

14  rather his campaign, would you have provided the explanation

15  you just described to him?

16  A    Yes.  I think so, yes, during the first meeting.

17  Q    And is that because you then needed to rely on him to

18  provide you the information that went into the reports?

19  A    Yeah.  And it was always to be an ongoing thing with each

20  report, we make sure that we reiterate that -- of the types of

21  information that's required, if it's over $100 -- whatever the

22  various needs are, and the types of reports.  In that first

23  meeting, we would go over that to make sure that we kind of set

24  the standard so that we can move that -- the reporting phase

25  forward.

Jones - Direct

1  Q    Did you also set up a campaign bank account for Scott

2  Jenkins's campaign?

3  A    Yes.

4  Q    Why did you do that?

5  A    It was -- it's kind of part of the whole process.  Most of

6  the ones that I had worked with, you get the registration set

7  up first, and then you get the bank account set up to go with

8  that.  So at the beginning, I helped get the bank account set

9  up and we were able to start -- just to help to start the

10 process, is basically what that was.

11 Q    Did Scott Jenkins need to authorize the setting up of that

12 bank account for his campaign?

13 A    Yes.

14 Q    And can you explain what is the difference between a bank

15 account for a campaign versus a personal bank account?

16 A    It might be a little different now, but generally a bank

17 account for a campaign, you try -- the bank statement -- you

18 have a little designation; exactly what that is, I'm not quite

19 sure on that --

20      (Reporter clarification)

21 A    The bank -- the bank gives it a certain designation; I'm

22 not quite comfortable with exactly what that is.  But

23 generally, with the campaign type account, you never want any

24 type of personal transfers going through there.  You always --

25 we always suggest never use a debit card.  That creates -- just

Jones - Direct

1    makes it harder to track expenses.  So as far as -- as far as

2    tracking, how it functions is pretty much the same as any bank

3    account.  It's just that what you want to run through that bank

4    account, there are requirements or restrictions as to what you

5    want going through that account.

6    Q    So is it fair to say that a campaign bank account is for

7    financial transactions for the campaign and not for an

8    individual person?

9    A    Yes.

10   Q    Now, with respect to the Scott Jenkins For Sheriff

11   campaign, can you describe the process your office went through

12   to help complete the forms that were eventually filed?

13   A    Yes.  So basically as we got closer to the deadline, we

14   would -- they would provide us with information, banking

15   information, deposit information, expenditure information, and

16   we would pull the reports together.  One of my staff always

17   pulled the reports together for me.  If there was anything that

18   we needed, she made sure that she contacted them and got that

19   information in.  She pulled the report together.  There is the

20   receipt and disbursement part of it.  There's also summary

21   parts of it.  Once she completed it, then I would fully review

22   the statement, and then when they were filing paper -- it's not

23   paper anymore, but filing paper we would compare, and then most

24   of the time I think we would even run that up to the election

25   board.

Jones - Direct

1  Q    Did you or anyone in your office try to independently

2  verify any of the information provided to you by the Scott

3  Jenkins campaign to go into those reports?

4  A    No.

5  Q    Why not?

6  A    Generally we were the after-the-fact preparers.  We let

7  them know that we're relying on the information that they

8  provide to us to prepare the reports.

9  Q    And is that common in terms of the work you've done for

10  other campaigns as well?

11  A    Yes.

12  Q    That you rely on information reported to you by the

13  campaign to put into the reports?

14  A    Yes.

15  Q    Now, let me turn your attention more specifically to some

16  of the documents you provided to the government.  Did you

17  provide the government in this case all of the campaign finance

18  reports your firm prepared for Scott Jenkins For Sheriff?

19  A    Yes.

20  Q    Would that have covered the period of around 2015 to 2023?

21  A    I believe so, yes.

22  Q    Now, I'm going to represent to you that all of those

23  reports you've provided have already been admitted into

24  evidence as Government Exhibit 606 to 636.  I'm going to ask

25  you about some of those, not all of them.

Jones - Direct

1      So can we pull up Exhibit 607 first, please, which is

2  already in evidence.

3      So Mr. Jones, what is it that we're looking at here on

4  this first page?

5  A    So the first page, that is always the very first page that

6  denotes the period that is -- what the reporting period is,

7  which is generally during an active election, is the middle

8  section.  And at the bottom right above the signature there it

9  gives you an idea of what that period is that's being covered,

10  because they cover different periods for each one of those

11  reporting periods as you go down.  So that particular period

12  was through May 27th.

13  Q    Okay.  So looking at this statement, what period does this

14  report cover?

15  A    I think this is the beginning report.  Could you close --

16  I'm sorry.

17      Yeah, so June 1 -- yeah, so that would have -- that would

18  have taken you from April 16th to June -- to May 27th, I

19  believe is when that would cover.  It doesn't have the

20  beginning date there, but generally that's what it is.  It's

21  whatever transactions are from the prior to -- the last

22  transactions on the prior report is where it would start.

23  Q    Okay.  So at the very top it says, Scott Jenkins For

24  Sheriff.  And that is the campaign for which this report is

25  made?

Jones - Direct

1  A    Yes.

2  Q    And the date of the election it says November 2015.  So

3  this would have been a report filed for that election cycle; is

4  that right?

5  A    That's right.

6  Q    And is it your e-mail that appears over there --

7  A    Yes.

8  Q    -- for the person preparing this report?

9       You can close that.

10      And whose signature is it that appears at the very bottom

11 there?

12 A    That's Mr. Jenkins's signature.  We did that when he

13 signed that one.

14 Q    And did he always sign all of these reports?

15 A    No.

16 Q    Who else would sign these reports?

17 A    I would.

18 Q    You can take that down.  Can we pull up Exhibit 624, which

19 has already been admitted.

