USA v. Jenkins, 3:23-cr-11 12/16/2024

1                    UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF VIRGINIA
2                      CHARLOTTESVILLE DIVISION

3  **************************************************************

4  UNITED STATES OF AMERICA,    CRIMINAL CASE NO.:  3:23-CR-11
                                DECEMBER 16, 2024, 8:58 A.M.
5                               CHARLOTTESVILLE, VIRGINIA
            Plaintiff,         JURY TRIAL, DAY 4
6  vs.

7  SCOTT HOWARD JENKINS,        Before:
                                HONORABLE ROBERT S. BALLOU
8                               UNITED STATES DISTRICT JUDGE
            Defendant.         WESTERN DISTRICT OF VIRGINIA
9
   **************************************************************
10
   APPEARANCES:
11

12 For the Government:          CELIA RUTH CHOY, ESQUIRE
                                LINA PENG, ESQUIRE
13                              DOJ-Crm
                                Public Integrity Section
14                              1301 New York Avenue NW, 10th Floor
                                Washington, DC 20530
15                              202-875-1557

16                              MELANIE SMITH, ESQUIRE
                                DOJ-USAO
17                              Western District of Virginia
                                255 West Main Street, Suite 130
18                              Charlottesville, VA 22902
                                434-293-4283
19

20

21

22 Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                     255 West Main Street, Suite 304
23                   Charlottesville, Virginia  22902
                     434.296.9284
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25 TRANSCRIPT PRODUCED BY COMPUTER.

USA v. Jenkins, 3:23-cr-11 12/16/2024

1  APPEARANCES CONTINUED:

2  For the Defendant:          PHILIP ANDONIAN, ESQUIRE
                               JOSEPH P. CALEB, ESQUIRE
3                              Caleb Andonian PLLC
                               1100 H Street, NW, Suite 315
4                              Washington, DC 20005
                               202-953-9850
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11 12/16/2024

1                          I N D E X

2    WITNESSES ON BEHALF OF THE GOVERNMENT:              PAGE

3    KEVIN RYCHLIK

4      Direct Examination by Ms. Choy                    11
       Cross-Examination by Mr. Andonian               125
5      Redirect Examination by Ms. Choy                150

6
     UC-1 ("JERRY MCKEE")
7
       Direct Examination by Ms. Smith                 158
8      Cross-Examination by Mr. Caleb                  184
       Redirect Examination by Ms. Smith              190
9
     THOMAS COOPER
10
       Direct Examination by Ms. Choy                  192
11     Cross-Examination by Mr. Andonian              228
       Redirect Examination by Ms. Choy               232
12
     JAMES METCALF
13
       Direct Examination by Ms. Peng                  234
14     Cross-Examination by Mr. Andonian              266
       Redirect Examination by Ms. Peng               275
15
     PHIL HOWELL
16
       Direct Examination by Ms. Peng                  276
17     Cross-Examination by Mr. Andonian              293

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11 12/16/2024

1                          INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE GOVERNMENT:

3        EXHIBIT:                  Marked      Received

4        501                        24            24

5        502                        24            24

6        445                        25            25

7        101                        31            31

8        105                        45            45

9        106                        49            49

10       126                        57            57

11       107                        59            59

12       32                         62            62

13       33A                        64            64

14       33B                        67            67

15       122                        68            68

16       1                          76            76

17       3                          80            80

18       5                          82            82

19       7                          84            84

20       11                         87            87

21       13                         91            91

22       19                         95            95

23       23                        101           101

24       31                        103           103

25       130                       107           107

USA v. Jenkins, 3:23-cr-11 12/16/2024

1                    INDEX OF EXHIBITS (Continued)

2  EXHIBITS ON BEHALF OF THE GOVERNMENT:

3          EXHIBIT:                    Marked      Received

4          401                        109         109

5          35                         111         111

6          39                         116         116

7          702                        117         117

8          40                         119         119

9          404                        121         121

10         405                        122         122

11         406                        123         123

12         407                        123         123

13         409                        166         166

14         420                        170         170

15         421                        172         172

16         519                        173         173

17         442                        174         174

18         20                         176         176

19         21                         179         179

20         416                        180         180

21         22                         182         182

22         735                        194         194

23         41                         201         201

24         15                         203         203

25         418                        205         205

USA v. Jenkins, 3:23-cr-11 12/16/2024

```
 1              INDEX OF EXHIBITS (Continued)

 2    EXHIBITS ON BEHALF OF THE GOVERNMENT:

 3         EXHIBIT:              Marked    Received

 4         16                    208        208

 5         415                   211        211

 6         419                   212        212

 7         17                    214        214

 8         517                   215        215

 9         518                   215        215

10         443                   215        215

11         402                   224        224

12         403                   225        225

13         428                   243        243

14         414                   244        244

15         426                   246        246

16         427                   247        247

17         444                   252        252

18         515                   252        252

19         516                   252        252

20         8                     258        258

21         9                     260        260

22         10                    262        262

23         12                    263        263

24         422                   285        285

25         423                   288        288
```

USA v. Jenkins, 3:23-cr-11 12/16/2024

1                    INDEX OF EXHIBITS (Continued)

2    EXHIBITS ON BEHALF OF THE GOVERNMENT:

3             EXHIBIT:              Marked    Received

4             417                      289        289

5             34                       291        291

6             523                      292        292

7             524                      292        292

8             440                      292        292

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11 12/16/2024

1  (Proceedings commenced, 8:58 a.m.)

2          THE COURT:  Good morning, everybody.  We are back on

3  the record in the *United States v. Jenkins*.  Let the record

4  reflect the government is present by its counsel.  The

5  defendant likewise is present along with the benefit of

6  counsel.

7          Anything we need to take up from the government's

8  perspective this morning?

9          MS. CHOY:  Just two small updates, Your Honor.

10          THE COURT:  Yes, ma'am.

11          MS. CHOY:  The first is that we do believe we're on

12  track to rest at the end of the day tomorrow.  And so that

13  makes the issue of that potential witness that was listed by

14  the defense relevant, and we would request that we receive that

15  notice that Your Honor had ordered by the end of the day today

16  if they are planning to call him.

17          THE COURT:  No problem, Mr. Andonian?

18          MR. ANDONIAN:  No problem.

19          THE COURT:  Whether you intend to call him?  All

20  right.

21          MS. CHOY:  And the second is just an update on the

22  progress of the jury instructions, Your Honor.  The parties are

23  planning to confer over lunch today.

24          THE COURT:  Okay.  Great.  I made a few -- never

25  leave things in the hands of the lawyer, so I made a few other

USA v. Jenkins, 3:23-cr-11 12/16/2024

1  changes.  As we get your changes back -- I didn't make any

2  substantive changes.  I took out things like "in other words,"

3  or, "as I've explained before," and so forth.  We'll

4  incorporate all that.

5       We'll have a draft of the verdict form that's going

6  to reflect the present status of the case.  I haven't -- there

7  have been no motions and I haven't ruled on any motions,

8  obviously, but -- so there will be a draft verdict form, and

9  we'll have some for closure instructions as well.  But those

10 will be pretty straightforward also.

11      Today at 1:30, I do have a phone call.  It won't take

12 long.  So I'd like to tell the jury that we'll proceed until at

13 least 1:00, maybe even 1:15, for our lunch.

14      So do you have Mr. Rychlik first?

15      MS. CHOY:  Yes, Your Honor.

16      THE COURT:  He was -- how long was his deposition,

17 about three hours?

18      MS. CHOY:  I think it was more like four, Your Honor.

19      THE COURT:  Four?  So that ought to -- maybe it's

20 going to work out just about right.  But other than that, you

21 know, we'll just -- we'll take a break, and let us be able to

22 have the hour.  My phone call is probably only 15 minutes,

23 other than that.

24      Okay.  Anything from the defense perspective?

25      MR. ANDONIAN:  No, Your Honor.

USA v. Jenkins, 3:23-cr-11 12/16/2024

1          THE COURT:  All right.  Are we ready for the jury?

2          Let's bring the jury in.

3  (*Jury in, 9:01 a.m.*)

4          THE COURT:  All right.  Ladies and gentlemen, please

5  have a seat.  Good morning to you all.  I hope you had a nice

6  weekend.  Thank you very much for being back.  Again, I

7  apologize for the weather.  It's a nasty drive over this

8  morning for I'm sure many of you, but I appreciate you being

9  here.  Before we brought you in, I spoke with the lawyers for a

10  bit to kind of understand where we are, and we are well on

11  track for where we're supposed to be at this point in the case.

12  So I'm optimistic about where we are as the case is moving

13  along, that we're going to get finished well in time, as we

14  anticipated.

15          So with that, the government is still presenting its

16  evidence.  And so Ms. Choy, I'll ask you to call the

17  government's next witness.

18          MS. CHOY:  Thank you, Your Honor.  The government

19  calls Kevin Rychlik.

20          THE COURT:  Kevin Rychlik.

21          Mr. Rychlik, come on up, and we're going to get you

22  sworn.

23      KEVIN RYCHLIK, CALLED BY THE GOVERNMENT, SWORN

24          THE COURT:  Have a seat right over here, Mr. Rychlik.

25  As you sit down, slide up to the microphone and speak into the

Rychlik - Direct

1   microphone so we can be able to hear you well.

2           Go ahead, please, Ms. Choy.

3           THE WITNESS:  Good morning, Your Honor.

4           THE COURT:  Good morning.

5                   DIRECT EXAMINATION

6    BY MS. CHOY:

7   Q    Good morning, Mr. Rychlik.  Could you please introduce

8   yourself to the jury and spell your last name for the court

9   reporter?

10  A    Yes.  Kevin Rychlik, R-Y-C-H-L-I-K.

11  Q    Where do you currently reside, Mr. Rychlik?

12  A    In Gainesville, Virginia.

13  Q    And where did you grow up?

14  A    In Westborough, Massachusetts.

15  Q    Are you married?

16  A    I am.

17  Q    Do you have kids?

18  A    I do.

19  Q    Could you briefly describe your educational and work

20  history?

21  A    I left right out of high school into the Marine Corps and

22  spent about six years in the Marine Corps, and then went into

23  the employment world, and I became self-employed.

24  Q    So have you owned any businesses?

25  A    I have.

Rychlik - Direct

1  Q    What businesses have you owned?

2  A    A handful, American Helicopters, American Aviation,

3  Security Associates, Virginia Arms Company, Motorsport

4  Solutions.  That's about it.  Incorporated a few things, but

5  they never went anywhere.

6  Q    So let's take those one by one.  You mentioned American

7  Helicopters.  What is that?

8  A    I'm sorry, what was the question?  What is it?

9  Q    What type of business is that?

10 A    It's an FAA certified Part 141 flight training school.

11 Q    You mentioned FAA certified.  What does that mean?

12 A    The Federal Aviation regulates aircraft flight training.

13 And in order to become a certified flight school, and get a

14 Part 141 certificate, you have to meet certain standards, which

15 are very high.

16 Q    And you also mentioned American Aviation.  What type of

17 business is or was that?

18 A    The same, but on the airplane training side.

19 Q    And Security Associates?

20 A    Security Associates is a security company that is licensed

21 by the Virginia Department of Criminal Justice Services to

22 provide uniform security services.

23 Q    And how about Virginia Arms?

24 A    Virginia Arms is a police equipment business, firearms

25 business, holds a federal firearms license issued by the Bureau

Rychlik - Direct

1   of Alcohol, Tobacco, and Firearms to deal in firearms.

2   Q    And the federal firearms license, is that also known as an

3   FFL?

4   A    Yes, it is.

5   Q    What is the current status of your businesses?

6   A    All of my businesses are closed.

7   Q    Did they go into bankruptcy?

8   A    Some did.  Security Associates just closed.

9   Q    When did that occur?

10  A    It all occurred on or around between the 1st and 15th of

11  August.

12  Q    Did you also found a nonprofit organization called

13  Virginia Airborne Search and Rescue Squad?

14  A    Yes.

15  Q    Was that known as VASARS for short?

16  A    Yes, it was.

17  Q    Is VASARS still operating?

18  A    No.  The board decided to shut that down in 2023.

19  Q    What was VASARS?

20  A    Virginia Airborne Search and Rescue Squad was an

21  all-volunteer 501(c)(3) nonprofit made up of about 20 volunteer

22  members, ex-military, EMS, firefighters, law enforcement, that

23  volunteered their time to fly helicopter missions for -- we had

24  a memorandum of understanding with the United States Coast

25  Guard, Culpeper County sheriff's office, Project Lifesaver, and

Rychlik - Direct

1   a number of other organizations that if somebody was lost we
2   could go out and help find them.  In the case of a law
3   enforcement agency, if they were looking for an escaped
4   prisoner, or another law enforcement need, or a search and
5   rescue, we'd go out and help them try to find the person.  It
6   was all volunteer.  There was no compensation.
7   Q    Have you also served as an auxiliary deputy sheriff?
8   A    I have.
9   Q    What is that?
10  A    An auxiliary deputy sheriff is generally a volunteer at
11  the sheriff's office that helps the sheriff's office in their
12  mission.
13  Q    In what jurisdictions did you serve as an auxiliary?
14  A    The first one was Prince William, Fauquier County,
15  Rappahannock County, Culpeper County, Spotsylvania County.
16  Q    What powers and authorities do auxiliaries have?
17  A    Generally the same as a regular paid deputy when they're
18  sworn in.
19  Q    And do auxiliaries have any special authorities with
20  respect to carrying firearms?
21  A    Yes.  Everywhere that I volunteered, you received full law
22  enforcement credentials, and you're allowed to carry a firearm
23  anywhere.
24  Q    So did that apply outside of Virginia as well?
25  A    Yes.

Rychlik - Direct

1   Q    Generally speaking, when you were serving as an auxiliary,

2   what types of activities did you engage in?

3   A    Mostly what I did prior to forming Virginia Airborne

4   Search and Rescue in 2009 -- prior to that, I went to Northern

5   Virginia Criminal Justice Academy, did a motorcycle operations

6   course, and I rode motors for Prince William County for eight

7   years, and then Fauquier County for two years.

8   Q    And you mentioned that you served in Culpeper County?

9   A    Yes.

10  Q    When did you first become an auxiliary in Culpeper County?

11  A    2012.

12  Q    Who was sheriff at the time?

13  A    Scott Jenkins was recently elected then.

14  Q    So I'm going to circle back to your time as an auxiliary

15  in Culpeper County, but first, I'd like to talk to you about

16  why you're here testifying today.

17       Were you charged with a tax crime in the Eastern District

18  of Virginia?

19  A    I was.

20  Q    Was that charge based on your failure to pay employment

21  taxes that you owed in connection with your businesses?

22  A    Yes.

23  Q    Over the years, did you fail to pay a total of $3.4

24  million in taxes?

25  A    Yes.

Rychlik - Direct

1  Q     Did you also fail to file corporate tax returns for your

2  businesses for multiple years?

3  A     Yes.

4  Q     And did you also fail to file personal tax returns for

5  multiple years?

6  A     Yes.

7  Q     Did you enter a plea agreement with the government in

8  connection with your tax case?

9  A     I did.

10 Q     Pursuant to that agreement, did you take responsibility

11 for your conduct by pleading guilty?

12 A     Yes, I took full and complete responsibility.

13 Q     Did you also agree to pay back the money that you owe to

14 the government?

15 A     Yes, I did.

16 Q     All $3.4 million?

17 A     Yes, I did.

18 Q     Have you been sentenced yet in that case?

19 A     No, I have not.

20 Q     Are you facing up to five years in prison?

21 A     Yes.

22 Q     After you learned that you were under investigation by the

23 IRS, did you come forward to provide information about a

24 separate criminal conspiracy that you were involved in?

25 A     Yes.

Rychlik - Direct

1  Q    Was that a criminal conspiracy here in the Western

2  District of Virginia?

3  A    Yes.

4  Q    And did it involve the defendant, Scott Jenkins?

5  A    Yes.

6  Q    Generally speaking, what was the nature of that criminal

7  conspiracy?

8  A    Taking money for bribes for credentials.

9  Q    As part of your plea agreement, did you agree to provide

10 information about that criminal conspiracy to the government?

11 A    Yes, I did.

12 Q    And did you agree to cooperate actively with the

13 government?

14 A    Yes, I did.

15 Q    What did you agree to do?

16 A    I agreed to work undercover with the FBI as an informant,

17 wear wires, videos, and continue that conduct to help them.

18 Q    Did your active cooperation last from approximately June

19 of 2022 to January of 2023?

20 A    Yes.

21 Q    Mr. Rychlik, are you hoping that you will receive a

22 reduced sentence due to your cooperation, including your

23 testimony here today?

24 A    Yes.

25 Q    Who is going to determine your sentence?

Rychlik - Direct

1  A    A judge.

2  Q    And is that the judge in the Eastern District of Virginia?

3  A    Yes, it is.

4  Q    Has anyone made any promises to you about whether you're

5  going to get a reduced sentence from that judge?

6  A    No, they have not.

7  Q    Before today, did you meet with me and other prosecutors

8  and agents in this case to prepare for your testimony?

9  A    Yes, I did.

10  Q    At all times during your cooperation, both when you met

11  with the government previously and in the courtroom here today,

12  what is the most essential thing you're required to do?

13  A    Be honest and tell the truth.

14  Q    Does the outcome of this case, meaning whether the

15  defendant is found guilty or not, matter at all for purposes of

16  the credit you may or may not receive for your cooperation?

17  A    No, it doesn't matter at all.

18  Q    Now, you have not been charged with any crime relating to

19  the bribery conspiracy; is that right?

20  A    Yes.

21  Q    Did you recently learn that one of your associates

22  received a subpoena relating to one of your businesses?

23  A    Yes.

24  Q    And did you learn that the Eastern District of Virginia

25  has an open investigation that relates to you in some way?

Rychlik - Direct

1   A    Yes.

2   Q    Has anyone from the government told you what that

3   investigation is about?

4   A    Not at all.

5   Q    Has anyone from the government made you any promises or

6   representations relating to that investigation?

7   A    No.

8   Q    In the past year or so, did you suffer a series of health

9   incidents?

10  A    Many.

11  Q    Could you describe those to us?

12  A    I had a -- my first stroke was in September of 2023.  That

13  involved several days in ICU, and I got the TNK stroke medicine

14  that reversed most of the side effects.  In January, I had a

15  second.  In March, I had a third.

16       MR. ANDONIAN:  Your Honor, I'll just object on

17  relevance grounds.

18       THE COURT:  I'll allow it.

19       THE WITNESS:  March, I had a fourth while getting a

20  procedure at Fairfax Hospital.  In June, I had a fifth.  On

21  July 19th, I had a sixth, which turned into -- my ambulance was

22  T-boned and totaled in an intersection on the way to the

23  hospital, and I injured my back and my neck while being

24  transported for the stroke.  And then on October 7th of this

25  year, after failing a stress test and other tests, I had a

Rychlik - Direct

1  open-heart quadruple bypass surgery and major aortic valve

2  surgery that I'm still recuperating from today.

3   BY MS. CHOY:

4  Q    And we're going to be taking scheduled breaks, but if you

5  feel during your testimony that you need an additional break,

6  you may request that from the court.

7  A    Thank you.

8  Q    Have the health issues that you just described affected

9  your ability to recall events or to testify truthfully here

10  today?

11  A    No, not at all.

12  Q    So you testified earlier that you served as an auxiliary

13  deputy sheriff under Sheriff Jenkins.  Approximately when did

14  you first meet Scott Jenkins?

15  A    I met Scott Jenkins through an associate of ours, Bryant

16  Arrington, who was a retired Manassas police officer.

17  Q    Let me focus you in on my question.

18  A    Okay.

19  Q    When did you meet him?

20  A    2011.

21  Q    At that time, how was Scott Jenkins employed?

22  A    He was a chief deputy, the second in charge at the

23  Rappahannock County sheriff's office.

24  Q    And I believe you were about to describe how you met him.

25  A    Yes.

Rychlik - Direct

1  Q    How was that?

2  A    A mutual friend of ours, Bryant Arrington, a friend of

3  mine of many years, retired from Manassas City, policeman, was

4  also a friend of Scott's and a friend of the sheriff, Connie

5  Smith, in Rappahannock County.  He called and asked me if I

6  would be willing to come out and meet with him.

7  Q    And did Mr. Arrington set up that meeting?

8  A    Yes, he did.

9  Q    Where did that meeting occur?

10 A    In Rappahannock County sheriff's office.

11 Q    Who was present?

12 A    I was present, Bryant Arrington was present, Scott Jenkins

13 was president -- I'm sorry, present -- and Connie Smith was

14 present.

15 Q    What occurred at that meeting?

16 A    Generally, I was introduced to everybody.  I had never met

17 Scott before that date, or Sheriff Smith.  The meeting was to

18 introduce me to them.  The sheriff was looking for some

19 financial support.  She was also interested in Virginia

20 Airborne Search and Rescue Squad.

21         MR. ANDONIAN:  Objection.  This is calling for

22 hearsay, Your Honor.

23         THE COURT:  Well, I'll allow it as it relates -- goes

24 to his state of mind as to the areas where they talked.

25         THE WITNESS:  And that was pretty much the meeting.

Rychlik - Direct

1    BY MS. CHOY:

2    Q    Did there come a time when Mr. Jenkins ran for sheriff in

3    Culpeper County?

4    A    Yes.

5    Q    What year was that?

6    A    He ran in 2011 for office in 2012.

7    Q    Did Mr. Jenkins solicit money from you in connection with

8    that campaign?

9    A    Yes.

10   Q    And did you give him money?

11   A    Yes.

12   Q    Do you recall how much?

13   A    I believe it was $5,000.

14   Q    What, if anything, did Mr. Jenkins do for you in exchange?

15   A    He swore me in as an auxiliary deputy sheriff in Culpeper

16   County.

17   Q    Did Mr. Jenkins subsequently run for re-election?

18   A    Yes.

19   Q    What year was that?

20   A    I believe it was 2015.

21   Q    And did Mr. Jenkins solicit money from you in connection

22   with that campaign?

23   A    Yes.

24   Q    And did you give him money?

25   A    Yes.

Rychlik - Direct

1   Q    What did you give him?

2   A    Approximately $5,000.

3   Q    And what, if anything, did Mr. Jenkins promise to do in

4   exchange for that payment?

5   A    Re-swear me in as a deputy sheriff.

6   Q    And to be clear, this was before you began cooperating

7   with the government; is that right?

8   A    Yes.

9   Q    And did Mr. Jenkins issue you sheriff's office badges and

10  ID cards over the years?

11  A    Yes.

12  Q    I'm handing you what's been marked as Government's

13  Exhibits 501 and 502.

14       Do you recognize these objects?

15  A    I do.

16  Q    Could you please explain what 501 is?

17  A    This is 501?

18  Q    There should be a sticker on there.

19  A    501 is a badge.

20  Q    Is that a badge issued to you by Sheriff Jenkins?

21  A    Yes.

22  Q    And what is 502?

23  A    502 is an ID card.

24  Q    Was that issued to you by Sheriff Jenkins?

25  A    Yes.

Rychlik - Direct

1          MS. CHOY:  The government moves Exhibits 501 and 502

2    into evidence.

3          THE COURT:  Any objection?

4          MR. ANDONIAN:  No objection.

5          THE COURT:  They may be admitted and published to the

6    jury.

7          (Government Exhibits 501 and 502 marked and

8    admitted.)

9    BY MS. CHOY:

10   Q    Could you hold those up so the jury can see them?

11         MS. CHOY:  And Ms. Fastenau, could you please pull up

12   Government's Exhibit 445?

13   BY MS. CHOY:

14   Q    Can you see that on your screen?

15   A    Yes.

16   Q    Do you recognize what's depicted in this photo?

17   A    I do.

18   Q    What is depicted in this photo?

19   A    The identification card and badge issued by Scott Jenkins.

20   Q    And is it a fair and accurate representation of those

21   items?

22   A    Yes.

23         MS. CHOY:  The government moves Exhibit 445 into

24   evidence.

25         THE COURT:  Any objection?

Rychlik - Direct

1        MR. ANDONIAN:  No objection.

2        THE COURT:  All right.  They may be admitted and

3   published to the jury.

4        MS. CHOY:  Thank you.

5        And you can take that down, Ms. Fastenau.

6        (Government Exhibit 445 marked and admitted.)

7   BY MS. CHOY:

8   Q    Did there come a time when Scott Jenkins asked you to

9   recruit additional individuals to pay money in exchange for

10  badges?

11  A    Yes.

12  Q    Approximately when did that occur?

13  A    Right after he won his first election, going into his

14  second, I was approached about helping.

15  Q    And what, if anything, did Scott Jenkins ask you to do?

16  A    He asked me for help bringing in more people for money,

17  because he needed money to get reelected.

18  Q    What, if anything, did he indicate he would do in exchange

19  for that money?

20  A    Issue them credentials and swear them in.

21  Q    And after that discussion, did you, in fact, recruit other

22  individuals to become an auxiliary as an exchange for money?

23  A    I did.

24  Q    And did Scott Jenkins and you have a term you used to

25  describe those individuals?

Rychlik - Direct

1    A     I told him I had a lot of money guys, meaning people that

2    supported my nonprofits and friends of mine that were wealthy.

3    And we referred to them as money guys.

4    Q     And this is before you began cooperating with the

5    government?

6    A     Yes.

7    Q     Roughly how many money guys did you recruit before you

8    began cooperating with the government?

9    A     About a half a dozen.

10   Q     And how did you select the money guys?

11   A     Some of the people I knew that were sworn in other

12   jurisdictions, people that I knew that had an interest in law

13   enforcement, and that had been sworn other places, and some of

14   my sponsors at Virginia Airborne Search and Rescue, people I

15   knew.

16   Q     Was there a going rate to get sworn in?

17   A     We used $5,000 as kind of the rate.

18   Q     Did some of them pay more than that?

19   A     Yes.

20   Q     And did you have an understanding of whether those

21   payments were going to Scott Jenkins personally or to his

22   campaign?

23   A     I assumed everything was going to his campaign.

24   Q     Did Mr. Jenkins have a term that he used to describe his

25   campaign account?

Rychlik - Direct

1  A    He called it his war chest.

2  Q    Did you personally receive any of that money?

3  A    No.

4  Q    And did you ever recruit any money guys without Scott

5  Jenkins's knowledge?

6  A    No.

7  Q    Did you ever recruit any money guys without Scott

8  Jenkins's authorization?

9  A    No.

10 Q    What is your understanding of why the money guys wanted to

11 be sworn in as auxiliaries?

12        MR. ANDONIAN:  Objection.  Calls for speculation.

13        THE COURT:  Well, I'll allow him to testify to his

14 understanding as to what he knows.

15        MS. CHOY:  You may answer.

16        THE WITNESS:  Could you repeat the question?

17  BY MS. CHOY:

18 Q    What's your understanding of why the money guys wanted to

19 be sworn in as auxiliaries?

20 A    So they would have credentials and have deputy sheriff

21 credentials that would give them those privileges.

22 Q    And when you say "those privileges," what are you

23 referring to?

24 A    The credentials allowed them to carry a firearm, concealed

25 firearm.  It allowed them to have the same authority a regular

Rychlik - Direct

1   deputy sheriff does.

2   Q    Have you ever heard the term professional courtesy?

3   A    Yes.

4   Q    What is that?

5   A    Professional courtesy in the law enforcement world is cops

6   giving other cops professional courtesy; for instance, if you

7   get pulled over for speeding and it wasn't too bad, nobody got

8   hurt, generally a cop will let another cop off with a warning.

9   Q    And was that also one of the reasons the money guys wanted

10  a badge?

11  A    Some, yes.

12  Q    So did Scott Jenkins swear in the money guys that you

13  brought in?

14  A    Yes.

15  Q    And did Scott Jenkins issue sheriff's badges to the money

16  guys?

17  A    Yes.

18  Q    Did he issue credentials to the money guys?

19  A    Yes.

20  Q    Did Scott Jenkins require the money guys to receive any

21  training?

22  A    No.

23  Q    Did he require the money guys to perform any actual

24  service for the sheriff's office?

25  A    No, but out of all of them, I think one did.

Rychlik - Direct

1  Q    And did he have any requirements for the number of

2  volunteer hours they had to perform?

3  A    No.

4  Q    Did any of the money guys reside in Culpeper County?

5  A    No.

6  Q    Did any of the money guys have any connection at all to

7  Culpeper County?

8  A    No.

9  Q    Did Scott Jenkins run for re-election in 2019?

10 A    He did.

11 Q    Did he have an opponent?

12 A    He did.

13 Q    And did he reach out to you regarding his re-election

14 campaign?

15 A    Yes, he did.

16 Q    Did he request your help?

17 A    Yes.

18 Q    What did he ask you to do?

19 A    He helped me -- he said that he really needed to raise

20 about $50,000.

21 Q    And how did you understand that he was going to raise that

22 money -- or ask you to raise that money?

23 A    By bringing in people into the program as auxiliary

24 deputies.

25 Q    And what would those people do in exchange for becoming

Rychlik - Direct

1  auxiliaries?

2  A    Make a donation.

3  Q    And so did the two of you set a goal for how much you

4  would raise?

5  A    Yes.

6  Q    What was your goal?

7  A    50,000.

8  Q    And again, this was still several years before you began

9  cooperating with the government; is that right?

10  A    Yes.

11  Q    Did Mr. Jenkins reach out to you about this request to

12  help bring in guys?

13  A    Yes.

14  Q    In what form did he reach out to you?

15  A    Both phone, text, and in person.

16        MS. CHOY:  Ms. Fastenau, could you please display

17  Government's Exhibit 101.

18  BY MS. CHOY:

19  Q    Do you recognize this document, Mr. Rychlik?

20  A    I do.

21  Q    What is it?

22  A    These are texts between Scott Jenkins in the gray, and me

23  on the other side.

24        MS. CHOY:  The government moves Exhibit 101 into

25  evidence.

Rychlik - Direct

1              THE COURT:  Any objection?

2              MR. ANDONIAN:  No objection.

3              THE COURT:  So admitted and may be published to the

4      jury.

5              (Government Exhibit 101 marked and admitted.)

6      BY MS. CHOY:

7      Q    Whose text messages appear in gray on the left -- you

8      mentioned this?

9      A    Scott Jenkins.

10     Q    And whose text messages appear on the right in blue or

11     green?

12     A    That's me.

13     Q    Directing your attention to the message on page 1 in gray

14     at the top of the page.  And this message is dated June 27th,

15     2019.  Do you see that?

16     A    I do.

17     Q    Is this a message from Scott Jenkins to you?

18     A    Yes, it is.

19     Q    And Scott Jenkins says, hey bud, how's things going.  Just

20     touching base on the campaign.  We'll be kicking things off in

21     two weeks, and I have finance report due soon too, so looking

22     to build the war chest and get donations in soon.  If you think

23     Mike or Mark are interested, please give them a shout, or I can

24     as well.  Thank you again for everything, brother.

25             What is Scott Jenkins asking you to do here?

Rychlik - Direct

1  A    He's asking me to go to Mike or Mark and see if they are

2  interested in donations for his campaign.

3  Q    Who are Mike and Mark?

4  A    That would be Michael Duggin and Mark Cummings.

5  Q    Had they been sworn in in the past?

6  A    Yes.

7  Q    And had they made donations in the past?

8  A    Yes.

9  Q    And Scott Jenkins refers to a finance report.  What's

10 that?

11 A    A finance report -- all elected officials are required to

12 turn in a quarterly finance report.

13 Q    And do you have an understanding of what that finance

14 report discloses?

15 A    Discloses the money that people have given him for his

16 campaign.

17 Q    And again, what is the war chest that's referenced in this

18 text message?

19 A    That's his amount of money that he's collected.

20 Q    What's your understanding of why Mr. Jenkins wanted to get

21 the donations into his war chest before the finance deadline?

22           MR. ANDONIAN:  Your Honor, I'm just going to make a

23 continuing objection to his understanding of what somebody else

24 was thinking or intending.

25           THE COURT:  Well, he can -- I'm going to allow him to

Rychlik - Direct

1    testify to what his understanding of conversations are.  Also

2    to the extent that there's -- there are conversations between

3    Mr. Jenkins and Mr. Rychlik, they're admissible as well.  But

4    you can have a continuing objection, of course.

5              Go ahead, please.

6     BY MS. CHOY:

7    Q    So the question was:  What is your understanding of why

8    Scott Jenkins wanted to get the donations into the war chest

9    before the finance report was due?

10   A    What he had stated previously is if you have a pretty good

11   amount of money that you've raised, and the opponents see how

12   much money you're raising, it could be advantageous to make

13   them back off a little bit, or you know, scare them into

14   running, or -- it's always good to have a lot of money in the

15   bank.

16   Q    And could you please read your response to that text

17   message?

18   A    I said, I'm on it, buddy.

19   Q    And how did Scott Jenkins respond?

20   A    Three thumbs up.

21   Q    Directing you to the message further down the page dated

22   July 9th, 2019.

23        Is this another text message from Scott Jenkins to you?

24   A    Yes, it is.

25   Q    And he says, hey brother, not bugging you, but FYI I've

Rychlik - Direct

1  got a campaign finance report due Monday the 15th, and just

2  checking to see if Cummings or Duggin are able to help this

3  year.

4       And again, who are Cummings and Duggin?

5  A    That is Mark Cummings and Michael Duggin.

6  Q    And what was your response?

7  A    My response was:  Checking.

8  Q    And directing you to the message dated July 12th, 2019.

9       So this is the -- is this the third time that Scott

10  Jenkins reached out to you?

11  A    Yes.

12  Q    And he says, hey brother, any luck from the guys; is that

13  right?

14  A    Yes.

15  Q    Could we please turn to the next page, and there's a

16  message on July 24th, 2019.  Is this another message from Scott

17  Jenkins to you?

18  A    Yes.

19  Q    Was this the fourth time that Sheriff Jenkins reached out

20  to you by text?

21  A    Yes, it was.

22  Q    And is he asking you again about the donations to his war

23  chest in this message?

24  A    Yes, he is.

25  Q    Could you please read your response?

Rychlik - Direct

1   A    I said, hey Bubba, working on it.  I think I got a big

2   fish for you.  Call me in a.m.  K.

3   Q    Who was the big fish?

4   A    Rick Rahim.

5   Q    How do you know Rick Rahim?

6   A    Rick and I had a business relationship.  He had a company

7   named Business Ventures that helped finance small business, and

8   we had taken out loans from him.  I had also previously worked

9   with Rick in another agency as a volunteer for Project

10  Lifesaver.

11  Q    Why did you refer to Rick Rahim as a big fish?

12  A    Because he was very wealthy.

13  Q    And did you have a discussion with Rick Rahim about giving

14  money to Scott Jenkins?

15  A    I did.

16  Q    What did you discuss with him?

17  A    With Rick?

18  Q    With Rick Rahim?

19  A    I told him that the sheriff was looking to bring in more

20  people.  Rick had asked me if anything came up he would like to

21  get back into volunteering for a sheriff's office.  And I told

22  him I would talk to the sheriff about it.

23  Q    Was Rick Rahim interested in giving money to the sheriff?

24  A    Yes.

25  Q    And in your conversation, did he want anything in

Rychlik - Direct

1   exchange?

2   A    Yes, he did.

3   Q    What did he want in exchange?

4   A    He had -- Rick was a convicted felon, and he got his civil

5   rights restored, and he wanted to get his firearms rights

6   restored so he could carry a firearm again.

7   Q    Did he want anything else in exchange?

8   A    Yes.  He wanted to be sworn in as a deputy sheriff.

9   Q    Following that text message, did you have a call with

10  Scott Jenkins?

11  A    I did.

12  Q    And did you relay Rick Rahim's requests to Scott Jenkins?

13  A    I did.

14  Q    Was Scott Jenkins interested?

15  A    Yes, he was.

16  Q    And did the two of you decide on a next step?

17  A    Yes, we were going to meet at his office to discuss it.

18          MS. CHOY:  Ms. Fastenau, could you please pull up the

19  next series of text messages.

20  BY MS. CHOY:

21  Q    And these messages are dated July 29th, 2019; is that

22  right?

23  A    Yes.

24  Q    Could you please read the first message in this series?

25  A    Rick is in for lunch Wednesday.  Time and location,

37

Rychlik - Direct

1  please.

2  Q    And was that a message from you to Scott Jenkins?

3  A    Yes, it was.

4  Q    And is that related to setting up the meeting you just

5  mentioned?

6  A    Yes, it was.

7  Q    And Scott Jenkins replies, great, I can come to you or you

8  all can come here.  Noon is fine or earlier or later.

9      Could you read your response to that?

10 A    I said, okay, sheriff's office at 12 noon.  We can get him

11 -- can we get him his unarmed auxiliary creds do you think

12 Wednesday.

13 Q    What are unarmed auxiliary creds?

14 A    Rick previously in another organization got credentials

15 that were civilian type, not law enforcement type, naming him

16 as a helicopter pilot.  And he was asking for these until he

17 was able to get sworn in.

18 Q    And why did you propose getting Rick Rahim unarmed

19 auxiliary creds?

20 A    He was asking for them to -- in order to help the sheriff.

21 Q    Could we pull up the next page, please.

22     What's the photo in the first message at the top of this

23 page?

24 A    That is Rick Rahim's driver's license.

25 Q    Why did you send Rick Rahim's driver's license to Scott

Rychlik - Direct

1  Jenkins?

2  A    Because that's the procedure when you bring somebody in as

3  an auxiliary deputy sheriff.  You want a copy of their driver's

4  license.

5  Q    Could you read the next two messages, please?

6  A    Rick's DL.  A little baggage, but almost 30 years ago,

7  nice guy.

8  Q    What do you mean when you said, "a little baggage?"

9  A    I wanted the sheriff to know about his past and criminal

10 history and so forth.

11 Q    Had you also discussed Rick's criminal history with

12 Sheriff Jenkins?

13 A    I did.

14 Q    Could you please read the next message?

15 A    He got his rights restored by the governor.

16 Q    What did you mean by that?

17 A    He got his civil rights restored by the governor.

18 Q    And the next message?

19 A    He is trying to get his -- says fis -- but I -- firearms

20 rights restored by a circuit court judge.  I imagine that may

21 come up as to your opinion and/or any possible help.  He is

22 very wealthy and helps a lot of causes.

23 Q    So what are you conveying to Mr. Jenkins here?

24 A    I'm conveying that Rick wants to get his firearms rights

25 restored.

Rychlik - Direct

1  Q    How did Mr. Jenkins respond?

2  A    Thumbs up.

3  Q    Did you subsequently meet with Scott Jenkins and Rick

4  Rahim?

5  A    I did.

6  Q    Could we flip to the next page, please.

7       Directing you to the series of messages at the top of this

8  page.

9       So that first message is dated July 31st, 2019; is that

10 right?

11 A    Yes.

12 Q    Could you read it, and Scott Jenkins's response?

13 A    We are here.

14      He responded, hang on 5.

15 Q    Are these messages related to that meeting you discussed?

16 A    Yes.

17 Q    And then at -- then your next response is, take your time,

18 no hurry; is that correct?

19 A    Yes.

20 Q    So where did that meeting occur?

21 A    At the sheriff's office in Scott's office.

22 Q    In Sheriff Jenkins's office within the larger sheriff's

23 office?