20      Now, what is it that we're looking at on the first page of

21 this report?

22 A    So this is the very same page, but a different reporting

23 period.  This reporting period was it looks like September

24 2019, and it gives you the actual transactional dates down

25 there again above my signature.  So you'll see that that's from

Jones - Direct

1  July 1st, 2019 to September 13th.  Odd dates that they look at,

2  but that's the transactional period.  The reporting period,

3  September 16th, but the transactions they want to see is July

4  1st to September 13th.

5  Q    So this report was due to be filed on September 16th of

6  2019, but covered the period of July 1st, 2019 through

7  September 13, 2019?

8  A    That's right.

9  Q    Can we go to the next page.

10        What is it that we're looking at here?

11  A    So this is the direct contribution or deposit -- campaign

12  deposit form for donations over $100.  And what it has -- as

13  you can see in the first column, it would be the donor.  You

14  see the requirements in gray for each one of those sections.

15  And generally it's the mailing address -- name and mailing

16  address of the contributor.  In addition, under column 2, you

17  can see there if it's an individual they want to know who your

18  employer is, or if you have a business, your occupation, and

19  your principal place of business.  We kind of shortened some of

20  that because it's pretty obvious with some of those donations.

21  The Republican Committee is right there in Culpeper.

22  Q    So this is what you were describing to us earlier, the

23  detail that is required for any contribution over 1,000 --

24  $100?

25  A    Over 100, yeah.

Jones - Direct

1  Q    And all of these columns are supposed to be filled out by

2  the time you file this report?

3  A    That's right.

4  Q    And it looks like for this particular period, July 1st,

5  2019 to September 13, 2019, there are three pages of schedule

6  A, which is the direct contributions over $100?

7  A    Right.  Yes.

8  Q    Now, I'm going to flip through -- I'm going to have

9  Ms. Fastenau flip through the three pages, but I just wanted to

10 ask you as you're looking through those three pages, if you see

11 an individual named Rick Rahim as one of the contributors.  So

12 that's page 1.

13 A    No.

14 Q    Page 2?

15 A    No.

16 Q    Page 3?

17 A    No.

18 Q    And so that's the end of the contributions reported for

19 this period?

20 A    Yes.

21 Q    Now, if there had been a $15,000 cash donation made to

22 Scott Jenkins's campaign during this period, should it have

23 been reported on this report?

24 A    It depends on who it was from.  When Scott funded the

25 campaign with personal funds, I put that as a loan generally.

Jones - Direct

1  Q    Let's say it was a $15,000 cash contribution from someone

2  that is not Scott Jenkins?

3  A    Yeah, so that would be an individual, it would go right on

4  this form.

5  Q    And if that $15,000 cash donation had never been deposited

6  into the Scott Jenkins For Sheriff campaign account, is there

7  any way for you as the accountant to know about that?

8  A    No.

9  Q    Let's move on to the next page of this report.

10        What is it that we're looking at here in schedule D?

11  A    That's an expenditure report.  That's a report of all

12  their expenditures for the various supplies or advertising, the

13  general things that a campaign pays for.  You can see it has

14  quite a lot of detail, as far as the vendor that they're using,

15  the business name and address, along with the item or type of

16  service that they're paying for, who authorized it, and the

17  date, and then the dollar amount.

18  Q    Next page, please.

19        And this is schedule F, debts remaining unpaid.  Can you

20  explain what this schedule is reporting?

21  A    Yeah.  So this is where -- and this is how I've handled

22  all small campaigns that we've done.  A lot of them are self-

23  funded, if that's the right term.  It's funded by the

24  candidate.  And I've always shown those as loans from the

25  candidate.

Jones - Direct

1  Q    Next page, please.

2       And what is it that we're looking at here in schedule G in

3  terms of statement of funds?

4  A    So you can see that the schedule G, this is more of a

5  summary schedule of kind of what we just looked at.  So when

6  you look at that first schedule, they have each schedule on

7  this summary type report.  Down here we list the number of

8  donors that were on that schedule A report.  You can see there

9  were 15.  And that number of 20,300 should match the number at

10 the bottom of schedule A.  Nothing on schedule B.  As far as

11 the -- this is where the un-itemized cash donations go that are

12 less than $100.

13 Q    So for cash contributions that are less than $100, you

14 don't need to provide the detail of who it's from, but you

15 still need to report an aggregate amount?

16 A    Yes.

17 Q    And that's also true, it looks like, for in-kind

18 contributions under $100?

19 A    That's correct.

20 Q    Next page.

21      And what is it that we're looking at here in schedule F --

22 H?

23 A    Yeah, so this is -- this is what kind of ties the bank

24 statement in, what we were talking about earlier.  We're

25 reconciling the balance from the last report.  We're looking at

Jones - Direct

1  those monies in, which would be the cash donations over 100,

2  cash donations under 100.  That would give you the total

3  expendable funds.  Then that next section gives you the total

4  expenditures.  If there were other types of expenditures, they

5  would also -- or incomes -- they would also show if they had

6  interest or dividends, that would also show on this report.

7  Never seen that with a campaign report, but...

8      As far as any type of expenditures in this summary, it

9  comes down and that ties into the total cash in the bank at the

10  end.  The one at the bottom starts at the very beginning, the

11  small one.  This one at the top is for that current period that

12  we just looked at.  The one at the bottom starts from the

13  beginning of the campaign and summarizes it -- summarizes it in

14  total, tying in the same number, the same cash in bank number

15  essentially.

16  Q    So is part of your work, you know, verifying whether these

17  amounts correspond to what is actually shown in the campaign

18  bank account?