24 A    Yes.

25 Q    Who was present for that meeting?

Rychlik - Direct

1    A    Scott Jenkins, myself, and Rick Rahim.

2    Q    What was discussed at that meeting?

3    A    Rick pledged financial support to the sheriff, other help,

4    asked the sheriff for help getting his firearms rights

5    restored, and asked the sheriff to swear him in.  The sheriff

6    said he can't swear him in until after he gets his firearms

7    rights restored, and he would help in any way possible.

8    Q    Did the topic of Mr. Rahim's felony record come up?

9    A    Yes, it did.

10   Q    What was discussed in that regard?

11   A    It was discussed that many years ago he wrote a couple of

12   bad checks and had a felony conviction.

13   Q    And was there any discussion of how Mr. Jenkins could help

14   get his rights restored?

15   A    Yes.

16   Q    What did Mr. Jenkins indicate?

17   A    He indicated that he would do his best to try and help.

18   He made no guarantee, but thought that through his knowledge of

19   everybody, he could get it done.

20   Q    Was there any discussion of any particular local officials

21   who would be involved in that process?

22   A    Yes.  He said he knew the Commonwealth Attorney pretty

23   well and the judge pretty well.

24   Q    Based on your observations, during that meeting on July

25   31st, 2019, did Mr. Jenkins and Mr. Rahim reach an agreement?

Rychlik - Direct

1    A    Yes.

2    Q    Based on your observations, what was that agreement?

3    A    The agreement was Rick could get him essentially as much

4    money as he needed, he could offer him other campaign help.

5    And the sheriff would do his best to get his firearms rights

6    restored, but it may take some time.

7    Q    And was there a discussion of swearing in Rick Rahim as

8    well?

9    A    Yes.

10   Q    Did Sheriff Jenkins agree to do that?

11   A    He did, but he said only if we could get the firearms

12   rights restored.

13   Q    Did there come a time when you observed Mr. Rahim give

14   money to Mr. Jenkins?

15   A    Yes.

16   Q    When did that occur?

17   A    That occurred at a later date following that meeting.

18   Q    So was it close in time to that meeting?

19   A    Yes.

20   Q    And can you recall precisely when that occurred?

21   A    That was at the sheriff's office.

22   Q    Sorry.  The question was -- you mentioned at a later date.

23   Do you have clarity as to exactly when that was in your memory?

24   A    Within -- within a month or so after we first met.

25   Q    And where did that occur?

Rychlik - Direct

1  A    That occurred outside the sheriff's office inside the

2  sheriff's vehicle.

3  Q    What type of vehicle was that?

4  A    That was the sheriff's pickup truck I believe at the time.

5  Q    What type of pickup truck?

6  A    It was gray.

7  Q    And what did you observe?

8  A    Rick was in the front passenger seat.  The sheriff was in

9  the driver's seat.  I was in the middle of the back seat.  And

10 I observed Rick give an envelope of cash to the sheriff.

11 Q    What type of envelope was that?

12 A    That was a manila envelope.

13 Q    Did Mr. Jenkins seem surprised?

14 A    No.

15 Q    What did he do with that envelope?

16 A    He took it.

17 Q    Do you recall where he put it?

18 A    I don't.  I think he just set it down right there.

19 Q    Going back to that July 31st, 2019 meeting, I just want to

20 circle back, was there a discussion of Rick Rahim's concealed

21 carry permit?

22 A    Yes, there was.

23 Q    What was that discussion?

24 A    The sheriff -- he wanted to get his concealed weapons

25 permit.  The sheriff said we'd have to get your firearms rights

Rychlik - Direct

1   restored first before we could get you the permit.

2   Q    Okay.  So we were just talking about you observed an

3   envelope of cash passed to Mr. Jenkins?

4   A    Yes.

5   Q    To your knowledge, did Mr. Rahim give Mr. Jenkins any

6   other things of value in relation to his campaign?

7   A    Yes.  He -- he provided a billboard, paid for a billboard

8   for his campaign.  He bought some trinkets, little things with

9   the sheriff's name on it.  He used his phone dialer system to

10  call people.  He did some analytics for the sheriff during the

11  campaign.  But these were things done that Rick and the sheriff

12  worked on directly.  Rick only told me about them.

13  Q    And to be clear, did you get a cut of any of the payments

14  that Mr. Rahim gave to Mr. Jenkins?

15  A    No, none at all.

16  Q    To your knowledge, did Mr. Rahim recruit others to give

17  Mr. Jenkins money?

18  A    Yes, he did.

19        MS. CHOY:  Ms. Fastenau, could you please pull up

20  Government's Exhibit 120, which is already in evidence.

21  BY MS. CHOY:

22  Q    Do you recognize this document?

23  A    I do.

24  Q    And directing you to the green message dated October 1st,

25  2019, do you recognize the number that this message is from?

Rychlik - Direct

1    A    From Rick Rahim.

2    Q    And who are the other participants in this text message

3    chain?

4    A    Myself and Scott Jenkins.

5    Q    Could you make sure you're speaking into the microphone?

6    A    Oh, I'm sorry.

7         Myself and Scott Jenkins.

8    Q    And so Mr. Rahim says, sirs, Kevin asked me to really go

9    to work.  I've been busy getting you more donors.  Have 20K in

10   hand from friends of the campaign.

11        At that time when you received the message, did you know

12   who that 20K was from?

13   A    No, I didn't.

14   Q    Did you later find out?

15   A    I did.

16   Q    Who was it from?

17   A    Fred Gumbinner.

18   Q    And did you find out what Mr. Rahim did with the money

19   that he got from Mr. Gumbinner?

20   A    I did.

21   Q    What did he do with it?

22   A    Gave it to the sheriff.

23        MS. CHOY:  Ms. Fastenau, could you please pull up

24   105.

25   BY MS. CHOY:

Rychlik - Direct


1  Q    Do you recognize this document, Mr. Rychlik?

2  A    I do.

3  Q    What is it?

4  A    Text messages between myself and Scott Jenkins.

5        MS. CHOY:  The government moves Exhibit 105 into

6  evidence.

7        THE COURT:  Any objection?

8        MR. ANDONIAN:  No, Your Honor.

9        THE COURT:  So admitted and may be published to the

10 jury.

11       (Government Exhibit 105 marked and admitted.)

12  BY MS. CHOY:

13 Q    Who are the gray messages on the left from?

14 A    Scott Jenkins.

15 Q    And who are the blue messages on the right from?

16 A    Me.

17 Q    Directing you to the blue message in the middle of the

18 page dated October 3rd, 2019, was this two days after the

19 message that we just saw?

20 A    Yes.

21 Q    Could you please read those messages?

22 A    How was your meeting with Rick?  Was he okay or did he try

23 to wheel and deal?

24 Q    And continue on.  What was Scott Jenkins's response?

25 A    Great.  No, he was great.

Rychlik - Direct

1  Q    And then what did you say?

2  A    I heard another 21K.  Awesome.  I'm working on more.

3  Q    When you say I heard another 21K, what was that in

4  reference to?

5  A    Rick telling me he gave the sheriff more money.

6  Q    And could you please keep reading?

7  A    It was good.  Wish you could have made it.  Talked a lot

8  about ideas, and he even suggested a few things I'm trying to

9  do on campaign.

10       I said, nice.

11  Q    Thank you.  Please continue on the next page.  What did

12  Scott Jenkins say?

13  A    Yes, amazing.

14  Q    And your response?

15  A    Thumbs up.

16  Q    And Scott Jenkins says, can't thank you enough, man.

17  Awesome.

18       And what was your response?

19  A    Prayer hands, aren't I due a promotion to reserve major or

20  something; laugh, laugh.

21  Q    Let's keep going.

22       Scott Jenkins says, yes.  And then what did you say?

23  A    Thumb up, smiley faces.

24  Q    And then what do you say after that?

25  A    I promised you 50K plus support from my guys, and we did

Rychlik - Direct

1  it.  Next time we'll shoot for 100, smiley face.

2  Q    What did you mean when you said, I promised you 50K plus

3  support from my guys and we did it?

4  A    We had earlier talked about raising a $50,000 war chest,

5  and that's what he said he needed, and we had accomplished that

6  goal.

7  Q    So was that a reference to the money that he received from

8  Rick Rahim and Fred Gumbinner?

9  A    Yes.

10 Q    Did Scott Jenkins win the election?

11 A    He did.

12        MS. CHOY:  Ms. Fastenau, could you please bring up

13 115, which is already in evidence.

14 BY MS. CHOY:

15 Q    Do you recognize this document?

16        It might help to flip to the next page.  Thank you.

17 A    Yes.

18 Q    And the date of this message chain is December 23rd, 2019;

19 is that right?

20 A    Yes.

21 Q    Was that after the election?

22 A    Yes.

23 Q    Directing you to the third message down the page, Rahim

24 says, Kevin, Fred is the close friend who helped me provide all

25 the recent support for our great sheriff.  Fred, Kevin is the

Rychlik - Direct

1  sergeant in charge of the Culpeper auxiliary.

2       Was this when you first learned that Fred Gumbinner was

3  the source of that 20K?

4  A    Yes, it was.

5  Q    And what did you mean Rahim -- what did you understand

6  Rahim to mean when he said all the recent support for our great

7  sheriff?

8  A    The money that was given to the sheriff.

9  Q    And Rahim continues, as we discussed, I'm asking Kevin to

10 get your paperwork started in becoming an auxiliary in

11 Culpeper.  Our goal would be to have Fred possibly sworn in

12 this coming January.  Thanks to you both for your friendship.

13      Can you please read your response?

14 A    Consider it done.

15 Q    Why were you confident that you could get Fred Gumbinner

16 sworn in?

17 A    Because he donated a lot of money to the sheriff.

18          MS. CHOY:  Can we take that down?  Thank you.

19 BY MS. CHOY:

20 Q    What was Scott Jenkins's first day in office in his new

21 term?

22 A    I believe it was 2021 -- 2020.

23 Q    You said 2020?

24 A    Yeah.

25 Q    Would that be at the beginning of the year 2020?

Rychlik - Direct

1    A    Yeah.

2    Q    And on that date, was he able to swear in new auxiliaries

3    for that term?

4    A    Yes.

5    Q    And did you reach out to him about swearing in new

6    auxiliaries in exchange for money?

7    A    Yes.

8            MS. CHOY:  Ms. Fastenau, could you please bring up

9    Government's Exhibit 106.

10   BY MS. CHOY:

11   Q    Do you recognize this document?

12   A    Nothing is on my screen.

13   Q    Give it a second.  Let me know when you can see it.

14   A    It's there.

15   Q    Okay.  Do you recognize it?

16   A    I recognize it.

17   Q    What is it?

18   A    It's text messages between Scott Jenkins and myself.

19           MS. CHOY:  Government moves 106 into evidence.

20           THE COURT:  Any objection?

21           It may be admitted and published to the jury.

22           (Government Exhibit 106 marked and admitted.)

23   BY MS. CHOY:

24   Q    Directing you to the second to last message on the page in

25   blue.  Who is this a message from?

Rychlik - Direct

1    A    From me.

2    Q    And who is it to?

3    A    Scott Jenkins.

4    Q    And what's the date?

5    A    January 1st, 2020.

6    Q    Could you read that message, please?

7    A    I got about five to six of my VASAR guys, supporters ready

8    to go, buddy, 5K each.  Let me know when ready.  Plus my VASAR

9    guys, plus Rick's guy Fred.

10   Q    So when you said you had some supporters ready to go, 5K

11   each, what did you mean by that?

12   A    I meant I have -- I had people that were willing to

13   donate.

14   Q    In exchange for what?

15   A    Credentials.

16   Q    And what was Scott Jenkins's response?

17   A    Sounds great, man.  Ready whenever.

18   Q    And what did you mean in the previous text message when

19   you said, plus Rick's guy Fred?

20   A    Fred Gumbinner wanted to get sworn in.

21   Q    Could you flip to page 3, please.

22        So just directing you to the first message at the top of

23   that page, dated January 23rd, 2020.  Could you summarize what

24   you're conveying to Scott Jenkins here?

25   A    I was putting in his ear that Rick -- Rick's guy Fred and

Rychlik - Direct

1  a couple of my guys, plus two of the VASAR chiefs are ready to

2  get re-sworn.  I told him about two new guys, Chuck and his

3  son, Scott.

4  Q    What did you mean when you said they will be big, dollar

5  sign, dollar sign?

6  A    Chuck Kuhn owns JK Moving and Storage, and has helped

7  previous sheriffs over the years that I knew of, so I was

8  saying that he had a lot of money and was wealthy.

9  Q    Could we look at Scott Jenkins's response?

10      So he says, hey, good morning.  Yes, sir, I'll get Bernie

11  to get info from you to process through.

12      Who is Bernie?

13  A    Bernie is the gentleman at the time that was processing --

14  the deputy that was processing the ID cards for the sheriff and

15  helping with new people.

16  Q    So what did you understand Scott Jenkins to mean by that?

17  A    He was going to let Bernie know to get info from me to

18  process it through.  So he was essentially approving it.

19  Q    Could you please read your response?

20  A    Cool, I told the Kuhns 5K each a year support with 5K each

21  coming in and lots more in re-election year.  They're also both

22  helicopter pilots and big VASAR sponsors too, FYI.

23  Q    Thank you.  And could we flip to page 4.

24      Directing you to the blue message in the middle of the

25  page that says, I also forgot.  And you said, I also forgot to

Rychlik - Direct

1    put Mike Duggin on your radar, one of my VASAR supporters you

2    swore in.  He was good for a couple of good dollar sign, dollar

3    sign hits.  Willing to do same if you want to get him re-sworn.

4           What did you mean by that?

5    A    Mike Duggin was willing to make another donation to get

6    re-sworn.

7    Q    And could we skip down to the next gray message from Scott

8    Jenkins.

9           He says, sure, I like Mike.  I'll add him.

10          What did you understand him to mean by that?

11   A    That he was approving him to get re-sworn.

12   Q    Did there come a time when Rick Rahim reached out to you

13   about Fred Gumbinner getting sworn?

14   A    Yes.

15   Q    What did he say?

16   A    He said that Fred was responsible for the previous

17   financial funds that he gave Rick to help the sheriff, and he

18   wanted to get Fred sworn in.

19   Q    Was he upset?

20   A    He was always upset.

21   Q    In this particular case, was he upset?

22   A    Yes.

23   Q    What was your understanding of why, from that

24   conversation?

25   A    It wasn't happening quick enough.

Rychlik - Direct

1  Q    Directing you to the last message on this page, dated

2  February 26, 2020, this is a message from you to Scott Jenkins;

3  is that right?

4  A    Yes.

5  Q    Could you read it, please?

6  A    Rick giving me crap about Fred not getting sworn yet after

7  putting up all that dough.  He gave me a ton of crap.  You had

8  told me yes on him over a month ago.  Rick said he is meeting

9  him on a business thing tomorrow and feels he is going to look

10 bad.  I sent you his OL over a month ago, and you said yes, and

11 I passed it on.  I understand, but Rick is aggravated and does

12 not want to look bad.  What do you want me to tell him?

13 Q    And could we flip to the next page, please?

14      And directing you to that first message.  This is another

15 message from you to Scott Jenkins?

16 A    Yes.

17 Q    Could you read it, please?

18 A    FYI, Rick sent this to me.  Help me out here.  What should

19 I tell him?  Rick was saying -- Rick told me, you don't

20 understand the world I play in.  When we shake hands, it's my

21 oath to the guy.  I have to give him back $20K now and

22 apologize for being a liar.  I told him it was a done deal.  I

23 look ridiculous now.

24 Q    So to clarify that first line, that's your words; is that

25 right?

Rychlik - Direct

1   A    Yes.

2   Q    And then the text in the middle, whose words are those?

3   A    Rick Rahim's.

4   Q    And were you forwarding those to Scott Jenkins?

5   A    I was.

6   Q    And so when you -- when Rahim in this message refers to my

7   oath to the guy, and I have to give him back 20K, who did you

8   understand him to be referring to?

9   A    Fred Gumbinner.

10  Q    Could we pull up the next message, please.

11       Is this another message from Rick Rahim that you were

12  forwarding to Scott Jenkins?

13  A    Yes.

14  Q    Could you read it, please?

15  A    Another text from Rick.  We've had his 20K for six plus

16  months, Kevin.  He's got nothing.  He makes me millions of

17  dollars.  I have to maintain credibility.  That's my world.  I

18  have to give the money back or I have to set a date for him.  I

19  was sure you had at least put everything through by now and all

20  we needed was to get him sworn.

21  Q    And could we keep reading this text message again, please.

22       So what does Scott Jenkins respond?

23  A    Give me 10 to 15 to call.

24  Q    And then what do you say?

25  A    I said, okay.

Rychlik - Direct

1  Q    And what's this photograph here?

2  A    That's another picture of Fred Gumbinner's license I

3  forwarded to Scott.

4  Q    And what did he say?

5  A    I said, this is who we are talking about.

6  Q    Can we keep going down this chain, please.

7       What was Scott Jenkins's response?

8  A    Thanks.  A few more minutes.  I'm with state police.

9  Q    And then what did you say?

10 A    I said, okay, thanks buddy, I'm holding off jumping in the

11 shower for your call.

12 Q    Did you have a phone call with Scott Jenkins that day?

13 A    I did.

14 Q    What did you discuss?

15 A    Rick Rahim.

16 Q    And did the topic of Fred Gumbinner getting sworn also

17 come up?

18 A    It did.

19 Q    Did Scott Jenkins agree to set a date for Fred Gumbinner?

20 A    He did.

21 Q    Did you then have a phone call with Rick Rahim?

22 A    I did.

23 Q    And what did you discuss with him?

24 A    What the sheriff had told me, and it calmed him down.

25 Q    And could you read the next message in this chain?

Rychlik - Direct

1  A    Rick good now, happy.  I told him next week midweek to get

2  back with me for the date.

3  Q    Okay.  And could we flip to the next page and just pull up

4  that first text message.

5        This is another message from you to the sheriff; is that

6  right?

7  A    Yes.

8  Q    Could you read it?

9  A    From Rick.  March 6 is good.  Kevin, Fred is available at

10  any time of the day next Friday to meet with the sheriff and

11  get sworn.  Appreciate your assistance in pushing this through.

12  Rick.

13  Q    To your knowledge, did Mr. Gumbinner get sworn in as an

14  auxiliary deputy shortly after this?

15  A    Yes, he did.

16        MS. CHOY:  Ms. Fastenau, could you please pull up

17  Exhibit 126.  And flip to the next page.

18  BY MS. CHOY:

19  Q    Do you recognize this document, Mr. Rychlik?

20  A    I do.

21  Q    What is it?

22  A    Text messages.

23  Q    Between who?

24  A    Between myself and Scott Jenkins.

25        MS. CHOY:  The government moves Exhibit 126 into

Rychlik - Direct

1  evidence.

2         THE COURT:  Any objection?

3         MR. ANDONIAN:  No, Your Honor.

4         THE COURT:  May be admitted and published to the

5  jury.

6         (Government Exhibit 126 marked and admitted.)

7         MS. CHOY:  And we'll just go ahead and take that

8  right down.

9  BY MS. CHOY:

10 Q    You testified earlier that Scott Jenkins agreed to help

11 Rick Rahim with his petition to restore his firearms rights.

12 Did he follow through?

13 A    Yes, he did.

14 Q    So let's walk through what he did.  As an initial matter,

15 are you familiar with whether there are any residency

16 requirements relating to firearms petitions?

17 A    I am.

18 Q    What are those requirements in your understanding?

19 A    My understanding is you have to apply for them in the

20 jurisdiction you reside in.

21 Q    Have you discussed that requirement with Scott Jenkins?

22 A    I have.

23 Q    To the best of your knowledge, has Rick Rahim ever resided

24 in Culpeper County?

25 A    No, to the best of my knowledge.

Rychlik - Direct

1  Q    Did Scott Jenkins take any steps to assist Rick Rahim in

2  regards to that issue?

3  A    Yes.

4  Q    What did he do?

5  A    He helped Rick secure the Culpeper address and asked the

6  Commonwealth Attorney and court -- the court in help doing so.

7  Q    And was Rick Rahim's petition approved?

8  A    Yes.

9  Q    You also testified that Scott Jenkins agreed to swear in

10 Rick Rahim as an auxiliary deputy.  Did he follow through on

11 that?

12 A    Yes.

13 Q    Was he able to swear in Rick Rahim immediately?

14 A    No.

15 Q    Why not?

16 A    There were delays in getting the petition signed, and

17 there were also delays with COVID.

18 Q    Did Scott Jenkins give Mr. Rahim anything in the interim?

19 A    A civilian helicopter ID.

20 Q    Could you please pull up Government's Exhibit 107.

21      Do you recognize this document?

22 A    Yes.

23 Q    What is it?

24 A    Text messages between myself and Scott Jenkins.

25           MS. CHOY:  Government moves Exhibit 107 into

Rychlik - Direct

1  evidence.

2          THE COURT:  Any objection?

3          MR. ANDONIAN:  No, Your Honor.

4          THE COURT:  May be admitted and published to the

5  jury.

6          (Government Exhibit 107 marked and admitted.)

7  BY MS. CHOY:

8  Q    And I'll direct you to the last text message on that first

9  page.

10       Who is this from?

11 A    From me.

12 Q    And who is it to?

13 A    Scott Jenkins.

14 Q    Could you read it, please?

15 A    Hey, buddy.  How are we looking in Rick's ID?  Need me to

16 do one up?

17 Q    What's this in reference to?

18 A    Rick's civilian ID.

19 Q    And the next page, please.

20       And directing you to that photograph and text message at

21 the top of the page.

22       Who sent this?

23 A    The sheriff.

24 Q    And what's this photo of?

25 A    It's an ID card with Rick Rahim's picture stating he's a

Rychlik - Direct

1  member of this office as a helicopter pilot.

2  Q    And could you read the text message below that, please?

3  A    From Scott, sorry, man, crazy last couple of days.  Headed

4  to grab dinner finally.  Bernie created this the other day.

5  Q    Directing you to the messages dated November 20th, 2020

6  below that.

7       Could you read your first message, please?

8  A    Can we use a helicopter unit badge for Rick till his comes

9  in.

10 Q    Why did you ask if we could use a helicopter unit badge

11 for Rick?

12 A    Because Rick was hounding me to get him a badge, and I

13 told him I couldn't.

14 Q    And at that point, had he been sworn in as an auxiliary

15 deputy?

16 A    No.

17 Q    So he didn't have a badge?

18 A    Correct.

19 Q    And Scott Jenkins responded, sure?

20 A    Yes.

21 Q    And could you read your response, please?

22 A    Disclaimer, it does say deputy sheriff in the circle.

23 Q    Why was that a disclaimer?

24 A    I wanted the sheriff to know -- I reminded him that our

25 helicopter unit badge identifies somebody as a deputy sheriff.

Rychlik - Direct

1   Q    And at that time, he wasn't a deputy sheriff; is that

2   right?

3   A    No.  Correct.

4   Q    What was Scott Jenkins's response?

5   A    I see nothing.

6   Q    Did Scott Jenkins eventually swear in Rick Rahim as an

7   auxiliary?

8   A    Yes, he did.

9   Q    You testified earlier that as part of your cooperation

10  with the government, you recorded conversations that you had

11  with Scott Jenkins?

12  A    Yes.

13  Q    In those conversations, did the topic of Rick Rahim come

14  up?

15  A    Yes.

16  Q    And by that time, had -- did Mr. Jenkins indicate that his

17  opinion of Rick Rahim had changed?

18  A    Yes.

19  Q    What did he say?

20  A    Well, Rick was always pushing for more and more and more,

21  and threatening him, turn in his stuff if he didn't get what he

22  wanted.  The sheriff was a little frustrated with that.

23           MS. CHOY:  Ms. Fastenau, could we bring up

24  Government's Exhibit 32, please, and play the first 5 seconds

25  of that for Mr. Rychlik.

Rychlik - Direct

1              (Audio playing.)

2     BY MS. CHOY:

3     Q     Before today, have you had an opportunity to review this

4     entire recording?

5     A     I have.

6     Q     And is it a fair and accurate recording of a conversation

7     in which you participated?

8     A     It is.

9              MS. CHOY:  Government moves Exhibit 32 into evidence.

10              THE COURT:  Any objection?

11              MR. ANDONIAN:  No objection.

12              THE COURT:  May be admitted and published to the

13     jury.

14              And again, ladies and gentlemen, the transcript is

15     for your benefit in listening today.  But the evidence is what

16     is on the audio, and you should be guided -- your memory should

17     be guided by what you hear.  If there's any difference in the

18     transcript, you're guided by the audio.

19              Go ahead, please, Ms. Choy.

20              (Government Exhibit 32 marked and admitted.)

21     BY MS. CHOY:

22     Q     Whose voice did you just hear in that recording?

23     A     Scott Jenkins.

24     Q     Who is the other participant in that conversation?

25     A     Me.

Rychlik - Direct

1  Q    And you heard Scott Jenkins say if he thinks that any

2  amount of support or help.  What did you understand him to mean

3  when he said support or help?

4  A    The financial support he's given and other support he's

5  given.

6  Q    And who is the "he?"

7  A    Rick Rahim.

8         MS. CHOY:  Could you play that from the beginning,

9  please, Ms. Fastenau.

10         (Audio playing.)

11   BY MS. CHOY:

12  Q    Did there come a time when Scott Jenkins tried to distance

13  himself from Rick Rahim?

14  A    Yes.

15  Q    And did that involve you in some way?

16  A    Yes.

17  Q    What was your role?

18  A    My role was kind of the in-between between the both of

19  them, because they were frustrated with each other.  And my

20  role was to kind of calm Rick down.

21  Q    Did there come a time when you became aware that Rick

22  Rahim had filed for bankruptcy?

23  A    Yes.

24  Q    Did you discuss that with Scott Jenkins?

25  A    I did.

Rychlik - Direct

1  Q    And in those conversations, did Scott Jenkins seem

2  concerned about that?

3  A    Yes.

4          MS. CHOY:  Could you please pull up Government's

5  Exhibit 33-A and play the first 5 seconds for the witness.

6          (Audio playing.)

7  BY MS. CHOY:

8  Q    Before today, have you had an opportunity to review this

9  clip?

10 A    I have.

11 Q    Is it a fair and accurate recording of a conversation in

12 which you participated?

13 A    Yes.

14 Q    And whose voices did you hear in that first bit of the

15 clip?

16 A    Scott Jenkins.

17 Q    And who is the other participant?

18 A    Me.

19         MS. CHOY:  Government moves Exhibit 33-A into

20 evidence.

21         THE COURT:  Any objection?

22         MR. ANDONIAN:  No, Your Honor.

23         THE COURT:  May be admitted and published to the

24 jury.

25         (Government Exhibit 33-A marked and admitted.)

Rychlik - Direct

1          MS. CHOY:  Ms. Fastenau, could you please play the

2    first 30 seconds of this clip.

3          (Audio playing.)

4   BY MS. CHOY:

5   Q    When Scott Jenkins said, I'm not going to put myself in a

6   spot where I don't have two or three avenues out, what did you

7   understand him to mean by that?

8   A    Well, I don't know what those two or three avenues are,

9   but I assumed it to mean that not going to --

10         MR. ANDONIAN:  Objection, Your Honor.  Calls for

11   speculation.

12         THE COURT:  Well, he can testify to what he

13   understood.  It's not offered for the statement for the truth

14   of the matter.  It's just what his understanding is.

15   BY MS. CHOY:

16   Q    You can continue.

17   A    Either to terminate Rick possibly, but he was certain that

18   he wasn't going to put up with it and that he had other options

19   if Rick caused a problem.

20         MS. CHOY:  Could you play to the end, please?

21         (Audio playing.)

22   BY MS. CHOY:

23   Q    When Scott Jenkins said, what support he gave me, I more

24   than made up for doing -- made up for by doing more than I told

25   him originally, what did you understand that to mean?

Rychlik - Direct

1  A    I understood that with all the money Rick gave to the

2  sheriff, that the sheriff got him his rights restored, got him

3  his concealed carry permit, swore him in, and gave him

4  credentials.  That's how I took it.

5  Q    Were those the things that Scott Jenkins told Rick Rahim

6  he would do originally?

7  A    Yes.

8         MS. CHOY:  Could we pull up Government's Exhibit

9  33-B, please.

10         (Audio playing.)

11  BY MS. CHOY:

12  Q    Have you had an opportunity to review this clip?

13  A    Yes.

14  Q    Is it a fair and accurate recording of a conversation in

15  which you participated?

16  A    Yes.

17  Q    Whose voice did you just hear on that clip?

18  A    Scott Jenkins.

19  Q    And who was the other participant?

20  A    Me.

21         MS. CHOY:  The government moves 33-B into evidence.

22         THE COURT:  Any objection?

23         MR. ANDONIAN:  No objection.

24         THE COURT:  So it will be admitted and may be

25  published to the jury.

Rychlik - Direct

1              (Government Exhibit 33-B marked and admitted.)

2              MS. CHOY:  Could we play the first 39 seconds,

3    please.

4              (Audio playing.)

5              MS. CHOY:  Can you pause for a moment?

6    BY MS. CHOY:

7    Q    And when he's referring to "this man," and "he," who did

8    you take him to be referring to?

9    A    Rick Rahim.

10             MS. CHOY:  Let's continue.

11             (Audio playing.)

12   BY MS. CHOY:

13   Q    When Scott Jenkins said, I can spin that and say it with a

14   straight face to anybody I want, what did you take him to mean

15   by that?

16   A    He was saying that if he was questioned about Rick being a

17   felon and having a badge, that he could spin it by saying DCJS

18   had a procedure that would allow a waiver for a convicted

19   felon, and it was a long time ago for Rick.

20   Q    And remind us, what is DCJS?

21   A    Department of Criminal Justice Services.

22             MS. CHOY:  Let's play to the end.

23             (Audio playing.)

24   BY MS. CHOY:

25   Q    Did there come a time when Scott Jenkins reached out to

Rychlik - Direct

1  you about his 2023 election campaign?

2  A    Yes.

3  Q    And what, if anything, did he ask you to do?

4  A    Help raise funds.

5  Q    Could we pull up Government's Exhibit 122, please.

6       Do you recognize this document?

7  A    It's not there yet.

8  Q    Give it a sec.

9  A    Yes.

10 Q    What is it?

11 A    Those are text messages between myself and Scott Jenkins.

12       MS. CHOY:  The government moves Exhibit 122 into

13 evidence.

14       THE COURT:  Any objection?

15       MR. ANDONIAN:  No objection.

16       THE COURT:  So admitted and may be published to the

17 jury.

18       (Government Exhibit 122 marked and admitted.)

19  BY MS. CHOY:

20 Q    Who are the gray messages on the left from?

21 A    Scott Jenkins.

22 Q    Who are the blue messages on the right from?

23 A    Me.

24 Q    And roughly when did this text message exchange occur?

25 A    That would have been December of -- I'm not sure it was

Rychlik - Direct

1  '21 or '22.

2  Q    Was it before you began your active cooperation with the

3  government?

4  A    I believe it was.

5  Q    And was it after you had learned that you were under

6  investigation by the IRS?

7  A    I believe it was.

8  Q    Could you read that first message in the chain?

9  A    Also while thinking I've got to build up a war chest for

10  2023 too.

11  Q    And what was your response?

12  A    Yes, we gotta keep you elected.

13  Q    And we can take that down.  Thank you.

14      Did you also discuss raising funds for the 2023 election

15  with Scott Jenkins by telephone?

16  A    Yes.

17  Q    And what did you discuss?

18  A    We discussed building up a war chest and ensuring that we

19  had enough funding to move forward.

20  Q    Did you and Mr. Jenkins agree on any kind of goal for how

21  much you would raise?

22  A    50,000.

23  Q    And what, if anything, did Mr. Jenkins indicate he would

24  do in exchange for any money he received?

25  A    Swear in people.

Rychlik - Direct

1  Q    So after that conversation, did you then begin actively

2  cooperating with the government?

3  A    I did.

4  Q    And that began I believe you testified earlier in

5  approximately June of 2022; is that right?

6  A    Yes.

7  Q    So you testified that as part of your active cooperation,

8  you made audio and video recordings of conversations that you

9  had with Scott Jenkins and others; is that right?

10 A    Yes.

11 Q    How did you record those conversations?

12 A    I recorded them on a phone provided by the FBI, as well as

13 various devices they put on me prior to meeting Scott Jenkins

14 each time.

15 Q    Did you tell Scott Jenkins that you were recording those

16 conversations?

17 A    No.

18 Q    And did you also as part of your cooperation set up

19 meetings between Scott Jenkins and individuals who wanted to be

20 sworn as auxiliaries?

21 A    I did.

22 Q    In total, how many meetings did you set up?

23 A    About a half a dozen.

24 Q    And were some of those individuals civilians, meaning not

25 law enforcement agents working on the case?

Rychlik - Direct

1   A   Yes.

2   Q   And were some of those individuals undercover FBI agents?

3   A   Yes.

4   Q   How many undercovers were there?

5   A   Two.

6   Q   And did each of those six individuals pay Scott Jenkins

7   money?

8   A   Yes.

9   Q   How much?

10  A   5 to 10,000.

11  Q   What -- and was that each?

12  A   Yes.

13  Q   What form did those payments take?

14  A   Mostly cash.  I think one or two was a check.

15  Q   And did you keep any of that money?

16  A   No.

17  Q   It all went to Scott Jenkins?

18  A   Yes.

19  Q   And did Scott Jenkins swear in all of those individuals as

20  auxiliary deputies?

21  A   Yes, he did.

22  Q   At all times during your active cooperation, did you let

23  Scott Jenkins know what you were doing?

24  A   No.

25  Q   Sorry, let me be more specific.  Did you let him know that

Rychlik - Direct

1    you were going out and recruiting individuals to become

2    auxiliaries?

3    A    Yes.

4    Q    And did you let him know that they expected to be sworn in

5    in return?

6    A    Yes.

7    Q    Did you ever recruit any auxiliaries without his

8    authorization?

9    A    No.

10    Q    So I'd like you to walk us through the general process

11    that those meetings followed.

12         Before someone became sworn in, was there paperwork that

13    had to be completed, or steps that had to be taken?

14    A    Generally, all that it required was a copy of their

15    driver's license to be sent to him or his designee, Pete

16    Siebel.  That was how it all pretty much started.  Sometimes

17    along with a lunch -- or a lunch would follow that.

18    Q    And was there paperwork that had to be signed by Scott

19    Jenkins, to your knowledge?

20    A    Yes.

21    Q    What was that?

22    A    That was an oath order that the judge also counter-signed,

23    I believe.

24    Q    And then would those individuals travel to Culpeper to get

25    sworn in?

Rychlik - Direct

1   A    Yes.

2   Q    And generally speaking, what would happen on those visits

3   to Culpeper?

4   A    We'd meet the sheriff, most of the time have lunch.  They

5   would go to the courthouse, get sworn in, take the oath of

6   office from the clerk of the Circuit Court.  Then we would go

7   back to the sheriff's office.  The ID card and badge would be

8   presented by the sheriff, and they would generally give the

9   sheriff a donation.  Sometimes the donation would happen at

10  lunch.  Sometimes it would happen at the sheriff's office.

11  Q    And just to clarify, did FBI pay you for your work as an

12  undercover?

13  A    No.

14  Q    Or as a cooperating witness, I should say?

15  A    No.

16  Q    Okay.  So I'd like to turn to those individuals that you

17  recruited for Scott Jenkins.  Who was the first person you

18  brought in?

19  A    I believe it was Jim Metcalf.

20  Q    How do you know Jim Metcalf?

21  A    I rode motors with Jim Metcalf in Prince William County

22  for eight years, and he's a business owner.

23  Q    And where does he live, generally?

24  A    He lives in Prince William County, Virginia.

25  Q    What's the nature of your relationship with him?

Rychlik - Direct

1    A    Friends.

2    Q    Did you have a conversation with Jim Metcalf about being

3    sworn in Culpeper?

4    A    I did.

5    Q    What, if anything, did you tell him about the terms of

6    getting sworn in?

7    A    Told him a donation of at least 5,000 would be expected.

8    Q    Did he agree to that?

9    A    Yes.

10   Q    And what step did you take next?

11   A    I arranged a meet and greet with the sheriff.

12   Q    Did you also obtain a driver's license from Jim Metcalf?

13   A    I did.

14   Q    What did you do with that driver's license?

15   A    I sent it to the sheriff and Pete.

16   Q    Could we pull up Exhibit 1, please.

17        Did you meet Scott Jenkins for lunch in Culpeper on or

18   around August 25th, 2022?

19   A    Yes.

20   Q    And at that meeting, did Scott Jenkins give you any

21   instructions about where to place your cell phone?

22            MR. ANDONIAN:  Objection, leading.

23            THE COURT:  Well, rephrase.

24    BY MS. CHOY:

25   Q    Did Scott Jenkins give you any -- did you talk about your

Rychlik - Direct

1  cell phone with Scott Jenkins?

2  A    I'm confused about something.  Could you go backwards?

3  This was the first time we met Jim Metcalf.  Is that what

4  you're saying, or are you talking about a later meeting?

5  Q    So I asked you whether you traveled to Culpeper and had

6  lunch with Scott Jenkins?

7  A    Yes.

8          THE COURT:  Is this with Jim Metcalf?

9  BY MS. CHOY:

10  Q    Was Jim Metcalf present at that lunch?

11  A    Yes.

12  Q    So let me -- sorry.  I think the timeline is getting a

13  little confused here.  And that's --

14  A    Right.  That's why I'm confused a little bit.

15  Q    My apologies.

16      So before Jim Metcalf came to Culpeper, did you have a

17  lunch with Scott Jenkins in which you discussed Jim Metcalf?

18  A    I did.

19  Q    Okay.  And at that lunch, was there a discussion of your

20  cell phone?

21  A    Yes.

22  Q    And what to do with it?

23  A    Yes.

24  Q    What was that discussion?

25  A    Put it aside.

Rychlik - Direct

1    Q    Did Scott Jenkins ask you to put it aside?

2    A    Yes.

3    Q    And did he indicate why?

4    A    You know, he was paranoid that people could be listening

5    through the cell phones.

6    Q    And did you record that meeting with Scott Jenkins?

7    A    Yes.

8            MS. CHOY:  Could we play the first 4 seconds, please.

9            (Audio playing.)

10   BY MS. CHOY:

11   Q    Have you reviewed this clip?

12   A    Yes.

13   Q    Is it a fair and accurate recording of a conversation in

14   which you participated?

15   A    Yes.

16           MS. CHOY:  The government offers Exhibit 1 into

17   evidence.

18           THE COURT:  Any objection?

19           MR. ANDONIAN:  No, Your Honor.

20           THE COURT:  So admitted and may be published to the

21   jury.

22           (Government Exhibit 1 marked and admitted.)

23    BY MS. CHOY:

24   Q    So who was that whose voice said, I should have asked you

25   before I started talking to him?

Rychlik - Direct

1   A    Mine.

2   Q    And who are you referring to?

3   A    Jim Metcalf.

4   Q    And who was the other participant in that conversation?

5   A    The sheriff.

6            MS. CHOY:  Could you please play the first 14

7   seconds.

8            (Audio playing.)

9   BY MS. CHOY:

10  Q    Does that refresh you about who you were referring to when

11  you said, I should have asked you before I started talking

12  about him?

13  A    Yes, because it was about Jim Metcalf, but it was about

14  getting Pete Siebel his information.

15  Q    Thank you.  And whose voice was that who said, yeah,

16  really good guy?

17  A    The sheriff.

18            MS. CHOY:  Could we play it again, please.

19            (Audio playing.)