19  A    Oh, yes.  Yes.

20  Q    Can we go to Exhibit 625, please, which is already in

21  evidence.

22      So is this another report for the Sheriff Jenkins

23  campaign?

24  A    Yes.

25  Q    And what period does this report cover?

Jones - Direct

1  A    So that period is 9-14-19 to 10-15-19.

2  Q    So is this still for the November 2019 election?

3  A    Yes.

4  Q    Go to the next page, please.

5       Now, it looks like for this period, there were two pages

6  of donations reported; is that right?

7  A    1 of 2, yes.

8  Q    Now, I'm going to ask you the same question I did before.

9  Tell me if you see any contributions reported for an individual

10 named Rick Rahim, and a second individual named Fred Gumbinner?

11 A    No.

12 Q    Next page?

13 A    No.

14 Q    And that is the conclusion of the donations reported for

15 this period?

16 A    Yes.

17 Q    Again, if there had been a $20,000 cash donation made to

18 the campaign from someone other than Scott Jenkins, should it

19 have been reported in this report?

20 A    Yes.

21            THE COURT:  Ms. Peng, we've been going almost two

22 hours, and some of us may need to stretch our legs briefly.

23 Why don't we -- why don't we take a break, and that way we

24 can -- you don't hurry through, and then we can get everything

25 through.

Jones - Direct

1           So ladies and gentlemen, let's take our afternoon

2    break.  When we come back, my hope is we can work our way

3    fairly diligently through this.  We'll try to come back at

4    3:40, no later than 3:45, and work our way through the rest of

5    the afternoon.  Again, please do not discuss the case at all or

6    begin to formulate any opinions.

7           We'll let the jury be excused.

8    (*Jury out, 3:28 p.m.*)

9           THE COURT:  3:40, if possible, 3:45, and then we'll

10   get through the end of this witness.

11          MS. PENG:  Oh, Your Honor, do you want to instruct

12   the witness not to speak to --

13          THE COURT:  Yeah.  Mr. Jones, since you are on the

14   stand, you can't have any discussion at all with anyone about

15   your testimony.  So please avoid that while we're on our break.

16   Thank you.

17          (Recess)

18          THE COURT:  We're back on the record in the matter of

19   *United States v. Jenkins*.  The record will reflect the

20   government is present by its counsel.  The defendant likewise

21   is present along with the benefit of counsel.

22          Ms. Peng, anything we need to address before we bring

23   the jury in?

24          MS. PENG:  No, Your Honor.

25          THE COURT:  Mr. Andonian, Mr. Caleb?

Jones - Direct

1          MR. ANDONIAN:  No, Your Honor.

2          THE COURT:  All right.  Let's go ahead and bring the

3    jury in if we can, please.  Thank you.

4    (*Jury in, 3:43 p.m.*)

5          THE COURT:  Ladies and gentlemen, please have a seat.

6          Ms. Peng, go right ahead.

7          MS. PENG:  Thank you.

8     BY MS. PENG:

9    Q    So before the break, we were talking about Government

10   Exhibit 625, and we had covered that for this reporting period,

11   September 14, 2019 to October 15, 2019, there were no

12   contributions reported for anyone named Rick Rahim or Fred

13   Gumbinner; is that right?

14   A    Correct.

15   Q    Okay.  So I just want to look at one more report with you.

16        Can we pull up Government 634, which has already been

17   admitted.

18        All right.  Mr. Jones, why does this report look a little

19   different than the other reports we have just been looking at?

20   A    So this is a report that -- now they're filed

21   electronically, and this is just a paper copy that we print off

22   for our records.

23   Q    So at some point, did the format of the reports change

24   from paper reports to an electronic format?

25   A    Yes.

Jones - Direct

1  Q    And that's what accounts for why this report looks a

2  little different than the other ones we've been looking at

3  earlier?

4  A    Yes.

5  Q    And so what period does this report cover, in terms of the

6  donations?

7  A    It looks like this period is July 1st, 2022 through

8  12-31-2022.

9  Q    And can you tell looking from this page whether this

10 corresponds to what we had been looking at in terms of schedule

11 A and direct contributions over $100?

12 A    Yes.

13 Q    And so it looks like in terms of the columns, it's the

14 same information we have been discussing in terms of the

15 contributors that need to be reported; is that right?

16 A    Yes.

17 Q    And you can see a total amount for this period at $11,500?

18 A    Yes.

19 Q    Okay.  I want to direct your attention to the first

20 contribution reported on here, Bridgeport International.

21      Do you see that?

22 A    Yes.

23 Q    Can you tell from looking at this report what kind of

24 entity that is?

25 A    Bridgeport International?

Jones - Direct

1    Q    Yes.

2    A    So as far as whether it's a corporate entity, or --

3    Q    Just anything you can tell from what's reported here.

4    A    As far as the type of entity, no.  As far as the industry,

5    it seems to be a merchant wholesaler.

6    Q    And can you tell from this report whether this donation of

7    $5,000 was in cash form or check form?

8    A    No.

9    Q    And do you have any knowledge about what persons may be

10   associated with Bridgeport International?

11   A    I don't.

12   Q    Now I want to direct your attention to the third

13   contribution, which says Yona Systems Group.

14        Do you see that?

15   A    Yes.

16   Q    Same question:  Can you tell whether this contribution of

17   $5,000 was made in cash or check?

18   A    No.

19   Q    And do you have any knowledge of any persons associated

20   with Yona Systems Group?

21   A    No.

22   Q    Just looking at this reporting period from July 2022 to

23   the end of that year, do you see any contributions reported for

24   an individual named Jerry McKee?

25   A    No.

Jones - Cross

1  Q   How about any contributions made by someone with the first

2  name Mike or Michael?