20  BY MS. CHOY:

21  Q    In the clip you just heard, did Scott Jenkins give you

22  directions about how to communicate?

23  A    Yes.

24  Q    What was your understanding of what he was telling you to

25  do?

Rychlik - Direct

1  A    It was okay to give Pete Siebel a driver's license.

2  Q    And what was your understanding of how you were to

3  communicate with Pete Siebel?

4  A    He preferred that I communicate, and don't text.

5  Q    Did you have an understanding of why Scott Jenkins didn't

6  want you to put anything in text?

7  A    He was afraid that it could be used against him.

8  Q    Is that something he discussed with you?

9  A    Yes.

10  Q    And on that clip, you also mentioned someone named Harry

11  Carr?

12  A    Yes.

13  Q    Who is that?

14  A    Harry Carr is a businessman from New York.

15  Q    And did you attempt to recruit Harry Carr to become an

16  auxiliary?

17  A    I did.

18  Q    And was he ultimately sworn in?

19  A    He was not.

20  Q    Now, in that lunch meeting with Sheriff Jenkins, did you

21  and Scott Jenkins have further discussions about who could know

22  about your efforts to recruit auxiliaries?

23  A    Yes, we did.

24  Q    And just generally speaking, how did Scott Jenkins want

25  you to handle that information, based on what he told you?

Rychlik - Direct

1  A    Within a small circle of people, very quietly and

2  confidentially.

3  Q    And what was Scott Jenkins's demeanor at that meeting when

4  you were discussing the topic of auxiliaries?

5  A    Quiet, protective, you know, concerned other people may

6  find out about this, and wanted me to keep it in a tight circle

7  of people.

8           MS. CHOY:  Let's pull up Government's Exhibit 3,

9  please, and play the first 7 seconds.

10          (Audio playing.)

11          MS. CHOY:  Do you think you could blow up that window

12  a little bit bigger so people can see the subtitles?  Thank

13  you.

14  BY MS. CHOY:

15  Q    Have you reviewed this clip?

16  A    Yes.

17  Q    Is it a fair and accurate recording of the conversation in

18  which you participated?

19  A    It is.

20          MS. CHOY:  The government moves Exhibit 3 into

21  evidence.

22          THE COURT:  Any objection?

23          MR. ANDONIAN:  No, Your Honor.

24          THE COURT:  May be admitted and published to the

25  jury.

Rychlik - Direct


1          (Government Exhibit 3 marked and admitted.)

2   BY MS. CHOY:

3   Q    And whose voice did you hear on that clip we just heard?

4   A    Scott Jenkins.

5   Q    And who else was participating in that conversation?

6   A    Me.

7          MS. CHOY:  Could you please play the first 20

8   seconds.

9          (Audio playing.)

10  BY MS. CHOY:

11  Q    Who is Mike?

12  A    Mike is Mike Jenkins, the sheriff's brother.

13         MS. CHOY:  Let's keep playing to 1 minute and 22

14  seconds, please.

15         (Audio playing.)

16  BY MS. CHOY:

17  Q    Who is the Ana that you referred to?

18  A    Ana is another sworn deputy that was a sheriff's executive

19  assistant or administrative assistant.

20  Q    What did you mean when you said, she doesn't have the

21  circle of knowledge of some of the sensitive stuff?

22  A    I was asking if it was okay to talk to her about

23  auxiliaries coming in, and he said no.

24         MS. CHOY:  Could we play to the end, please?

25         (Audio playing.)

Rychlik - Direct

1  BY MS. CHOY:

2  Q    Scott Jenkins mentioned someone named Curtis.  Who is

3  that?

4  A    That's Curtis Hawkins, his chief deputy.

5  Q    And who is the Mack that he referred to?

6  A    Mack was his previous chief deputy.

7  Q    And who is Johnny?

8  A    Johnny is his brother.

9  Q    What did you understand Scott Jenkins to mean when he said

10  those are the only people who can, quote, hear anything?

11  A    Those were the only people I could discuss or get

12  assistance with in recruiting auxiliary deputies.

13  Q    All right.  So after that lunch meeting in Culpeper, did

14  you follow up with Scott Jenkins regarding getting Jim Metcalf

15  sworn?

16  A    I did.

17  Q    Did you give him a call on or about August 29th, 2022?

18  A    I did.

19         MS. CHOY:  Can we pull up Exhibit 5, please.

20         (Audio playing.)

21  BY MS. CHOY:

22  Q    Have you reviewed this clip?

23  A    I have.

24  Q    Is it a fair and accurate recording of a conversation in

25  which you participated?

Rychlik - Direct

1   A    It is.

2           MS. CHOY:  The government moves Exhibit 5 into

3   evidence.

4           THE COURT:  Any objection?

5           MR. ANDONIAN:  No, Your Honor.

6           THE COURT:  May be admitted and published to the

7   jury.

8           (Government Exhibit 5 marked and admitted.)

9    BY MS. CHOY:

10  Q    So who is that who is speaking at the beginning of the

11  clip?

12  A    Me.

13  Q    And who is the other participant in the conversation?

14  A    Scott Jenkins.

15          MS. CHOY:  So let's play from the beginning to the

16  16-second mark, please.

17          (Audio playing.)

18  BY MS. CHOY:

19  Q    What did you mean when you said Jim Metcalf was ready to,

20  quote, plop down 5K?

21  A    Make a $5,000 campaign donation.

22  Q    And why did you ask Scott Jenkins to, quote, put his boot

23  behind Pete?

24  A    Because Pete wasn't -- had not gotten back to me yet, and

25  Jim Metcalf was pestering me to get him sworn.

Rychlik - Direct

1   Q    And what was it that Pete was doing?

2   A    Pete was processing the paperwork and doing any background

3   information that needed to be done.

4   Q    And what did you mean when you said you'd get Jim Metcalf

5   over for lunch and, quote, have him hit you?

6   A    Meaning set up a lunch and have him make the donation.

7            MS. CHOY:  Could we play to the end, please.

8            (Audio playing.)

9   BY MS. CHOY:

10  Q    When Mr. Jenkins referred to the timeline on the judge,

11  what did you take him to mean by that?

12  A    The request to get somebody appointed, the sheriff has to

13  sign a document and get it over to the courthouse for the judge

14  to countersign.

15  Q    Did Jim Metcalf travel to Culpeper to get sworn in?

16  A    He did.

17  Q    Did that occur on or about September 7th, 2022?

18  A    Yes, it did.

19  Q    Were you present?

20  A    I was.

21  Q    So I'm going to have you walk us through that day.

22       Did you go out to lunch with the sheriff?

23  A    We did.

24  Q    And after that lunch, did you have a conversation with the

25  sheriff and Jim Metcalf in the parking lot?

Rychlik - Direct

1    A    I did.

2            MS. CHOY:  And could we pull up Exhibit 7, please.

3            (Audio playing.)

4    BY MS. CHOY:

5    Q    Have you had an opportunity to review this clip?

6    A    I have.

7    Q    Is it a fair and accurate recording of the conversation in

8    which you participated?

9    A    It is.

10           MS. CHOY:  The government moves Exhibit 7 into

11   evidence.

12           THE COURT:  Any objection?

13           MR. ANDONIAN:  No, Your Honor.

14           THE COURT:  So admitted and may be published to the

15   jury.

16           (Government Exhibit 7 marked and admitted.)

17    BY MS. CHOY:

18   Q    Whose voices could be heard on that recording?

19   A    Mine and the sheriff.

20   Q    And who else was present?

21   A    Jim Metcalf.

22           MS. CHOY:  Ms. Fastenau, could you please play until

23   the 32-second mark.

24           (Audio playing.)

25           Could we play a little bit more until we get to the

Rychlik - Direct

1  screen -- and a little bit more.  Thank you.

2   BY MS. CHOY:

3  Q    So who is the man in the black shirt at the center of the

4  screen?

5  A    That's Scott Jenkins.

6  Q    And whose hand is visible in the lower right-hand corner

7  of the screen?

8  A    Jim Metcalf.

9  Q    And what is that white object that Mr. Metcalf is passing

10  to Mr. Jenkins?

11  A    That's an envelope with the $5,000 check from Yona,

12  Mr. Metcalf's company.

13          MS. CHOY:  Let's play to the end.

14          (Audio playing.)

15  BY MS. CHOY:

16  Q    At some point after that lunch, was Mr. Metcalf sworn in?

17  A    Yes, he was.

18  Q    And at some point, did you go back to the sheriff's

19  office?

20  A    Yes, we did.

21  Q    And when you were in the car with Mr. Metcalf, did the

22  topic of recruiting auxiliaries come up?

23  A    Yes, it did.

24  Q    And did Mr. Metcalf offer to do anything?

25  A    Yes, he did.

Rychlik - Direct

1  Q    What did he offer to do?

2  A    He offered to recruit more people for the auxiliary

3  program.

4  Q    And did he indicate whether they'd be willing to pay?

5  A    Yes, he did.

6  Q    What did he say in that regard?

7  A    5 to 10,000 each.

8  Q    And when you got to the sheriff's office, did you go

9  somewhere within the sheriff's office?

10  A    Yes, we did.

11  Q    Where did you go?

12  A    We went into the conference room.

13  Q    And did there come a time when Mr. Metcalf stepped out of

14  the conference room?

15  A    Yes, there was.

16  Q    And did you have a conversation with Scott Jenkins?

17  A    Yes, I did.

18  Q    What did you discuss with him?

19  A    We discussed the fact that Jim brought up he had more

20  people he wanted to bring in.

21          MS. CHOY:  Could we bring up Exhibit 11, please.

22          THE COURT:  Mr. Rychlik, can you slide that

23  microphone a little bit closer to you?

24          THE WITNESS:  I'm sorry, Your Honor.  Is that better?

25          THE COURT:  Yes, sir.  Thank you.

Rychlik - Direct

1              (Audio playing.)

2     BY MS. CHOY:

3     Q     Have you had an opportunity to review this clip?

4     A     Yes, I have.

5     Q     Is it a fair and accurate recording of a conversation in

6     which you participated?

7     A     Yes, it is.

8              MS. CHOY:  The government moves Exhibit 11 into

9     evidence.

10             THE COURT:  Any objection?

11             MR. ANDONIAN:  No, Your Honor.

12             THE COURT:  Admitted, and may be published to the

13    jury.

14             (Government Exhibit 11 marked and admitted.)

15    BY MS. CHOY:

16    Q     Where was this video taken?

17    A     In the sheriff's office.

18    Q     And who was that who said at the beginning, he mentioned?

19    A     Me.

20    Q     Who is the other participant in the conversation?

21    A     Scott Jenkins.

22             MS. CHOY:  Let's play until 16 seconds, please.

23             (Audio playing.)

24    BY MS. CHOY:

25    Q     So when you said, they're $10,000 guys and you'll never

Rychlik - Direct

1  hear from them, what did you mean by that?

2  A    I meant they were willing to pay 10,000 for credentials

3  and all they wanted was credentials.  They didn't want to work

4  or do anything; never hear from them.

5  Q    And what was Scott Jenkins's response?

6  A    Great.

7  Q    And did he agree to that?

8  A    Yes.

9         MS. CHOY:  Could we play to the end, please.

10         (Audio playing.)

11  BY MS. CHOY:

12  Q    In that clip, you saw Mr. Jenkins making some statements

13  about his brother, Mike.  What did you understand him to be

14  conveying to you there?

15  A    He was conveying that if people didn't want to go on

16  record with their business or personally making a donation,

17  they could give it to his brother, and his brother could make

18  the donation, and they wouldn't be on record for giving it to

19  him, circumventing the donation requirements.

20  Q    Did you have an understanding of what the purpose of

21  giving to someone else would be?

22  A    Well, it makes it non-traceable from that person, and it

23  also keeps it off the donation reporting for the person giving

24  it.

25  Q    And who is the man in the dark shirt who entered the room

Rychlik - Direct

1  at the end of that video clip?

2  A    That was Jim Metcalf.

3  Q    Okay.  So I'd like to turn now to the two FBI undercover

4  agents that you mentioned earlier.

5       What's your understanding of what an undercover agent is,

6  just generally?

7  A    They're federal FBI agents that work under assumed names

8  to complete a specific task for the mission that they're

9  assigned to.

10 Q    And did the FBI provide backstories for those undercover

11 agents?

12 A    Yes, they did.

13 Q    And did the FBI direct you to convey those backstories to

14 Scott Jenkins?

15 A    Yes, they did.

16 Q    And was the assumed name of one of those undercover agents

17 Jerry McKee?

18 A    Yes.

19 Q    And was the assumed name of the other one Mike or Michael?

20 A    Yes.

21 Q    Was there anything special about Mike's backstory?

22 A    Yes.  The backstory was he had a criminal history record

23 and a credit card fraud problem in his past.

24 Q    And did you convey to Scott Jenkins that Mike had a felony

25 record?

Rychlik - Direct

1    A    I did.

2    Q    And what was the backstory for how you knew Jerry and

3    Mike?

4    A    That they were donators -- they were supporters of VASAR

5    and I had known them a period of time.

6    Q    Did you meet with Scott Jenkins in Culpeper on or about

7    October 6th of 2022?

8    A    Yes.

9    Q    And at that meeting, did you discuss with Scott Jenkins

10   Jim Metcalf's efforts to recruit additional money guys?

11   A    I did.

12   Q    And did you discuss those two undercover agents?

13   A    I did.

14            MS. CHOY:  Could we play the first 3 seconds of this

15   clip, please.

16            (Audio playing.)

17   BY MS. CHOY:

18   Q    Have you reviewed this clip?

19   A    I have.

20   Q    Is it a fair and accurate recording of the conversation in

21   which you participated?

22   A    Yes.

23            MS. CHOY:  The government moves Exhibit 13 into

24   evidence.

25            THE COURT:  Any objection?

Rychlik - Direct

1          MR. ANDONIAN:  No, Your Honor.

2          THE COURT:  All right.  Be admitted and may be

3   published to the jury.

4          (Government Exhibit 13 marked and admitted.)

5   BY MS. CHOY:

6   Q    Where was this video taken?

7   A    In Culpeper at a shooting range that there was an event

8   at.

9          MS. CHOY:  Let's play the first 11 seconds, please.

10          (Audio playing.)

11  BY MS. CHOY:

12  Q    Who was that first speaker who said, going in your car?

13  A    That was me.

14  Q    And who was the second speaker, the man in the dark

15  button-down shirt and jeans?

16  A    That was Scott Jenkins.

17  Q    And what did Scott Jenkins put in his car?

18  A    His two -- his phones.

19  Q    And did you also put your phones in your car?

20  A    I did.

21  Q    Why did you do that?

22  A    It's something he liked to do because he felt people could

23  be listening.

24          MS. CHOY:  Let's play the first 2 minutes and 3

25  seconds, please.

Rychlik - Direct

1                  (Audio playing.)

2    BY MS. CHOY:

3    Q    So who were you discussing with Scott Jenkins in that clip

4    we just heard?

5    A    Discussing the people that we had ready to get sworn in,

6    and letting him know that we -- if we get them sworn in, that

7    would be about 50,000, which met our goal.

8                  MS. CHOY:  Let's play to the end.

9                  (Audio playing.)

10    BY MS. CHOY:

11    Q    So in that clip, there is a discussion of the order in

12    which to do things.  Do you recall that?

13    A    I do.

14    Q    What did you understand Scott Jenkins to be conveying to

15    you?

16    A    He was conveying that he would prefer to swear them in

17    first and then get their donation later, versus get their

18    donation prior to or the day of, in case it drew attention to

19    that.

20    Q    And what was he conveying about why he wanted things to

21    happen in that order, based on your understanding of the

22    conversation?

23    A    He felt it would bring less attention to the fact that

24    people were paying for a badge, is the way that I interpreted

25    it.

Rychlik - Direct

1   Q    And when Scott Jenkins said, I'd rather do my part first,

2   what did you take him to be referring to?

3   A    Swearing them in.

4   Q    Are you familiar with an individual named Tom Cooper?

5   A    I am.

6   Q    How did you meet Tom Cooper?

7   A    Fred Gumbinner introduced me to Tom Cooper and asked if

8   there was a way to get him sworn in.

9   Q    And did you have a conversation with Tom Cooper about

10  that?

11  A    I did.

12  Q    What did you tell him?

13  A    I asked him why he wanted to be sworn in.  He said because

14  he wanted the creds to carry his firearm and protect his

15  family.  And I told him that there's a donation coming in.  He

16  asked how much.  I said 5 to 10.  He said okay.

17  Q    And did Mr. Cooper travel to Culpeper to get sworn in?

18  A    He did.

19  Q    Were you present that day?

20  A    I was.

21  Q    And generally speaking, did that visit follow the same

22  process as Jim Metcalf's visit?

23  A    It did.

24  Q    So did you and Tom Cooper go to lunch with the sheriff?

25  A    We did.

Rychlik - Direct

1  Q    And did you go to the clerk's office for Mr. Cooper to be

2  sworn in?

3  A    We did.

4  Q    And after Mr. Cooper was sworn in, where did you go next?

5  A    To the sheriff's office.

6  Q    And what occurred at the sheriff's office?

7  A    He got his ID and his badge.

8  Q    Did he meet with anyone else at the sheriff's office?

9  A    Pete.

10  Q    Let me put it this way.  You said he got his ID and badge.

11  Who did he get them from?

12  A    The sheriff.

13  Q    And was anyone else present during that meeting?

14  A    Fred Gumbinner.

15  Q    Did Mr. Jenkins give anything to Mr. Cooper in the

16  sheriff's office?

17  A    A badge and ID card.

18  Q    And did Mr. Cooper give anything to Scott Jenkins?

19  A    A donation.

20  Q    Do you know how much money Mr. Cooper gave to Scott

21  Jenkins?

22  A    He said 5,000, but I'm not sure.

23  Q    And did you observe what format that payment took, cash or

24  check?

25  A    I'm not sure if it was cash or check.

Rychlik - Direct

1  Q    And did you have any discussions with Scott Jenkins about

2  the amounts of the payments that he was receiving?

3  A    Yes.

4          MS. CHOY:  So let's pull up Exhibit 19, please.

5          (Audio playing.)

6  BY MS. CHOY:

7  Q    Have you had an opportunity to review this recording?

8  A    I have.

9  Q    Is it a fair and accurate recording of the conversation in

10 which you participated?

11 A    It is.

12         MS. CHOY:  The government moves Exhibit 19 into

13 evidence.

14         THE COURT:  Any objection?

15         MR. ANDONIAN:  No, Your Honor.

16         THE COURT:  So admitted and may be published to the

17 jury.

18         (Government Exhibit 19 marked and admitted.)

19 BY MS. CHOY:

20 Q    Who was that first speaker who said, probably about six or

21 eight in the hopper?

22 A    That was me.

23 Q    And who was the second speaker who said, sounds good?

24 A    Scott Jenkins.

25         MS. CHOY:  Could we play this recording, please.

Rychlik - Direct

1             (Audio playing.)

2    BY MS. CHOY:

3    Q    What was your understanding of what Scott Jenkins meant

4    when he said, we've had a few the same number so far?

5    A    What he was saying is a number of people who were brought

6    in were all giving 5, and it would be better to break it up

7    half and half so it didn't create attention.

8    Q    And did you have an understanding of why he wanted to

9    break up those amounts?

10   A    My understanding was he felt it would draw attention to

11   selling the badges for money if it was all the same amount of

12   money, and if we broke it up, it would look different.

13             THE COURT:  Is this a good breaking point?

14             MS. CHOY:  Yes, it is.

15             THE COURT:  All right.  So ladies and gentlemen, it

16   is about 10:50.  We went a little bit longer today.  We're

17   going to take our lunch break a little bit later today.  I've

18   got a call I've got to take at 1:30.  So I'm trying to break

19   where I can take the call during lunch and not have to take any

20   additional time for lunch.

21             So let's come back around 5 after 11, and we'll

22   probably go until 1:00 or maybe shortly thereafter.

23             So with that, I'll again remind you please don't

24   discuss the case or begin to formulate any thoughts at all or

25   discuss the case among yourselves.

Rychlik - Direct

1           All right.  We'll dismiss the jury.

2    (*Jury out, 10:52 a.m.*)

3           THE COURT:  Mr. Rychlik, you can step down.  Since

4    you're still on direct examination, do not discuss your

5    testimony at all, even with your own counsel.

6           THE WITNESS:  Yes, sir.

7           THE COURT:  Otherwise, anything we need to address,

8    Ms. Choy?

9           MS. CHOY:  No, Your Honor.

10          THE COURT:  Mr. Andonian?

11          MR. CALEB:  Your Honor, I just need to run back and

12    grab some medicine, so I'll come back probably maybe a couple

13    minutes late.

14          THE COURT:  That's fine.  I also noticed you were

15    getting some -- I've got some other things up here if you need

16    it.  It's that time of year, ladies and gentlemen.

17          MS. CHOY:  Some of us on our side have that too.

18          THE COURT:  All right.  We'll stand in recess for 15

19    minutes.  Thank you.

20          (Recess.)

21          THE COURT:  We're back on the record in the matter of

22    *United States v. Jenkins*.  Let the record reflect the

23    government is present by its counsel.  Defendant likewise is

24    present along with the benefit of counsel.

25          Let me say this:  It's that time of year.  If someone

Rychlik - Direct

1   doesn't feel well, if someone needs a break, tell me.  I don't

2   want to just drive on or whatever, and have someone suffer in

3   silence.  And also, you know, we can instruct the jury that the

4   lawyers can get up and move around.  Mr. Jenkins, you're the

5   only one that can't get up and just leave.  But in all

6   seriousness, if someone needs to leave, if someone needs a

7   break, please tell me, because I want to make sure that

8   everyone is as comfortable as possible.

9           MS. CHOY:  Thank you, Your Honor.  And I did want to

10  raise that with you.  I know Your Honor was planning to take a

11  later lunch break today in about two hours.  And I just wanted

12  to request because Mr. Rychlik is still recuperating from a

13  major surgery --

14          THE COURT:  Do we want to take an interim break?

15          MS. CHOY:  Yes.

16          THE COURT:  Okay.  So why don't we try to go until

17  maybe around 12, a little after, and then just take maybe a

18  five-minute break, ten-minute break, whatever -- and

19  Mr. Rychlik, especially goes for you.  And I would tell every

20  witness this same thing, and that is that if anyone needs a

21  break, I don't want anyone to be uncomfortable at all.  So what

22  we'll do is we'll try to go until maybe around 5 after 12.

23          Will you be able to get your direct done by 1:00, do

24  you think?

25          MS. CHOY:  Yes, I think I've got about an hour.

Rychlik - Direct

1          THE COURT:  Okay.  So we may be in the middle of your

2   cross when we break for lunch.

3          Okay.  Anything we need to bring up from the defense

4   standpoint, Mr. Andonian?

5          MR. ANDONIAN:  No, Your Honor.

6          THE COURT:  All right.  Let's bring the jury in.

7   (*Jury in, 11:11 a.m.*)

8          THE COURT:  Ladies and gentlemen, please be seated.

9          Ladies and gentlemen, let me just raise one thing

10  with you before we continue on with Mr. Rychlik's examination.

11  And that is that I probably went too long for some folks this

12  morning.  It's not a marathon for how long we can go until our

13  next break.  If we're proceeding on and someone is

14  uncomfortable or someone is tired, someone just needs to

15  stretch their legs, let us know.  Just flag us down.  Let the

16  CSOs know.  I've told the lawyers the same thing.  I think

17  where we are in the case, we have the benefit of time, and I

18  would rather make sure that everyone is awake, alert, and

19  feeling as well as possible as we proceed on.  So I think what

20  we're going to do is try to maybe take an interim break before

21  1:00, you know, maybe in about an hour or so, get up, stretch

22  our legs for ten minutes or so, and then come back and make our

23  run to lunch.

24          All right.  With that, Ms. Choy, please proceed.

25          MS. CHOY:  Thank you, Your Honor.

Rychlik - Direct

1   BY MS. CHOY:

2   Q    Mr. Rychlik, you testified earlier that you introduced two

3   FBI undercover agents to Mr. Jenkins.  Do you recall that?

4   A    Yes.

5   Q    And you testified that one of them used the assumed name

6   Jerry McKee; is that right?

7   A    Yes.

8   Q    Did Mr. McKee visit Culpeper on or around November 8th,

9   2022?

10  A    Yes.

11  Q    Were you present that day?

12  A    Yes.

13  Q    And just generally speaking, what occurred that day?

14  A    Mr. McKee was sworn in.  We went to lunch with the

15  sheriff.  He was sworn in by the clerk of the court, and we

16  went back to the sheriff's office.  He was presented his badge

17  and credentials by the sheriff, and a donation was given in

18  cash.

19  Q    And after Mr. McKee was sworn in and left, did you discuss

20  the second undercover agent, Mike, with Sheriff Jenkins?

21  A    Yes.

22         MS. CHOY:  Could we pull up Government's Exhibit 23,

23  please, and play the first 5 seconds.

24         (Audio playing.)

25  BY MS. CHOY:

Rychlik - Direct

1   Q    Have you reviewed this clip?

2   A    Yes, I have.

3   Q    Is it a fair and accurate recording of the conversation in

4   which you participated?

5   A    Yes.

6            MS. CHOY:  The government moves Exhibit 23 into

7   evidence.

8            THE COURT:  Any objection?

9            MR. ANDONIAN:  No, Your Honor.

10           THE COURT:  So admitted and may be published to the

11   jury.

12           (Government Exhibit 23 marked and admitted.)

13   BY MS. CHOY:

14   Q    Who was that first speaker that you heard speaking?

15   A    Me.

16   Q    And who's the other participant in the conversation?

17   A    Scott Jenkins.

18           MS. CHOY:  Could we play this clip, please.

19           (Audio playing.)

20   BY MS. CHOY:

21   Q    So again, who is the Mike that you referred to in that

22   clip?

23   A    That was the undercover FBI agent.

24   Q    And what was it that you were conveying to Scott Jenkins

25   about Mike's background?

Rychlik - Direct

1   A    That he had a criminal history and credit card fraud and

2   so forth.

3   Q    And what did you mean when you said he'd probably hit you

4   a couple of times?

5   A    He'd make a couple of donations.

6   Q    And when you conveyed that information about Mike's

7   background to Scott Jenkins, what did he instruct you to do?

8   A    To not send his ID to the usual method, which is Pete, and

9   to send it to him directly.

10  Q    And was that typical?

11  A    No.

12  Q    And did you have additional conversations with Scott

13  Jenkins in which he discussed ways to conceal that money that

14  he was receiving?

15  A    Yes.

16        MS. CHOY:  Could you please bring up Exhibit 31?

17        (Audio playing.)

18  BY MS. CHOY:

19  Q    Have you reviewed this clip?

20  A    I have.

21  Q    Is it a fair and accurate recording of a conversation in

22  which you participated?

23  A    It is.

24        MS. CHOY:  The government offers Exhibit 31 into

25  evidence.

Rychlik - Direct

1           THE COURT:  Any objection?

2           MR. ANDONIAN:  No, Your Honor.

3           THE COURT:  So admitted and may be published to the

4    jury.

5           (Government Exhibit 31 marked and admitted.)

6    BY MS. CHOY:

7    Q    Who was the first speaker who said, even if somebody does

8    give it?

9    A    Could you repeat that again?

10   Q    The first speaker you heard on that clip who said, even if

11   somebody does give it, with subtitles in white?

12   A    I believe that was me.  It's either me or the sheriff.  I

13   don't remember which one of us talked first.

14   Q    Okay.  So who are the two speakers in this tape?

15   A    Myself and Scott Jenkins.

16          MS. CHOY:  Could we please play until 1 minute and 48

17   seconds.

18          (Audio playing.)

19   BY MS. CHOY:

20   Q    So you just heard a discussion about a tractor.  And do

21   you have an understanding of who was at issue in that

22   discussion?

23   A    Rick Rahim purchased the tractor.

24   Q    So could you explain what the discussion of this tractor

25   purchase was about?

Rychlik - Direct

1  A    Yeah, it was another way of concealing a donation of

2  purchasing a tractor that never left and the -- although I was

3  not involved in that transaction in any way, I was told about

4  it through this, as well as Rick saying it when he got upset,

5  but it was purchasing a tractor that stayed on the farm where

6  he had the false lease to reside in Culpeper.

7  Q    Okay.  So Rick Rahim had a purported lease to reside in

8  Culpeper; is that right?

9  A    Yes.

10 Q    And do you know who owned that farm?

11 A    The Jenkins family.

12 Q    And so there was discussion about purchasing a tractor?

13 A    Yes.

14 Q    And you said it never left.  What did you mean by that?

15 A    Meaning the tractor -- he made a donation, gave the

16 sheriff money for the tractor, but he really didn't buy the

17 tractor.  It was just a cover for the donation.

18 Q    So was it your understanding in this discussion that Scott

19 Jenkins is referring to a real purchase of a tractor?

20 A    Yes.

21 Q    Well, was that the true purpose of that transaction?

22 A    No.

23 Q    And in your understanding, based on this conversation and

24 others you've had with Mr. Jenkins, what was the true purpose

25 of the money changing hands?

Rychlik - Direct

1    A    To conceal the donation.

2    Q    And there was a statement that said -- by Mr. Jenkins --

3    he said, you paid cash for it.

4        So what did you understand him to be referring to there?

5    A    That Rick paid him cash for the tractor.

6    Q    And again, was it your understanding that money was really

7    for the tractor?

8    A    No.

9        MS. CHOY:  Let's play it again, please.

10       (Audio playing.)

11   BY MS. CHOY:

12   Q    When Scott Jenkins said, it comes to me clean, what did

13   you understand he meant by that?

14   A    It comes to him as a purchase of a tractor versus a

15   campaign donation, and he doesn't --

16   Q    It being what?

17   A    The money.

18   Q    Sorry.  Continue.

19   A    It comes to him as a purchase of a tractor versus a

20   donation.

21   Q    And when he said, I ain't getting tagged or touched, what

22   did you understand him to mean by that?

23   A    That nobody could catch him on the transaction.

24   Q    Are you familiar with someone named Phil Howell?

25   A    I am.

Rychlik - Direct

1  Q    Who is that?

2  A    Phil Howell is an associate of Jim Metcalf's that was

3  previously sworn in in Prince William County sheriff's office

4  that Jim recruited to come into the program.

5  Q    And did Phil Howell travel to Culpeper to get sworn in?

6  A    He did.

7  Q    Were you present for that?

8  A    I was.

9  Q    Was Jim Metcalf present for that?

10  A    He was.

11  Q    And did you observe Phil Howell giving money to Scott

12  Jenkins?

13  A    I did.

14  Q    And did you observe Scott Jenkins giving him a badge in

15  exchange?

16  A    I did.

17  Q    Are you familiar with someone named Rubar Sandi?

18  A    I am.

19  Q    Who is Rubar Sandi?

20  A    Rubar Sandi is a friend of Tom Cooper.  Tom asked to bring

21  Rubar Sandi in.  He was a former -- I guess he's a former

22  businessman from overseas that is wealthy, and Tom wanted him

23  to be sworn in.

24  Q    Did Rubar Sandi travel to Culpeper to get sworn in?

25  A    He did.

Rychlik - Direct

1  Q    Were you present that day?

2  A    I was.

3  Q    Was Tom Cooper also present that day?

4  A    He was.

5  Q    Was that on or about January 4th, 2023?

6  A    Yes, it was.

7         MS. CHOY:  Could you please pull up Exhibit 130,

8  Ms. Fastenau.  And could you highlight the first two messages

9  on that page.

10 BY MS. CHOY:

11 Q    Do you recognize this document?

12 A    I do.

13 Q    What is it?

14 A    Checks between me and Scott Jenkins.

15         MS. CHOY:  The government moves Exhibit 130 into

16 evidence.

17         THE COURT:  Any objection?

18         MR. ANDONIAN:  No, Your Honor.

19         THE COURT:  May be admitted and published to the

20 jury.

21         (Government Exhibit 130 marked and admitted.)

22 BY MS. CHOY:

23 Q    So directing you to that first blue message, who is that

24 from?

25 A    That is from me.

Rychlik - Direct

1   Q    And who is it to?

2   A    The sheriff.

3   Q    And you said, see you Wednesday at 11:30.  Note Tom is

4   coming too.

5        What's that in reference to?

6   A    Tom Cooper coming to get lunch and get sworn.

7   Q    So Tom is coming too?

8   A    Yes.

9   Q    And who else would have been coming in January of 2023?

10  A    Rubar Sandi.

11  Q    And directing you to the green message.

12       Who is that from?

13  A    Me.

14  Q    So who is it from?

15  A    Oh, the sheriff.

16  Q    And who is it to?

17  A    Me.

18  Q    And you said, see you a little later this morning; is that

19  right?

20  A    Yes.

21  Q    What's that in reference to?

22  A    Meeting for lunch.

23  Q    So did you and Rubar Sandi go to lunch with Scott Jenkins?

24  A    Yes.

25  Q    And was Tom Cooper present too?

Rychlik - Direct

1    A    Yes.

2    Q    At that lunch, did Rubar Sandi give anything to Scott

3    Jenkins?

4    A    Yes.

5    Q    What?

6    A    A bag containing a trinket elephant, a Turkish Delight,

7    and 5,000 in cash.

8    Q    And after you left the restaurant, did you have a

9    conversation in the parking lot?

10   A    Yes, we did.

11   Q    Could you pull up Government's Exhibit 401, please.

12        Do you recognize this?

13   A    I do.

14   Q    Just generally speaking, what is it?

15   A    It's a photo of all of us after lunch.

16   Q    Is that a fair and accurate photo?

17   A    Yes, it is.

18            MS. CHOY:  The government moves 401 into evidence.

19            THE COURT:  Any objection?

20            MR. ANDONIAN:  No, Your Honor.

21            THE COURT:  May be admitted and published to the

22   jury.

23            (Government Exhibit 401 marked and admitted.)

24   BY MS. CHOY:

25   Q    So again, where was this photo taken?

Rychlik - Direct

1    A    Outside of a restaurant in Culpeper.

2    Q    And was that on or about January 4th of 2023?

3    A    Yes.

4    Q    Who are the individuals pictured?

5    A    From right to left, Scott Jenkins, Tom Cooper, myself with

6    my back turned, and Rubar Sandi.

7    Q    What is the blue gift bag in Scott Jenkins's hand?

8    A    That is a bag that Rubar Sandi gave him with the items I

9    described earlier.

10   Q    How do you know there was $5,000 cash in that bag?

11   A    They both told me.

12   Q    They both meaning who?

13   A    Rubar Sandi and later Scott Jenkins.

14   Q    And did you have a conversation about what was in that

15   gift bag?

16   A    Yes.

17          MS. CHOY:  Could you please pull up Government's

18   Exhibit 35, Ms. Fastenau, and play the first 14 seconds of that

19   clip.

20          (Audio playing.)

21   BY MS. CHOY:

22   Q    Have you reviewed this clip?

23   A    Yes.

24   Q    Is it a fair and accurate recording of the conversation in

25   which you participated?

Rychlik - Direct

1    A    Yes.

2              MS. CHOY:  The government moves Exhibit 35 into

3    evidence.

4              THE COURT:  Any objection?

5              MR. ANDONIAN:  No, Your Honor.

6              THE COURT:  So admitted and may be published to the

7    jury.

8              (Government Exhibit 35 marked and admitted.)

9    BY MS. CHOY:

10   Q    So who was that who said, we're going to go get you sworn?

11   A    That was me.

12   Q    And who was that who said, it's good timing because I need

13   to run there?

14   A    Scott Jenkins.

15   Q    And who said great?

16   A    Scott Jenkins.

17   Q    Did you -- did you hear someone speaking with an accent?

18   A    Yes.

19   Q    Who is that?

20   A    Rubar Sandi.

21             MS. CHOY:  So let's play from the beginning to 25

22   seconds, please.

23             (Audio playing.)

24   BY MS. CHOY:

25   Q    Who was that who you heard say, he already did?

Rychlik - Direct

1    A    That was Scott Jenkins.

2    Q    So you heard that to be Scott Jenkins?

3    A    Yes.

4    Q    And when you said, you have cash from him in the bag, who

5    were you talking to?

6    A    I was talking to Scott Jenkins.

7    Q    And who is the him you were talking about?

8    A    Rubar Sandi.

9           MS. CHOY:  Let's play to the end.

10           (Audio playing.)

11   BY MS. CHOY:

12   Q    When Rubar Sandi said, I live and work overseas, I know

13   how to do these things, what did you take him to mean by that?

14   A    That he knows how to quietly do things with money and not

15   bring attention to it.

16   Q    And did you hear someone laugh after he said that?

17   A    Yes.

18   Q    Who was laughing?

19   A    I think we all laughed.

20   Q    Was Scott Jenkins present for that conversation?

21   A    Yes.

22   Q    And at some point after that conversation, did Scott

23   Jenkins give Rubar Sandi a badge?

24   A    Yes.

25   Q    After Rubar Sandi was sworn in, did there come a time when

113

Rychlik - Direct

1  Scott Jenkins contacted you and asked you to meet?

2  A    Yes.

3  Q    Roughly how long after the Rubar Sandi meeting was that?

4  A    Not too long.

5  Q    So was that also in January of 2023?

6  A    Yes.

7  Q    And was that request to meet urgent?

8  A    Yes.

9  Q    Did he tell you what he wanted to meet about?

10  A    No.

11  Q    And did you agree to meet him?

12  A    I did.

13  Q    Where did you meet him?

14  A    I met him in the Target parking lot in Gainesville.

15  Q    When you met Scott Jenkins in that Target parking lot,

16  what was his demeanor?

17  A    He was quiet.  He seemed a little wary.

18  Q    And did he ask you to do anything with your cell phone?

19  A    Yes.  He asked me to put it in the car with his.

20  Q    And did he then explain what had prompted this urgent

21  request to meet?

22  A    Yes.

23  Q    What did he say?

24  A    He said he was giving it a lot of thought, talked to his

25  wife about it, he was -- seemed very distraught over the cash

Rychlik - Direct

1  donations from the previous four people, and he brought with

2  him four high-dollar firearms.

3  Q    Let me pause you for a second.  So did he indicate what

4  his concern was about those donations?

5  A    Yes.  He was afraid, essentially, that somebody was going

6  to pick up the cash donations and the fact that he needed to

7  make a decision on his quarterly financial report.  And he

8  asked me if I would help him contact the four people that gave

9  the donations and talk them into saying that that money was

10  really for a firearm.  And then he asked me if I still had my

11  federal firearms license so I could transfer the firearms, and

12  I told him I did.  He asked me if I'd be willing to do that.  I

13  said I would.  I said, but you know, whoever gets them has to

14  go through the proper background checks.  And if they live out

15  of state, we've got to send them to a dealer out of state.  He

16  said, I don't really care what you do with them, you know, once

17  they're out of my possession and they're on your license, I'm

18  clean.  So I said, do these people know that these guns are

19  coming for the cash they gave you?  He said no.  And I said, so

20  I have to work it out?  He said yes.

21  Q    So let me just pause you there.

22       So you said he wanted you to give these guns to those

23  individuals?

24  A    Yes.

25  Q    Did he want you to convey something to those individuals?

Rychlik - Direct

1   A    Yes.

2   Q    What was it he wanted you to convey to them?

3   A    That it was for the cash donation that they gave.

4   Q    And was it your understanding in that moment that that

5   cash donation was really for the purchase of a gun?