3  A   No.

4  Q   Do you see any contributions reported made by someone

5  named Phil Howell?

6  A   No.

7         MS. PENG:  That's all I have for now.

8         THE COURT:  Thank you very much.

9         Any cross-examination, Mr. Andonian?

10        MR. ANDONIAN:  Thank you, Your Honor.

11               CROSS-EXAMINATION

12   BY MR. ANDONIAN:

13  Q   Good afternoon.

14  A   Good afternoon.

15  Q   Just a few questions, Mr. Jones.

16     You talked about when you're dealing with cash donations

17  that it's important to have controls in place, I think is the

18  phrase that you used to kind of keep track of them, right?

19  A   Uh-huh.

20  Q   And when you say "controls in place," you mean that your

21  clients need to have controls in place?

22  A   Yes.  Clients.

23  Q   Because you're just simply receiving whatever information

24  comes from the client?

25  A   That's correct.

Jones - Cross

1  Q    Okay.  You've known Scott Jenkins for a long time, right?

2  A    Yes.

3  Q    I think you talked about your relationship as being both

4  professional and social?

5  A    Yes.

6  Q    Okay.  You know that Scott Jenkins has had no formal

7  training in campaign finance laws, right?

8  A    Yes.

9  Q    And you know that Scott Jenkins has had no formal training

10 in finance of any kind really?

11 A    Yes.

12 Q    If a campaign -- I'm just asking kind of a hypothetical

13 right now -- so if a campaign got a donation from a donor and

14 failed to report that to you, you wouldn't know about it,

15 right?

16 A    Correct.

17 Q    And then it wouldn't show up on the reports that we were

18 looking at?

19 A    If it didn't enter the bank account, then I would have no

20 way to track it, yes.

21 Q    And my follow-up question was going to be just that.

22 A    Yes.  I'm sorry.

23 Q    No, that's fine.

24      If a campaign were to get a donation and didn't record it

25 in the bank account, likewise, you -- as far as you know, you

Jones - Examination by the Court

1  would have no knowledge of its existence?

2  A    Yes.

3  Q    But that wouldn't mean that in actuality it wasn't there.

4  It just wasn't recorded, right?

5  A    Correct.

6         MR. ANDONIAN:  Court's brief indulgence.

7         That's all I have.

8         THE COURT:  Let me make sure I understand to follow

9  up on Mr. Andonian's questions.

10        If it's in the bank, you can't -- if the report

11 doesn't match up with the bank account, you have to reconcile

12 that; is that correct, Mr. Jones?

13        THE WITNESS:  Well, it would -- yes, it would be --

14 it would be a violation, and you would have to amend the report

15 if it was failing.

16        THE COURT:  Okay.  So your report is essentially

17 another way of reconciling the bank account of what comes in

18 and what goes out --

19        THE WITNESS:  Yes.

20        THE COURT:  -- for that campaign.

21        Okay.  I apologize.  Does that prompt any further

22 questions, Ms. Peng, or do you have any redirect?

23        MS. PENG:  Oh, yes, just briefly.

24        THE COURT:  Actually, before I do that -- because I'm

25 going to give you the last word on redirect -- Mr. Andonian,

Jones - Redirect

1    did my questions prompt anything further?

2                MR. ANDONIAN:  No, Your Honor.

3                THE COURT:  Okay.  Fine.  Any redirect?

4                    REDIRECT EXAMINATION

5    BY MS. PENG:

6    Q    Mr. Jones, you were just asked on cross whether you were

7    aware that Scott Jenkins had any training on campaign finance.

8         Do you recall that?

9    A    Yes.

10   Q    Did you, in fact, have that initial meeting with Scott

11   Jenkins when he first came on as a client where you gave him

12   general instructions on what needed to be provided to you?

13   A    Yes.  We had that meeting, yes.

14   Q    And you also testified that the reason you had that

15   meeting is because you need to know or receive information from

16   a campaign in terms of what to include in a report, right?

17   A    Right.

18   Q    You were also asked about, you know, if donations were not

19   reported, it doesn't mean that they were not made.

20        If a campaign receives donations, whether it's in cash or

21   in check over $100, are they supposed to be reported to you to

22   include in the report?

23   A    Even if they're under $100, they're required.  So all are

24   required.  It's just how they're reported.

25                MS. PENG:  Thank you.  That's all I have.

McKnight - Direct

1          THE COURT:  Thank you.  May this witness be excused?

2          MS. PENG:  Yes.

3          THE COURT:  Mr. Jones, thank you very much for coming

4   in.  I appreciate you coming.  Please do not discuss your

5   testimony as long as the case is pending.  Thank you.

6          Ms. Smith, call your next witness, please.

7          MS. SMITH:  The United States calls Chad McKnight.

8          THE COURT:  Come on up, Mr. McKnight.  Ms. Brown will

9   get you sworn in.

10          CHAD MCKNIGHT, CALLED BY THE GOVERNMENT, SWORN

11          THE COURT:  Have a seat right over here in the

12   witness box.  As you sit down, slide on up to the microphone

13   and bring the microphone over to you and speak into it, and

14   we'll be able to pick up our conversation.

15          All right.  Ms. Smith, go right ahead, please.

16          MS. SMITH:  Thank you, Your Honor.

17                     DIRECT EXAMINATION

18    BY MS. SMITH:

19   Q    Good afternoon.  Could you please introduce yourself to

20   the jury by stating your name and spelling your last name for

21   the court reporter?