6   A    No, it wasn't.  It was for his campaign.

7   Q    Had there ever been any discussion with those individuals

8   that the money they gave Scott Jenkins was for the purchase of

9   a gun?

10  A    Not that I'm aware of.

11  Q    What did you understand to be the purpose of this proposal

12  that Scott Jenkins was making to you?

13  A    That it would help him conceal the donations so he didn't

14  have to report it on his campaign, and that he was worried

15  about -- he seemed very distraught, more than usual.  He was

16  very secretive about what the meeting was about, and I just

17  interpreted it to be, you know, he was worried about getting

18  caught.

19  Q    And did you record that conversation with Scott Jenkins?

20  A    I did.

21          MS. CHOY:  Could we pull up Government's Exhibit 39,

22  please.

23          (Audio playing.)

24  BY MS. CHOY:

25  Q    Have you reviewed this recording?

Rychlik - Direct

1    A    I have.

2    Q    Is it a fair and accurate recording of a conversation in

3    which you participated?

4    A    It is.

5         MS. CHOY:  The government moves Exhibit 39 into

6    evidence.

7         THE COURT:  Any objection?

8         MR. ANDONIAN:  No, Your Honor.

9         THE COURT:  So admitted and may be published to the

10   jury.

11        (Government Exhibit 39 marked and admitted.)

12   BY MS. CHOY:

13   Q    So again, is this a recording of that conversation with

14   Scott Jenkins in the Target parking lot on January 30th, 2023?

15   A    Yes, it is.

16   Q    And who were the speakers that you heard on that clip?

17   A    Myself and Scott Jenkins.

18        MS. CHOY:  Let's play that recording, please,

19   Ms. Fastenau.

20        (Audio playing.)

21   BY MS. CHOY:

22   Q    In that meeting, did Scott Jenkins ask you to create

23   documentation for this purported firearms transfer?

24   A    Yes.

25   Q    And did you do that?

Rychlik - Direct

1   A    Yes.

2   Q    I'm showing you what's been marked as Government's Exhibit

3   702.

4        Do you recognize this document?

5   A    I do.

6   Q    What is it?

7   A    That is a receipt that we wrote up as a federal firearms

8   dealer.  In order to take firearms and log them into your

9   records, you have to have a receipt, something signed.  So this

10  is a receipt that I received four guns from Scott Jenkins, and

11  a description of the guns and their serial numbers.

12          MS. CHOY:  The government moves Exhibit 702 into

13  evidence.

14          THE COURT:  Any objection?

15          MR. ANDONIAN:  No, Your Honor.

16          THE COURT:  So admitted and may be published to the

17  jury.

18          (Government Exhibit 702 marked and admitted.)

19          MS. CHOY:  Could we zoom in on the first block of

20  text at the top of the page, please.

21  BY MS. CHOY:

22  Q    Could you read that, please?

23  A    Received four guns from Scott Jenkins, 14358 Jenkins Ridge

24  Road, Culpeper, Virginia 22701, Virginia OL, T62008779.

25  Q    And is that dated January 30th, 2023?

Rychlik - Direct

1    A    Yes.  I'm sorry.

2    Q    And what are the four items that are listed below that?

3    A    An Ed Brown Kobra Carry 1911, 45 ACP handgun, serial

4    number 2625; a Winchester Arms rifle, serial number 1A01012; an

5    LWRC REPR tactical rifle, 765 by 51, serial number 72-02407;

6    and a Wilson Combat EDC-X9, 9-millimeter handgun, serial number

7    WCX-2953.

8    Q    Can we pull up the last block of text on the page, please?

9         And what does that say?

10   A    Received for transfer from Scott Jenkins on 1-30-23 at

11   6:16 p.m.

12   Q    And whose signature is that on the first line?

13   A    That's mine, receiving it.

14   Q    And whose signature is that on the second line?

15   A    Scott Jenkins.

16   Q    And what did you understand to be the purpose of creating

17   this document?

18   A    The purpose was to take the firearms in and transfer them

19   to the four individuals that gave him cash -- or donations, I'm

20   sorry.

21   Q    And in that parking lot meeting, did you and Scott Jenkins

22   continue to discuss this plan that he had?

23   A    Yes.

24         MS. CHOY:  Could we pull up Exhibit 40, please, and

25   play the first 8 seconds.

Rychlik - Direct

1                    (Audio playing.)

2    BY MS. CHOY:

3    Q    Have you reviewed the entirety of this recording?

4    A    I have.

5    Q    And is it a fair and accurate recording of the

6    conversation in which you participated?

7    A    It is.

8            MS. CHOY:  The government moves Exhibit 40 into

9    evidence.

10           THE COURT:  Any objection?

11           MR. ANDONIAN:  No, Your Honor.

12           THE COURT:  So admitted and may be published to the

13   jury.

14           (Government Exhibit 40 marked and admitted.)

15   BY MS. CHOY:

16   Q    Whose voices did you hear on that recording?

17   A    That's mine and Scott Jenkins.

18           MS. CHOY:  Let's play this full recording, please.

19           (Audio playing.)

20   BY MS. CHOY:

21   Q    Did Scott Jenkins, in fact, give you four guns that day?

22   A    Yes.

23   Q    What did you do with them?

24   A    I turned them over to the FBI agents that had the meeting

25   under surveillance.

Rychlik - Direct

1              MS. CHOY:  And Ms. Fastenau, could you please bring

2    up 702 again?

3              So at this time, I'm going to ask Special Agent

4    Clouser to bring what's been marked as Government's Exhibit 503

5    and display it to the witness.

6              THE COURT:  And again, ladies and gentlemen, any of

7    these handguns have all been checked by our marshal and they've

8    been rendered safe before they're brought into the courtroom.

9              Thank you, Special Agent Clouser.

10   BY MS. CHOY:

11   Q    Do you recognize this?

12   A    I do.

13   Q    What is it?

14   A    That's item number 1, the Ed Brown Kobra Carry, serial

15   number 2625.

16             MS. CHOY:  Ms. Fastenau, could you please bring up

17   Government's Exhibit 404.

18   BY MS. CHOY:

19   Q    And what is this document?

20   A    That's a photo of the firearm I just described.

21             MS. CHOY:  The government moves 404 into evidence.

22             THE COURT:  Any objection?

23             MR. ANDONIAN:  No, Your Honor.

24             THE COURT:  So admitted.  503 is just used for

25   demonstrative purposes?

Rychlik - Direct


1          MS. CHOY:  Correct.

2          THE COURT:  So 404 is admitted and 503 is simply a

3  demonstrative exhibit.  Thank you.

4          MS. CHOY:  And I will ask Special Agent Clouser to

5  display 503 to the members of the jury.

6          (Government Exhibit 404 marked and admitted.)

7          MS. CHOY:  At this time, I'll ask Special Agent

8  Clouser to show what's been marked as Government's Exhibit 504

9  to the witness.

10          Could you take down 404, please?

11          THE WITNESS:  My screen went blank.

12          MS. CHOY:  But keep 702 up.  Thank you.

13  BY MS. CHOY:

14  Q    Do you recognize this?

15  A    I do.

16  Q    What is it?

17  A    That's the Wilson Combat EDC-9, item number 4 on the

18  receipt, serial number WCX-2953.

19          MS. CHOY:  And Ms. Fastenau, could you please pull up

20  Government's Exhibit 405.

21  BY MS. CHOY:

22  Q    What's depicted in this photograph?

23  A    The same firearm I just described.

24          MS. CHOY:  The government moves 405 into evidence.

25          THE COURT:  Any objection?

Rychlik - Direct

1          MR. ANDONIAN:  No, Your Honor.

2          THE COURT:  So 405 will be admitted and 504 is a

3   demonstrative exhibit, and may be published to the jury.

4          MS. CHOY:  Thank you, Your Honor.

5          Special Agent Clouser, could you please display 504

6   to the members of the jury.

7          (Government Exhibit 405 marked and admitted.)

8          MS. CHOY:  Special Agent Clouser, could you please

9   show what's been marked as Government's Exhibit 505 to the

10  witness.

11  BY MS. CHOY:

12  Q    Do you recognize this, Mr. Rychlik?

13  A    I do.  That's item 3 on the receipt, the LWRC REPR

14  tactical rifle, serial number 72-02407.

15         MS. CHOY:  Ms. Fastenau, could you please pull up

16  Government's Exhibit 406.

17  BY MS. CHOY:

18  Q    What is depicted in this photograph?

19  A    The same firearm I just described.

20         MS. CHOY:  The government moves 406 into evidence.

21         THE COURT:  Any objection?

22         MR. ANDONIAN:  No, Your Honor.

23         THE COURT:  406 is admitted and may be published to

24  the jury.  And 505 is a demonstrative exhibit.

25         MS. CHOY:  And Special Agent Clouser, please display

Rychlik - Direct

1   505 for the members of the jury.

2          (Government Exhibit 406 marked and admitted.)

3          MS. CHOY:  And Special Agent Clouser, could you

4   please show what's been marked as Government's Exhibit 506 to

5   the witness.

6   BY MS. CHOY:

7   Q    Do you recognize this, Mr. Rychlik?

8   A    I do.

9   Q    What is it?

10  A    That's item 2 on the receipt, the Winchester lever action

11  commemorative, serial number 1A01012.

12         MS. CHOY:  Ms. Fastenau, could you please pull up

13  Government's Exhibit 407.

14  BY MS. CHOY:

15  Q    Mr. Rychlik, what's depicted in this photograph?

16  A    That's the same firearm I just described.

17         MS. CHOY:  The government moves 407 into evidence.

18         THE COURT:  Any objection?

19         No objection, Mr. Andonian?

20         MR. ANDONIAN:  No, Your Honor.

21         THE COURT:  So admitted and may be published to the

22  jury.  And 506 is a demonstrative of 407.

23         MS. CHOY:  And Special Agent Clouser, would you

24  please display 506 to the members of the jury.

25         (Government Exhibit 407 marked and admitted.)

Rychlik - Direct

1  BY MS. CHOY:

2  Q    Mr. Rychlik, are the four firearms that you just viewed

3  the four guns that Scott Jenkins gave you on January 30th, 2023

4  as part of the effort to cover up the cash bribes?

5  A    Yes.

6           MS. CHOY:  Nothing further.

7           THE COURT:  Ladies and gentlemen, why don't we take

8  about ten minutes.  We're going to start Mr. Rychlik's

9  cross-examination, but why don't we take ten minutes, and we'll

10 come back and roughly break about an hour into your

11 cross-examination, and then we'll break for lunch about 1:00 or

12 shortly thereafter.  Again, please do not discuss your

13 testimony at all or begin to formulate any decisions.

14           Stand in recess for ten minutes.

15           (Recess.)

16 (*Jury out, 12:03 p.m.*)

17           THE COURT:  So we'll come back around 12:10.  Again,

18 Mr. Rychlik, I'll remind you of the instruction not to have any

19 discussion at all about your testimony with anybody, as long as

20 you're still testifying.

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Anything we need to address before we

23 come back in ten minutes, counsel?

24           MS. CHOY:  No, Your Honor.

25           MR. ANDONIAN:  No, Your Honor.

Rychlik - Cross

1           THE COURT:  All right.  Thank you very much.  We'll

2    stand in recess.

3           (Recess.)

4           THE COURT:  You all please have a seat.  We're back

5    on the record in the matter of *United States v. Jenkins*.

6           Are we ready for the jury, counsel?

7           MS. CHOY:  Yes, Your Honor.

8           MR. ANDONIAN:  Yes, Your Honor.

9           THE COURT:  All right.  Very well.  Let's go ahead

10   and bring the jury in.

11   **(***Jury in, 12:12 p.m.***)**

12          THE COURT:  All right.  Ladies and gentlemen, please

13   have a seat.  Thank you very much for being here.

14          We're ready for Mr. Rychlik's cross-examination.

15          Mr. Andonian, please proceed.

16          COURT SECURITY OFFICER:  One more coming, Judge --

17   one more.

18          THE COURT:  Oh, I'm sorry.  I didn't count too well.

19          All right.  The jury is present and seated now.

20   Thank you very much.

21          Go ahead, Mr. Andonian.

22          MR. ANDONIAN:  Thank you, Your Honor.

23                        CROSS-EXAMINATION

24    BY MR. ANDONIAN:

25   Q    Mr. Rychlik, as you sit here today, you talked about on

Rychlik - Cross

1  direct some of the health problems that you've had over the

2  past handful of months.  None of those health problems are in

3  any way interfering with your ability to recollect information

4  that you've been testifying about, right?

5  A    No, sir.

6  Q    And you've got a clear memory of all the things that

7  you've said?

8  A    Yeah, you know, some of them were years ago.  I can't give

9  you a specific date two years ago, but yes, I remember

10 everything.

11 Q    You talked on direct about a conversation that occurred

12 between Rick Rahim and Scott Jenkins inside of Scott Jenkins's

13 pickup truck.

14      Do you remember that?

15 A    I do.

16 Q    Okay.  And you said you were in the pickup truck, right?

17 A    I was.

18 Q    You remember being inside the vehicle?

19 A    I do.

20 Q    You remember sitting on the seat?

21 A    I remember being in the back seat.

22 Q    You remember being in the back seat.  Do you remember what

23 it looked like?

24 A    I do.

25 Q    Do you remember seeing Mr. Rahim and Mr. Jenkins speaking?

Rychlik - Cross

1  A    I do.

2  Q    The fact is, that's not true, is it, Mr. Rychlik?

3  A    Of course it's true.

4  Q    You weren't actually in the truck while Mr. Rahim and

5  Mr. Jenkins were speaking, right?

6  A    That's not correct.

7  Q    Would it surprise you if you heard that Mr. Rahim had a

8  different memory than you do?

9  A    Not really.

10          MS. CHOY:  Objection.

11          THE COURT:  Overruled.

12 BY MR. ANDONIAN:

13 Q    You talked about -- just sticking on Mr. Rahim, Mr. Rahim

14 had at some point civilian credentials as a helicopter pilot

15 from some other agency; is that right?

16 A    Yes, sir.

17 Q    Mr. Rahim actually owned a helicopter?

18 A    At one point he did.  Two.

19 Q    Two helicopters?

20 A    Yes.

21 Q    And when we say at one point, at the time that Mr. Rahim

22 was becoming an auxiliary deputy sheriff with the Culpeper

23 County sheriff's office, he owned those helicopters?

24 A    No, he did not.

25 Q    He knew how to fly helicopters?

Rychlik - Cross

1   A    Yes, he did.

2   Q    We've seen a lot of text message exchanges between you and

3   Mr. Jenkins as exhibits during your direct testimony.  Do you

4   recall all of those?

5   A    I recall what I saw today.

6   Q    That's what I'm asking.

7   A    Yes, sir.

8   Q    And those text messages, there would sometimes be gaps of

9   time in between, you know, texts from one of you and responses

10  from the other, right?

11  A    Yes, sir.

12  Q    And in those gaps of time, you and Mr. Jenkins would also

13  have telephone conversations, correct?

14  A    From time to time, yes, sir.

15  Q    We've talked -- or you talked about the process of

16  bringing individuals on board to be potential auxiliary

17  deputies with the Culpeper County sheriff's office.  And I just

18  want to ask a few questions about that.

19       You were the one that made outreach to individuals that

20  you thought would be good candidates, correct?

21  A    Yes, sir.

22  Q    And the reason for that is because, apart from your law

23  enforcement experience, you're a businessman, right?

24  A    Yes.

25  Q    Or you were, right?

Rychlik - Cross

1   A    Yes.

2   Q    And you knew people in the business community?

3   A    Yes.

4   Q    And you knew people in the business community who had

5   money?

6   A    Yes.

7   Q    And you knew people in the business community who had

8   money who wanted to support political candidates?

9   A    Yes.

10  Q    You identified the individuals that you then brought to

11  Mr. Jenkins's attention, correct?

12  A    Yes.

13  Q    And then, as you described, you would send a copy of their

14  driver's license primarily to Pete Siebel, correct?

15  A    Bernie at first, then Pete when he took over, yes.

16  Q    Okay.  And Bernie Feaganes, that's who you're referring

17  to?

18  A    Yes, sir.

19  Q    And he was another member of the Culpeper County sheriff's

20  office?

21  A    Yes.

22  Q    Okay.  And I think you said it was all but one exception

23  with an individual named Mike, you would follow that process of

24  sending driver's license pictures to Pete or Bernie?

25  A    From time to time when that didn't progress, I would send

Rychlik - Cross

1  it to the sheriff to get him to move it, but yes, what you're

2  saying is correct.

3  Q    Now, you know that the sheriff of Culpeper County is an

4  elected position?

5  A    Of course.

6  Q    And you know that somebody running for sheriff like

7  Mr. Jenkins is a politician when it comes down to it, right?

8  A    Yes, sir.

9  Q    And you know politicians have political opponents?

10 A    I do.

11 Q    And you know that politicians have political enemies,

12 even?

13 A    Absolutely.

14 Q    And Mr. Jenkins was certainly no exception to that rule,

15 right?

16 A    Right.

17 Q    And you know that political opponents have the ability to

18 access publicly filed campaign records, right?

19 A    Could you say that one more time?

20 Q    Sure.  Campaigns -- you talked about this on direct -- you

21 know file documents that are publicly available about the

22 campaign, right?

23 A    You mean the campaign donation report?

24 Q    Correct.

25 A    Quarterly report?  Yes.

Rychlik - Cross

1   Q    Right.  More specifically.  And you know that political

2   opponents have equal access to that information as anybody else

3   in the public does, right?

4   A    I would assume so.

5   Q    It's fair to say that Scott Jenkins was paranoid, right?

6   A    Yes.

7   Q    You talked about some of the measures that he took, for

8   example, putting cell phones somewhere else when conversations

9   were happening, right?

10  A    Yes.

11  Q    He didn't like to have a lot of information in text

12  messages, right?

13  A    Yes.

14  Q    And you know the reason for that is because Mr. Jenkins

15  was distrustful of what people might do with information

16  against him, correct?

17  A    I would assume so.

18  Q    You would agree that you had a position of trust with

19  Scott Jenkins back in the -- let's say the 2019 to end of 2022

20  period?

21  A    Yes.

22  Q    You were -- you were a confidant of his?

23  A    Yes.

24  Q    You would certainly consider yourself a friend of his

25  during that time?

Rychlik - Cross

1  A    Yes.

2  Q    You were a member of the Culpeper County sheriff's office

3  in fact, right?

4  A    Yes.

5  Q    You were a lieutenant?

6  A    Yes.

7  Q    And that's why actually when we saw a picture of your

8  badge earlier, your badge had the full circle around the

9  five-pointed star, correct?

10 A    Yes.

11 Q    And that was unlike other -- the auxiliary deputies that

12 just had the five-pointed star with no circle around it?

13 A    Most of them, yes.

14 Q    And in your role as a lieutenant of the Culpeper County

15 sheriff's office, you actually oversaw the auxiliary deputy

16 program, correct?

17 A    Not really.

18 Q    Not really?  Well, you were the lieutenant that was over

19 the auxiliary deputy program?

20 A    The sheriff was over the auxiliary deputy program.

21 Q    The sheriff ultimately had final say over everything that

22 happened in that office, right?

23 A    Yes, he did.

24 Q    As is the prerogative of anybody who occupies that seat,

25 right?

Rychlik - Cross

1   A     Right.

2   Q     The sheriff, though, had people underneath him doing

3   different jobs within the sheriff's office, fair to say?

4   A     Yes.

5   Q     There were certain individuals that oversaw the jail, for

6   example, right?

7   A     Yes.

8   Q     There was an individual who saw -- who oversaw the

9   criminal investigations division, for example, right?

10  A     Yes.

11  Q     Your particular job was you were overseeing the auxiliary

12  deputies?

13  A     Not really.  I was overseeing a small group of people who

14  were interested in search and rescue.  And most of my job was

15  to try to get a search and rescue unit going.  So I don't -- I

16  mean, there was 40 people I'd never met or never knew in the

17  auxiliary program.  So it would be hard to be over them if you

18  don't know them or you've never touched them.  But the intent

19  was to eventually build a search and rescue unit.

20  Q     Okay.  And the search and rescue unit would be comprised

21  entirely or almost entirely of auxiliary deputies?

22  A     No.  Both.

23  Q     Both.  Okay.  But it would include auxiliary deputies?

24  A     Sure.

25  Q     And the reason you had that particular role is you've

Rychlik - Cross

1  talked a little bit about VASARS, and that was your search and

2  rescue company at the time, right?

3  A    It was our search and rescue nonprofit that had an MOU

4  with the sheriff's office and the Coast Guard and Project

5  Lifesaver.

6  Q    Okay.  I'm sorry.  I didn't mean to cut you off.

7  A    Yeah.

8  Q    And that is -- my next question was going to be, VASARS

9  worked directly with the Culpeper County sheriff's office?

10 A    Yes.

11 Q    And through -- and just for the benefit of the jury,

12 through a memorandum of understanding; is that correct?

13 A    It was either that or a general order he signed.  I can't

14 remember.  One of the two.

15 Q    But there was a formal affiliation between VASARS and the

16 Culpeper County sheriff's office?

17 A    Absolutely.

18 Q    As a political candidate running for office, Scott Jenkins

19 needed money to run his campaign?

20 A    Yes.

21 Q    And that's true of any politician, right?

22 A    Yes.

23 Q    And he eventually tapped you to help him get money to run

24 his campaign, correct?

25 A    Absolutely.

Rychlik - Cross

1  Q    A big part of that was because you were a friend of his,

2  right?

3  A    Not initially, but we became friendlier as time went on,

4  but I believe he knew of my business affiliations and people I

5  hung with that had the financial support -- but yes, to your

6  question.

7  Q    Okay.  And then of course as you said, another part of the

8  reason was you are a businessman and you had ties to the

9  business community?

10  A    Sure.

11  Q    And you ultimately did, in fact, identify individuals that

12  would contribute to Mr. Jenkins's campaign with money

13  donations, right?

14  A    Yes.

15  Q    As somebody who was -- just using the way you described

16  it -- that was eventually going to be overseeing or helping

17  develop a search and rescue squad within the sheriff's office

18  that included auxiliary deputies, you were -- you were looking

19  for individuals that might be good candidates to be auxiliary

20  deputies, right?

21  A    No.

22  Q    So you had no interest whatsoever in finding people who

23  would be good candidates to be part of this search and rescue

24  squad that you described?

25  A    No.  People I brought in were people I knew that had

Rychlik - Cross

1   money.

2   Q    I'm asking a different question.

3   A    Okay.

4   Q    You in your capacity as somebody that was overseeing or

5   would be overseeing a search and rescue operation, you were

6   also interested in individuals who might be good candidates to

7   staff that squad, right?

8   A    Well, it never went anywhere.  It was just talk.

9   Q    Sure.  It never -- but it was something that was at least

10  discussed, right?

11  A    Yes.  Once or twice.

12  Q    And in your capacity as the person that would be

13  overseeing that, you were keeping an eye out for individuals

14  that might make good candidates to be part of that squad one

15  day if it got off the ground?

16  A    We never got to that level, but I'm sure it would have.

17  Q    And that's, in fact, what you were doing when you brought

18  individuals to Mr. Jenkins's attention.  You were bringing

19  people who were both wanting to donate to his campaign and who

20  you thought would be good candidates to be auxiliary deputies

21  in the office?

22  A    I don't quite understand the question.  What do you mean

23  by auxiliary deputies in the office?

24  Q    The people that we've discussed that you identified as

25  being people who could donate to Mr. Jenkins's campaign, they

Rychlik - Cross

1  were also individuals that you thought would be good auxiliary

2  deputies in the Culpeper County sheriff's office?

3  A    The people that I brought in, sir, were people that were

4  for campaign contributions that wanted the credentials and

5  didn't want to do anything in the sheriff's office.

6  Q    Oh, I see.  So there was nothing about them at all that in

7  your mind would make them good deputy -- auxiliary deputy

8  candidates?

9  A    That wasn't what at the time -- my understanding was the

10  sheriff wasn't looking for that.  The only people that I

11  brought in that were good for search and rescue were some of

12  the members of Virginia Airborne Search and Rescue who were

13  sworn without giving a donation just to help fly the missions

14  when somebody was lost.  But the people I brought in were just

15  money guys that donated for credentials.

16  Q    You brought in individuals from Virginia Airborne Search

17  and Rescue to be sworn in, right?

18  A    Two or three.

19  Q    And they were in fact sworn in?

20  A    Yes.

21  Q    Mr. Rychlik, you talked a little bit about this with

22  Ms. Choy on direct:  You pled guilty to a felony in the Eastern

23  District of Virginia, right?

24  A    I did.

25  Q    That's federal court in another district in this

Rychlik - Cross

1   Commonwealth?

2   A    Yes.

3   Q    And that was failing to pay over taxes, right?

4   A    Correct.

5   Q    And specifically, it was in connection with one of your

6   businesses, and you talked about a lot of them at the

7   beginning, but it was Security Associates International, right?

8   A    Correct.

9   Q    SAI for abbreviation?

10  A    Yes, sir.

11  Q    And you entered into a plea agreement in order to plead

12  guilty to that offense, right?

13  A    Yes, sir.

14  Q    And the plea agreement was with the United States of

15  America, right?

16  A    Yes, sir.

17  Q    And that's the same United States of America that these

18  attorneys here represent, correct?

19  A    Yes, sir.

20  Q    You got some benefits in exchange for entering a guilty

21  plea to the one count of failing to pay over taxes, right?

22  A    I got the plea agreement.

23  Q    Well, let's talk about it.  You got the plea agreement.

24  And as part of the plea agreement, you were given immunity from

25  any further prosecution in the Eastern District of Virginia,

Rychlik - Cross

1  correct, for that particular case?

2  A    I believe -- yes, sir.

3  Q    And you understand that that means that other than that

4  single count of failing to pay over taxes, you wouldn't be

5  prosecuted for any other tax-related offenses that arose from

6  the case that was pending in the Eastern District of Virginia?

7  A    Yes, sir.

8  Q    And that under that plea agreement, you were only required

9  to enter a guilty plea to one count of failing to pay over

10  taxes?

11  A    Yes, sir.

12  Q    But in fact, you had failed to pay over taxes far more

13  than just one time, right?

14  A    Yes, sir.

15  Q    And just taking AHI, which is the company that you -- that

16  the charge you pled guilty to arose from, you --

17  A    Do you mean SAI?

18  Q    I'm sorry, SAI.  I said -- right.

19       You failed to pay taxes for a total of 44 quarters, right?

20  A    Yes, sir.

21  Q    That's -- for a total of roughly $2.8 million?

22  A    Yes, sir.

23  Q    And those are 44 instances in which you could have been

24  prosecuted, correct?

25            MS. CHOY:  Objection, Your Honor.

Rychlik - Cross

1          THE COURT:  Well, sustained.  Strike the question.

2    BY MR. ANDONIAN:

3    Q    But you failed to pay over taxes for 44 quarters with

4    respect to SAI?

5    A    Yes, sir.

6    Q    For another one of your companies, AHI, you failed to pay

7    taxes for 25 quarters, right?

8    A    I believe so, yes, sir.

9    Q    So if you add the quarters that you didn't pay taxes for

10   for AHI and SAI, so 25 and 44 respectively, you get 69 quarters

11   in total for just those two companies that you failed to pay

12   over taxes?

13   A    Yes, sir.

14   Q    And you pled guilty to just one count of failing to pay

15   over taxes for SAI, right?

16   A    Yes, sir.

17   Q    Now, according to your testimony today, you were involved

18   in what you have described for us over the last few hours as a

19   bribery scheme involving Mr. Jenkins, right?

20   A    Yes, sir.

21   Q    And you have stated that you took part in this bribery

22   scheme with Mr. Jenkins through your own conduct, correct?

23   A    Yes, sir.

24   Q    You're not being prosecuted for anything in connection

25   with that alleged bribery scheme, correct?

Rychlik - Cross

1   A    Correct.

2   Q    You're not facing any counts of conspiracy in connection

3   with that?

4   A    No, sir.

5   Q    You're not facing any counts of bribery, right?

6   A    No, sir.

7   Q    You're not facing any counts of honest services mail and

8   wire fraud?

9   A    No, sir.

10  Q    And you know that each and every one of those charges

11  carries with it significant consequences, right?

12  A    Yes, sir.

13  Q    Significant fines?

14  A    Yes, sir.

15  Q    Significant prison time?

16  A    Yes, sir.

17  Q    And you're not facing any of that in connection with what

18  you have spent the morning describing for us?

19  A    Yes, sir.

20  Q    Now, you also entered into what was titled the plea

21  agreement addendum with the Eastern District of Virginia,

22  right?

23  A    Yes, sir.

24  Q    And in that document, it sets out some additional benefits

25  that you're receiving by pleading guilty in that case, correct?

Rychlik - Cross

1   A    Yes, sir.

2   Q    And one of them is that the United States in that case in

3   the Eastern District of Virginia reserves its right to seek any

4   departure from the applicable sentencing guidelines pursuant to

5   what's called Section 5K1.1 of the sentencing guidelines,

6   right?

7   A    Yes, sir.

8   Q    And you know that just in plain English what that means is

9   that the government in the Eastern District of Virginia is

10  reserving the right to ask the judge to give you a more lenient

11  sentence, right?

12  A    Yes, sir.

13  Q    One of the other benefits in the plea agreement addendum

14  is that the government is reserving any rights it had under

15  Federal Rule of Criminal Procedures 35(b), right?

16  A    Yes, sir.

17  Q    And you know that that rule states that the government can

18  make a motion to the court to reduce the sentence when someone

19  provides substantial assistance in investigating or prosecuting

20  another person, right?

21  A    Yes, sir.

22  Q    And again, in plain English, what that means is that the

23  United States in the Eastern District of Virginia is reserving

24  the right to ask for a reduced sentence if you provide

25  substantial assistance in prosecuting somebody, right?

Rychlik - Cross

1   A    Yes, sir.

2   Q    You're here today in this courtroom testifying as a

3   witness for the government, correct?

4   A    Yes.

5   Q    For the United States of America, right?

6   A    Yes.

7   Q    And you're here testifying as a witness for the government

8   in a case against Scott Jenkins, correct?

9   A    Yes.

10  Q    You're providing substantial assistance to the United

11  States by being here today, aren't you?

12  A    I would assume so.

13  Q    You understand that the benefit of this 5K1.1 or rule

14  35(b) benefit that you received in the plea agreement addendum

15  is that the government in your tax case in the Eastern District

16  of Virginia could get up and ask the court to sentence you to

17  some lesser amount of time than you might be facing, right?

18  A    Yes.

19  Q    And you understand that you're looking at a maximum

20  penalty of five years in prison for the taxes -- failing to pay

21  taxes, right?

22  A    Yes, which I take full responsibility for.

23  Q    Yeah, you definitely took full responsibility for it.  And

24  what you're hoping is that when you took full responsibility

25  for it under that deal, that the government at the time of

Rychlik - Cross

1  sentencing was going to ask that you not get the full five

2  years that you're exposed to, right?

3  A    I don't know that.

4  Q    Well, you certainly hope that's the case, right?

5  A    Right.

6  Q    You don't want to go to prison, do you?

7  A    Nobody does.

8  Q    You have a family, right?

9  A    Yes, I do.

10 Q    You have kids?

11 A    Yes, I do.

12 Q    You're married, you have a wife?

13 A    Yes, I do.

14 Q    You don't want to be away from them, right?

15 A    No.

16 Q    You don't want to be pulled out of your house, right?

17 A    No one does.

18 Q    Right.  So you're hoping that the government at the time

19 of sentencing -- because you haven't been sentenced yet in that

20 case, right?

21 A    Correct.

22 Q    That sentencing is happening after today where you've been

23 providing testimony against Scott Jenkins, right?

24 A    Correct.

25 Q    And you're hoping at that time the government in the

Rychlik - Cross

1  Eastern District of Virginia will ask the judge to give you

2  leniency?

3  A    Sure.

4  Q    And you know that all you need to do in order to get the

5  government to ask the judge for a lenient sentence for you is

6  to cooperate with the government, right?

7  A    Yes.

8  Q    To provide substantial assistance in the prosecution of

9  another person, right?

10 A    Yes.

11 Q    And you know that the determination of whether or not

12 you've fully cooperated or whether or not you've provided

13 substantial assistance, that discretion lies solely within the

14 government in the Eastern District of Virginia, right?

15       MS. CHOY:  Objection, Your Honor.  That misstates the

16 law.

17       THE COURT:  Sustained.

18       MR. ANDONIAN:  Your Honor, may we approach?

19       THE COURT:  Well, the court's involved in making

20 those decisions.  The government can make the motion.

21       MR. ANDONIAN:  That's what I was asking.

22       THE COURT:  So rephrase the question.

23       MR. ANDONIAN:  Sure.  I'll rephrase.

24 BY MS. ANDONIAN:

25 Q    In making a decision to make a motion for a reduced

Rychlik - Cross

1   sentence, or making a recommendation for a reduced sentence

2   under the guidelines, you know that it's the United States that

3   has the discretion in making one of those requests, right?

4   A    Yes.

5   Q    And you know that the United States might do that, might

6   make a request for a reduced sentence, or might make a request

7   for a reduced guidelines sentence if you cooperate with the

8   government, right?

9   A    Yes.

10  Q    And they might make the recommendation if you provide

11  substantial assistance in prosecuting another person, right?

12  A    Yes.

13  Q    And you know that in deciding whether or not to make that

14  recommendation, it is the United States that makes the

15  determination about whether or not you have cooperated, right?

16  A    Yes.

17  Q    And it's the United States that determines whether or not

18  you have provided substantial assistance?

19            MS. CHOY:  Same objection, Your Honor.

20            THE COURT:  Sustained.

21  BY MR. ANDONIAN:

22  Q    So your goal as you're sitting here in this courtroom

23  testifying is to keep the government happy, right?

24  A    No.  My goal is to sit here and tell the truth.

25  Q    Oh, I see.  Your goal is to sit there and tell the truth,

147

Rychlik - Cross

1  regardless of what that is, and regardless of how it impacts

2  the government's recommendation for your sentence in the

3  Eastern District of Virginia; is that what you're telling us?

4  A    I'm confused with the question.  I'm told it doesn't

5  matter the outcome of the case for me to get my cooperation.

6  So there's no incentive for me to do anything but tell the

7  truth.

8  Q    And that's what you were told by the government, right?

9  A    Absolutely.

10 Q    That's what you were told by these prosecutors sitting in

11 the courtroom today?

12 A    And the ones in EDVA.  Tell the truth.

13 Q    So that's -- well, that's what you're -- the reason you're

14 saying that here is because that's what you were told by those

15 prosecutors, correct?

16 A    Yes.

17 Q    You met with the government before you testified here

18 today, correct?

19 A    Yes, sir.

20 Q    You met with them a handful of times?

21 A    Yes, sir.

22 Q    And during those meetings -- and just to make sure the

23 record is clear, when I say you met with the government, I'm

24 talking about the attorneys sitting at this table to my right?

25 A    Yes, sir.

Rychlik - Cross

1  Q    And when you had those meetings, you talked about your

2  testimony here today?

3  A    Yes, sir.

4  Q    You talked about some of the questions that you might be

5  asked?

6  A    Not really.  Mostly the -- reviewed the video and the

7  text.  But I believe on one of them there was -- there was some

8  of the questions I might get.

9  Q    Sure.  And you were even given maybe a dry run through

10  some of the questions I might ask, right?

11  A    Well, I already have with the deposition.

12  Q    That's right.  You had -- you sat for a deposition in this

13  case earlier in the year, right?

14  A    Yes, sir.

15  Q    And you met with these prosecutors before that deposition

16  as well?

17  A    Yes, sir.

18  Q    When you met with the prosecutors, they showed you -- I

19  think you just said this -- but they showed you exhibits that

20  you were going to be shown here in this courtroom?

21  A    Yes, sir.

22  Q    The exhibits that you identified throughout the course of

23  your direct testimony, right?

24  A    Yes, sir.

25  Q    So when you were asked here in court on direct examination

Rychlik - Cross

1   a number of times what you understood someone to be saying or

2   what you understood someone to mean, you had already gone over

3   all of those questions and answers with the government before

4   you got here, right?

5   A    No, not really.  Most of those were my interpretations.

6   Q    Which you shared with the government?

7   A    When asked, yes.  Some I did.  Some I didn't.

8   Q    Because you wanted to make sure that the government was

9   happy with the answers that you were giving, right?

10  A    Not necessarily.

11  Q    I want to take you back to 2019.  So you've talked about

12  you started formally cooperating with the government in this

13  case sometime in 2022; is that right?

14  A    Yes.

15  Q    But back in 2019, you weren't cooperating with the

16  government in this case, right?

17  A    No.

18  Q    But you owned the businesses that you talked about,

19  including SAI and AHI -- you owned those businesses back in

20  2019?

21  A    Yes.

22  Q    And at that time in 2019, you were actively failing to pay

23  taxes that you owed, correct?

24  A    Yes.  Some.

25  Q    And you knew as you were interacting with Mr. Jenkins and

Rychlik - Redirect

1  others that you were engaged in illegal activity with respect

2  to not paying taxes for some of your companies, right?

3  A    Yes.

4  Q    At that time in 2019?

5  A    Yes.

6         MR. ANDONIAN:  If I could just have a brief

7  indulgence, Your Honor?

8         THE COURT:  Yes, sir.

9         MR. ANDONIAN:  Thank you, Your Honor.  I have no

10 further questions.

11        THE COURT:  Any redirect?

12        MS. CHOY:  May I consult briefly with my co-counsel?

13        THE COURT:  Yes, ma'am.

14 (Pause.)

15        MS. CHOY:  Just a little bit, Your Honor.

16        THE COURT:  Yes, ma'am.

17                   REDIRECT EXAMINATION

18  BY MS. CHOY:

19 Q    Hello again, Mr. Rychlik.

20 A    Good afternoon.

21 Q    So on cross-examination, Mr. Andonian asked you some

22 questions about your role in recruiting individuals to come in

23 and become auxiliaries; do you remember that?

24 A    I do.

25 Q    And he asked you whether it was you who went out and found

Rychlik - Redirect

1  those individuals?

2  A    The ones that I brought in, yes.

3  Q    Who told you to go out and recruit people?

4  A    Scott Jenkins.

5  Q    Did Scott Jenkins know you were doing that?

6  A    Yes.  Absolutely.

7  Q    And did you keep him informed of your activities?

8  A    Yes, I did.

9  Q    And did he approve of those activities?

10  A    Yes, he did.

11  Q    And you testified on cross-examination that you were

12  recruiting people who might be political donors, something

13  along those lines; do you recall that?

14  A    Yes.

15  Q    So these people you were bringing in to pay money to Scott

16  Jenkins and get badges, did you ever have conversations with

17  them where they said they wanted to give the money because they

18  supported Scott Jenkins politically?

19  A    No.

20  Q    What was your understanding of why they were giving that

21  money?

22  A    So they could get law enforcement credentials.

23  Q    And there was some discussion of the auxiliary program and

24  VASARS and your role in that on cross.  Do you remember that

25  testimony?

Rychlik - Redirect

1   A      I do.

2   Q      So let me just try to clear that up a little bit.

3   A      Okay.

4   Q      So you were part of an organization called VASARS; is that

5   right?