22   A    Chad McKnight.  Last name M-C-K-N-I-G-H-T.

23   Q    And where are you from, Mr. McKnight?

24   A    Culpeper, Virginia.

25   Q    And have you lived in Culpeper all your life?

McKnight - Direct

1   A    No, ma'am.

2   Q    When did you move to Culpeper?

3   A    I believe it was around 2002 that I moved there.

4   Q    And what is the highest level of education that you have

5   achieved?

6   A    Bachelor's degree.

7   Q    And how are you currently employed?

8   A    I'm employed with the Culpeper County sheriff's office.

9   Q    And what is your rank?

10  A    Captain.

11  Q    And my apologies for referring to you as "Mr."  It should

12  have been captain.

13       Captain McKnight, how long have you been with the Culpeper

14  County sheriff's office?

15  A    About 22 years now.

16  Q    So when you moved to Culpeper, Virginia, did you

17  immediately seek employment with the Culpeper County sheriff's

18  office?

19  A    At the time I was employed with Warrenton police

20  department, and then when we moved to Culpeper introduced to a

21  few of the deputies there, and transferred over to that agency,

22  and been there since.

23  Q    Now, 22 years is a long time.  Can you tell the jury the

24  various positions that you've held since joining the office

25  just generally?

McKnight - Direct

1   A    Most of my career was spent in patrol.  I was eventually

2   promoted to the ranks of patrol sergeant.  From there I went

3   over into the schools after I suffered an injury, and continued

4   to -- continued through my path.  I made it to lieutenant and

5   then eventually captain.  At the end of the last

6   administration, I had made it to major, and now I'm captain

7   again.  We did away with majors currently in this

8   administration.

9   Q    And you mentioned you were a patrol sergeant.  Is that a

10  leadership position?

11  A    Yes, ma'am.

12  Q    And you also mentioned going over to the schools.  What

13  does that mean?

14  A    I was a school resource officer.

15  Q    At some point in your time at the Culpeper County

16  sheriff's office, did you also take over the position of

17  training coordinator and accreditation manager?

18  A    Yes, ma'am, which I currently am now.

19  Q    And when did you take over that position?

20  A    I believe it would have been around May of '22.

21  Q    And what were the duties and responsibilities for that

22  position?

23  A    To ensure that the training was kept up for members of the

24  agency.

25  Q    Is that for all of the deputies employed by Culpeper

McKnight - Direct

1  County sheriff's office?

2  A    Correct.

3  Q    Does that also include any auxiliary deputy sheriffs back

4  under the prior administrations?

5  A    Correct.

6  Q    When someone is hired as a new sheriff's deputy, what

7  training is required?

8  A    If they're hired, they're required within one year of that

9  hiring to attain either a law enforcement certification or a

10  jail basic certification, and that includes their field

11  training at the conclusion of the academy.

12  Q    How much training is that?

13  A    Rough estimate for law enforcement academy, 18 weeks.

14  Breaking down the hours, I'm not quite sure.  I believe it's

15  around 700 hours or something.  Jail basic, it's I believe

16  about a 12-week academy.  I don't know broken down what that

17  would be hourly.

18  Q    It's a significant amount of training when you have a new

19  hire as a deputy; is that right?

20  A    Yes, ma'am.

21  Q    What if someone joins your office from another law

22  enforcement agency?

23  A    We would obtain their TRACER records, which is held

24  through DCJS and it's transferred over to us, and then we start

25  maintaining them.

McKnight - Direct

1   Q    And what is DCJS?

2   A    Department of Criminal Justice Services.

3   Q    Is there ongoing training required for sheriff's deputies?

4   A    Yes, ma'am.

5   Q    What type of training is required?

6   A    You have in-service hours.  If you're in a law enforcement

7   position, you're required to get 40 hours of in-service every

8   two years.  If you're in the jail basic -- or, correction, jail

9   officer -- you're required 24 hours.

10  Q    Do you also have firearms qualification requirements?

11  A    Yes, ma'am.

12  Q    And what are those?

13  A    Annually you're required to qualify once a year.

14  Q    Are you familiar with auxiliary deputy sheriffs?

15  A    Yes, ma'am.

16  Q    And are you also familiar with the sheriff's General

17  Orders?

18  A    Yes, ma'am.

19  Q    And you worked under Scott Jenkins for how long?

20  A    All 12 of his years as sheriff.

21  Q    And are you familiar with the General Orders that were in

22  place when he was the sheriff?

23  A    Yes, ma'am.

24  Q    And under his General Order, are auxiliary deputies

25  required to have the same training and certifications as a

McKnight - Direct

1  regular sheriff's deputy?

2  A    Yes, ma'am.

3  Q    And during your time as a training coordinator, if someone

4  became an auxiliary deputy, would you have been responsible for

5  helping organize any training that they may have needed?

6  A    Yes, ma'am.

7  Q    How would you know that you needed to organize that

8  training?

9  A    If we were putting on classes, I would be notified of the

10 class that we would be hosting or putting on ourselves through

11 our instructors.  That came a number of ways, either by the

12 sheriff himself or by other command staff members wanting to

13 put a class together.  Other than that, I would look at the

14 TRACER records once a year -- well, multiple times a year, but

15 I would send that out to those that would expire that year.  So

16 I would have the names and the list of people that expired so I

17 could notify them that they needed training in order to

18 complete their mandatory in-service requirements, which is

19 their MIRs.

20 Q    So you had a list of deputies that you would need to keep

21 track of the training for?

22 A    Our roster through TRACER.

23 Q    Did you have a roster of auxiliary deputy sheriffs?

24 A    No, ma'am.

25 Q    Were you ever asked to set up training for auxiliary

McKnight - Direct

1    deputy sheriffs?

2    A    No, ma'am.

3    Q    During May 2022 through January of 2023, did you ever

4    organize or coordinate any training for auxiliary deputy

5    sheriffs?