6   A      Yes.

7   Q      And did VASARS do work with sheriff's offices?

8   A      Yes, it did.

9   Q      And as part of that work, did some of the members of

10  VASARS become sworn in Culpeper?

11  A      Yes, they did.

12  Q      And did those individuals pay to become sworn?

13  A      No, they did not.

14  Q      And did some of them do -- and did you do legitimate law

15  enforcement help for that sheriff's office?

16  A      Yes.  Many -- many helicopter flights, yes.

17  Q      And was there also a different category of people that you

18  were bringing in to be sworn who you're referring to as money

19  guys?

20  A      Yes.

21  Q      And is that separate from VASARS and any possible search

22  and rescue operations?

23  A      100 percent.

24  Q      And what did the -- what did the money guys do?

25  A      They gave money to get credentials.

Rychlik - Redirect

1  Q    And did they participate in search and rescue activities?

2  A    With the exception of one, no.

3  Q    Who is the one?

4  A    Not really search and rescue.  It was uniform and details

5  later on, was Rick Rahim.

6  Q    So other than Rick Rahim, did any of the money guys render

7  any services to the sheriff's office?

8  A    No.

9  Q    So that was a different program from the search and rescue

10 idea?

11 A    Yes.

12 Q    Mr. Andonian asked you on cross about Mr. Jenkins's

13 paranoia; do you remember that?

14 A    I do.

15 Q    And he suggested to you on cross that the reason Scott

16 Jenkins was paranoid was because he had political opponents; do

17 you recall that?

18 A    I do.

19 Q    So based on your interactions with Scott Jenkins and your

20 history with him and your understanding of everything that was

21 going on, do you believe Scott Jenkins had any other reasons to

22 be paranoid?

23 A    Many.

24 Q    And what were those?

25 A    That he was taking cash bribes for credentials, doing

Rychlik - Redirect

1  people favors.  I feel that Rick Rahim -- helping Rick get his

2  firearms rights restored and the strings he had to pull to get

3  it done, I think he was really worried about.  I think he was

4  worried about the press finding out things, and his opponents.

5  I think some of his other concerns were also legitimate.  So I

6  think it was a lot of things.

7  Q    On cross-examination, Mr. Andonian asked you questions

8  about your meetings with myself and other prosecutors and

9  agents from the government.  Do you recall that?

10  A    I do.

11  Q    And you met with us to prepare for your testimony.  We

12  talked about that on direct, right?

13  A    Yes.

14  Q    At any time when you were interacting with anyone from the

15  government's side, have I or anyone else ever told you what to

16  say?

17  A    No.  You just told me to tell the truth and answer the

18  questions honestly no matter what they were.

19  Q    And do you understand that any cooperation credit that you

20  may or may not receive from the Eastern District of Virginia is

21  not dependent on the outcome of this case, meaning whether or

22  not the defendant is held guilty -- found guilty?

23  A    Yes, I do.

24  Q    In every meeting that we had to prepare for your

25  testimony, what did I tell you was your only job here in the

Rychlik - Redirect

1  courtroom today?

2  A    Tell the truth.

3          MS. CHOY:  Nothing further.

4          THE COURT:  All right.  And may this witness be

5  excused?

6          MS. CHOY:  Yes, Your Honor.

7          THE COURT:  All right.  Thank you.

8          Mr. Rychlik, thank you very much for being here.

9  You're free to go.  Please do not discuss your testimony with

10  anyone as long as the case is pending.

11          THE WITNESS:  Thank you, Your Honor.

12          THE COURT:  Thank you very much.

13          Ladies and gentlemen, why don't we break for lunch at

14  this time, take a little bit longer than normal break.  We'll

15  plan on coming back at 2.  If for some reason my phone call has

16  extended past that, then I will let you -- you can go ahead,

17  Mr. Rychlik -- then I'll send instructions in that regard, but

18  I think I should well be done by 2:00.

19          Again, please do not discuss the case.  Do not begin

20  to make any decisions at all or discuss -- have anyone talk to

21  you about the case.  So with that, 2:00.

22  **(**Jury out, 12:51 p.m.**)**

23          THE COURT:  Ladies and gentlemen, please have a seat

24  for just a second.  So we'll break until 2:00.

25  Ms. Curry-Ledbetter has sent the verdict form.  Again, any

Rychlik - Redirect

1    changes, send those back in red line.  And then if the

2    government wraps up tomorrow afternoon, depending upon what the

3    defense may or may not do, we may stay a little bit late

4    tomorrow afternoon, and see if we can knock out most of our

5    instructions.  We'll have one final go once all the evidence is

6    in, just to make sure we know what's in, what's out, and the

7    order that they're going to be in.  They're close to the same

8    order, though.  I think that there are some instructions that I

9    might move around a little bit.

10            Ms. Choy, when do you expect the undercovers to

11   testify?  Will that be tomorrow?

12            MS. CHOY:  Actually, I was just going to raise that

13   with Your Honor.  The first undercover is our next witness.

14            THE COURT:  Okay.  All right.  So -- and we're going

15   to have to let the folks downstairs know that for the next

16   witness -- and will we use the entire afternoon with the

17   undercovers?

18            MS. CHOY:  No.  We have three more witnesses.

19            THE COURT:  Okay.  So with the next witness, other

20   than counsel, no one can bring their electronics into the

21   courtroom, including computers, cell phones, tablets, or any

22   other device that has a recording or photograph potential on

23   it.

24            Does that cover it all, Ms. Choy?

25            MS. CHOY:  Yes.  Thank you, Your Honor.

Rychlik - Redirect

1          THE COURT:  So we'll need to let the folks downstairs

2    know.  Counsel can certainly bring in their cell phones,

3    tablets, iPads, and so forth, but no other -- we've allowed the

4    press to bring -- we're going to have to tell them to take

5    those back to their car.

6          So with that, we'll stand in recess until 2:00.

7    Thank you.

8          (Recess.)

9          THE COURT:  We're back on the record in the matter of

10   *United States v. Jenkins*.  Let the record reflect the

11   government is present by its counsel.  The defendant likewise

12   is present by counsel.

13          There's nobody here.  I was going to make an

14   announcement.  We do have a couple of people.  If there is

15   anyone in the courtroom that has any electronics, whether it be

16   computers, cell phones, iPads, they need to be taken outside

17   the courtroom at this point.  And if we could just post

18   somebody at the door during the testimony of the next witness

19   to make sure if anyone comes in that they don't have any

20   electronics, that would be good.

21          All right.  Anything we need to address from the

22   government's standpoint?

23          MS. CHOY:  No, Your Honor.

24          THE COURT:  How about from the defendant's

25   standpoint?

McKee - Direct

1              MR. ANDONIAN:  No, Your Honor.

2              THE COURT:  All right.  Very well.  When we get a CSO

3    back we'll get the jury back.

4              All right.  I'm not sure that anyone is posted out

5    there yet, but we just had a couple of people come into the

6    courtroom.  If anyone has any electronics at this point, they

7    need to be taken out of the courtroom, whether they be cell

8    phones, iPads, computers, or anything that has the ability

9    either to record electronically or to take photographs.

10   (*Jury in, 2:03 p.m.*)

11             THE COURT:  You all please have a seat.

12             Let the record reflect that the jury is present and

13   seated.

14             All right.  Ms. Smith, please call your next witness,

15   please.

16             MS. SMITH:  Thank you, Your Honor.  The United States

17   calls Jerry McKee.

18             THE COURT:  All right.  Jerry McKee.

19             Sir, if you can come on up and be sworn, I'd be much

20   obliged.

21             JERRY MCKEE, CALLED BY THE GOVERNMENT, SWORN

22             THE COURT:  Have a seat over there in the witness

23   box.  Slide yourself up to the microphone and speak directly

24   into the microphone, sir.

25             Go ahead, Ms. Smith.

McKee - Direct

1          MS. SMITH:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3    BY MS. SMITH:

4    Q    Good afternoon.  Mr. McKee, were you previously employed

5    as an undercover FBI agent?

6    A    I was.

7    Q    And did the Court give you permission to testify today

8    using the pseudonym Jerry McKee?

9    A    Yes.

10   Q    Now, let's talk a little bit about your employment with

11   the FBI.  Prior to October of 2024, how were you employed?

12   A    I was employed as a special agent with the FBI.

13   Q    And if you could make sure you're speaking into that

14   microphone, just kind of scoot up or move the microphone closer

15   to you, that would be great.  Thank you.

16        How long were you employed with the FBI?

17   A    20 years.

18   Q    And what were your duties and responsibilities as a

19   special agent with the FBI?

20   A    To investigate both criminal and national security

21   investigations, and to -- as an undercover employee.

22   Q    And what types of cases did you investigate?

23   A    Both criminal and national security from every -- not

24   every violation, but most violations.

25   Q    So many different types of crimes?

McKee - Direct

1  A     Correct.

2  Q     And you mentioned you were an undercover employee?

3  A     Correct.

4  Q     What is an undercover employee?

5  A     It's an employee that's trained to be inserted into

6  different situations to gather evidence, just like we would

7  in a -- as a -- but we would do it as no affiliation with the

8  government, not using our real names, not -- no affiliation

9  with the government.

10 Q     So do you assume a false identity?

11 A     We do.

12 Q     And you said you're inserted into situations.  Can you

13 tell us a little bit more about what type of situations you're

14 inserted into?

15 A     It depended on what kind of case, but a criminal case, we

16 could be introduced by someone.  In a national security case or

17 any other type we could be introduced by someone, or we could

18 cold go in as a business person and insert ourself to --

19 introduce ourself to different parts of the investigation.

20 Q     Many times are you sent in to interact with criminal

21 targets of an investigation?

22 A     Yes, we are.

23 Q     Is there specialized training to be an undercover

24 employee?

25 A     There is.

161

McKee - Direct

1  Q    Can you tell the jury a little bit about what type of
2  training is involved?
3  A    It's multiple steps.  So, one, you have to be picked, and
4  it has to be multiple steps to get to even know if you qualify.
5  And then you're actually -- there's a -- once you're qualified,
6  you get into -- you take a two-week school.  And a two-week
7  school, you would come out certified if you successfully
8  passed.
9  Q    Now, along with that initial two-week school, do you have
10 ongoing training?
11 A    Yes.  There's certain things we have to do or need to do.
12 Q    And how many investigations have you been involved in as
13 an undercover employee?
14 A    In some way, shape, or form, 20 plus.
15 Q    Were you utilized as an undercover employee in the Scott
16 Jenkins investigation?
17 A    I was.
18 Q    And was your pseudonym for your involvement in this case
19 Jerry McKee?
20 A    It was.
21 Q    What was your assignment as it relates to the Jenkins
22 investigation?
23 A    My assignment was to be introduced and to be sworn in as
24 an auxiliary deputy.
25 Q    And in exchange for being sworn in as an auxiliary deputy,

McKee - Direct

1  was there something that you also were going to do?

2  A    I was going to pay Mr. Jenkins $5,000.

3  Q    Now, when you are working in an undercover capacity, do

4  you typically have a backstory?

5  A    Yes.  We develop a backstory of -- so we have a

6  understanding and have a believable story, and one that can

7  also be -- if it's searched, will stand scrutiny.

8  Q    Can you tell the jury a little bit more about what a

9  backstory entails?

10  A    A backstory can go back, depending on the investigation,

11  it can go back for 10, 20 years of the residence you've stayed

12  at, jobs you've had, different things throughout your life, to

13  where if someone searches in a system, either open source, a

14  law enforcement system, you would -- it would appear as a real

15  person.

16  Q    And have you assumed multiple identities with multiple

17  back -- with different backstories as an undercover employee?

18  A    I have.

19  Q    And what was your backstory as it related to the Jenkins

20  investigation?

21  A    I was a businessman that owned a logistics company, and I

22  was -- resided up in northern Virginia, and I traveled quite a

23  bit with the company.

24  Q    And now you mentioned if you were searched in a database

25  it would come back as a real individual; is that right?

McKee - Direct

1    A    Correct.

2    Q    Did you have a driver's license under the assumed name,

3    Jerry McKee?

4    A    I did.

5    Q    And was it sent to someone at the Culpeper County

6    sheriff's office?

7    A    It was.

8    Q    Now, if a criminal history was run in that assumed name of

9    Jerry -- sorry -- Jerry McKee, what would the results be?

10   A    The results for that would be it would show a real person

11   but no criminal history.

12   Q    Let's turn now to the date that you traveled down to

13   Culpeper County to be sworn in.  Did you travel to Culpeper,

14   Virginia on November 14th of 2022?

15   A    I did.

16   Q    And did you obtain a specific type of vehicle to fit in

17   with your alias or backstory?

18   A    I obtained a large truck that would fit in with a owner of

19   a logistics company.

20   Q    And prior to meeting with Scott Jenkins in Culpeper, were

21   you briefed with the agents from this case?

22   A    I was.

23   Q    And what did that briefing entail?

24   A    It was entailed -- it went about that I -- my purpose was

25   to go into -- be introduced to Mr. Jenkins to be sworn in as a

McKee - Direct

1  deputy and to provide him with currency for doing so.

2  Q    And who was going to make that introduction?

3  A    Kevin.

4  Q    Is that Kevin Rychlik?

5  A    Yes.  Sorry.

6  Q    Beyond that, did you know anything about the case?

7  A    No.  Very little.

8  Q    And why is it important to know a little bit about the

9  case, but not the full investigation?

10 A    Well, you want to make sure that you develop the right

11 story and that you develop the right -- to where you can fit in

12 and find that commonality.

13 Q    Were you wired with a covert video recorder when you were

14 going in on November 14th of 2022?

15 A    I was.

16 Q    And what is the purpose of being wired with a covert video

17 recording?

18 A    To document any evidence, or everything that goes on

19 during that meeting.

20 Q    And where generally was that recording device located?

21 A    It was located around the chest area.

22 Q    And did it capture the entire interaction that you had

23 with Scott Jenkins?

24 A    It did.

25 Q    Now, besides the recording equipment, did you bring

McKee - Direct

1  anything else with you?

2  A    I had recording equipment and I had cash.

3  Q    And how much in cash did you have?

4  A    $5,000.

5  Q    And who provided those funds?

6  A    The FBI.

7  Q    Now, if U.S. currency is being used in an undercover

8  operation, does the FBI have certain protocols in place?

9  A    We make copies of it to make sure we document the serial

10 numbers that are given.

11 Q    I'm sorry, I didn't mean to interrupt you.  Go ahead.

12 Could you finish what you were saying?

13 A    Yes, to document the serial numbers that are being used.

14 Q    And you said you make copies of it.  What is -- what are

15 you referring to?

16 A    Copies of the bills.

17 Q    Of the cash.

18     If we could pull up Government's Exhibit 409, please.

19 We're just flipping through that.  Do you recognize

20 Government's Exhibit 409?

21 A    That would have been the currency that I used for that

22 investigation.

23 Q    Is it a true and accurate depiction of the cash you used

24 to pay the bribe in this case?

25 A    Yes, ma'am.

McKee - Direct


1        MS. SMITH:  The government would move into evidence

2   Government's 409, please.

3            THE COURT:  Any objection?

4            MR. CALEB:  No objection.

5            THE COURT:  So admitted and may be published to the

6   jury.

7            (Government Exhibit 409 marked and admitted.)

8            MS. SMITH:  And if we could just flip through each

9   page, please, Ms. Fastenau.

10  BY MS. SMITH:

11  Q    And so this is the currency that you brought with you to

12  meet with Scott Jenkins; is that right?

13  A    Yes, ma'am.

14  Q    And how did you package that money?

15  A    I packaged it in a bank envelope.

16  Q    And where did you go in Culpeper first?

17  A    I went to the sheriff's office.

18  Q    And what did you do when you went to the sheriff's office?

19  A    I met with Kevin Rychlik, and then we did a short tour,

20  did meet with Sheriff Jenkins and -- for a brief moment, and

21  then we left.

22  Q    And was Kevin Rychlik aware of your undercover status?

23  A    He was.

24  Q    He was cooperating with the government at that point?

25  A    Correct.

McKee - Direct

1  Q    And you mentioned that you were introduced to Scott

2  Jenkins.  Was this the first time you'd ever met Scott Jenkins?

3  A    It was.

4  Q    And after you had that brief encounter with him at the

5  sheriff's office, where did you go next?

6  A    We went to lunch in Culpeper.

7  Q    And what was the lunch like?

8  A    Very casual, just talking in general about a little bit of

9  everything, but it was just a very casual for two people who

10 didn't know each other type of lunch.

11 Q    And who was at that lunch?

12 A    My -- Sheriff Jenkins, Kevin Rychlik, and myself.

13 Q    Was there any sort of interview conducted by Scott Jenkins

14 about your qualifications to be an auxiliary deputy?

15 A    No.

16 Q    Was he aware that you wanted to be an auxiliary deputy?

17 A    Yes.

18 Q    Did he ever ask you about any law enforcement background

19 you may have?

20 A    No.

21 Q    What about any law enforcement training?

22 A    No.

23 Q    Did he ask you if you had any military background?

24 A    No.

25 Q    Did he ask you to fill out an application?

McKee - Direct

1  A    No.

2  Q    Did he ask you if you ever had any firearms training?

3  A    No.

4  Q    Is it safe to say it was just kind of a general

5  conversation with nothing -- no deep topics; is that right?

6  A    Correct.

7  Q    Was it like an interview at all?

8  A    I did not see it as an interview at all.  It was a very

9  casual low-key type of lunch.

10  Q    And after lunch, where did you go?

11  A    We went to the clerk of court.

12  Q    Was that at the courthouse in Culpeper?

13  A    Correct.

14  Q    And were you sworn in there?

15  A    I was.

16  Q    And who swore you in?

17  A    It would have been the clerk of court.

18  Q    Did anyone come with you to get sworn in as an auxiliary

19  deputy sheriff?

20  A    Kevin Rychlik took me there, and we met the sheriff -- or

21  excuse me -- the clerk of court there.

22  Q    If we could pull up what's already been admitted into

23  evidence as Government's 711, please.

24        And do you recognize this document?

25  A    I do.

McKee - Direct

1  Q    And what is it?

2  A    That is the oath that I signed on the 14th.

3  Q    And I see it says Jerry McKee and then a signature.  Whose

4  signature is that?

5  A    That's my signature.

6  Q    And this was the oath you took in front of the clerk of

7  court?

8  A    Correct.

9  Q    And he signed it as well on November 14th of 2022; is that

10 correct?

11 A    Correct.

12 Q    If we could pull up Government's Exhibit 420.

13      Do you recognize this?

14 A    Yes.

15 Q    And what is Government's Exhibit 420?

16 A    That is where I was taking the oath with the clerk of

17 court.

18 Q    It's a photograph of you taking the oath?

19 A    Correct.

20 Q    And why does your face appeared to be blurred in this

21 photograph?

22 A    To protect my identity.

23 Q    Is it standard practice in the cases in which you are an

24 undercover -- have undercover capacity to do things to kind of

25 obscure your identity?

McKee - Direct

1   A    Yes, it is.

2   Q    And why is it important to do that?

3   A    To protect our identity, protect any other investigations

4   that we've worked in, and to protect any covert assets that the

5   bureau or the government may have that I've been involved with.

6   Q    You said covert assets you may be involved in.  What does

7   covert assets mean?

8   A    Any covert vehicles, companies, any other personal

9   property that may not be -- have a government affiliation.

10  Q    But would be registered in your alias?

11  A    Correct.  Or some type of alias.

12  Q    Now, beyond the blurring of your face, is this photograph

13  a true and accurate depiction of being sworn in on November

14  14th of 2022?

15  A    It is.

16          MS. SMITH:  Your Honor, the government would move to

17  admit Government's Exhibit 420.

18          THE COURT:  Any objection?

19          MR. CALEB:  No objection.

20          THE COURT:  So admitted and may be published to the

21  jury.

22          (Government Exhibit 420 marked and admitted.)

23   BY MS. SMITH:

24  Q    And so who is the individual with the blurred face on the

25  right of the photo?

McKee - Direct

1    A    That's the clerk of court.

2    Q    With the blurred face?

3    A    Oh, that's me.  I'm sorry.

4    Q    Okay.  And who's the left with the tie on?

5    A    That's the clerk of court.

6    Q    And after you were sworn in by the clerk of court, what

7    happened?

8    A    We then departed there and went back to the sheriff's

9    office.

10   Q    And who did you meet with at the sheriff's office?

11   A    Sheriff Jenkins.

12   Q    And do you recall where you met with him in the sheriff's

13   office?

14   A    In the hallway, and then we met inside of a -- we went

15   into a conference room.

16   Q    And what happened when you guys were in that conference

17   room?

18   A    That's where I -- he presented me with a badge, and I gave

19   him $5,000.

20   Q    If we could pull up Government's Exhibit 421, please.

21        I'm showing you what's been marked as Government's Exhibit

22   421.

23        Do you recognize this?

24   A    I do.

25   Q    And what is it?

McKee - Direct

1   A    That's a photo that was taken of the badge presentation.

2   Q    And again, is your face blurred in this photo?

3   A    It is.

4   Q    Beyond the blurring of your face, is it a true and

5   accurate depiction of the -- you receiving your badge?

6   A    It is.

7            MS. SMITH:  The government would move into evidence

8   421.

9            THE COURT:  Any objection?

10           MR. CALEB:  No objection.

11           THE COURT:  So admitted and may be published to the

12   jury.

13           MS. SMITH:  Thank you, Your Honor.

14           (Government Exhibit 421 marked and admitted.)

15   BY MS. SMITH:

16   Q    Okay.  If we could talk through this picture.

17        Who's the individual with the cowboy hat on?

18   A    Sheriff Jenkins.

19   Q    And then -- and who is the person with the blurred face?

20   A    That's me.

21   Q    And I am going to show you what's been marked as

22   Government's Exhibit 519.

23           MS. SMITH:  Your Honor, permission to approach the

24   witness?

25           THE COURT:  Yes, ma'am.  And you can move about the

McKee - Direct

1  courtroom freely.

2          MS. SMITH:  Thank you, Your Honor.

3  BY MS. SMITH:

4  Q    Do you recognize what I just presented to you,

5  Government's Exhibit 519?

6  A    Yeah, I do.

7  Q    Okay.  And what is that?

8  A    That's the badge I received in that photo.

9  Q    That's the badge you received from Scott Jenkins on

10 November 14th of 2022?

11 A    Correct.

12         MS. SMITH:  Your Honor, the government would move

13 into evidence Government's Exhibit 519.

14         THE COURT:  Any objection?

15         MR. CALEB:  No objection.

16         THE COURT:  All right.  So admitted and may be

17 published to the jury.

18         MS. SMITH:  If you could just hold it up and show it

19 to the jury, please.

20         Thank you.

21         (Government Exhibit 519 marked and admitted.)

22         MS. SMITH:  If you could pull up Government's Exhibit

23 442.

24 BY MS. SMITH:

25 Q    And before I ask about this, did you also receive an

McKee - Direct

1  identification card from the sheriff's office?

2  A    I did.

3  Q    And do you recognize what's been marked as Government's

4  Exhibit 442?

5  A    I do.

6  Q    And what is Government's Exhibit 442?

7  A    That's a photo of the badge I received and a photo of the

8  credentials that I received as a deputy sheriff.

9  Q    And is your face again redacted for that identification

10 card?

11 A    Yes.

12 Q    But otherwise, is it a true and accurate representation --

13 or photograph of the badge and the identification card you

14 received?

15 A    Correct.

16        MS. SMITH:  Your Honor, the government would move

17 into evidence Government's Exhibit 442.

18        THE COURT:  Any objection?

19        MR. CALEB:  No objection.

20        THE COURT:  So admitted and may be published to the

21 jury.

22        MS. SMITH:  Thank you.

23        (Government Exhibit 442 marked and admitted.)

24 BY MS. SMITH:

25 Q    And so these are the two items you received from the

McKee - Direct

1  sheriff's office back in November of 2022?

2  A    Correct.

3          MS. SMITH:  If we could pull up Government's Exhibit

4  20, please.

5          (Audio playing.)

6          MS. SMITH:  If you could just pause it right here.

7          Thank you.

8  BY MS. SMITH:

9  Q    Prior to today's testimony, did you review Government's

10  Exhibit 20?

11  A    I did.

12  Q    And what is Government's Exhibit 20?

13  A    It is a copy of the recording that I wore that day.

14  Q    Is it a clip from a much longer video from that covert

15  recording device you were wearing?

16  A    Correct.

17  Q    Is it a true and accurate recording of the events that

18  occurred on November 14th of 2022?

19  A    It is.

20          MS. SMITH:  Government would move into evidence

21  Government's Exhibit number 20.

22          THE COURT:  Any objection?

23          MR. CALEB:  No objection.

24          THE COURT:  So admitted and may be published to the

25  jury.

McKee - Direct

1              (Government Exhibit 20 marked and admitted.)

2              MS. SMITH:  And if we could start at the beginning,

3    please, and stop at 11 seconds, please.

4              (Audio playing.)

5     BY MS. SMITH:

6    Q    And whose text is in green and just said, here's good if

7    it works for you?

8    A    That would be Mr. Jenkins.

9    Q    And you heard on -- earlier in the recording someone

10   talking about taking a photograph.  Who was that?

11   A    That was Kevin.

12   Q    And what is happening in that clip we just saw?

13   A    That clip is where we were setting up for that photo that

14   was just taken in -- over the badge presentation.

15             MS. SMITH:  If we could continue this on to stop at

16   the 41-second mark, please.

17             (Audio playing.)

18   BY MS. SMITH:

19   Q    And did Kevin Rychlik just say, Jerry, thank you for

20   helping my friend?

21   A    I'm sorry?

22   Q    Did Kevin Rychlik just say, and Jerry, thank you for

23   helping my friend?

24   A    Yes, he did.

25   Q    And when he says Jerry, who was he referring to?

McKee - Direct

1  A    He was referring to me.

2  Q    And what was your understanding of what Kevin Rychlik

3  meant when he said, thank you for helping my friend?

4  A    Help him for giving him $5,000.

5  Q    And the "my friend," who was that in reference to?

6  A    To Mr. Jenkins.

7          MS. SMITH:  If we could continue playing this clip to

8  the end, please.

9          (Audio playing.)

10 BY MS. SMITH:

11 Q    And when you said, this is for you, what were you

12 referring to in that clip?

13 A    The $5,000.

14 Q    And it looked like it was almost like a hand shake

15 exchange.  What was occurring in that clip?

16         MR. CALEB:  Objection.

17         THE COURT:  Replay it and ask him to explain it.

18         MS. SMITH:  If we could go back and replay it,

19 please, and have -- I'll tell you when to stop, Ms. Fastenau.

20         (Audio playing.)

21         MS. SMITH:  If you could pause at 55 seconds.

22 BY MS. SMITH:

23 Q    What did we just see occur in that video?

24 A    That was when I was handing him the money.

25 Q    And that was in that envelope you referred to earlier?

McKee - Direct

1  A    Yes, it was.

2  Q    When Scott Jenkins says, it will be put to great use, did

3  you have an understanding of what he was referring to?

4  A    I didn't have an understanding of exactly what he was

5  using it for, but he was -- he did -- he was using it for -- it

6  was me giving it to him with no expectations.

7  Q    And when you say "it," what are you referring to?

8  A    The money.

9  Q    What was Scott Jenkins's reaction when you handed him that

10 envelope with $5,000 in cash?

11 A    He was expecting it, and he was glad I gave it to him.  So

12 there was a thank you.

13 Q    Why did you -- why do you say that he was expecting it and

14 was glad that you gave it to him?

15 A    There was -- there was no hesitation on what it was or no

16 look of, what is this?  It was an expectation, is the way I

17 took it.

18 Q    And what at first did he do with that envelope of cash

19 when you gave it to him?

20 A    He held it in his hand for several minutes, two or three

21 minutes in his hand, just sort of -- I don't want to say waving

22 it around, but just sort of passing his hands back and forth

23 with it.

24 Q    And eventually what did he do with that envelope of cash?

25 A    He put it in his coat pocket.

McKee - Direct

1          MS. SMITH:  If we could pull up Government's Exhibit

2    21, please.

3          (Audio playing.)

4    BY MS. SMITH:

5    Q    Prepare to today, have you reviewed Government's Exhibit

6    21?

7    A    I have.

8    Q    And what is Government's Exhibit 21?

9    A    That would be the video footage from the longer video that

10   I had of him putting the $5,000 in his pocket.

11   Q    And is this clip from that longer video a true and

12   accurate depiction of what occurred during your meeting with

13   Scott Jenkins on November 14th of 2022?

14   A    It is.

15          MS. SMITH:  At this time, the government would move

16   into evidence Government's Exhibit 21.

17          THE COURT:  Any objection?

18          MR. CALEB:  No objection.

19          THE COURT:  So admitted and may be published to the

20   jury.

21          (Government Exhibit 21 marked and admitted.)

22          MS. SMITH:  Thank you.

23          If we could play from the beginning, please.

24          (Audio playing.)

25   BY MS. SMITH:

McKee - Direct

1  Q    What does Government's Exhibit 21 depict?

2  A    A short video clip of him putting the money into his

3  pocket.

4  Q    If we could pull up Government's Exhibit 416, please.

5       If we could just flip through those various pages, please.

6       Do you recognize Government's Exhibit 416?

7  A    Those are still shots from the video that I was -- had

8  that day.

9  Q    And so are those true and accurate still shots from

10 Government's Exhibit 21?

11 A    They are.

12          MS. SMITH:  At this time, Your Honor, the government

13 would move into evidence Government's 416.

14          THE COURT:  Any objection?

15          MR. CALEB:  No objection.

16          THE COURT:  All right.  So admitted and may be

17 published to the jury.

18          (Government Exhibit 416 marked and admitted.)

19  BY MS. SMITH:

20 Q    Is this the first page of Government's Exhibit 416?

21 A    Yes.

22          MS. SMITH:  And if we could move to the second page,

23 and the third, please, and the fourth.

24          Thank you, Ms. Fastenau.

25 BY MS. SMITH:

McKee - Direct

1    Q    After you received the badge and paid Scott Jenkins

2    $5,000, what happened next?

3    A    We talked briefly, and then we went out and met with

4    another sheriff's office employee and had those credentials

5    made.

6    Q    When you say credentials, that's the identification card

7    we saw earlier?

8    A    Correct.

9    Q    And who went with you to get your identification card

10   made?

11   A    Sheriff Jenkins, Kevin Rychlik, myself, and then we met an

12   employee up there.

13           MS. SMITH:  If we could pull up Government's Exhibit

14   22.

15           (Audio playing.)

16   BY MS. SMITH:

17   Q    And what is Government's Exhibit 22?

18   A    That's a short video of the -- over at the area where we

19   had the credentials made.

20   Q    Is it a true and accurate depiction of the meeting that

21   you were continuing to have with Scott Jenkins?

22   A    It is.

23           MS. SMITH:  The government would move into evidence

24   Government's Exhibit 22, please.

25           THE COURT:  Any objection?

McKee - Direct

1          MR. CALEB:  No objection.

2          THE COURT:  So admitted and may be published to the

3   jury.

4          (Government Exhibit 22 marked and admitted.)

5          MS. SMITH:  If we could start at the very beginning

6   and play it to the end.

7          (Audio playing.)

8    BY MS. SMITH:

9   Q    Now, during your time at the Culpeper County sheriff's

10  office and your time with Scott Jenkins, did you speak with

11  Scott Jenkins about any expectations he had about your

12  involvement as an auxiliary deputy sheriff?

13  A    I did.

14  Q    And what did he tell you?

15  A    He said there wasn't a lot of expectations, that we could

16  plug in whenever we sort of wanted to.

17  Q    What does plug in mean?

18  A    I don't know.  I took that as there was no really

19  responsibilities.

20  Q    Did he tell you whether he had any expectations of you

21  volunteering for the sheriff's office?

22  A    He did not.

23  Q    And what about having you on call or available to serve?

24  A    He did not.

25  Q    Did he tell you if there were any expectations of training

McKee - Direct

1  for you?

2  A    There was not.

3  Q    And when you say it was not, does that mean there was no

4  training?

5  A    There was no -- no discussion.

6  Q    At any time during your meeting with Scott Jenkins, did he

7  ask if you wanted to purchase a firearm?

8  A    He did not.

9  Q    And was the topic of purchasing a firearm ever brought up

10 with the sheriff?

11 A    It was not.

12 Q    And was this meeting on November 14th of 2022 the first

13 and only time you ever met Scott Jenkins?

14 A    Correct.

15 Q    Did you ever hear from him after your swearing in?

16 A    I did not.

17 Q    Did anyone ever call you from the Culpeper County

18 sheriff's office about volunteering as an auxiliary deputy

19 sheriff?

20 A    They did not.

21 Q    Were you ever offered any training?

22 A    I was not.

23 Q    Were you ever called to serve in any capacity for that

24 office?

25 A    I was not.

McKee - Cross


1          MS. SMITH:  No further questions, Your Honor.

2          THE COURT:  Thank you very much.

3          All right.  Mr. Caleb?

4                          CROSS-EXAMINATION

5   BY MR. CALEB:

6   Q    Good afternoon.

7   A    Good afternoon.

8   Q    All right.  Just a few questions.  So you testified that

9   you are -- or you were operating in an undercover capacity back

10  in November 14th, 2022, correct?

11  A    Correct.

12  Q    Okay.  And before you -- I guess before you started your

13  assignment with -- in this particular investigation, you were

14  briefed, correct?

15  A    Correct.

16  Q    And a briefing is when you kind of get your assignment,

17  right?

18  A    Correct.

19  Q    And you're told details about what your assignment is

20  going to be, right?

21  A    It's not necessarily a -- you're told what your assignment

22  are -- you're told a brief of the investigation and what the

23  expectations are, and -- those that are open discussions of how

24  the best way to go forward.

25          MR. CALEB:  I'm not sure if my voice is carrying.

McKee - Cross

1  Can you all hear just fine?

2   BY MR. CALEB:

3  Q    And so you said you're given expectations?  You're told

4  expectations?

5  A    You're given -- it's discussed what the investigation is

6  about, and what the -- what they would like to -- type of

7  evidence they would like to get if it's there.

8  Q    So you're basically told what you need to do, correct?

9  A    What they would like to happen.

10 Q    Well, your job is to get what you're told you need to get,

11 correct?

12 A    I don't necessarily agree with that 100 percent.  Your job

13 is to get the evidence, if it's there.

14 Q    Okay.  And so when you -- before you went to -- before you

15 were introduced to Mr. Jenkins, you were obviously introduced

16 to Mr. Rychlik, correct?

17 A    Correct.

18 Q    And that introduction, you were brought in to be

19 introduced with Mr. Jenkins by Mr. Rychlik, correct?

20 A    Correct.

21 Q    You didn't know Mr. Jenkins before Mr. Rychlik introduced

22 you to him?

23 A    Correct.

24 Q    And Mr. Rychlik was your only connection to Mr. Jenkins?

25 A    Correct.

McKee - Cross

1   Q    So it would also be accurate to say that your

2   understanding of what -- of what you needed to do in terms of

3   the money you brought to meet with Mr. Jenkins was -- that was

4   all based on your conversations with either Mr. Rychlik or

5   internally with the FBI?

6   A    Ask that question again.  I don't quite understand.

7   Q    So you brought $5,000 because you spoke to Mr. Rychlik,

8   correct?

9   A    Correct.

10  Q    And you brought $5,000 because that was sort of the

11  arrangement or the mission that was identified by the FBI.

12  That was a part of what you needed, correct?  Right?

13  A    Yes.

14  Q    And so you talked about a -- you talked about what happens

15  before you're actually introduced to someone -- in this case,

16  Mr. Jenkins; do you remember that?

17  A    Correct.

18  Q    And what you said was that in order -- before the

19  introduction is made, you come up with a backstory, correct?

20  A    Correct.

21  Q    And that backstory, it's not your back -- you don't come

22  up with the story.  That's sort of something that the -- do you

23  have handlers?  Is that something?

24  A    We do, but -- yes.

25  Q    So you have handlers?

McKee - Cross

1    A    We have case agents that we work with.

2    Q    Okay.  And so a case agent would be a handler?

3    A    Depending on the type of case, would be what we would

4    consider a handler or a case agent.

5    Q    Okay.  All right.  So in this case, you had a case agent?

6    A    Had a case agent.

7    Q    Okay.  And so that backstory would be something that's

8    developed between -- is that between yourself and the case

9    agent?

10   A    It's discussed, but I pretty much come up with a

11   backstory.

12   Q    That's what you come up with?

13   A    Correct.

14   Q    And that backstory is something you come up with based on

15   conversations with -- in this case, conversations with

16   Mr. Rychlik, correct?

17   A    No.  It comes up on something that I can speak to.

18   Q    Okay.  In order to come up with a backstory, you have to

19   -- so let's cut to the chase.  A backstory is a lie, right?

20   A    Correct.

21   Q    In order to come up with a lie that would work, you have

22   to have good information, correct?

23   A    Let me back up just a second.  It's a partial.  It's not a

24   lie.  It's a -- it's knowledge -- I come up with backstories,

25   and undercovers come up with backstories with things that they

McKee - Cross

1  know about in some way, shape, or form.  So it's not a complete

2  fabricated lie.

3  Q    You didn't have a logistics company?

4  A    I did not.

5  Q    That was a lie?

6  A    Correct.

7  Q    Your name isn't Jerry McKee?

8  A    That's correct.

9  Q    That was a lie?

10 A    It's not correct.

11 Q    That's a lie?

12 A    Call it as you wish, but it was not correct.

13 Q    That was false?

14 A    That's not my name.

15 Q    That was false?

16 A    Correct.

17 Q    Okay.  All right.  And so -- but in order to come up with

18 a story that would work, that has to be -- in this case, would

19 have to be informed by your conversations with Mr. Rychlik,

20 correct?

21 A    He did not develop the story.

22 Q    That's not what I'm asking.

23 A    Okay.

24 Q    In order for -- in order for the story to work, in order

25 for you to be involved in this undercover operation, you would

McKee - Cross

1  have to get certain information from Mr. Rychlik, correct,

2  because he was your introduction?

3  A    Correct.  We met before to get minor things, but I only

4  spoke with him once before then.

5  Q    Okay.  And -- but -- and so the basis of your -- the basis

6  of your involvement is pretty much 100 percent reliant upon --

7  upon your conversations with Mr. Rychlik, correct?

8  A    I would not say so.  I had other information from the case

9  agent and everywhere -- everything that I did was not based on

10  what Mr. Rychlik did.

11  Q    Okay.  That's fine.  But you did know what you were

12  investigating, correct?

13  A    Correct.

14  Q    And you did -- when you were introduced to Mr. Jenkins,

15  you did already believe that Mr. Jenkins had committed a crime?

16  A    I believed that he was a predicated target.

17  Q    I'm sorry, can you answer my question?

18  A    I believed that there was evidence -- that they were

19  looking for evidence to charge him with a crime.

20  Q    And it was -- and you were going to help them get that

21  evidence?

22  A    Correct.

23  Q    And "them" is the FBI?

24  A    Correct.

25  Q    And the FBI is the agency that at the time you worked for?

McKee - Redirect

1   A     Correct.

2   Q     The agency that was paying your salary?

3   A     Correct.

4   Q     The agency that also was -- is an investigative arm for

5   the Department of Justice?

6   A     Correct.

7   Q     The Department of Justice is the -- is the agency or the

8   department that is prosecuting Mr. Jenkins?