6    A    No, ma'am.

7    Q    Was that lack of training consistent for your entire time

8    at the sheriff's office?

9    A    I'm sorry, lack of training?

10   Q    For auxiliary deputy sheriffs?

11   A    For auxiliary deputies, I know three specific auxiliary

12   deputies that I had that were in our TRACER, and they were

13   upheld to those training requirements, but they were previous

14   law enforcement.  Those are the three that I'm familiar with.

15   Q    You said you know of three auxiliary deputies that the

16   training was kept track of; is that right?

17   A    Yes, ma'am.

18   Q    And who were those three auxiliary deputies?

19   A    Todd Armal, Mike Sager and Twyla Demoranville.

20   Q    And you mentioned that they were prior law enforcement

21   officers?

22   A    Yes, ma'am.

23   Q    So they had already completed some training when they

24   joined the ranks as an auxiliary deputy sheriff?

25   A    Yes, ma'am.

McKnight - Direct

1  Q    Was Scott Jenkins aware that only those three auxiliary

2  deputy sheriffs were receiving training?

3            MR. ANDONIAN:  Objection.  Speculation.

4            THE COURT:  Well, rephrase the question as to what,

5  if anything, he may know.

6   BY MS. SMITH:

7  Q    Do you know whether or not Scott Jenkins was aware that

8  there was no training for any auxiliary deputies, except for

9  those three you just mentioned?

10 A    I'm not sure if he was aware of what training beyond those

11 three.

12 Q    Did he ever come to you and request training for other

13 auxiliary deputies?

14 A    No, ma'am.

15 Q    When you took over the position as training coordinator in

16 May of 2022, were there records for any auxiliary deputies?

17 A    There were.  I was not aware of them until all this

18 started happening, but there were some records.

19 Q    Can you explain that for me?

20 A    When there was records that needed to be located in

21 reference to auxiliaries that we had, I had located in a filing

22 cabinet in the office that I was in a small group of names that

23 were part of the list that were required for us to find, and

24 there were a few of them on there.

25 Q    Was that in reference to a subpoena from the government?

McKnight - Direct

1   A    Yes, ma'am.

2   Q    And why were you unaware of that small amount of records

3   prior to that occasion?

4   A    Just never had any occasion to look in the small filing

5   cabinet in the corner of that office.

6   Q    No one ever gave you any list when you took over that

7   position and said:  These are all the auxiliary deputies we

8   have?

9   A    No, ma'am.

10  Q    I want to talk a little bit about Scott Jenkins's role as

11  sheriff.  Did he routinely demote or promote individuals?

12  A    Yes, ma'am.

13  Q    And tell us about that.

14  A    People would -- people would come into the office and have

15  certain ranks.  Some people would be a certain rank, and one

16  day would no longer be that rank, whether it be a demotion or a

17  promotion.  There was movement throughout that office.

18  Q    Was it pretty frequent?

19  A    Fairly frequent.

20  Q    And what reasons did Scott Jenkins give for those

21  personnel actions?

22  A    I don't know why they were promoted or demoted.  I can

23  only speak from personal experience for myself.  I don't know

24  about others.

25  Q    Were there also suspensions without pay?

McKnight - Direct

1  A    Yes, ma'am.

2  Q    And did those happen frequently?

3  A    Again, I can only speak of what happened to me.

4  Frequently?  No, thankfully.

5  Q    You said not frequently for you?

6  A    No, ma'am.

7  Q    Were you worried that you could be suspended without pay?

8  A    That was always a fear.

9  Q    And why is that?

10 A    Just because I had seen it happen to others and it had

11 happened to me a couple of times.

12 Q    And why were you suspended without pay?

13 A    One was because a command staff member had given a

14 directive, and we followed that directive.  And a year later

15 when the sheriff discovered that this directive was given, I

16 just happened to be one of the people that was in that unit at

17 the time and, was suspended for it.

18 Q    And how long were you suspended?

19 A    It was a week without pay.

20 Q    And what was the directive that you were suspended over?

21 A    At the time our school resource division was required to

22 have a deputy on every campus.  And I had been out with COVID

23 for a long period of time and there were others that were out

24 as well.  Our unit was low on manpower, and we were trying to

25 shuffle manpower between schools so that they could see

McKnight - Direct

1  coverage.  We just didn't have somebody there the full school

2  day.  The captain at the time was notified of this issue.  He

3  said that he had no people, and continue doing what we're

4  doing, and so we did.  I was transferred out of that unit, and

5  then a year later it had come to his attention through the

6  current SR supervisor who was not on campus at the time, and

7  through that investigation it was found that we had been short

8  on manpower and been moving personnel to cover the school.  And

9  so we were all suspended and one was demoted.

10  Q    Did that incident include Pete Siebel?

11  A    Yes, ma'am.

12  Q    And who suspended you?

13  A    The sheriff did.

14  Q    And how do you feel about that suspension?

15  A    That was a directive that was given to us by our senior

16  command staff, and I followed that directive.  I had concern

17  when I came back from having COVID so much that I continued to

18  address it with Pete Siebel.  And he continued to say do what

19  we're doing.  I asked if the sheriff was aware and he said yes,

20  he was aware.  So no, I don't believe I should have been

21  suspended or lost pay.

22  Q    Do you know if the sheriff was worried about bad publicity

23  over the school resource decision?

24  A    Yes, ma'am.

25  Q    Can you tell me about that?

McKnight - Direct

1              MR. ANDONIAN:  Your Honor, I'm just going to object

2    to this line of questioning on relevance grounds.