9   A     Correct.

10  Q     And you knew all of this when you started your undercover

11  work on November 14 -- or I'm sorry -- you knew all of this on

12  November 14, 2022, right?

13  A     Yes. I was well aware of who I worked for.

14  Q     You were also well aware -- I'm sorry.  Strike that.

15          MR. CALEB:  Court's indulgence?

16          THE COURT:  Yes, sir.

17  BY MS. CALEB:

18  Q     One last question.  Mr. Jenkins never told you that you

19  had to pay for a badge, correct?

20  A     Correct.

21          MR. CALEB:  No further questions.

22          THE COURT:  Any redirect?

23          MS. SMITH:  Yes, Your Honor.

24                      REDIRECT EXAMINATION

25   BY MS. SMITH:

McKee - Redirect

1  Q    On cross-examination, you were asked about being

2  introduced to Scott Jenkins by Kevin Rychlik and the events

3  leading up to that.  When did you first meet Kevin Rychlik for

4  the first time?

5  A    I met with him one -- I think it was just one time with

6  the case agents.

7  Q    And that was when he was working undercover -- or as an

8  informant for the FBI?

9  A    Correct.

10 Q    And when you're an undercover employee and you're being

11 sent in to meet with targets, is an introduction by another

12 individual involved in crimes typical?

13 A    It's very common.

14 Q    And when you met with Scott Jenkins and you gave him that

15 envelope full of cash, what would you have done if he hadn't

16 taken the bribe?

17 A    I would have put it right back in my pocket.

18 Q    And it would have been recorded the entire time?

19 A    Correct.

20          MS. SMITH:  No further questions.

21          THE COURT:  May this witness be excused?

22          MS. SMITH:  Yes, Your Honor.

23          THE COURT:  Sir, you may be excused.  Please do not

24 discuss your testimony as long as the case is pending.  Thank

25 you very much for being here today.

Cooper - Direct

1            Who's your next witness, Ms. Choy?

2            MS. CHOY:  The government calls Thomas Cooper.

3            THE COURT:  Thomas Cooper.

4            And the restrictions that I had placed -- put in

5    place with respect to electronics we're going to lift at this

6    time.

7            Thomas Cooper.

8            Mr. Cooper, come on up if you would, please, sir.

9            THOMAS COOPER, CALLED BY THE GOVERNMENT, SWORN

10           THE COURT:  Mr. Cooper, slide on up to the microphone

11   and make sure you speak into the microphone so we can be able

12   to hear you.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Go ahead, please, Ms. Choy.

15                       DIRECT EXAMINATION

16    BY MS. CHOY:

17   Q    Good afternoon, Mr. Cooper.  Could you please introduce

18   yourself to the jury and spell your last name for the court

19   reporter?

20   A    Thomas Edward Cooper, C-O-O-P-E-R.

21   Q    Mr. Cooper, where do you reside?

22   A    I live in Fairfax County.

23   Q    Where did you grow up?

24   A    I grew up in Augusta County.

25   Q    Did you go to college?

Cooper - Direct

1   A    I did.

2   Q    Where?

3   A    I went to Virginia Tech.

4   Q    And what's your current occupation?

5   A    I'm retired.

6   Q    Before you retired, what was your occupation?

7   A    I was the president of Columbia Therapeutic, and also sole

8   owner of Bridgeport Training.

9   Q    What is Columbia Therapeutic?

10  A    It's an immune therapy company.

11  Q    And what is Bridgeport -- the Bridgeport company?

12  A    It's a company that we work with people that want to do

13  humanitarian projects.

14  Q    Mr. Cooper, have you been charged with any crimes in

15  relation to your testimony here today?

16  A    No, ma'am.

17  Q    Did you enter into an agreement with the government in

18  connection with your testimony?

19  A    Yes, I did.

20  Q    Could we pull up Government's Exhibit 735, please.

21       Can you see that?

22  A    Yes.

23  Q    Is this the agreement that you entered?

24  A    Yes, ma'am.

25            MS. CHOY:   The government offers 735 into evidence.

Cooper - Direct

1           THE COURT:  Any objection?

2           MR. ANDONIAN:  No, Your Honor.

3           THE COURT:  No objection?  All right.  So admitted

4    and may be published to the jury.

5           (Government Exhibit 735 marked and admitted.)

6    BY MS. CHOY:

7    Q    And could we highlight paragraph 1 in this agreement,

8    please.

9         Mr. Cooper, what are your obligations under this

10   agreement?

11   A    That I'll fully tell the truth.

12   Q    Could we highlight paragraph 2, please.

13        Do you understand that this agreement provides the

14   government cannot use your testimony here today against you in

15   a future criminal prosecution?

16   A    Yes, ma'am.

17   Q    And do you understand that under this agreement if you lie

18   here today you could be prosecuted for perjury, false

19   statements, obstruction of justice, and other crimes related to

20   the conduct we're about to discuss?

21   A    Yes, ma'am.

22          MS. CHOY:  You can take that down.  Thank you.

23   BY MS. CHOY:

24   Q    Do you know someone named Fred Gumbinner?

25   A    I do.

Cooper - Direct

1  Q    How long have you known him?

2  A    I've known Mr. Gumbinner over 20 years.

3  Q    What is the nature of your relationship?

4  A    We're personal friends, and he was attorney for Columbia

5  Therapeutic.

6  Q    At some point, did Mr. Cooper -- I'm sorry, Mr. Gumbinner

7  -- show you a law enforcement badge that he owned?

8  A    Yes, ma'am.

9  Q    And did he show you law enforcement credentials that he

10 owned?

11 A    He did.

12 Q    Did Mr. Gumbinner explain to you how he got that badge and

13 those credentials?

14 A    Yes, he did.

15 Q    What did he say?

16 A    He said that he had a relationship with Mr. Rychlik in

17 Culpeper sheriff's department, and that's how he got them.

18 Q    And did he say whether he made any payment in connection

19 with obtaining them?

20 A    It was not clear if he made a donation or not.

21 Q    Did Mr. Gumbinner explain what rights or authorities that

22 badge conveyed?

23 A    No, he did not.

24 Q    Did there come a time when you expressed interest in

25 getting your own badge?

Cooper - Direct

1  A    Yes, I did.

2  Q    And did Mr. Gumbinner agree to facilitate that?

3  A    He agreed to introduce me to the person that could

4  facilitate that.

5  Q    And who is that person?

6  A    Mr. Rychlik, Kevin Rychlik.

7  Q    And did he make that introduction?

8  A    He did.

9  Q    And did you end up entering a business transaction with

10  Mr. Rychlik?

11  A    I did.

12  Q    Could you explain that?

13  A    Well, I knew that if I wanted to build this relationship

14  to have the opportunity to get a badge, that Mr. Rychlik owned

15  a gun shop, and so I applied to buy a gun through his shop and

16  develop that relationship, which took about a year to do.

17  Q    And for that gun that you wanted to buy, was there a

18  special license that was required?

19  A    Yes, there was.

20  Q    So did you have to apply for that license through his gun

21  store?

22  A    I did.

23  Q    And did it take some time for that license to come

24  through?

25  A    Yes, ma'am, it took over a year.

Cooper - Direct

1  Q    And did you remain in contact with Mr. Rychlik during that

2  time?

3  A    I did.

4  Q    Did there come a time when you expressed your interest to

5  Mr. Rychlik in obtaining a Culpeper County sheriff's office

6  badge?

7  A    Yes.

8  Q    What did Mr. Rychlik say?

9  A    He said that I would need to make available to him a

10 driver's license so they could do a background check.

11 Q    And did he tell you whether anything else would be

12 required in order to get that badge?

13 A    He said that -- I'm -- I wasn't sure if it was right at

14 that moment, but eventually, that I make a donation to get the

15 sheriff reelected.

16 Q    And did he indicate an amount of that donation?

17 A    Not at that time.

18 Q    At some point, did he indicate an amount?

19 A    Yes, ma'am.

20 Q    What did he say?

21 A    He said that he thought a $5,000 donation to his

22 re-election would be nice.

23 Q    And so you mentioned that he requested your driver's

24 license?

25 A    Yes, ma'am.

Cooper - Direct

1   Q    Did you provide that to him?

2   A    I did.

3   Q    And did you have to complete any other paperwork?

4   A    No, ma'am.

5   Q    Did you fill out an application?

6   A    No.

7   Q    Did anyone interview you?

8   A    No.

9   Q    Did anyone check any references?

10  A    Not that I'm aware of.

11  Q    Did anyone ask about your qualifications to become an

12  auxiliary deputy?

13  A    No, ma'am.

14  Q    Do you have any law enforcement experience?

15  A    No, ma'am.

16  Q    Any military experience?

17  A    No.

18  Q    Any law enforcement training?

19  A    No.

20  Q    And at the time you were having these discussions, had you

21  ever met Scott Jenkins?

22  A    No, ma'am.

23  Q    Had you ever been to Culpeper?

24  A    I'd been through Culpeper, but never been to Culpeper.

25  Q    And were you a person who politically supported

Cooper - Direct

1  Mr. Jenkins?

2  A    No, ma'am.

3  Q    And did you ultimately decide to make that $5,000, as you

4  put it, donation in order to get the badge?

5  A    Say that again, please.

6  Q    Did you ultimately agree to make that $5,000 donation to

7  get the badge?

8  A    Yes, ma'am.

9  Q    Did you decide to give Scott Jenkins that $5,000 because

10  you supported him politically?

11  A    I liked his platform, but I gave the $5,000 so I could get

12  my badge.

13  Q    So at some point after providing your driver's license to

14  Kevin Rychlik, did you travel to Culpeper to be sworn in?

15  A    I did.

16  Q    Was that in the fall of 2022?

17  A    Yes, it was.

18  Q    So when you drove down to Culpeper in the fall of 2022,

19  where did you go?

20  A    I went to the parking lot at the sheriff's station.

21  Q    And when you went down to Culpeper that day, had you

22  already cut a check for $5,000 to Scott Jenkins's campaign?

23  A    Yes, I had.

24  Q    And did you intend to provide that check to Scott Jenkins?

25  A    I did.

Cooper - Direct

1   Q    So what happened when you arrived at the sheriff's office?

2   A    Kevin Rychlik met me in the parking lot, and then we

3   walked inside, and I got a tour of the station.

4   Q    And at some point, did you go to lunch with the sheriff?

5   A    Yes, I did.

6   Q    Who else was present?

7   A    It was Kevin Rychlik, the sheriff, and myself.

8   Q    During the lunch, did you explain to Sheriff Jenkins why

9   you wanted a badge?

10  A    I did.

11  Q    And could you explain what you told him?

12  A    Yes.  I told him that I wanted the badge because my

13  children live in Maryland, and I had a concealed carry, and I

14  did not have the ability with a Virginia concealed carry to

15  cross into Maryland.  And I was going over to Maryland almost

16  all the time to see my kids and grandkids.  And sometimes I'd

17  leave the house, and it would be in the car, and I'd have to

18  turn around -- get to Tysons and turn around, because I -- oh

19  my -- that's not the word I used, but I'd have to turn around

20  and go back home and drop my gun off.  That was one reason.

21  The other reason was, in case there was ever a national

22  emergency and the roads were blocked or something, that I would

23  be able to maybe facilitate to get over to get my grandkids and

24  kids and get them out of harm's way.  So those were the two

25  reasons I said.

Cooper - Direct

1   Q    And how did you think a badge would help you get to your

2   kids in an emergency?

3   A    I was hoping that if I just showed the credentials -- if

4   there was a stop on the highway or something, that they would

5   give me some preferential treatment to get around to an

6   alternate route.

7            MS. CHOY:  Could we pull up Exhibit 41, please.

8            Could you play the first 3 seconds for Mr. Cooper,

9   please.

10           (Audio playing.)

11  BY MS. CHOY:

12  Q    Do you recognize that video?

13  A    Yes, ma'am.

14  Q    Before today, have you had an opportunity to review it?

15  A    Yes.

16  Q    And is it a fair and accurate recording of the

17  conversation in which you participated?

18  A    It is.

19           MS. CHOY:  The government offers Exhibit 41 into

20  evidence.

21           THE COURT:  Any objection?

22           MR. ANDONIAN:  No.

23           THE COURT:  So admitted and may be published to the

24  jury.

25           (Government Exhibit 41 marked and admitted.)

Cooper - Direct

1    BY MS. CHOY:

2    Q    So Mr. Cooper, who is the person in the blue blazer who

3    was visible at the beginning of that clip?

4    A    Sheriff Jenkins.

5    Q    And whose voice did you hear speaking?

6    A    I'm not sure.  I might need to hear it again.

7              MS. CHOY:  Okay.  Let's play a few more seconds of

8    that for Mr. Cooper.

9              (Audio playing.)

10   BY MS. CHOY:

11   Q    Did you recognize the speaker?

12   A    Yes.

13   Q    Who was that?

14   A    It was me.

15   Q    Where was this video taken?

16   A    At a restaurant, steakhouse.

17   Q    And is that during your visit to Culpeper?

18   A    Yes.

19             MS. CHOY:  And let's play the rest of the video,

20   please.

21             (Audio playing.)

22   BY MS. CHOY:

23   Q    Was that you telling Mr. Jenkins why you wanted that

24   badge?

25   A    Yes, ma'am.

Cooper - Direct

1    Q    And what happened after that lunch?

2    A    After that lunch, Kevin Rychlik and I went to the

3    courthouse.

4    Q    What happened at the courthouse?

5    A    I met the clerk of the court.

6    Q    And was anyone else present for that?

7    A    Kevin Rychlik and myself and the clerk of the court.

8            MS. CHOY:  Let's pull up Government's Exhibit 15,

9    please.  Show the first 13 seconds.

10           (Audio playing.)

11   BY MS. CHOY:

12   Q    Before today, have you reviewed this entire clip?

13   A    Yes, ma'am.

14   Q    Is it a fair and accurate recording of a conversation in

15   which you participated?

16   A    Yes.

17           MS. CHOY:  The government offers 15 into evidence.

18           THE COURT:  Any objection?

19           MR. ANDONIAN:  No, Your Honor.

20           THE COURT:  15 will be admitted and may be published

21   to the jury.

22           (Government Exhibit 15 marked and admitted.)

23    BY MS. CHOY:

24   Q    Did you see yourself in that clip we just reviewed?

25   A    Yes, I did.

Cooper - Direct

1   Q    Did you recognize anyone else's voice?

2   A    Kevin Rychlik.

3   Q    Where was this video taken?

4   A    In the clerk of the court's office.

5          MS. CHOY:  Let's play through to 1 minute and 33

6   seconds, please.

7          (Audio playing.)

8   BY MS. CHOY:

9   Q    Who is the man in the shirt sleeves and tie who came in

10  towards the end there?

11  A    It was the clerk of the court.

12  Q    And did you recognize who that uniformed deputy was who

13  was present?

14  A    No, I did not.

15         MS. CHOY:  Okay.  Let's play it again, please.

16         (Audio playing.)

17  BY MS. CHOY:

18  Q    Mr. Cooper, could you explain what happened towards the

19  end of that video clip?

20  A    I got sworn in, if that's what you're in reference to.

21  Q    It is.

22  A    Yes.

23  Q    You got sworn in as an auxiliary deputy?

24  A    Yes.

25         MS. CHOY:  And Ms. Fastenau, could you please pull up

Cooper - Direct

1  Government's Exhibit 418.

2  BY MS. CHOY:

3  Q    Mr. Cooper, what's depicted in this photograph?

4  A    I am raising my hand and being sworn in as an auxiliary

5  sheriff.

6  Q    Is this a fair and accurate depiction of you being sworn

7  in as an auxiliary sheriff?

8  A    Yes, ma'am.

9          MS. CHOY:  The government moves 418 into evidence.

10          THE COURT:  Any objection?

11          MR. ANDONIAN:  No, Your Honor.

12          THE COURT:  So admitted and may be published to the

13  jury.

14          (Government Exhibit 418 marked and admitted.)

15   BY MS. CHOY:

16  Q    And could we please bring up 715, which is already in

17  evidence.

18          Do you recognize this?

19  A    Yes, I do.

20  Q    What is it?

21  A    It is my oath and qualification that I signed.

22  Q    That's your signature there on the line?

23  A    Yes, it is.

24  Q    And whose signature is that below?

25  A    Clerk of the court.

Cooper - Direct

1   Q    And what's the date?

2   A    10-26-22.

3   Q    So after you were sworn, where did you go next?

4   A    Kevin Rychlik and I went back to the sheriff's station.

5   Q    And did you go to a particular room within the sheriff's

6   station?

7   A    Yeah, we went to the conference room.

8   Q    Who was present in the conference room?

9   A    Sheriff Jenkins, his brother, Mike Jenkins, Kevin Rychlik,

10  and myself.

11  Q    What happened in that conference room?

12  A    We chatted.  We got to tell some antidote [sic] stories

13  and just visited.

14  Q    And did there come a time when statements were made about

15  who could be trusted in the room?

16  A    Yes.

17  Q    What do you recall about that?

18  A    We were standing at the end of the table closest to the

19  door, and I don't know who said it.  I guess we'll see.  But he

20  said, you know, to be trusted, and I said okay.  And he said,

21  this is a trusted group.  I said, okay.

22  Q    How did you interpret that statement?

23  A    I was a little -- at first I thought, well, this is a

24  trusted group, that's good, that makes sense.  Second time it

25  was said, I thought it was a little peculiar.  Why would they

Cooper - Direct

1  say it the first time and then the second time.

2  Q    And did that statement prompt you to do anything?

3  A    It did.

4  Q    And what's that?

5  A    I felt that was my cue to put out my donation.

6  Q    And is that what you did?

7  A    I did.

8  Q    So did you give Sheriff Jenkins that check that you

9  brought with you?

10 A    I put it on the table.

11 Q    And what was his reaction?  Did he seem surprised?

12 A    No.

13      Thank you.

14 Q    So he thanked you?

15 A    Well, I think he did.

16 Q    And after you gave him that check, did he give you

17 anything in return?

18 A    Yeah, I got a badge and -- I got a badge.

19 Q    Did you receive credentials at some point too?

20 A    Yes.

21      MS. CHOY:  Ms. Fastenau, could we bring up

22 Government's Exhibit 16, please, and play the first 5 seconds

23 for Mr. Cooper.

24          (Audio playing.)

25 BY MS. CHOY:

Cooper - Direct

1   Q     Do you recognize this video?

2   A     I do.

3   Q     Have you had an opportunity to review the full clip?

4   A     I have.

5   Q     Is it a fair and accurate depiction of the events of that

6   day?

7   A     Yes, ma'am.

8              MS. CHOY:  The government moves Exhibit 16 into

9   evidence.

10              THE COURT:  Any objection?

11              MR. ANDONIAN:  No, Your Honor.

12              THE COURT:  So admitted, and may be published to the

13   jury.

14              (Government Exhibit 16 marked and admitted.)

15    BY MS. CHOY:

16   Q     Where was this video taken?

17   A     Culpeper sheriff's station.

18              MS. CHOY:  Could we please play the first 44 seconds.

19              (Audio playing.)

20   BY MS. CHOY:

21   Q     So who is the individual wearing the cowboy hat that we

22   saw in that video?

23   A     Sheriff Jenkins.

24   Q     And did you recognize the voice that says, my pleasure,

25   that's the lowest one?

Cooper - Direct

1  A    I was not paying attention.  I was looking around the

2  courtroom.  I'm sorry.

3           MS. CHOY:  That's all right.

4           Could we go back a few seconds and play that again?

5           (Audio playing.)

6  BY MS. CHOY:

7  Q    Did you catch it that time?

8  A    No, ma'am.

9  Q    Would you like us to go back and play that 44 seconds

10 again?

11 A    No, not the whole 44.  I'm just trying to figure out --

12 there are only four of us in the room.  So it was either myself

13 or Sheriff Jenkins or Kevin Rychlik or Mike Jenkins, so --

14 Q    Let's just play that little bit again so we can see if you

15 can identify that voice.

16 A    I'm sorry.

17    (Audio playing.)

18 Q    Did you get it that time?

19 A    I did.

20 Q    Who was that who was speaking?

21 A    Mike Jenkins.

22 Q    Thank you.

23           MS. CHOY:  Let's play through to 1 minute and 7

24 seconds, please.

25           (Audio playing.)

Cooper - Direct

1  BY MS. CHOY:

2  Q    Did you see yourself leaning into the frame there?

3  A    I did.

4  Q    Could you explain what was going on?

5  A    That's when I put my check on the table.

6  Q    And then what did Sheriff Jenkins and you do?

7  A    We shook hands, and then he gave me my badge and

8  credentials.

9         MS. CHOY:  Okay.  Let's play to the end, please.

10        (Audio playing.)

11        MS. CHOY:  Can you bring up Government's Exhibit 415,

12 please.

13 BY MS. CHOY:

14 Q    Do you recognize these photographs, Mr. Cooper?

15 A    Yes.

16 Q    Do you recognize them to be still images from the video

17 that you just reviewed?

18 A    Yes.

19 Q    Are they fair and accurate still images from the video we

20 just reviewed?

21 A    Yes, ma'am.

22        MS. CHOY:  The government moves Exhibit 415 into

23 evidence.

24        THE COURT:  Any objection?

25        MR. ANDONIAN:  No objection.

Cooper - Direct

1          THE COURT:  So admitted, and may be published to the

2  jury.

3          (Government Exhibit 415 marked and admitted.)

4   BY MS. CHOY:

5  Q    So taking a look at this first picture, what's happening

6  here?

7  A    I'm leaning forward to put my check on the table.

8  Q    And page 2, what's happening there?

9  A    Shaking hands with Sheriff Jenkins.

10  Q    And page 3, please; what's that white object on the table

11  next to Sheriff Jenkins's leg?

12  A    It looks like my check.  I can't tell from that.

13  Q    Do you recall putting your check on the table next to

14  Sheriff Jenkins?

15  A    Yes.  Yes.

16  Q    Could you bring up 419, please.

17       Do you recognize this?

18  A    I do.

19  Q    What is it?

20  A    This is Sheriff Jenkins and me shaking hands.

21  Q    Is that a fair and accurate photo of Sheriff Jenkins and

22  you shaking hands?

23  A    It is, yes.

24          MS. CHOY:  The government moves Exhibit 419 into

25  evidence.

Cooper - Direct


 1            THE COURT:  Any objection?

 2            MR. ANDONIAN:  No, Your Honor.

 3            THE COURT:  So admitted and it may be published to

 4   the jury.

 5            (Government Exhibit 419 marked and admitted.)

 6   BY MS. CHOY:

 7   Q    Was this taken right after you gave Sheriff Jenkins the

 8   $5,000 check and then he gave you the badge?

 9   A    Yes.

10            MS. CHOY:  Could we bring up Government's Exhibit

11   311, please.  And this is already in evidence.  And could you

12   zoom in on that check image, please.

13   BY MS. CHOY:

14   Q    Do you recognize this?

15   A    I do.

16   Q    What is it?

17   A    That is a check that I wrote for his re-election.

18   Q    And it looks like it's from Bridgeport International.  Is

19   that your company?

20   A    Yes, it is.

21   Q    And it's made out to Scott Jenkins For Sheriff; is that

22   right?

23   A    Correct.

24   Q    And is that your signature?

25   A    Yes, it is.

Cooper - Direct

1          MS. CHOY:  You can take that down.

2     BY MS. CHOY:

3  Q    So there in that conference room, was there also a

4  discussion about making payments in cash versus check?

5  A    Yes.

6  Q    What do you recall about that discussion?

7  A    I believe it was after I put my check down, or sometime

8  thereafter, that they said that cash would have been fine too.

9  And I'm thinking, okay, but I had gone through several calls

10 with Kevin Rychlik about what to put on the donation, and he

11 told me, he says, look, it's tax deductible.  He said, write a

12 check.  But in the conference room, they said I could pay cash

13 too for that.  And their reason was that if other people saw

14 that I was making a donation, which they might see from the

15 check, that they would be hitting me up for donations also to

16 try to, you know, give them money also.

17          MS. CHOY:  Could we pull up Government's Exhibit 17,

18 please, and play the first 5 seconds for Mr. Cooper.

19          (Audio playing.)

20 BY MS. CHOY:

21 Q    Do you recognize this clip?

22 A    Yes.

23 Q    And have you reviewed the whole clip?

24 A    I have.

25 Q    And is it a fair and accurate representation of the

Cooper - Direct

1  conversation you had in the conference room there?

2  A    Yes, it is.

3           MS. CHOY:  The government moves Exhibit 17 into

4  evidence.

5           THE COURT:  Any objection?

6           MR. ANDONIAN:  No objection.

7           THE COURT:  So admitted and may be published to the

8  jury.

9           (Government Exhibit 17 marked and admitted.)

10          MS. CHOY:  So let's play from the beginning to the

11  56-second mark, please.

12          (Audio playing.)

13  BY MS. CHOY:

14  Q    Who was the man in the blue blazer that we saw on the

15  screen there?

16  A    Sheriff Jenkins.

17  Q    And who were the other voices that you heard speaking?

18  A    Kevin Rychlik and myself.

19  Q    And when Mr. Jenkins was saying words to the effect of, it

20  can be him, or him, or multiple people with different names,

21  what did you understand him to be saying there?

22  A    I didn't understand anything at that time, what that was

23  in reference to.

24          MS. CHOY:  Okay.  Let's play through to the end,

25  please.

Cooper - Direct

1              (Audio playing.)

2    BY MS. CHOY:

3    Q    And you mentioned you got a badge and credentials that

4    day, correct?

5    A    Yes.

6    Q    I'm going to show you what's been marked as Government's

7    Exhibit 517 and 518.

8         Do you recognize Government's Exhibits 517 and 518?

9    A    I do.

10   Q    What are they?

11   A    It is the badge that I was given and the credential I was

12   given.

13             MS. CHOY:  Government moves Exhibits 517 and 518 into

14   evidence.

15             THE COURT:  Any objection?

16             All right.  So admitted and may be published to the

17   jury.

18             (Government Exhibits 517 and 518 marked and

19   admitted.)

20             MS. CHOY:  Could you just hold those up so the

21   members of the jury can see them?

22             And Ms. Fastenau, could we please pull up

23   Government's Exhibit 443.

24   BY MS. CHOY:

25   Q    What do you recognize in this exhibit?

Cooper - Direct

1  A     That's the credentials and badge I just held up.

2  Q     Is it a fair and accurate photo?

3  A     Yes, ma'am.

4          MS. CHOY:  The government moves in Exhibit 443.

5          THE COURT:  Any objection?

6          MR. ANDONIAN:  No, Your Honor.

7          THE COURT:  So admitted and may be published to the

8  jury.

9          (Government Exhibit 443 marked and admitted.)

10  BY MS. CHOY:

11  Q     That day in Culpeper, did Sheriff Jenkins tell you

12  anything about the powers or authorities that came with that

13  badge?

14  A     Yes, he did.

15  Q     What did he tell you?

16  A     He said it was an auxiliary license, that it had the same

17  power as a clerical person, and it didn't have the authority of

18  a -- of gun management.

19  Q     Did he tell you that it gave you any authority to carry

20  your own weapon?

21  A     He did.  He said that I could carry in all 50 states, but

22  it may not be recognized, and that he would take a call if

23  needed to validate that I was a part of his team.

24  Q     After you got your badge, did you receive any training

25  from the sheriff's office?

Cooper - Direct

1  A    No.

2  Q    Did you ever come back and volunteer with the sheriff's

3  office?

4  A    No.

5  Q    Did you ever have to qualify with the use of a firearm?

6  A    No.

7  Q    Did you use your badge for anything?

8  A    I did.

9  Q    Could you explain that?

10  A    Yeah.  I had -- across the street at my house, two Fairfax

11  County policemen showed up, and -- at my neighbor's house, and

12  my neighbor is not home, and he had asked me to watch out for

13  his house.  So I went across the street and I thought, okay,

14  I'll take my credential and show these guys so that they won't

15  be nervous at having a big guy from across the street just show

16  up with -- you know, behind them.  So I said, hey, look, I'm

17  okay.  What's going on?  Can I help?  And they said it was just

18  a wellness check, and I said fine, and I went home.  So that

19  was the first time.

20  Q    Were there other times?

21  A    One other time.

22  Q    Please tell us.

23  A    I was on 495 headed to Maryland to see my kids, and the

24  road had a tanker that caught on fire, and the road was

25  completely blocked for miles and miles.  So I went up to a

Cooper - Direct

1  policeman who was directing traffic, and I showed it to him to

2  see if I could get around and see if he could give me some

3  better directions, and he was having none of that.  He said, go

4  that way, and that was it.  He was not impressed.  So that was

5  the last time I ever used it.

6  Q    Earlier you mentioned wanting to carry your gun in your

7  car to Maryland?

8  A    Correct.

9  Q    Did you ever do that?

10 A    I did.

11 Q    Using your badge?

12 A    I did.

13 Q    And do you have a concealed carry permit in Maryland?

14 A    I do not.

15 Q    After you were sworn in, did you seek to have anyone else

16 sworn in as an auxiliary in Culpeper?

17 A    I did.

18 Q    Who was that?

19 A    Dr. Rubar Sandi.

20 Q    Who is Dr. Rubar Sandi?

21 A    He is a businessman.

22 Q    How do you know him?

23 A    I met him through a business meeting and I really liked

24 him.  And he was a very special person in my mind, and my eyes,

25 and we became friends.

Cooper - Direct

1    Q    And at some point, did you raise with him the possibility

2    of becoming a deputy in Culpeper?

3    A    I did.

4    Q    What led you to believe he might be interested in that?

5    A    He told me that he was looking into a 16-hour gun course

6    so that he could get his concealed carry.

7    Q    And how would the deputy badge relate to that gun course?

8    A    Well, I was hoping that if he got a deputy badge that he

9    would not have to take that course.

10   Q    And so did you talk to him about this opportunity?

11   A    I did.

12   Q    What did you tell him about it?

13   A    I told him that I might be able to help him out and get a

14   sheriff's badge from Culpeper.

15   Q    In the initial conversation, did you indicate to him that

16   he'd have to make a payment to Sheriff Jenkins?

17   A    No.

18   Q    Why not?

19   A    Because, one, at first I wasn't sure that Kevin Rychlik

20   would -- or Culpeper would accept him.  So I didn't say

21   anything.

22   Q    And did you take any steps to facilitate Mr. Sandi getting

23   sworn in Culpeper?

24   A    I did.

25   Q    What steps did you take?

Cooper - Direct

1  A    Kevin Rychlik asked me to get his driver's license and

2  provide that so they could do a background check.

3  Q    And did Mr. Sandi -- or I should say Dr. Sandi -- get a

4  date to go to Culpeper to get sworn?

5  A    Eventually, yes.

6  Q    Eventually?  And did you eventually tell him that he would

7  have to make that payment to Scott Jenkins?

8  A    I did eventually two days before.  And so I kind of

9  surprised him with that, and -- so yeah.

10 Q    What was his reaction?

11 A    His reaction was, okay, I'll make the donation.

12 Q    And did you help him obtain the cash needed?

13 A    I did.

14 Q    How did you do that?

15 A    He -- because I sprung it on him at the last moment, he

16 said he didn't have the cash on him, and so I said I would go

17 to the bank and get it, and he could pay me back, which he did.

18 Q    And by the way, why did you discuss with him paying cash

19 instead of check?

20 A    It didn't come up.  He just -- he said he didn't have the

21 cash on him, and I said, okay, I'll get it.  It wasn't

22 discussed.

23 Q    Could we pull up Government's Exhibit 312, which is in

24 evidence, please.

25       What is this document?

Cooper - Direct

1   A     That's my ledger.

2   Q     And what is the transaction that's circled there?

3   A     That's the money that -- the check that I cashed to take

4   out of the bank to give Dr. Sandi.

5   Q     Could we bring up Exhibit 313, which is in evidence.

6         What is this document?

7   A     That's my actual check ledger.

8   Q     And what's reflected there?

9   A     That I wrote a check to myself and that it was for

10  Dr. Sandi.

11  Q     And so did you give that cash to Dr. Sandi?

12  A     I did.

13  Q     And what did he do with it?

14  A     Put it in his pocket.

15  Q     And did you travel to Culpeper with Dr. Sandi for his

16  swearing-in?

17  A     I did.

18  Q     Did that day follow the same general pattern that yours

19  did?

20  A     Exact pattern.

21  Q     Was there a visit to the sheriff's office?

22  A     Yes.

23  Q     Was there a lunch?

24  A     Yes.

25  Q     What was the nature of the conversation at that lunch?

Cooper - Direct

1   A    I'm not really sure, because I pretty well checked out

2   mentally.  There was a lot of them talking and discussing and

3   getting to know each other.

4   Q    Do you recall any questions by Mr. Jenkins about

5   Dr. Sandi's qualifications to be an auxiliary?

6   A    No.

7   Q    Do you remember any discussion about training?

8   A    No.

9   Q    Do you remember Sheriff Jenkins explaining the auxiliary

10  program to him?

11  A    No.

12  Q    Do you remember Sheriff Jenkins discussing his

13  expectations for Dr. Sandi in terms of service to Culpeper?

14  A    No.

15  Q    During that lunch, did Dr. Sandi provide anything to

16  Sheriff Jenkins?

17  A    Yes.  He had a -- had a bag and had Turkish candies and

18  then a -- not a pottery, but a little plaque.

19  Q    A trinket of some kind?

20  A    Yes.

21  Q    Do you know what, if anything else, was in that bag?

22  A    I wasn't sure.

23  Q    You weren't sure?

24  A    No.

25  Q    Okay.  But earlier that day, had you provided Dr. Sandi

Cooper - Direct

1  with $5,000 in cash?

2  A    Yes.

3  Q    And did Dr. Sandi later pay you back that $5,000?

4  A    He did.

5  Q    Could we pull up Exhibit 401, please.  It's already in

6  evidence.

7       Do you recognize this photo?

8  A    I do.

9  Q    Where was it taken?

10 A    It was outside of the steakhouse.

11 Q    And who do you see in this photo?

12 A    Dr. Sandi on the left.  You can see his head.  Kevin

13 Rychlik with his back to us.  Me in the middle.  And Sheriff

14 Jenkins on the right.

15 Q    And what is Sheriff Jenkins holding?

16 A    A bag.

17 Q    Is that the bag that Dr. Sandi gave him?

18 A    Yes.

19 Q    And was there a conversation where you, Dr. Sandi, Scott

20 Jenkins, and Kevin Rychlik discussed what was in that bag?

21 A    Yes.

22         MS. CHOY:  Could we play Government's Exhibit 35,

23 which is in evidence.

24         (Audio playing.)

25 BY MS. CHOY:

Cooper - Direct

1    Q    So who all was present for this conversation?

2    A    Dr. Sandi, Kevin Rychlik, Sheriff Jenkins, and myself.

3    Q    After the lunch, did you go over to the courthouse?

4    A    Yes.

5    Q    What happened at the courthouse?

6    A    Dr. Sandi got sworn in by the clerk of the court.

7    Q    Could we please pull up Government's Exhibit 402.

8         Do you recognize this?

9    A    I do.

10   Q    What's depicted in this photo?

11   A    This is Dr. Sandi getting sworn in by the clerk of the

12   court for his badge.

13   Q    Is it a fair and accurate depiction of Dr. Sandi getting

14   sworn in?

15   A    Yes, ma'am.

16             MS. CHOY:  The government moves Exhibit 402 into

17   evidence.

18             THE COURT:  Any objection?

19             MR. ANDONIAN:  No.

20             THE COURT:  So admitted and may be published to the

21   jury.

22             (Government Exhibit 402 marked and admitted.)

23   BY MS. CHOY:

24   Q    Can you tell us who are the individuals that are pictured?

25   A    Clerk of the court on the left, Dr. Sandi in the middle,

Cooper - Direct

1  and me on the right.

2  Q    What happened after Dr. Sandi was sworn in?

3  A    We went back to the sheriff's station.

4  Q    Could we pull up Government's Exhibit 403, please.

5       What's depicted in this photo?

6  A    Sheriff Jenkins and Dr. Sandi shaking hands, getting his

7  badge.

8  Q    Is that a fair and accurate depiction of Dr. Sandi and

9  Sheriff Jenkins shaking hands?

10 A    Yes, it is.

11            MS. CHOY:  The government moves 403 into evidence.

12            THE COURT:  Any objection?

13            MR. ANDONIAN:  No.

14            THE COURT:  So admitted and may be published to the

15 jury.

16            (Government Exhibit 403 marked and admitted.)

17 BY MS. CHOY:

18 Q    Is that Dr. Sandi on the left?

19 A    Yes.

20 Q    And this is taken in the conference room at the sheriff's

21 office?

22 A    Yes, it was.

23 Q    You can take that down.  Thank you.

24       So at any time during that visit to Culpeper, did

25 Dr. Sandi and Sheriff Jenkins discuss Dr. Sandi purchasing a

Cooper - Direct

1  gun from Sheriff Jenkins?

2  A    Not that I know of.

3  Q    So was there any discussion at all that the money that

4  Dr. Sandi was giving to Sheriff Jenkins was for the purchase of

5  a firearm?

6  A    Not that I know of.  I knew nothing about any conversation

7  they might have had.

8  Q    What was your understanding of what that money was for?

9  A    The same as what mine was for, political donation for his

10 re-election.

11 Q    And what would he -- what was your understanding of what

12 he was expecting in exchange, if anything?

13 A    His credentials and badge, sheriff's badge.

14 Q    So having gone through this process twice, and looking

15 back now with the wisdom of hindsight, what's your impression

16 of how these events unfolded?

17 A    It was very, very smooth, very orchestrated, and protocol

18 driven.

19         MS. CHOY:  Thank you.

20         THE COURT:  All right.  Mr. Andonian, how long do you

21 think your cross will be?  Is it better to take a break before

22 we start our cross?

23         MR. ANDONIAN:  Sure, Your Honor.

24         THE COURT:  Yeah, why don't we do that.  Ladies and

25 gentlemen, we've been going about an hour and a half.  Why

Cooper - Direct

1  don't we take a break for 15 minutes.  We'll come back at 3:45

2  and make our final run to the end of the day.

3          Again, I'll remind you, please do not discuss the

4  case amongst yourselves or begin to make any decisions until

5  after all the evidence is in.  Allow the jury to recess until

6  3:45.

7  **(***Jury out, 3:30 p.m.***)**

8          THE COURT:  Mr. Cooper, while we are on break, I will

9  remind you that you're not to have any discussions at all with

10 anyone about your testimony since you're still in the midst of

11 testifying.

12         THE WITNESS:  I'm going to sit right here.

13         THE COURT:  Okay.  That's fine by me, sir.

14         Anything we need to address, Ms. Choy, from the

15 government's perspective?

16         MS. CHOY:  No, Your Honor.

17         THE COURT:  Mr. Andonian?

18         MR. ANDONIAN:  No, Your Honor.

19         THE COURT:  All right.  Very well.  We'll be in

20 recess until 3:45.

21         (Recess.)

22         THE COURT:  We're back on the record in the matter of

23 *United States v. Jenkins*.  The government is present by

24 counsel.  The defendant is present along with the benefit of

25 counsel.

Cooper - Cross

1           Ms. Choy, anything we need to take up before we bring

2    the jury in?

3           MS. CHOY:  No, Your Honor.

4           THE COURT:  Mr. Andonian?

5           MR. ANDONIAN:  No, Your Honor.

6           THE COURT:  Let's bring the jury in, please.

7    (*Jury in, 3:48 p.m.*)

8           THE COURT:  Ladies and gentlemen, please have a seat.

9           The jury is present and seated.

10          All right.  Let's call our next witness, please.

11          MR. ANDONIAN:  I believe --

12          THE COURT:  Oh, that's right.  It's

13   cross-examination.  Excuse me.  I was lost where we were.  I

14   was wondering why I wasn't getting a response from the

15   government.