3              THE COURT:  Where are we going with this?

4              MS. SMITH:  Your Honor, I think it shows the culture

5    of the office and what was going on, and I think it also

6    explains why certain decisions were made or not made by some of

7    the subordinates of Scott Jenkins.

8              THE COURT:  Let's move it along.

9              MS. SMITH:  Yes, Your Honor.

10    BY MS. SMITH:

11   Q    Have you also been a firearms instructor for the Culpeper

12   County sheriff's office?

13   A    Yes, ma'am.

14   Q    And when did you take over that position, if you can

15   recall?

16   A    Maybe 15 years, possibly.

17   Q    Were you -- have you been a firearms instructor for the

18   whole 15 years?

19   A    Yes, ma'am.

20   Q    How frequently do sheriff's deputies have to certify their

21   firearm?  You said that's once a year?

22   A    Once a year.

23   Q    Did you ever help any auxiliary deputies certify for

24   firearms?

25   A    The only ones that I would have seen would have been the

McKnight - Direct

1   three names that I have given you, but I don't recall an

2   auxiliary deputy coming to me for assistance with firearms.

3   Q    I'm going to read through a few names, and you can tell me

4   whether or not you helped with any training or firearm

5   certifications for them?

6   A    Okay.

7   Q    James or Jim Metcalf?

8   A    No, ma'am.

9   Q    Phil Howell?

10  A    No, ma'am.

11  Q    Jerry McKee?

12  A    No, ma'am.

13  Q    Rubar Sandy?

14  A    No, ma'am.

15  Q    Tom Cooper?

16  A    No, ma'am.

17  Q    Are you familiar at all with any of those individuals?

18  A    I have no idea who any of those people are.

19  Q    And what was your time like at the sheriff's office under

20  Scott Jenkins?

21  A    It could be very stressful at times.  Like I said, you did

22  not know one minute to the next if kind of things ended up

23  focusing on you for some reason or not.  And again, I had my

24  own personal roller coaster under Scott Jenkins.  Then there

25  were other times where things were great, and he was a very

McKnight - Direct

1    compassionate with a lot of the officers and would do things

2    for them and their families.

3    Q    Was Scott Jenkins involved in the day-to-day operations of

4    the sheriff's office?

5    A    We didn't see him very often, but I would imagine he was

6    involved.

7    Q    Do you know what level of control he had over

8    decision-making in the office?

9    A    Oh, he had direct control over the decision-making of the

10   office.

11   Q    And how do you know that?

12   A    Just because any decisions that needed to be made needed

13   to go through him.

14   Q    Were there times when people didn't have decisions go

15   through him and there were adverse consequences?

16   A    Yes, ma'am.  We'd have meetings where decisions were made

17   that hadn't been approved.

18   Q    Were you ever in meetings with Scott Jenkins where there

19   were rules about whether or not phones could be brought into

20   the meetings?

21   A    I personally was not involved in that meeting.

22   Q    Based on what you observed in your interactions with Scott

23   Jenkins, what did he value in his subordinates?

24   A    Loyalty.  He valued loyalty and obedience from his

25   subordinates.

McKnight - Cross

1  Q    And why did you feel that way?

2  A    I mean, you definitely felt that you needed to make -- you

3  needed to follow the decisions that were made or your job could

4  depend on it.

5  Q    So were there consequences if you were not loyal?

6  A    Yes, ma'am.  I believe that would go back to demotions.

7             MS. SMITH:  No further questions, Your Honor.

8             THE COURT:  Any cross-examination, Mr. Andonian?

9             MR. ANDONIAN:  Thank you, Your Honor.

10                          CROSS-EXAMINATION

11   BY MR. ANDONIAN:

12  Q    Good afternoon, Captain.

13  A    Good afternoon.

14  Q    Captain, just a few questions.  You talked about the

15  General Order regarding auxiliary deputies.  I just want to ask

16  a few questions about that.

17        The General Order is an internal policy for the sheriff's

18  office, right?

19  A    Correct.

20  Q    It's created within the sheriff's office?

21  A    Correct.

22  Q    And the ultimate authority over creating a General Order

23  rests with the sheriff, right?

24  A    Correct.

25  Q    And the sheriff has the ability to implement a General

McKnight - Cross

1  Order, right?

2  A    Correct.

3  Q    And has the authority to revoke a General Order?

4  A    Correct.

5  Q    Ask and can do that at any point in time?

6  A    Yes, sir.

7  Q    For any reason the sheriff deems necessary?

8  A    Yes, sir.

9  Q    Putting the General Order aside for just a second, you

10 understand that auxiliary deputies that are brought in by the

11 sheriff are treated differently than let's say, for example,

12 city police officers, right?

13 A    Yes, sir.

14 Q    The sheriff's office and the city police department have

15 different standards that they have to abide by, right?

16 A    Yes, sir.

17 Q    And you understand that auxiliary deputies have different

18 training requirements depending on different levels, right?

19 A    Yes, sir.

20 Q    And there are certain auxiliary deputies that don't work

21 enough hours or volunteer enough hours in a month that any

22 training is required of them, right?

23 A    Correct.

24          MR. ANDONIAN:  Court's brief indulgence.

25          THE COURT:  Yes, sir.

USA v. Jenkins, 3:23cr11, 12/13/2024

1      MR. ANDONIAN:  If I could just have one moment.

2      THE COURT:  Yes, sir.

3      MR. ANDONIAN:  That's all I have, Your Honor.

4      THE COURT:  Any redirect?

5      MS. SMITH:  No, Your Honor.

6      THE COURT:  May Mr. McKnight be excused?

7      MS. SMITH:  Yes, Your Honor.

8      THE COURT:  Mr. McKnight, thank you very much for

9  being in.  You're free to go.  Please do not discuss your

10  testimony as long as the case is pending.  Thank you.  Have a

11  nice weekend.