16          I apologize, Mr. Andonian.  Go right ahead.

17          MR. ANDONIAN:  Thank you, Your Honor.

18                         CROSS-EXAMINATION

19    BY MR. ANDONIAN:

20   Q    Good afternoon, Mr. Cooper.

21   A    Good afternoon.

22   Q    Mr. Cooper, in 2022 in the fall, the period that we were

23   talking about here, you lived in Fairfax County; is that

24   correct?

25   A    Yes.

Cooper - Cross

1  Q    And that's about an hour's drive from Culpeper, right?

2  A    Correct.

3  Q    Okay.  And at that time, you owned firearms, right?

4  A    Correct.

5  Q    And you knew how to shoot them?

6  A    Yes.

7  Q    And you talked a little bit about -- on direct about what

8  you did or didn't do in terms of volunteering for the Culpeper

9  County sheriff's office.  But it's true that you would have

10 been there had Scott Jenkins asked a favor of you or asked

11 something of you, correct?

12 A    Yes.

13 Q    And again, only being an hour away, you would have been

14 able to get to Culpeper relatively easily?

15 A    Correct.

16 Q    In terms of the process that you went through to get a

17 badge and to give the political contribution to Sheriff

18 Jenkins, Kevin Rychlik was your point of contact, right?

19 A    Correct.

20 Q    And he was the person that you cultivated a relationship

21 with, right?

22 A    Yes.

23 Q    And he's the one that coordinated the swearing-in

24 ceremony?

25 A    Correct.

Cooper - Cross

1  Q    And he's the one that coordinated the lunch with Sheriff

2  Jenkins?

3  A    Correct.

4  Q    When you arrived at the Culpeper County sheriff's office

5  on the day that you received the badge from Sheriff Jenkins,

6  you had a check from your business on your person, right?

7  A    Correct.

8  Q    And it was just -- it wasn't even in an envelope, was it?

9  A    No.

10 Q    It was just you had the check and it was out there in the

11 open for anyone to see, right?

12 A    Yes.

13 Q    And you put it on the table?

14 A    Yes.

15 Q    Okay.  And the memo line on that check said re-election,

16 right?

17 A    Correct.

18 Q    Because that's what you intended that check for, correct?

19 A    Correct.

20 Q    On the topic of Dr. Sandi, just switching gears, Dr. Sandi

21 is somebody that you knew pretty well at that time in the fall

22 of 2022, right?

23 A    Yes.  He was a new relationship; I had known him about

24 maybe five months.

25 Q    Okay.  But you knew that Dr. Sandi was himself an

Cooper - Cross

1   auxiliary deputy at a sheriff's office in New Orleans, I

2   believe, right?

3   A    I found that out, yes.

4   Q    Right.  He was a colonel, I think was his rank?

5   A    Correct.

6   Q    Now, you had heard about Scott Jenkins before you met him,

7   right?

8   A    Correct.

9   Q    And you had heard that he had been a speaker at CPAC,

10  right?

11  A    Correct.

12  Q    That's the -- I'm not going to try to guess, but it's a

13  conservative convention?

14  A    Correct.

15  Q    Okay.  You testified on direct that you liked Sheriff

16  Jenkins's platform?

17  A    Correct.

18  Q    And that platform included Sheriff Jenkins's stance on the

19  Second Amendment, right?

20          MS. CHOY:  Objection.  Calls for hearsay.

21          THE COURT:  Well, I'll let him testify to what he

22  knows.

23          THE WITNESS:  Ask again, please.

24  BY MR. ANDONIAN:

25  Q    Sure.  When you say that you liked Sheriff Jenkins's

Cooper - Redirect

1   platform, part of that platform included Sheriff Jenkins's

2   stance on the Second Amendment?

3   A    Correct.

4            MR. ANDONIAN:  The Court's brief indulgence?

5            THE COURT:  Yes, sir.

6            MR. ANDONIAN:  I have nothing further.  Thank you.

7            THE COURT:  All right.  Thank you.

8            Any redirect, Ms. Choy?

9                       REDIRECT EXAMINATION

10   BY MS. CHOY:

11   Q    So when you gave Sheriff Jenkins the check that you gave

12   him, that was in the conference room in the sheriff's office,

13   correct?

14   A    Correct.

15   Q    And there were only four people present?

16   A    Correct.

17   Q    And did you expect that you would get something in

18   exchange for that check?

19   A    Yes.

20   Q    And what was it you expected to get in exchange?

21   A    My badge and credentials.

22   Q    Would you have given him that check if you didn't expect

23   anything in exchange?

24   A    Not without knowing him a lot better, I would not have.

25   Q    So no?

Cooper - Redirect

1  A     No.

2  Q     And you testified that you had heard something about his

3  platform?

4  A     Yes.

5  Q     Was that the reason you gave the check?

6  A     The reason why I gave the check was I trusted my attorney,

7  Fred Gumbinner, to give me directions.  And after getting to

8  know Kevin Rychlik, I assumed he was credible, and that this

9  was a process that you go through.  And I was totally ignorant

10 of the process, quite frankly.  And what was your question

11 again, please?

12 Q     Sure.  The question was just, why did you give that check?

13 A     I gave it because I wanted my credentials and I felt good

14 about supporting somebody that had the same ideology as I did.

15        MS. CHOY:  Thank you.

16        THE COURT:  Thank you.  May this witness be excused?

17        MS. CHOY:  Yes.

18        THE COURT:  All right.  Thank you very much,

19 Mr. Cooper.  You may be excused.  Please do not discuss your

20 testimony as long as the case is pending.

21        THE WITNESS:  Promise.

22        THE COURT:  Thank you very much.

23        All right.  Let's call our next witness.  Ms. Peng?

24        MS. PENG:  The United States calls Jim Metcalf.

25        THE COURT:  Jim Metcalf.

Metcalf - Direct

1          Mr. Metcalf, come on up, if you would, please, sir.

2          Come right on up here and Ms. Brown will get you

3   sworn in, and we'll get you in the witness box.

4          JAMES METCALF, CALLED BY THE GOVERNMENT, SWORN

5          THE COURT:  Step right on over here to the witness

6   box.  As you step in and sit down, if you can slide up to the

7   microphone and bring the microphone over to you and speak into

8   it, I'd be much obliged.

9          THE WITNESS:  Yes, sir.  Does that work?

10          THE COURT:  Yes, sir.

11                          DIRECT EXAMINATION

12   BY MS. PENG:

13   Q    Hello, sir.  Would you please state your name and spell

14   your last name?

15   A    James Metcalf, M-E-T-C-A-L-F.

16   Q    Mr. Metcalf, where do you currently live?

17   A    Manassas, Virginia.

18   Q    How long have you lived there?

19   A    37 years.

20   Q    Have you ever been a resident of Culpeper County?

21   A    No, ma'am.

22   Q    What do you do for work?

23   A    I'm in the government IT space.

24   Q    Can you tell me a little bit more about that?

25   A    I provide information technology consulting to government

Metcalf - Direct

1  agencies.

2  Q    What is the name of your company?

3  A    Yona, Y-O-N-A, Systems Group, Incorporated.

4  Q    In 2022, did you pay $5,000 to then-Sheriff Scott Jenkins

5  of Culpeper County in exchange for an appointment as an

6  auxiliary sheriff?

7  A    Yes.

8  Q    For that conduct, did you plead guilty to one count of

9  bribery concerning programs receiving federal funds?

10  A    Yes.

11  Q    In your own words, what did you do that made you guilty of

12  that crime?

13  A    Paid the $5,000 in exchange for an appointment as a

14  deputy.

15  Q    Paid to who?

16  A    The campaign of Sheriff Scott Jenkins.

17  Q    Now, in connection with that guilty plea, did you enter a

18  plea agreement with the United States?

19  A    Yes.

20  Q    And at some point, did you also decide to cooperate with

21  the government?

22  A    Yes.

23  Q    What is your understanding of what your obligations are

24  when cooperating with the government?

25  A    To appear in court and testify truthfully.

Metcalf - Direct

1  Q    All right.  I want to talk to you a little bit more about

2  that.  But first, tell me how you came to understand that if

3  you gave $5,000 to Scott Jenkins you could get deputized as an

4  auxiliary.

5  A    That information was shared with me by Kevin Rychlik.

6  Q    And what did Kevin Rychlik tell you?

7  A    He advised me that he could facilitate my appointment as a

8  deputy in Culpeper County, that there would be a donation

9  required to the sheriff.

10 Q    Did he tell you anything else about that process?

11 A    Not particularly, although we spoke many times about that

12 over a long period of time.

13 Q    Did he tell you that you could bypass certain tasks that

14 other deputies might have to do?

15 A    He did share that.

16 Q    What did he tell you about that?

17 A    My interest was very specific over there, and he knew

18 that.  I had worked with him in that capacity elsewhere.  And

19 that is a pretty coveted duty.  And he did share that we could

20 perhaps get others who may want to do that so that I could do

21 it.

22 Q    Do what exactly?  Can you clarify?

23 A    My interest was in police motorcycle operations.

24 Q    So that's what you were interested in doing?

25 A    Yes, ma'am.

Metcalf - Direct

1  Q    And you were not interested in performing other duties

2  that might be there?

3  A    Not specifically, but certainly as a primary would be the

4  motorcycle.

5  Q    Okay.  And so in communicating to you about being

6  deputized in Culpeper County, that was one of the things that

7  Kevin Rychlik discussed with you?

8  A    Yes, ma'am.

9  Q    When did you first meet Scott Jenkins?

10 A    I first met Scott Jenkins at National Night Out in August

11 of 2022.

12 Q    What is National Night Out?

13 A    It's a national dog and pony show for law enforcement

14 agencies around the country to show their people, resources,

15 and equipment.

16 Q    Is it a community event of sorts?

17 A    Yes, ma'am.

18 Q    Did you speak to Scott Jenkins at that event?

19 A    I did.

20 Q    Can you tell me about what you talked to him about?

21 A    It was a very busy event with lots of people.  Mr. Rychlik

22 introduced me to the sheriff, and we spoke in generality.  I

23 assumed Mr. Rychlik had -- he's the one who invited me there --

24 I assumed that he intended to introduce me and knew what my

25 intentions were in any discussions he may have had with the

Metcalf - Direct

1    sheriff.  Very general discussion about nice to meet him and

2    nothing specific.  It was a big event.

3    Q    So it was a brief introduction to Scott Jenkins?

4    A    Yes, ma'am.

5    Q    Did the topic of getting a badge come up in that

6    conversation?

7    A    No, ma'am.

8    Q    At some point after that National Day Out, did you decide

9    that you actually did want to make a donation for a badge?

10   A    One week later, I told then-lieutenant Kevin Rychlik that

11   I would be interested in joining the Culpeper County sheriff's

12   office.

13   Q    And what did you -- did you have any additional

14   conversation with Kevin Rychlik about that?

15   A    Many subsequent to that, but it was at that time that he

16   advised me of the procedure.

17   Q    What did he tell you about the procedure?

18   A    He told me that it was a donation -- could I make a

19   donation to the sheriff's office, and that a donation was

20   required, and he even provided me the amount.

21   Q    What did he tell you was the required donation amount?

22   A    $5,000.

23   Q    Now, aside from the National Day Out and prior to you

24   eventually getting a badge, did you ever speak to Scott Jenkins

25   directly?

Metcalf - Direct

1  A    No, ma'am.

2  Q    Did it concern you that you had not spoken to Scott

3  Jenkins directly?

4  A    It did not.  Kevin was carrying lieutenant arms and

5  credentials, and he had been there a very long time.

6  Q    Did you believe that Kevin Rychlik acted with authority

7  from Scott Jenkins?

8  A    I did.

9  Q    Why did you believe that?

10 A    Again, his tenure there was 12 years, came into office

11 with the sheriff.  And I had -- he had risen through the ranks

12 from sergeant to lieutenant, and I had no reason to think he

13 didn't have excellent access there.

14 Q    And so when Kevin Rychlik told you that you could get a

15 badge for $5,000, you believed him?

16 A    I did.

17 Q    And in fact, did you get a badge from Scott Jenkins after

18 you paid $5,000?

19 A    I did.

20 Q    Just like Kevin Rychlik said you would?

21 A    Yes, ma'am.

22 Q    All right.  I'm going to direct your attention to

23 September 7th, 2022.  Is that when you met Scott Jenkins for

24 the second time?

25 A    Yes, ma'am.

Metcalf - Direct

1   Q    Was that the day that you got your badge?

2   A    Yes, ma'am.

3   Q    All right.  Did you bring anything with you to that

4   meeting?

5   A    Yes.

6   Q    What did you bring with you?

7   A    I brought a check payable to the sheriff's campaign fund

8   in the amount of $5,000 in a white envelope.

9   Q    In a white envelope, you said?

10  A    Yes, ma'am.

11  Q    Would you have brought that check if you did not expect to

12  be sworn that day?

13  A    No.

14  Q    Where did you go with that check?

15  A    We went to the sheriff's office where I got into

16  Lieutenant Rychlik's car and rode to a restaurant in downtown

17  Culpeper.

18  Q    And what happened next?

19  A    We had lunch, Mr. Rychlik, the sheriff, and I, at that

20  location.  And then departed and went directly to the

21  courthouse.

22  Q    Do you recall what you, Kevin Rychlik, and Scott Jenkins

23  discussed at lunch?

24  A    That was a very generic discussion about the agency, the

25  sheriff's missions, goals, needs.  It was a cordial lunch about

Metcalf - Direct

1  -- just a general more detailed discussion than we had had at

2  the National Night Out.

3  Q    Did Scott Jenkins tell you what would be required of you

4  as an auxiliary deputy?

5  A    He did not specifically address that with me at that

6  lunch.

7  Q    Did he ask you to fill out any paperwork?

8  A    No, ma'am.

9  Q    Did he tell you that an interview would be required?

10 A    No, ma'am.

11 Q    Did he ask for any references?

12 A    No, ma'am.

13 Q    Did he tell you about any training requirements for

14 auxiliaries?

15 A    No, ma'am.

16 Q    Did he tell you you had to make any time commitments?

17 A    No, ma'am.

18 Q    At what point did you give Scott Jenkins the envelope

19 containing the $5,000 check?

20 A    As we departed lunch, at the end of lunch, en route to the

21 vehicles to head to the courthouse.

22 Q    Was it in the parking lot?

23 A    In the parking lot, yes, ma'am.

24 Q    Was Scott Jenkins surprised when you handed him that

25 envelope?

Metcalf - Direct

1   A    He did not appear surprised.

2   Q    Did he open it to see what was inside?

3   A    No, ma'am.

4   Q    Did he act as if he knew exactly what you were giving him?

5           MR. ANDONIAN:  Objection to the leading, Your Honor.

6           THE COURT:  Yeah, you're starting to lead.  So go

7   ahead and rephrase.

8    BY MS. PENG:

9   Q    Did he ask you what was inside?

10  A    No, ma'am.

11  Q    Did he appear to you like he knew what exactly you were

12  giving him?

13  A    His appearance was fairly ambivalent.  It didn't seem out

14  of the ordinary.  Nothing unusual.  I handed it to him.  He

15  accepted it.

16  Q    Can we pull up Exhibit 428, please.

17       Mr. Metcalf, do you see 428 on your screen?

18  A    Yes, ma'am.

19  Q    Do you recognize what it's depicting?

20  A    A couple have gone by here.  This picture here is me

21  handing the check to the sheriff.

22  Q    Hold on a second.  Let me ask you a question first.

23  A    Sorry.

24  Q    Do you recognize these as photographs of your interactions

25  with Scott Jenkins that day?

Metcalf - Direct

1    A    Yes, ma'am.

2              MS. PENG:  Move to admit 428 at this time.

3              THE COURT:  Any objection?

4              MR. ANDONIAN:  No, Your Honor.

5              THE COURT:  Be admitted and it may be published to

6    the jury.

7              (Government Exhibit 428 marked and admitted.)

8     BY MS. PENG:

9    Q    So on page 1 of 428, can you describe what we're seeing

10   here, Mr. Metcalf?

11   A    That is Lieutenant Rychlik, myself, and the sheriff

12   departing the restaurant where we had lunch.

13   Q    So this is right after the lunch you just described?

14   A    Yes, ma'am.

15   Q    Next one, please.

16        And what is it that we're looking at here?

17   A    That looks like the lower -- right on there, it says --

18   that lower door of the courthouse.  But I don't know whether

19   that's us entering or exiting.

20   Q    So it's either you entering or exiting the Culpeper County

21   courthouse?

22   A    Correct.

23   Q    What happened at the Culpeper County courthouse?

24   A    I was sworn in by the clerk of the court.

25   Q    Next page, please.

Metcalf - Direct

1        Is this you and Mr. Rychlik again?

2   A    Yes.  And that looks like us exiting to my vehicle in that

3   parking lot.

4   Q    Next page.  Next page.

5        What is it that we're looking at here?

6   A    That's me handing the white envelope to the sheriff in the

7   parking lot just outside where we had lunch.

8   Q    That's the envelope containing the check?

9   A    Yes, ma'am.

10  Q    And does this look like a screenshot of a video?

11  A    Yes, ma'am.

12  Q    Can we pull up 414, please.

13       Is this the same photograph that we were just looking at?

14  A    Yes, ma'am.

15           MS. PENG:  I move to admit 414.

16           THE COURT:  Any objection?

17           MR. ANDONIAN:  No objection.

18           THE COURT:  Admitted and may be published to the

19  jury.

20           (Government Exhibit 414 marked and admitted.)

21   BY MS. PENG:

22  Q    Can we pull up next 310.

23       Mr. Metcalf, do you recognize what 310 is?

24  A    I'm sorry.

25           THE COURT:  And this is already in evidence.

Metcalf - Direct

1           MS. PENG:  Oh.  May we publish, then?

2           THE COURT:  Yes.

3   BY MS. PENG:

4   Q    Do you recognize what 310 is?

5   A    Yes, ma'am.  It looks like a bank records copy of the

6   check that I wrote to the sheriff's campaign.

7   Q    This is a check that you wrote?

8   A    Yes, ma'am.

9   Q    Is this the same check that you handed him that day?

10  A    Yes, ma'am.

11  Q    And at the top of this check it says, Yona Systems Group,

12  Inc.?

13  A    Yes, ma'am.

14  Q    Is that the name of your business?

15  A    Yes.

16  Q    And that's your signature on the check?

17  A    Yes.

18  Q    You can take that down.

19       So you were saying -- at what point did you go to the

20  clerk's office to swear an oath to become an auxiliary?

21  A    Immediately following lunch.

22  Q    Can we pull up 709, please.  It's already in evidence, so

23  it may be published.

24       Mr. Metcalf, do you recognize what this document is?

25  A    Yes.

Metcalf - Direct

1    Q    What is it?

2    A    It's the oath of office.

3    Q    And this is the oath of office you signed that day?

4    A    Yes.

5    Q    And that's your signature there?

6    A    Yes, ma'am.

7    Q    And the signature below is the clerk of court?

8    A    I assume so.

9    Q    Can we pull up 426, please.

10        Do you recognize what this photograph is depicting?

11   A    Yes, ma'am.

12   Q    What is it?

13   A    It's me taking the oath from who I was told was the clerk

14   of the court.

15        MS. PENG:  I would move to admit 426 and publish,

16   please.

17            THE COURT:  Any objection?

18            MR. ANDONIAN:  No objection.

19            THE COURT:  May be admitted and published to the

20   jury.

21            (Government Exhibit 426 marked and admitted.)

22   BY MS. PENG:

23   Q    Mr. Metcalf, what happened after you took the oath in the

24   clerk's office that day?

25   A    We departed from the courthouse and returned back to the

Metcalf - Direct

 1  sheriff's office.

 2  Q    And did you encounter Mr. Jenkins again?

 3  A    I did.

 4  Q    Can you tell me what happened?

 5  A    We came back to the office.  I believe I was processed for

 6  my ID before we actually had contact directly with the sheriff,

 7  but I could have that incorrect.  And then afterwards we spoke

 8  with the sheriff briefly at the office, Kevin, myself, and the

 9  sheriff.

10  Q    Did you receive a badge from Mr. Jenkins?

11  A    I did.

12  Q    Can we pull up 427.

13       Do you recognize what 427 is depicting?

14  A    Yes, ma'am.

15  Q    What is it?

16  A    It's a photo of the sheriff presenting me with the badge

17  in the conference room.

18            MS. PENG:  Move to admit 427 and publish, please.

19            THE COURT:  Any objection?

20            MR. ANDONIAN:  No, Your Honor.

21            THE COURT:  So admitted and may be published to the

22  jury.

23            (Government Exhibit 427 marked and admitted.)

24  BY MS. PENG:

25  Q    So what is it that you're holding in your hand?

Metcalf - Direct

1  A    That's a traditional five-star sheriff's badge that said

2  Culpeper County sheriff's office deputy sheriff.

3  Q    And that was the photograph that was taken in the

4  sheriff's office conference room after lunch?

5  A    Yes.

6  Q    You can take that down, thank you.

7       At some point, were you approached by the FBI for an

8  interview regarding your dealings with Scott Jenkins?

9  A    Yes.

10 Q    Has that been the first time you spoke to the FBI?

11 A    At all?

12 Q    Yeah.

13 A    In my total history?

14 Q    Well, was that the only time the FBI has approached you

15 for an interview?

16         THE COURT:  Regarding this matter?

17 BY MS. PENG:

18 Q    Regarding this matter?

19 A    Yes, ma'am.

20 Q    And during that initial interview with the FBI, did you

21 deny paying a bribe?

22 A    Yes, ma'am.

23 Q    Was that a lie?

24 A    Yes.

25 Q    Why did you lie?

Metcalf - Direct

1    A    They arrived very early in the morning.  I had just gotten

2    up.  It was a little startling.  I knew who they were by their

3    attire and demeanor immediately.  And so between being a little

4    bit startled, nervous, and my knee-jerk reaction was I did not

5    want to get in trouble.  That was the basis of the start of our

6    discussion.

7    Q    Did you have a second interview with the FBI about the

8    same matter about a month later?

9    A    I apologize.  I don't know that I -- just with the FBI?

10   Q    About the investigation, yes?

11   A    I don't recall a second discussion solely with the FBI.

12   Q    Who do you recall that discussion with?

13   A    I met with the DOJ in a proffer meeting, but it was

14   attended by more than just the FBI.

15   Q    I apologize.  With the Department of Justice, did you have

16   a second meeting?

17   A    Yes, ma'am, I did.

18   Q    And during that interview, did you essentially come clean

19   about the exchange that we just -- you just testified about?

20           MR. ANDONIAN:  Objection again to the leading, Your

21   Honor.

22           THE COURT:  Sustained.  Rephrase the question.

23   BY MS. PENG:

24   Q    What did you tell them during that second interview, the

25   Department of Justice?

Metcalf - Direct

1    A    There were a series of questions over a period of time.   I

2    don't know if I can summarize that totally, but there was a

3    very comprehensive list of questions that I was asked by the

4    DOJ at that meeting.   And it went on for maybe an hour and a

5    half or two hours.

6    Q    Well, during that second interview, did you tell them that

7    you had, in fact, paid a bribe to Scott Jenkins for the badge?

8              MR. ANDONIAN:   Objection, leading.

9              THE COURT:   Rephrase.

10   BY MS. PENG:

11   Q    Did you discuss the topic of the bribe and the lie that

12   you told in the first interview?

13   A    Yes, ma'am.

14   Q    What did you tell them about that?

15   A    More details about how it happened, and why it happened,

16   and the mechanics of how it happened, which changed perhaps the

17   perspective you're referring to in my first visit.

18   Q    Did you tell them it was a bribe?

19   A    Yes, ma'am.

20   Q    Now, after that second interview, were you charged by an

21   indictment along with others for conspiracy, honest services

22   fraud -- sorry -- honest services wire and mail fraud and

23   bribery?

24   A    Yes, ma'am.

25   Q    Did you plead guilty to bribery, one of those counts,

Metcalf - Direct

1  pursuant to a plea agreement?

2  A    Yes.

3  Q    And then we already discussed that you've decided to

4  cooperate with the government?

5  A    Yes.

6  Q    As part of that plea agreement, did you acknowledge that

7  even if you fully cooperated with law enforcement, the United

8  States is under no obligation to recommend a reduction in your

9  sentence?

10 A    Yes.

11 Q    Have you been sentenced yet in connection with your

12 bribery conviction?

13 A    No.

14 Q    Have any promises been made to you regarding whether or

15 not you will receive a recommendation for a reduced sentence?

16 A    No.

17 Q    Who will decide what your sentence will be?

18 A    The judge.

19 Q    Do you understand that even if the prosecution did make a

20 recommendation that you should receive a reduced sentence, the

21 court can ignore that recommendation?

22 A    I do.

23         MS. PENG:  Ms. Fastenau, can you pull up Government

24 Exhibit 444.

25 BY MS. PENG:

Metcalf - Direct

1   Q    And I'm going to hand you what's been marked as 515 and

2   516.

3        Mr. Metcalf, do you recognize what is inside of 515 and

4   516?

5   A    I do.

6   Q    What are they?

7   A    This is my issued Culpeper County sheriff's ID and the

8   badge that was given to me by the sheriff in the conference

9   room.

10  Q    And do you recognize what is on Government Exhibit 444?

11  A    Is that on my screen?

12  Q    Yeah.

13  A    Yeah, if that's -- I don't see a number.  I apologize.

14  But if that's -- okay.  There we go.  Thank you.  That's just a

15  picture of both of these two items.

16            MS. PENG:  Move to admit those exhibits at this time.

17            THE COURT:  Are you admitting 515 and 516, or are

18  they just demonstrative?

19            MS. PENG:  I'm admitting them.

20            THE COURT:  All right.  So any objection?

21            MR. ANDONIAN:  No, Your Honor.

22            THE COURT:  So all three will be admitted and may be

23  published to the jury.

24            (Government Exhibits 444, 515, and 516 marked and

25  admitted)

Metcalf - Direct

1  BY MS. PENG:

2  Q    Would you please just hold up the badge and credential for

3  the jury?

4  A    (Witness complies).

5  Q    Mr. Metcalf, what did you understand this badge and

6  credentials allow you to do?

7  A    These credentials are -- give you the authority of a

8  deputy sheriff in the Commonwealth of Virginia, most

9  specifically in Culpeper.

10 Q    So you understood that they gave you the same authority as

11 a regular deputy?

12 A    That's what I assumed, yes, ma'am.

13 Q    What did it entitle you to do with respect to carrying a

14 weapon?

15            MR. ANDONIAN:  Objection, leading.

16            THE COURT:  To the extent he knows, I'll allow him to

17 answer.

18            MS. PENG:  Let me rephrase.

19            THE WITNESS:  Thank you.

20 BY MS. PENG:

21 Q    What is your understanding of what, if anything, it

22 allowed you to do with respect to carrying a weapon?

23 A    It was assumed by me that it would allow you to carry a

24 weapon in the course of your duties and off duty.

25 Q    Does that mean conceal and carry?

Metcalf - Direct

1   A    Yes, ma'am.

2   Q    What did you understand it allowed you to do with respect

3   to arrest authority?

4   A    I assumed full power of arrest.

5   Q    That with that badge you have the full power of arrest?

6   A    Yes, ma'am.

7   Q    Once you were sworn in, did you receive any training from

8   the Culpeper sheriff's office?

9   A    No, ma'am.

10  Q    Did you ever end up doing anything for Culpeper County?

11  A    No, ma'am.

12  Q    Did you actually want to do something for Culpeper County?

13  A    I did.

14  Q    Did you express that to Scott Jenkins when you met him?

15  A    I did.

16  Q    But you were never asked to do anything?

17  A    No, ma'am.

18  Q    Did you end up using your badge for anything?

19  A    No, ma'am.

20  Q    You never showed it to anyone?

21  A    No, ma'am.

22  Q    Now, did you give that $5,000 check to Scott Jenkins

23  because you supported his political agenda?

24  A    That was not the primary motivation.

25  Q    What was the reason you gave him that check?

Metcalf - Direct

1  A    It was part and parcel of what Lieutenant Rychlik

2  explained was the process of becoming deputized.

3  Q    My question was:  What was the reason you gave him the

4  $5,000?

5  A    To fulfill the monetary component of the specifics that

6  Mr. Rychlik clearly laid out.  So it was a donation in exchange

7  for the badge.

8  Q    Now, did you intend to recruit more individuals who would

9  pay money for a badge from Scott Jenkins?

10  A    If I could change your wording, I didn't intend to, but I

11  was asked if I could help in that process.

12  Q    And did you give that help?

13  A    I did.

14  Q    Can you tell me about what you did?

15  A    I reached out to a number of individuals after hearing

16  that the -- I overhead a conversation between Mr. Rychlik and

17  the sheriff looking to build a war chest to -- a potential

18  political candidate.  And then Mr. Rychlik asked me if I knew

19  anybody that would be interested in the program.  I know many

20  people because of a long history, and so I reached out to a few

21  people.

22  Q    How many people did you end up identifying to participate?

23  A    I identified specifically four total.

24  Q    And how many of them ended up being sworn in auxiliary

25  deputies in Culpeper County?

Metcalf - Direct

1    A    One.

2    Q    Who was that person?

3    A    Phil Howell.

4    Q    Who is Phil Howell?

5    A    A friend of mine who served with me in the Prince William

6    County sheriff's office.

7    Q    Did you accompany Phil Howell to get sworn in?

8    A    I did.

9    Q    Do you recall approximately when that was?

10   A    Vague, but I think it was December of 2022.

11   Q    So can you tell me briefly what happened when you

12   accompanied Phil Howell to get sworn in?

13   A    I went with Phil and Lieutenant Rychlik to lunch with the

14   sheriff at the same location that I had met prior, and then I

15   went with Phil to the clerk's office, and I also went with him

16   back to the sheriff's office.

17   Q    So was that similar to the process you went through?

18   A    Yes.

19   Q    Did you see Phil Howell make -- give Scott Jenkins a

20   donation?

21   A    I saw him hand an envelope to the sheriff in the

22   conference room that I assumed was that, but that's what I did

23   see.

24   Q    What were you able to observe about the envelope that Phil

25   Howell gave to Scott Jenkins?

Metcalf - Direct

1  A    At the moment I saw it, it appeared pretty thick, but

2  that's all I recognized.

3  Q    Pretty thick, what do you mean by that?

4  A    It appeared to be a thick envelope to me.

5  Q    Did you tell Phil Howell how much money he was supposed to

6  give?

7  A    I did not tell him, but I did inform him what I had done.

8  Q    You told him that you gave $5,000?

9  A    Yes.

10         MS. PENG:  Can we pull up what's already been

11  admitted as Government's Exhibit 7, please.

12         (Audio playing.)

13   BY MS. PENG:

14  Q    What is it that we're looking at in this recording,

15  Mr. Metcalf?

16  A    That's a conversation between the sheriff and I, and

17  Mr. Rychlik is there as well, walking out of the restaurant

18  towards the vehicles.

19  Q    Is this the interaction you described for us earlier where

20  you handed him the check?

21  A    If it's the instance where I was there, yes.  This is -- I

22  assume this is a video of my lunch.  I was also at one with

23  Phil Howell in the same --

24  Q    Well, do you recognize yourself in this video?

25  A    I don't see myself in the video clip you played, but I

Metcalf - Direct

 1  recognize my voice.

 2          MS. PENG:  Let's keep playing.

 3          (Audio playing.)

 4   BY MS. PENG:

 5  Q    Having seen the full clip, do you recognize this clip?

 6  A    Yes.  That is the video of us departing lunch, and I'm in

 7  that video.

 8  Q    And did that video capture you handing him the check?

 9  A    Yes, ma'am.

10          MS. PENG:  Can we pull up Government's Exhibit 8.

11          (Audio playing.)

12          Can you stop it for a sec.

13   BY MS. PENG:

14  Q    Do you recognize this as a continuation of the video we

15  were just looking at?

16  A    Yes.

17          MS. PENG:  Move to admit Government's Exhibit 8.

18          THE COURT:  Any objection?

19          MR. ANDONIAN:  No.

20          THE COURT:  So admitted and may be published to the

21  jury.

22          (Government Exhibit 8 marked and admitted.)

23          MS. PENG:  Can you go back to the beginning of the

24  video and then publish, please.

25          (Audio playing.)

Metcalf - Direct

1    BY MS. PENG:

2    Q    Mr. Metcalf, can you describe what was just depicted on

3    that video?

4    A    That's Lieutenant Rychlik and I getting back in my car to

5    head from the lunch restaurant to the courthouse.

6    Q    And earlier in the clip you were interacting with

7    Mr. Jenkins right after the lunch?

8    A    Yes.

9    Q    What did you mean in that video when you said that's a

10   good old boy?

11   A    I meant that my impression of the sheriff after lunch,

12   that he was a good old boy.

13   Q    What is that term?

14   A    I thought he was a good guy.

15           MS. PENG:  Can we pull up Government's Exhibit 9.

16           (Audio playing.)

17           Can you pause right there.

18    BY MS. PENG:

19   Q    Do you recognize this as a continuation of the prior video

20   we were just looking at with you and Kevin Rychlik?

21   A    Yes.

22           MS. PENG:  Your Honor, I move to admit Government's

23   Exhibit 9.

24           THE COURT:  Any objection?

25           MR. ANDONIAN:  No, Your Honor.

Metcalf - Direct

1          THE COURT:  So admitted and may be published to the

2    jury.

3          (Government Exhibit 9 marked and admitted.)

4          MS. PENG:  Can we go back to the beginning and play

5    it, please.

6          (Audio playing.)

7          Can you pause right there, please.

8    BY MS. PENG:

9    Q    Now, that person who is speaking about the mod squads,

10   that's you?

11   A    Yes.

12   Q    And what did you mean by the "mod squad"?

13   A    That's a phrase that was not coined by myself or

14   Lieutenant Rychlik, but was used in the Prince William County

15   sheriff's office for individuals that donated and you didn't

16   see them very much.

17   Q    And that was Kevin Rychlik saying that they just wanted it

18   for the creds to get out of traffic tickets?

19   A    Yes, ma'am.

20   Q    And you were agreeing with him?

21   A    Yes.

22          MS. PENG:  Okay.  We can keep playing.

23          (Audio playing.)

24   BY MS. PENG:

25   Q    Mr. Metcalf, earlier in that clip there is a reference by

261

Metcalf - Direct

1  you to pay to play.

2       What did you mean by that?

3  A    Again, not a phrase that I coined or, frankly, Lieutenant

4  Rychlik coined, but it's a phrase I've heard before working at

5  other sheriff's offices.

6  Q    What did you mean by that?

7  A    Those are individuals that will make donations and are

8  interested in whatever specifically they're interested in, but

9  they're not going to be participating at the level of somebody

10 that may be pushed around and told where to go and what to do.

11 So these guys had specific interests, including some of them

12 had interest in doing nothing.

13 Q    And at the very end of that clip you were explaining to

14 Kevin Rychlik, or saying to Kevin Rychlik, it don't work like

15 that, it don't work like that.

16      What were you referring to there?

17 A    It's just a personal opinion that a lot of times political

18 donations are not made just out of the blue.  There's usually

19 something tied to it.

20 Q    And in this case, what was the thing that was tied to it?

21 A    The badge.

22          MS. PENG:  Can you pull up Government's Exhibit 10,

23 please.

24          (Audio playing.)

25  BY MS. PENG:

Metcalf - Direct

1  Q    Do you recognize what's being depicted in this video?

2  A    It's the setup for the picture of the sheriff handing me

3  the badge in the conference room of the sheriff's office.

4  Q    So it's a recording of him giving a badge?

5  A    Yes.

6           MS. PENG:  Move to admit Government's Exhibit 10,

7  please.

8           THE COURT:  Any objection?

9           MR. ANDONIAN:  No, Your Honor.

10          THE COURT:  So admitted and may be published to the

11 jury.

12          (Government Exhibit 10 marked and admitted.)

13          (Audio playing.)

14  BY MS. PENG:

15 Q    That was just him handing you the badge, right?

16 A    Yes, ma'am.

17          MS. PENG:  Can we get Exhibit 12.

18          (Audio playing.)

19          Can you pause right there.

20  BY MS. PENG:

21 Q    Do you recognize what is in this video?

22 A    It looks like a continuation of the same day and room

23 after the sheriff had presented me the badge.

24 Q    So it's a recording of your interactions that day with

25 Scott Jenkins?

Metcalf - Direct

1   A    Yes.

2            MS. PENG:  Move to admit Exhibit 12.

3            THE COURT:  Any objection?

4            MR. ANDONIAN:  No, Your Honor.

5            THE COURT:  So admitted and may be published to the

6   jury.

7            (Government Exhibit 12 marked and admitted.)

8            MS. PENG:  Can you start from the beginning, please.

9            (Audio playing.)

10           Can you pause.

11    BY MS. PENG:

12   Q    Who is the person who is speaking right now?

13   A    Lieutenant Rychlik.

14   Q    And that's you to the left?

15   A    Yes.

16   Q    And was Scott Jenkins to the right?

17   A    Yes.

18           MS. PENG:  Okay.  You can keep going.

19           (Audio playing.)

20           Can you pause right there.

21    BY MS. PENG:

22   Q    What did you understand Scott Jenkins to be talking about

23   when he was saying "cull the herd" and "war chest"?

24   A    That's a continuation of a conversation that he and

25   Lieutenant Rychlik were having prior, not inside the sheriff's

Metcalf - Direct

1   office, looking to raise a war chest to -- more candidates.

2   And I understood -- personally my understanding there is that

3   the more you have in your war chest, the more likely an

4   opponent may be less likely to join the race.

5   Q    And is that connected to the guys you were proposing to

6   bring in to Sheriff Jenkins?

7   A    Mr. Rychlik had asked if I knew anybody that would be

8   interested.  I participated in serving two other sheriffs

9   before.  So I had seen the effort to raise money, and that was

10  my response to that, yes, ma'am.

11            MS. PENG:  Keep going, please.

12            (Audio playing.)

13   BY MS. PENG:

14  Q    Mr. Metcalf, what are you telling Scott Jenkins at the end

15  there?

16  A    That's a reflection of my previous experience where

17  agencies that had individuals that were squirrely -- which was

18  my word -- can cause problems for the elected official

19  sheriffs.  And so I was just rambling on about a response to

20  their -- Kevin's request to me to see if I knew anybody that

21  might be interested, and not to take in squirrely individuals.

22  Q    What did you mean by squirrely guys?

23  A    Squirrely people can abuse the badge and reflect poorly on

24  the sheriff.

25  Q    And you also made a reference to do-nothing guys.  Are

Metcalf - Direct

1  they different than the squirrely guys?  What did you mean

2  by --

3  A    They are different because they typically don't do

4  anything.  So therefore they don't make mistakes and cause

5  problems, but they are a different category, the individuals

6  who don't do anything.

7  Q    Why were you giving the description of the squirrely guys

8  and the do-nothing guys in this conversation with Scott

9  Jenkins?

10  A    Pretty comfortable with Lieutenant Rychlik.  I've known

11  him since 1998, and seemed to be the appropriate format to just

12  talk about it.  As you see, I wasn't leading that, but it was

13  probably a caution to myself and to Mr. Rychlik as well not to

14  bring squirrely people into anybody's house, but in that case,

15  Sheriff Jenkins's house.

16  Q    So were you trying to communicate that some of the people

17  you were introducing would not be squirrely guys?