12      All right.  Does that bring us to the conclusion of

13  the witnesses that the government has on tap for today?

14      MS. SMITH:  Yes, Your Honor.

15      THE COURT:  So ladies and gentlemen, I think you may

16  get a sunset.  We're going to break now for the weekend.  I'm

17  assured that this is exactly where the government expected to

18  be in their case.  We're on schedule, which is a good thing.

19  So we can break early and let you all get home for the weekend.

20      I will remind you:  Don't look at any press reports.

21  Don't have any conversations with anyone.  Don't let anyone

22  have any conversations with you.  Friends and family over the

23  weekend may ask you about the case, may want to know what it's

24  about, may want to talk with you about it.  Just tell them you

25  can't do so.  You have to wait until the case is over.  Also,

USA v. Jenkins, 3:23cr11, 12/13/2024

1  don't do any independent research.  Don't consult anything.  If

2  you see any press reports, turn your eyes away.  If you hear

3  anything come onto the news, please go in another room or

4  change the channel as well.

5          It is critically important that -- for the fairness

6  to all parties that you reserve any judgment in the case until

7  after all the evidence is in and you've been given the

8  instructions that will follow the case.  So I very much

9  appreciate you all's attention.  I appreciate you being here

10 all week.  We will start again Monday morning bright and early.

11 We'll be ready to go at 9:00 if you all can all be here at

12 8:45.  We'll try to start early as well and try to get through

13 the week as expeditiously as possible.

14          With that, I wish you save travels to and from, and

15 hope you have a very nice and relaxing weekend.

16          We'll release the jury.

17 **(Jury out, 4:14 p.m.)**

18          THE COURT:  You all please have a seat.

19          Okay.  So we have shared with you all jury

20 instructions.  You all are still looking to get to the

21 conclusion of your case Tuesday afternoon, Wednesday morning at

22 the latest; is that fair to say?

23          MS. CHOY:  Yes.

24          THE COURT:  So here's what I'd like to do with jury

25 instructions since that's the timing and we don't know what, if

USA v. Jenkins, 3:23cr11, 12/13/2024

1  any, will follow from the defendant's standpoint.  If we can --

2  if you all can confer over the weekend, Monday at the latest,

3  and -- did we send them Word versions, Campbell?

4          You all have Word versions.  If you can prepare -- if

5  there are any instructions that -- I want you all to try to

6  agree as many places as possible.  If there are any

7  instructions that need to be changed for which you agree, just

8  redline them.  And then to the extent you don't agree, in the

9  same document put in comments as to what the government would

10  like and what the defendant would like, and try to get those

11  back to us at the end of the day on Monday so we can look at

12  those Monday night.  The instructions break down pretty simply.

13  The first half of them are just general instructions, some of

14  which we may not need.  We've over-included.  We'll see what

15  the evidence shows or doesn't show.  The other half are the

16  substantive instructions.  I've tried to combine some of them

17  as well in hopes of -- it looks like these instructions are

18  pretty similar to the case, if not almost identical to the case

19  that Judge Allen tried.  I forget the name of that case.

20          MS. CURRY-LEDBETTER:  McCabe.

21          THE COURT:  McCabe, that's right.  And we had gotten

22  the transcript as well and looked at those instructions, so we

23  know what they are.  And it looks like you all agree to about

24  90 percent of those instructions in any event.  We'll see what

25  the evidence ultimately bears out.  There may be some

USA v. Jenkins, 3:23cr11, 12/13/2024

1   objections on some of them as well.

2           But, for example, on the bribery instructions I tried

3   to combine -- rather than have six different instructions on

4   it, have a general instruction and then list them so that -- in

5   hopes that the jury can then understand what Counts Six, Seven,

6   Eight and so forth are all about.  You may not like it.  You

7   may have better ideas on how to wordsmith that.  And if you do,

8   that's perfectly fine.  So we can do that.

9           I see and I appreciate you all have uploaded Defense

10  Exhibits 1 and 2 to Box.  We'll get those moved over to the

11  admitted exhibits.

12          And then who do we anticipate having on Monday?

13          MS. CHOY:  Mr. Rychlik, Tom Cooper and Jim Metcalf.

14          THE COURT:  You've got about 13 witnesses left on

15  your list, if I remember them.  You may not call them all.

16          Otherwise, is there anything that you all anticipate

17  we need to address either this evening or Monday morning?

18          MS. CHOY:  Nothing from the government.

19          THE COURT:  Mr. Andonian?

20          MR. ANDONIAN:  Nothing from us right now, Your Honor.

21          THE COURT:  All right.  Very well.  Well, I

22  appreciate -- it's been a long half week.  We still have a ways

23  to go, but I appreciate the cooperation between lawyers and

24  being able to get the case on as well.  I think that's very

25  helpful for the jury so that they can get the case in front of

USA v. Jenkins, 3:23cr11, 12/13/2024

1  them.  So I appreciate that.

2        If anything comes up, you all have my email.  You

3  have Campbell's email.  You can reach out to us over the

4  weekend as well.  But otherwise, I hope you all have a nice

5  weekend and we'll see you back here bright and early on Monday

6  morning.  Thank you, and we'll stand in recess.

7  (Proceedings adjourned, 4:18 p.m.)

USA v. Jenkins, 3:23cr11, 12/13/2024

1                 C E R T I F I C A T E

2      I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10 understanding.

11     I further certify that the transcript fees and format

12 comply with those prescribed by the Court and the Judicial

13 Conference of the United States.

14     /s/ Lisa M. Blair                Date: December 13, 2024

15

16

17

18

19

20

21

22

23

24

25