18  A    Correct.

19  Q    But what about do-nothing guys?

20  A    Well, do-nothing guys don't present a risk because they

21  don't do anything, but they may provide other value.  That's at

22  the discretion, obviously, of the individual that brings them

23  in.  But the squirrely guys we identify in the course of a long

24  history of doing this.

25  Q    So you were communicating there's nothing wrong with

Metcalf - Cross

1    do-nothing guys to Scott Jenkins?

2    A    They do not become squirrely and they don't typically

3    cause problems.  So in that sense, yes.

4    Q    And in the context of that conversation, did you get the

5    impression that Scott Jenkins was on the same page as you?

6    A    Not specific to that, but I certainly got the impression

7    that he wanted to build a war chest for the purposes of running

8    a campaign.

9              MS. PENG:  Thank you.

10             THE COURT:  Thank you, Ms. Peng.

11             Cross-examination, Mr. Andonian?

12             MR. ANDONIAN:  Thank you, Your Honor.

13                       CROSS-EXAMINATION

14    BY MR. ANDONIAN:

15    Q    Good afternoon, Mr. Metcalf.

16    A    Good afternoon, sir.

17    Q    Mr. Metcalf, you talked a little bit about having served

18    prior sheriffs in different jurisdictions.  So you have, in

19    fact, been a deputy in other sheriff's offices before, correct?

20    A    Yes, sir.

21    Q    Okay.  And you talked about the police motorcycle unit.

22    You've been part of a police motorcycle unit before, right?

23    A    A few of them.

24    Q    A few of them.

25             Okay.  And you know how to handle a firearm, right?

Metcalf - Cross

1  A    Yes, sir.

2  Q    So it's fair to say that you have training in law

3  enforcement -- well, law enforcement training?

4  A    Yes, sir.

5  Q    And you've known Kevin Rychlik since 1998?

6  A    Yes, sir.

7  Q    And as far as you're aware, Kevin knows all about your

8  background with the different sheriff's offices, right?

9  A    He does.

10 Q    Kevin knows about your background in being able to handle

11 a firearm?

12 A    He does.

13 Q    I want to go back to the fall of 2022 when you were

14 introduced to Scott Jenkins.  You talked actually about a

15 couple of times that you met with him before some of the events

16 that we saw in the videos here.

17      One was the National Night Out; is that correct?

18 A    Yes, sir.

19 Q    And then there was another time that you met with him

20 before, or was the next time the lunch that you went to?

21 A    Only three times in total.  The next time was the lunch.

22 Q    Okay.  You thought -- you liked Scott Jenkins back then,

23 correct?

24 A    I did.

25 Q    And you liked him -- and I mean beyond just kind of a

Metcalf - Cross

1    personal capacity, you liked him as a sheriff?

2    A    For what I -- much of what I knew about him came through

3    Lieutenant Rychlik, but Lieutenant Rychlik did report favorably

4    for a long time about his service there and how he was treated

5    by the sheriff.

6    Q    Okay.  So when you first got introduced to Sheriff Jenkins

7    at that National Night Out, Kevin Rychlik is the one that put

8    you in touch with him?

9    A    He invited me to attend that event.

10   Q    Okay.  Kevin Rychlik was the reason that you and Scott

11   Jenkins ended up meeting each other that night, right?

12   A    Yes, sir.

13   Q    Kevin Rychlik is the one who you describe -- let me back

14   up.  On direct you described this process of becoming an

15   auxiliary deputy in Culpeper.  Kevin Rychlik is the one who

16   talked you through all of the details, right?

17   A    Yes, sir.

18   Q    You never had a conversation with Scott Jenkins directly

19   about anything about becoming an auxiliary deputy, right?

20   A    No, sir.

21   Q    Scott Jenkins certainly never told you:  Hey, if you give

22   me money, I'll make you a deputy?

23   A    He did not.

24   Q    Kevin Rychlik was your entire point of contact with

25   respect to the auxiliary deputy process?

Metcalf - Cross

1  A    Yes, sir.

2  Q    Mr. Metcalf, you talked a little bit on direct about your

3  involvement in the prosecution of -- in this case; do you

4  remember that?

5  A    Yes, sir.

6  Q    And you, in fact, pleaded guilty to a felony in connection

7  with this prosecution, right?

8  A    Yes, sir.

9  Q    Okay.  And that was earlier this year?

10 A    March 1st of this years.

11 Q    March 1st of this year.

12       Okay.  And that was right here in this courtroom?

13 A    Yes, sir.

14 Q    And you pled guilty to one count of bribery, right?

15 A    Yes, sir.

16 Q    And in exchange for pleading guilty to one count of

17 bribery, all the other counts that were pending against you in

18 the indictment would be dismissed at the time of sentencing,

19 correct?

20 A    Yes, sir.

21 Q    Now, you have not been sentenced yet?

22 A    No, sir.

23 Q    And you are, in fact, cooperating with the government,

24 right?

25 A    Yes, sir.

Metcalf - Cross

1  Q    And when I say the government, I mean the government

2  that's sitting at this table to my right, correct?

3  A    Yes, sir.

4  Q    And Ms. Peng went over with you some of the terms of your

5  cooperation agreement with the government; do you remember

6  that?

7  A    Yes, sir.

8  Q    And there's a provision that says even if you fully

9  cooperate, there is no guarantee that the government would

10  recommend or advocate for a reduced sentence, right?

11  A    Yes, sir.

12  Q    But you know, as you sit here today, that your chances of

13  getting the government to come on board and ask for a reduced

14  sentence are better if you cooperate with the government than

15  if you didn't cooperate at all, right?

16  A    It is my hope that I get a reduced sentence.

17  Q    Right.  It is your hope.

18      And that's because you know that you would be facing

19  potentially serious jail time for the charge you pled guilty

20  to, right?

21  A    I'm aware of the statutory maximum for the charge, yes,

22  sir.

23  Q    Right.  And that's five years, correct?

24  A    I believe it's ten years, sir.

25  Q    Or my mistake.  So ten years.  And you don't want to do

Metcalf - Cross

1  ten years in prison?

2  A    No.

3  Q    You don't want to do five years in prison?

4  A    No.

5  Q    You don't want to do any time in prison?

6  A    No.

7  Q    And as you said, it is your hope that your cooperation

8  will spark the government into recommending a lower sentence,

9  right?

10  A    It is my hope.

11  Q    And in recommending a lower sentence, that would include

12  recommending a sentence of no jail time at all?

13  A    Again, using the word "hope," I assume ten years versus

14  nothing is the difference between the worst and the best in

15  this scenario for me, yes, sir.

16  Q    Right.  And that's what you hope will happen?

17  A    I am hoping for a reduction in sentence.

18  Q    And you know that the determination -- the government's

19  decision about whether or not you have cooperated, that's the

20  government's determination to make at the end of the day,

21  right?

22  A    I understand that to be the case.

23  Q    Right.  And so you know, as you sit here -- and again, you

24  were called here to testify by the government, correct?

25  A    Yes.

Metcalf - Cross

1  Q    And as you sit here today testifying, it is your hope that
2  the things that you have said in this courtroom will make the
3  government happy, right?
4  A    I don't know if I'd use the word "happy."  I just came
5  here to testify truthfully, which fulfills my cooperation
6  requirement.
7  Q    Well, but you hope -- let me dig into that, though.  I'll
8  retract the word "happy."  It is your hope that your testimony
9  that you've given in this courtroom today will satisfy the
10 government that you have cooperated, correct?
11 A    I certainly intend to do my best to fulfill my cooperation
12 requirements.  Testifying truthfully is kind of the start and
13 end of that.
14 Q    You met with the government before you came into the
15 courtroom today, right?
16 A    Previously, sir?
17 Q    Yes.
18 A    Yes, sir.
19 Q    And during those -- well, how many times did you meet with
20 them?
21 A    Three times, sir.
22 Q    Okay.  And in those three meetings you discussed,
23 generally speaking, your testimony that you've given here
24 today, correct?
25 A    That's correct.

Metcalf - Cross

1  Q     And you've looked at some of the exhibits or all of the

2  exhibits that we looked at on your direct examination, right?

3  A     Yes, sir.

4  Q     You went over potential questions that you might be asked

5  in this courtroom?

6  A     Yes, sir.

7  Q     You went over potential questions that I might ask you in

8  this courtroom, right?

9  A     Yes, sir.

10 Q     In the video that we looked at when you were in the car

11 with Mr. Rychlik and the term "pay-to-play guys" came up, that

12 was Mr. Rychlik brought up the term or used the term "pay to

13 play," correct?

14 A     That's correct.

15             MR. ANDONIAN:  Court's brief indulgence.

16             THE COURT:  Yes, sir.

17             (Pause.)

18  BY MR. ANDONIAN:

19 Q     You, in fact, wanted to do some sort of work as an

20 auxiliary deputy sheriff with the Culpeper County sheriff's

21 office, right?

22 A     That's correct.

23 Q     And I think you said on direct you wanted to kind of

24 either resurrect or develop a police motorcycle unit; is that

25 right?

Metcalf - Cross

1   A    There were existing motorcycles that were not being used

2   full time, as I was told by the department at National Night

3   Out, and by Mr. Rychlik.

4   Q    So you wanted to develop a program that put those

5   motorcycles and maybe more motorcycles into use?

6   A    Yeah, developing a program, but I could put myself on one

7   of them and serve in that capacity.

8   Q    Okay.  And you made it clear to Sheriff Jenkins that you,

9   in fact, had the intention of wanting to do work with him at

10  the sheriff's office?

11  A    I did.

12  Q    And if Sheriff Jenkins -- you live in Manassas, right?

13  A    Yes, sir.

14  Q    And you lived in Manassas at the time that we're talking

15  about --

16  A    Yes, sir.

17  Q    -- in '22?

18       And that's not far from Culpeper?

19  A    It's 45 minutes from me, sir.

20  Q    Right.  So if Sheriff Jenkins -- apart from your own

21  interest that you expressed to him about wanting to do

22  something at the sheriff's office, after you became a deputy,

23  if Sheriff Jenkins had called upon you for service of some

24  sort, you certainly would have obliged that, right?

25  A    Forty-five minute drive if that were to happen, yes, sir.

Metcalf - Redirect

1          MR. ANDONIAN:  Thank you.  I have nothing further.

2          THE COURT:  Thank you.

3          Any redirect, Ms. Peng?

4          MS. PENG:  Just briefly.

5          THE COURT:  Yes, ma'am.

6                        REDIRECT EXAMINATION

7   BY MS. PENG:

8   Q    Mr. Metcalf, you were asked on cross about your

9   communications with Kevin Rychlik.

10       Who has the authority to appoint auxiliary deputies?

11  A    The sheriff of the county.

12  Q    Did Kevin Rychlik have that authority?

13  A    No, ma'am.

14  Q    So when you showed up to Culpeper County sheriff's office

15  in September of 2022, did Scott Jenkins, in fact, give you the

16  badge just like Kevin Rychlik said he would?

17  A    Yes, ma'am.

18  Q    Now, you were also asked about the ten years maximum

19  penalty on cross; do you recall that?

20  A    Yes, ma'am.

21  Q    What is your understanding of whether or not that maximum

22  penalty represents the actual time that you're potentially

23  facing?

24  A    Statutory it's ten years, but typically guidance is much

25  lower.

Howell - Direct

1  Q    And when you say "guidance," what do you mean by that?

2  A    Individuals with that charge don't typically fall towards

3  that high range, and the guidance is a word that phrases the

4  time they typically get sentenced to.

5  Q    Now, and do you understand whether or not you get

6  cooperation credit is not dependent on the outcome of this

7  trial?

8  A    Yes, I do understand that.

9          MS. PENG:  Thank you.

10          THE COURT:  May this witness be excused?

11          MS. PENG:  Yes.

12          THE COURT:  Mr. Metcalf, thank you very much for

13  being in today.  You're free to go.  Please do not discuss your

14  testimony with anyone as long as the case is pending, sir.

15          Let's call your next witness, please.

16          MS. PENG:  The government calls Phil Howell.

17          THE COURT:  Phil Howell.

18          Mr. Howell, come on up, if you would, please, sir.

19          PHIL HOWELL, CALLED BY THE GOVERNMENT, SWORN

20          THE COURT:  Step right on over there.  As you sit

21  down, Mr. Howell, slide on up to the microphone and bring the

22  microphone close to you so that we can pick up our conversation

23  together.

24          THE WITNESS:  Can you hear me?

25          THE COURT:  All right.  Ms. Peng?

Howell - Direct

1          Yes, sir.

2                    DIRECT EXAMINATION

3   BY MS. PENG:

4   Q    Sir, would you please state your full name and spell your

5   last name for the jury?

6   A    Philip Quentin Howell, H-O-W-E-L-L.

7   Q    Where do you currently live, Mr. Howell?

8   A    Ashburn, Virginia.

9   Q    How long have you lived there?

10  A    August 1st.

11  Q    Where did you live before that?

12  A    Reston, Virginia.

13  Q    How long did you live in Reston, Virginia?

14  A    Five years, six years.

15  Q    Have you ever lived in Culpeper County?

16  A    No.

17  Q    What is your occupation?

18  A    I'm a mortgage banker.

19  Q    How long have you been a mortgage banker?

20  A    Today, 35 years -- 34 years.

21  Q    In December 2022, did you pay $5,000 to Scott Jenkins to

22  be appointed as an auxiliary sheriff deputy in Culpeper County?

23  A    Yes, ma'am.

24  Q    Have you admitted that conduct to the FBI?

25  A    Yes.

Howell - Direct

1  Q    Were you criminally charged for that conduct?

2  A    No, ma'am.

3  Q    Has anyone promised you anything to testify here today?

4  A    No, ma'am.

5  Q    Who first introduced you to Scott Jenkins?

6  A    Jim Metcalf.

7  Q    What your relationship --

8  A    I mean, Kevin, Jim Metcalf.

9  Q    So tell me a little bit about that.  How did these two

10 individuals introduce you to Scott Jenkins?

11 A    Jim Metcalf called me and said -- told me that there was

12 availability of doing exactly this, and then had Kevin call

13 me -- text me, actually, most of it from text.

14 Q    You said Jim Metcalf told you about doing exactly this.

15 What is exactly this?

16 A    Getting a badge from the sheriff of Culpeper County.

17 Q    What is your relationship with Jim Metcalf when he told

18 you this?

19 A    I'd known him for 33, 34 years, just business.

20 Q    What did Jim Metcalf tell you about the process of getting

21 this badge?

22 A    The constitutional carry availability for the 50 states

23 would be made available having the badge.  And that was really

24 my only interest, so to speak.

25 Q    So Jim Metcalf told you that getting the badge would allow

Howell - Direct

1  you to carry a weapon concealed in all 50 states?

2  A    Yes, ma'am.

3  Q    Did he tell you anything about what you would have to do?

4  A    There was not really duties that we discussed.  There was

5  items that we could do, but it never came about, nor did we

6  really talk about it after that conversation.

7  Q    Did he tell you that you would have to make a donation or

8  payment?

9  A    Yes.

10  Q    What did he tell you about that?

11  A    It costs $5,000.

12  Q    And did you decide to take Jim Metcalf up on this offer?

13  A    Yes.

14  Q    What did you do in order to put it in motion?

15  A    Ma'am, I mean, did I --

16  Q    Well, did you -- were you put in contact with Kevin

17  Rychlik?

18  A    I was.

19  Q    Okay.  Tell me about how you were put in touch with him.

20  A    I believe James said Kevin would call.  I wasn't sure of

21  his last name.  I am, of course, now.  And he texted.  Most of

22  it was done via text.

23        THE COURT:  Mr. Howell, can you slide up and talk

24  more directly into the microphone.

25        THE WITNESS:  Yes, sir.

Howell - Direct

1              THE COURT:  Thank you, sir.

2     BY MS. PENG:

3     Q    So Jim Metcalf told you Kevin would reach out to you?

4     A    Yes, ma'am.

5     Q    Did Kevin, in fact, reach out to you after?

6     A    Yes, ma'am.

7     Q    Did you have a conversation with him?

8     A    A lot more texting going on, but yes, I did have a

9     conversation.

10    Q    Okay.  So what did Kevin tell you you had to do?

11    A    Ma'am, it's been two years plus, but I'm just -- from

12    memory, I'd have to show up, get sworn in, and I'll owe the

13    $5,000 --

14    Q    So --

15    A    -- meet the sheriff and go home, I guess.  Sorry, I don't

16    have a lot of details for that.

17    Q    That's fine.  That's understandable.

18    A    I'm sorry.

19    Q    Did you -- do you recall sending your driver's license

20    to --

21    A    Yes.  I sent my driver's license to Jim Metcalf.  I texted

22    it to him.

23    Q    And at some point you had a conversation with Kevin?

24    A    Yes.

25    Q    About the process?

Howell - Direct

1   A    Yes.

2   Q    And did you eventually set a date for when you would be

3   sworn in as an auxiliary?

4   A    Yes, ma'am, there were several dates.

5   Q    Did at one point you have some hesitation about whether or

6   not you wanted to do this?

7              MR. ANDONIAN:  Objection, leading.

8              THE COURT:  Sustained.  Rephrase.

9    BY MS. PENG:

10  Q    Was it your own decision to go that day to be sworn in?

11  A    Yes.  It was my own decision to go, yes.  There was --

12        (Reporter clarification.)

13             THE WITNESS:  I made -- via text to not go and back

14  out, because I thought it was very pricey.  And I also came

15  down with COVID.  That's during COVID.  And so -- may I?

16   BY MS. PENG:

17  Q    Yeah.

18  A    Okay.  It seemed they wanted to get this done for the

19  books or whatever, but he kept kind of insisting -- Kevin --

20  that I come down and get this done before the end of the year,

21  and that he had already -- maybe the sheriff or somebody was

22  going to look silly in front of the judge that signed off on

23  it.

24  Q    So then after that you decided to go and you brought the

25  $5,000 with you?

Howell - Direct

1   A    Yes, ma'am.

2   Q    Can we pull up Government's Exhibit 716, which I think is

3   already admitted.

4        Mr. Howell, do you recognize what this is?

5   A    I'll have to look at it.  One moment, please.

6        Yes, ma'am.

7   Q    What is it?

8   A    Well, it's appointing me auxiliary deputy sheriff.

9   Q    Is that your --

10  A    That's not my signature.  It's my printed name.

11  Q    That's your name on there?

12  A    Yes.

13  Q    Did you, in fact -- you can take that down.

14       Did you, in fact, get sworn in on December 29, 2022?

15  A    Yes, ma'am.

16  Q    What happened on that day?

17  A    From A to Z?

18  Q    Yeah, just give us a description of what occurred that

19  day.

20  A    Made it to -- I drove to the front of the sheriff's

21  office.  Jim Metcalf met there, and Kevin was either there

22  inside or he had pulled up.  I don't remember.  And then the

23  three of us went inside, did a little tour of the place.  And

24  there's six minutes gone by at this point in time.  And Kevin

25  said, well, while we're here, why don't we get your photo ID

Howell - Direct

1  done.  And the woman was there to -- she took my photo with an

2  iPad up against a wall or a cubicle, and took that, and then it

3  was to go meet the sheriff with Jim and Kevin.  We rode in

4  Kevin's car.  Went to a restaurant where we met the sheriff,

5  and went inside and had lunch.

6  Q    Okay.

7  A    And then we -- from there we went to the courthouse and

8  went to the second or third floor to the clerk of court where I

9  was sworn in in the old records room, it looked like.  And from

10 there -- the sheriff did not go there.  It was just Kevin, Jim

11 Metcalf and myself.  And then we went to -- from there back to

12 the sheriff's office and got my ID, and small talk, and then --

13 excuse me, I got my ID when it was in the conference room.  And

14 again, small talk.  The sheriff came in.  I handed him the five

15 thousand bucks after a few small words.  And he said, Here's

16 your badge and ID.  And then we walked out, stood by the front

17 door and we discussed a few things.  They were talking about

18 motors, riding motorcycles.  I was kind of in the background.

19 We then talked about possibly going down January to get

20 qualified for weapons, and the sheriff had said he was up for

21 getting involved.  And then I left and that was it.

22 Q    Okay.  So let me go back a little bit to the lunch.

23      Was that the first time you had met Scott Jenkins?

24 A    Yes, ma'am.

25 Q    And during the lunch do you recall what you all talked

Howell - Direct

1  about?

2  A     Very small talk.

3  Q     So at the lunch it was --

4  A     Kids, this and that.

5  Q     Sorry.  It was Scott Jenkins, Kevin Rychlik and Jim

6  Metcalf and yourself at the lunch?

7  A     Yes, ma'am.

8  Q     Did Scott Jenkins ask you anything about your

9  qualifications to be auxiliary deputy?

10  A    Not really.

11  Q    Did he ask you whether you had any law enforcement

12  experience?

13  A    Not really.  I believe -- not really, no.

14  Q    Did you just -- do a call discussing any training

15  requirements for becoming an auxiliary deputy?

16  A    No, ma'am.

17  Q    Did he ask you any -- did he tell you anything about what

18  would be expected of you as an auxiliary deputy?

19  A    No, ma'am.

20  Q    Now, after lunch you said you went to the Culpeper

21  courthouse?

22  A    Yes, ma'am.

23  Q    Is that where you took the oath with the clerk of court?

24  A    Yes, ma'am.

25         MS. PENG:  Can we pull up Government's Exhibit 717.

Howell - Direct

1  BY MS. PENG:

2  Q    Mr. Howell, do you recognize what this document is?

3  A    Yes, ma'am.

4  Q    What is it?

5  A    Oath and qualification deputy sheriff with my signature on

6  it.

7  Q    That was the oath you signed that day?

8  A    Yes, ma'am.

9         MS. PENG:  Can we pull up Government's Exhibit 422?

10  BY MS. PENG:

11  Q    Mr. Howell, do you recognize what this photograph is

12  depicting?

13  A    It looks like me getting sworn in.

14  Q    You're being sworn in?

15  A    Yes, ma'am.

16         MS. PENG:  Move to admit Government's Exhibit 422.

17         THE COURT:  Any objection?

18         MR. ANDONIAN:  No, Your Honor.

19         THE COURT:  All right.  Be admitted and may be

20  published to the jury.

21         (Government Exhibit 422 marked and admitted.)

22  BY MS. PENG:

23  Q    So you said after you got sworn in at the clerk's office,

24  you went back to the sheriff's office?

25  A    Yes, ma'am.

Howell - Direct

1  Q    And then at that point did you have additional -- did you

2  have an additional conversation with Scott Jenkins in the

3  conference room?

4  A    Yes.  It was mainly small talk.

5  Q    And in the conference room, did you give him the $5,000

6  you had brought?

7  A    Yes, ma'am.

8           MS. PENG:  You can take that down, by the way.

9   BY MS. PENG:

10  Q    Now, what form was the $5,000 you gave him that day?

11  A    Cash in an envelope.

12  Q    It was cash in an envelope?

13  A    Yeah.

14  Q    And do you recall what denomination it was in?

15  A    I believe it was in hundreds.

16  Q    It was in $100 bills?

17  A    Yes, ma'am.

18  Q    Had you just gotten the $100 bills from somewhere?

19  A    Within two to three days earlier.

20  Q    From the bank?

21  A    Yeah.

22  Q    Do you remember what the quality of those $100 bills were?

23  A    No, ma'am.

24  Q    But you had just gotten them from the bank?

25  A    They weren't brand new.  I know that.

Howell - Direct

1  Q    I'm sorry?

2  A    They were not brand new.  I know that.

3  Q    But you had taken them out from the bank?

4  A    Yes, ma'am.

5  Q    And do you recall when you gave him the envelope of the

6  $100 bills?

7  A    In the conference room -- in the conference room.  I mean,

8  when he had walked in, I did some small talk and went over by

9  the flag in the corner of the conference room.  And I think

10 there was a picture taken, I think.  And then I said, Oh, I

11 guess I owe you something, and I gave him the money.  And he

12 gave me -- I don't know if he gave me the badge or the -- and

13 the identification prior or after.  I'm sorry.

14 Q    Okay.  But when you handed him the money, you recall

15 saying something to the effect of, I guess I owe you something?

16 A    Yes, ma'am.

17 Q    And then you handed him the envelope?

18 A    Yes, ma'am.

19 Q    Was he surprised when you handed him the envelope?

20 A    I don't believe so, but like anybody, just oh, okay.

21 Q    Did he ask you what was inside?

22 A    I don't believe so.

23 Q    He just accepted it?

24 A    Yes, ma'am.

25 Q    And then at some point in the same conference room he gave

Howell - Direct

1   you the badge?

2   A    Yes, ma'am.

3   Q    Can we pull up Government's Exhibit 423.

4        Do you recognize what this is depicting?

5   A    There you go.  There's that picture.

6   Q    It's you and the sheriff?

7   A    Yes, ma'am.

8           MS. PENG:  I move to admit Government's Exhibit 423.

9           THE COURT:  Any objection?

10          MR. ANDONIAN:  No, Your Honor.

11          THE COURT:  It will be admitted and may be published

12   to the jury.

13          (Government Exhibit 423 marked and admitted.)

14    BY MS. PENG:

15   Q    Can you describe what this photograph is depicting?

16   A    Him shaking my hand and there is a badge.  And yeah, that

17   was it.

18          MS. PENG:  Can we pull up Government's Exhibit 417.

19    BY MS. PENG:

20   Q    Do you recognize what Exhibit 417 is depicting?

21   A    It looks like me handing him an envelope of cash.

22          MS. PENG:  Move to admit Government's Exhibit 417 and

23   publish.

24          THE COURT:  Any objection?

25          MR. ANDONIAN:  No, Your Honor.

Howell - Direct

1          THE COURT:  It will be admitted and may be published

2     to the jury.

3          (Government Exhibit 417 marked and admitted.)

4     BY MS. PENG:

5     Q    Do you recall whether it was before or after he handed you

6     the badge that you gave him the envelope of cash?

7     A    I'm going to say it's after.

8     Q    And then when you did that, you said, I guess I owe you

9     this?

10    A    Yes, I believe so.

11    Q    You can take that down.

12         Did you end up using your badge for anything?

13    A    No, ma'am.

14    Q    Did you ever return to Culpeper County to receive any kind

15    of training?

16    A    No, ma'am.

17    Q    Were you ever called to serve by Culpeper County after you

18    got the badge?

19    A    No, ma'am.

20    Q    And eventually were you interviewed by the FBI?

21    A    Yes, ma'am.

22    Q    Did you tell them initially that you did not give the

23    money for the badge?

24    A    For three seconds, yes.

25    Q    Okay.  And then what happened after three seconds?

Howell - Direct

1   A    Yes, I did -- it was this gentleman right here.  Yes, I

2   did say:  Yes, I did I give him the money.

3   Q    Why did you correct yourself quickly?

4   A    Because it was wrong.

5          MS. PENG:  Okay.  Can we pull up Government's Exhibit

6   34.  Can you play the first couple of seconds.

7          (Audio playing.)

8    BY MS. PENG:

9   Q    Mr. Howell, do you recognize yourself depicted in this

10  video?

11  A    I recognize myself, yes.

12  Q    And this video, have you reviewed it previously?

13  A    No, ma'am.

14  Q    Okay.  I'll play it a little more for you.

15         (Audio playing.)

16         MS. PENG:  Pause it right there.

17   BY MS. PENG:

18  Q    Do you recognize what's being depicted in this video, sir?

19  A    It looks like it's in the conference room at the sheriff's

20  office.  And what's being depicted, I mean, it looks like Jim

21  Metcalf right there and I saw the sheriff right there.

22  Q    So is this a video of your interactions with the sheriff

23  that day in the sheriff's office?

24  A    Yes.  Yes, ma'am.

25         MS. PENG:  Move to admit Exhibit 34.

Howell - Direct

1          THE COURT:  Any objection?

2          MR. ANDONIAN:  No, Your Honor.

3          THE COURT:  It will be admitted and may be published

4   to the jury.

5          (Government Exhibit 34 marked and admitted.)

6          MS. PENG:  Can we go back to the beginning, please.

7          (Audio playing.)

8    BY MS. PENG:

9   Q    Mr. Howell, does that refresh your recollection as to

10  whether you handed Scott Jenkins the money before or after he

11  gave you the badge?

12  A    I thought I saw it was after.

13  Q    After you took the photograph with the badge?

14  A    Yes.

15  Q    And when you handed it to Scott Jenkins did you hear him

16  say on the video, That's always nice?

17  A    Yes.

18  Q    I'm going to hand you what's been marked as Government's

19  Exhibit 523 and 524.

20        Can you take those items out of the envelopes and tell me

21  if you recognize them?

22  A    Yes, ma'am.

23  Q    What are they?

24  A    Well, it's the identification card I was handed and the

25  badge I was handed.

Howell - Cross

1  Q    So those are the badge and credentials you got from

2  Sheriff Jenkins?

3  A    Yes, ma'am.

4  Q    Would you show the jury those items, please?

5  A    Yes, of course.

6          MS. PENG:  Could we pull up 440, please.

7   BY MS. PENG:

8  Q    Mr. Howell, do you recognize what this photograph is?

9  A    Yes, ma'am.

10 Q    What is it?

11 A    It's the badge and identification card.

12          MS. PENG:  Move to admit 440 and publish.

13          THE COURT:  Any objection?

14          MR. ANDONIAN:  No objection.

15          THE COURT:  What about 523 and 524?

16          MS. PENG:  Those should be admitted as well as

17 physical exhibits.

18          THE COURT:  Any objection to 523 and 524?

19          All right.  All will be admitted and may be published

20 to the jury.

21          (Government Exhibits 440, 523 and 524 marked and

22 admitted.)

23          MS. PENG:  No more questions at this time.

24          THE COURT:  Any cross?

25                          CROSS-EXAMINATION

Howell - Cross

1    BY MR. ANDONIAN:

2    Q    Good afternoon, Mr. Howell.

3    A    Hello, sir.

4    Q    Mr. Howell, your point of contact for everything that

5    you've described in terms of becoming an auxiliary deputy in

6    Culpeper was Kevin Rychlik, right?

7    A    Yes.

8    Q    And you met Mr. Rychlik through Jim Metcalf?

9    A    Yes.

10   Q    Mr. Rychlik is the one who made -- who told you about a

11   dollar amount in terms of a contribution, correct?

12   A    Correct.

13   Q    And Mr. Rychlik is the one that set up a meeting with you

14   and Sheriff Jenkins; is that correct?

15   A    Yes.

16   Q    Sheriff Jenkins never said anything to you directly about

17   I'll give you this badge if you give me money, right?

18   A    Correct.

19   Q    We saw a video of you just a moment ago in the conference

20   room when you took the picture with Sheriff Jenkins.  And you

21   said, I'm okay with doing anything to help out.

22        Do you remember that?

23   A    Yes, I do.

24   Q    That was true, right?

25   A    Very much.

USA v. Jenkins, 3:23-cr-11, 12/16/2024

1   Q    If Sheriff Jenkins had called you and asked for your

2   service as an auxiliary deputy, you would have obliged?

3   A    In a minute.

4   Q    In a minute.

5        And you lived in Reston at that time, correct?

6   A    Correct.

7   Q    And that's not that far of a drive from Culpeper?

8   A    It's an hour.

9   Q    An hour drive?

10  A    It takes an hour to get to D.C.

11           MR. ANDONIAN:  That's all I have.  Thank you.

12           THE COURT:  Any redirect?

13           MS. PENG:  No, Your Honor.

14           THE COURT:  May this witness be excused?

15           MS. PENG:  Yes.

16           THE COURT:  Mr. Howell, thank you very much for being

17  here today.  You're free to go.  Please do not discuss your

18  testimony with anyone as long as the case is pending.  Thank

19  you, sir.

20           You can just leave those there and we'll get those.

21  Thank you very much, sir.  Have a nice evening.

22           THE WITNESS:  Thank you very much.

23           You probably don't have a 15- or 20-minute witness,

24  do you?

25           MS. CHOY:  Sadly not, Your Honor.

USA v. Jenkins, 3:23-cr-11, 12/16/2024

1          THE COURT:  That's fine.

2          Ladies and gentlemen, let's call this our break for

3   the day.  We will adjourn until tomorrow morning at 8:45.  I

4   wish you safe travels to and fro.

5          Again, I will remind you, do not discuss the case at

6   all with anybody.  Do not allow anyone to try and discuss it

7   with you.  Do not discuss the case amongst yourselves.  Please

8   do not engage in any type of investigation, research or

9   anything in connection with this matter.

10          With that, I will release you all.  I wish you safe

11   travels, and I hope that we're going to have better weather for

12   you to drive in tomorrow.  Thank you very much and we'll see

13   you in the morning.

14   (*Jury out, 5:17 p.m.*)

15          THE COURT:  You all please have a seat.

16          Ms. Choy, what do we have for tomorrow?

17          MS. CHOY:  We only have four witnesses left, Your

18   Honor, and we are moving a bit faster than anticipated.  So I

19   expect we will be in a position to rest around lunchtime or

20   shortly thereafter.

21          THE COURT:  Very well.

22          Will the defense be ready to go tomorrow to the

23   extent you decide to put on any evidence?

24          MR. ANDONIAN:  Your Honor, I think we had anticipated

25   a little bit of a slower pace.  So we were eyeing Wednesday

USA v. Jenkins, 3:23-cr-11, 12/16/2024

1  morning as being ready to go.

2          THE COURT:  Can you get folks here?  I just hate to

3  send the jury home.  We can work on jury instructions, if need

4  be.  I hate to send the jury home at lunch and bring them back.

5          MR. ANDONIAN:  It would be our -- if we, in fact,

6  finish at lunchtime tomorrow, I guess it would be our request

7  that we -- that we excuse the jury and we work on what we can

8  work on here with jury instructions so we're not obviously

9  wasting the time.

10          THE COURT:  Right.

11          MR. ANDONIAN:  And then I would anticipate, to the

12  extent we put on a case, it would be done Wednesday.

13          THE COURT:  Would it take all day, do you think?

14          MR. ANDONIAN:  I don't -- I don't think our

15  affirmative presentation would.

16          THE COURT:  What I'm wondering is are we -- if you

17  begin to put a case on -- and I'm not holding anyone's feet to

18  the fire here.  If you begin to put a case on Wednesday morning

19  and we have been efficient with our work on jury instructions,

20  could we get the jury instructed and argue and let them start

21  working on Wednesday evening?

22          MR. ANDONIAN:  I mean, that might be a little

23  ambitious, although some of that is I don't know, to the extent

24  we put on a case, what cross would look like.  It seems as

25  though possibly getting them instructed at least --

USA v. Jenkins, 3:23-cr-11, 12/16/2024

 1              THE COURT:  I'd like to instruct them and have the

 2     arguments and let them get to work at the same time, because

 3     you go home and -- I mean, that would be my desire.  Given the

 4     number of instructions that we're looking at, I'm suspecting

 5     it's going to take about an hour to instruct the jury, maybe an

 6     hour and 15 or something like that.  What I'd probably do is

 7     about halfway through, depending on how many we have, is break

 8     just because it's hard to listen to one person drone on reading

 9     to them for that period of time, and I'd rather take a short

10     break and let them refocus.

11              Ms. Choy?

12              MS. CHOY:  It would be our preference to keep working

13     and moving ahead and not to release the jury for half a day

14     tomorrow if possible, given that we are approaching our hard

15     stop and there's a fairly short time for deliberations.  So we

16     do -- that would be the government's preference, Your Honor.

17     And we will be ready to give closing arguments on Wednesday.

18              THE COURT:  I'd like you to be able to get witnesses

19     here.  If we can go forward, I'd like you to be able to get

20     witnesses here so we can keep moving forward, if we possibly

21     can.

22              MR. ANDONIAN:  Very well.

23              THE COURT:  I think it's -- we can be -- I mean,

24     we'll see what you all give back to me with respect to

25     instructions, but given where you all were on instructions

USA v. Jenkins, 3:23-cr-11, 12/16/2024

1  before I sent those out to you, there were not many that were

2  in dispute.  There may be a handful that do we need to give or

3  not give depending on what the evidence is, but I suspect that

4  our charge conference is going to be fairly quick and we can

5  work -- I don't want to keep Ms. Blair here too late on any one

6  particular evening because she's also working on dailies for

7  you guys.  So maybe we can break a little bit early on

8  Wednesday.  But if we can get some witnesses done, get our

9  instructions done on Wednesday, finish the government's

10 evidence -- I mean, finish the defendant's evidence by lunch

11 and then maybe instruct them, argue, and let them start

12 deliberating on Wednesday afternoon, if we possibly can.

13         MR. ANDONIAN:  Very well, Your Honor.

14         THE COURT:  Ms. Choy, anything else?

15         MS. CHOY:  We have the same expectation that there is

16 not a lot of areas of disagreement on the jury instructions.

17 So I don't expect that that would take much time.

18         I'll just note the defense has only noticed one

19 witness, and they haven't told us they do intend to call him.

20 So it really is our preference that we keep this moving

21 forward.

22         THE COURT:  Okay.  Yeah, if you could let -- also let

23 the government know whether you intend to call that one

24 particular witness, I'd be much obliged.

25         Okay.  Anything else from the government's

USA v. Jenkins, 3:23-cr-11, 12/16/2024

1   perspective?

2           MS. CHOY:  No, Your Honor.

3           THE COURT:  All right.  How about from the

4   defendant's perspective?

5           MR. ANDONIAN:  Nothing else, Your Honor.

6           THE COURT:  Who are we going to start with in the

7   morning?

8           MS. CHOY:  Tomorrow we've got Harry Carr, the second

9   undercover agent, Dawn Miesle and Special Agent Scott Medearis.

10          THE COURT:  Can we start with the second undercover

11  agent so I can give out the instructions and people can come to

12  court prepared?

13          MS. CHOY:  Yes, Your Honor.

14          THE COURT:  So tomorrow morning we will start with

15  the second undercover agent, who I think is known as "Mike;" is

16  that right?  And so during that witness's testimony the same

17  rules will apply as applied with respect to the first

18  undercover agent, and that is no electronic devices are allowed

19  in the courtroom.  The courtroom is open, but there are no

20  electronic devices that will allow any type of recording,

21  photographs at all.  So no computers, iPads, phones, tablets or

22  things along those lines.

23          Anything else?

24          MS. CHOY:  And just to bring up again what I flagged

25  this morning that if the defense is planning on calling Richard

USA v. Jenkins, 3:23-cr-11, 12/16/2024

1  Mack, that we would need that proffer really by today given

2  that that would be tomorrow.

3          THE COURT:  Right.  So you can give that to the

4  government by -- it's 5:30 -- give it to them by 7 o'clock this

5  evening.  I'd be much obliged.  We'll address that -- I'll be

6  here by 8:45.  Why don't I plan on I will touch base with you

7  all and be ready to go at 8:45.  So if we have to address that

8  particular issue we can do it between 8:45 and 9 so we can try

9  to start as early as we can with the jury.

10         We'll stand in recess until the morning.

11 (Proceedings adjourned, 5:25 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/16/2024

1                  C E R T I F I C A T E

2       I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10 understanding.

11      I further certify that the transcript fees and format

12 comply with those prescribed by the Court and the Judicial

13 Conference of the United States.

14      /s/ Lisa M. Blair                Date: December 16, 2024

15

16

17

18

19

20

21

22

23

24

25